# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KELLY KIRSTEN TANKERSLEY<br><br>Plaintiff,<br>vs.<br><br>UNITED STATES OF AMERICA;<br>THE UNITED STATES<br>DEPARTMENT OF THE NAVY,<br><br>Defendant. | Case No. 3:25-cv-05030-AGT<br><br>FIRST AMENDED<br>COMPLAINT<br><br>Date: Nov. 29, 2025<br>Time:<br>Courtroom: A 15th Floor<br>Judge: Hon. Alex G. Tse |

## I PARTIES

The Plaintiff, Kelly Tankersley, is a natural person who resides at 1033 Revere Avenue in San Francisco, California. The events that were the direct, proximate cause of the injury to the plaintiff occurred while she lived at this location.

The proper defenant is the United States, acting by and through the Navy. The very nature of this injury has been significantly magnified by the continued act of negligence from the lack of response that is overdue. Prompt resolution is justified by all powers that the Court possess and decide are proper.

## II JURISDICTION

This court has jurisdiction over FTCA claim pursuant to 28 U.S.C. 1346(b)(1) and 2671 for all claims of injury. loss of property, or death caused by negligent or wronful acts or omissions of any federal employee acting within the scope of their employment under like circumstances according to laws of the state it occurs.

## III  VENUE

The Northern California District Court is the proper venue due to the fact that all the events occurred in this district and the plaintiff resides in this district.

## IV EXHAUSTION OF ADMINISTRATIVE REMEDIES AND TIMELINESS

1. On August 27, 2024, plaintiff presented a formal administrative claim for damages to the Navy Judge Advocate General. A is retained in evidence by defendant.
2. Plaintiff's claim accrued when injury was discovered on or about June 2024. The administrative claim was presented to the agency within two years of this accrual date, satisfying the requirement of 28 U.S.C. 2401(b).
3. On January 10, 2025, the Judge Advocate mailed a final written denial of the plaintiff's administrative claim via certified mail. A copy of the denial letter is attached as exhibit A.
4. The civil action was filed on June 15, 2025, which is within six months of the mailing date of the final agency denial, in compliance with the time limit set by 28 U.S.C. 2401(b). This is the plaintiff's first amended complaint filed on November 29, 2025.
5. The agency asserted in it's final denial letter that the claim was time-barred (See exhibit A). This assertion is incorrect because the federal 'discovery rule applies, as the plaintiff did not reasonably discover the nature and cause of the injury until she recieved the results the test results identifying plutonium which was a contaminant completely unknown to the plaintiff at the time.
6. The understanding required to connect her injury to the actions of the defendant and conclude that this is the only possible cause was on June of 2024 starting with the first initial correspondence to the Judge Advocate requesting assistance in locating the proper individual or agency to help with this time-sensitive exposure. This falls well within the two year statutory window.

Plaintiff incorporates by reference the allegations contained in paragraphs 1-9

1). Plaintiff was exposed to plutonium on or around June 2022, while living at 1033 Revere Avenue in San Francisco. At the time of exposure, the danger and the potential for injury were not known to plaintiff and a reasonable person in the same circumstances would not have known of the injury or its cause.

2). Symptoms of plaintiffs injury did not manifest until approximately 2023 at which plaintiff sought immediate medical attention

3) Despite exercising due diligence in seeking a diagnosis, the link between the plaintiff's symptoms and the plutonium exposure was not discoverable until the results of the specialized testing was disclosed to plaintiff

4). Upon discovery of the link between the exposure and the injury, plaintiff timely filed this complaint within the applicable statute of limitations as measured from the date of discovery.

5). Plaintiff was tested in June 2022 and received the results of that test on or around January 2023 that revealed internal contamination of plutonium 238 and 244.

6). Plaintiff requested treatment from the UCSF Occupational and Environmental clinic and received no response.

7). Plaintiff acquired a new primary care provider and requested treatment again and was referred to the previous UCSF Occupational clinic and was given an another appointment with same doctor.

8). It was an awkward appointment. Doctor knew exactly what treatment I was requesting and had my test results in hand but stated that he needed other test results as well and made no mention about whether he would treat or not. There was no discussion about hunter's Point and it is irrevelant to the decision to treat.

9). The additional test results were sent to the clinic and plaintiff received a message that stated that they could only test for manganese and nothing else. Plaintiff also received in the mail a paper excusing her from work that was unnecessary and was neither discussed during the appointment or the purpose of the appointment.

FACTUAL ALLEGATIONS

1. Plaintiff, Kelly Tankersley has lived at 1033 Revere Avenue since 1997. She lives with Mats Lindskoug. We both have significant internal contamination of plutonium 244 and the plaintiff has plutonium 238 also. This is considered almost impossible and speaks to the extent of harm that has been done. .

2. . The plaintiff suspects that exposure may have occurred earlier because of the years of extensive earth-moving that has been taking place in this area and really no where else. The rest of the shipyard is paved and still have buildings. The problem has been with how close she lives to this area and the fact that they always said it was safe even when it wasn't.

3. As early as 2008 or 2009, plaintiff started to experience extreme menstrual issues to the point where after bleeding for 3 months straight, the only choice was surgical intervention. It disrupted her life, changed her longterm goals.

4. In 2016, what started with hand pain and a visit to the doctor, led to three cortizone injections in one finger on both hands. This led to a tendon burst dislocating index finger in right hand and instead of attempting to fix the problem they created, the doctors attempted to erase all history of the injections from her medical history.

5. Then after a routine blood test, the plaintiff was told she had Graves Disease and directed to take thyroid medication to prevent damage to her thyroid. Absent any symptoms of this condition or sound reasoning behind the need take medication daily, she refused. Blood tests later confirmed that her thyroid function had returned to normal and there was no need.

6. When the skeletal issues progressed and impacted the plaintiffs ability to use either hand , it was suggested that she apply for disability in 2019.

7. The plaintiff thought that the treatment received for her hands was responsible and spent all her time from 2019 on diligently looking for answers to help understand the extreme disability she had developed.

## BACKGROUND

Hunters' Point is on a long promontory in the southeastern portion of San Francisco, extending eastward into the San Fransisco Bay. The facility is a deactivated shipyard which totals 986 acres, consists of 493 acres of relatively flat lowlands constructed by placing fill materials along the bays edge, 443 acres are under water. A small portion of the land is on a moderately to steep sloping ridge. Most of the lowlands are covered by asphalt and buildings. The non-paved open areas are either sparsely vegetated or bare ground. The Hunters' Point Naval Shipyard was originally established as a commercial shipyard in 1870. The Navy acquired the property in 1941. From 1941 to 1974, the major activities were ship building, maintenance, and repair of naval ships and submarines. Additionally, the facility was used for base housing, naval ordinance training exercises, radiological defense research, and research on exposure to radioactive fallout. The Navy deactivated the shipyard in 1974. In 1989, the U.S. EPA placed the shipyard on its National Priorities List, thus, designating it a federal "Superfund site". Parcel E landfill is a 47 acre industrial landfill which operated from 1958 to 1974. The landfill received liquid chemical waste, domestic waste and refuse, sandblast grit solvent waste and low-level radioactive waste. The soil layer is not uniform in thickness and in portions of the landfill waste is less than one foot below ground surface.

## REMEDIATION COMPLETE

Rework or retesting is unlikely. The Navy submitted the annual operation and maintenance (O&M) summary report detailing the inspection, maintenance and repair activities performed to maintain and repair the durable cover remedies installed in Parcel B-1, B-2, C, D-1, E, E-2, G and UC-3 and Installation (IR) Sites 07 and 18 (IR-07/18) at Hunters Point Naval Shipyard, San Francisco, California. The period of O&M discussed spans January 1 through December 31, 2024. This is a statement of completion more or less except for Parcel F which has been underway for over a year now. They mention that the RA is currently ongoing for Parcel E-2 and further claim that since 2019, the RA construction has included removal of vegetation and approximately 1 foot of existing soil from the top of the landfill (including the rock drain that traversed the landfill from the northeast to the southwest). See exhibit C.

FACTUAL ALLEGATIONS

The identity of one of the isotopes is the undeniable link to the shipyard. Plaintiff lives 200 feet from Parcel e-2 and this is where she witnessed the events responsible

2. Most of the published studies on plutonium 244 are related the thermonuclear weapons testing in the Marshall Islands. Plutonium 244 was first detected in sample related to the Ivy Mike device detonated on November 1, 1952 on the island of Elugelab, Enewetak Atoll.

3. The only plutonium 244 that originated through human activity, other than dispersal from nuclear weapon explosions, was produced in the unique high flux reactors, now decommissioned, that operated at the Savannah River Site (SRS) during the Cold War.

4. Plutonium 244 is a highly valuable nuclear material used in applications such as nuclear forensics and medical research. And it is extremely rare. The material is thought to exist in nature in almost undetectable quantities as a relic of the violent galactic activity that contributed to the formation of our solar system over 4.6 billion years ago. It has a half-life of 81 million years.

5. Only 20 grams of this material exists in only one place: the Mark-18A "targets," or nuclear material assemblies, stored at SRS. In 2011, DOE asked the Savannah River National Laboratory (SRNL) to preserve the valuable, rare and and irreplaceable plutonium 244 as a National asset.

6 The U.S. Naval Radiological Defense Laboratory NRDL was established at the Hunter's Point Shipyard in 1946 to manage the clean up of Navy ships contaminated during nuclear weapons tests at Bikini Atoll, known as Operation Crossroads. This was where the first thermonuclear tests were carried out

7. Hunters' Point Shipyard was the only place that could accept radiological waste during the time the NRDL was operating at the site. It is unclear if if this waste was dumped at sea or buried onsite and the plutonium may have come from a number of California Laboratories that sent waste to the shipyard.

## NEGLIGENCE BY OMISSION

"Either a person's action's or omissions can be found negligent, when the omission of actions is considered negligent only when the person had a duty to act."(e.g. a duty to help someone because of one's own previous conduct.

Federal Radiological Response Plan (FRERP)
The FRERP is an agreement among 17 federal departments and agencies for responding to any peacetime radiological emergency that has actual, potential or perceived radiological consequences within the U.S., it's territories, possessions or territorial waters.  Responses to emergencies occurring at nuclear facilities or involving radioactive materials, including nuclear weapons, regardless of the amount, fall within the scope of this plan. The FRERP applies simutaneously with the NCP during radiological releases.  That has been the issue ever since the plaintiff discovered her contamination of plutonium.  Multiple federal actors unwilling to perform their duty that lies within the responsibilities inherent of their employment. The only exception would be the people at REAC/TS under the DOE who have extended all the necessary requirements for any licensed doctor to provide treatment for plutonium contamination.  The very obvious question is why didn't the doctor who arranged for the testing provide this and it is because the only motivation was to win funds for medical monitoring for multiple contaminants, but specifically for plutonium as well.  These are the typical career legal experts that have never treated, let alone observed an individual suffering from chronic long-term exposure.  There is little data on what the consequences are and no one qualified to give testimony regarding what it feels like even though they frequent civil coutrooms nationwide.

# CLAIM OF NEGLIGENCE

1.) **CCR 1714(a)** States that "everyone is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill, in the management of his or her property or person."

The defendant was fully aware of the potential for harm after one of it's contractors was caught and convicted of falsifying data. The defendant's promise to retest the work, establishes a specific, voluntary undertaking to ensure safety and rectify know hazards.

**EXPLICIT ASSUMPTION OF DUTY:**

By publicly promising to retest the work, the defendant explicitly assumed a duty to the people on or near the site to verify the area was safe.

**BREACH OF PROMISE AS BREACH OF DUTY**

The failure to follow through on this specific, public promise, especially after admitting the initial data was fraudulant, constitutes a clear breach of that self-imposed duty of care. This moves the claim from a vague "should have known better argument, into a concrete promise of duty that the defendant failed to deliver.

(Control of Radioactive Contamination of the Environment Act)
California Health and Safety Code Division 104, Part 9, Chapter 8

CLAIM OF NEGLIGENCE CONTINUED

This series of laws, particularly HSC 114650 through HSC 114835, addresses emergency response, containment, and the transportation of radioactive materials:

HSC 114705: Declares state policy that the department (CDPH) initiate and administer necessary programs of surveillance and control of those activities that could lead to the introduction of radioactive materials into the environment. This speaks directly to the duty to control contamination of the environment.

HSC 114820(d): Relates to the handling and disposal of radioactive wastes, specifically prohibiting disposal except in manners and locations that prevent 'significant radioactive contamination of the environment."

California Health and Safety Code, Division 20, Chapter 6.95
(Hazardous Materials Release Response Plans and Inventory)

HSC 25507: requires handlers of hazardous materials (including radioactive materials) to immediately report any release or threatened release to local authorities.

California Code of Regulations (CCR)
Title 8, Division 1, Chapter 4, Subchapter 7, Article 109
(Hazardous Waste and Emergency Response):
8CCR 5192: Requires employers to develop and implement written safety and health programs for employees involved in hazardous waste operations to evaluate, and control hazards.

NEGLIGENCE CONTINUED

8 CCR 5164:    Outlines requirements for the "storage of hazardous substances" in appropiate containers to prevent damage, deterioration or exposure.

Safe Drinking Water and Toxic Enforcement Act of 1986, Proposition 65 HSC 25249.6:  Requires any person "in the course of doing business" to provide a "clear and reasonable warning" before knowingly and intentionally exposing an individual to a listed chemical (plutonium is one of those listed chemicals and a known carcinogen)

Plutonium is specifically excluded from the Toxic Release Inventory under CERCLA and is a substance that carries strict liability nationwide.

The defendant, the United States, has a comprehensive structure that involves federal, state, local and tribal governments and is governed by The National Response Framework 's Nuclear/Radiological Incident Annex. The plaintiff was at a loss at what to do in a situation where there is an overlap of authorities that doesn't provide a clear path to follow.  There is also Article 31 which controls the provider of the plaintiff's health care plan. The San Francisco Article 31 gives the department the authority to oversee earth-moving activities and enforce environmental regulations to protect Bayview-Hunter's Point Community.

One of the off-site areas that article 31 has extended it's control over is the property where the plaintiff lives and has now created an unsafe living condition she is unable to remove herself from.

NEGLIGENCE CONTINUED

HSC 25249.6: Requires any person "in the course of doing business" to provide a "clear and reasonable warning" before knowingly and intentionally exposing an individual to a listed hazardous chemical. Plutonium is a listed carcinogen.

PRAYER FOR RELIEF

The probability of any member of the public having internal exposure to two rare isotopes of plutonium is almost impossible. The negligence in not providing immediate treatment is the injury in itself. This has never occurred before. What has gone wrong and why is the plaintiff having to bring a federal claim just to have access to the care extended to every other individual that finds themselves in this situation. She is overwhelmed by what has happened. The amount of money that has already been spent in resources of the court more than likely has surpassed the amount needed to test the plaintiff to confirm her allegations. That is what she initially ask the Judge Advocate. They didn't want to do that because they know what it would reveal even after the length of time that has passed. The plaintiff is unable to work to make her way to somewhere safer. She needs treatment to be able to return to work. It is unethical to refuse to treat someone with the degree of exposure the plaintiff has.

All the information that is within this complaint the Plaintiff, Kelly Tankersley, declares to be her true account of all the events.

December 1, 2025



-Kelly Tankersley