Kelly Tankersley

1033 Revere

San Francisco, CA 94124

415-583-6821

tk0260@gmail.com

KELLY KIRSTEN TANKERSLEY

     Plaintiff, pro per

THE UNITED STATES

DEPARTMENT OF THE NAVY

_____

Case No.   3:25-cv-05030-AGT

)
)
)
) REQUEST FOR JUDICIAL
) NOTICE OF ADJUCATIVE FACTS
)
)
)
)
)
)
)
)
)
)
)
)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN CALIFORNIA DISTRICT

-------------------------------------------------------------------------------------------

### SAN FRANCISCO DIVISION

Plaintiff, Kelly Tankersley, request judicial notice pursuant to FRE 201(b)(1)

and FRE 201(b)(2). The court may judicially notice a fact that is not subject

to reasonable dispute because it:

   (1) Can be accurately known within the trial court's territorial jurisdiction.

or:

    (2) Can be accurately and readily determined from sources whose

accuracy cannot reasonably be questioned.

## REQUEST FOR JUDICIAL NOTICE

Pursuant to FRE 201(c)(2), the court must take judicial notice if a party requests it and the court is supplied with the necessary information. FRE 201(d), the court may take notice at any stage of the proceeding. FRE 201(e)  states that a party is entitled to be heard on the propriety of taking judicial notice and the nature of the fact to be noticed.  If the court takes notice before notifying a party, the party, on request, is still entitled to be heard.

Plaintiff, Kelly Tankersley, hereby request the court to take judicial notice of the following documents attached as exhibits A through V.  This request is made and supported by FRE 201, the authorities cited below and the Declaration of Kelly Tankersley attached herein.

1. Attached hereto marked as"Exhibit A"is a trueand correct copy of FDA's " questions and answers on ca-dtpa/zn-dtpa." Available at: https://www.fda.gov/drugs/bioterrorism-and-drug-preparedness/ questions-and-answers-calcium-dtpa-and-zinc-dtpa-updated#footer. Last accessed at ( December 30, 2025 @ 4:40 p.m.)

2. Attached hereto marked as "Exhibit B" is a true and correct copy of FDA's announcement in the federal registry approval ca-dtpa/zn-dtpa Available at https://ww.fda.gov/drugs/bioterrorism-and-drug-prepare-dness/fda-approves-drugs-treat-internal-contamination-radioactive-elements. Last acessed @ (01/24/2026 3:24 a.m.)

3. Attached hereto and marked as "Exhibit C" is a true and correct copy of DHS radiological, nuclear response and recovery overview fact sheet from 2003 prior to ca-dtpa/zn-dtpa fda approval with cost estimate from 2001. Included to highlight the affordability of this treatment.  Available at https://dhs.gov/sites/default/files/2023-11/23 1113_st_nusti_radiological_nuclear_response_and_recovery_over-view_fact_sheet.pdf.  Acessed last @( January 8, 2026 11:00 p.m.)

4. Attached hereto and marked as "Exhibit D" is a true and correct copy of CDC's radiation emergencies/ "contamination versus exposure". Available at https://www.cdc.gov/radiation-emergencies/causes /index.html. Acessed last on (November 17, 2025 @4:45 p.m.)

5. Attached hereto and marked as "Exhibit E" is a true and correct copy of CDC's toxicological profile for plutonium.  Available https://www.atsdr .gov/ToxProfiles/tp143.pdf.  Last accessed on (October 30 @ 2:15 p.m.)

6. Attached hereto and marked as "Exhibit F" is CDC's "treating radiation with ca-dtpa/zn-dtpa".  Available at https://cdc.gov/radiation-emergencies /treatment/dtpa.html.  Last accessed ( August 10, 2025 @ 1:30 p.m.)

7. Attached hereto and marked as "Exhibit G" is a true and correct copy of U.S. HHS REMM (Radiological Emergency Medical Management) "managing internal radiation contamination", "isotopes of interest-properties, treatment, fact sheets".  Available at https://remm.hhs.gov /int_contamination.html#isotopestable.  Last visited on 02/11/25 2:30.

8.  Attached hereto and marked as "Exhibit H" is a true and correct copy of the U.S. department of Health and Human Services ASPR-A. Administration for Strategic Preparedness and Response "Strategic Plan 1.1 for FY 2026-2029".  Available at https://aspr.hhs.gov/Strat plan/Documents/ASPR-Strategic-Plan-FY2026-29-508.pdf.  Last visited on January 24, 2026 @ 10:34 p.m.

9.  Attached hereto and marked as "Exhibit I" is a true and correct copy of PHEMCE "Public Health Emergency Medical Countermeasures Enterprise, structure, goals and functions.  An interagency under HHS. Available at https://aspr.hhs.gov/PHEMCE/2024-PHEMCE-SIP/Pages/default.aspx.  Accessed on January 23, 2026 @ 3:00 a.m.

10. Attached hereto and marked as "Exhibit J" is a true and correct copy of U.S. DHS, FEMA, Nuclear Radiological Incident Annex (NRIA). Available at https://www.fema.gov/sites/default/files/documents/fema_ incident-annex_nuclear-radiological.pdf.  Accessed on 01/24/2026 5 a.m.

11.  Attached hereto and marked as "Exhibit K" is a true and correct copy of the DoDD 3150.08-m "NARP" Nuclear Weapon Accident Response Procedure directive.  Available at https://www.esd.whs.mil/Portals/54/ Documents/DD/issuances/dodm/315008m.pdf.   Accessed last on January 25, 2026 @ 4:00 a.m.

12. Attached hereto and marked as "Exhibit L" is a true and correct copy of U.S. DOE "Good Practices for Occupational Radiological Protection in Plutonium Facilities.  Available at https://www.standards.doe.gov/ standards-documents/1100/1128-AStd-2013/@@images/file.  Access last on January 25, 2026 @ 6:00a.m.

13.  Attached hereto and marked as "Exhibit M" is a true and correct copy
of the "2009 Plutonium Spill at NIST".  Available at https://www.nist.gov
/news-events/news/2021/02/update-status-nist-center-neutron-research
-ncnr.  Last accessed on January 23, 2026 @ 4:30 a.m.

14.  Attached hereto and marked as "Exhibit N" is a true and correct copy
of the  2009 NIST Plutonium Spill in Boulder, Colorado slide show.
Available at https://https://www.slideserve.com/search/presentations/?
qNIST+plutonium+spill.  Accessed last on December 24, 2025@ 6:30.

15.  Attached hereto and marked as "Exhibit O" is a true and correct copy
news release "sixteen workers exposed to radiation at DOE lab in
Idaho".   Available at https://bellona.org/news/nuclear-issues/nuclear-
usa/2011-11-sixteen-workers-exposed-to-radiation-at-us-doe-lab-
idaho.  Last accessed  on January 29, 2026 @6:30 a.m.

16.  Attached herto and marked as "Exhibit P"is a true and correct copy of
letter the navy sent explaining the 10 month delay in reporting
plutonium 239 in air sample at parcel C at hpns.  Available at https://
3819826/-1/-1/0-1/BPMOW-25-225%20TO%20TO%20SFDPH%

17.  Attached hereto and marked as "Exhibit Q" is a true and correct copy
of  "Internal Contamination Cases:  the REAC/TS's experience".
Available at https:https://www.sciencedirect.com/science/article/pii/
S2666765722000643.  Last accessed on January 29, 2026 @ 10 a.m.

18.  Attached hereto and marked as "Exhibit R" is a true and correct copy "Chelation modeling of plutonium 238 inhalation incident treated with delayed ca-dtpa".  Available at https://laro.lanl.gov/esploro/outputs /journalArticle/Chelation-Modeling-of-a-Plutonium-238-Inhalation/ 9916423939903761.  Last accessed on  January 29, 2026 @ 11 a.m.

19.  Attached hereto and marked as "Exhibit S" is a true and correct copy Incident in Japan where the use of ca-dtpa aided in the diagnosis of plutonium exposure when nondetect nasal smear.  Available at https: //ouci.dntb.gov.ua/en/works/4vqveBV7/ .  Radiation Protection

Last accessed on January 29, 2026 @10:00 a.m.

.

DECLARATION OF KELLY KIRSTEN TANKERSLEY

I, Kelly Kirsten Tankersley, I am the plaintiff in this case.  I am over the age of eighteen and good health is my natural state.  I have submitted several exhibits, specifically "Exhibit A"  through "Exhibit J" that are readily available on verifiable government websites and contains the most current information.  At some time after March 22, 2024, I visited FDA's website: https://www.gov/drugs/bioterrorism-and-drug-preparedness and located information concerning the approval, the usage and prescribing information for ca-dtpa/zn-dtpa.  I last visited this site on January 8, 2026 when I was gathering information to fulfill this request.

I located "Exhibit C" on or November around 17, 2025 and although it reflects pre-approval prices for ca-dtpa/zn-dtpa, this is an affordable and is the only treatment available to treat plutonium contamination.  I used  my laptopandvisitedhttps://dhs.gov/sites/default/files/2023-11/23_1113_st_nu sti_radiological_nuclear_response_and_recovery_overview_fact_sheetpdf On or around December of 2025, I visited https://www.nist.gov/news and learned of the NIST incident and the additional updates as well.  I believe I have read about every radiation contamination event that has occurred in the United States and internationally.  I visited https://www.energy.gov many times over the last several years and have included multiple exhibits from https://www.energy.gov and https://www.standards.doe.gov/standards. I declare under the penalty of pergury the foregoing is true and correct. Executed on this 29th day of January, 2026

_____

Case No.  3:25-cv-05030-AGT

1   Kelly Kirsten Tankersley
    1033 Revere Avenue
2   San Francisco, CA 94124
3   415-583-6821                    PLAINTIFF'S REQUEST FOR
4   tk0260@gmail.com                JUDICIAL NOTICE OF
                                    ADJUCATIVE FACTS
5

6   KELLY KIRSTEN TANKERSLEY
7            Plaintiff

8   UNITED STATES OF AMERICA;
9   DEPARTMENT OF THE NAVY
              Defendant
10
---------------------------------------------------------------------------
11

12      This notice is to certify that I, Kelly Tankersley served a copy to the

13   Defendant, The United States by means of electronic filing through the

14   federal court electronic filing system.  Executed on this 29th day of January

15    2026.

16                              _____

17

18

19

20

21

22

23

24

25

26

27

28   _____

"EXHIBIT A"

https://www.fda.gov/drugs/bioterrorism-and-drug-preparedness/questions-and-answers-calcium-dtpa-and-zinc-dtpa-updated

fda.gov

# Questions and Answers on Calcium-DTPA and Zinc-DTPA (Updated)

*Center for Drug Evaluation and Research*

10–12 minutes

### 1. What is the Food and Drug Administration (FDA) announcing today?

The FDA is announcing its decision to approve Hameln's new drug applications (NDAs) for pentetate calcium trisodium injection (Ca-DTPA) and pentetate zinc trisodium injection (Zn-DTPA) for the treatment of internal contamination with plutonium, americium, or curium to increase the rates of elimination of these materials from the body.

This is part of FDA's continuing efforts to foster the development and availability of drug products for treatment of people who are accidentally contaminated internally with radioactive materials (i.e., radioactive material that gets inside the body), and as countermeasures to terrorist attacks. Contamination with radioactive materials could occur from laboratory or industrial accidents, or through terrorist attacks. Radioactive materials could be spread through an explosion of a radiation dispersal device (RDD), commonly known as a "dirty bomb." A dirty bomb is a conventional explosive device that contains radioactive material. Radioactive materials could also be spread through use of an improvised nuclear device from which only a small portion of the plutonium is consumed in the nuclear reaction and the rest of the plutonium is spread through the air by the explosion.

## 2. What are Ca-DTPA and Zn-DTPA?

Calcium-DTPA (Ca-DTPA) and Zinc-DTPA (Zn-DTPA) are drug products that have been used investigationally for over 40 years to speed up excretion of the transuranium elements plutonium, americium, and curium from the body. Ca-DTPA and Zn-DTPA bind to these elements and are then excreted in the urine. The FDA has found that when produced under conditions specified in approved new drug applications (NDAs), both of these products can be safe and effective for the treatment of internal contamination with plutonium, americium, or curium. Ca-DTPA and Zn-DTPA do not treat contamination with radioactive iodine, uranium and neptunium, or the complications of radiation exposure (e.g., bone marrow suppression). Other treatments should be initiated if these conditions are suspected.

## 3. What are plutonium, americium, and curium?

Plutonium, americium, and curium are transuranium elements (elements with atomic numbers higher than uranium). All transuranium elements are radioactive. In addition to their use in laboratory and industrial environments, these elements may be found in nuclear weapons and nuclear power plant waste.

People can become internally contaminated with these radioactive materials by inhalation, ingestion, or direct contact through wounds. Internal contamination with plutonium, americium, or curium can occur through a variety of routes including ingestion, inhalation, or direct contact through wounds. The goal of treatment with Ca-DTPA and Zn-DTPA is to enhance the removal of these radioactive contaminants and hence the risk of possible future biological effects, including the development of certain cancers which may occur years after contamination.

### 4. How are Ca-DTPA and Zn-DTPA administered?

Ca-DTPA and Zn-DTPA should not be administered simultaneously. FDA recommends that, if both products are available, Ca-DTPA be given as the first dose. If additional treatment is needed, treatment should be switched to Zn-DTPA. This treatment sequence is recommended because Ca-DTPA is more effective than Zn-DTPA during the first 24 hours after internal contamination. After the initial 24 hours, Zn-DTPA and Ca-DTPA are similarly effective, but Ca-DTPA causes more loss of essential metals, such as zinc, from the body. Therefore, Zn-DTPA is preferred for maintenance therapy.

- If Ca-DTPA is not available or treatment cannot be started within the first 24 hours after contamination, treatment should begin with Zn-DTPA.

- If Zn-DTPA is not available, Ca-DTPA can be given for continued treatment, along with vitamin or mineral supplements that contain zinc.

- Ca-DTPA and Zn-DTPA can be administered by nebulizer or directly into the blood stream (i.e. intravenously). If the route of internal contamination is through inhalation alone, then nebulized chelation therapy will suffice. If the routes of contamination are multiple (e.g., inhalation and through wounds), then intravenous chelation therapy is preferred.

- Ca-DTPA and Zn-DTPA can be administered by nebulizer or directly into the blood stream (i.e. intravenously). If the route of internal contamination is through inhalation alone, then nebulized chelation therapy will suffice. If the routes of contamination are multiple (e.g., inhalation and through wounds), then intravenous chelation therapy is preferred.

- The duration of treatment is dictated by the level of internal contamination and the individual's response to therapy. Levels of internal contamination should be ascertained weekly during chelation therapy to determine when to terminate treatment.

- Zn-DTPA is the preferred treatment for the pregnant woman with internal contamination.

### 5. How soon after internal contamination should someone receive Ca-DTPA or Zn-DTPA to avoid illness?

**5. How soon after internal contamination should someone receive Ca-DTPA or Zn-DTPA to avoid illness?**

In most cases of contamination with transuranium elements, it is unlikely that immediate illness would occur. In order to reduce the risks of future biological effects, Ca-DTPA or Zn-DTPA should be taken as soon as possible after internal contamination, following or concurrent with distancing the individual from the radioactive source and appropriate external decontamination. However, even when treatment cannot be started right away, individuals should be given Ca-DTPA or Zn-DTPA as soon as the products are available. Treatment with Ca-DTPA or Zn-DTPA is still effective even after time has elapsed since contamination, but effectiveness decreases once these elements are trapped in the bones.

**6. Are there any side effects associated with taking Ca-DTPA or Zn-DTPA?**

The main side effect of Ca-DTPA is loss of certain essential nutritional metals, such as zinc, from the body. Zinc can be replaced by taking oral zinc supplements. Although Zn-DTPA may also decrease the levels of certain nutritional metals, the effect (which can be countered by taking mineral supplements) is less than with Ca-DTPA. Chelation therapy administered by nebulized inhalation may cause breathing difficulties in some individuals. In addition, Ca-DTPA should be used with caution in patients suffering from a severe form of a disease called hemochromatosis.

**7. What is the basis for FDA's finding that Ca-DTPA and Zn-DTPA can be found safe and effective?**

The FDA has determined that Ca-DTPA and Zn-DTPA, when manufactured under the conditions of approved NDAs, can be found safe and effective for the treatment of individuals with known or suspected internal contamination with plutonium, americium, or curium. This finding is based on data maintained in a U.S. Registry of individuals with internal radioactive contamination with these materials from acute occupational exposure, as well as from a careful review of published literature articles containing reports and data. Both Ca-DTPA and Zn-DTPA were found to increase the excretion of these radioactive materials from the body.

**8. Why is FDA revising the Ca-DTPA and Zn-DTPA labeling?**

FDA is announcing revisions to the draft Ca-DTPA and Zn-DTPA labeling that were placed on the FDA website in September 2003, based on additional literature articles and clinical data. FDA is also revising the guidance on submitting NDAs for Ca-DTPA and Zn-DTPA to highlight the revised labeling. The revised labeling represent the FDA's current thinking on the Ca-DTPA and Zn-DTPA products in several areas:

- FDA recommends nebulized Zn-DTPA for adults whose internal contamination is only by inhalation;

  - The safety and efficacy of the nebulized route of administration have not been established in the pediatric population for Ca-DTPA or Zn-DTPA;

  - The safety and effectiveness of the intramuscular route have not been established for Ca-DTPA or Zn-DTPA;

  - The duration of Ca-DTPA and Zn-DTPA therapy depends on the amount of internal radioactive contamination and the individual's response to therapy; and

  - Ca-DTPA should be used with caution in patients suffering from a severe form of a disease called hemochromatosis.

Manufacturers who wish to submit NDAs for these products and who rely on FDA's finding that Ca-DTPA and Zn-DTPA are safe and effective should submit the revised labeling with their applications.

**9. Are there currently any other FDA-approved products to treat internal contamination with transuranium elements?**

No, there are currently no other FDA-approved products for treating internal contamination with transuranium elements.

**10. How does this relate to FDA's previous findings that Prussian blue may be safe and efficacious for people internally contaminated with radioactive materials?**

**10. How does this relate to FDA's previous findings that Prussian blue may be safe and efficacious for people internally contaminated with radioactive materials?**

Both Prussian blue and the DTPA products are drugs intended to enhance the elimination of radioactive materials from the body. The drugs differ in chemical composition, routes of administration, side effects, and types of radioactive materials that they eliminate from the body. Prussian blue is administered by mouth while the DTPA products are injected in the blood stream or inhaled. The main side effects of Prussian blue are constipation and upset stomach. The main side effect of the DTPA products, especially Ca-DTPA, is a decrease in levels of certain essential nutritional metals. Prussian blue remains in the intestine and binds radioactive cesium and thallium. DTPA products circulate through the blood stream

and bind radioactive transuranium elements (i.e., plutonium, americium, curium).

**11. How can I get treatment with Ca- DTPA and Zn-DTPA?**

Ca-DTPA and Zn-DTPA are available only by prescription and should be given only under the supervision of a physician after assessing your medical condition. These drugs are only effective to treat internal contamination with radioactive plutonium, americium and curium. The duration of treatment depends on the amount of internal contamination a person is exposed to and their response to treatment. Therefore, these drugs should be given only when the physician has determined your need for them.

**12. Will Ca-DTPA and Zn-DTPA be added to the National Stockpile?**

The U.S. government makes sure that needed medications, especially medicines that may be needed to treat a terrorist threat, are stored in sufficient quantity to provide treatment if there is an emergency.

"EXHIBIT B"

LEGAL STATUS

This site displays a prototype of a "Web 2.0" version of the daily Federal Register. It is not an official legal edition of the Federal Register, and does not replace the official print version or the official electronic version on GPO's govinfo.gov.

The documents posted on this site are XML renditions of published Federal Register documents. Each document posted on the site includes a link to the corresponding official PDF file on govinfo.gov. This prototype edition of the daily Federal Register on FederalRegister.gov will remain an unofficial informational resource until the Administrative Committee of the Federal Register (ACFR) issues a regulation granting it official legal status. For complete information about, and access to, our official publications and services, go to About the Federal Register on NARA's archives.gov.

The OFR/GPO partnership is committed to presenting accurate and reliable regulatory information on FederalRegister.gov with the objective of establishing the XML-based Federal Register as an ACFR-sanctioned publication in the future. While every effort has been made to ensure that the material on FederalRegister.gov is accurately displayed, consistent with the official SGML-based PDF version on govinfo.gov, those relying on it for legal research should verify their results against an official edition of the Federal Register. Until the ACFR grants it official status, the XML rendition of the daily Federal Register on FederalRegister.gov does not provide legal notice to the public or judicial notice to the courts.

LEGAL STATUS

# Guidance for Industry on Pentetate Calcium Trisodium and Pentetate Zinc Trisodium for Treatment of Internal Contamination with Plutonium, Americium, or Curium; Availability

A Notice by the Food and Drug Administration on 09/15/2003

PUBLISHED CONTENT - DOCUMENT DETAILS

**Agencies:** Department of Health and Human Services
Food and Drug Administration
**Agency/Docket Number:** Docket No. 2003D-0399
**Document Citation:** 68 FR 53984
**Document Number:** 03-23489
**Document Type:** Notice
**Pages:** 53984-53989 (6 pages)
**Publication Date:** 09/15/2003

**DOCUMENT HEADINGS**

**Department of Health and Human Services**
**Food and Drug Administration**
  [Docket No. 2003D-0399]

## AGENCY:

Food and Drug Administration, HHS.

## ACTION:

Notice.

## SUMMARY:

The Food and Drug Administration (FDA) is announcing that we (FDA) have concluded that pentetate calcium trisodium (Ca-DTPA) and pentetate zinc trisodium (Zn-DTPA), when produced under conditions specified in approved new drug applications (NDAs), can be found (  printed page 53985) to be safe and effective for the treatment of internal contamination with plutonium, americium, or curium to increase the rates of elimination. We encourage the submission of NDAs for Ca-DTPA and Zn-DTPA drug products. We are also announcing the availability of a guidance for industry entitled "Calcium-DTPA and Zinc-DTPA Drug Products—Submitting a New Drug Application." This guidance is intended to assist manufacturers who plan to submit NDAs for Ca-DTPA and Zn-DTPA.

## ADDRESSES:

Submit NDAs to the Food and Drug Administration, Center for Drug Evaluation and Research, Central Document Room, 12229 Wilkins Ave., Rockville, MD 20857. Submit requests for copies of draft labeling to the Division of Medical Imaging and Radiopharmaceutical Drug Products (HFD-160), Center for Drug Evaluation and Research, Food and Drug Administration, 5600 Fishers Lane, Rockville, MD 20857, 301-827-7510. Copies of the reports referred to in this document will be on display at the Division of Dockets Management (HFA-305), Food and Drug Administration, 5630 Fishers Lane, rm. 1061, Rockville, MD 20852. Submit written requests for single copies of the guidance to the Division of Drug Information (HFD-240), Center for Drug Evaluation and Research, Food and Drug Administration, 5600 Fishers Lane, Rockville, MD 20857. Send one self-addressed adhesive label to assist that office in processing your requests. Submit written comments

on the guidance to the Division of Dockets Management (address given previously). Submit electronic comments to *http://www.fda.gov/dockets/ecomments (http://www.fda.gov /dockets/ecomments)*. See the **SUPPLEMENTARY INFORMATION** section for electronic access to the guidance document.

## FOR FURTHER INFORMATION CONTACT:

Kyong Kang, Center for Drug Evaluation and Research (HFD-160), Food and Drug Administration, 5600 Fishers Lane, Rockville, MD 20857, 301-827-7510.

## SUPPLEMENTARY INFORMATION:

### I. Background

#### A. Plutonium, Americium, and Curium

Plutonium, americium, and curium are transuranium radioactive elements of the actinide series. They are products of nuclear bombardment and are found in the fallout from the detonation of nuclear weapons and the waste from nuclear power plants. These elements are used in various types of research. All isotopes of plutonium, americium, and curium are radioactive.

Contamination with plutonium, americium, or curium can occur through a variety of routes including ingestion, inhalation, and/or wounds. Contamination can cause serious illness or death when high radiation absorbed doses are delivered to critical organs. Lower doses have been associated with the development of cancer long after exposure. In addition to concerns about exposure to plutonium, americium, or curium in industrial and research environments, contamination by radioactive elements such as these, is of particular concern because of their potential use in a radiological dispersal device (RDD), commonly called a "dirty bomb." An RDD is a conventional explosive or bomb containing radioactive material. The conventional bomb is used as a means to spread radioactive material. An RDD is not a nuclear weapon and does not involve a nuclear explosion. Significant amounts of radioactive material, particularly plutonium, could also be spread by the detonation of an improvised nuclear device by terrorists. The extemporized design and construction of such a terrorist weapon could lead to an incident where only a small portion of the weapon's plutonium is consumed in the atomic reaction, and the rest of the plutonium is spread through the air by the explosion of the device. There are currently no approved treatments for internal contamination with plutonium, americium, or curium.

#### B. Ca-DTPA and Zn-DTPA

Diethylenetriaminepentaacetate (DTPA) is a ligand that can chelate with high affinity for plutonium, americium, and curium. The calcium salt of DTPA is known as pentetate calcium trisodium and is referred to as Ca-DTPA. The zinc salt of DTPA is known as pentetate zinc trisodium and is referred to as Zn-DTPA.[1]

For several decades, Ca-DTPA and Zn-DTPA have been used investigationally to enhance the excretion of plutonium, americium, and curium from the body by means of ion exchange, chelation, and, ultimately, excretion through the urine. Because DTPA has a very high affinity for these transuranium elements, when it comes in contact with such elements, the calcium or zinc ions of Ca-DTPA and Zn-DTPA drugs are readily exchanged for the transuranium elements. The transuranium-DTPA complex is then rapidly excreted in the urine. There are currently no approved NDAs for drug products containing Ca-DTPA or Zn-DTPA.

Ca-DTPA and Zn-DTPA in sterile aqueous solution have been used under investigational new drug applications (INDs) held by the Radiation Emergency Assistance Center/Training Site (REAC/TS). REAC/TS is part of the Oak Ridge Associated Universities (ORAU). ORAU operates the Oak Ridge Institute for Science and Education under a contract with the Department of Energy. The INDs are for treatment of contamination resulting from nuclear power or other industrial accidents.

Traditional clinical trials have not been conducted because it would be unethical to deliberately expose patients to radiation; it would also be unethical to withhold potential beneficial medications from patients who have been accidentally exposed. Instead, under these INDs, accidentally exposed patients were treated empirically and the findings were reported in the literature as observational studies.

REAC/TS has retained the medical case reports on 646 patients treated with Ca-DTPA and Zn-DTPA for radiation contamination during the last 40 years. To facilitate the development and ultimate approval of Ca-DTPA and Zn-DTPA drug products, we have reviewed the medical reports on the patients in the REAC/TS database and reviewed the available published literature. This notice announces our conclusions about the safety and effectiveness of Ca-DTPA and Zn-DTPA drug products, and it is addressed primarily to persons interested in submitting NDAs for Ca-DTPA or Zn-DTPA drug products.

## II. Safety and Effectiveness of Ca-DTPA and Zn-DTPA Drug Products

We have concluded that Ca-DTPA and Zn-DTPA drug products, when produced under conditions specified in approved NDAs, can be found to be safe and effective for the treatment of patients with known or suspected internal contamination with plutonium.

development and ultimate approval of Ca-DTPA and Zn-DTPA drug products, we have reviewed the medical reports on the patients in the REAC/TS database and reviewed the available published literature. This notice announces our conclusions about the safety and effectiveness of Ca-DTPA and Zn-DTPA drug products, and it is addressed primarily to persons interested in submitting NDAs for Ca-DTPA or Zn-DTPA drug products.

## II. Safety and Effectiveness of Ca-DTPA and Zn-DTPA Drug Products

We have concluded that Ca-DTPA and Zn-DTPA drug products, when produced under conditions specified in approved NDAs, can be found to be safe and effective for the treatment of patients with known or suspected internal contamination with plutonium, americium, or curium to increase the rates of elimination. As described in section II.A of this document, our conclusion is based on our review of medical reports in the REAC/TS database.

We encourage the submission of NDAs for both Ca-DTPA and Zn-DTPA drug products. If you are interested in submitting NDAs for these products, please contact the Center for Drug (    printed page 53986) Evaluation and Research's (CDER's) Division of Medical Imaging and Radiopharmaceutical Drug Products for a copy of the draft labeling (see **ADDRESSES** ). We also recommend that you consult the guidance entitled "Calcium-DTPA and Zinc-DTPA Drug Products—Submitting a New Drug Application," which is being made available with this notice (see section V of this document).

### A. Basis for Finding of Safety and Effectiveness

We have reviewed medical reports in the REAC/TS database and have determined that Ca-DTPA and Zn-DTPA drug products, when produced under conditions specified in an approved NDA, can be found to be safe and effective for treatment of patients with known or suspected internal contamination with plutonium, americium, or curium to increase the rates of elimination. Our conclusion is supported by our review of reports in the literature, which provided information consistent with that in the REAC/TS database.

Administration of a loading dose of Ca-DTPA followed by maintenance treatment with Zn-DTPA increases the rate of elimination of these radioactive elements from the body and is expected to decrease the risk of death and major morbidity from radiation

complications.

In reaching our determination on the effectiveness of Ca-DTPA and Zn-DTPA, we evaluated reports from the REAC/TS database on 646 patients who received one or more doses of these drugs during the last 40 years. Ca-DTPA was administered either by inhalation or by intravenous injection. Zn-DTPA was administered by intravenous injection. Data on the type of transuranium element and amount of urine elimination were available for detailed analysis from 18 patients. In these patients, administration of Ca-DTPA by inhalation or intravenous injection of a 1-gram (g) dose of Ca-DTPA in a 5 milliliter (mL)-sterile aqueous solution increased the rate of radiation elimination in the urine an average of 39-fold. Maintenance doses of Zn-DTPA administered once daily resulted in continued elimination of radiation.

Some adverse effects were identified as resulting from Ca-DTPA and Zn-DTPA administration. The primary adverse effects of Ca-DTPA administration were the elimination from the body of endogenous essential trace metals, particularly zinc, but also including magnesium and manganese. The endogenous trace metal decreases occurred after treatment for several days and appeared to increase when the drugs were given in divided doses over 1 day. Although Zn-DTPA is also believed to decrease serum magnesium and manganese, no serious toxicity has been observed with the administration of Zn-DTPA in humans or animals. In patients undergoing administration of Ca-DTPA or Zn-DTPA drug products, blood levels of these endogenous trace metals should be followed closely and can be treated with nutritional supplements.

In pregnant animals, multiple doses of Ca-DTPA are associated with fetal malformations and fetal death. Similar effects on animal fetuses were not seen with Zn-DTPA. As a result, Zn-DTPA should be used to begin treatment in pregnant patients. However, if Zn-DTPA is not available, the risks related to radiation contamination should be weighed against the risks of Ca-DTPA to the mother and fetus.

Intravenous administration of Ca-DTPA is recommended and should be used if the route of radioactive contamination is not known or if multiple routes of contamination are possible. In patients whose contamination is only by inhalation within the preceding 24 hours, Ca-DTPA administered as a single loading dose by nebulized inhalation is an alternative route of administration. However, administration of Ca-DTPA by inhalation may irritate some patients, especially those with a history of respiratory disorders. In

these patients, the intravenous route can be used. Other rare adverse events are discussed in the published literature and in the draft labeling we have prepared.

## B. Labeling for Ca-DTPA and Zn-DTPA

We have prepared draft labeling for Ca-DTPA supplied as 1 g in a 5 mL-sterile aqueous solution for administration either by inhalation (with a 1:1 dilution with saline and delivered by nebulization) or intravenous injection. We have also prepared draft labeling for Zn-DTPA supplied as 1 g in a 5-mL sterile aqueous solution for intravenous injection. You can submit this draft labeling as part of an NDA for Ca-DTPA or Zn-DTPA drug product that relies on our findings of safety and effectiveness. The draft labeling reflects our conclusion on the potential safety and effectiveness of Ca-DTPA and Zn-DTPA for treatment of patients with known or suspected internal contamination with plutonium, americium, or curium to increase the rates of elimination. The draft labeling may need to be modified if you submit an NDA for either Ca-DTPA or Zn-DTPA and there is not an approved NDA for the other DTPA drug product, or the other drug product is otherwise unavailable. If you wish to change the labeling to include a different or broader indication or different dosage, or if you wish to make any other significant changes to the draft labeling, you should provide, as part of your NDA, additional literature or other studies to support your requested changes. If you submit an NDA for either a Ca-DTPA or Zn-DTPA drug product that is not based on our findings of the safety and effectiveness of Ca-DTPA and Zn-DTPA, you cannot use the draft labeling because it is based on our review of the REAC/TS database and published literature. If you submit such an NDA, your labeling must be based on the safety and effectiveness data contained in your NDA.

The draft labeling for NDAs based on our review of the REAC/TS database and published literature is available on the Internet at *http://www.fda.gov/cder/drug/ infopage/dtpa/default.htm (http://www.fda.gov/cder/drug/infopage/dtpa/default.htm)*. You may also contact CDER's Division of Medical Imaging and Radiopharmaceutical Drug Products for a copy of the draft labeling (see **ADDRESSES** ).

## III. Conclusions

We have determined that Ca-DTPA and Zn-DTPA can be safe and effective for treatment of patients with known or suspected internal contamination with plutonium, americium, or curium to increase the rates of elimination. We encourage the submission of NDAs

for Ca-DTPA and Zn-DTPA drug products. The requirement under 21 U.S.C. 355(b)(1) (https://www.govinfo.gov/link/uscode/21/355) for full reports of investigations to support these NDAs may be met by citing this notice and the published literature we relied on in preparing this notice. For a list of this published literature see section V of this document. A list of the published literature and reprints of the reports will be available for public inspection in the Division of Dockets Management (see **ADDRESSES** ). It is unnecessary to submit copies and reprints of the reports from the listed published literature. We invite applicants to submit any other pertinent studies and literature of which they are aware.

## IV. Availability of a Guidance

### A. Notice of Availability

In this document, we are also announcing the availability of a guidance for industry entitled "Ca-DTPA and Zn-DTPA Drug Products—Submitting a New Drug Application." The guidance is intended to assist manufacturers who plan to submit NDAs for Ca-DTPA and Zn-DTPA.

(    printed page 53987)

This guidance is being issued as a level 1 guidance consistent with our good guidance practices regulation (21 CFR 10.115 (https://www.ecfr.gov/current/title-21/section-10.115)). It is being implemented immediately without prior public comment because we believe it is in the interest of the public health to communicate this information to the public as quickly as possible. However, we welcome comments on the guidance, and if comments are submitted, we will review them and revise the guidance if appropriate. The guidance represents our current thinking on issues associated with the submission of NDAs for Ca-DTPA and Zn-DTPA drug products. It does not create or confer any rights for or on any person and does not operate to bind FDA or the public. An alternative approach may be used if such approach satisfies the requirements of the applicable statutes and regulations.

### B. Comments

Interested persons may, at any time, submit written comments on the guidance to the Division of Dockets Management (see **ADDRESSES** ). Two copies of any mailed comments are to be submitted except that individuals may submit one copy

Comments are to be identified with the docket number found in the brackets in the heading of this document. The document and received comments are available for public examination in the Division of Dockets Management between 9 a.m. and 4 p.m., Monday through Friday.

## C. Electronic Access

Persons with access to the Internet may obtain the guidance at either *http://www.fda.gov/cder/guidance/index.htm (http://www.fda.gov/cder/guidance/index.htm)* or *http://www.fda.gov/ohrms/dockets/default.htm (http://www.fda.gov/ohrms/dockets/default.htm)*.

# V. Published Literature on the Safety and Effectiveness of Ca-DTPA and Zn-DTPA

The published literature we have relied on in making the determinations regarding Ca-DTPA and Zn-DTPA contained in this notice is listed in this section of this document. Copies of the published literature will be on display in the Division of Dockets Management (see **ADDRESSES** ) and can be seen by interested persons between 9 a.m. and 4 p.m., Monday through Friday. (FDA has verified the Web site address, but we are not responsible for subsequent changes to the Web site after this document publishes in the **Federal Register** .)

1. Aronson, A. L., P. B. Hammond, and A. C. Strafuss, "Studies with Calcium Ethylenediaminetetraacetate in Calves; Toxicity and Use in Bovine Lead Poisoning," *Toxicology and Applied Pharmacology*, 12:337-349, 1968.

2. Bair, W. J., J. F. Park, G. E. Dagle, et al., "Overview of Biological Consequences of Exposure to Plutonium and Higher Actinides," *Radiation Protection Dosimetry*, 26:125-135, 1989.

3. Ballou, J. E., G. E. Dagle, K. E. McDonald, et al., "Influence of Inhaled Ca-DTPA on the Long-term Effects of Inhaled Pu Nitrate," *Health Physics*, 32:479-487, 1977.

4. Blakely, W. F., P. G. S. Prasanna, M. B. Grace, et al., "Radiation Exposure Assessment Using Cytological and Molecular Biomarkers," *Radiation Protection Dosimetry*, 97:17-23, 2001.

"EXHIBIT C"

# Department of Homeland Security Working Group on Radiological Dispersal Device (RDD) Preparedness

# Medical Preparedness and Response Sub-Group





5/1/03 Version

- Ca-DTPA is classified pregnancy category D and Zn-DTPA is classified pregnancy category C.

Ca-DTPA is thought to be approximately 10 times more effective than Zn-DTPA for initial chelation of transuranics; therefore, Ca-DTPA should be used whenever larger intakes of transuranics are involved. Ca-DTPA is the form of choice for initial patient management unless contraindicated. Approximately 24 hours after exposure, Zn-DTPA is as effective as Ca-DTPA. This comparable efficacy, coupled with its lesser toxicity, makes Zn-DTPA the preferred agent for protracted therapy.

## Clinical History

Over 4,600 doses have been administered in 40 years of investigational use. Less than 1% of patients have shown adverse reactions, almost all minor. There are currently 40 U.S. co-investigators.

## Cost and Scope Implications

Estimated Cost
The estimated cost per dose is $1.15 per 1g ampule of Ca-DTPA and $1.70 per 1g ampule of Zn-DTPA. These estimates are based on a December 2001, estimate from Heyl GmBH for orders of 100,000-200,000 units (each unit with 5 ampules).

Scope of Patients Treated
- For a radiological dispersion device, <1,000 patients could reasonably be treated with this countermeasure.

- For an improvised nuclear device, <1,000 patients could reasonably be treated with this countermeasure.

## Policy Issues
- There is currently an insufficient supply of Ca-DTPA and Zn-DTPA in the U.S. to respond to multiple mass casualty events.

- The only supplier of DTPA is Heyl GmBH, Berlin, Germany. Multiple terrorist events could result in significant radiological exposures both in the U.S. and in Europe. In such a case, it is likely that the German supplier would preferentially meet European needs. Establishing domestic manufacturing capacity is necessary to assure adequate access for U.S. needs.

- DTPA is normally administered intravenously, sometimes in multiple doses, and treatment should begin within 6 hours of exposure. In a mass casualty event, investing in development of a product suitable for oral administration

"EXHIBIT D"



# What Causes Contamination versus Exposure

For Everyone
APRIL 10, 2024

**KEY POINTS**

- People can become contaminated with radioactive materials when the materials get on their clothes, hair, or skin.
- People can also become contaminated if radioactive materials enter their body through swallowing, breathing, or open wounds.
- People can spread contamination to others and should take steps to decontaminate themselves.



## What causes it

Radioactive contamination and radiation exposure could occur as the result of an accident, an event in nature, or an act of terrorism. Such a release could expose people and contaminate their surroundings and personal property.

**ON THIS PAGE**

What causes it

How contamination spreads

Resources



▷ Low Resolution Video

**RELATED PAGES**

Radiation Thermometer

Signs and Symptoms

Prevention

Preparing for a Radiation Emergency

What to Do in Radiation Emergencies

**VIEW ALL**
**Radiation Emergencies**

## Radiation exposure



When a person has an X-ray, he or she is exposed to radiation but not contaminated.

RELATED PAGES

Radiation Thermometer

Signs and Symptoms

Prevention

Preparing for a Radiation Emergency

What to Do in Radiation Emergencies

VIEW ALL
Radiation Emergencies

Radioactive materials give off a form of energy that travels in waves or particles. This energy is called radiation.

When a person is exposed to radiation, the energy enters the body. For example, when a person has an X-ray, he or she is exposed to radiation.

When a person is exposed to radiation, the energy enters the body. For example, when a person has an X-ray, he or she is exposed to radiation.

## Radioactive contamination



A contaminated person has radioactive materials on or inside their body.

Radioactive contamination occurs when radioactive material is deposited on or in an object or a person. A contaminated person has radioactive materials on or inside their body. Radioactive materials released into the environment can cause contamination of:

RELATED PAGES

Radiation Thermometer

Signs and Symptoms

Prevention

Preparing for a Radiation Emergency

What to Do in Radiation Emergencies

VIEW ALL
Radiation Emergencies

- Air

- Water

- Surfaces

- Plants and soil

- Buildings

- People

- Animals

## External contamination



External contamination is when radioactive material is on a person's skin, hair, or clothing.

External contamination occurs when radioactive material, in the form of dust, powder, or liquid, comes into contact with:

- Skin

- Hair

- Clothing

In other words, the contact with radioactive material is outside your body. If you are externally contaminated, you can become internally contaminated if radioactive material gets into your body.

## Internal contamination



Some types of radioactive materials stay in the body.

Internal contamination occurs when you swallow or breathe in radioactive materials. It also happens when radioactive materials enter the body through an open wound or are absorbed through the skin.

Some types of radioactive materials stay in the body and accumulate in different body organs. Other types are eliminated from the body in:

- Blood

- Sweat

- Urine

- Feces

# How contamination spreads

If you are externally contaminated with radioactive material, you can contaminate other people or surfaces that you touch. For example, if you have radioactive dust on your clothing, you may spread the radioactive dust when you sit in chairs or hug other people.

If you are internally contaminated, you can expose people near you to radiation from the radioactive material inside your body. Body fluids (blood, sweat, urine) can contain radioactive materials if you are contaminated. Touching these body fluids can result in contamination or exposure.

## Contamination at home

If you are externally contaminated, you can spread the contamination by

- Touching surfaces

- Sitting in a chair

- Walking through a house

Contaminants can easily fall from clothing and contaminate other surfaces.

Homes can also become contaminated with radioactive materials from body fluids of people with internal contamination.

Making sure that others do not come in contact with dust or body fluids from a person with contamination will help prevent contamination of other people in the home.

## Prevention methods

Because radiation cannot be seen, smelled, felt, or tasted, people at the site of an incident will not know whether radioactive materials were involved. You can take the following steps to limit your contamination:

1. Get out of the current area quickly. Go inside to the closest safe building or to an area to which you are directed by law enforcement or health officials.

2. Remove the outer layer of your clothing. If radioactive material is on your clothes, getting it away from you will reduce the external contamination and decrease the risk of internal contamination. It will also reduce the length of time that you are exposed to radiation.

3. If possible, place the clothing in a plastic bag or leave it in an out-of-the-way area, such as the corner of a room. Keep people away from it to reduce their exposure to radiation. Keep cuts and abrasions covered when handling contaminated items to avoid getting radioactive material in them.

4. Wash all of the exposed parts of your body using lots of soap and lukewarm water to remove contamination. This process is called decontamination. Try to avoid spreading contamination to parts of the body that may not be contaminated, such as areas that were clothed.

5. After authorities determine that internal contamination may have occurred, you may be able to take medication to reduce the radioactive material in your body. There are some medications that can help remove internal contamination from certain radioactive materials.

## Resources

"EXHIBIT E"



**Radiation Emergencies**

EXPLORE THIS TOPIC ∨

Q SEARCH

# Plutonium



Health Care Providers
APRIL 17, 2024

**AT A GLANCE**

Plutonium is created from uranium in nuclear reactors. Because it emits alpha particles, plutonium is most dangerous when inhaled. The alpha particles can kill lung cells and may lead to lung disease and cancer. Plutonium that is ingested from contaminated food or water does not pose a serious threat to humans.



# Properties

Plutonium-238 (Pu-238) Half-life: 87.7 years

Plutonium-239 (Pu-239) Half-life: 24,110 years

Plutonium-240 (Pu-240) Half-life: 6,564 years

Mode of decay: Alpha particles

Chemical properties: Solid under normal conditions, plutonium can form compounds with other elements.

# Use

Plutonium-238 generates significant heat through its radioactive decay process. This makes it useful as a heat source for sensitive electrical components in satellites. Plutonium-238 is also used as a power source (for example, battery power) for satellites. Plutonium-239 is used to make nuclear weapons. Pu-239 and Pu-240 are byproducts of nuclear reactor operations and nuclear bomb explosions.

# Origin

Plutonium is created from uranium in nuclear reactors. It is a by-product of nuclear weapons production and nuclear power operations.

# Form

Plutonium is a solid material made into rods for use in nuclear reactors and into ceramic buttons for satellite systems.

## What plutonium looks like

Plutonium is a silvery-gray metal that becomes yellowish when exposed to air. Most plutonium in the environment is in the form of microscopic particles. These microscopic particles are the remnants of nuclear weapons testing and nuclear reactor accidents.

# Risk

Because it emits alpha particles, plutonium is most dangerous when inhaled. When plutonium particles are inhaled, they lodge in the lung tissue. The alpha particles can kill lung cells, which causes scarring of the lungs, leading to further lung disease and cancer. Plutonium can enter the blood stream from the lungs and travel to the kidneys. This exposes the blood and the kidneys to alpha particles.

Once plutonium circulates through the body, it concentrates in the bones, liver, and spleen, exposing these organs to alpha particles.

Once plutonium circulates through the body, it concentrates in the bones, liver, and spleen, exposing these organs to alpha particles.

Plutonium that is ingested from contaminated food or water does not pose a serious threat to humans. The stomach does not absorb plutonium easily and so it passes out of the body in the feces.

# Resources

"EXHIBIT F"

https://www.cdc.gov/radiation-emergencies/treatment/dtpa.html

cdc.gov

# Treating Radiation Exposure with DTPA

*CDC*

5–7 minutes

- DTPA (Diethylenetriamine pentaacetate) is a medicine that helps reduce radioactive material in the body.
- DTPA helps the body remove radioactive contamination through urine.
- DTPA works best when given shortly after radioactive material has entered the body.



## Treatment overview

DTPA (Diethylenetriamine pentaacetate) is a medicine that can bind to radioactive plutonium, americium, and curium to decrease the amount of time it takes to get radioactive plutonium, americium, and curium out of the body.

DTPA cannot bind all of the radioactive plutonium, americium, and curium that might get into a person's body after a radiation emergency. It also cannot prevent them from entering the body.

### How it works

DTPA comes in two forms: calcium (Ca-DTPA) and zinc (Zn-DTPA). Radioactive materials (bound to DTPA) are then passed from the body in the urine.

DTPA works best when given shortly after radioactive plutonium, americium, and curium have entered the body. The more quickly radioactive material is removed from the body, the fewer and less serious the health effects will be.

Ca-DTPA is more effective than Zn-DTPA when given **within the first day** after internal contamination has happened. After 24 hours have passed, Ca-DTPA and Zn-DTPA are equally effective.

After 24 hours, DTPA binds less effectively to radioactive plutonium, americium, and curium. However, DTPA can still work to remove these radioactive materials from the body several days or even weeks after a person has been internally contaminated.

## Taking DTPA

### Before taking DTPA

Doctors and public health authorities will work together to decide who likely will benefit from DTPA treatment.

For doctors who may be administering DTPA for patients, use the following guidelines:

- **Infants** (including breastfed infants) and children less than 12 years of age can be given either Ca-DTPA or Zn-DTPA.
  - The dosage of DTPA should be based on the child's size and weight.
  - The safety and effectiveness of the inhaled route of DTPA has not been studied in children.

- **Young adults and adults** internally contaminated with plutonium, americium, or curium should receive Ca-DTPA if treated within the first 24 hours after contamination. After 24 hours, if additional treatment is needed, adults should receive Zn-DTPA. If Zn-DTPA is not available, patients may receive Ca-DTPA together with a vitamin and mineral supplement that contains zinc.
- **Women who are pregnant** should be treated with Zn-DTPA, unless they have very high levels of internal contamination with plutonium, americium, or curium.
  - Ca-DTPA should be used in women who are pregnant only to treat very high levels of internal radioactive contamination.

  - Ca-DTPA should be used in women who are pregnant only to treat very high levels of internal radioactive contamination.
  - In this case, doctors and public health authorities may prescribe a single dose of Ca-DTPA, together with a vitamin and mineral supplement that contains zinc, as the first treatment.
  - After the first dose of Ca-DTPA, treatment should continue 24 hours later with a daily dose of Zn-DTPA, as needed.
- **Breastfeeding** women who are internally contaminated with plutonium, americium, or curium can be treated with Ca-DTPA or Zn-DTPA.

### Using DTPA

DTPA can be injected directly into a vein in the arm or dripped into a vein from a bag (intravenously [IV]).

Adults who have inhaled plutonium, americium, or curium can be treated with DTPA mist that is breathed into the lungs.

- Inhaling DTPA might cause some people, especially those with asthma, to cough or wheeze.
- The safety and effectiveness of inhaled DTPA has not been shown in children.

DTPA should be taken only as long as needed, as determined by a doctor.

Doctors might collect samples of blood, urine, and feces during DTPA treatment. These samples can tell the doctors how much radioactivity you are passing and how much remains in your body.

The length of treatment with DTPA will depend on:

- The amount of radioactive material in your body.
- How well your body gets rid of the radioactive material with the help of DTPA.

**Side effects**

People who are given repeat doses of Ca-DTPA within a short period of time may have:

- Nausea

- Vomiting
- Diarrhea
- Chills
- Fever
- Itching
- Muscle cramps

Other side effects may include headache, light-headedness, chest pain, and a metallic taste in the mouth.

Ca-DTPA should be used cautiously in patients with a blood disease called hemochromatosis.

Ca-DTPA (and Zn-DTPA) bind to important minerals that the body needs (zinc, magnesium, and manganese). As a precaution, patients receiving long-term treatment with DTPA should be given a vitamin and mineral supplement that contains zinc.

## Getting DPTA

DTPA can **only** be administered by a doctor.

During a radiation emergency, doctors will provide DTPA treatment as needed.

More detailed information on DTPA can be found at the FDA website.

January 31, 2025

"EXHIBIT G"

# Managing Internal Radiation Contamination

## Isotopes of Internal Radiation Contamination

### Isotopes of Interest: Properties, Treatment, and Fact Sheets

## Radiation Countermeasures for Treatment of Internal Radiation Contamination

"EXHIBIT H"

# ASPR
## STRATEGIC PLAN
Version 1.1

**FISCAL YEAR**
**2026**
**–**
**2029**










aspr.hhs.gov

**U.S. Department of Health & Human Services | Administration for Strategic Preparedness & Response**

# Contents

**Message from the Principal Deputy Assistant Secretary** — 1

**Introduction** — 2

    ASPR's Vision — 2

    ASPR's Mission — 2

    Core Beliefs — 2

    Authorities — 3

**Goals and Objectives** — 4

    **Goal 1:**
Empower the Workforce and Reinforce a "One ASPR" Culture — 5

    **Goal 2:**
Help Strengthen Preparedness and Resiliency of State and Local Governments — 6

    **Goal 3:**
Execute Rapid, Efficient, and Adaptive Federal Response — 7

    **Goal 4:**
Secure America's Medical Supply Chain — 8

    **Goal 5:**
Address Emerging Health Security Threats — 9

**The Path Forward** — 10

# Message
## from the Principal Deputy Assistant Secretary



As stewards of the nation's health security, the Administration for Strategic Preparedness and Response (ASPR) carries a profound responsibility: to safeguard the American people against disasters, public health emergencies, and threats to national security. This strategic plan reflects the Secretary's vision, the President's executive orders on state resiliency and pharmaceutical onshoring, and the fiscal responsibility entrusted to us by the American taxpayer.

Our charge is clear: strengthen state and local readiness, secure America's medical supply chain, address emerging health security threats, advance gold standard science, and execute rapid and efficient federal response. This plan establishes a streamlined path forward, focused on partnerships, transparency, and results that matter.

Together, with our state, local, tribal, and territorial partners, ASPR will ensure the nation is prepared before disaster strikes—not while standing on top of the rubble.

# Introduction

ASPR is the nation's lead health security agency—driving preparedness before disaster strikes, securing domestic medical supply chains, advancing gold standard science, and delivering a fast, accountable federal response when lives are on the line. We partner with states, local communities, tribes, territories, other federal agencies, and the private sector to strengthen readiness at home. We invest in American manufacturing to reduce foreign dependency, and steward taxpayer resources with transparency, discipline, and measurable outcomes. ASPR protects the American people and ensures that the United States can prepare for, respond to, and recover from any threat to national security, anytime, anywhere.

## ASPR'S VISION

A resilient nation where every community is prepared for disasters and public health emergencies while supported by a secure domestic medical supply chain, gold standard science, and a rapid, accountable federal response that protects lives and strengthens national security.

## ASPR'S MISSION

ASPR strengthens national security by preparing for, responding to, and recovering from disasters and public health emergencies.

## CORE BELIEFS

ASPR's core beliefs anchor national health security by reinforcing partnership, gold standard science, stewardship, efficiency, accountability, and transparency. This ensures funding aligns with national priorities, waste is eliminated, and stakeholders are openly engaged.

 **People and partnerships are fundamental—**trust must be forged in advance of crises.

 **Health security is national security—**supply chain security and medical readiness are part of national preparedness.

 **Science must serve the nation—**safe, transparent, and unbiased research guides investments.

 **Accountability and transparency are paramount—**every dollar must reflect national priorities and deliver measurable results.

## AUTHORITIES

The Public Health Service (PHS) Act (42 USC §201 et seq.), as amended, establishes ASPR's core legal authorities and scopes ASPR's public health emergency functions. ASPR operates in accordance with applicable laws, regulations, Presidential directives, executive orders, and HHS priorities. Core authorities, mainly from the Public Health Service Act, include:

- **Section 301 (42 USC 241):** Research and Development
- **Section 311 (42 USC 243):** Federal/State Cooperation; Temporary Assistance to States
- **Section 319 (42 USC 247d):** Declaration of a Public Health Emergency
- **Section 319C-2 (42 USC 247d-3b):** Partnerships for State and Regional Hospital Preparedness to Improve Surge Capacity
- **Section 319F-2(a) (42 USC 247d-6b(a)):** Strategic National Stockpile
- **Section 319F-2(b) (42 USC 247d-6b(b)):** Smallpox Vaccine Development
- **Section 319F-2(c) (42 USC 247d-6b(c)):** Project BioShield's Special Reserve Fund
- **Section 319F-2(i) (42 USC 247d-6b(i)):** State Stockpile Pilot
- **Section 319F-3 (42 USC 247d-6b):** Public Readiness and Emergency Preparedness Act
- **Section 319I (42 USC 247d-7b):** Emergency System for Advance Registration of Volunteer Health Professionals
- **Section 319L (42 USC 247d-7e):** Biomedical Advanced Research and Development Authority
- **Section 319L-1 (42 USC 247d-7f):** Collaboration and Coordination
- **Section 319M (42 USC 247d-7g):** National Biodefense Science Board
- **Sections 1201-4 (42 USC 300d-300d-6):** Trauma Care Coordination
- **Section 1291 (42 USC §300d–91):** Military and Civilian Partnership for Trauma Readiness Grant Program
- **Section 2801 (42 USC 300hh):** Public Health and Medical Preparedness and Response Functions
- **Section 2802 (42 USC 300hh–1):** National Health Security Strategy
- **Section 2803 (42 USC 300hh–2):** Enhancing Medical Surge capacity
- **Section 2811 (42 USC 300hh–10):** Coordination of Preparedness For and Response to All-Hazards Public Health Emergencies; ASPR Duties and Functions
- **Section 2811(b)(7) (42 USC 300hh–10(b)(7)): P**ublic Health Emergency Medical Countermeasures Enterprise **(**PHEMCE) Multiyear Budget
- **Section 2811-1 (42 USC 300hh–10a):** PHEMCE
- **Section 2811A (42 USC 300hh–10b):** National Advisory Committee on Children and Disasters
- **Section 2811B (42 USC 300hh–10c):** National Advisory Committee on Seniors and Disasters
- **Section 2811C (42 USC 300hh–10d):** National Advisory Committee on Individuals with Disabilities and Disasters
- **Section 2811D (42 USC 300hh–10e)**: Advisory Committee Coordination
- **Section 2812 (42 USC 300hh–11):** National Disaster Medical System
- **Section 2813 (42 USC 300hh–15):** Volunteer Medical Reserve Corps
- **Section 2814 (42 USC 300hh-16):** At-Risk Individuals
- **P.L. 81-774 (50 U.S.C. §§4501 et seq.):** As amended: Defense Production Act

# Goals and
# OBJECTIVES

Goals establish the overarching strategic direction for ASPR's mission to protect the nation's health security. They define priorities that guide decision-making, investments, and partnerships across government, health care systems, and industry. These goals serve as the foundation for preparedness and response, ensuring that ASPR's work addresses evolving threats with foresight, resilience, efficiency, and national unity throughout the span of this strategic plan (federal fiscal years 2026 through 2029).

Objectives clarify and target outcomes within each goal. As part of ASPR's implementation approach, key ASPR centers will be responsible for carrying out assigned actions to support reaching objectives. The ASPR centers are Center for Administration, Center for Preparedness (includes components of the HHS Coordination Operations and Response Element), Center for Response, Center for the Strategic National Stockpile, Center for the Biomedical Advanced Research and Development Authority, Center for Industrial Base Management and Supply Chain, and the Immediate Office of the ASPR.











# GOAL 1:
## Empower the Workforce and Reinforce a "One ASPR" Culture

An empowered, engaged, talented, and trained workforce—operating within an organization that values collaboration and transparent communication—is fundamental to successfully executing ASPR's mission on behalf of the American people. ASPR will focus on improving integration across ASPR centers to eliminate "silos" of information or activity. This will be accomplished by increasing cross-center coordination, reducing duplication of effort, and reinforcing a "One ASPR" culture of teamwork, mutual respect, service, and professional development. By pairing effective and agile collaborative work across the centers with cultural reinforcement, ASPR can strengthen its unity of effort while preserving center-level expertise. To strengthen the workforce and reinforce a "One ASPR" culture, ASPR will meet the following objectives through targeted actions.



**OBJECTIVE 1.1**

Promote a culture of information and resource sharing, collaboration, and transparency where employees have opportunities to contribute to innovative solutions.



**OBJECTIVE 1.2**

Promote an adaptable, engaged, well-trained workforce to improve operational readiness, employee resilience, and capability to carry out the ASPR mission.

## GOAL 2:

### Help Strengthen Preparedness and Resiliency of State and Local Governments

Strengthening disaster resilience and readiness requires a collective approach from all levels of government, the private sector, communities, families, and individuals. ASPR will empower these partners to identify, prepare for, and mitigate evolving threats and hazards through risk-informed decisions and smart investments. ASPR also stands ready to provide adaptive and effective support to state, local, tribal, and territorial (SLTT) partners should their health systems become overwhelmed. This approach will efficiently improve coordination and strengthen health systems that are reliable and ready to perform under pressure. To strengthen SLTT resiliency and readiness, ASPR will meet the following objectives through targeted actions.

**OBJECTIVE 2.1**
Support SLTT partners with the guidance, resources, training, and planning tools necessary to implement the President's Executive Order 14239 on achieving efficiency through state and local preparedness.

**OBJECTIVE 2.2**
Re-scope Hospital Preparedness Program (HPP) and National Special Pathogen System (NSPS) effectiveness by setting measurable readiness performance measures and tracking outcomes to identify, prepare for, and mitigate evolving threats.

**OBJECTIVE 2.3**
Strengthen health care and public health (HPH) sector resilience by providing partners with transparent information through unified, accessible systems and new or improved tools.

**OBJECTIVE 2.4**
Engage SLTT and Federal partners to build trust and partnerships before disaster strikes by supporting exercises of response plans, simplifying access to federal support, and reducing complexity of preparedness and response models.

**OBJECTIVE 2.5**
Improve SLTT supply chain readiness and visibility to ensure health systems can respond to disruptions.

**OBJECTIVE 2.6**
Support SLTT capacity and capability to receive, distribute, dispense, and administer medical countermeasures (MCMs) and manage medical materiel.

# GOAL 3:
## Execute Rapid, Efficient, and Adaptive Federal Response

When large-scale disasters or public health emergencies overwhelm SLTT resources, a swift, coordinated federal response is critical to protect lives and stabilize health systems. To meet this need, deployable federal medical response teams are maintained using efficient, continuously updated models that focus on life-saving outcomes and the rapid deployment of personnel and resources. To deliver a rapid, efficient response, ASPR will meet the following objectives through targeted actions.


**OBJECTIVE 3.1**
Maintain deployable federal medical response teams and support non-federal response assets based on efficient and updated models focused on life-saving outcomes.


**OBJECTIVE 3.2**
Strengthen operational coordination by establishing clear lines of authority in disaster response to rapidly deploy responders and coordinate seamlessly with federal and SLTT partners.


**OBJECTIVE 3.3**
Strengthen ASPR's Response Data Ecosystem by advancing data modernization and consolidation to drive informed decision-making during response operations.


**OBJECTIVE 3.4**
Standardize after-action reviews across regions and share with SLTT and private sector partners to ensure lessons learned from previous responses are implemented in the future.

**OBJECTIVE 3.5**
Develop a core competency framework for disaster training to ensure ASPR responders and SLTT partners are equipped with response skills.

**OBJECTIVE 3.6**
Maintain the Strategic National Stockpile to safeguard the nation's health.



# GOAL 4:
## Secure America's Medical Supply Chain

A resilient and reliable medical supply chain can ensure that lifesaving medicines, devices, personal protective equipment (PPE), and other medical supplies are available during emergencies. The United States continues to be reliant on concentrated foreign sourcing of critical medicines, which can be impacted by shipping delays, geopolitical tensions, trade disruptions, and disasters. To secure America's supply chain, ASPR will meet the following objectives through targeted actions.



**OBJECTIVE 4.1** Bolster domestic manufacturing of critical medicines and their components, including active pharmaceutical ingredients (APIs) and key starting materials (KSMs), to reduce dependency on foreign sourcing.



**OBJECTIVE 4.2** Incentivize the onshoring of manufacturing and minimize barriers to make it easier for industry to produce domestic MCMs and medical supplies.



**OBJECTIVE 4.3** Engage with industry and government partners to identify innovative and agile manufacturing models and increase visibility of supply chain vulnerabilities and dependencies.

## GOAL 5:
### Address Emerging Health Security Threats

The nation confronts an increasingly complex threat landscape. The need to advance gold standard science in support of national health security has never been greater. Despite significant scientific progress, challenges persist in ensuring that biomedical research is transparent, reproducible, and aligned with national preparedness goals. Outdated methodologies, limited integration of digital health and AI, and inconsistent adherence to integrity standards complicate efforts to safeguard public health. High-quality science ensures that MCM and emergency response strategies are based on sound evidence, thereby reducing risks posed by chemical, biological, radiological, and nuclear (CBRN) threats, including emerging infectious diseases, and ensuring the U.S. MCM portfolio is optimally positioned to safeguard Americans. To address emerging health security threats through gold standard science, ASPR will meet the following objectives through targeted actions.



**OBJECTIVE 5.1**

Assess new and emerging threats regularly to ensure MCM investments are risk-informed and protect the nation's health from future public health emergencies.



**OBJECTIVE 5.2**

Prioritize biomedical research & development (R&D) for CBRN threats and pandemics by investing in reproducible, transparent science and research models that reduce reliance on animal testing and leverage flexible technologies that can adapt more easily to novel threats.



**OBJECTIVE 5.3**

Foster partnerships with organizations committed to the highest standards of integrity and conflict-of-interest management.



**OBJECTIVE 5.4**

Integrate digital health and AI where proven effective to improve threat assessment and enhance patient care.

**OBJECTIVE 5.5**

Improve the safety, security, and transparency of the life science research enterprise to safeguard public health and restore public trust.

# The Path
# FORWARD



ASPR will continue to draw on lessons from past emergencies to strengthen the nation's preparedness for the future. Our path forward is focused on ensuring the United States remains resilient and ready to protect the health and security of the American people—before, during, and after crises.

Central to this mission are the dedicated ASPR employees who deliver preparedness, response, and recovery every day. Their expertise, commitment, and service form the foundation of our readiness and our ability to support state, local, tribal, and territorial partners when it matters most.



Guided by this Strategic Plan, ASPR will strengthen readiness across communities, secure the medical supply chain, advance gold-standard science, and deliver rapid, effective federal response—while operating with transparency, accountability, and responsible stewardship of taxpayer resources.

This Strategic Plan establishes a clear and disciplined path forward, grounded in partnership, preparedness, and responsibility, and driven by the people of ASPR who make our mission possible.





"EXHIBIT I"

# PHEMCE Structure and Function

Public Health and Emergency Medical Countermeasures
Enterprise Strategy and Implementation Plan 2024



The PHEMCE is an interagency partnership of federal MCM
experts who collaborate across sectors to protect the U.S.
population from public health emergencies that require the
availability and timely provision of effective MCMs.  The
PHEMCE exists to support a cohesive federal process for MCM

Case 3:25-cv-05030-AGT    Document 32    Filed 02/02/26    Page 61 of 521

development, acquisition, distribution, and dispensing, bridging gaps in the country's MCM portfolio. The PHEMCE does not direct or oversee plans, programs, and resources of other Departments or Agencies for medical countermeasures but rather develops recommendations that agencies may implement based on funding availability. Federal agency strategic priorities — including the work of the PHEMCE — should align with national strategies, such as the *National Security Strategy, National Biodefense Strategy, and National Health Security Strategy*.



**Figure 1. Medical Countermeasure Preparedness Partners**

Co-chaired by the Assistant Secretary for Preparedness and Response (the ASPR) and the Director of the White House Office of Pandemic Preparedness and Response Policy (OPPR),[1] PHEMCE membership includes the Director of the Centers for Disease Control and Prevention (CDC), Director of the National Institutes of Health, Commissioner of the U.S. Food and Drug Administration, Secretary of Defense, Secretary of Homeland Security, Secretary of Agriculture, Secretary of Veterans Affairs, and the Director of National Intelligence.  PHEMCE representatives also include the Director of the Center for the Biomedical Advanced Research and Development Authority (BARDA), the Director of the Center for the Strategic National Stockpile (SNS), the Director of the National Institute of Allergy and Infectious Diseases (NIAID) and the Director of the Office of Readiness and Response.  A principal official for each agency coordinates within their respective organizations to contribute technical expertise to PHEMCE's mission space.  As the principal advisor to the HHS Secretary on federal public health and medical preparedness and response, the ASPR evaluates and synthesizes recommendations from the PHEMCE and presents them to the HHS Secretary.  While ASPR leads each function outlined in the PHS Act, the PHEMCE ensures coordinated action across USG agencies.  It does so by identifying what is needed to protect the U.S. population, developing strategies, and making recommendations to address any gaps, vulnerabilities, and challenges.  PHEMCE's harmonization of these efforts results in a well-coordinated portfolio of MCMs available when needed to respond to and mitigate the

impacts of public health emergencies.

Subject matter experts and technical teams from across the
member agencies bring together information regarding
threats; early research and development (R&D); advanced
R&D (including enabling technologies); monitoring and
surveillance; manufacturing and supply chains; regulatory
science; procurement and stockpiling; and the deployment,
distribution, dispensing, administration, and utilization of
MCMs.  The PHEMCE does not recreate each of these functions
but rather builds on the existing infrastructure for these
activities to inform recommendations for the HHS Secretary.
The statute also directs PHEMCE to solicit and consider input
from SLTT public health departments and officials.  CDC's
ongoing epidemiologic, laboratory, clinical consultation, and
state and local support work with SLTT and clinical partners
address not just routine, day-to-day outbreak and event
responses but also informs ongoing planning and need for
scaling as part of broader preparedness activities.  ASPR
accomplishes this through routine engagement from ASPR
regional offices, formalized webinars, and targeted
partnerships.  Engagement with partners at all levels of
emergency response improves understanding of capability
needs, which serves to optimize USG investments in a more
meaningful MCM portfolio.  Additionally, when appropriate,
the PHEMCE works with HHS and USG partners to consider
international aspects of its mission to support global health
security and international coordination to ensure national
health security.

Case 3:25-cv-05030-AGT    Document 32    Filed 02/02/26    Page 65 of 521

# PHEMCE Functions



## Identify Needs to Protect the Nation

PHEMCE will identify national health security needs, gaps in MCM preparedness and response, and challenges to addressing these needs.



## Develop Strategies to Address Gaps

PHEMCE will optimize the USG's MCM portfolio by contemplating MCM logistics, deployment, distribution, dispensing, and utilization.



## Make Recommendations to the HHS Secretary

PHEMCE will provide the ASPR with the necessary input they need to make recommendations to the Secretary and inform the preparedness and response efforts.

Case 3:25-cv-05030-AGT    Document 32    Filed 02/02/26    Page 66 of 521

About ASPR (/Pages/Home.aspx)

PHEMCE SIP 2024 (/PHEMCE/2024-PHEMCE-SIP/Pages/default.aspx)

# Executive Summary

Public Health and Emergency Medical Countermeasures
Enterprise Strategy and Implementation Plan 2024



The 2024 *Public Health Emergency Medical Countermeasures
Enterprise (PHEMCE)* Strategy and Implementation Plan (SIP)
describes the PHEMCE's goals and objectives to improve the
nation's medical countermeasure (MCM) preparedness against
chemical, biological, radiological, and nuclear (CBRN) threats,

including pandemic influenza and other emerging infectious diseases (EIDs). These goals were created in close collaboration with PHEMCE member agencies across the federal government. Aimed at establishing an ambitious agenda, these PHEMCE SIP goals include:

- **Ensuring the U.S. government (USG) has defined the right MCM capabilities to respond to public** health emergencies and disasters by reviewing the threat landscape, prioritizing those threats that represent the highest risks, and harmonizing USG capabilities.

- **Driving unified action toward developing and sustaining priority MCMs aligned with key USG strategies** by improving information sharing, reducing duplication of efforts, and identifying critical gaps and priorities to support MCM capabilities, particularly in an era of budget austerity.

- **Optimizing collaborations with partners** ensuring state, local, tribal, and territorial (SLTT), industry, and other stakeholders are ready to respond during public health emergencies and disasters.

- **Strengthening last-mile MCM efforts** to enable a more coordinated and equitable MCM response to future public health emergencies and disasters by ensuring incorporation of last-mile capabilities into appropriate USG response plans, with a focus on at-risk individuals and historically underserved communities.







| About Us ⌄ | Response Operations ⌄ | Health Care Readiness ⌄ | Medical Countermeasures & Biodefense ⌄ | Partnering ⌄ | Tools ⌄ | Current Responses ⌄ |

## Public Health Emergency Medical Countermeasures Enterprise

The PHEMCE is an interagency partnership of federal medical countermeasure experts who collaborate across sectors to advance the country's medical countermeasure (MCM) preparedness against CBRN threats including emerging infectious diseases (EID).  PHEMCE members work together to guide the U.S. government's MCM portfolio and enhance the nation's ability to prepare for and respond to national health security threats.

The PHEMCE informs the plans and actions that ensure the right balance of MCMs and improves the availability and use of those MCMs during disasters and emergencies. Improving capabilities also enhances the nation's ability to nimbly respond to unknown and unforeseen threats.



Mission, Vision, and Functions



Priority Threats



Frequently Asked Questions



FY2023-2027 PHEMCE Multiyear Budget



2024 PHEMCE Strategy and Implementation Plan

Home | Contact Us | ASPR Archive ☑ | Accessibility | Privacy Policies | Disclaimer |
HHS Viewers & Players ☑ | HHS Plain Language ☑ | FOIA ☑ | Vulnerability Disclosure Policy ☑ |



 HHS, Administration for Strategic Preparedness and Response (ASPR) 200
Independence Ave., Washington, DC 20201

 Administration for Strategic
Preparedness & Response



About Us ⌄   Response Operations ⌄   Health Care Readiness ⌄   Medical Countermeasures & Biodefense ⌄   Partnering ⌄   Tools ⌄   Current Responses ⌄

## PHEMCE Mission, Vision, and Function



**PHEMCE**

Mission, Vision, and Functions

Priority Threats

Frequently Asked Questions

2023-2027 PHEMCE Multiyear Budget

2024 PHEMCE Strategy and Implementation Plan

The PHEMCE is an interagency partnership of federal medical countermeasure experts who collaborate across sectors to protect the U.S. population during public health emergencies that require the availability and timely provision of effective medical countermeasures. The PHEMCE exists to provide a cohesive federal process for medical countermeasure development, acquisition, distribution, and dispensing, bridging gaps in the country's medical countermeasure portfolio.

MCMs include both pharmaceutical interventions (e.g., vaccines, antimicrobials, antidotes, antitoxins, or other therapies such as those that may target the host) and nonpharmaceutical interventions (e.g., medical devices including diagnostics, life support products, personal protective equipment, decontamination systems, and clinical decision-making support tools), as well as other needed medical products that may be used to detect or assess, prevent, mitigate, or treat the adverse health effects of a public health emergency caused by a naturally occurring, accidental, or deliberate threat.

The PHEMCE, at its core, is responsible for 1) identifying what capabilities are needed to protect the U.S. population, 2) developing strategies to address gaps in our capabilities, and 3) making recommendations to the HHS Secretary to improve access to medical products during public health emergencies and disasters.

### Vision



*A coordinated medical countermeasure (MCM) enterprise that enables the nation to prepare for and respond to national health security threats*

### Mission



*To guide the USG MCM portfolio and enhance the nation's capabilities to prepare for and respond to national health security threats*

Co-chaired by the Administrator and Assistant Secretary for Preparedness and Response (ASPR) and the Director of the Office of Pandemic Preparedness and Response Policy (OPPR), PHEMCE membership includes the Director of the Centers for Disease Control and Prevention, the Director of the National Institutes of Health, the Commissioner of the Food and Drug Administration, the Secretary of Defense, the Secretary of Homeland Security, the Secretary of Agriculture, the Secretary of Veterans Affairs, and the Director of National Intelligence.

The PHEMCE meets quarterly to discuss key issues and make recommendations. Additionally, subject matter experts and technical teams from across the member agencies meet routinely to bring together information. Information may touch on analyzing the current threats; early and advanced research and development, including enabling technologies; monitoring and surveillance; manufacturing; supply chains; regulatory science; procurement and stockpiling; and the deployment, distribution, dispensing, and administration of medical countermeasures.

The PHEMCE does not recreate each of these functions but rather builds on the existing infrastructure for these activities to inform recommendations for the Secretary of HHS.

This partnership informs the plans and actions that ensure the right balance of medical countermeasures and improves availability and use of those medical countermeasures during disasters and emergencies. Improving the capabilities also enhances the nation's ability to nimbly respond to unknown and unforeseen threats.

The PHEMCE was established by the Department of Health and Human Services in 2006 and codified by Congress in 2019 to advance the country's medical countermeasure preparedness against chemical, biological, radiological, nuclear threats, and emerging infectious diseases (EID).

The PHEMCE produces three primary outputs: the Strategy and Implementation Plan (SIP), the Medical Countermeasure Preparedness Review (MCMPR), and the Multiyear Budget (MYB). The SIP and MYB are publicly available. The MCMPR is available for Congress, but due to sensitivities around quantities of stockpiled products, is distributed at FOUO classification and thus not available.

The *Strategy and Implementation Plan* (SIP) is developed in collaboration with PHEMCE leadership and describes PHEMCE's functions, accomplishments, and four main goals with objectives and key milestones that will mark progress during the next two years of implementation. The goals and objectives aim to encapsulate PHEMCE's overarching purpose and collaborative presence to convene an interagency body focused on public health emergency preparedness.

The *Medical Countermeasure Preparedness Review (MCMPR)*, leverages partner agencies' technical expertise to inform an annual threat-based review of the Strategic National Stockpile (SNS) contents and other stockpiles. Technical experts evaluate existing Requirements, MCMs currently stockpiled or managed by the USG, and gaps in procurement and stockpiling for each high-priority threat. Based on this assessment, they formulate and propose changes and/or corrective actions to enhance the USG's preparedness posture.

A critical component of the MCMPR is to inform Congress when annual appropriations for procurement and stockpiling do not allow for replacement of all expiring product and procurement of new products to fulfill existing Requirements. Additionally, when funds are insufficient for the SNS to maintain current capabilities and absorb additional products, ASPR, in consultation with PHEMCE member agencies, must weigh considerable tradeoffs. Inability to replenish MCM stocks or add new and innovative products that are safer and more effective may ultimately translate to increasing levels of risk across the threat portfolios and reduce ASPR's ability to respond in the event of a public health emergency or disaster.

The *Multiyear Budget (MYB)* forecasts the funding required to conduct basic research, advanced R&D, regulatory review, procurement, stockpiling, and replenishment of the USG's civilian MCM products. The MYB is a professional judgement budget, meaning it is formulated irrespective of the competing priorities considered in the annual budget formulation process. This report is focused on HHS's MCM needs but may incorporate other Departments and Agencies in future iterations.

[1.]PHS Act (42 U.S.C. § 300-10a) - Public Health Emergency Medical Countermeasures Enterprise.

# Recent Accomplishments

## Public Health and Emergency Medical Countermeasures Enterprise Strategy and Implementation Plan 2024

Leveraging federal and non-federal partners, the PHEMCE made progress toward the three previously established goals in the 2022 SIP.  The accomplishments below, achieved throughout 2022 and 2023, informed vital decisions that strengthened the MCM enterprise:

1. **Identified needs to protect Americans against current and emerging threats.**

   2022 was a critical year for continuing to reconstitute the PHEMCE infrastructure and ensuring the PHEMCE meets the statutory requirements set forth by the PHS Act.  In 2022, the PHEMCE aligned on MCM goals and funding availability. The PHEMCE established critical processes, such as business rules and mechanisms for information sharing, integral to PHEMCE's ability to make recommendations.  Next, the PHEMCE reviewed all existing Requirements and made recommendations to retire, update, or validate existing models and the Requirements on which they are based.  In parallel, PHEMCE responded to emerging MCM-related issues in Ukraine as well as the mpox outbreak.

In 2023, the PHEMCE conducted threat horizon scans to assess emerging threats and associated risks to determine whether Requirements need to be updated. Importantly, because these activities drive many technical discussions across interagency partners, they included subject matter experts and decision-makers to ensure the enterprise is aligned on the PHEMCE's highest priorities.  While the threat landscape analysis did not significantly shift the portfolio, the PHEMCE members recognized the importance of emerging pandemic threats to national security.  Because these emerging pandemic threats pose risk to national security, the PHEMCE will take steps to recognize, assess, and prioritize them in addition to CBRN threats already in the PHEMCE mission.  The PHEMCE also reviewed and made recommendations for four updated Requirements, which incorporate lessons learned from the COVID-19 and mpox responses, update the scenarios that drive Requirements setting, and update capabilities based on recent learnings to ensure the USG is prepared for the next public health

emergency.

Additionally, the PHEMCE:

- Expanded its membership to include the newly established White House OPPR as a PHEMCE co-chair to provide policy perspectives and ensure alignment between PHEMCE efforts and overall USG strategies and priorities for pandemic preparedness and biodefense.

- Initiated portfolio assessments to identify gaps in MCM preparedness, including for EIDs. While PHEMCE agencies have already been investing in EIDs, in 2024 and beyond PHEMCE will build on these efforts to conduct detailed appraisals of needs to address these threats across the MCM space.

2. **Developed strategies to address identified gaps and assess opportunities for continuous improvement.**

In 2023, the PHEMCE took important steps to align and extend collaboration with SLTTs, the private sector, non-governmental organizations, the broader MCM community, and international partners. Outreach included engaging via public meetings, hosting webinars, and connecting with partners in topic-focused conversations. These efforts increased transparency into PHEMCE operations, collected lessons learned, and identified opportunities to improve collaboration. PHEMCE met with partners around the following topics:

- Increasing awareness around important emerging technologies, such as platform approaches and development pathways for threat agnostic products that should be on PHEMCE's horizon.

- Understanding challenges SLTT partners face in the wake of the COVID-19 pandemic response and opportunities to transform as we prepare for future emergencies.

- Sharing best practices with international partners on Requirements setting, prioritization, and stockpiling processes.

In parallel with these outreach efforts, the PHEMCE conducted thorough assessments of the MCM budget landscape and reviewed the contents of the SNS, incorporating feedback from industry, SLTT, and other partners.

3. **Provided recommendations to the HHS Secretary based on the best available evidence combined with situational awareness and field deployment realities.**

The first two goals of the *2022 PHEMCE SIP* highlighted how PHEMCE conducts day-to-day business, leveraging the best available evidence to coordinate, share information, and make recommendations that balance the evidence against real-world limitations. These recommendations are shared with the HHS Secretary through various venues, including:

- As part of the *PHEMCE MYB*, the PHEMCE outlined the near- and long-term priorities for MCM R&D, procurement, stockpiling, and replenishment. The MYB outlines funding priorities for HHS agencies to ensure the end-to-end MCM development cycle is efficient, innovative, and adaptive to emerging threats while accounting for budget limitations.

- As part of a comprehensive SNS portfolio review, PHEMCE led the threat-based review of the SNS contents, taking stock of the portfolio of products, identifying gaps, and making recommendations. Such recommendations, captured in the MCMPR, account for updating the threat landscape and Requirements as needed, capturing advances in R&D and advanced product development, and feedback from relevant stakeholders.

## 2024 PHEMCE GOALS

Public Health and Emergency Medical Countermeasures Enterprise Strategy and Implementation Plan 2024



**Goal 1**



**Goal 2**



**Goal 3**



**Goal 4**

| Define the right MCM capabilities | Develop & sustain priority MCMs | Optimize & strengthen collaborations | Strengthen last-mile MCM access efforts |

**GOAL 1: Ensure the U.S. government has defined the right MCM capabilities to respond to future public health emergencies and disasters.**

Up-to-date risk assessments of the current and evolving threat landscape are critical for preparedness and response planning, and decision-making. These assessments help identify the most critical CBRN, pandemic influenza, and other EID threats to national security and inform USG's MCM development and procurement. They also provide decision-makers with information needed to prioritize threats, support the capabilities needed to deploy and use MCMs effectively, and integrate available solutions into MCM preparedness and response.

ASPR collaborates with the U.S. Department of Homeland Security (DHS) to leverage risk assessments, as well as existing material threat determinations (MTDs), to establish Requirements that (a) assess capabilities, (b) identify gaps, (c) outline solutions, and (d) justify the timely allocation of resources. Such Requirements inform tradeoffs that balance existing resources and constraints and inform MCM procurement and sustainment decisions for both CBRN and emerging threats. To guide PHEMCE's evaluation and prioritization of MCMs, PHEMCE members will:

- **Objective 1.1** Conduct a comprehensive threat landscape review and update scenarios and modeling to inform Requirements.

  ○ **Key Milestones:**

    ▪ 1.1.1 Continue annual threat briefing for PHEMCE member agencies.

    ▪ 1.1.2 Conduct annual risk analysis that integrates updated intelligence and surveillance information on emerging and re-emerging threats.

    ▪ 1.1.3 Leverage interagency expertise to review and update scenarios and models used to inform Requirements development for 25 percent of the threats each year.

- **Objective 1.2** Update Requirements for MCM-related activities, including stockpiling, to reflect current and emerging threats and operational plans.

  ○ **Key Milestones:**

- 1.2.1 Leverage the current risk analysis to ensure that high priority threats are aligned with DHS's list of MTDs, such that as new threats emerge, new MTDs are added, as needed, and rescinded if certain threats wane. These determinations incorporate latest threat information and guide the MCM portfolio.

- 1.2.2 Use current scenarios and models to finalize requirements for developing and acquiring MCMs and the capabilities required to use and monitor them.

- 1.2.3 Ensure all populations, particularly vulnerable, at-risk, and historically underserved are considered in updated scenarios and models.

- 1.2.4 Integrate updated Requirements and MTDs into the *MCMPR* report.

- **Objective 1.3** Increase the visibility of current USG capabilities through the development of a comprehensive MCM database for federal partners (ensuring appropriate protections for information contained in the database), which outlines the status of products and technologies from the development pipeline through stockpiling.

  - **Key Milestones:**

    - 1.3.1 Ensure PHEMCE members have access to the latest information on products in the MCM pipeline, including how these address updated MTDs and Requirements.

    - 1.3.2 Establish and maintain a comprehensive database of available MCMs across all priority CBRN and emerging infectious disease threats. Database should capture the regulatory approval status for high-risk populations, including pregnant women and children.

**GOAL 2: Drive unified action toward developing and sustaining priority MCMs aligned with key USG strategies.**

PHEMCE member agencies do not have access to the funds needed to fully support and sustain a robust MCM pipeline and capabilities that ensures full preparedness — from early research to delivery, utilization, and safety monitoring — necessary to meet the established Requirements for a holistic MCM enterprise. At the same time, the PHEMCE is addressing an increasing number of threats, including emerging infectious diseases, some of which do not have established MTDs. This growing gap in projected need versus available funding identified by the PHEMCE MYB makes it challenging for PHEMCE agencies to ensure our nation is best prepared to respond to future public health emergencies or disasters. A well-harmonized set of priorities across interagency partners is critical to ensuring all key stakeholders work together and maximize available resources. Guided by

national strategies, including the N*ational Health Security Strategy and National Biodefense Strategy and Implementation Plan for Countering Biological Threats, Enhancing Pandemic Preparedness, and Achieving Global Health Security (NBS)*, the PHEMCE pursues unified priorities balanced against existing resources. For example, the *NBS's* implementation plan calls for seven Joint Capabilities Plans (JCPs), many of which are specific to MCMs and relevant to the PHEMCE's scope. Where possible, the PHEMCE's approach is to prioritize broadly acting or threat-agnostic countermeasures, aligning to the goals of the JCPs, to ensure MCMs can be adapted and readily scaled to address novel emerging threats. To this end, the PHEMCE members will:

- **Objective 2.1** Conduct routine USG MCM portfolio reviews to ensure coordinated action (and avoid duplication) across partners, departments, and agencies.
  - ○ **Key Milestones:**

- 2.1.1 Leverage the MCM database (see Objective 1.3) to conduct a comprehensive PHEMCE-wide portfolio review and identify critical gaps and inefficiencies.

- 2.1.2 Establish a regular review cadence to ensure the portfolio stays up-to-date and aligned with key priorities.

- 2.1.3 Promote information sharing with key international partners to improve the global preparedness posture.

- **Objective 2.2** Identify the most critical capability gaps and priorities across MCM development, including platform technologies and threat-agnostic approaches.

  ○ **Key Milestones:**

    - 2.2.1 Identify opportunities for collaboration among priority areas for research and development, from discovery through approval and sustainment.  Given limited funds, these priorities will be weighed against existing priorities to minimize risk.

    - 2.2.2 Identify opportunities for development activities to leverage flexible technologies that can adapt more easily to novel, unknown threats.

    - 2.2.3 Identify in advance regulatory mechanisms to support medical product use in identified populations at risk.

    - 2.3.4 Coordinate across interagency partners and maximize resources for the development and use of emerging technologies.

  - **Objective 2.3** Leverage USG plans to develop critical MCM capabilities.

○ **Key Milestones:**

- 2.3.1 Leverage development of Requirements, stakeholder engagements, lessons learned initiatives, table-top exercises, and/or other mechanisms or policy initiatives to update or refine USG plans and policies, including the JCPs.

- 2.3.2 Identify opportunities to coordinate planning exercises to ensure appropriateness of proposed plans and policies.

- 2.3.3 Identify innovative approaches to develop MCM capabilities.

- 2.3.4 Ensure PHEMCE partners share MCM-related strategic plans, playbooks, or other relevant guiding documents to support communication and cross-collaboration.

- 2.3.5 Incorporate development of new initiatives into PHEMCE's MYB to track

and forecast budget needs.

### GOAL 3: Optimize and strengthen collaborations with stakeholders.

An effective MCM enterprise is contingent on close coordination and collaboration among all partners.

As required in statute, PHEMCE member agencies routinely engage with non-federal partners.  With SLTT public health departments and officials, these occur via routine engagement from ASPR regional offices, formalized webinars, and targeted partnerships and from CDC emergency management, epidemiology, laboratory, clinical and state and local staff who engage with epidemiologic, laboratory, healthcare and regulatory partners.  With industry partners, PHEMCE engages via market research, new and existing partnerships, and targeted solicitations.  These mechanisms, among others, were actively utilized during recent response efforts and are continuously assessed for improvement opportunities. The PHEMCE will also continue to improve coordination and collaboration between federal and non-federal partners and:

- **Objective 3.1** Enhance collaboration between federal and non-federal (e.g., industry and nonprofit, SLTT, pharmacies, and healthcare systems) partners to improve engagement for effective MCM decision-making and use.

  ○ **Key Milestones:**

    ▪ 3.1.1 Finalize a PHEMCE stakeholder engagement strategy for engaging non-federal partners, leveraging existing available channels, and developing new mechanisms to fill gaps.

    ▪ 3.1.2 Ensure quarterly engagement with industry partners through

appropriate channels.

- 3.1.3 Ensure regular engagement among federal partners through appropriate channels.

- 3.1.4 Conduct targeted outreach on specific topics identified and prioritized by PHEMCE members and stakeholders.

- 3.1.5 Leverage existing cooperative agreements that can support partnership building and collaboration.

- **Objective 3.2** Identify and develop resources or tools to support collaboration with relevant partners.  Tools should improve how MCMs are developed, manufactured, sustained, distributed, used, or monitored for safety and effectiveness.

  ○ **Key Milestones:**

appropriate channels.

- 3.1.3 Ensure regular engagement among federal partners through appropriate channels.

- 3.1.4 Conduct targeted outreach on specific topics identified and prioritized by PHEMCE members and stakeholders.

- 3.1.5 Leverage existing cooperative agreements that can support partnership building and collaboration.

- **Objective 3.2** Identify and develop resources or tools to support collaboration with relevant partners.  Tools should improve how MCMs are developed, manufactured, sustained, distributed, used, or monitored for safety and effectiveness.

  ○ **Key Milestones:**

- 3.2.1 Identify existing tools used across interagency partners for MCM training, deployment, data collection (such as safety and real-world effectiveness monitoring), and guidance development.

- 3.2.2 Develop a new resource or tool for coordinated partner engagement.

- 3.2.3 Integrate external feedback into development of resources or tools.

**GOAL 4: Strengthen last-mile MCM access efforts to enable a more coordinated and equitable MCM response to a future public health emergency or disasters.**

MCM preparedness efforts are only successful if products are able to be used when they are needed by those who need them the most.  This requires a concerted effort among key federal and non-federal partners on MCM dispensing, distribution, and administration, including safety and effectiveness monitoring, paying particular attention to challenges faced by vulnerable individuals and underserved communities disproportionately impacted by public health emergencies and disasters.  Lessons learned from COVID-19 and mpox provide opportunities to improve last-mile MCM capabilities.  The PHEMCE will incorporate recent lessons into USG preparedness efforts to ensure a more coordinated and equitable MCM response during future public health emergencies or disasters.  To strengthen last-mile efforts, the PHEMCE members will:

- **Objective 4.1** Identify last-mile MCM dispensing, distribution, and administration lessons from COVID-19 and mpox, capitalizing on preserving capabilities built during responses and new capabilities that need to be established.

  ○ **Key Milestones:**

    ▪ 4.1.1 Review existing after-action and lessons-learned reports from recent response efforts as well as trainings and exercises.  Examples include but are not limited to COVID-19 and mpox.  Identify areas of improvement for MCM use that may be addressed by guidance development.

    ▪ 4.1.2 Leverage collaborative tools (Objective 3.2) to engage key federal and non-federal partners on MCM dispensing, distribution, and administration issues experienced during response efforts.

- **Objective 4.2** Ensure lessons are incorporated into appropriate HHS plans, including product development, acquisition, and stockpiling efforts.

  ○ **Key Milestones:**

    ▪ 4.2.1 Collaborate with interagency partners on developing response plans, as appropriate, to align last-mile roles and responsibilities and reduce duplication of efforts.  Where possible, plans should include triggers for release of products.

    ▪ 4.2.2 Develop data-driven tools to address last-mile dispensing and administration and safety monitoring efforts.

    ▪ 4.2.3 Share collected distribution lessons learned with stakeholders, as appropriate.

    ▪ 4.2.4 Where relevant, incorporate last-mile lessons learned into product research and development efforts.

- **Objective 4.3** Consider MCM needs across ALL populations — focusing on vulnerable, at-risk, and historically underserved communities — to improve equitable deployment and access to MCMs.

  ○ **Key Milestones:**

    ▪ 4.3.1 Review research and development portfolios as well as stockpiled MCMs to identify data gaps, including clinical studies, to address the needs of vulnerable individuals and underserved communities.

    ▪ 4.3.2 Integrate existing efforts analyzing vulnerable and medically fragile populations into planning and response efforts.

▪ 4.3.3 Coordinate updates to guidance documents incorporating new information, including lessons learned from recent response efforts.

▪ 4.3.4 Identify mechanisms to collect and inform product access and use across underserved communities.

# Conclusion

Public Health and Emergency Medical Countermeasures Enterprise Strategy and Implementation Plan 2024

Public health, healthcare, and MCM preparedness are essential components of national health security. Without a strong domestic MCM enterprise, the nation remains vulnerable to an expanding list of naturally occurring, accidental, and deliberate threats. The above goals and objectives require extensive coordination among federal, SLTT, and public- and private-sector partners. This strategy and implementation plan are intended to promote readiness in the MCM enterprise by aligning efforts across the USG, assessing preparedness and response capabilities, supporting innovation, enhancing strategic partnerships, and strengthening last-mile distribution efforts.

The PHEMCE will continue to modernize its efforts to establish and maintain an improved state of MCM preparedness, track the execution of these priorities, and provide periodic updates through the PHEMCE governance structure and future iterations of the PHEMCE SIP.

# Appendix: PHEMCE High-Priority Threats

Public Health and Emergency Medical Countermeasures Enterprise Strategy and Implementation Plan 2024

The U.S. continues to face a range of serious threats to its health security from naturally occurring, accidental, and deliberate use of CBRN agents, as well as naturally occurring EIDs, including pandemic influenza.

## PHEMCE High-Priority Threats

The PHEMCE will continue to address MCM needs to protect against high-priority threats. These may be determined by the Secretary of Homeland Security to pose a sufficient material threat to affect national security or determined by PHEMCE leadership to have the potential to threaten national health security. The PHEMCE high-priority threats are (in alphabetical order by threat area):

## Biological Threats

- Bacillus anthracis (anthrax)* and multidrug resistant B. anthracis (MDR anthrax)*
- Burkholderia mallei (glanders)* and Burkholderia pseudomallei (melioidosis)*
- Clostridium botulinum toxin (botulism)*
- Ebolavirus (Ebola hemorrhagic fever)*
- Emerging infectious diseases
- Francisella tularensis (tularemia)*
- Marburgvirus (Marburg hemorrhagic fever)*
- Pandemic influenza virus
- Rickettsia prowazekii (typhus)*
- Severe acute respiratory syndrome-related coronavirus (SARS-CoV) (including

SARS-CoV-1 and -2)*

- Variola virus (smallpox)*
- Yersinia pestis (plague)*

## Chemical Threats

- Acetylcholinesterase inhibitor nerve agents*
- Chlorine
- Cyanide salts (potassium and sodium cyanide)*
- Hydrogen cyanide*
- Pharmaceutical based agents (including opioids)*
- Phosgene
- Vesicants*

## Radiological and Nuclear* Threats

- Radiological and nuclear agents*

(*) Indicates an identified material threat under section 319F-2(c)(2)(A)(ii) of the Public Health Service Act.

"EXHIBIT J"



# Nuclear/Radiological Incident Annex to the Response and Recovery Federal Interagency Operational Plan

*May 2023*



This page intentionally left blank.

# HANDLING INSTRUCTIONS

Questions pertaining to the distribution, transmission, or destruction of this annex should be submitted to the Federal Emergency Management Agency, Office of Response and Recovery, Planning and Exercise Division, National Planning Branch at fema-response-ped@fema.dhs.gov.

# INTENDED AUDIENCE

The intended audience for this annex includes departments and agencies (D/As) of the federal government. Also included are state, local, tribal, and territorial (SLTT) stakeholders and other partners that are committed to response and recovery operations during nuclear/radiological incidents.

# USE OF THIS DOCUMENT

Those with equity and interest in the U.S. government response to a nuclear/radiological incident will find the mechanisms of coordination and communication by the federal government in this annex. Matters and methods of operations should refer to the operations plans housed within the appropriate D/As responsible for response.

# RESCISSION NOTICE

Publication of this annex to the *Response and Recovery Federal Interagency Operational Plan* hereby rescinds the following documents: *Federal Radiological Emergency Response Plan, 1996;*[1] *Improvised Nuclear Device Concept of Operations Plan (Version 10), 2009*; and *Nuclear/Radiological Incident Annex to the Response and Recovery Federal Interagency Operational Plan, 2016*.

---

[1] Previously rescinded upon development of the *National Response Plan* (2004) and later, the *National Response Framework* (2008) and should no longer be referenced by planners.

This page intentionally left blank.

# RECORD OF CHANGES

| Version | Date | Summary of Changes | Name |
|---------|------|--------------------|------|
|         |      |                    |      |
|         |      |                    |      |
|         |      |                    |      |
|         |      |                    |      |
|         |      |                    |      |
|         |      |                    |      |
|         |      |                    |      |
|         |      |                    |      |
|         |      |                    |      |
|         |      |                    |      |
|         |      |                    |      |
|         |      |                    |      |
|         |      |                    |      |
|         |      |                    |      |
|         |      |                    |      |
|         |      |                    |      |
|         |      |                    |      |
|         |      |                    |      |
|         |      |                    |      |
|         |      |                    |      |
|         |      |                    |      |
|         |      |                    |      |
|         |      |                    |      |
|         |      |                    |      |
|         |      |                    |      |
|         |      |                    |      |
|         |      |                    |      |
|         |      |                    |      |
|         |      |                    |      |
|         |      |                    |      |
|         |      |                    |      |
|         |      |                    |      |
|         |      |                    |      |
|         |      |                    |      |
|         |      |                    |      |

This page intentionally left blank.

# TABLE OF CONTENTS

Annex Overview ........................................................................................................................... 1

Situation ...................................................................................................................................... 2

    Purpose ................................................................................................................................... 4

    Scope ...................................................................................................................................... 5

    Facts, Planning Assumptions, and Critical Considerations ................................................... 5

        Facts ................................................................................................................................. 5

        Planning Assumptions ...................................................................................................... 7

        Critical Considerations ..................................................................................................... 8

Mission ...................................................................................................................................... 11

    Desired End State .................................................................................................................. 12

    Authorities .............................................................................................................................. 12

Execution .................................................................................................................................. 14

    Concept of Operations .......................................................................................................... 14

        Response/Recovery Coordination Constructs ................................................................. 15

        Lead Federal Agencies with Primary Authority .............................................................. 18

        Operational Phases ......................................................................................................... 21

        Protective Action Phases ................................................................................................ 23

    Roles, Responsibilities, and Capabilities .............................................................................. 24

        U.S. Department of Defense (DOD) ................................................................................ 24

        U.S. Department of Energy (DOE) .................................................................................. 25

        U.S. Department of Homeland Security (DHS) ............................................................... 27

        Federal Emergency Management Agency (FEMA) ......................................................... 28

        U.S. Customs and Border Protection (CBP) ................................................................... 29

        U.S. Coast Guard (USCG) ............................................................................................... 29

        U.S. Department of Justice (DOJ) ................................................................................... 30

        U.S. Department of State (DOS) ..................................................................................... 31

        U.S. Environmental Protection Agency (EPA) ................................................................. 31

        National Aeronautics and Space Administration (NASA) ................................................ 32

        Nuclear Regulatory Commission (NRC) .......................................................................... 32

        Federal Aviation Administration (FAA) ........................................................................... 33

        Additional Federal Capabilities ...................................................................................... 34

    Support and Coordination Elements ...................................................................................... 38

        Countering Weapons of Mass Destruction (CWMD) ...................................................... 39

        Federal Radiological Monitoring and Assessment Center (FRMAC) .............................. 39

        Interagency Radiological Aerial Monitoring Concept of Operations................................. 40

Interagency Modeling and Atmospheric Assessment Center (IMAAC) ........................................... 41

Advisory Team for Environment, Food, and Health (A-Team)....................................................... 41

Nuclear/Radiological Incident Task Force (NRITF) ..................................................................... 42

Unified Coordination Group (UCG) ....................................................................................... 43

Radiological Operations Branch (Rad Branch)........................................................................... 43

Domestic Emergency Support Team (DEST) ............................................................................. 44

Weapons of Mass Destruction Strategic Group (WMDSG)............................................................ 44

Radiological Operations Support Specialist (ROSS) ................................................................... 45

Planning and Preparedness Support Elements .......................................................................... 45

Critical Information Requirements............................................................................................. 46

Radiation Identification ...................................................................................................... 46

Incident Characterization ................................................................................................... 46

Protective Actions ............................................................................................................ 47

Radiation Exposure .......................................................................................................... 47

Resource Availability ........................................................................................................ 47

Evacuation and Sheltering .................................................................................................. 47

Temporary Housing and Relocation........................................................................................ 47

Health Effects ................................................................................................................. 47

Reentry/Reoccupation ....................................................................................................... 48

Infrastructure Impacts ....................................................................................................... 48

Responsible Party Liability.................................................................................................. 48

SLTT Plans/Agreements..................................................................................................... 48

Mass Fatality Management .................................................................................................. 48

**Administration, Resources, and Funding** .................................................................................. **49**

Administration .................................................................................................................... 49

Resources.......................................................................................................................... 49

Funding ............................................................................................................................ 49

Stafford Act..................................................................................................................... 49

Federal to Federal Support – Non-Stafford Act........................................................................ 50

The Economy Act of 1932 .................................................................................................. 50

Defense Production Act (DPA) ............................................................................................. 50

**Oversight, Coordination, and Communications**............................................................................ **51**

Oversight........................................................................................................................... 51

Coordination ...................................................................................................................... 52

Radiological Data Sharing .................................................................................................. 52

Coordination with Infrastructure Owner/Operators .................................................................... 53

Non-Governmental Organizations (NGOs) ............................................................................... 54

Communications ............................................................................................... 54

**Appendix A: Federal Response Coordination Constructs** .......................................... **A-1**

    Initial Actions ................................................................................................. A-1

        Discovery and Notification ............................................................................. A-1

        Federal OSC Assessment and Determination of Response Coordination Constructs ................. A-1

    Response Coordination Constructs ................................................................... A-2

        No Federal Response Required ....................................................................... A-2

        Unified Command Response ........................................................................... A-2

        Unified Command Response with ESFs ............................................................ A-3

        Stafford Act Response ................................................................................... A-4

    Coordination with Federal Law Enforcement ...................................................... A-6

    Recommendations and Decision Making ............................................................ A-7

**Appendix B: Community Lifelines** ............................................................................ **B-1**

    Lifeline Stabilization and Condition Determination ............................................... B-1

        Lifeline Stabilization .................................................................................... B-1

        Determining Lifeline Status ........................................................................... B-2

    Hazardous Materials Lifeline and Nuclear/Radiological Incidents ........................... B-2

    Nuclear/Radiological Recovery Outcomes ........................................................ B-3

**Appendix C: Law Enforcement Coordination for Intentional Nuclear/Radiological Incidents** ........... **C-1**

    Background ................................................................................................... C-1

        Nuclear Detonation ...................................................................................... C-2

        Radiological Dispersal Device (RDD) ............................................................. C-2

        Radiological Exposure Device (RED) ............................................................. C-3

    Unique Characteristics of an Intentional Nuclear/Radiological Incident .................... C-3

    Law Enforcement Operational Coordination ...................................................... C-4

        Information Collection and Sharing ................................................................ C-4

        Interagency Coordination ............................................................................. C-7

        Operational Phases ..................................................................................... C-9

**Appendix D: International Nuclear/Radiological Incidents** ........................................... **D-1**

    Background ................................................................................................... D-1

        International Incidents That Directly Impact or Threaten to Impact the United States ........... D-1

        U.S. Government Assistance to Foreign Governments ......................................... D-2

    Unique Characteristics of an International Nuclear/Radiological Incident ................... D-2

    Federal Agency Roles and Responsibilities ...................................................... D-4

        National Security Council (NSC) ................................................................... D-4

        U.S. Department of State (DOS) ................................................................... D-4

        U.S. Chief of Mission ................................................................................... D-5

U.S. Agency for International Development (USAID) Office of U.S. Foreign Disaster Assistance (OFDA) ........................................................................................................................ D-5

U.S. Department of Defense (DOD) ........................................................................... D-6

National Nuclear Security Administration (NNSA) ..................................................... D-6

Nuclear Regulatory Commission (NRC) ..................................................................... D-6

U.S. Department of Health and Human Services (HHS) .............................................. D-7

U.S. Department of Homeland Security (DHS) ........................................................... D-8

U.S. Environmental Protection Agency (EPA) ............................................................ D-8

U.S. Department of Agriculture (USDA) ..................................................................... D-9

National Oceanic and Atmospheric Administration (NOAA) ...................................... D-9

U.S. Department of Justice (DOJ) Federal Bureau of Investigation (FBI)..................... D-9

Operational Coordination .............................................................................................. D-9

International Nuclear and Radiological Event Scale ..................................................... D-10

**Appendix E: Incidents Involving Commercial Nuclear Facilities** .......................................... E-1

Nuclear Regulatory Commission (NRC) Incident Response ............................................ E-1

NRC Response Teams .................................................................................................. E-1

Liaison Team ............................................................................................................... E-1

Public Information Team ............................................................................................. E-2

Reactor Safety or Fuel Cycle Group ........................................................................... E-2

Protective Measures Group .......................................................................................... E-2

Security Group ............................................................................................................ E-2

Senior Agency Representatives .................................................................................... E-2

Emergency Classifications .............................................................................................. E-2

Emergency Classifications for Nuclear Power Plants and Research and Test Reactors.......... E-2

Emergency Classifications for Nuclear Materials and Fuel Cycle Facility Licensees.......... E-3

Zoned Approach for Fixed Nuclear Facilities ................................................................. E-3

Emergency Planning Zones .......................................................................................... E-4

Evacuation Zones ........................................................................................................ E-5

**Appendix F: Nuclear Detonations and Radiation Dispersal** ................................................ F-1

Zoned Approach .............................................................................................................. F-2

Radiation Zones .......................................................................................................... F-3

Blast Damage Zones .................................................................................................... F-4

**Appendix G: Data & Models** .................................................................................................. G-1

Emergency Support Function Leadership Group (ESFLG) Modeling and Data Inventory ...... G-1

Interagency Modeling and Atmospheric Assessment Center (IMAAC) ........................... G-1

Federal Radiological Monitoring and Assessment Center (FRMAC) ............................... G-2

Radiological Monitoring and Assessment System ....................................................... G-2

TurboFRMAC .................................................................................................. G-2

National Atmospheric Release Advisory Center (NARAC) Modeling System ................... G-2

CBRNResponder ............................................................................................... G-3

CRC SimPLER ................................................................................................... G-3

Radiation Emergency Medical Management (REMM) .............................................. G-3

Data and Modeling Assets for Decontamination and Cleanup ................................... G-3

Incident Waste Decision Support Tool (I-WASTE DST) ........................................ G-4

RDD Waste Estimation Support Tool (RDD WEST) ............................................. G-4

Preliminary Remediation Goals Calculator ....................................................... G-4

Residual Radioactivity Family of Codes ........................................................... G-5

Data and Modeling Assets for Electromagnetic Effects .......................................... G-5

Electromagnetic Pulse Response Model ........................................................... G-5

**Appendix H: Additional Assets** ............................................................................ **H-1**

**Appendix V: Authorities** .................................................................................... **V-1**

Atomic Energy Act of 1954 (as amended) .............................................................. V-1

Price-Anderson Nuclear Industries Indemnity Act .................................................... V-2

Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) ...... V-3

The National Oil and Hazardous Substances Pollution Contingency Plan ...................... V-3

Clean Water Act ................................................................................................. V-4

Safe Drinking Water Act ...................................................................................... V-4

The Defense Against Weapons of Mass Destruction Act ........................................... V-5

Resource Conservation and Recovery Act (RCRA) ................................................... V-5

Project BioShield Act ........................................................................................... V-5

Pandemic and All-Hazards Preparedness Act .......................................................... V-5

Pandemic and All-Hazards Preparedness Reauthorization Act .................................... V-6

Pandemic and All-Hazards Preparedness and Advancing Innovation Act ...................... V-6

Public Readiness and Emergency Preparedness Act (PREP Act) .................................. V-6

Public Health Service Act ..................................................................................... V-7

Social Security Act, Section 1135 .......................................................................... V-8

Federal Food, Drug, and Cosmetic Act ................................................................... V-8

The Office of Federal Procurement Policy Act .......................................................... V-8

Foreign Assistance Act of 1961 ............................................................................. V-8

Defense Production Act ........................................................................................ V-9

Hazardous Materials Transportation Act ................................................................. V-9

The Occupational Safety and Health Act of 1970 ..................................................... V-9

10 CFR § 20 – Standards for Protection Against Radiation ......................................... V-10

10 CFR § 61.55 – Waste Classification .................................................................... V-10

Reorganization Plan No. 3 of 1970 ................................................................................. V-10

44 CFR § 350 – Review and Approval of State and Local Radiological Emergency Plans and Preparedness .................................................................................................................. V-10

44 CFR § 351 – Radiological Emergency Planning and Preparedness ........................... V-11

28 CFR § 0.85 – Federal Bureau of Investigation General Functions .......................... V-11

Title 50, USC, War and National Defense......................................................................... V-11

Title 18, USC, Crimes and Criminal Procedure................................................................ V-11

Title 28, USC Judiciary and Judicial Procedure .............................................................. V-12

Convention on Supplementary Compensation for Nuclear Damage ............................... V-12

Convention on Early Notification of a Nuclear Accident and Convention on Assistance in the Case of a Nuclear Accident or Radiological Emergency .......................................... V-12

Executive Order 12656 of November 18, 1988 (as amended)...................................... V-13

**Appendix Y: Acronyms and Abbreviations** .........................................................................Y-1

# LIST OF FIGURES

Figure 1: Purpose of the NRIA .................................................................................................... 5

Figure 2: Federal Coordination Constructs for Nuclear/Radiological Incident Response ................... 17

Figure 3: FEMA Operational Phases ......................................................................................... 21

Figure 4: Protective Action Phases Aligned to Operational Phases ............................................... 23

Figure 5: Potential Exposure Pathways and Effective Protective Actions by Operational
Phase ................................................................................................................................. 24


Figure A-1: No Federal Response Required Coordination Construct .............................................. A-2

Figure A-2: Unified Command Response Coordination Construct .................................................. A-3

Figure A-3: Unified Command Response with ESFs Coordination Construct .................................. A-4

Figure A-4: Stafford Act Response Coordination Construct ......................................................... A-5

Figure A-5: Federal Law Enforcement Components Involved in Nuclear/Radiological
Incident Response ............................................................................................................... A-6


Figure B-1: Community Lifelines ............................................................................................... B-1

Figure B-2: Components of the Hazardous Materials Lifeline ...................................................... B-3


Figure C-1: Example of a Joint Operations Center Configuration ................................................ C-7


Figure E-1: Zoned Approach to Fixed Nuclear Facility .............................................................. E-4

This page intentionally left blank.

# LIST OF TABLES

Table 1: Lead Federal Agency with Primary Authority for Federal Response........................................ 19

Table B-1: Hazardous Materials Lifeline Examples ........................................................................ B-2

Table B-2: Lifeline Operational Status Reporting.......................................................................... B-2

Table B-3: Examples of Recovery Outcomes by RSF ...................................................................... B-3

Table D-1: Event Level Descriptions for the International Nuclear and Radiological Event
        Scale................................................................................................................................ D-11

This page intentionally left blank.

# ANNEX OVERVIEW

This version of the *Nuclear/Radiological Incident Annex* (NRIA) *to the Response and Recovery Federal Interagency Operational Plan* (FIOP) supersedes the previous NRIA (2016).[2] The Response and Recovery FIOP provides a coordination and communication framework for coordinated interagency federal government activities in response to and recovery from all hazards. The NRIA complements the FIOP by utilizing the same base concept of operations but also provides federal guidance specific to the unique considerations of nuclear/radiological incidents.

The NRIA focuses on the Response Mission area, which includes activities that protect public health and safety, property, critical infrastructure, and the environment; restore government services; and provide emergency relief to governments, businesses, and individuals affected by the consequences of an incident. For nuclear/radiological incident responses, these activities include securing the incident site, assessing the dispersal of radioactive material, enhancing first responder capabilities, and providing medical triage capabilities, including for radiological exposure-induced injuries, and establishing contamination control measures, including ensuring availability of decontamination and site remediation resources. Recovery Mission activities for nuclear/radiological incidents can include long-term housing assistance and/or permanent resettlement, long-term health monitoring programs for the affected population, and long-term environmental consequence management. The time frame for response and recovery activities described in this annex will vary according to the specific incident dependent on how long it takes to reach the desired end states for each activity. Some recovery activities may continue long-term.

The NRIA also describes Prevention Mission activities, which include site security and scene preservation, law enforcement investigation activities, and attribution for suspected or actual intentional incidents.[3] Emergency management planners should recognize that some mission area activities can happen concurrently and may have overlapping resource needs and therefore require increased coordination, though life-saving activities remain paramount. The policy of the United States is that any possible terrorist incident will be treated as an actual terrorist incident until otherwise determined by the Attorney General, acting through the Director of the Federal Bureau of Investigation (FBI).[4] This presumption requires federal response to nuclear/radiological incidents to be well coordinated across the U.S. government and integrated with federal law enforcement and/or counterterrorism activities.[5]

Although the NRIA describes how responding federal departments and agencies (D/As) will communicate and coordinate their activities, this annex does not alter or impede the ability

---

[2] Response and Recovery Federal Interagency Operational Plan (FIOP) (2023).
[3] The Prevention Mission area scope includes imminent threats, incidents, and stopping follow-on attacks.
[4] Planners should anticipate the execution of counterterrorism activities during a response to any potential terrorist-related nuclear/radiological incident that will involve additional roles and responsibilities of federal and SLTT D/As.
[5] For the purposes of this annex, the term "law enforcement" will encompass criminal investigative activities and counterterrorism activities.

of state, local, tribal, and territorial (SLTT) governments or federal departments and D/As[6] to execute their responsibilities under applicable laws, executive orders, and directives.

# SITUATION

Most nuclear/radiological incidents are due to loss, theft, or mismanagement of relatively low-level radioactive sources. Nuclear and radiological facilities include fixed facilities that store nuclear material; those that store or use radioactive material; industries such as radiation source and radiopharmaceutical manufacturers; educational research institutions; and other facilities involved in the production, refinement, handling, storage, transportation, or use of nuclear/radioactive materials. Further, natural hazards, such as fires and earthquakes, may impact nuclear or radiological facilities, resulting in an incident.

The following are examples of accidental nuclear/radiological incidents:

- Natural hazard causing an accident at a nuclear facility[7]
- Accidentally lost, found, or orphaned radioactive material sources
- U.S. nuclear facilities accidents
- Accidental breaches of research and test reactors
- Transportation accidents involving radioactive materials
- Domestic nuclear weapons accidents
- Launch or reentry accidents involving spacecraft containing nuclear systems[8]

In addition, intentional nuclear/radiological incidents can occur, such as terrorist attempts by hostile actors or other criminal acts. Threats involving devices[9] can be categorized as either nuclear devices[10] or dispersal devices[11] containing radiological or nuclear materials.[12]

---

[6] For this annex, "federal agency" includes any federal executive branch department or agency including boards, commissions, government corporations, and any independent agencies of the U.S. government that have authority for, or provide support to, the response to and recovery from a nuclear/radiological incident.

[7] This includes nuclear power plants, national laboratories, research facilities, spent fuel sites, nuclear fuel cycle facilities (production and decommissioning), and naval reactors.

[8] Space nuclear systems include radioisotope power systems, such as radioisotope thermoelectric generators and radioisotope heater units, and fission reactors used for power and propulsion.

[9] All potential terrorist threats or incidents, including weapons of mass destruction threats or incidents, are presumed to be an act of terrorism unless otherwise determined by the Attorney General, acting through the FBI Director.

[10] A nuclear device is a device incorporating fissile materials that has, appears to have, or is claimed to have the capability to produce harmful effects via nuclear fission. This includes any U.S. nuclear weapon that is no longer in the control of a competent authority or custodian or is suspected to be modified from its designated firing sequence. This includes improvised nuclear devices (INDs).

[11] A dispersal device is a device containing chemical, biological, or radiological materials and the essential electrical or mechanical components to enable the material to be disseminated explosively, mechanically, or by means of pressure or exposure. The device may be of a crude, nonstandard design, intended to cause destructive, lethal, or noxious effects. This includes radiological dispersal devices (RDDs) and radiological exposure devices (REDs).

[12] National Security Presidential Memorandum (NSPM) 36 Guidelines for U.S. Government Interagency Response to Terrorist Threats and Incidents in the United States and Overseas (classified) (2021).

- A nuclear detonation can result in mass casualties, radioactive contamination,[13] and destruction of property. Even a relatively small nuclear detonation in an urban area could result in tens of thousands of fatalities and many survivors requiring medical care, behavioral health care, and dose assessments. This detonation could also result in massive infrastructure damage and hundreds of square miles of long-term contamination.
- An RDD is any device that disperses radioactive material or emits radiation by conventional explosive or other mechanical means, such as a spray, at a harmful level without a nuclear detonation occurring. While these devices can cause significant damage as a result of explosion, the radiological harm caused by a dispersal device is principally contamination and denied use of the contaminated area, perhaps for many years. High radiation exposures are unlikely, but costs associated with remediation and loss of access due to an effective dispersal device could be significant.
- An RED is a terrorist device intended to expose people to significant doses of ionizing radiation without their knowledge. Constructed from partially or fully unshielded radioactive material, an RED could be hidden from sight in a public place, exposing those who sit or pass close by.

Nuclear/radiological incidents that occur internationally, which may be accidental or intentional, can also threaten or impact the United States.

Some nuclear/radiological incidents can develop into multi-jurisdictional, interagency, catastrophic disasters with serious environmental and public health consequences. Such serious incidents require well-coordinated responses among SLTT governments; private-sector entities; non-governmental organizations (NGOs); and the federal government.

For most nuclear/radiological incidents, SLTT emergency responders initiate response activities because they are first on-scene. In addition, a Federal On-Scene Coordinator (Federal OSC) may be dispatched to the scene to coordinate with SLTT responders and to determine whether the incident can be managed with existing resources or whether additional federal resources are required. If the Federal OSC determines a need for increased federal support, the level of federal assistance will vary based on the magnitude of the incident, potential or actual impacts to public health or the environment, and other factors. A nuclear/radiological incident that triggers the need for federal assistance may have varying characteristics, including some or all of the following:

- SLTT capabilities are overwhelmed, and additional resources are requested.
- The incident covers multiple states or Federal Emergency Management Agency (FEMA) regions or is international in scope.
- A significant portion of the population in the affected area needs prolonged mass care and emergency assistance.

---

[13] Contamination (radioactive) is when unwanted radioactive material is deposited on the surfaces of structures, areas, objects, or people, where it may be external or internal.

- Impacts to critical infrastructure result in significant loss of critical lifeline services (such as energy, water, communication, and transportation), which poses risks to personal safety, national security, economic viability, and physical and behavioral health, including continuity of care. (See Appendix B: Community Lifelines for further discussion of lifelines.)
- The federal government has substantial authority and responsibility during nuclear and radiological incident response under laws described in Appendix V: Authorities, which are applied in coordination with SLTT governments.

## Purpose

The NRIA provides incident-specific supplemental information to the Response and Recovery FIOP. Federal interagency partners respond in support to SLTT governments to save lives, to protect safety and health, property, critical infrastructure, and the environment and to meet basic human needs when a nuclear/radiological incident occurs. This annex provides the following information (which is also depicted in Figure 1):

- Describes the process and organizational constructs that federal D/As will use to support SLTT governments in responding to nuclear/radiological incidents.
- Identifies how federal interagency partners will respond, coordinate national response to nuclear/radiological incidents, and provide recovery support under federal authorities.
- Provides information specific and unique to federal nuclear/radiological incident response and recovery processes, assets, resources, and teams.
- Details the mechanisms and structures for information sharing and operational coordination with the Prevention Mission's response to suspected or actual intentional incidents.



**Figure 1: Purpose of the NRIA**

## Scope

This annex applies to federal responses to nuclear/radiological incidents, regardless of size, complexity, or cause. It also applies to federal support for recovery from such incidents. This annex does not address acts of nuclear war. The NRIA does not alter or impede the ability of any SLTT government or federal agency to execute authorities or meet responsibilities under applicable laws and executive orders, including Presidential policy directives and memoranda. Federal D/As may take independent emergency actions pursuant to their own statutory authorities and actions described in national policy.

This annex applies to federal D/As responding to or supporting recovery from nuclear/radiological incidents under a wide range of legal authorities, including those listed in Appendix V: Authorities. This annex is intended to be consistent with U.S. laws, policies, and other related requirements.

## Facts, Planning Assumptions, and Critical Considerations

The following information represents facts, planning assumptions, and critical considerations used to develop the planning environment for the Nuclear/Radiological Incident Annex.

### Facts

Facts are known data concerning the situation that can be substantiated.

- A nuclear/radiological incident presents unique challenges and complications for traditional emergency management and all-hazards response functions.

- A nuclear or radiological incident can occur at any time with little or no warning, can involve single or multiple geographic areas, and can result in mass casualties, property damages, and environmental impacts.
- A significant nuclear/radiological incident exceeds the response capabilities of SLTT governments and the private sector, requiring federal assistance.
- Clear, consistent, unified, timely, and actionable public messaging and information is critical to limiting radiation exposure and saving lives due to the public's limited experience with nuclear/radiological incidents.
- The following three primary methods limit exposure to radiation, and officials will need to weigh which method to prioritize to achieve the best radiation dose reduction:

  o Time: Minimize time spent near a radioactive source. The less time exposed to the source of radiation, the lower the dose received.
  o Distance: Maximize the distance from a radioactive source. The farther one is from the source of radiation, the lower the dose received.
  o Shielding: Shielding means having something that will absorb radiation (such as concrete, steel, etc.) between an individual and the source of the radiation. Keep as much protection between oneself and the source as possible.

- SLTTT governments have primary responsibility for decision making and implementation of protective actions. Protective actions for nuclear/radiological incidents include evacuation, sheltering in place, self-decontamination, administration of radioprotectants,[14] food and water restrictions, and potential long-term relocation and remediation.[15]
- Personnel are required to follow federally mandated protective protocols, limit time near radioactive material, and monitor changing conditions. Federal D/As are responsible for ensuring the safety and health of their own response and recovery workers (including contract workers).[16] D/As must comply with applicable requirements for protecting worker safety and health, including applicable dose limits for workers.[17] Occupational radiation workers responding to an emergency should

---

[14] A radioprotectant is any drug or biologic that protects or aids in protecting against cell damage caused by radiation.
[15] Protective Action Guides (PAGs) are radiation dose guidelines that would trigger public safety measures, such as evacuation or staying inside, to safeguard public health during a radiation emergency. See the current PAGs in the EPA's *Protective Action Guidance Manual*, EPA-400/R-17-001 (2017).
[16] The federal law enforcement agencies within the Prevention Mission area are responsible for the health and safety of their personnel entering these areas. However, law enforcement personnel must refrain from undertaking missions in areas where radioactivity may be present until radiation levels can be accurately determined and readily monitored. While law enforcement response should be unimpeded, as their activities may prevent follow-on attacks and save additional lives, all responders, including law enforcement personnel, must be fully informed of the risks of exposure they may experience and must be trained and equipped, to the extent possible, on actions to be taken.
[17] See National Council on Radiation Protection and Measurements (NCRP) Guidance for Emergency Response Dosimetry, Report No. 179 (2017), its accompanying Commentary 28, and NCRP Management of Exposure to Ionizing Radiation: Radiation Protection Guidance for the United States, Report No. 180 (2018) for additional information.

follow the emergency guidelines established at their site for the incident, not those of their usual occupational setting.

## Planning Assumptions

In the absence of known facts, planning assumptions represent information presumed to be true, as necessary to facilitate planning. During response and recovery operations, assumptions may be validated as or replaced by facts.

- During a federal, interagency response to a nuclear/radiological incident, multiple authorities will be used concurrently as each agency fulfills its mission area responsibilities.
- As a nuclear/radiological incident increases in complexity and scale, the multi-layered response will require an organization structure to coordinate response activities across federal interagency partners.
- For a complex nuclear/radiological incident response, specialized equipment, technical expertise, and other required resources will be limited. Specifically, for intentional incidents, competition for scarce resources will increase due to concerns about subsequent attacks.
- Public fear of radiation will result in many concerned citizens seeking unnecessary medical assistance, which could further exacerbate strains to medical resources and reduce the capacity to assist the more critically affected patients.[18] In addition to straining medical resources, public fear of radiation will also result in unnecessary self-evacuation from uncontaminated areas adjacent to the incident, which could cause transit congestion and constrain federal D/As from responding efficiently.
- Behavioral health impacts will be significant in survivors and responders. Significant behavioral health impacts (e.g., depression, anxiety, anger, post-traumatic stress disorder) will overwhelm existing behavioral health counseling professionals and facilities.
- Preparedness, public education, awareness of nuclear/radiological risks, and understanding of protective actions are limited.
- Employers, including federal D/As must still comply with applicable requirements for protecting worker safety and health, including Occupational Safety and Health Administration (OSHA) and Nuclear Regulatory Commission (NRC) dose limits for workers
- Fatality management resources will be strained by nuclear/radiological incidents that cause mass fatalities. Systems for managing human remains will be overwhelmed because of unusually great numbers of fatalities and specific decontamination requirements.

---

[18] See the NRC's Nonradiological Health Consequences from Evacuation and Relocation, NUREG/CR-7285 (2021) for additional information

## Critical Considerations

Critical considerations are elements of information that must be taken into account when developing a plan. The following critical considerations are supplemental to those outlined in the Response and Recovery FIOP:

- In a nuclear/radiological incident that requires federal interagency support to SLTT jurisdictions, the President will likely declare a Major Disaster or Emergency under the Robert T. Stafford Disaster Relief and Emergency Assistance Act (Stafford Act).

- For nuclear/radiological incidents that occur on federal lands not owned or operated by the Department of Defense or the Department of Energy, federal D/As designated as federal land or facilities managers will be the first responder on-scene and will conduct initial response and notification of a nuclear or radiological incident.

- Following a nuclear/radiological incident, communication with the public is critical for life-saving activities. Due to the ongoing nature of the incident, the government must continually provide accurate and reliable information to the public to facilitate appropriate protective actions and mitigate physical and behavioral health effects.

  - While social media can be beneficial when used as a public information outreach tool, information control on these platforms is difficult. Rumors and misinformation on these platforms following an incident can create confusion.
  - Despite consistent and accurate messaging to inform the public about specific protective actions, part of the population may choose to disregard this information for a variety of reasons, taking unnecessary health and safety risks.

- A nuclear/radiological incident will likely overwhelm the local medical community and result in a high demand for medical care. Local medical facilities can be unavailable if affected by the incident. Provision of emergency care, patient transport to definitive care, contamination control, availability of trained medical personnel, and medical logistics are expected to be negatively impacted.

  - Early access to medical care will increase the likelihood of survival and quality of life, but this can be difficult due to excessive debris and/or if survivors are located within dangerous radiation zones.
  - People exposed to high levels of radiation during nuclear/radiological incidents will require long-term medical monitoring and care.

- After a nuclear/radiological incident, disruptions to the water supply can occur, making firefighting and decontamination difficult.

- A radiological incident may not be recognized until responders detect radioactive material, a breach or theft is reported, or the health effects of radiation exposure are manifested in the population and identified by the public health community.

- Residual radioactivity in the environment (e.g., waterways, livestock, forests, agricultural land, and wildlife) may affect the food supply and drinking water.

- Meteorological conditions and weather forecasts throughout the incident will likely play a significant role in decision making, including evacuation routes, locations for staging areas and shelters, and establishing incident response zones. Weather will affect contamination, with precipitation and wind potentially creating "hot spots" some distance away from the initial impact areas.

- The radioactive plume[19] from airborne releases can reach areas distant from the point of release and can rapidly change in intensity and area coverage (based on weather conditions and radioactive decay). Response to a large incident will depend on the extent of radiological dispersion and can require that certain operations are conducted in contaminated areas over multi-jurisdictional and multi-state regions.

- By policy, any possible terrorist incident, including those relating to a nuclear/radiological incident, will be treated as an actual terrorist incident until otherwise determined by the Attorney General, acting through the FBI Director. In these instances, the Attorney General acting through the FBI Director has lead responsibility for the federal operational law enforcement response to and criminal investigations of terrorist threats and/or incidents in the United States and its territories.

- If a nuclear/radiological incident is caused by or suspected of having been caused by terrorism or other criminal activity, coordination with the law enforcement and/or counterterrorism communities must also be included.

- The location of a suspected or actual intentional incident will be treated as a federal crime scene. The preservation and collection of evidence is critical to determine the identity of culpable parties or information regarding potential additional planned attacks.

- Some critical response personnel will be personally affected by the incident and unable to execute their job responsibilities.

- Contamination control measures will place additional constraints on responder and mass care resources. Clear public messaging will be critical for survivors to perform self-decontamination activities effectively. Mass decontamination activities will require specialized resources and equipment. Resources and technical expertise will be limited and competition among various governmental entities and the private sector should be anticipated.[20]

- A nuclear/radiological incident can result in long-term displacement of affected individuals from their normal residences and/or places of business.

---

[19] A plume is the material spreading from a particular source and traveling through environmental media such as air or ground water. A plume could describe the dispersal of particles, gases, vapors, and aerosols in the atmosphere or the movement of contamination through an aquifer (for example, dilution, mixing, or absorption onto soil).

[20] See the CDC's Population Monitoring in Radiation Emergencies: A Guide for State and Local Public Health Planners (2014) for more information about decontamination activities.

- If a nuclear/radiological incident affects both the environment and population, close coordination between the emergency management and environmental protection communities will be required throughout the incident.
- A nuclear/radiological incident can require concurrent implementation of the *National Contingency Plan, the Biological Incident Annex to the Response and Recovery FIOP* and *Oil and Chemical Incident Annex to the Response and Recovery FIOP* to address oil, chemical, or biological as well as radiological releases into the environment.
- The disposition of human remains is complicated by both internal and external radiological contamination. Special considerations for personnel handling and processing remains, waste, and final disposition is required.[21] Law enforcement investigations also necessitate that human remains be recovered and preserved as evidence.
- The incident type will affect radioactive and hazardous waste processing and disposal. Management of large quantities of radioactive and hazardous waste is challenging and will further drain limited critical resources.
- Depending on the scale of the nuclear/radiological effects, communities can remain uninhabitable for years. Displaced residents could require alternative long-term housing and permanent relocation plans.
- Following a major incident, short- and long-term domestic and international contamination migration issues can occur due to unmonitored and uncontrolled movement of people, household pets and service animals, and transportation conveyances outward from the affected area, which can cause cascading challenges across multiple jurisdictions.
- Radiation contamination can require long-term or permanent closure of buildings or public spaces. Environmental decontamination and remediation can take an extended period, closing affected areas to individuals and businesses, which could cause long-term economic and supply chain impacts.
- Following a nuclear/radiological incident, commercial communications and public safety communications infrastructure in the impacted area can be affected for long periods of time or permanently. Infrastructure that survives the initial event but remains exposed to the effects of ionizing radiation can degrade, impacting the performance and survivability of electronic devices in radiation environments. Responders dependent on commercial communications may experience deteriorating capabilities. Equipment brought into areas with increased radiation may be required to be left in those areas due to contamination and can also degrade with continued exposure. Communications plans should incorporate the risk of electronic component failures, as well as a means of incorporating surge and/or mobile

---

[21] See the CDC's Guidelines for Handling Decedents Contaminated with Radioactive Materials (2021) for additional information.

communications recovery capabilities that will likely be rendered unusable through repeated use.

- Due to OSHA standards, response teams should not enter affected areas until radiation levels in these areas can be accurately determined and readily monitored, and personnel must receive pre-entry briefings (in addition to any other required radiation safety training) before entering such areas, when feasible.[22] This requirement can delay response activities and require additional staffing. The principle "as low as reasonably achievable" applies to all federal and SLTT responders, requiring every reasonable effort to maintain exposures to ionizing radiation as far below the dose limits as practical.[23] However, the Protective Action Guide (PAG) developed by the Environmental Protection Agency (EPA) provides higher dose level guidance for responders to allow for life saving activities and protection of critical infrastructure under certain circumstances.[24]

- Embargos or stop movement orders can be placed on interstate or exported products and/or goods from the affected areas due to contamination concerns.

  - Neighboring states and countries can close transit hubs and crossings, restricting the flow of resources, waste, response/recovery personnel, and evacuees.

- A nuclear/radiological incident can warrant federal continuity of operations actions.

# MISSION

The mission of the federal government following a nuclear/radiological incident is to save lives, protect health and safety, reduce human suffering, protect property and the environment, restore critical infrastructure capacity,[25] re-establish an economic and social base, and support community activities to successfully overcome the physical, psychological, and environmental impacts of a nuclear/radiological incident. To achieve this mission, the federal interagency operations seek to stop, contain, and remediate the harmful effects produced by the incident and implement consequence management by assisting survivors. For intentional incidents, the mission of the federal government includes the operational law enforcement response, which includes conducting investigations, attributing the incident to perpetrators, and using all available tools to hold them accountable.[26]

---

[22] See OSHA's *Hazardous Waste Operations and Emergency Response Standard*, 29 CFR 1910.120 for additional information.
[23] See the U.S. National Response Team (NRT) Guidance, Technical Assistance, and Planning Resources website at https://www.nrt.org/Main/Resources.aspx?ResourceType=Health%20and%20Safety&ResourceSection=2.
[24] For more information about higher dose level guidance for responders, the EPA's Protective Action Guide Manual: Protective Action Guides and Planning Guidance for Radiological Incidents (2017).
[25] *Presidential Policy Directive 21 (PPD-21): Critical Infrastructure Security and Resilience* (2013) advances a national policy to strengthen and maintain secure, functioning, and resilient critical infrastructure.
[26] For additional information on responding to suspected and actual intentional incidents, see Appendix C: Law Enforcement Coordination for Intentional Nuclear/Radiological Incidents.

# Desired End State

The desired end state of federal response and recovery operations after a nuclear/radiological incident is achieved when the following conditions are fulfilled:

- All necessary lifesaving and life-sustaining assistance is provided.
- SLTT governments can provide individuals and families with the means to recover from their losses in a manner that sustains their physical, emotional, social, and economic well-being.
- All affected land has been assessed for environmental safety, need for decontamination, and appropriateness for re-occupancy and resumption of use. Results of the assessments have been made public. Remediation activities for the contaminated areas have been established.
- Critical infrastructure capability and capacity are restored.
- Public safety and health protection are reestablished.
- Affected populations are fully identified and have received appropriate medical care or other interventions to protect or restore health.
- Commercial activity meets the demand of the population. Economic disruptions are minimized locally, nationally, and internationally.
- Contaminated waste is effectively managed, transported, contained, and/or disposed of. Systems are in place to prevent entry of contaminated food and agricultural products into the market.
- Displaced populations have returned or relocated to permanent housing.
- Long-term public health monitoring and behavioral health programs are in place.
- Processes are in place to support potential multi-year fatality management activities.
- For intentional nuclear/radiological incidents, law enforcement investigations have concluded, and perpetrators have been identified and held accountable.

# Authorities

The following key authorities are applicable to this annex. More information on the authorities listed below can be found in Appendix V: Authorities.

- Presidential Policy Directive (PPD) 8: National Preparedness
- PPD-35: United States Nuclear Weapons Command, Control, Safety and Security
- PPD-44: Enhancing Domestic Incident Response
- Homeland Security Presidential Directive (HSPD) 5: Management of Domestic Incidents
- National Security Memorandum (NSM) 16: Strengthening the Security and Resilience of United States Food and Agriculture (classified)
- NSM-19: Counter Weapons of Mass Destruction (WMD) Terrorism and Advance Nuclear and Radioactive Material Security Worldwide (classified)

- National Security Presidential Directive (NSPD) 42 / HSPD-14: Domestic Nuclear Detection
- National Security Presidential Memorandum (NSPM) 36: Guidelines for U.S. Government Interagency Response to Terrorist Threats and Incidents in the United States and Overseas Homeland Security Act of 2002
- Post-Katrina Emergency Management Reform Act of 2006 (PKEMRA)
- Pets Evacuation and Transportation Standards Act of 2006
- Robert T. Stafford Disaster Relief and Emergency Assistance Act of 1988 (Stafford Act)
- Sandy Recovery Improvement Act of 2013
- Atomic Energy Act of 1954

Certain federal D/As are authorized to respond directly to specific nuclear/radiological incidents. Federal D/As may take appropriate independent emergency actions within the limits of their own statutory authority to protect their workers (including contractors) and the public, mitigate immediate hazards, and gather information concerning the emergency to avoid delay. Nothing in this annex alters or impedes the ability of federal D/As to carry out their respective authorities and associated responsibilities under law. This annex does not create new authorities nor change existing ones.

In addition to the authorities referenced above, which include classified policy directives and memoranda, the following key legal authorities are also applicable to this annex:

- The Energy Reorganization Act of 1974
- Price-Anderson Nuclear Industries Indemnity Act
- Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA)
- National Oil and Hazardous Substances Pollution Contingency Plan (NCP)
- The Defense Against Weapons of Mass Destruction Act
- Resource Conservation and Recovery Act
- Clean Water Act
- Safe Drinking Water Act
- Clean Air Act
- Project BioShield Act
- Pandemic and All-Hazards Preparedness Act
- Pandemic and All-Hazards Preparedness Reauthorization Act
- Pandemic and All-Hazards Preparedness and Advancing Innovation Act
- Public Readiness and Emergency Preparedness Act
- Public Health Service Act
- Social Security Act, Section 1135
- Federal Food, Drug, and Cosmetic Act
- The Office of Federal Procurement Policy Act
- Foreign Assistance Act of 1961

- Defense Production Act
- Hazardous Materials Transportation Act
- The Occupational Safety and Health Act of 1970
- 10 CFR § 20 – Standards for Protection Against Radiation
- 10 CFR § 61.55 – Waste Classification
- Reorganization Plan No. 3 of 1970
- 44 CFR § 350 – Review and Approval of State and Local Radiological Emergency Plans and Preparedness
- 44 CFR § 351 – Radiological Emergency Planning and Preparedness
- 28 CFR § 0.85 – Federal Bureau of Investigation General Functions
- Title 50 USC – War and National Defense
  - §§ 2406, 2511 (codifying Executive Order 12344): Naval Nuclear Propulsion
- Title 18 USC – Crimes and Criminal Procedure
  - § 831: Prohibited Transactions Involving Nuclear Materials
  - § 2332a: Use of Weapons of Mass Destruction
  - § 2332b(f): The Attorney General of the United States has primary investigative responsibility for all federal crimes of terrorism and certain other designated offenses
  - § 2332f: Bombings of places of public use, government facilities, public transportation systems and infrastructure facilities
  - § 2332h: Radiological Dispersal Devices
  - § 2332i: Acts of Nuclear Terrorism
- Title 28 USC – Judiciary and Judicial Procedure
- Convention on Supplementary Compensation for Nuclear Damage
- Convention on Early Notification of a Nuclear Accident and Convention on Assistance in the Case of a Nuclear Accident or Radiological Emergency
- Executive Order 12656 of November 18, 1988, as amended

# EXECUTION

## Concept of Operations

When possible, the consequences of nuclear/radiological incidents are managed by local and state governments, but for incidents that require federal response and recovery support, the NRIA concept of operations (CONOPS) employs four constructs. As incidents change in size, scope, and complexity, the federal response and recovery support constructs are designed to be scalable, layered, and adaptable to meet operational requirements.

**Tiered Response**

This annex is founded on the principle of tiered response or the understanding that most incidents are handled at the lowest possible jurisdictional level. As resources and capabilities are exceeded, additional SLTT and federal assets are applied. A key component of tiered response is mutual aid and assistance. Local communities and states have mutual aid compacts in place to share critical resources across jurisdictional boundaries in a timely manner.

The owner/operator of a nuclear/radiological facility or materials is primarily responsible for consequence management within the bounds of the facility, notifying and providing protective action recommendations to SLTT governments and minimizing the radiological hazard. For incidents involving nuclear/radiological fixed facilities, the owner/operator may be responsible or liable for response and recovery activities outside the facility boundary under applicable legal obligations.[27] For areas surrounding a nuclear/radiological incident site, SLTT governments have primary responsibility for protecting life, property, and the environment. Federal and SLTT governments and owners/operators of nuclear/radiological facilities should request assistance through established protocols.

When a federal crime has been or is suspected to have been committed, the FBI will establish an FBI Command Post or Joint Operations Center (JOC) at the local level for the purpose of managing the investigation, as well as leading and coordinating the law enforcement response. If necessary, on the national level, the FBI will activate the Weapons of Mass Destruction Strategic Group (WMDSG) to enhance information sharing and the deconfliction of law enforcement and consequence management operations. The FBI may also establish other command posts, such as the Critical Incident Response Group National Asset Command Post, which provides all technical information represented by and collected from any weapons of mass destruction (WMD) devices. The FBI will establish operational coordination with the response community within these local, regional, and national level operations centers. For incidents involving terrorist use of orphan material, the Department of Homeland Security (DHS) and FEMA lead the response and recovery actions for the federal government. For additional information, see Appendix C: Law Enforcement Coordination for Intentional Nuclear/Radiological Incidents.

## Response/Recovery Coordination Constructs

The federal response to nuclear/radiological incidents is consistent with the authority of the federal government as described in the *National Response Framework* (NRF),[28] *National Disaster Recovery Framework* (NDRF),[29] and other national policy guidance and directives.

---

[27] *The Comprehensive Environmental Response, Compensation, and Liability Act,* otherwise known as CERCLA or Superfund, provides a federal "Superfund" to clean up uncontrolled or abandoned hazardous waste sites as well as accidents, spills, and other emergency releases of pollutants and contaminants into the environment. Through CERCLA, EPA was given power to seek out those parties responsible for any release and assure their cooperation in the cleanup.
[28] The NRF (2019) is a guide to how the nation responds to all types of disasters and emergencies. It is built on scalable, flexible, and adaptable concepts identified in the National Incident Management System (NIMS) to align key roles and responsibilities.
[29] The NDRF (2016) enables effective recovery support to disaster impacted SLTT jurisdictions. It provides a flexible structure that enables disaster recovery managers to operate in a unified and collaborative manner. The NDRF focuses on how best to restore, redevelop, and revitalize the health, social, economic, natural, and environmental fabric of the community and build a more resilient nation.

In addition, the federal response must be well coordinated and may involve owner/operators, SLTT governments, NGOs, and private-sector partners.

Emergency Support Functions (ESFs) are the primary coordinating structure for building, sustaining, and delivering the response core capabilities during a federal interagency response. However, while ESFs are designed for both Stafford Act and non-Stafford Act incidents, ESFs may not always be the most appropriate response coordination structure for non-Stafford Act incidents. For incidents in which there has been no declaration under the Stafford Act, the lead agency should respond in a standard National Incident Management System (NIMS) structure. In addition to their NIMS structures, D/As responding under their own legal authorities may request that FEMA activate relevant ESFs. This annex describes the coordination structures, in addition to the ESFs, that may be used to deliver core capabilities and respond to complex nuclear/radiological incidents.

Consistent with the NDRF, the federal government uses Recovery Support Functions (RSFs) to coordinate key functional areas of recovery support. Each RSF has a designated coordinating agency along with primary agencies and supporting organizations with programs relevant to the functional area. The RSF Coordinating Agency, with the assistance of FEMA, provides leadership, coordination, and oversight for each RSF. The RSF Coordinating Agency also ensures ongoing communication and coordination among federal D/As, SLTT governments, and non-profit and private sector organizations. The NDRF will provide the overarching interagency coordination structure for the recovery phase for Stafford Act incidents, and elements of the framework may be used for significant non-Stafford Act incidents.

Nuclear/radiological incidents vary significantly in scope, consequences, and required resources. Most are managed at the local level, while others require the deployment of a Federal OSC to assist owners/operators and SLTT responders in determining the need for and level of federal support. Most Federal OSCs for nuclear/radiological incidents will be provided by the EPA and U.S. Coast Guard (USCG) depending on geographical jurisdiction. However, the Department of Energy (DOE) and the Department of Defense (DOD) also have the authority and responsibility to provide the Federal OSC for emergency hazardous substance releases specifically from DOE and DOD facilities and materials, which includes nuclear/radiological incidents.

The four federal coordination constructs identified in Figure 2 assist the Federal OSC and other federal authorities in determining the level of federal support required, if any. These constructs are adaptable to escalating incidents that may require moving from lesser to greater federal response. Typically, as severity and complexity increase, a higher-level construct is implemented to manage the incident. Factors determining which federal construct applies to a given nuclear/radiological incident include the following:

- The ability of SLTT governments to manage the incident without federal assistance
- The ability of owners/operators to execute response activities
- The applicability of specific federal response authorities to a given incident
- The type and extent of incident impacts, which can include the following:

  o Lifesaving and life-sustaining needs (including need for mass care)
  o Public health impacts, including number of fatalities and injuries

- Severity of impacts to critical infrastructure and key resources
- Property damage
- General economic impacts
- Environmental contamination
- Damage to natural resources, including recreational and cultural sites

Figure 2 illustrates the four constructs and displays how the level of federal support required scales based upon the size and complexity of the nuclear/radiological incident. A summary of each construct is provided below, but more detailed information can be found in Appendix A: Federal Response Coordination Constructs.



Figure 2: Federal Coordination Constructs for Nuclear/Radiological Incident Response

### No Federal Response Required

The Federal OSC assesses the situation in collaboration with SLTT authorities and owner/operators and determines that the nuclear/radiological incident can be managed by SLTT authorities, owner/operators, NGOs, and private-sector resources and that **no federal response/recovery coordination is required.**

### Unified Command Response

The Federal OSC assesses the situation in collaboration with SLTT authorities, federal land management agencies, and/or owner/operators, as appropriate, to determine if the nuclear/radiological incident **requires federal response/recovery coordination** to deliver appropriate resources to support response/recovery operations. Lead Federal Agencies (LFAs) may exercise command or coordination authorities granted by national policy depending on the nature and complexity of the nuclear/radiological incident.

### Unified Command Response with Emergency Support Functions

The Federal OSC or other federal official determines that the nuclear/radiological incident **requires federal resources beyond those that can be delivered solely through the Unified Command response construct.** One or more ESFs are required to support the federal

response/recovery. In addition, a Federal Resource Coordinator (FRC) is designated to ensure federal D/As are working collaboratively to support response/recovery operations in conjunction with the Federal OSC and SLTT governments.

> **Command**
>
> The act of directing or ordering by virtue of explicit statutory, regulatory, or delegated authority.
>
> **Coordinate**
>
> To advance an analysis and exchange of information systematically among principals to carry out specific incident management responsibilities.

### Stafford Act Response

The President issues a **major disaster or emergency declaration under the Stafford Act** due to the magnitude of the nuclear/radiological incident. A Federal Coordinating Officer (FCO) is designated, and a Joint Field Office (JFO) is established. The relevant ESFs coordinate with the appropriate federal D/As and officials in support of the SLTT response/recovery.

## Lead Federal Agencies with Primary Authority

The agency that is responsible for leading and coordinating all aspects of the federal response is referred to as the Lead Federal Agency (LFA)[30] and is determined by the context and characteristics of a specific incident. When a federal D/A owns, authorizes, regulates, or is deemed responsible for the facility or activity causing the nuclear/radiological incident and has authority to manage federal actions onsite, that federal D/A will be designated the LFA.

### Determination of Lead Federal Agency

Table 1[31] details which federal D/A is designated as the LFA based upon the context and characteristics of the nuclear/radiological incident. The LFA is determined by incident type, facilities, and/or materials involved. The LFAs listed in Table 1 have authorities, technical expertise, and/or assets for responding to the unique characteristics of nuclear/radiological incidents that are not otherwise described in the Response and Recovery FIOP. Specific roles and responsibilities are determined by the scope of their authorities over relevant aspects of the incident. As Table 1 illustrates, the LFA has specific responsibilities, and as a result, depending on the nature of the nuclear/radiological incident and the response required, there may be more than one LFA for the same incident. In such circumstances, coordination should occur through national coordination structures. For further information, see Response and Recovery FIOP, Figure 2: Example Unified Coordination Organization, and accompanying text.

---

[30] In the 2016 version of the NRIA, the term "primary authority" designated the lead agency for federal response. The term "Lead Federal Agency" (LFA) is used to designated agencies with primary authority in this version to align with its usage in other national-level documents and plans. For certain emergency response actions, under CERCLA, LFA is defined in Title 40 CFR Part 300.5.

[31] For incidents involving nuclear facilities licensed by the NRC or an NRC Agreement State, FEMA may assume coordination of federal response if the incident includes offsite consequence. NRC remains the primary federal authority for onsite response.

**Table 1: Lead Federal Agency with Primary Authority for Federal Response**

| INCIDENT TYPE, FACILITIES, OR MATERIALS INVOLVED | LEAD FEDERAL AGENCY WITH PRIMARY AUTHORITY |
|---|---|
| **NUCLEAR FACILITIES** | |
| Owned or operated by the DOD | **DOD** |
| Owned or operated by the DOE | **DOE** |
| Licensed by the NRC or an NRC Agreement State | **NRC** |
| Not licensed, owned, or operated by a federal agency, an NRC Agreement State or currently or formerly licensed facilities for which the owner/operator is not financially viable or is otherwise unable to respond | **EPA** |
| **Nuclear Weapons and Components** | |
| In the custody of the DOD | **DOD** |
| In the custody of the DOE | **DOE** |
| **Radioactive Materials Owned, Licensed, or Being Transported** | |
| By or for the DOD | **DOD** |
| By or for the DOE | **DOE** |
| Containing NRC or NRC Agreement State licensed materials | **NRC** |
| Within the coastal zone for materials that are not licensed or owned by a federal agency or an NRC Agreement State | **USCG** |
| All others | **EPA** |
| **Radioactive Materials in Space Vehicles Impacting the United States** | |
| Managed by the National Aeronautics and Space Administration (NASA) | **NASA** |
| Managed by the DOD | **DOD** |
| Not managed by the NASA or the DOD, not licensed by the Federal Aviation Administration (FAA) for launch or reentry, and impacting the coastal zone | **USCG** |
| All others not licensed, permitted, regulated, or managed by a federal D/A | **EPA** |
| **Disused and Unwanted Sealed Sources with no Disposition Pathway** | |
| Off-Site Source Recovery | **DOE** |
| **Unknown or Unlicensed Materials, and Domestic Response to Foreign Materials and International Incidents** | |
| Inadvertently imported radioactive materials that are interdicted at or between U.S. Ports of Entry | **CBP** |
| Imported contaminated consumer products that are distributed before detection | **EPA** |
| Within the coastal zone for materials that were not imported | **USCG** |
| All others | **EPA** |
| **Inadvertent Incidents Involving Lost/Found/Orphaned Radioactive Material** | **DOE, NNSA** |
| **U.S. Assistance to Foreign Governments for Incidents with International Impacts** | **DOS** |
| **All Intentional Incidents Involving Nuclear/Radiological Facilities or Materials (e.g., RDDs, INDs)** | **DHS, FEMA** |
| **NOTE:** DHS/FEMA may be called upon to lead or provide supplemental operational consequence management and response coordination support for the Lead Federal Agency during complex incidents. | |

## Notification of Incident

The owner/operator of a nuclear/radiological facility or owner/transporter of nuclear/radiological material is generally the first to become aware of an incident and may be obligated to notify SLTT governments, as well as relevant federal D/As. For example, NRC licensees are legally required to notify SLTT governments and the NRC.

Federal and SLTT governments that become aware of a nuclear/radiological incident shall notify the appropriate federal D/A, per Table 1. The LFA provides notification of a nuclear/radiological incident to the DHS National Operations Center (NOC) and other appropriate federal D/As, in compliance with other statutory requirements for notification.

In nuclear/radiological incidents involving suspected criminal acts, LFAs should immediately inform the FBI field office nearest to the incident site. Federal D/As performing response missions will cooperate with the FBI throughout the course of the investigation, giving priority to lifesaving activities. Further, SLTT law enforcement agencies should continue to coordinate with their local FBI field office regarding potential ongoing terrorist activities, incidents, or investigations.

If an SLTT government requests assistance directly from a specific federal D/A that does not have primary authority, that federal D/A must notify the correct LFA for the nuclear/radiological incident.

## Activation of Federal Interagency Response

Once notified, the LFA initiates the coordinated federal interagency response in accordance with its authorities.

Responding federal D/As provide representatives to the coordination elements described in the NRF and NDRF (e.g., JFO, NOC). For Stafford Act incidents, FEMA may issue mission assignments to federal D/As to support response and recovery activities.

The LFA may request that FEMA activate NRF and/or NDRF elements to support response and/or recovery activities. The LFA may also request assistance from other federal D/As.

The LFA will be represented in appropriate positions within the Command Staff in the Incident Command/Unified Command (IC/UC) structure, will coordinate federal radiological response and recovery activities at appropriate field facilities, and will provide personnel to other sections of the IC/UC as needed (i.e., the Nuclear Radiological Incident Task Force Leader).

For any nuclear/radiological incident, responding federal D/As may establish a field facility, assist SLTT response and recovery organizations, monitor and support owner/operator activities, provide technical support to the owner/operator if requested, and serve as a federal source of information about incident conditions.

## State, Local, Tribal, and Territorial Coordination

The federal response and recovery support following a nuclear/radiological incident must be coordinated closely with the SLTT governments in the area near the incident. Response to and recovery from nuclear/radiological incidents affecting land owned by the U.S. government are coordinated with the agency responsible for managing that land to ensure that incident management activities are consistent with federal statutes governing use and occupancy. In the case of tribal lands, tribal governments have a special relationship with

the U.S. government. Federal and SLTT governments may have limited or no authority on tribal lands. The NRF's Tribal Relations Support Annex[32] provides further guidance.

Recovery activities often begin while sustained response operations are still ongoing. Early and effective recovery coordination enables the appropriate SLTT stakeholders to better understand the federal programs and other assistance available. For successful recovery, federal D/As should discern the SLTT governments' priorities for rebuilding their community after the incident. Federal D/As should work closely with SLTT governments to support and execute their vision of recovery.[33]

## Operational Phases

The Response and Recovery FIOP provides a more detailed description of FEMA's phased approach to federal operations. Other federal D/As may use different methods for operational phasing, but for the purposes of this document, FEMA emergency management phasing applies. Figure 3 illustrates these phases. The timing and duration of each phase may vary depending on the incident.



Figure 3: FEMA Operational Phases[34]

### Phase 1: Pre-Incident Operations

Appropriate federal D/As coordinate with each other and with SLTT governments, NGOs, and private-sector stakeholders to plan for nuclear/radiological incidents and maintain situational awareness. See the Response and Recovery FIOP for a more detailed description of all-hazards preparedness actions for the federal government.[35]

Sub-phase transitions differ for no-notice and notice incidents. Sub-Phases 1b and 1c pertain to notice incidents. Examples of notice incidents include an impending hurricane and a criminal or terrorist threat identified by law enforcement. Most nuclear/radiological

---

[32] See the Tribal Relations Support Annex (2013) to the NRF.
[33] See FEMA's Effective Coordination of Recovery Resources for State, Tribal, Territorial and Local Incidents (2015) document for more information on SLTT coordination.
[34] Although not depicted in Figure 3, during intentional nuclear and/or radiological incidents, such as terrorism, Prevention mission operations may be occurring at the same time during Phase 2 Response and Recovery Operations and Phase 3 Recovery and Restoration Operations depending on the nature of the intentional incident.
[35] There could be requests to prepare or preposition assets in connection with the U.S. government's response to an imminent terrorist threat prior to actual incident. This, however, is not addressed within this annex.

incidents are accidental and therefore are no-notice incidents. In these incidents, Sub-Phases 1b and 1c are bypassed and the response moves directly to Sub-Phase 2a.

For nuclear/radiological incidents with notice, federal D/As will take the preliminary actions in preparation for a Sub-Phase 2a response. The following include some of the key federal government activities that occur during Sub-Phase 1b and 1c:

- Analyzing and modeling the potential impacts from a nuclear/radiological incident, analyzing the market impacts to the economy, and determining the effect on other critical infrastructure (CI)
- Conducting coordination calls among appropriate federal D/As and obtaining situational awareness with nuclear/radiological industry representatives and SLTT governments
- Determining if the potential incident is related to crime or terrorism through the FBI and sharing that information with SLTT law enforcement, if necessary

### Phase 2: Coordinated Response and Recovery and Operations

Sub-Phases 2a and 2b typically include actions beginning within 72 hours of a nuclear/radiological incident. When feasible, these actions can begin as early as 24 to 48 hours following a nuclear/radiological incident. Actions focus on saving lives, meeting basic human needs, protecting the environment, including limiting the spread of contamination, and supporting the transition to recovery. For nuclear/radiological incidents, communication during this phase is critical to minimize potential impacts to the public and the environment. During these sub-phases, the federal government takes actions, including deployment of specialized teams and assets, conducting damage assessments, and sharing information.

Sub-Phase 2c normally covers a period of approximately 3 to 30 days following the incident, though the unique nature of nuclear/radiological incidents may extend this timeline. The following include some of the key federal government activities during this sub-phase:

- Coordinating with SLTT governments, owner/operators, and other affected entities to identify potential cascading impacts
- Continuing to communicate critical information to the public
- Ensuring that public protective actions continue to conform to environmental modeling and established protective action guidelines

### Phase 3: Recovery and Restoration Operations

Initial recovery actions begin during the response phases (Sub-Phases 2a through 2c) and include preparing to support longer-term health and safety needs, assessing damages, and beginning to restore infrastructure. Recovery activities may last for an extended period, which includes Sub-Phases 3a and 3b. Each SLTT government defines its own goals for successful recovery based on its circumstances, challenges, vision, and priorities. In general, the goals of federal operations to recover from a nuclear/radiological incident include ensuring the relocation or return of displaced survivors, reestablishment of essential services, and the remediation of the environment. The following actions occur during this phase:

- Supporting and advising SLTT governments on recovery options

- Identifying and facilitating federal programs to expedite CI restoration
- Developing a Recovery Support Strategy, including a projected timeline detailing the levels, types, and durations of federal support, which may be long-term for nuclear/radiological incidents
- Advising how to incorporate mitigation, sustainability, and resilience-building into recovery operations

## Protective Action Phases

Federal response and recovery actions are carried out with appropriate health and safety guidelines and concurrent with SLTT decision making. For example, if the area is contaminated by radioactive material and appropriate personal protective equipment (PPE) and capabilities are not available, response actions may be delayed until the radiological hazard dissipates to a safe level for emergency response personnel or until appropriate PPE and capabilities arrive. The federal government established Protective Action Guides (PAGs)[36] for nuclear/radiological incidents. Protective action decision making can be divided into three action phases that are common to all nuclear/radiological incidents: the early phase, the intermediate phase, and the late phase. The phases, which may overlap, represent non-precise time periods in which response officials would be making public health protection decisions. Figure 4 outlines how these protective action phases align to operational phases. Figure 5 lists potential exposure pathways, their corresponding protective actions, and approximate operational phase.



Figure 4: Protective Action Phases Aligned to Operational Phases

### Early Phase

The early phase is the period at the beginning of the incident when immediate decisions for effective protective actions are required. There may be little or no information available on actual releases or field measurement data. Protective actions in the early phase are aimed at avoiding inhalation of gases or particulates in a plume, minimizing external exposure, and limiting the spread of contamination.

---

[36] See the EPA's Protective Action Guide Manual: Protective Action Guides and Planning Guidance for Radiological Incidents (2017).



**Figure 5: Potential Exposure Pathways and Effective Protective Actions by Operational Phase**

### Intermediate Phase

The intermediate phase may overlap with and/or follow the early phase response within as little as a few hours and can last for weeks or months. This phase is assumed to begin after the incident source and releases have been brought under control and protective action decisions can be made based on measurements of exposure and radioactive materials that have been deposited. Protective actions in the intermediate phase are intended to reduce or avoid exposure of the public to radioactivity, control worker exposures and the spread of contamination, and prepare for late-phase cleanup.

### Late Phase

The late phase is the period when actions designed to reduce radiation levels in the environment to acceptable levels are conducted. The late phase entails final clean-up decisions and implementation of remediation strategies. The late phase will overlap with the intermediate phase response, making Sub-Phase 2c part of both the intermediate and late phases.

The clean-up process described in this document does not rely on and does not affect authority under CERCLA, 42 USC 9601 et seq. and the National Oil and Hazardous Substances Pollution Contingency Plan (NCP), 40 CFR § 300.

# Roles, Responsibilities, and Capabilities

## U.S. Department of Defense (DOD)

Consistent with applicable Presidential policies and memoranda, U.S. Department of Defense (DOD) is responsible for coordinating federal actions related to nuclear/radiological

incidents involving nuclear weapons in DOD custody, DOD facilities (including U.S. nuclear-powered ships), or material otherwise under DOD jurisdiction.

Under the CERCLA, Executive Order 12580, and the NCP, DOD is responsible for hazardous substance responses to releases on or from DOD facilities or vessels under the jurisdiction, custody, or control of DOD, including transportation-related incidents. For responses under these circumstances, DOD provides a Federal OSC or Remedial Project Manager (RPM) who is responsible for all CERCLA response actions, both onsite and offsite.

For incidents occurring on, or where the sole source of the nuclear/radiological release is from, any facility or vessel under DOD jurisdiction, custody, or control, DOD is responsible for the following actions:

- Mitigate the consequences of the incident.
- Provide notification and appropriate protective action recommendations to SLTT government officials.
- Minimize the radiological hazard to the public.

If the incidents for which DOD is responsible require integration of federal consequence management capabilities, then DOD will coordinate with other federal entities under the NRF, the NIMS, and the NCP. For radiological incidents involving a nuclear weapon, special nuclear material, and/or classified components that are in DOD custody, DOD may establish a National Defense Area (NDA), consistent with applicable law and Presidential policies and directives. An NDA is an area established on non-federal lands located within the United States or its possessions or territories for the purpose of safeguarding classified defense information or protecting DOD equipment and/or materiel. Establishment of an NDA temporarily places such non-federal lands under the effective control of DOD and results only from an emergency incident. The senior DOD representative at the scene will define the boundary, mark it with a physical barrier, and post warning signs. The landowner's consent and cooperation will be obtained whenever possible; however, military necessity will dictate the final decision regarding location, shape, and size of the NDA. DOD will manage the response within the boundaries of the DOD facility or NDA and will coordinate with SLTT officials to ensure appropriate public health and safety actions are taken outside the NDA. DOD will lead the overall response to safeguard national security information and/or restricted data, equipment, or materiel.

DOD coordinates the federal response for incidents involving the release of nuclear/radioactive materials from DOD space vehicles or joint space vehicles with significant DOD involvement. A joint venture is an activity in which the U.S. government has provided extensive design/financial input; has provided and maintains ownership of instruments, spacecraft, or the launch vehicle; or is intimately involved in mission operations. A joint venture with a foreign nation is not created by simply selling or supplying material to a foreign country for use in its spacecraft.

## U.S. Department of Energy (DOE)

The U.S. Department of Energy (DOE) and the National Nuclear Security Administration (NNSA) maintain a diverse array of authorities, responsibilities, and capabilities for responding to nuclear and radiological incidents. DOE provides technical and operational support to all types of nuclear/radiological incidents via the Nuclear Emergency Support

Team (NEST) and is responsible for coordinating the federal response to a nuclear/radiological incident at a DOE facility or involving DOE materials.

NEST is the umbrella designation that encompasses all DOE/NNSA nuclear/radiological emergency and incident response functions, including resources that can be deployed both nationally and internationally. NEST coordinates across all levels of the NRF operational coordination structure and NIMS command and coordination elements to provide tailorable, flexible and scalable response capabilities backed by DOE technical expertise.

NEST performs four principal missions:

1. Countering WMD threats

2. Responding to accidents involving U.S. nuclear stockpile weapons

3. Protecting public health and safety during potential and actual releases of radioactive materials

4. Performing nuclear forensic activities to attribute the origin of nuclear material interdicted outside regulatory control or used in a nuclear device

NEST protects public health and safety by delivering timely, technically sound, and actionable decision support to federal and SLTT authorities in response to nuclear or radiological incidents. NEST capabilities specific to nuclear/radiological response and recovery includes the following:

- Contingency planning

- Radiological incident assessment

- Atmospheric modeling

- Specialized radiation detection systems

- Monitoring and sampling

- Data management and assessment

- Laboratory analysis

- Radiological health and safety

- Resources to establish and manage the FRMAC for the initial response

- Technical and scientific expertise in nuclear/radiological incidents

- Remote technical support within the National Laboratory complex

- NEST Senior Response Official (SRO) cadre

For radiological/nuclear incidents involving its own facilities or materials, DOE maintains initial response capabilities at its facilities and sites, as well as mutual aid agreements with SLTT and federal partners. Under CERCLA and the NCP, DOE is responsible for hazardous substance responses to releases on or from DOE facilities or vessels under the jurisdiction, custody, or control of DOE, including transportation-related incidents. In these incidents, DOE provides a Federal OSC or Remedial Project Manager responsible for taking all CERCLA response actions.

DOE also has responsibility for the disposition, handling, and disposal of radioactive waste materials that derive from operational activities at DOE sites. This includes the disposal of high-level waste, Transuranic waste, low level waste, and waste from DOE radioactive waste sites under the EPA's CERCLA Program.

Through NEST, DOE/NNSA maintains capabilities to respond to incidents involving U.S. nuclear weapons in DOD and DOE custody, including a lost or stolen weapon. In accordance with the Atomic Energy Act, DOE is responsible for protection of certain nuclear materials, facilities, information, and nuclear weapons under DOE control, including U.S. nuclear materials and weapons at DOE facilities and while in transit under DOE custody. NEST provides weapon recovery and safety expertise, consequence management and health physics support, and incident management capabilities. NEST scientists, technical specialists, and incident managers work closely with the NNSA Office of Defense Programs and DOD in execution of this mission.

For nuclear/radiological incidents involving nuclear weapons, special nuclear material, and/or classified components that are in DOE custody, DOE may, in accordance with the Atomic Energy Act, establish a national security area (NSA). DOE will lead the overall response to safeguard national security information and/or restricted data, or equipment and materiel. DOE will manage the response within the boundaries of the DOE facility or NSA and will coordinate with SLTT officials to ensure appropriate public health and safety actions are taken outside the NSA. DOE is assigned authority under CERCLA and the NCP for DOE custody weapons accidents with release of nuclear/radiological material, or the threat of release of nuclear/radiological material.

DOE will manage recovery and remediation efforts for incidents in which DOE is designated LFA, and for other incidents may provide resources as requested by federal or SLTT partners, or as directed by DHS/FEMA through mission assignments or other authorities. As an incident transitions from response to recovery, DOE will closely coordinate with the EPA and transfer leadership of specific mission functions, particularly radiological monitoring and assessment activities under FRMAC, to EPA. Upon stabilization of an incident, priority will be given to demobilizing NEST resources to ensure readiness for mission essential functions and requirements. During a large-scale incident, NEST will prioritize operations most effective in protecting public health and safety.  Following an initial response period of days to one week at high operational requirements, absent substantial support from interagency response resources of a similar type and capability to those provided by NEST, DOE/NNSA expects substantial impacts to NEST's ability to sustain operations.

DOE and NNSA nuclear and radiological resources, including NEST, are a finite pool of specialized resources that are leveraged across multiple mission spaces.  During complex and sustained responses, DOE and NNSA will work with FEMA and interagency partners to identify additional resources and effectively allocate DOE, NNSA, and interagency responses to sustain a whole of government response.

## U.S. Department of Homeland Security (DHS)

The Secretary of Homeland Security is the principal federal official for domestic incident management. Pursuant to the Homeland Security Act of 2002, the Secretary is responsible for coordinating federal preparedness activities and operations within the United States for response to and recovery from terrorist attacks, major disasters, and other emergencies.

HSPD-5 provides that the Secretary shall coordinate the federal government's resources utilized in response to or recovery from terrorist attacks, major disasters, or other emergencies if and when any one of the following four conditions applies: (1) A federal department or agency acting under its own authority has requested the assistance of the Secretary; (2) SLTT capabilities are overwhelmed and federal assistance has been requested by the appropriate SLTT authorities; (3) more than one federal department or agency has become substantially involved in responding to the incident; or (4) the Secretary has been directed to assume responsibility for managing the domestic incident by the President. The Secretary coordinates with federal D/As to provide federal unity of effort for domestic incident management.

Consistent with applicable presidential guidance including NSPM-36, HSPD-5, and PPD-44, an LFA may be assigned by the President to coordinate the federal interagency response in accordance with PPD-8 and the relevant incident-specific plan.

## Federal Emergency Management Agency (FEMA)

The Stafford Act provides that a presidential declaration of a major disaster or an emergency triggers financial and physical assistance through FEMA. The Stafford Act gives FEMA the responsibility for coordinating government-wide relief activities. The Stafford Act constitutes the statutory authority for most federal disaster response activities especially as they pertain to FEMA and FEMA programs.

PKEMRA designated the FEMA Administrator as the principal advisor to the President, the Secretary of Homeland Security, and the National Security Council regarding emergency management. FEMA responsibilities include operation of the National Response Coordination Center (NRCC); the effective coordination of all ESFs and RSFs; and the preparation for, protection against, response to, and recovery from all-hazards incidents.

FEMA may be called upon to provide lead or supplemental operational coordination for consequence management support for the primary D/A for complex and/or large-scale incidents.

PKEMRA established the key principle that after a major disaster or emergency declaration, accelerated federal assistance could be sent by FEMA, in the absence of a specific request by a state, to save lives and prevent suffering. PKEMRA established the following important provisions:

- Requires the development of pre-scripted mission assignments as part of the planning activities for ESF response.
- Transfers to FEMA various preparedness functions formerly assigned to other parts of DHS.
- Establishes NIMS and the NRF, as the framework for emergency response and domestic incident management.
- Requires the development of comprehensive plans to respond to catastrophic incidents to include clear standardization, guidance, and assistance to ensure common terminology, approach, and framework for all strategic and operational planning.

- Directs the development of a National Disaster Recovery Strategy and National Disaster Housing Strategy.
- Amends the Stafford Act to direct FEMA to appoint a Disability Coordinator to ensure that the needs of individuals with disabilities are addressed in emergency preparedness and disaster relief.
- Requires an annual report to Congress on all federal planning and preparedness activities.
- Adds protection for household pets and service animals.

## U.S. Customs and Border Protection (CBP)

U.S. Customs and Border Protection (CBP) coordinates the federal response for incidents involving the inadvertent or illegal import of radioactive materials that are interdicted at or between U.S. Ports of Entry.

CBP maintains radiation detection equipment and nonintrusive inspection technology at ports of entry and Border Patrol checkpoints to detect the presence of radiological substances transported by persons, cargo, mail, or conveyance arriving from foreign countries.

Through its National Targeting Center, CBP provides extensive analytical and targeting capabilities to identify and interdict suspect nuclear/radiological materials.

The CBP Laboratories and Scientific Services Teleforensic Center provides 24/7 WMD reachback support to federal law enforcement personnel in the identification of interdicted suspect nuclear/radiological material, as well as providing a link for coordination with and triage to other federal D/As as appropriate for the incident.

## U.S. Coast Guard (USCG)

The National Contingency Plan[37] (see Appendix V: Authorities) designates the U.S. Coast Guard (USCG) as the Federal OSC for directing the removal and mitigation of oil spills and releases of hazardous substances, pollutants, or contaminants into or threatening the waters and adjoining shorelines of the coastal zone.[38]

The NCP establishes the USCG National Strike Force (NSF) and the USCG Public Information Assist Team as special teams. The NSF provides highly trained, experienced personnel and specialized equipment to USCG and other federal D/As to facilitate preparedness for and response to oil and hazardous substance incidents to protect public health and the environment. The NSF's area of responsibility covers all USCG districts and federal response regions. The Public Information Assist Team is an element of the USCG that is available to assist Federal OSCs to meet the demands for public information during a response or exercise.

While not part of the NCP, the USCG Maritime Security Response Team (MSRT) possess specialized equipment with an advanced organic detection, identification, and technical

---

[37] See the National Oil and Hazardous Substances Pollution Contingency Plan, 40 CFR Part 300.
[38] Precise zone boundaries are determined by EPA/USCG agreements and identified in federal regional contingency plans. Refer to 40 CFR 300.5 for definition of coastal and inland zones.

capabilities similar to that possessed by DOE's Nuclear Radiological Advisory Teams. MSRT members also have federal law enforcement authorities.

The National Response Center, staffed by the USCG, is a 24-hour sole federal point of contact for reporting all hazardous substances releases and oil spills. The National Response Center receives all reports of releases involving hazardous substances and oil that trigger federal notification requirements under several laws.

## U.S. Department of Justice (DOJ)

The Attorney General has lead responsibility for investigating and prosecuting violations of federal criminal law, including terrorist acts by individuals or groups inside the United States or directed at U.S. citizens or institutions abroad, where such acts are within the federal criminal jurisdiction of the United States. The U.S. Department of Justice (DOJ) leads and coordinates law enforcement activities to detect, prevent, preempt, and disrupt federal crimes, including crimes involving acts of terrorism by acting through the FBI. The FBI acts primarily through its Joint Terrorism Task Forces (JTTFs) to investigate terrorism-related activities. The Attorney General, acting through the FBI Director, also has primary responsibility for searching for, finding, and neutralizing WMDs within the United States and its territories and for conducting, directing, and overseeing the forensic examination of evidence collected in connection with domestic investigations.

The FBI has a WMD Coordinator and Special Agent Bomb Technicians (SABTs) assigned to each of its field offices. WMD Coordinators are responsible for managing the field offices' WMD programs and serve as the points of contact for emergency responders and public health officials at the SLTT level in the event of an incident potentially involving a WMD. Further, all commercial nuclear power plants have an assigned FBI liaison agent. In the event of a WMD-related terrorism incident, the WMD Coordinator serves as a conduit for obtaining federal assistance and support. Consistent with relevant Presidential directives, FBI SABTs are responsible for responding to and conducting defeat and mitigation actions for WMD devices and materials. FBI SABTs also serve as points of contact for public safety bomb squad coordination at the SLTT level in threat scenarios or incidents potentially involving a WMD. The FBI's Critical Incident Response Group (CIRG) is responsible for training and certifying all public safety bomb technicians at the FBI's Hazardous Devices School. The CIRG ensures that all public safety bomb squads are trained to understand the protocols for responding to all WMD incidents.

The FBI On-Scene Commander (FBI OSC) is the designated senior FBI representative responsible for leading and coordinating the federal operational law enforcement response and investigative activities necessary to resolve terrorist incidents and preserving evidence for subsequent criminal prosecution. The FBI OSC retains the authority to take appropriate law enforcement actions at all times during a law enforcement response to a terrorist incident. Additionally, the FBI OSC has primary responsibility to conduct, direct, and oversee crime scenes, including those involving WMD, its security, and evidence management through all phases of the response.

The FBI OSC also leads the JOC, a multijurisdictional interagency investigative and intelligence operations center, supported by a multiagency command group. The JOC is the place from which the FBI leads and coordinates law enforcement investigations, intelligence activities, and counterterrorism in response to terrorist incidents. The FBI OSC establishes

the JOC within a regional area of responsibility. Additionally, the FBI JOC may be staffed by federal D/As, SLTT law enforcement agencies, private industry, and other entities as may be appropriate, including representatives from the DEST (if deployed). The FBI JOC is established to ensure incident coordination and to organize multiple agencies and jurisdictions within an overall command and coordination structure.

In addition, DOJ, acting through the ESF #13 National Coordinator, is also responsible for coordinating the federal interagency law enforcement response to provide force/asset protection for other federal responders and assistance to SLTT officials charged with maintaining public safety and security in the affected areas. During a nuclear/radiological incident, ESF #13 may be called on to perform duties such as perimeter and/or crime scene security, quarantines, and other public safety missions related to the incident.

## U.S. Department of State (DOS)

U.S. Department of State (DOS) has the lead responsibility for protection of U.S. government personnel on official duty abroad and their accompanying dependents. DOS is the lead coordinating agency for U.S. government response to U.S. Chief of Mission and/or host nation requests for support to international nuclear/radiological incidents. DOS will manage the provision of humanitarian assistance to refugee populations affected by an incident, in coordination with the U.S. Agency for International Development (USAID) Office of Foreign Disaster Assistance (OFDA). For nuclear/radiological incidents that may be terrorist-related and are directed at U.S. citizens or governmental institutions abroad and within the federal criminal jurisdiction of the United States, DOS coordinates with the Attorney General and the Director of the FBI. DOS has the responsibility for handling issues related to the safety and security of U.S. private citizens abroad, which includes compliance with the DOS "no double standard" policy of providing members of the official and non-official U.S. community with relevant security information. DOS also coordinates U.S. government assistance to U.S. private citizens and works to provide information regarding other assistance that may be available to them from host country officials or non-governmental entities, as appropriate. DOS, in coordination with the U.S. Department of Health and Human Services (HHS), has a repatriation and evacuation mission related to U.S. citizens abroad.[39]

DOS serves as the U.S. government lead in notification of foreign governments and the International Atomic Energy Agency (IAEA) in accordance with the Convention on Early Notification of a Nuclear Accident. DOS will immediately notify Canada and Mexico to negotiate cooperative and collaborative cross-border activities. DOS serves as the U.S. government lead in requesting or accepting assistance in accordance with the IAEA Convention on Assistance in Case of a Nuclear Accident or Radiological Emergency.

## U.S. Environmental Protection Agency (EPA)

The U.S. Environmental Protection Agency (EPA) is responsible for coordinating the federal environmental response to incidents that occur at facilities not licensed, owned, or operated by a federal agency or an NRC Agreement State.[40] The EPA is also responsible for incidents

---

[39] See HHS's *National Emergency Repatriation Incident Framework* (2021) for information about the repatriation mission.
[40] The Atomic Energy Act authorizes the NRC to enter into agreements that allow states to assume regulatory authority over specified types of radioactive materials. The NRC has relinquished to 39 states portions of its regulatory authority to license and regulate byproduct materials (radioisotopes), source materials (uranium and thorium), and quantities of special nuclear materials under critical mass. The mechanism for the transfer of the NRC's regulatory authority to a state is an agreement signed by the governor of the state and the Chairman of the Commission.

involving currently or formerly licensed facilities for which the owner/operator is not financially viable or is otherwise unable to respond in certain areas of the inland zone.

The EPA also coordinates the federal environmental response to incidents involving the release of nuclear/radioactive materials that occur in the inland zone. Precise zone boundaries are determined by EPA/USCG agreements and are identified in federal regional contingency plans. The following are incidents that fall under EPA authority:

- Transportation incidents involving the release of nuclear/radioactive materials that are not licensed or owned by a federal agency or NRC Agreement State
- Incidents involving space vehicles that are not managed, licensed, permitted, or regulated by DOD, National Aeronautics and Space Administration (NASA), or any other federal D/A
- Incidents involving foreign, unknown, or unlicensed radiological sources in the United States or its territories, possessions, or territorial waters, and that are not addressed by CBP

For incidents where contaminated consumer goods are distributed before detection, the response is primarily carried out at the SLTT level. However, the EPA will provide federal coordination and technical assistance to the states as needed.

For a DHS-led federal response, the EPA will generally provide response coordination support to DHS through this annex and ESF #10 Oil and Hazardous Materials Response. For an EPA-led federal response, the EPA will generally respond under the NCP, which is an operational supplement to the NRF.[41] For some incidents, the EPA may also rely upon its Public Health Service Act and Atomic Energy Act authorities.

## National Aeronautics and Space Administration (NASA)

National Aeronautics and Space Administration (NASA) is responsible for coordinating the federal response to incidents involving the release of nuclear/radioactive materials from NASA space vehicles or joint space vehicles with significant NASA involvement. For radiological incidents involving nuclear material in NASA custody, NASA may establish a security area per 14 CFR Part 1203a. NASA will manage the response within the boundaries of the security area and coordinate with SLTT officials to ensure appropriate public health and safety actions are taken outside the security area.

## Nuclear Regulatory Commission (NRC)

The Nuclear Regulatory Commission (NRC) is responsible for coordinating response to incidents at or caused by a facility or an activity that is licensed by the NRC or an NRC Agreement State. These facilities include, but are not limited to, commercial nuclear power plants, fuel cycle facilities, DOE-owned gaseous diffusion facilities operating under NRC regulatory oversight, independent spent fuel storage installations, radiopharmaceutical manufacturers, and research reactors within facility boundaries. For incidents with offsite consequences, FEMA may assume the role of coordinating offsite federal response. The NRC would remain the primary federal authority for onsite activities.

---

[41] Subject to certain limitations. See 42 U.S.C. § 9604(a)(3).

The NRC licensee and agreement state licensee primarily are responsible for taking action to mitigate the consequences of an incident and providing appropriate protective action recommendations to SLTT government officials.

The NRC is responsible for the following activities, as appropriate:

- Perform an independent assessment of the incident and potential offsite consequences and provides recommendations concerning any protective measures.
- Perform oversight of the licensee, to include monitoring, evaluation of protective action recommendations, advice, assistance, and direction.
- Dispatch NRC technical experts to the licensee's facility.

Under certain extraordinary situations involving public health and safety or national defense and security, the NRC may order the transfer of special nuclear materials and/or specific operator actions at certain facilities regulated by the NRC.

The NRC closely coordinates its actions with SLTT government officials during an incident by providing advice, guidance, and support as needed.

## Federal Aviation Administration (FAA)

The Federal Aviation Administration (FAA) Office of Commercial Space Transportation licenses commercial launch and reentry activities and the operation of launch and reentry sites as carried out by U.S. citizens or within the United States. The FAA issues a license if an applicant demonstrates compliance with all applicable requirements of 14 CFR 400, and the FAA determines that the proposed launch or reentry will not jeopardize public health and safety, safety of property, or national security or foreign policy interests of the United States.

FAA requires launch and reentry applicants to submit a written plan (as according to 14 CFR § 450.173) to report, respond to, and investigate mishaps. The requirements address public safety, including the implementation of agreements with government authorities and emergency response services. Applicants must address toxic hazards mitigation for ground operations. Under § 450.189(e), an "operator must have general emergency procedures that apply to any emergencies not covered by the mishap plan of § 450.173 that may create a hazard to the public."

In addition, FAA reviews a payload proposed for launch or reentry (§ 450.43) to determine whether it would jeopardize public health and safety, safety of property, U.S. national security or foreign policy interests, or international obligations of the United States. FAA consults with other D/As for Payload Reviews, including DOD, DOS, NASA, Department of Commerce (DOC), DHS, Federal Communications Commission (FCC), and the Office of the Director of National Intelligence. Other D/As can be added if needed. FAA does not make a payload review determination for those aspects of payloads that are subject to regulation by FCC or DOC, or payloads owned or operated by the U.S. government.

Any radionuclides in a launch or reentry are evaluated by the FAA on a case-by-case basis (§ 450.45). An environmental review is also required in FAA launch and reentry licensing (and for non-federal launch sites), including meeting the National Environmental Policy Act. FAA's authority focuses on hazardous activities associated with launch and reentry. The FAA can enforce representations in an application. The FAA does not certify launch or reentry vehicles.

## Additional Federal Capabilities

The following additional federal agency capabilities may be used to support the LFA during nuclear/radiological incident response.

### U.S. Department of Agriculture (USDA)

The U.S. Department of Agriculture (USDA) provides the following capabilities in support of response to and recovery from a nuclear/radiological incident:

- Assists in the planning and collection of agricultural samples within the Ingestion Exposure Pathway Emergency Planning Zone (See Appendix E: Incidents Involving Commercial Nuclear Facilities).
- Assesses damage to crops, soil, livestock, poultry, animal feeds, and processing facilities and incorporates the findings in a damage assessment report.
- Assists in the evaluation and assessment of data to determine the impact of the incident on agriculture.
- Provides support and advice on screening and decontamination of pets and farm animals that may have been exposed to radiation or contaminated with radioactive materials.
- Assists in the planning and operations for disposal of animal carcasses.
- Inspects and assists in the collection of samples of crops, meat and meat products, poultry and poultry products, egg products, and milk and dairy products to ensure that they are safe for human consumption.
- Collects samples of agricultural products to monitor and assess the extent of contamination as a basis for recommending or implementing protective actions (as coordinated with FRMAC).
- Assists, in conjunction with HHS, in monitoring the production, processing, storage, and distribution of food through the wholesale level to eliminate contaminated product and to ensure that the levels of contamination in the product are safe and below the designated intervention levels.
- Acts as a federal land manager, and through the National Forest Service, is responsible for conducting initial response and notification after the discovery of nuclear/radiological incidents on National Forest Service-managed lands.

### National Oceanic and Atmospheric Administration (NOAA)

National Oceanic and Atmospheric Administration (NOAA) provides the following capabilities in support of response to and recovery from a nuclear/radiological incident:

- Provides near or on-scene weather observations upon request.
- Prepares forecasts tailored to support emergency incident management activities.
- When the Interagency Modeling and Atmospheric Assessment Center (IMAAC) is activated, provides atmospheric transport and dispersion (plume) modeling and forecasts, surface weather observations, and weather forecasts.

- When the IMAAC is not activated, provides atmospheric transport and dispersion (plume) modeling and forecasts to the LFA, in accordance with established procedures.
- Maintains and further develops the Hybrid Single Particle Lagrangian Integrated Trajectory Transport and Dispersion Model.
- Archives the meteorological data from national observing and numerical weather analysis and prediction systems applicable to the monitoring and assessment of the response.
- Provides assistance and reference material for calibrating radiological instruments.
- Provides support in the testing and evaluation of radiation shielding materials.
- In the event of materials potentially crossing international boundaries, provides atmospheric transport and dispersion products to international hydrometeorological services and associated agencies through the mechanisms afforded by the World Meteorological Organization.
- Provides radioanalytical measurement support and instrumentation.
- Provides assistance for collection and monitoring for marine and estuary contamination assessment.
- Advises and provides assistance on building operations for contamination control and decontamination processes.
- Provides laboratory support for analysis of materials and environmental samples.

## *U.S. Army Corps of Engineers (USACE)*

As a support agency to the EPA, the U.S. Army Corps of Engineers (USACE) provides the following capabilities in support of response to and recovery from a nuclear/radiological incident:

- Provides response and cleanup support.
- Provides technical expertise and support to response and recovery operations regarding contamination and remediation activities through USACE Natural Resource Management Environmental Compliance Coordinators (ECCs), if needed.
- Integrates and coordinates with other D/As, as requested, to perform any or all of the following:
  - Radiological survey functions
  - Gross decontamination
  - Site characterization
  - Contaminated water and debris management
  - Site remediation
  - Disposal options

## *U.S. Department of Health and Human Services (HHS)*

The Secretary of HHS has the authority to declare a Public Health Emergency (PHE) should conditions warrant. The Secretary also may declare an emergency and justify an emergency

use authorization (EUA), where the Commissioner of the Food and Drug Administration (FDA) may authorize the use of an unapproved medical product or an unapproved use of an approved medical product to diagnose, treat, or prevent serious or life-threatening disease or conditions where no adequate or appropriate alternatives are available. HHS provides the following capabilities in support of response to and recovery from a nuclear/radiological incident:

- Provides guidance and conducts epidemiological surveillance to detect symptoms consistent with exposure to radioactive materials, collect exposure histories, or identify public health needs.
- Provides advice for preventing or reducing exposure of the general population and response workers to radiation or radioactive materials.
- Provides advice on triage, assessment, medical management, behavioral health, and treatment of casualties for trauma and exposure to or contamination by radioactive materials, including among response workers.
- Provides available medical countermeasures (MCMs) through deployment of the Strategic National Stockpile assets.
- Facilitates the development, approval/authorization, availability, and security of MCMs.
- Provides assessment and treatment teams for those exposed to radiation or contaminated by radioactive materials.
- Provides advice, guidance, and resources in assessing the impact of the effects of radiological incidents on the health, including behavioral health, of persons in the affected area.
- Provides guidance on food safety, animal feeds, medicines, and other regulated commodities.
- Manages long-term public monitoring and supports follow-on personal data collection, collecting and processing of blood samples and bodily fluids/matter samples, and advice concerning medical assessment and triage of survivors, which tracks patient treatment and long-term health effects.
- Maintains the Epidemiologic Contact Assessment Symptom Exposure (Epi CASE) toolkit (formerly Rapid Response Registry toolkit), through the Agency for Toxic Substances and Disease Registry (ATSDR), which helps SLTT public health and incident response agencies rapidly establish registries of persons who are exposed or potentially exposed to chemicals or other harmful agents, including radiation, during catastrophic incidents.
- Provides, through ATSDR, public health assessments of waste sites, health consultations concerning specific hazardous substances, health surveillance, and applied research to support public health assessments.
- Coordinates all aspects of the national medical and public health response to include the National Disaster Medical System and the Radiation Injury Treatment Network, as well as radiation specific clinical guidance and training materials.

- Coordinates patient movement.
- Coordinates all aspects of national fatality management activities.
- Coordinates the behavioral health response and recovery activities.

## U.S. Department of Interior (DOI)

U.S. Department of Interior (DOI) provides the following capabilities in support of response to and recovery from a nuclear/radiological incident:

- Provides resources, including personnel, equipment, and laboratory support, to advise and assist in evaluating processes affecting radioisotopes in soils.
- Provides resources, including personnel and equipment, to advise and assist in the development of geographic information systems databases to be used in the analysis and assessment of contaminated areas.
- Provides liaison between federally recognized tribal governments and federal, state, and local D/As for coordination of response activities.
- Advises and assists DHS on economic, social, and political matters should a nuclear/radiological incident occur in an U.S. insular area.
- Acts as a federal land manager responsible for conducting initial response and notification after the discovery of nuclear/radiological incidents on DOI-managed lands.
- Supports the identification and tracking of contaminated transient wildlife, which can transport radioisotopes outside of the known radiation zones of the incident.

## Occupational Safety and Health Administration (OSHA)

OSHA provides the following capabilities in support of response to and recovery from a nuclear/radiological incident:

- Provides advice and technical assistance to the LFA and SLTT governments concerning the health and safety of response and recovery workers.
- Provides assistance with developing site health and safety plans.
- Provides technical assistance with emergency worker decontamination.

During the initial emergency response, OSHA will likely operate in a technical assistance and support mode, pursuant to the NRF, rather than issuing citations for workplace violations. However, OSHA retains its enforcement authority under the Occupation Safety and Health Act of 1970, particularly during cleanup, remediation, and other recovery activities.

## U.S. Department of Transportation (DOT)

DOT provides the following capabilities in support of response to and recovery from a nuclear/radiological incident:

- Provides technical advice and assistance on the transportation of radiological materials and the impact of the incident on the transportation infrastructure.
- Regulates the transportation of hazardous materials such as radiological materials.

In emergencies, the Pipelines and Hazardous Material Safety Administration (PHMSA) can provide technical advice including recommendations for special permit situations.

### Defense Threat Reduction Agency (DTRA)

DTRA provides the following capabilities in support of response to and recovery from a nuclear/radiological incident:

- Maintains a 24-hour, year-round Technical Reachback program to provide critical operational support and modeling of chemical, biological, radiological, nuclear, and explosive (CBRNE) events in support of DOD and other interagency customers.
- Provides technical expertise through SMEs in biology, medicine, nuclear/radiology, chemistry, explosives, structural engineering, meteorology, and targeting support.
- Serves as the technical operations hub for FEMA's IMAAC.
- In the event of an emergency, activates the IMAAC and conducts an initial response in about an hour, which includes notifying interagency partners, initiating modeling of the hazard, providing completed modeling products in the IMAAC Portal in CBRNResponder, hosting and coordinating an interagency meeting to exchange incident information and improve modeling products, and coordinating with the requester for recurring modeling updates as necessary.
- Addresses a wide range of nuclear phenomenology through available modeling tools, including space effects, high-altitude electromagnetic pulse, near-surface detonation, and ground shock on hard and deeply buried structures.
- Provides Hazard Prediction and Analysis Capability (HPAC), a fast-running Lagrangian atmospheric transport and dispersion tool for nuclear and radiological atmospheric hazards. Modules within HPAC provide a capability to model effects from a single nuclear device and up to hundreds of strategic incidents, a fissile material release from a nuclear device involved in a chemical explosion or fire, RDDs, and releases from fixed nuclear facilities.

### Department of Veterans Affairs (VA)

The VA provides the following capability in support of response to and recovery from a nuclear/radiological incident:

- In coordination with HHS, provides medical assistance using the Medical Emergency Radiological Response Team (MERRT), which provides direct patient treatment, assists and trains local health care providers in the managing, handling, and treatment of radiation-exposed and contaminated casualties, assesses the impact on human health, and provides consultation and technical advice to federal and SLTT authorities.

# Support and Coordination Elements

To facilitate federal interagency coordination and information sharing during a nuclear/radiological incident, several support and operational coordination elements may be utilized. These elements, combined with the assets, resources, and teams identified in Appendix H: Additional Assets, represent unique or critical federal nuclear/radiological capabilities that support federal and SLTT response and recovery operations.

## Countering Weapons of Mass Destruction (CWMD)

Within DHS, Countering Weapons of Mass Destruction (CWMD) supports the deployment of an enhanced global nuclear detection architecture to identify and report on attempts to import, possess, store, transport, develop, or use an unauthorized nuclear explosive device, fissile material, or radiological material in the United States. CWMD serves as a focal point, within DHS, in the counter-WMD mission space, by strengthening DHS-wide coordination and federal interagency cooperation and providing direct support to DHS, federal interagency, and SLTT partners in equipment, research and development, training and exercises, among other activities. DHS CWMD also continuously operates a CWMD Watch within the DHS NOC.

## Federal Radiological Monitoring and Assessment Center (FRMAC)

The FRMAC is an interagency coordination element responsible for coordinating all federal radiological monitoring and assessment activities. The FRMAC integrates radiological response resources from DOE/NNSA, EPA, the Advisory Team, and other federal D/As as needed in support of the FRMAC mission. FRMAC provides the following capabilities to support situational awareness and decision making during nuclear/radiological incident response and recovery:

- Ground and aviation-based monitoring and sampling
- Data assessment and management
- Sample processing and laboratory analysis
- Health and safety monitoring
- Technical coordination with radiological response authorities and decision makers
- Data product development and dissemination

FRMAC is activated and deployed for nuclear/radiological incidents that require significant federal interagency responses. FRMAC will activate when requested by a SLTT government,[42] LFA,[43] FEMA, responding Federal OSC,[44] or when a Stafford Act declaration is made in a nuclear/radiological incident.

The FRMAC is established at or near the incident location, in coordination with SLTT authorities, and FEMA or the appropriate LFA. The FRMAC initially coordinates and communicates with SLTT radiological response authorities and federal partners. Initial coordination with FEMA is through the NRCC and NRITF. At the local level, FRMAC field teams integrate with SLTT counterparts under field-level incident command to conduct coordinated monitoring and sampling operations, informed by FRMAC assessment and laboratory analysis requirements, to accomplish incident objectives.

DOE/NNSA leads the FRMAC for the initial response and coordinates all federal radiological monitoring and assessment activities including data management, assessment product development, and data and product distribution, regardless of LFA designation.[45] FRMAC

---

[42] A request from a state should be informed by the state radiological response authority and coordinated with the state emergency management entity.

[43] Table 1 of the NRIA details the agencies with primary authority based on incident type, facility, or materials involved.

[44] Federal On-Scene Coordinators under CERCLA and the NCP may activate and deploy FRMAC in accordance with statutory authorities and funding.

[45] This does not include offsite air monitoring and exposure data that is collected and collated by EPA's RadNet system.

leadership transitions to EPA when the immediate emergency operations shift predominantly to remediation and/or recovery, at which time EPA assumes responsibility as FRMAC lead for coordination of long-term radiological monitoring and assessment activities. Although it is difficult to specify in advance, specific conditions and guidance for this transition are established between DOE/NNSA and EPA. For operations of a scale or complexity such that this transition cannot occur within days to one week, DOE/NNSA expects substantial impacts to NEST's ability to sustain operations. These impacts would persist if substantial support from NEST resources is required following FRMAC leadership transition.

Some participating federal D/As have radiological planning and emergency responsibilities as part of their statutory authority. FRMAC plans and procedures do not supersede these authorities and partner agencies do not abdicate authority or responsibility through FRMAC participation and integration. Instead, FRMAC plans and procedures facilitate coordination of various federal monitoring and assessment authorities by providing a framework to implement those authorities and responsibilities as part of an integrated response in a coordinated fashion. It does not alter these authorities and responsibilities but instead complements them.

Most nuclear/radiological incidents will not require a FRMAC activation. In those instances, federal D/As with radiological response missions will continue to execute their respective missions through their statutory authorities.

FRMAC standards and procedures are established through an interagency process led by DOE/NNSA. These standards and procedures are subject to extensive peer review and are published in FRMAC manuals. All nuclear/radiological response entities, including SLTT governments, are encouraged to adopt and implement these standards and procedures to facilitate integration with FRMAC.

**FRMAC Responsibility**

The FRMAC is only responsible for coordinating monitoring activities in areas affected by the release and those that are adjacent. Other D/As with fixed monitoring capabilities are responsible for maintaining those monitoring activities outside the affected areas and reporting the results. For example, EPA will continue to operate and maintain the RadNet system and report results through the normal channels.

## Interagency Radiological Aerial Monitoring Concept of Operations

The Interagency Radiological Aerial Monitoring Concept of Operations provides an integration structure and supporting processes for coordinating all Nuclear Incident Response Team and all aerial assets engaged in radiological surveys during consequence management response and recovery operations. The concept of operations can be applied in support of the response to a range of radiological incident scenarios, including those of national significance covered under Stafford Act declarations. This concept of operations is intended for use by federal and SLTT entities, among others, that have the capability to provide aerial assets to assist in radiological monitoring. Central to the execution of this document is the staffing of a FRMAC position, the Radiological/Nuclear Aerial Coordinator

(RNAC), who will coordinate radiological aerial monitoring as part of the air operations group. This document is available on CMWeb along with the other FRMAC manuals.

## Interagency Modeling and Atmospheric Assessment Center (IMAAC)

The Interagency Modeling and Atmospheric Assessment Center (IMAAC) is an interagency coordination element responsible for production, coordination, and dissemination of federal atmospheric dispersion modeling and hazard predictions for an airborne portion of a hazardous material release. The IMAAC provides the single federal consensus on atmospheric predictions of hazardous material concentration to all levels of the Incident Command and national response organizations. This is achieved through a partnership between DHS, DOC (NOAA), DOD, DOE (NNSA), EPA, HHS, and the NRC. Through plume modeling analysis, the IMAAC provides emergency responders with predictions of hazards associated with atmospheric releases to aid in the decision-making process to protect the public and the environment.

The National Atmospheric Release Advisory Center (NARAC) is the primary provider of the modeling for nuclear/radiological incidents for the IMAAC.

## Advisory Team for Environment, Food, and Health (A-Team)

The Advisory Team for Environment, Food, and Health (A-Team) includes representatives from the EPA, USDA, FDA, Centers for Disease Control and Prevention (CDC), and other federal D/As as needed. The A-Team acts as an operational arm of the Federal Radiological Preparedness Coordinating Committee (FRPCC), which is organized under FEMA. The A-Team develops coordinated advice and recommendations on environmental, food, health, and animal health matters for the IC/UC, the JFO, the Unified Coordination Group (UCG), the LFA, and/or SLTT governments, as appropriate. The A-Team uses information provided by the IMAAC, FRMAC, and other relevant sources. The A-Team makes protective action recommendations, not decisions. It also provides coordinated technical and scientific advice through the LFA and SLTT governments and bases its recommendations on science and best practices. The A-Team is a coordinated asset that must be officially requested to be activated. Activation of the A-Team can be requested by any federal or SLTT entity through the FEMA Operations Center (FOC). It could also be activated through its participation on the NRITF. When the FRMAC is activated, the A-Team should be activated concurrently.

The A-Team provides advice on matters related to the following subjects:

- Protective Action Guides and their application to the incident
- Protective action recommendations using data and assessment from FRMAC
- Information needed to perform FRMAC environmental assessments (field monitoring) in support of protective action recommendations
- Health and safety advice or information for the public and for workers
- Estimated effects of radioactive releases on human health and the environment
- Measures to prevent or minimize contamination of milk, food, and water
- Recommendations for minimizing losses of agricultural resources from contamination

- Recommendations regarding the health, the management, and the disposition of livestock, poultry, pets, and other animals and the disposition of contaminated foods, especially perishable commodities
- Availability of food, animal feed, and water supply inspection programs to ensure wholesomeness
- Relocation of survivors, re-entry into the contaminated area, and other radiation protection measures
- Recommendations for recovery, return, and remediation activities of the contaminated area
- Other matters, as requested by the Incident Command or LFA

## Nuclear/Radiological Incident Task Force (NRITF)

The NRITF is an interagency group that convenes within the NRCC to provide standardized nuclear/radiological subject matter expertise in support of national level incident planning and core capability delivery. The mission of the NRITF is to offer recommendations to the NRCC regarding technical insight, consequence management support, and other nuclear/radiological critical considerations as needed to inform response/recovery operations and future planning.[46]

The task force is scalable, based on the size, scale, and type of incident. The task force leadership is determined by the incident, designated by the NRCC Chief, and may be filled by the LFA. The task force includes, but is not limited to, the following entities that will provide support during a nuclear/radiological incident:

- A-Team
- DOC/NOAA
- DOD
- DOE/NNSA
- Department of Labor (DOL)/OSHA
- EPA
- DHS/FEMA
- HHS/ Administration for Strategic Preparedness and Response (ASPR)
- HHS/CDC
- HHS/FDA
- NRC
- USDA

Other federal D/As, and liaisons may support the NRITF on an ad hoc basis depending on the shifting needs surrounding the nuclear/radiological incident.

The NRITF will include a recovery liaison staffed by FEMA or an RSF coordinating, supporting, or primary agency.

---

[46] Additional operational information can be obtained in the Nuclear Radiological Incident Task Force Standard Operating Procedure (2022).

The NRITF does not take the place of any ESF, RSF, or federal agency; rather, it augments capabilities to focus on specific priorities defined by NRCC leadership. Besides the NRITF, many interagency organizations provide nuclear/radiological subject matter expertise. The NRITF will not duplicate efforts but rather conduct its primary mission within the NRCC complementary to other nuclear/radiological subject matter expert organizations.

The NRITF can be activated in two ways: (1) the LFA for a nuclear/radiological incident requests that the NRITF be activated; or (2) the FEMA Administrator activates the NRCC in anticipation of or in response to a nuclear/radiological incident, thereby activating the NRITF.

## Unified Coordination Group (UCG)

The UCG is coordination structure composed of senior leaders representing federal and SLTT interests and, in certain circumstances, local jurisdictions and the private sector. The UCG acts as a decision-making body for interagency leadership during response and recovery operations. UCG members must have significant jurisdictional responsibility and authority. The composition of the UCG varies depending on the type, scope, and nature of the incident. Due to the complex nature of nuclear/radiological incidents, additional consideration must be given to ensure that all appropriate entities are represented on the UCG.

## Radiological Operations Branch (Rad Branch)

The Radiological Operations Branch (Rad Branch) is a functional component of an Initial Operating Facility (IOF) or JFO operations section designed to coordinate federal radiological response operations and support. The Rad Branch coordinates federal radiological response activities, which may include, but are not limited to, the following areas: (1) environmental monitoring, (2) population and worker monitoring, (3) decontamination, (4) waste management, (5) health and safety, and (6) response to nuclear reactors.

The Rad Branch executes the following activities in support of response to and recovery from a nuclear/radiological incident:

- Maintains operational status of federal radiological response resources.
- Reviews and coordinates Action Request Forms (ARFs) for radiological response requests.
- Allocates radiological response resources in accordance with UCG guidance.
- Identifies additional radiological response resource requirements.
- Coordinates with deployed federal radiological response resources.
- Establishes technical response priorities and objectives.
- Reviews and coordinates radiological response mission assignments (MAs) across all ESFs.
- Assists in maintaining a radiological response common operating picture with the planning section and/or situation unit.
- Provides radiological expertise to other elements of the JFO operations section.
- Coordinates with the NRITF on radiological response operations, federal radiological response resource allocation, and situational awareness.

- Coordinates with ESFs that maintain radiological response capabilities, including, but not limited to ESF #8, ESF #10, and ESF #11.

## Domestic Emergency Support Team (DEST)

The DEST is a rapidly deployable interagency team that supports the FBI. As part of its mission, the DEST supports the FBI OSC and other officials, such as the National Assets Commander, and supports the integration of law enforcement and counterterrorism operations with consequence management operations that may be taking place simultaneously. Based on the threat and requirements, the FBI determines the composition of the DEST and maintains operational control throughout its activation. The DEST can provide the FBI with expert advice and guidance that can inform Prevention Mission operations and may include a ready roster from FEMA, FBI, DOD, HHS ASPR, DOE, EPA, and others as appropriate. The FEMA Administrator, in support of the FBI, is responsible for policies and planning governing the use of the DEST and for facilitating approval for its deployment in accordance with agreed-upon policies and procedures.

## Weapons of Mass Destruction Strategic Group (WMDSG)

The WMDSG is an FBI-led interagency crisis action team. When facing a credible WMD threat or incident, the WMDSG is activated within the FBI's Strategic Information and Operations Center (SIOC) located at FBI Headquarters. The WMDSG supports information exchange, deconfliction of law enforcement operations, and/or counterterrorism operations to prevent and resolve imminent WMD terrorist threats while simultaneously coordinating with federal D/As responsible for consequence management activities to save lives, protect property, critical infrastructure, and the environment. The WMDSG facilitates the integration and sharing of real-time investigative information, intelligence, and technical analysis; facilitates the identification, acquisition, and use of interagency assets; and enhances the synchronization and deconfliction of Prevention, Response, and Recovery Mission operations. The WMDSG can include subject matter experts from different D/As depending on the nature of the threat and its modality. For example, this can include representatives from DOE NNSA during nuclear/radiological threats.

The WMDSG contributes to risk-informed decision making at all levels of the response, including, when appropriate, with SLTT, public health, private sector, and international partners through its collaborative environment and informative products like the WMD Threat Profile. The WMDSG connects with other FBI command posts within the FBI SIOC, such as the FBI CIRG National Asset Command Post regarding all technical information represented by and collected from the WMD device, and to the operations centers of other federal D/As. It also connects to the FBI field office(s) and appropriate local/regional partners through the JOC(s). The WMDSG connects to the DHS NOC, which maintains the DHS common operating picture and situational awareness for the federal government during intentional threats or incidents.

### Consequence Management Coordination Unit (CMCU)

FEMA staffs and manages the WMDSG's Consequence Management Coordination Unit (CMCU). The CMCU is the principal advisory unit for consequence management considerations within the WMDSG and provides strategic recommendations and integrated courses of action considering ongoing law enforcement operations. The CMCU supports

operational coordination and information sharing regarding response and protection activities. The CMCU is supported by federal technical capabilities provided through DOE/NNSA, HHS, DOD, and DHS. The CMCU responsibilities include the following activities:

- Coordination of the identification of potential risks for impacted populations
- Identification of potential preparatory consequence management actions to reduce risks to life and property by lessening the impact of the incident
- Positioning the response community to be able to respond should the incident occur
- Providing recommendations on sheltering and evacuating

## Radiological Operations Support Specialist (ROSS)

During nuclear/radiological incidents, the Radiological Operations Support Specialist (ROSS) identifies and provides critical information to responders, key leaders, and decision makers. The ROSS is a state and local subject matter expert with the ability to bridge the gap between response and radiological knowledge in order to minimize the impact of a potential or actual incident involving the release of radiological or nuclear materials.

A ROSS provides SLTT leadership, decision makers, and responders with appropriate recommendations for hot zone definition, population monitoring and decontamination levels, patient handling, release of vehicles and equipment from a hot zone, responder PPE, decontamination techniques, and dose and turn-back guidance. The ROSS also gives SLTT response centers instant expertise in the federal radiological response framework, including assets, capabilities, deployment timelines, logistical needs, and contact information. During nuclear/radiological incidents, the ROSS helps responders and decision makers interpret federal and local data products, and deconflict contradictory measurements and models.

## Planning and Preparedness Support Elements

The following support elements are active before nuclear/radiological incidents occur and provide planning and preparedness expertise. While not the focus of this annex, pre-incident preparedness can influence the effectiveness of response/recovery operations and must be considered. The following support elements execute pre-incident planning and preparedness activities that inform successful response/recovery operations.

### *Federal Radiological Preparedness Coordinating Committee (FRPCC)*

The FRPCC is an interagency body composed of subject matter experts from 20 federal D/As that work together to ensure that the United States is prepared for incidents involving nuclear or radioactive materials, including acts of terrorism.

The FRPCC is a national-level forum for the development and coordination of radiological preparedness policies and procedures. Chaired by FEMA, it assists FEMA and other federal D/As on policy development and direction concerning federal assistance to SLTT governments in their nuclear/radiological emergency planning and preparedness activities. The FRPCC also coordinates the research study activities of its member agencies related to SLTT government radiological emergency preparedness, which ensures minimum duplication of efforts and maximum benefits to SLTT governments.

*Radiological Emergency Preparedness (REP) Program*

FEMA's Radiological Emergency Preparedness (REP) Program coordinates the national effort to provide SLTT governments with relevant and executable planning, training, and exercise guidance. The REP Program advises SLTT governments of policies to increase capabilities to protect against, mitigate the effects of, respond to, and recover from incidents involving commercial nuclear power plants. The REP program assists SLTT governments in the development and conduct of offsite radiological emergency preparedness activities within the emergency planning zones of NRC-licensed commercial nuclear power facilities. The REP Program's activities integrate and enhance SLTT and federal governments' preparedness planning and response capabilities for radiological emergencies involving commercial nuclear power plants.

*DHS Science and Technology Directorate (DHS S&T)*

DHS Science and Technology Directorate (DHS S&T) is the primary research and development arm of DHS, promoting the development of homeland security technologies and providing the scientific expertise, assessments, and knowledge products that enable risk-based funding and deployment decisions by the Homeland Security Enterprise (HSE). DHS S&T, in coordination with the Assistant Secretary for CWMD, produces the Chemical, Biological, Radiological, and Nuclear (CBRN) Strategic Risk Assessment. Since this assessment includes a significant number of radiological and nuclear attack scenarios, these assessments are used to inform immediate mitigation measures, including protective and consequence management efforts.

# Critical Information Requirements

The following critical information requirements are supplemental to those outlined in the Response and Recovery FIOP and are linked to key decisions where appropriate.

## Radiation Identification

- Identification of the radiation source elements and their half-life,[47] as well as the area of highly hazardous or lethal radiation, and the identification of areas not subject to elevated radiation
- Movement and timing of fallout/plume, if present
- Baseline background radiation levels[48] in affected areas, if available[49]

## Incident Characterization

- Identification of damage zones and fallout/plume pathway to determine safe locations for initial support bases and staging areas, and identification of where to deploy response teams

---

[47] Radioactive half-life is the time required for any given radionuclide to decrease to one-half of its original radioactivity amount. For example, after a time of three half-lives, a given radionuclide will decrease to 1/8 of the original radioactivity amount.

[48] Background radiation is ionizing radiation from natural sources such as terrestrial radiation due to radionuclides in the soil or cosmic radiation originating in outer space.

[49] See the NCRP's Decision Making for Late-Phase Recovery from Major Nuclear or Radiological Incidents, Report No. 175, (2014).

- Deployment of rescue and triage resources, which requires estimates of where survivors can be found and extraction considerations
- Current and projected weather conditions
- Identification of command structure for operational communications

## Protective Actions

- Current protective action recommendations issued to the public and to response and recovery workers, including any changes or conflicts with protective actions ordered by non-federal entities
- Identification of response and recovery tasks specific to the incident that workers can safely perform

## Radiation Exposure

- Projections and real-time data for population and response and recovery worker radiation exposure, food contamination, and environmental contamination
- Determination of recommended operational exposure guidance
- Ongoing assessment of the radiation dose threat

## Resource Availability

- Availability of radiological response assets within the impacted area, which will affect response and recovery options
- Identification of private sector radiological response and recovery resources
- Status of SLTT radiological response resources

## Evacuation and Sheltering

- A map of the plume/fallout to identify safe (lowest risk) routes for evacuation and locations for triage sites and community reception centers[50]
- Locations of host communities with concentrations of evacuees

## Temporary Housing and Relocation

- Long-term evacuee/displaced persons status tracking (employment, temporary housing, preferences for permanent relocation versus return, if applicable)

## Health Effects

- Dose and exposure limits for workers (authorities for approving modification of dose/exposure limits)
- Potential long- and short-term physical and behavioral health effects to the affected population and responders

---

[50] See the FEMA *Planning Guidance for Response to a Nuclear Detonation* (2022), Chapter 5, Section 5.3, for information on CRCs.

- Availability of treatment and prophylaxis agents (including delivery time and total doses available) for both public and responder use
- Dosing guidelines for treatment and prophylaxis agents
- Guidelines for diagnosis and treatment of radiation injury or injury complicated with concomitant radiation exposure
- Evaluation of both penetrating radiation exposure and internal/external radioactive material contamination for effective diagnosis, triage, and treatment

## Reentry/Reoccupation

- Acceptable levels of contamination to determine reentry and/or relocation of impacted individuals and households
- Acceptable levels of radiation to allow homeowners to reoccupy contaminated areas, using the EPA's PAG Manual (January 2017)

## Infrastructure Impacts

- Forecasted impacts to transportation infrastructure, which may affect mobility within the area for an extended period of time
- Determination of whether transportation modes will enter the contaminated area
- Forecasted prolonged impacts and/or degradation to communications and public safety infrastructure due to exposure to radiation, which may affect communications within the area for an extended period of time
- Potential cascading impacts from affected critical infrastructure, which may not be operational and could impact surrounding areas

## Responsible Party Liability

- Insurance coverage, to include the Price Anderson Act (when applicable) and private party resources available

## SLTT Plans/Agreements

- Pre-incident waste management plans and potential sites for temporary debris/waste storage
- Host community agreements to support displaced populations, etc.

## Mass Fatality Management

- Assessment of known radiation information and determination of what level of PPE personnel must wear for each phase of the operation
- Determination of what conditions, if any, human remains can be safely recovered and processed for disposition
- Identification of facility sites for contaminated remains, to include capability and capacity

# ADMINISTRATION, RESOURCES, AND FUNDING

## Administration

Federal D/As are responsible for managing their own financial activities during all operational phases and across all mission areas within their established processes and resources. The *Financial Management Support Annex to the NRF* provides basic financial management guidance for all federal D/As that provide support for incidents that require a coordinated federal response.

## Resources

Federal D/As are responsible for personnel augmentation to support operations under this annex. Each federal agency possesses individual policies for personnel augmentation that is predicated on its authorities, various policies, memorandums of understanding, and mutual aid agreements. Federal D/As must ensure that their employees who are engaged in incident response activities are able to perform in accordance with operational requirements.

Pursuant to HSPD-5, the Secretary of Homeland Security is designated as the principal federal official for domestic incident management. Federal D/As are expected to provide their full and prompt cooperation, resources, and support to the Secretary, as appropriate and consistent with their own authorities, roles, and responsibilities for protecting national security and their respective missions for domestic incident management.

## Funding

Nuclear/radiological incidents that require a federal interagency response could be covered by the Stafford Act if an emergency or major disaster is declared. In addition to the Stafford Act, several other funding mechanisms are available for federal response operations depending on the incident. Those most likely to be utilized to fund nuclear/radiological incident response and recovery activities are described below.

### Stafford Act

The Stafford Act authorizes the President to issue a disaster or emergency declaration upon the request of a governor of a state or territory or the chief executive of a federally recognized Indian tribe when an incident overwhelms SLTT governments.

The Disaster Relief Fund is not available for activities not authorized by the Stafford Act, for activities undertaken under other authorities or agency missions, or for non-Stafford Act incidents requiring a coordinated federal response.

If a state or tribal government needs direct federal assistance, it can request (written or verbal) an emergency declaration for direct federal assistance. If a state or tribal entity requests reimbursement or individual assistance, then the standard preliminary damage assessment process applies. Direct federal assistance requested by the state for resources is provided to the affected SLTT jurisdictions when they do not have the resources to provide specific types of disaster assistance. This activity is subject to the cost-share provision designated for that specific disaster. Cost-share provisions are normally 75 percent federal

share and 25 percent state share. However, the President can waive the cost-share requirement and make this type of assistance 100 percent federally funded. An example of this type of assistance is providing generators.

FEMA may direct another agency to utilize the agency resources to address an identified unmet need. FEMA may mission assign another agency with or without reimbursement.

Other federal D/As have authority to provide assistance to support jurisdictions during nuclear/radiological incidents. Assistance provided by FEMA under the Stafford Act may not duplicate the assistance provided or available under the authority of another federal agency. Where the task falls within the statutory authority of the other federal agency, the mission assignment should be without funding.[51]

## Federal to Federal Support – Non-Stafford Act

Federal D/As may not have designated funds available to cover emergency/disaster operations; however, they may respond if the requested operations fall within their statutory role and responsibility. For federal D/As requested to provide assistance through FEMA to support a nuclear/radiological incident response, funding may occur through the agencies' existing funding streams. Additional funding to support a specific federal-to-federal support request may likely require implementation of the Economy Act or additional appropriations other than what is appropriated to operate existing department and agency programs.

Federal D/As called upon to provide supplemental capabilities or support will seek reimbursement from the LFA, as depicted in Table 1, and funding sources through an interagency agreement under the Economy Act.

## The Economy Act of 1932

The Economy Act of 1932, as amended, 31 USC § 1535, permits federal government agencies to purchase goods or services from other federal government agencies or other major organizational units within the same agency. An Economy Act purchase is permitted only if (1) amounts for the purchase are actually available, (2) the purchase is in the best interest of the federal government, (3) the ordered goods or services cannot be provided by contract from a commercial enterprise (i.e., the private sector) as conveniently or cheaply as could be by the federal government, and (4) the agency or unit to fill the order is able to provide or get by contract the ordered goods or services.

## Defense Production Act (DPA)

The Defense Production Act (DPA) is the primary source of Presidential authorities to expedite and expand the supply of critical resources from the U.S. industrial base to support the national defense and homeland security. In addition to military, energy, and space activities, the DPA definition of "national defense" includes emergency preparedness activities conducted pursuant to Title VI of the Stafford Act; protection and restoration of critical infrastructure; and activities to prevent, reduce vulnerability to, minimize damage from, and recover from acts of terrorism within the United States. The President's DPA authorities are delegated to the heads of various federal departments in Executive Order 13603.[52]

---

[51] Notable exceptions may occur, for example, codified policies pursuant to 6 USC 314 (a) (3).
[52] See National Defense Resources Preparedness, Executive Order 13603 (2012).

*Highlights of DPA Provisions*

The following bullets are highlights of the DPA:

- Provides authority to require acceptance and priority performance of contracts and orders to promote the national defense.
- Provides various types of financial incentives and assistance for industry to expedite production and deliveries or services under government contracts and to provide for creation, maintenance, protection, expansion, and restoration of production capabilities needed for national defense.
- Provides antitrust protection for actions conducted in accordance with voluntary agreements among business competitors to enable cooperation to plan and coordinate measures to increase the supply of materials and services needed for national defense purposes.

  - A "voluntary agreement" is an association approved by the federal government and entered into freely by two or more representatives of industry, business, financing, agriculture, labor, or other private interests, with the intent to plan and coordinate measures to increase the supply of materials and services needed for national defense and homeland security purposes, including emergency preparedness and response activities.

- Provides authority to establish the National Defense Executive Reserve, a cadre of persons with recognized expertise for employment in executive positions in the federal government in the event of an emergency.

The DPA's priorities and allocations authorities can be utilized to ensure the timely delivery of resources required to meet national defense requirements, including emergency preparedness (nuclear/radiological incident) and critical infrastructure protection and restoration activities. USDA, DOE, HHS, DOT, and the DOC have issued priorities and allocations regulations that can be used to prioritize contracts for food resources, all forms of energy, health resources, all forms of civil transportation, and industrial resources under each department's resource jurisdiction from the U.S. industrial base to meet national defense and emergency preparedness requirements of approved programs. The DOC has delegated authority to DHS/FEMA to place priority ratings on contracts for industrial resources to support DHS/FEMA's response activities under emergency and non-emergency conditions.

# OVERSIGHT, COORDINATION, AND COMMUNICATIONS

## Oversight

FEMA, in close coordination with the DHS Office of the Secretary and with the Federal Radiological Preparedness Coordinating Committee, is the executive agent for this annex

and is responsible for its management and maintenance. This annex will be updated periodically, as required, to incorporate new presidential directives, legislative changes, and procedural changes based on lessons learned from exercises and actual incidents.

# Coordination

## Radiological Data Sharing

### The CBRNResponder Network

The CBRNResponder Network is the national standard and whole community solution for the management of radiological data. It is a product of collaboration between FEMA, DOE/NNSA, the EPA, and states within the Conference of Radiation Control Program Directors.[53]

CBRNResponder is provided to all SLTT response organizations and allows individual users to leverage information from across the nation to uniformly establish a flexible, efficient, and networked approach to radiological data management. CBRNResponder can be accessed on smartphones, tablets, and via the Web, allowing it to be seamlessly and rapidly employed at all levels of government during a response to a radiological or nuclear emergency. Partnership functions within the network provide flexibility for organizations allowing them to manage how, with whom, and when they share radiological data.

The entire CBRNResponder initiative adheres to the field data management protocols established by the FRMAC.[54] Moreover, during a radiological and nuclear emergency, all environmental data collected by organizations using the CBRNResponder Network can be quickly verified by the FRMAC to support rapid assessment and critical decision making.

### Data Sharing

A well-coordinated response in a nuclear/radiological emergency will be heavily dependent on quick and accurate data analysis across numerous responding organizations.[55] Note that communications and data sharing could be substantially impeded by the effects of the nuclear/radiological incident.

- States have the authority to grant access to their data to other states. Data sharing among state programs can happen at any time.
- When a coordinated federal response is warranted (for a national-level incident), environmental data collected by state programs in CBRNResponder shall automatically be shared with federal response officials.
- Federal data should be shared with SLTT governments in a timely fashion using CBRNResponder.
- CBRNResponder should never be locked or turned off during an incident; organizations should always be able to access their input data.

---

[53] Conference of Radiation Control Program Directors is an organization whose members represent state radiation protection programs. For more information, visit the CRCPD website at http://www.crcpd.org.
[54] See FRMAC Monitoring and Sampling Manual Volume II, Revision 3, (2021) and FRMAC Monitoring and Sampling Manual Volume I, Revision 3 (2019) for more information.
[55] A committee of the Conference of Radiation Control Program Directors provided these data sharing recommendations.

- Access to FRMAC information management systems shall not be taken away in an emergency. Previously identified state radiation control program staff and other government emergency response partners need continuous access to view data streams and products.
- Products developed from FRMAC databases will always be made available to approved representatives of the response organizations responsible for public protection.
- To provide confidence in the environmental data posted in CBRNResponder, each partner organization should have a documented quality assurance process that can be applied to the collected data.
- Confidence in data or data providers can be indicated by the organization's quality assurance program/process and a description of the sample collection and analysis protocols (geometry, standard operating procedures, meter type, count time) to account for variability in sample collection and analysis. This will enable independent assessment by other organizations accessing the data. All data should be verified and validated as defined by the organization's documented quality assurance process and this status reflected in the database it is stored in to be considered final.
- Data from FRMAC and the EPA's RadNet monitoring system, which tracks levels of radiation in the environment, should be shared promptly with SLTT partners. This data may not yet be fully validated but is still shared to facilitate quick emergency assessments.[56]

## Coordination with Infrastructure Owner/Operators

The following bullets provide examples of how the federal government can coordinate with infrastructure owner/operators:

- Federal D/As collect, share, and disseminate status updates on critical infrastructure operations, impact, consequences and analysis, and recommendations for restoring critical infrastructure in coordination with the DHS Cybersecurity and Infrastructure Security Agency (CISA) and relevant Sector Risk Management Agencies (SRMAs).
- The federal government coordinates support through public-private partnerships, associations, and contractual agreements in responding to and recovering from a disaster or emergency in collaboration with the appropriate sector-specific agency.
- DHS CISA will provide visibility on the status of private sector–operated critical infrastructure, identify direct or cascading effects of private sector critical infrastructure failure, and coordinate with private sector partners to identify potential support requirements to ensure rapid stabilization and access to impacted private sector critical infrastructure.

---

[56] For more information on data validation methods, see *FRMAC Laboratory Analysis Manual* (2013).

- Independent regulatory agencies have established relationships, outage reporting mechanisms, and the ability to provide regulatory relief that will assist in response and recovery operations, as well as contribute to a common operating picture of the impacted critical infrastructure.

## Non-Governmental Organizations (NGOs)

The following bullets provide examples of how NGOs support nuclear/radiological operations:

- Voluntary Agency Liaisons coordinate federal support for non-governmental organizations' volunteers and programs and should perform the following activities:

  o Assess needs generated by the incident to coordinate the provision of timely and efficient services.
  o Coordinate with SLTT agencies to determine the need for any federal resource requests for needed mass care items and help facilitate their deployment and arrival.
  o Determine federal support for SLTT recovery activities to include referrals for housing, unmet needs, case management, and referral services.

# Communications

It is essential to ensure early coordinated, consistent, and unified public messaging that is credible and provides clear, timely, and actionable information that is accessible and culturally and linguistically appropriate for all affected populations. This public messaging must be accessible to individuals with disabilities, understood by individuals who are limited English proficient, and available to older adults and others without access to the Internet. Public messaging should adhere to the principles of risk communications, even in areas unaffected by the incident, and include information regarding the threat, hazard, or incident, as well as the actions being taken and the assistance that is available, including addressing behavioral health impacts that may be significant in impacted populations. Communication systems for federal and SLTT agencies should coordinate to maintain situational awareness and permit timely assessments of the status of critical services, resources, and infrastructure.

The Domestic Communications Strategy developed and maintained by the DHS Office of Public Affairs will be activated for federal interagency responses to a nuclear/radiological incident. The White House Office of Communications reviews and approves its content and provides strategic direction during its employment. The Domestic Communications Strategy is intended for the U.S. domestic audience, but its execution is coordinated and shared with federal partners to ensure consistency with international activities. The strategy is adaptable and can be adjusted as necessary to support emergency planning activities, particularly during the pre-incident phase.

The potential effects from a nuclear/radiological incident may destroy or degrade communication infrastructure in the immediate area and severely hinder communications. The survivability and operational capacity of both existing emergency communications networks and interoperable communication systems may be negatively affected.

The National Response Framework ESF #2 Communications Annex provides support to federal and SLTT governments and first responders when their systems have been impacted and provides communication and information technology support to the Joint Field Office and federal field teams.

FEMA's Integrated Public Alert and Warning System provides significant capability for public messaging, including capability to broadcast an alert message to all cellular phones in a given area as a Wireless Emergency Alert, and access to the Emergency Alert System, NOAA All Hazards Weather Radio network, and internet connected alerting tools.

The FEMA Mobile Emergency Response Support (MERS) element will provide communications connectivity for FEMA and other federal responders to the maximum extent possible. This connectivity consists of, but is not limited to, satellite, high frequency, and microwave line-of-sight interconnected by fiber optic cables to voice and data switches, local area networks, and desktop devices such as personal computers and telephones. The MERS element will assist in establishing initial communications operations at the Joint Field Office once it is established.

The primary reporting methods for interagency information flow are Homeland Security Information Network (HSIN) and FEMA's Crisis Management System, formally known as WebEOC™. Each federal department and agency will use HSIN common operating picture for incident reporting. The HSIN Intelligence portal will be used for the dissemination, collaboration, and notification of unclassified information and intelligence.

HSIN provides information capability that supports both National Infrastructure Protection Plan and National Response Framework. In addition, HSIN provides situational awareness and facilitates information sharing and collaboration with homeland security partners throughout federal, SLLT, and private sector partners. Each federal D/A will use HSIN common operating picture for incident reporting.

Additional threat-reporting mechanisms are in place through the FBI, where information is assessed for credibility and possible criminal investigation. The FBI-led interagency WMDSG threat products may also be useful to inform operations and decisions by the response community.

Prior to the release of information involving a potential terrorist incident, to ensure that sensitive law enforcement information is not improperly released, federal D/As must coordinate their public messaging communications with the Attorney General of the United States.

Additional information can be found in the interagency document *Communicating During and After a Nuclear Power Plant Incident*.[57]

---

[57] See FEMA's Communicating During and After a Nuclear Power Plant Incident (2013) for additional guidance.

This page intentionally left blank.

# Appendix A: FEDERAL RESPONSE COORDINATION CONSTRUCTS

This appendix expands on the discussion of the four federal response coordination constructs identified in "Response/Recovery Coordination Constructs" (page 15) and Figure 2. These constructs are based upon a graduated scale that ranges from localized nuclear/radiological incidents requiring no additional federal resources to those that require a large-scale federal interagency response.

Application of one of the four federal response coordination constructs is based upon the severity of the incident, its impact on the population and environment, and the resources required and available to respond to the incident. The Federal On-Scene Coordinator (OSC) makes the initial assessment of which federal coordination construct is required to respond to a nuclear/radiological incident. As an incident escalates in size and complexity, the level of response scales to the appropriate response construct.

## Initial Actions

For a Federal OSC to become aware of a nuclear/radiological incident and complete their initial assessment of the situation, multiple initial actions must be completed. After discovery of the incident, Federal OSCs must be notified and conduct the preliminary assessment to determine the appropriate level of federal response required.

### Discovery and Notification

Federal OSCs may become aware of nuclear/radiological incidents from any of the following sources:

- Notifications made to the NRC under federal laws and regulations
- Reported observations from government agencies or the public, government patrols or investigations, or citizen petitions
- Operational coordination with federal law enforcement

### Federal OSC Assessment and Determination of Response Coordination Constructs

The Federal OSC makes a preliminary assessment of impacts to determine the appropriate level of federal response, as depicted in Figure 2. The Federal OSC collects pertinent information, to the extent practicable, about the incident. These assessments may include the following information:

- Magnitude and severity of the discharge or threat
- Identification of potential owner/operators
- Nature, amount, and location of materials released
- Probable direction and time of travel of materials released
- Pathways to human and environmental exposure
- Potential impact on human health, welfare, safety, and the environment

- Natural resources and property affected
- Impacts to critical infrastructure such as closure of waterways, ports, and locks; shutdown of water intakes; and disruptions to critical supply chains
- Priorities for protecting human health, welfare, and the environment
- The need for lifesaving, life-sustaining, and protective measures such as evacuation, mass care, and health measures
- Description of responder and owner/operators' initial actions

The Federal OSC may collect information by telephone and may deploy to the incident scene. The Federal OSC typically coordinates with SLTT or insular governments on the need for a federal response, but in all cases, the Federal OSC makes an independent assessment of this need.

## Response Coordination Constructs

Following is a detailed breakdown of the four federal response coordination constructs including a description of each construct and the D/As and other organizations involved in coordination and response. These response coordination constructs depict the consequence management coordination structure during a federal interagency response only. Law enforcement response coordination is discussed in a separate section starting on page A-6, as well as in Appendix C: Law Enforcement Coordination for Intentional Nuclear/Radiological Incidents.

### No Federal Response Required

Under this construct, the Federal OSC has evaluated the situation and determined that owner/operator(s) (O/O) and SLTT responders have enough resources to manage and control the response to a nuclear/radiological incident, as depicted in Figure A-1. The resources provided by a federal interagency response are not required, but the Federal OSC continues to act as a federal liaison to the response operation.



Figure A-1: No Federal Response Required Coordination Construct

### Unified Command Response

Under this construct, the Federal OSC has evaluated the situation and determined the incident requires federal coordination to deliver appropriate resources to support response/recovery operations. Many federal D/As with different authorities may respond to nuclear/radiological incidents and may be designated as the LFA. However, initially, most

federal nuclear/radiological incidents will be evaluated by a competent federal authority listed in Table 1 until an LFA is determined. An LFA is determined based on the incident's characteristics and coordinates with the SLTT authorities and owner/operators to execute response operations. In addition to the LFA resources, capabilities and assets from other federal D/As may be requested to support response/recovery operations. The Federal OSC and LFA will coordinate the federal incident response with various agency, SLTT, and owner/operator resources using a unified command structure as depicted in Figure A-2.



Figure A-2: Unified Command Response Coordination Construct

The National Response System (NRS), established by the NCP, provides access to organizations that routinely and effectively prepare for and respond to a wide range of oil and hazardous-substance releases. Key federal response components of the NRS include the National Response Center, Federal OSCs, thirteen Regional Response Teams (RRTs), the National Response Team (NRT), and NCP federal special teams. When a Federal OSC determines that a federal response is needed, the NRT, RRT, and special teams are available to the Federal OSC to support the response.

> **National Response System (NRS)**
>
> The NRS is a multi-layered system of individuals and teams from SLTT and federal D/As, industry, and other organizations that share expertise and resources to ensure that response to an oil spill or hazardous material release, including nuclear/radiological incidents, is timely and efficient and that threats to human health and the environment are minimized.

## Unified Command Response with ESFs

When the effects of a nuclear/radiological incident require federal resources significantly beyond those that can be delivered solely through the unified command response construct, the Secretary of Homeland Security, acting through the FEMA Administrator, may be asked to facilitate assistance through the ESF response structure. It should be assumed that a nuclear incident response will likely require this additional assistance beyond the basic unified command structure. Figure A-3 illustrates the unified command response with ESFs that is typically deployed in this case.

Figure A-3: Unified Command Response with ESFs Coordination Construct

### *Federal Resource Coordinator*

When the LFA requests the assistance of DHS to obtain support from other federal D/As through the ESF response structure, the FEMA Administrator may designate a Federal Resource Coordinator (FRC). The FRC's responsibilities may include the following activities:

- Coordinating timely delivery of resources to the requesting D/A using interagency agreements and memorandums of understanding
- Coordinating the ESFs as necessary to support the Federal OSC or other senior officials and to address broader incident impacts
- Providing support to the Federal OSC or other senior officials in the identification, deployment, and coordination of federal resources
- Tasking federal ESF lead D/As with providing needed federal-to-federal assistance

## Stafford Act Response

When a nuclear/radiological incident is of increased size and complexity, SLTT resources are overwhelmed, and the incident will require an extensive federal interagency response. In these incidents, the governor of a state or territory or the chief executive of a federally recognized Indian tribe may request federal assistance under the Stafford Act. When the President approves a Stafford Act declaration request, a major disaster or emergency declaration is issued, which makes federal financial and other support to SLTT governments available for response and recovery. In incidents that are primarily the responsibility of the federal government, the President can issue a Stafford Act declaration without a request. FEMA leads the federal response and recovery during a Stafford Act incident and designates a Federal Coordinating Officer (FCO) to coordinate the overall federal response. This response typically includes a Unified Coordination Group that oversees the Unified Command Response with the support of both the ESFs and RSFs as depicted in Figure A-4.



Figure A-4: Stafford Act Response Coordination Construct

### Stafford Act Federal Activities

The federal response under a Stafford Act declaration is described in the Response and Recovery FIOP. After a Presidential declaration of a major disaster or emergency, a FEMA Regional Response Coordination Center (RRCC) will coordinate initial regional and field activities until a JFO is established.

A FEMA FCO will deploy to coordinate the overall federal response in support of the Federal OSC, operating from an IOF until the JFO is established. When established, the JFO provides a central location coordinating the activities of the federal government, SLTT governments, and private sector and NGOs with primary responsibility for response and recovery operations. The JFO is organized, staffed, and managed in a manner consistent with principles of NIMS.

Personnel from federal and state D/As, other jurisdictional entities, the private sector, and NGOs staff various positions within the JFO, depending on the requirements of the incident. These personnel constitute the Unified Coordination Staff (UCS). The UCS is led by the UCG, which is composed of an FCO, State Coordinating Officer, and other senior officials, as necessary.

Although the UCS uses the structure of the Incident Command System, it does not manage on-scene operations. Instead, it focuses on providing support to on-scene response activities and conducting broader support operations that may extend beyond the incident site.

The FCO coordinates the overall federal response, and the Federal OSC conducts response actions with other federal D/As, as described in the NRF's ESF annexes and in the Response and Recovery FIOP. During response, the Federal OSC retains the authority to take action following NCP procedures, including direction and oversight of owner/operator responses.

Under a Stafford Act declaration, ESFs provide representatives to the RRCC, JFO, and FEMA NRCC when requested and may send liaisons to SLTT emergency operations centers (EOCs). Where nuclear/radiological response is a significant component of the overall response, the FCO should ask the LFA and/or other relevant federal D/As to designate a senior official to be part of the UCG.

## Coordination with Federal Law Enforcement

For federal interagency responses to suspected or actual intentional nuclear/radiological incidents, federal law enforcement includes two major components: (1) law enforcement and investigative operations led by the FBI and (2) public safety and security activities led by ESF #13 as seen in Figure A-5.



**Figure A-5: Federal Law Enforcement Components Involved in Nuclear/Radiological Incident Response**

If the incident involves a suspected or confirmed terrorist attack or other federal crime under its jurisdiction, the FBI will establish a local command post, referred to as the Joint Operations Center (JOC), to manage law enforcement and investigative operations. During a threat or incident involving a WMD or chemical, biological, radiological, and nuclear (CBRN) materials or devices, the JOC will include a consequence management group staffed by representatives of other D/As. When such incidents affect multiple locations, additional JFOs and FBI JOCs may be established. JFO elements will coordinate at the local level with the JOC consequence management group and at the national level with the FBI-led WMDSG and embedded CMCU. For additional information regarding the WMDSG and the CMCU, see page 44-45. For additional details concerning the law enforcement response, see Appendix C: Law Enforcement Coordination for Intentional Nuclear/Radiological Incidents.

During the initial response to a suspected or actual intentional nuclear/radiological incident, the priority will be on protecting human health and safety (of both the public and responders), while also considering the need for evidence preservation, documentation, and collection in a potentially contaminated environment. In addition to consequence management and law enforcement operations, there will also be a simultaneous need for environmental response. Every effort will be made to share information between response and law enforcement activities to support respective missions.

If a Federal OSC discovers evidence of suspected criminal activity associated with the incident, the Federal OSC will contact, consult, and coordinate with the local FBI field office and the FBI Special Agent in Charge (SAC).

In addition to law enforcement investigation and intelligence operations, DOJ, through the ESF #13 National Coordinator, is responsible for coordinating the federal interagency law enforcement response related to public safety and security activities.

For more detailed information on law enforcement operations following a nuclear/radiological incident and how law enforcement coordinates with consequence management operations, refer to Appendix C: Law Enforcement Coordination for Intentional Nuclear/Radiological Incidents.

## Recommendations and Decision Making

The Federal OSC leads the federal response and coordinates operational recommendations and decisions. Federal D/As provide recommendations or related technical support to SLTT governments for the following protective actions:

- Public sheltering in place or evacuation
- Responder protective actions
- Potable water, food safety, and other health and safety issues

SLTT governments typically decide sheltering and evacuation actions; however, various federal D/As have the expertise and authority to provide recommendations and technical assistance for incident response, if necessary.

In some cases, federal statutory and regulatory requirements may determine protective actions for the public and responders. For example, the USDA provides federal recommendations on the safety of meat, poultry, and processed egg products. Depending on jurisdiction, OSHA, states, or EPA recommends actions to protect response workers. For a federally led response, the Federal OSC also develops a site safety plan for the nuclear/radiological incident response site.

Several laws and executive orders may also apply to response actions, to protect natural and cultural resources and historic properties and to ensure consultation with tribes.

This page intentionally left blank.

# Appendix B: COMMUNITY LIFELINES

Community lifelines enable the continuous operation of critical government and business functions and are essential to human health and safety or economic security. Lifelines are the most fundamental services in the community that, when stabilized, enable all other aspects of society to function. Lifelines are the integrated network of assets, services, and capabilities that are used day to day to support the recurring needs of the community. When a lifeline is disrupted, decisive intervention (such as rapid service reestablishment or employment of contingency response solutions) is required to stabilize the situation. For a nuclear/radiological incident, the lifeline concept may be applied to prioritize the delivery of critical services that alleviate immediate threats to life and property.

Lifelines help frame how disaster impacts are identified, assessed, and addressed. Figure B-1 illustrates the seven lifelines: Safety and Security; Food, Water, Shelter; Health and Medical; Energy (Power & Fuel); Communications; Transportation; and Hazardous Materials.



Figure B-1: Community Lifelines

## Lifeline Stabilization and Condition Determination

When a nuclear/radiological incident disrupts lifeline services to the point that survivors and property are severely affected, stabilizing the lifelines becomes the highest priority. Lifelines provide a framework for responders to use in assessing disruption to critical lifesaving and life-sustaining services. These services are assessed at each level of government.

### Lifeline Stabilization

Assessing lifeline status allows for more efficient decision-making during response by gathering critical information associated with the following response activities:

- Determine the severity of impact on critical infrastructure.
- Identify limiting factors and gaps to address those impacts.
- Quickly prioritize solutions to alleviate threats to life and property.
- Provide stabilization to survivors by rapidly reestablishing critical services.

Stabilization may occur through the employment of a temporary solution to restore a lifeline until a permanent solution can be established. When a lifeline has been restored, follow-on events may lead to lifeline degradation. Therefore, lifelines must be continually resourced, and their condition monitored. Depending on severity of impact on each lifeline, some lifelines may be restored earlier than others.

For the hazardous materials lifeline, an example of a stabilization target could be the identification and securing of all affected areas from a nuclear/radiological incident as shown in Table B-1.

Table B-1: Hazardous Materials Lifeline Examples

| Item | Examples for Hazardous Materials |
|---|---|
| Planning factors | <ul><li>Number of facilities damaged</li><li>Amount of total debris (tons)</li></ul> |
| Stabilization targets | <ul><li>All affected areas are identified and secured</li></ul> |
| Related federal assistance | <ul><li>Debris management</li><li>Environmental cleanup</li></ul> |

## Determining Lifeline Status

Once situational awareness is attained, leadership determines the status of the lifelines within the affected area. The status indicates the level of degradation of lifeline services and provides a snapshot for an operational period. Lifeline statuses should be determined collaboratively and continually as circumstances evolve over the course of an incident. FEMA's reporting products use four colors (grey, red, yellow, and green) for operational reporting on lifelines as given in Table B-2.

Table B-2: Lifeline Operational Status Reporting

| Status | Description |
|---|---|
| Unknown: Grey | Disruption and impacts to lifeline services are unknown |
| Unstable: Red | Lifeline services disrupted, with no solution identified or in progress |
| Stabilizing: Yellow | Lifeline services disrupted but solution in progress with estimated time to stabilization identified |
| Stable: Green | Lifeline services stabilized, reestablished, or not affected |

# Hazardous Materials Lifeline and Nuclear/Radiological Incidents

The Hazardous Materials lifeline monitors the status of hazardous materials and facilities, pollutants, and contaminants during an incident. A nuclear/radiological incident may disrupt multiple lifelines. For example, if an accidental nuclear release occurs at a power plant, then the response must stabilize both the Hazardous Material lifeline and the Energy lifeline. If a radiological release causes more people to seek medical care than local hospitals can handle, then response must stabilize both the Hazardous Materials lifeline and the Health and Medical lifeline.

The Hazardous Materials (HAZMAT) lifeline has two components: (1) infrastructure and (2) contaminants and exposure. Figure B-2 shows the components and subcomponents.



Figure B-2: Components of the Hazardous Materials Lifeline

For the affected communities to be fully stabilized after a nuclear/radiological incident, all lifelines must be stable, including Hazardous Materials. Stabilization targets are developed for all components and subcomponents of every lifeline early in the response process—typically immediately following completion of component assessment. Initial stabilization targets should be revisited and refined periodically throughout the response. Stabilization targets drive key leadership decisions and prioritization of response resources and actions, including the development of strategies, operational priorities, and objectives. Due to the unique and complex nature of nuclear/radiological incidents, other stabilization targets will need to be identified, in addition to the Hazardous Materials lifeline stabilization targets, as multiple community lifelines will likely be impacted. This may include the Food, Water, Shelter lifeline, the Health and Medical lifeline, and the Safety and Security lifeline, among others.

## Nuclear/Radiological Recovery Outcomes

When stabilization of community lifelines is achieved, the focus of the mission shifts to achieving recovery outcomes. The outcome-driven recovery model is an approach that emphasizes long-term, resilient solutions across all lifelines and other aspects of a community and would be used following a nuclear/radiological incident. To the greatest extent possible, recovery operations will use reporting templates similar to those used during response but modified to reflect recovery outcomes by RSFs rather than stabilization targets by lifeline.

Table B-3 provides an example of recovery outcomes by RSF. These are the national-level outcomes as approved by Recovery Support Function Leadership Group (RSFLG) undersecretaries. SLTT leaders can use these as a reference point for tailoring their own recovery outcomes in circumstances such as a nuclear/radiological incident.

Table B-3: Examples of Recovery Outcomes by RSF

| Recovery Support Function | Recovery Outcome |
|---|---|
| Community Planning and Capacity Building | Aid SLTT governments in building their local capabilities to effectively plan for and manage recovery. |
| Economic | Return economic and business activities to a state of health and develop new economic opportunities that result in a sustainable and economically viable community. |

| Recovery Support Function | Recovery Outcome |
|---|---|
| Health and Social Services | Support locally led recovery activities to address public health, health care facilities and coalitions, and essential social services' needs. |
| Housing | Implement adequate, affordable, and accessible housing solutions that effectively support the needs of the community and contribute to its sustainability and resilience. |
| Infrastructure Systems | Facilitate the restoration of infrastructure systems and services to support a viable, sustainable community and improve resilience to and protection from future hazards. |
| Natural and Cultural Resources | Preserve, conserve, rehabilitate, and restore natural and cultural resources and historic properties consistent with post-disaster community priorities and in compliance with applicable environmental and historical preservation laws and executive orders. |

# Appendix C: LAW ENFORCEMENT COORDINATION FOR INTENTIONAL NUCLEAR/RADIOLOGICAL INCIDENTS

The appendix addresses incidents involving nuclear/radiological materials, weapons, and devices that are intentionally imported, possessed, stored, transported, developed, or used without authorization by the appropriate regulatory authority. The focus is on such incidents for which (1) immediate federal support or assistance is required, (2) resource pre-positioning could be complex or not possible, or (3) the requirements for resources and support are not fully known. Any possible terrorist incident involving nuclear/radiological materials, weapons, or devices will be treated as an actual terrorist incident until otherwise determined by the Attorney General, acting through the FBI Director. This appendix does not address acts of nuclear war.

## Background

In the event of an intentional nuclear/radiological threat or incident, the federal government will work to save lives and minimize the damage to property, critical infrastructure, and the environment by resolving the threat and preventing further potential attacks. Operational coordination, information sharing, and decision-making help to ensure an effective response and recovery. Federal D/As will coordinate with and support SLTT authorities to respond to and recover from nuclear/radiological incidents affecting their jurisdictions.

The Protection and Prevention Mission areas include core capabilities necessary to prevent or stop an imminent or ongoing act of terrorism and follow-on attacks. This appendix outlines the federal interagency coordination mechanisms that ensure the integration of these two mission areas with those of Response and Recovery Missions during a suspected or actual intentional incident. This integration involves coordination and timely information sharing that will achieve unity of effort to inform operations and decisions across the mission areas. Given the complexity of response across mission areas, unity of effort is essential to avoid unintended consequences that may otherwise result from independent or unilateral response and recovery operations. Unity of effort increases the likelihood of saving lives; protecting property, critical infrastructure, and the environment; and successfully resolving or preventing intentional threats and incidents.

Information regarding imminent credible threats from law enforcement will be communicated to the relevant consequence management organizations through established interagency coordination mechanisms identified in the National Prevention Framework[58] and the Prevention FIOP,[59] such as the FBI's Weapons of Mass Destruction Strategy Group (WMDSG) for the national-level coordination and the FBI's Joint Operations Center (JOC) for local-level coordination. In rare instances, however, concerns for national security, counterterrorism, or law enforcement operational security may limit the release of certain

---

[58] See the *National Prevention Framework*, Second Edition (2016).
[59] The Prevention FIOP contains sensitive information and is not publicly available on unclassified systems in the interest of national security. Stakeholders can receive a copy through their local Fusion Center.

information. Therefore, during any response to a credible threat involving suspected or actual criminal or terrorist activity, federal D/As must follow the applicable policies, including any classified Presidential policies, and closely coordinate their proposed public messaging and SLTT outreach activities. Close coordination also will ensure that federal leadership is well informed for making decisions.

> **Prevention Federal Interagency Operational Plan (FIOP)**
>
> The Prevention FIOP describes the federal law enforcement investigative, intelligence, and operational response to a terrorist threat or attack. It also describes how federal law enforcement entities will coordinate with SLTT agencies and other federal D/As with law enforcement responsibilities.

The Attorney General, acting through the Director of the FBI, leads and coordinates the operational law enforcement response to terrorist threats and incidents, which include the law enforcement activities at the crime scene and related law enforcement investigative and intelligence activities. Acting through the FBI, and in cooperation with other federal D/As engaged in activities to protect national security, the Attorney General also coordinates the activities of other members of law enforcement community to detect, prevent, preempt, and disrupt terrorist attacks against the United States. The Attorney General, acting through the FBI Director, also has primary responsibility for investigating, locating, assessing, interdicting, recovering, rendering safe, and neutralizing a WMD within the United States.

The following are descriptions of the methods, weapons, materials and/or devices that may be employed during suspected or actual intentional nuclear/radiological incidents. Intentional nuclear/radiological incidents are the most likely to require heavy law enforcement involvement because of the presumption of terrorist and/or criminal activity. During intentional nuclear/radiological incidents, law enforcement operations and activities will be severely impacted due to contaminated environments, reduced resource availability, and potential damage to critical infrastructure.

## Nuclear Detonation

Nuclear detonations release intense light, a pulse of heat and radiation, and a blast wave. In many circumstances, additional effects include residual radiation in the form of fallout and an electromagnetic pulse. Even a small nuclear detonation produces an explosion and effects far surpassing that of a radiological dispersal device, radiological exposure device, or conventional explosives. For more information about nuclear detonations, see Appendix F: Nuclear Detonations and Radiation Dispersal.

## Radiological Dispersal Device (RDD)

An RDD is any device that disperses radioactive material or emits radiation by conventional explosive or other mechanical means, such as a spray, at a harmful level without a nuclear detonation occurring. The harm caused by an RDD can include radioactive contamination, increased public fear of radioactive contamination, and denial of use of the contaminated area, perhaps for many years, which would also have an economic impact and require costly remediation. For more information about the radiation zones used to respond to an RDD incident, see Appendix F: Nuclear Detonations and Radiation Dispersal.

An RDD that uses explosives for spreading or dispersing radioactive material is called an "explosive RDD." A well-known, non-technical term for an explosive RDD is a "dirty bomb." For an explosive RDD, the explosion adds an immediate threat to human life and property. Most RDDs would not release enough radiation to kill people or cause severe illness. The conventional explosive itself would be more harmful to individuals than the radioactive material.

Non-explosive RDDs could spread radioactive material using common items such as pressurized containers, fans, building air-handling systems, sprayers, or crop dusters or even spreading by hand.

### Radiological Exposure Device (RED)

An RED is also sometimes called a "hidden sealed source." An RED is a device incorporating radioactive material designed to harm or injure people by passively exposing them to ionizing doses of radiation without their knowledge. Constructed from partially or fully unshielded radioactive material, an RED could be hidden from sight in a public place (e.g., under a subway seat, in a food court, or in a busy hallway), exposing those who sit or pass close by. Health effects may take hours, days, or weeks to appear. These effects range from mild to severe including cancer or death.

If a sealed source is breached and the radioactive materials are released and dispersed, the device could become an RDD, capable of causing radiological contamination.

RED incidents are more likely to include multiple devices or successive occurrences. This may significantly alter the federal response to assure resources remain available for follow-on incidents.

# Unique Characteristics of an Intentional Nuclear/Radiological Incident

Intentional nuclear/radiological incidents have unique characteristics that must be considered by federal and SLTT law enforcement and consequence management responders. The following characteristics pertain to suspected or actual intentional nuclear or radiological incidents:

- During the response to an intentional nuclear/radiological incident, law enforcement operations, including investigative activities and evidence collection, will be conducted in contaminated environments, which will be considered a crime scene.
- An intentional nuclear/radiological incident will result in many casualties that will quickly overwhelm law enforcement resources, which will impact investigative and operational activities.
- During the response to an intentional nuclear/radiological incident, law enforcement will need to coordinate with the private sector to conduct investigative activities, protect critical infrastructure, and prevent follow-on incidents.

- The complexity, scope, and consequences from an intentional nuclear/radiological incident will require multi-agency and multi-jurisdictional coordination at all levels with law enforcement, including with the public health and medical response communities.
- An intentional incident will be presumed to include potential follow-on threats and incidents. Planning to address such additional attacks will need to consider that resources may be limited, as they are already in use to response to the immediate incident.
- Although an intentional nuclear/radiological incident will be presumed to be a terrorist attack until determined otherwise, initial indications may be inconclusive, and responders' identification of suspicious activity and potential evidence will be key for triggering further federal law enforcement operational activities.
- The release of information to the public during and in connection with suspected or actual intentional incidents must be coordinated through the White House, the Secretary of DHS, and the Attorney General. This is to ensure sensitive law enforcement information is protected and for various other security considerations.
- Persons who may be witnesses or otherwise possess evidence relevant to the criminal investigation will be relocated and transported to locations that are outside the immediate crime scene after decontamination, as applicable.

# Law Enforcement Operational Coordination

Although saving lives remains the highest priority, coordination between response and recovery operations and law enforcement operations during response to a suspected or actual intentional nuclear/radiological incident is critical to ensure that the federal response is unified and well-organized.

Information collection and sharing is crucial for effective decision making, while interagency coordination ensures that consequence management operations and law enforcement activities are deconflicted and coordinated. Prior to the release of information involving an actual or suspected intentional incident pertaining to investigation or other law enforcement operations, the proposed communication must be coordinated with the Attorney General, acting through the FBI Director.

## Information Collection and Sharing

Information collected domestically about terrorist threats, including reports of suspicious activity involving suspected federal crimes of terrorism, must be shared immediately and comprehensively with the FBI-led Joint Terrorism Task Forces (JTTFs) so that threats can be investigated and resolved as soon as practical. In addition to the JTTFs, this information should also be reported to the nearest FBI field office and FBI Headquarters.

FBI JTTFs include federal and SLTT law enforcement personnel and are located nationwide. The National JTTF, located at FBI Headquarters, coordinates the activities of local JTTFs to ensure that information and intelligence is continually shared. JTTFs investigate terrorism threats including WMDs and resolve reports of possible terrorist activity from all sources, including those submitted from the public.

When a nuclear/radiological incident occurs as a result of suspected criminal activity or terrorism, the Attorney General, acting through the FBI Director, will use national-level command posts located in or connected through the FBI Strategic Information and Operations Center (SIOC), as well as the local-level command post established by the FBI field office (e.g., the JOC in Figure C-1), to coordinate law enforcement activities, which includes deconflicting activities with the consequence management operations that are taking place simultaneously. These command posts ensure effective operational coordination and information sharing among federal and SLTT partners. They also enable the FBI to manage the law enforcement, investigative, and intelligence domestic threat response. In addition, several other structures support coordination and information sharing to monitor terrorist threats. Other national-level coordinating structures include the DHS's National Operations Center (NOC), the Office of the Director of National Intelligence's National Counterterrorism Center, and the DOD's National Military Command Center. Other field coordinating structures, such as state and major urban area fusion centers and SLTT counterterrorism and intelligence units also play critical roles.

*Joint Operations Center (JOC)*

FBI JOCs are local-level command posts from which the FBI manages its law enforcement response, investigation, intelligence collection, and counterterrorism operations. A JOC complies with the National Incident Management System (NIMS). The JOC is led by the FBI OSC and is staffed by federal and SLTT agencies. The JOC coordinates operations and shares information with other regional command and intelligence centers, including state emergency operations centers (EOCs) and fusion centers. The JOC includes the following groups.

- **Command Group:** The multiagency Command Group, led by the FBI OSC, ensures that conflicts are resolved, and priorities and objectives are established. Members of the Command Group play an important role in ensuring information sharing and coordinating federal counterterrorism operations with consequence management. The Command Group provides strategic recommendations and advice to resolve the threat and save lives. It also approves the employment of law enforcement investigative and intelligence resources. The Command Group is composed of senior officials with decision-making authority from federal and SLTT agencies and private partners based upon the circumstances of the threat or incident. It is supported by federal and state prosecutors, legal counsel, and media representatives.

- **Operations Group:** This group manages all investigative, intelligence, and operational functions related to the imminent threat or incident. The Operations Group usually consists of the following functions: (1) Intake, (2) Intelligence, and (3) Investigation. The Operations Group is staffed by subject matter experts and specific operational components, such as tactical, negotiations, hazardous evidence, forensics, surveillance, and technical.

- **Operations Support Group:** This group is staffed by coordinators who provide advice and assistance within their areas of expertise, such as victim and witness coordination, communications, administration and logistics, liaison, and information management.

- **Consequence Management Group:** This group is staffed as needed by representatives from the FEMA region, DOD, SLTT governments, and private-sector partners. These agencies and organizations have expertise in consequence management, emergency management, and related technical matters. The group helps establish joint priorities that inform law enforcement operations and decision making.

The JOC can also be augmented by the Domestic Emergency Support Team (DEST), a rapidly deployable interagency team that supports the FBI. As part of its mission, the DEST supports the FBI OSC and other officials (e.g., the National Assets Commander) and supports the integration of law enforcement and counterterrorism operations with consequence management operations that may be taking place simultaneously. The DEST provides the FBI with expert advice and guidance about crisis and consequence management capabilities that can inform Prevention Mission operations. DEST composition includes a ready roster from FEMA, FBI, DOD, HHS, DOE, EPA, and others as appropriate. Based upon the threat and requirements, the FBI determines the composition of the DEST and maintains operational control throughout its activation. The FEMA Administrator, in support of the FBI, is responsible for policies and planning governing the use of the DEST in accordance with agreed-upon policies.



Figure C-1: Example of a Joint Operations Center Configuration[60]

The location of a suspected or actual intentional nuclear/radiological incident will be treated as a federal crime scene. Preserving and collecting evidence is critical to determining the identity of culpable parties and obtaining information about additional planned attacks. Those engaged in response and recovery should establish joint priorities with those engaged in law enforcement operations within the JOC to save lives, protect property, resolve threats, and prevent further attacks.

Fusion centers are state owned and operated centers that serve as focal points in states and major urban centers for the receipt, analysis, gathering, and sharing of threat-related information among federal, SLTT, and private-sector partners. More information on fusion centers can be found at http://www.dhs.gov/fusion-centers.

## Interagency Coordination

Interagency coordination is critical to ensure both law enforcement and consequence management response and recovery operations are aligned in their activities. This includes

---

[60] For a graphical representation of the relationship between the FBI JOC and other coordination structures, see page A-2, Figure A-1, in the *Response and Recovery FIOP.*

coordination at the both the national and FBI field office levels, as well as within the Emergency Support Function (ESF) and Recovery Support Function (RSF) structures.

## Weapons of Mass Destruction Strategic Group (WMDSG)

At the national level, when facing a credible WMD threat or incident, the FBI-led WMDSG is an interagency crisis-action team that is activated within the FBI SIOC. The WMDSG supports information exchange and deconfliction of law enforcement and/or counterterrorism operations to prevent imminent threats from occurring, while simultaneously coordinating with the activities of federal D/As responsible for public health and other consequence management activities to save lives and protect property, critical infrastructure, and the environment.

The WMDSG includes a Consequence Management Coordination Unit (CMCU) led by FEMA to ensure information is shared and coordinated among authorized partners. The WMDSG's CMCU provides a critical coordination link between FBI-led operations and FEMA-coordinated consequence management operations through the FEMA home team. After FBI notification of a credible terrorist threat or actual incident, the FBI will activate the WMDSG, and FEMA will staff the CMCU. This unit is also supported by federal technical capabilities provided through NNSA in DOE, HHS, DOD, and DHS. As the principal advisory unit for consequence management within the WMDSG, the CMCU recommends courses of action for ongoing and evolving operations.

The WMDSG connects with the FBI JOC and its WMD desk to support risk-informed decisions and operations. The WMDSG also connects with other FBI command posts (e.g., the CIRG National Asset Command Post regarding all technical information represented by and collected from the WMD device) within the FBI SIOC, and to the operations centers of other federal D/As and to local and regional partners through the FBI JOC. These links also enable the WMDSG to connect to the Unified Coordination Group (UCG) that may be established.

At the FBI field office level, response and recovery activities should be coordinated with the FBI OSC, who is managing law enforcement activities through the JOC. The FBI OSC retains the authority to enforce the law through all phases of the response. However, the FBI OSC fulfills this responsibility concurrently with other activities led by other D/As.

## Emergency Support Function (ESF) Integration

Each ESF should review the tasks contained in the Response and Recovery FIOP for Phase 2 (Coordinated Response and Recovery and Operations) to identify tasks that may be required to support law enforcement in crisis operations. During this type of response, any pre-incident activity, including pre-staging, must be closely coordinated to avoid compromising law enforcement and intelligence operations.

In addition to law enforcement investigation and intelligence operations, DOJ, through the ESF #13 National Coordinator, is responsible for coordinating the federal interagency law enforcement response related to public safety and security activities. ESF #13 activations focus on support to the impacted SLTT law enforcement D/As and their ability to provide public safety and security within their jurisdictions, as well as support for other federal D/As, including the FBI. During a nuclear/radiological incident, ESF #13 may be asked to perform duties such as facility security, protection of emergency responders, and other public safety missions related to the incident.

In response to complex incidents, the Attorney General may appoint a Senior Federal Law Enforcement Official (SFLEO). If an SFLEO is appointed, the FBI remains the primary investigative agency for threats and incidents with ties known or suspected terrorism. The SFLEO is primarily responsible for addressing federal criminal investigative and intelligence missions, which are not commonly needed in disaster response. On the rare occasion an SFLEO is appointed by the Attorney General, ESF #13's mission as performed by DOJ remains unchanged. ESF #13 is responsible for coordinating the federal law enforcement support for public safety and security assistance during response, while the SFLEO is responsible for coordinating the criminal investigative and law enforcement intelligence aspects of the response. Any resource conflicts or mission overlaps between ESF #13 and the SFLEO are adjudicated through the UCG. If an SFLEO is not appointed, but the FBI JOC is operationally related to a federally coordinated incident response, ESF #13 and the FBI exchange liaison officers to prevent and address any resource conflicts or mission overlaps.

## Operational Phases

The following describes the critical activities during each operational phase that ensure law enforcement and consequence management operations align during a federal interagency response to a suspected or actual intentional nuclear/radiological incident. These activities demonstrate how the coordination mechanisms described above integrate into response and recovery.

### Phase 1: Pre-Incident Operations

The FBI and federal and SLTT law enforcement partners are constantly vigilant for threats of terrorism, including nuclear/radiological-related terrorism. During Sub-Phase 1a, the FBI distributes terrorism-related information via classified and unclassified intelligence products, notes, placards, posters, and bulletins and conducts training with law enforcement. The public health community and emergency management officials should work closely with law enforcement regarding posturing resources and appropriate capabilities in the event of an intentional nuclear/radiological incident.

During Sub-Phases 1b and 1c, discovering and locating nuclear/radiological threats and/or hazards may be accomplished through active and passive surveillance and search procedures, which may include the use of systematic examinations and assessments, sensor technologies, or physical investigation and intelligence. Elevated threat or credible threat information may be provided by law enforcement officials; therefore, operations may begin with recognition of the threat.

Law enforcement personnel may be confronted with several situations involving the actual or threatened use of nuclear/radiological material, devices, or weapons. These can range from non-credible threats (hoaxes[61]), announcements or indications that a release of nuclear/radiological material has occurred (overt), or unannounced releases of nuclear/radiological material (covert). Threat information is provided through a variety of sources, including open source, private sector, and SLTT partners; federal D/As; the intelligence community; or foreign governments. Potential threats and incidents must be

---

[61] If the threat is deemed non-credible, the FBI may initiate an investigation to identify and prosecute those responsible for creating the perception that there was a threat (i.e., a hoax). Under federal law (18 U.S.C. 2332a, 18 U.S.C. 831, and 18 U.S.C. 832), a threat involving radiological/nuclear material is a criminal act, whether or not the perpetrator actually possesses the radiological/nuclear material.

immediately evaluated to determine if they may be a WMD-related incident and possibly linked to crime or terrorism.

No single agency, department, or level of government can independently complete a threat picture of all terrorism and national security threats. If a potential exists for a WMD, the threat information must be immediately passed to the FBI to begin the Threat Credibility Evaluation (TCE) process, which is facilitated by the FBI's Weapons of Mass Destruction Directorate (WMDD) and the FBI WMD Coordinators located in all FBI field offices. The TCE process is used (1) to evaluate the credibility of the actual or potential WMD threat or incident; (2) to discuss whether it may pose a risk of substantial loss of life or substantial damage to property; and (3) to support the coordination of initial operations, if necessary. TCE participants share information and discuss potential courses of action, including whether additional resources, assets, or capabilities are needed to augment those in the affected FBI field office to resolve the threat or incident. During credible WMD threats and incidents, interagency crisis action teams and other coordination mechanisms and command posts will be activated, as discussed above.

If a WMD device is suspected or known, unless specifically contradicted by observations, assessments, or other relevant information, the policy of the U.S. government is to treat the device under the following assumptions:

- The WMD device is credible.
- The threat actor intends to defend and use the WMD device.
- The WMD device will function as designed unless specific and authorized actions are taken by the designated, trained, and equipped response forces.

### Phase 2: Coordinated Response and Recovery and Operations

Sub-Phase 2a includes all lifesaving operations at federal and SLTT levels, while law enforcement and counterterrorism operations are actively underway. During this sub-phase, the FBI OSC, operating out of the FBI's JOC, will lead and coordinate the federal operational law enforcement response and all investigative activities necessary to resolve the terrorist threat or incident.

Law enforcement and counterterrorism operations will be taking place in contaminated environments during this sub-phase. Consistent with relevant Presidential directives, FBI Special Agent Bomb Technicians will be responsible for responding to and conducting WMD device defeat and mitigation actions for WMD devices and materials and serve as a point of contact for public safety bomb squad coordination.

Sub-Phase 2a is also dominated by activities to provide accurate and credible information to survivors to enable initial shelter-in-place and delayed evacuation actions. Further, the White House is actively involved in coordinating the implementation of the Domestic Communications Strategy using primarily ESF #8 (Public Health and Medical) and ESF #15 (Public Information and Warning).

During Sub-Phase 2b, law enforcement and counterterrorism operations will be continuing while lifesaving operations are implemented and ongoing. Most survivors will have been located and evacuated and will be receiving life-sustaining support services. These survivors may be witnesses or otherwise possess information or evidence relevant to the law enforcement investigation.

During Sub-Phase 2c, all survivors will have been evacuated and are being sustained through mass care and recovery activities. Ongoing crime scene investigations and evidence recovery in contaminated areas will continue to take place. Normal response and recovery operations are resumed in the impacted area, except for in any of the remaining Dangerous Radiation Zone.

### Phase 3: Recovery and Restoration Operations

Recovery operations begin during Phase 2, but they will continue after response operations have concluded. SLTT planners and decision makers, in collaboration with federal D/As, are also engaging stakeholders and technical experts to develop recovery priorities and long-term recovery outcomes. The law enforcement investigation and attribution activities are ongoing, as are activities to investigate and prevent any follow-on attacks.

This page intentionally left blank.

# Appendix D: INTERNATIONAL NUCLEAR/RADIOLOGICAL INCIDENTS

A significant nuclear/radiological incident, whether caused by accidental or intentional means, may disperse radioactive material beyond the site of release, causing harm not only to a specific area or country but also to the international community. This could result in adverse consequences for the health, safety, and security of populations across international borders. An international nuclear/radiological incident demands careful and thorough coordination of all U.S. national capabilities and capacities to mount an appropriate response to such a catastrophic incident. Special consideration must be paid to Chief of Mission authority. All federal D/As conducting work in the affected foreign country must do so with the approval of the U.S. Chief of Mission in that country.

This appendix provides supplemental information specific to international incidents. It also addresses incidents that have international impacts leading to requests for U.S. assistance. This appendix guides federal interagency partners to respond in a coordinated fashion to support foreign government response during nuclear/radiological incidents (1) to save lives, protect property and the environment, and meet basic human needs; (2) to coordinate the assessment of potential impacts of a foreign nuclear incident; and (3) to communicate risks, consequences, and protective actions to inter-government partners and the public within the United States and abroad. There is also a responsibility to protect U.S. citizens abroad, as well as other U.S. resources such as military installations and equipment, embassies, and consulates.

During a nuclear/radiological incident, the affected nation will have primary responsibility for all aspects of consequence management, including incident command and response. The affected nation is also responsible for requesting bilateral and/or multilateral international assistance, deploying its domestic emergency response forces, and coordinating with foreign partners and international organizations to augment the existing capabilities and resources.

## Background

This appendix applies to all federal response and recovery activities, as they pertain to the unique circumstances of the following types of international nuclear/radiological incidents:

- Accidental or intentional foreign incidents involving nuclear/radiological material that directly impact or threaten to impact the United States
- U.S. government support to foreign government operations in response to and/or recovery from a foreign incident

Brief descriptions of these two circumstances follow.

### International Incidents That Directly Impact or Threaten to Impact the United States

Incidents at foreign facilities could directly impact U.S jurisdictions and interests. A nuclear liability insurance framework does not exist to protect those impacted by these foreign

nuclear/radiological incidents. Impacted SLTT governments may require additional federal support to respond to and recover from these foreign incidents. The Department of State (DOS) will lead coordination with foreign governments and the International Atomic Energy Agency (IAEA).

Depending upon the nation where the nuclear/radiological incident is located, nuclear liability insurance may be available to protect those impacted. U.S. citizens may be able to make claims for damages or injuries incurred in the incident nation. If the incident nation is a party to the Convention on Supplementary Compensation for Nuclear Damage, U.S. victims should be able to obtain compensation for damages and injury.

## U.S. Government Assistance to Foreign Governments

In June 2014, a National Security Council Interagency Policy Committee finalized and approved the International Chemical, Biological, Radiological, Nuclear Response (ICBRNR) Protocol.[62] The protocol provides principles, guidance, and considerations for the U.S. government response to a catastrophic, international CBRN incident. In addition, the protocol calls for the development of an associated ICBRNR Concept of Operations that will be used as an implementing guide for all U.S. D/As involved in a CBRN response. All planning and guidance being offered within this document regarding international response shall adhere to the ICBRNR Protocol and the ICBRNR Concept of Operations.[63] This appendix also addresses U.S. assistance for incidents that originate in the United States that have international impacts leading to requests for U.S. assistance.

# Unique Characteristics of an International Nuclear/Radiological Incident

Due to the complex nature of international nuclear/radiological incidents, the following unique characteristics must be considered by the U.S. government:

- An international nuclear/radiological response will most likely be conducted by the affected country, along with members of the international community, including the United States.
- Several days may elapse after a catastrophic international nuclear/radiological incident before the affected nation can assess the magnitude of hazards, its internal ability to respond effectively to those hazards, and its need for assistance from the U.S. government and international community.
- Requests for U.S. government assistance after an international nuclear/radiological incident may come from affected partner nations or international organizations, such as the IAEA or the World Health Organization (WHO) and are coordinated by DOS.[64]

---

[62] See the United States Government International Chemical, Biological, Radiological, and Nuclear Response (ICBRNR) Protocol (2014).

[63] See the United States Government International Chemical, Biological, Radiological, and Nuclear Response (ICBRNR) Concept of Operations (2017).

[64] Under the *International Health Regulations Framework* (2005), the World Health Organization is responsible for declaring a Public Health Emergency of International Concern, which may include a nuclear/radiological incident.

- All requests for U.S. government assistance following an international nuclear/radiological incident will follow the structure outlined in the ICBRNR Protocol and associated Concept of Operations.
- DOS will serve as the LFA for U.S. response assistance to a nation affected by an international nuclear/radiological incident for proper coordination.
- Requests for U.S. government resources will depend on the capabilities and capacity of the affected nation, its allies, and neighboring countries, as well as intergovernmental, international, and non-governmental organizations. Requests for U.S. government assistance may also be made by nations party to the IAEA Convention on Assistance in the Cases of a Nuclear Accident or Radiological Emergency.[65] Under this convention, member states may offer or request assistance in the event of a radiological or nuclear incident under the Response and Assistance Network (RANET). The DOS coordinates all U.S. government offers or requests for assistance.
- Media will have an intense interest in any response to an international nuclear/radiological incident, and their coverage will influence important political decisions in the United States and abroad.
- U.S. government public communication activities will be coordinated with affected partner nations and international organizations via DOS to ensure consistent messaging.
- In addition to evaluating domestic implications of response operations, federal D/As shall consider the following actions:

  o Ensure U.S. government response operations or activities are respectful of the affected nations' sovereignty and laws and comply with the following: (1) relevant U.S. statutory requirements and restrictions on foreign aid, (2) existing international treaties and conventions, agreements, and (3) applicable policy arrangements with foreign countries and international organizations.
  o In extreme situations, be prepared to develop options to exercise the President's responsibilities to safeguard the lives of U.S. citizens when the affected nation(s) are unable to do so after an international nuclear/radiological incident.
  o Understand the mechanisms and authorities that may be available to allocate funding for nuclear/radiological support, when required.

---

[65] *The Convention on Assistance in the Case of a Nuclear Accident or Radiological Emergency* (1986) sets out an international framework for cooperation among member states and with the IAEA to facilitate prompt assistance and support in the event of nuclear accidents or radiological emergencies. It requires member states to notify the IAEA of their available experts, equipment, and materials for providing assistance.

- In response to an international nuclear/radiological incident, all federal D/As must conduct their activities abroad under the authority and permission of the U.S. Chief of Mission in the relevant foreign nation(s). In addition, federal D/As must report all requests and offers of assistance and stand prepared to work with any task force established by the DOS to address the U.S. government's response to the incident.

# Federal Agency Roles and Responsibilities

## National Security Council (NSC)

The NSC is the President's principal forum for considering national security and foreign policy matters with senior national security advisors and cabinet officials. The NSC is the forum for providing input to the President to determine U.S. government policy in the event of an international nuclear/radiological incident. Among its other considerations in determining the U.S. government's response, the NSC will be required to balance the needs of the requesting country/international organization with any potential domestic needs within the United States, especially when directing national resources. The NSC will coordinate with the DOS, the Office of Management and Budget, and other White House offices when managing the U.S. government's response to an incident.

## U.S. Department of State (DOS)

DOS has the lead responsibility for matters involving protection of U.S. government personnel on official duty abroad and their accompanying dependents and promoting the safety and security of private U.S. citizens. DOS is the lead coordinating agency for U.S. government response to U.S. Chief of Mission and/or host nation requests for support to international nuclear/radiological incidents. DOS will manage the provision of humanitarian assistance to refugee populations affected by the incident, in coordination with U.S. Agency for International Development (USAID) Office of Foreign Disaster Assistance (OFDA). For nuclear/radiological incidents that may be terrorist-related, DOS coordinates the overall U.S. government response to the incident and will also coordinate with the Attorney General and the FBI Director whenever those incidents are perpetrated by or directed at U.S. citizens, interests, or institutions abroad and when those incidents fall within the federal criminal jurisdiction of the United States. DOS is responsible for issues related to the safety and security of U.S. private citizens abroad, which includes compliance with the DOS "No Double Standard" policy of providing members of the official and non-official U.S. community with relevant security information. DOS also coordinates U.S. government assistance to U.S. private citizens and provides information regarding other assistance that may be available to them from host country officials or non-governmental entities, as appropriate. DOS will be the point of contact for notifications under the Convention on Early Notification of a Nuclear Accident and for requests under the Convention on Assistance in the Case of a Nuclear Accident or Radiological Emergency.

DOS will likely stand up a state task force to expedite communication and coordination within the U.S. government and provide decision makers with the most current and accurate information available. The state task force will receive all requests/offers of assistance from U.S. government D/As and the embassy Emergency Action Committee. Furthermore, the state task force consolidates, validates, and disseminates requirements to the interagency for the development of solution packages. The state task force will recommend completed

solution packages to the NSC for approval. The DOS Bureau of International Security and Nonproliferation will contact relevant U.S. government D/As to request the necessary interagency personnel to augment the state task force, if needed.

## U.S. Chief of Mission

The U.S. Chief of Mission, typically an ambassador, is the President's official representative in a foreign country and, under the direction of the President, has responsibility for the direction, coordination, and supervision of all U.S. government executive branch employees in that country. However, those under the command of a U.S. area military commander, under another chief of mission, or on the staff of an international organization are not under the authority of the U.S. Chief of Mission. These responsibilities include the following:

- Speak with one voice to others on U.S. policy and ensuring mission staff do likewise.
- Cooperate with the U.S. legislative and judicial branches so that U.S. foreign policy goals are advanced; security is maintained; and executive, legislative, and judicial responsibilities are carried out.
- Review communications to or from mission elements.
- Take direct responsibility for the security of the mission and protecting U.S. government personnel on official duty (other than those personnel under the command of a U.S. area military commander) and their dependents.

The mission's Emergency Action Committee supports the U.S. Chief of Mission in crisis and consequence planning and management. Through the Emergency Action Plan, DOS and the U.S. Mission maintain formal processes for crisis and consequence management and coordination at post for incidents that affect the Mission or the host country.

The Chief of Mission will lead the coordination of the U.S. government response within the affected nation. The Chief of Mission may request the deployment of an interagency team to support the collection of information, validation of requests to/from the affected nation, and coordination of assistance packages from the United States and their corresponding implementation. This interagency team will serve as a liaison between the host country and U.S. Embassy. DOS will contact relevant D/As to request the necessary personnel to augment the U.S. Chief of Mission's goal, as necessary.

## U.S. Agency for International Development (USAID) Office of U.S. Foreign Disaster Assistance (OFDA)

The U.S. Agency for International Development (USAID) Office of Foreign Disaster Assistance (OFDA) is the federal lead for managing the provision of U.S. government international humanitarian assistance and disaster response as specified under the Foreign Assistance Act of 1961. The USAID Administrator is the President's special coordinator for international disaster assistance as established in section 493 of the Foreign Assistance Act. With a mandate to save lives and reduce human suffering, OFDA's approach to a nuclear/radiological response will focus on providing lifesaving assistance (food, water, shelter, and medicine) to the population that is affected by the incident as afforded in USAID's broad authority to provide disaster assistance pursuant to section 491 of the Foreign Assistance Act. OFDA provides yearly guidance to all posts for disaster planning and response outlining the support from OFDA before, during, and after the occurrence of

natural and human-caused disasters abroad. Procedures highlight the need for continuous collaboration in the planning process for disaster response, as well as regular and sustained communication between mission disaster relief officers and the USAID OFDA regional staff to ensure timely, appropriate, and effective U.S. government emergency response and humanitarian assistance.

## U.S. Department of Defense (DOD)

When requested by DOS and directed by the Secretary of Defense, DOD can support international nuclear/radiological incident operations to the extent allowed by law and agreement and subject to the availability of DOD nuclear/radiological capabilities and resources. At the request of foreign civilian officials in geographic proximity to DOD installations in affected partner nations, a U.S. military commander with assigned forces at or near the immediate scene of a foreign disaster may take prompt action to save human lives.

## National Nuclear Security Administration (NNSA)

Through its Nuclear Emergency Support Team (NEST), DOE/NNSA provides the U.S. government with nuclear/radiological expertise and assessments via field and/or remote technical and scientific support. NEST serves as part of the response force in accordance with established interagency protocols domestically and overseas. The NEST mission spans the national security and public health and safety domains through all stages of a response, from initial technical assessments to final forensic disposition. Specific mission areas include countering WMD threats, responding to U.S. nuclear weapon accidents, protecting the public from radiation emergencies, and attributing the source of any material associated with a nuclear incident.

NEST assets fall into two primary mission categories: Render Safe programs and Public Health & Safety (PHS). During an incident involving a possible nuclear/radiological device, NEST Render Safe assets provide remote and on-scene scientific and technical support to device defeat operations. This includes the DOE triage process, in which DOE collaborates with the FBI domestically and DOD internationally to provide an initial assessment of whether a device or material represents a nuclear/radiological threat. NEST PHS capabilities support all nuclear/radiological incidents for which a U.S. government response is required, including search operations, radiological monitoring and modeling, medical expertise on radiation health effects, and consequence management guidance.

NNSA works with many foreign governments and international counterparts to build capacity for effective emergency response, and NEST responds to nuclear/radiological incidents of all types, both domestically and internationally.

## Nuclear Regulatory Commission (NRC)

The Nuclear Regulatory Commission (NRC) provides subject matter expertise on radiological and technical issues related to nuclear power plant and nuclear fuel cycle technologies and radioactive materials to the U.S. Chief of Mission in the affected country. In support of the U.S. Chief of Mission, the NRC can provide ongoing assessment of radiological conditions, dose predictions, and protective action recommendations for U.S. citizens abroad. The NRC also maintains working relationships with many international regulatory counterparts. Depending upon incident specifics, the NRC could use these established relationships to

facilitate incident-related communication and provide technical advice and assistance to the affected country.

## U.S. Department of Health and Human Services (HHS)

The Department of Health and Human Services (HHS), through the Administration for Strategic Preparedness and Response (ASPR), the Office of Global Affairs (OGA), the Centers for Disease Control and Prevention (CDC), and the Office of the Assistant Secretary of Health (OASH), provides the following capabilities to address an international nuclear/radiological incident:

- Provides leadership in international programs, initiatives, and policies with public health and medical emergency preparedness and response.
- Provides leadership for HHS activities during the U.S. nuclear/radiological response to an affected nation in close coordination with other U.S. government D/As.
- In collaboration with DHS, implements the following activities:
  - ASPR exercises the responsibilities and authorities of the HHS Secretary with respect to use of the Strategic National Stockpile (a stockpile of drugs, vaccines, biological products, medical devices, and other supplies to provide for U.S. emergency health security).
  - ASPR directs the deployment of Strategic National Stockpile assets in ESF #8 responses and has deployment authority for federal (non-DOD) medical personnel (including the National Disaster Medical System).
  - OGA coordinates international health and human services policy, research, and global health diplomacy for HHS.
  - OGA manages the U.S. International Health Regulations (IHR) National Focal Point (NFP). This endeavor facilitates the timely flow of information with the WHO, other countries' IHR NFPs, and U.S. government partners. OGA coordinates with U.S. government D/As (a) to notify WHO and other international partners of public health incidents with potential of spreading across international borders, including potential public health emergencies of international concern (PHEICs); (b) to share contact tracing information with other countries; (c) to lead and coordinate assessments of IHR capacities, including radiological emergencies; and (d) to collaborate with WHO and other NFPs on IHR-relevant programmatic activities.
  - CDC supports the U.S. mission with technical assistance and messaging to U.S. citizens in or near the affected country.
  - CDC monitors potential public health impacts from fallout coming from an international incident affecting U.S. states or territories.
  - If requested, CDC may provide technical assistance to public health officials of the affected country.

- OASH can deploy the Public Health Service Commissioned Corps internationally when appropriately authorized, which may be done under DOD or DOS authorities.

In response to an international incident, HHS core public health capabilities that may support the U.S. government response include public health assessment and disease control, mass disaster response, protection of responder/worker safety and health, nuclear/radiological public health and medical consultation, technical assistance and support, and health/medical equipment and supplies.

## U.S. Department of Homeland Security (DHS)

In the event that a major nuclear/radiological incident happens anywhere in the world, DHS would immediately begin reassessing threats, vulnerabilities, and the protective posture for the homeland. DHS, in coordination with interagency partners, will monitor the requests for international deployment of federal resources. When the international deployment of a federal resource creates a potential shortfall in the U.S. government's ability to safeguard the homeland, DHS shall immediately notify the relevant D/A and the NSC of the potential conflict. DHS would also take steps to assess and mitigate any direct impacts from the nuclear/radiological incident on DHS operations, particularly in cases that involve its neighbors in the Caribbean, Mexico, or Canada. For example, DHS will assess the need to increase its border and/or transportation security screening procedures, implement specific protocols to resolve any security or safety risks that are identified with inbound travelers and/or cargo, and consider requests for deployment of specialized DHS capabilities within its existing authorities. The DHS National Operations Center (NOC) will produce a common operating picture available on the Homeland Security Information Network (HSIN) for an international nuclear/radiological incident when it affects or threatens U.S. interests. DHS will include consolidated State Task Force status reports in the national common operating picture which enables all agencies, including embassy personnel, to have situational awareness from anywhere in the world. FEMA will activate the IMAAC to coordinate the U.S. government's atmospheric modeling activities consistent with interagency agreements. CISA will provide visibility on the status of private sector–operated critical infrastructure through ESF 14 Business & Industry Stakeholder's Coordination Calls. CISA will also identify direct or cascading effects of private sector critical infrastructure failure, and coordinate with private sector partners to identify potential support requirements to ensure rapid stabilization and access to impacted private sector critical infrastructure.

## U.S. Environmental Protection Agency (EPA)

During an international incident that causes real or perceived environmental impacts in the United States or its territories, the EPA is the lead agency for the domestic response that focuses on assessing any radiological effects on the United States and informing the public of health risks or long-term consequences.[66] The EPA maintains a continuous nationwide environmental radiation monitoring program, RadNet. The EPA can support foreign assistance operations with technical expertise relating to preparedness, assessment, and cleanup. Within the United States, the EPA can provide dose assessment and environmental survey support, remediation and waste management advice, and technical

---

[66] DOS is the lead coordinating agency for U.S. Government response to U.S. Chief of Mission and/or host nation requests for support to international nuclear/radiological incidents.

recommendations on various environmental concerns relating to the release of radioactive material. The EPA has agreements in place with Canada and Mexico and has also historically provided assessment and technical assistance on matters related to environmental contamination and incident recovery all over the world.

## U.S. Department of Agriculture (USDA)

The USDA can support an international nuclear/radiological incident through the following capabilities:

- Assist in the assessment of damage to crops, soil, livestock, and poultry, and related processing facilities.
- Assess agricultural trade impacts.
- Provide technical assistance for the management of contaminated animals, crops, and related products and facilities.
- Provide technical assistance for the management of contaminated non-agricultural animals.

## National Oceanic and Atmospheric Administration (NOAA)

The National Oceanic and Atmospheric Administration (NOAA) provides predictions of weather, atmospheric and oceanic dispersion, ocean state, and marine debris. NOAA is the U.S.-designated Regional Specialized Meteorological Centre for the World Meteorological Organization. In that role, NOAA provides atmospheric dispersion predictions to other World Meteorological Organization member states and would be prepared to share its predictions with requesting federal D/As, including the State Task Force. NOAA is a member of the IMAAC, which would coordinate any use of these predictions as the U.S. government position.

## U.S. Department of Justice (DOJ) Federal Bureau of Investigation (FBI)

The Attorney General, acting through the FBI, has lead responsibility for investigations of terrorist acts or threats. These include those involving WMDs and those that are perpetrated by or directed at U.S. citizens, interests, or institutions abroad where such acts are within the federal criminal jurisdiction of the United States. In coordination with DOS, where appropriate and in a manner consistent with U.S. Chief of Mission authorities, the Attorney General and FBI have lead responsibility for the U.S. government's investigative response abroad to acts of terrorism. By policy, if a U.S. citizen or interest is affected by a suspected or actual intentional international nuclear/radiological incident, the presumption is terrorism, and it will be investigated by the FBI as such until determined otherwise. The FBI has WMD Coordinators located abroad in different countries and will designate a senior representative who will coordinate the FBI's response with the appropriate embassy personnel. Requests for access to international crimes scenes that the FBI is authorized to process for evidence should be coordinated with this senior FBI representative.

# Operational Coordination

After the discovery or notification of an international nuclear/radiological incident, the response begins with operations to understand the potential and actual radioactive releases impacting the United States to provide accurate information to the public to convey

protective action decisions. Actions intended to support U.S. citizens abroad and the delivery of resources intended to assist the affected nation will likely be initial priorities of the U.S. government. The Chief of Mission will engage the affected nation on needs, capabilities, and assistance requests.

As response operations progress, monitoring and sampling capabilities will be operational and public information will have been provided. At this time, requests for assistance from the affected nation are received and offers of assistance by the U.S. government are initially developed.

As part of the emergency action plan, DOS and the U.S. Mission maintain formal processes for crisis management and coordination on site for incidents that affect the Mission or the host country. The Chief of Mission, based on the plan, may make a disaster declaration, as appropriate.

DOS will open dialogue with other foreign governments and non-governmental organizations to seek information transfer and response support. DOS will also determine the content and timing of public messaging, coordinating with the NSC staff as necessary. Operations transition to be recovery-focused when all in-country U.S. citizens have been evacuated (if appropriate) and are being sustained through mass care activities as needed.

## International Nuclear and Radiological Event Scale

The International Nuclear and Radiological Event Scale is a worldwide tool for communicating to the public in a consistent way the safety significance of international nuclear/radiological events. The International Nuclear and Radiological Event Scale applies to any event associated with the transport, storage, and use of radioactive material and radiation sources, whether or not the event occurs at a facility. It covers a wide spectrum of practices, including industrial use such as radiography, use of radiation sources in hospitals, activity at nuclear facilities, and transport of radioactive material. It also includes the loss or theft of radioactive sources or packages and the discovery of orphan sources, such as sources inadvertently transferred into the scrap metal trade.

The Event Scale is used by the international scientific community to coordinate and communicate between countries and governments. The Event Scale explains the significance of events from a range of activities, including industrial and medical use of radiation sources, operations at nuclear facilities, and transport of radioactive material. Events are classified on the scale at seven levels: Levels 1 to 3 are called "incidents" and Levels 4 to 7 "accidents." The scale is designed so that the severity of an event is about 10 times greater for each increase in level on the scale. Events without safety significance are called "deviations" and are classified Below Scale/Level 0. The scale is only intended for use in civil applications and only relates to the safety aspects of an incident. The International Nuclear and Radiological Event Scale is not intended for use in rating security-related incidents or intentional acts to deliberately expose people to radiation.

Table D-1 describes the seven event levels of international nuclear/radiological incidents in terms of three areas of impact along with the seven event levels.

**Table D-1: Event Level Descriptions for the International Nuclear and Radiological Event Scale[67]**

| INES LEVEL | PEOPLE AND ENVIRONMENT | RADIOLOGICAL BARRIERS AND CONTROL | DEFENSE-IN-DEPTH |
|---|---|---|---|
| **MAJOR ACCIDENT LEVEL 7** | • Major release of radioactive material with widespread health and environmental effects requiring implementation of planned and extended countermeasures | | |
| **SERIOUS ACCIDENT LEVEL 6** | • Significant release of radioactive material likely to require implementation of planned countermeasures | | |
| **ACCIDENT WITH WIDER CONSEQUENCES LEVEL 5** | • Limited release of radioactive material likely to require implementation of some planned countermeasures<br>• Several deaths from radiation | • Severe damage to reactor core<br>• Release of large quantities with a high probability of significant public exposure. This could arise from a major criticality accident or fire. | |
| **ACCIDENT WITH LOCAL CONSEQUENCES LEVEL 4** | • Minor release of radioactive material unlikely to result in implementation of planned countermeasures other than local food controls<br>• At least one death from radiation | • Fuel melt or damage to fuel resulting in more than 0.1% release of core inventory<br>• Release of significant quantities of radioactive material within an installation with a high probability of significant public exposure | |
| **SERIOUS INCIDENT LEVEL 3** | • Exposure in excess of ten times the statutory annual limit for workers<br>• Non-lethal deterministic health effect (e.g., burns) from radiation | • Exposure rates of more than one Sv/hour in an operating area<br>• Severe contamination in an area not expected by design, with a low probability of significant public exposure | • Near accident at a nuclear power plant with no safety provisions remaining<br>• Lost or stolen highly radioactive sealed source<br>• Mis-delivered highly radioactive sealed source without procedures in place to handle it |
| **INCIDENT LEVEL 2** | • Exposure of member of the public in excess of 10 mSv<br>• Exposure of a worker in excess of the statutory annual limits | • Radiation levels in an operating area of more than 50 mSv/hour<br>• Significant contamination within the facility into an area not expected by design | • Significant failures in safety provisions but with no actual consequences<br>• Found highly radioactive sealed orphan source, device or transport package with safety provisions intact<br>• Inadequate packaging of a highly radioactive sealed source |
| **ANOMALY LEVEL 1** | | | • Overexposure of a member of the public in excess of statutory annual limits<br>• Minor problems with safety with components with significant defense-in-depth remaining<br>• Low activity lost or stolen radioactive source, device or transport package |

---

[67] 1 Sv = 100 rem; 1 mSv = 100 mrem

This page intentionally left blank.

# Appendix E: Incidents Involving Commercial Nuclear Facilities

This appendix will address the unique nature of federal response and recovery operations for incidents involving commercial nuclear facilities. Federal interagency partners can respond in a lead role or in support to SLTT governments to save lives; protect property, critical infrastructure, and the environment; and meet basic human needs. In addition to federal and SLTT capabilities, response to incidents involving commercial nuclear facilities may also include assets and resources provided by the private sector owner/operators.

## Nuclear Regulatory Commission (NRC) Incident Response

If an emergency occurs at a facility licensed by the NRC, the licensee's primary responsibility is to mitigate the emergency to protect public health, safety, and the environment. The licensee will promptly notify SLTT governments and, when required, will provide a protective action recommendation such as evacuation or sheltering. The licensee will also notify the NRC Headquarters Operations Center, which is continuously staffed 24 hours a day, 7 days a week.

The Headquarters Operations Officer (HOO) and/or the Headquarters Emergency Response Official (HERO) are the initial points of contact for the licensee. Depending on the nature of the reported incident, the HOO and/or HERO notifies designated headquarters and regional management-level decision makers. In addition to internal notifications, the HOO and/or HERO notify other federal D/As and, if necessary, state agencies and other licensees. The headquarters and regional offices are staffed with trained and qualified responders. These responders include scientists, engineers, and operations experts who analyze the incident and evaluate possible recovery strategies. They perform independent assessments, project the future status of the plant, and continuously assess the licensee's response to ensure that procedural actions taken to mitigate the emergency are appropriate. The incident response organization provides technical expertise and support to the NRC Response Director. The NRC incident response organization includes the following components.

### NRC Response Teams

NRC response teams maintain communications with their licensee counterparts in their response facilities and the control room of the nuclear power plant. NRC resident inspectors assigned to the specific facility maintain communications with their respective regional office and headquarters. During the incident, the NRC continues these assessments and maintains communications with the facility and stakeholders until the emergency is over and the facility is stable.

### Liaison Team

The Liaison Team is responsible for the response activities and interactions with representatives of federal, state, local, tribal, territorial, congressional, and international organizations and is responsible for information flow between the NRC response organization and external agencies/stakeholder groups.

## Public Information Team

The Public Information Team provides continuous support during an incident or accident to ensure that accurate information is reaching the public. Once the NRC is involved in a response, this team produces coordinated messages to inform the public. The team dispatches staff as needed to appropriate response facilities such as licensee, SLTT, or federal Joint Information Centers.

## Reactor Safety or Fuel Cycle Group

These groups evaluate incident information, assess licensee actions to ensure safety, perform independent calculations to confirm the extent of damage, and project what may happen next during the incident.

## Protective Measures Group

The Protective Measures Group prepares an independent assessment of possible radiological exposure to the public and reviews the licensee's protective action recommendations and SLTT protective action decisions. This team provides the "source term" to the IMAAC to develop plume projections for federal decision making.

## Security Group

The Security Group assesses licensee actions during security-related incidents and coordinates the security response with law enforcement and intelligence agencies.

## Senior Agency Representatives

The NRC may deploy Senior Agency Representatives (SARs) to a licensee's emergency facility and to a JFO to serve on the UCG during radiological incidents.

The NRC SAR at the licensee's emergency facility interfaces primarily with the licensee's emergency director but may also interact with the media, public, and SLTT government officials.

The NRC SAR at the JFO interfaces primarily with the other members of the UCG. The SAR has the authority to speak on behalf of the NRC at the UCG, including the authority to commit NRC resources to UCG priorities, enter into cost-sharing agreements to support UCG priorities, and loan or share NRC resources with other jurisdictions.

# Emergency Classifications

An emergency classification is one of a set of names or titles established by the NRC for grouping off-normal events or conditions according to (1) potential or actual effects or consequences and (2) resulting onsite and offsite response actions.

## Emergency Classifications for Nuclear Power Plants and Research and Test Reactors

The emergency classification levels, in ascending order of severity, are notification of unusual event, alert, site area emergency, and general emergency. Nuclear power plants and research and test reactors use these emergency classifications as defined below.

### Notification of Unusual Event

The classification of "notification of unusual event" includes events that indicate a potential degradation of the level of safety of the plant or indicates a security threat to facility protection. No releases of radioactive material requiring offsite response or monitoring are expected unless further degradation of safety systems occur. This term is sometimes shortened to "unusual event."

### Alert

The classification of "alert" includes events that involve an actual or potential substantial degradation of the level of safety of the plant or a security event that involves probable life-threatening risk to site personnel or damage to site equipment because of hostile action. Any releases are expected to be limited to small fractions of the EPA Protective Action Guide (PAG) exposure levels.

### Site Area Emergency

The classification of "site area emergency" includes events that involve actual or likely major failures of plant functions needed for protection of the public or hostile action that results in intentional damage or malicious acts. These malicious acts may be directed toward site personnel or equipment that could lead to facility failure. Malicious acts may also prevent effective access to equipment needed for the protection of the public. Any releases are not expected to result in exposure levels that exceed the EPA PAG recommendations beyond the site boundary.

### General Emergency

The classification of "general emergency" includes events that involve actual or imminent substantial core degradation or melting with potential for loss of containment integrity or hostile action that results in an actual loss of physical control of the facility. Releases can be reasonably expected to exceed the EPA PAG exposure levels offsite for more than the immediate site area.

## Emergency Classifications for Nuclear Materials and Fuel Cycle Facility Licensees

### Alert

The classification of "alert" includes events that could lead to a release of radioactive material(s), but the release is not expected to require a response by a non-facility response team to protect people offsite.

### Site Area Emergency

The classification of "site area emergency" includes events that could lead to a significant release of radioactive material(s) that may require a response by a non-facility response team to protect people offsite.

# Zoned Approach for Fixed Nuclear Facilities

Fixed nuclear facilities provide a unique opportunity for the planning of nuclear/radiological incident response before an incident occurs. While radiation levels and contamination will

still require the use of zone designations during incident response, these zones can be estimated using modeling tools during planning activities.



Figure E-1: Zoned Approach to Fixed Nuclear Facility

## Emergency Planning Zones

To facilitate a preplanned strategy for protective actions during an emergency, two emergency planning zones are defined (Figure E-1[68]) around each commercial nuclear power plant. The exact size and shape of each emergency planning zone depends on the specific conditions at each site, unique geographical features of the area, and demographic information. This strategy provides a substantial basis to support activity beyond the planning zones in the extremely unlikely event it would be needed. The two emergency planning zones are described below.[69]

### Plume Exposure Pathway

The plume exposure pathway[70] emergency planning zone has a radius of about 10 miles from the reactor site. Predetermined protective action plans are in place for this emergency planning zone and are designed to avoid or reduce doses from potential exposure of radioactive materials. These actions include sheltering, evacuation, and the use of potassium iodide where appropriate.

---

[68] The zoned approach depicted in Figure E-1 is consistent with the guidance set forth in the joint NRC and FEMA document, *Criteria for Preparation and Evaluation of Radiological Emergency Response Plans and Preparedness in Support of Nuclear Power Plants,* NUREG-0654/FEMA-REP-1 (2019), which codified a structure of Emergency Planning Zones and corresponding Exposure Pathways.

[69] For information on developing evacuation time estimates for fixed nuclear facilities, see the NRC's *Criteria for Development of Evacuation Time Estimate Studies,* NUREG/CR-7002 (2020).

[70] Exposure pathway is a route by which a radionuclide or other toxic material can enter the body. The main exposure routes are inhalation, ingestion, absorption, and entry through a cut or wound in the skin.

*Ingestion Exposure Pathway*

The ingestion exposure pathway emergency planning zone has a radius of about 50 miles from the reactor site. Predetermined protective action plans are in place for this emergency planning zone and are designed to avoid or reduce doses from potential ingestion of radioactive materials. These actions include evaluation; movement control; and dispositions for unsafe livestock, poultry, water, crops, food, and medicines.

## Evacuation Zones

Evacuation does not always call for completely emptying the 10-mile zone around a nuclear power plant. In most cases, the release of radioactive material from a plant during a major incident would move with the wind, not in all directions surrounding the plant. The release would also expand and become less concentrated as it travels away from a plant. Therefore, evacuations should be mapped to anticipate the path of the release. Generally, as a minimum, in the event of a General Emergency, a 2-mile ring around the plant is evacuated, along with people living in the 5-mile zone directly downwind and slightly to either side of the projected path of the release. This helps account for potential wind shifts and fluctuations in the release path. Evacuation beyond 5 miles is assessed as the accident progresses. Also, in response to a General Emergency, people living in the remainder of the 10-mile zone will most likely be advised to go indoors to monitor emergency alert system broadcasts.

This page intentionally left blank.

# Appendix F: NUCLEAR DETONATIONS AND RADIATION DISPERSAL

A nuclear detonation produces effects that are overwhelmingly more consequential than those produced by a radiological dispersal device (RDD), radiological explosive device (RED), or conventional explosive. A nuclear detonation differs from a conventional explosion in the following ways:

- Produces energy that, pound for pound, is much greater than that produced by conventional explosives.
- Instantaneously produces a very large and hot nuclear fireball.
- Instantaneously generates an electromagnetic pulse that can destroy or disrupt electronic equipment.
- Transmits a large percentage of energy in the form of heat and light within a few seconds that can cause burns, fires, and visual impairment or injuries at great distances.
- Emits highly penetrating prompt nuclear radiation (defined as that radiation emitted within the first minute, although intense radiation will continue to be emitted after one minute) that could be harmful to life and damaging to electronic equipment, and depending on proximity, causes humans and animals to receive significant doses of radiation including at levels high enough to cause acute radiation sickness (ARS)[71] and death.
- Generates, if it is a surface or near-surface burst,[72] a shock wave that can destroy underground critical infrastructure.
- Generates, if it is a surface or near-surface burst, radioactive products that emit residual nuclear radiation over an extended period of time, some of which are fallout that can be distributed by wind currents over wide areas, requiring extensive cleanup and rendering some locations uninhabitable and unsuitable for agriculture.
- Can cause extended infrastructure damage as well as a high volume of simultaneous communication traffic, both of which will impair or prevent transmission of communications signals.

The response to a nuclear detonation is unique compared to other types of radiological and nuclear incidents. A nuclear detonation will result in extensive destruction of critical infrastructure and great numbers of casualties and displaced people, causing needs for response capabilities that will rapidly outstrip available resources. Protective actions in areas with high radiation emissions due primarily to fallout require self-decontamination and sheltering in place after the blast, waiting 12–48 hours in locations with radiation protection

---

[71] Acute Radiation Syndrome (ARS), or radiation sickness, is a serious illness that can happen when a person is exposed to very high levels of radiation, usually over a short period of time.

[72] Surface burst is a nuclear weapon explosion that is close enough to the ground for the radius of the fireball to vaporize surface material. Fallout from a surface burst contains very high levels of radioactivity.

for fallout emissions to diminish, rather than universal prompt evacuation and mass decontamination. Effective communication will be important of where sheltering is needed, what type of shelter can be effective, and where potential immediate and subsequent exposures to radiation are likely sufficient to require early clinical or diagnostic evaluation and provision and administration of medical countermeasures. Federal response will be very limited in the first 24 hours after a detonation and substantially limited for up to 72 hours.

For additional information about nuclear detonations and preparedness for, response to, and recovery from them, see the *FEMA Planning Guidance for Response to a Nuclear Detonation* (2022).

## Zoned Approach

Although the NRIA is not an operational plan, effective nuclear/radiological incident response requires understanding a zoned approach to facilitate achievement of the following goals:

- Prioritize response and recovery activities.
- Coordinate and allocate scarce resources among jurisdictions.
- Adapt response and recovery operations to allow flexibility depending on incident circumstances.

A zoned approach provides a tailored response to the various hazards present surrounding the nuclear/radiological incident depending on their severity and proximity to the incident site. The traditional approach of deploying the maximum number of resources and responders to the incident area as quickly as possible is not realistic or effective for response to nuclear detonation due to the scope and complexity of the scenario. The goal of a zoned approach is to save lives while managing risks to emergency responder life and health.

A zoned approach (Figure F-1) for response to a nuclear detonation is based on two types of zones, radiation zones and blast zones. Recognizing how response operations relate to the various zones facilitates achievement of the following goals:

- Lifesaving operations
- Safety of responders
- Effectiveness of responder activities



**Figure F-1: Example of Radiation and Blast Damage Zones used in a Zoned Approach**

## Radiation Zones

The radiation zones in the following text are not visually distinguishable or capable of precise geographic boundaries and must be determined by actual radiation level measurements. Radiation zones include both the Dangerous Radiation Zone and the Hot Zone. These radiation zones are also applicable in response to other nuclear/radiological incidents that include radiological dispersal including those caused by an RDD.

### Dangerous Radiation Zone (DRZ)

Unlike the damage zones, the DRZ is distinguished by radiation levels, not by structural damage. Exposure to radioactivity levels within the DRZ has the potential to produce ARS. Radiation exposure rates in high-fallout areas can deliver doses that are fatal. The DRZ is the area that could cause ARS and poses the greatest challenge for lifesaving operations.

The DRZ is defined as the area where a radiation exposure rate of 0.1 sievert/hour (Sv/hour) (10 rem/hour or ~10 roentgen/hour) or greater exists. This area may include parts of the Light Damage Zone, Moderate Damage Zone, and/or Severe Damage Zone, as well as areas outside the blast damage zones. The highest radiation level from fallout occurs within the first 4 to 6 hours and continues to drop as the fission products decay. As radioactivity levels drop, the DRZ will steadily shrink in size. Response operations within this zone must be avoided and, if necessary, undertaken by extreme exception only and with time limitations or other provisions to minimize exposure. Using personal protective equipment (PPE) and properly monitoring radiation levels is essential for entering the DRZ. Any operation near the DRZ must be justified, optimized, and planned to ensure responders refrain from undertaking missions in areas where radioactivity levels have not yet been accurately determined and readily monitored.

In areas where the DRZ overlaps with either the Light or Moderate Damage Zones, response activities should be planned according to the potentially lethal radiation levels present.

The most important mission in the DRZ is communicating protective action guidance to the public. Effective preparedness requires public education, effective communication plans, messages, and means of delivery in the DRZ.

### Hot Zone (HZ)

The HZ is the area covered by fallout that creates radiation exposure rates from 0.1 millisieverts/hour (mSv/hr) (0.01 rem or ~0.01 roentgen) to 0.01 Sv/hour (10 rem/hour or ~10 roentgen/hour). These levels do not present an acute threat, but the HZ may warrant protective actions. Fallout deposition at great distances is dictated by the parameters of winds at altitudes of the fallout cloud. The 0.1 mSv/hour (0.01 rem/hour or ~0.01 roentgen/hour) line can reach a maximum extent of several hundred miles within hours of the incident and then shrink in size due to decay. Using PPE and properly monitoring radiation levels are essential for entering the HZ.

Emergency operations can be safely performed in the HZ as long as responders undertake appropriate planning, dose monitoring measures, and protective measures. Staging, triage, and reception centers should be established outside of this area whenever possible.

## Blast Damage Zones

Generally, no clear boundaries exist between the representative blast damage zones resulting from a nuclear detonation, but the general characteristics of each follow.[73]

- Light Damage Zone – all or most windows broken and few serious injuries
- Moderate Damage Zone – significant building damage, rubble, downed utility lines and poles, overturned automobiles, fires, and serious injuries
- Severe Damage Zone – completely destroyed infrastructure and high radiation levels resulting in unlikely survival of victims

### Light Damage Zone (LDZ)

Damage is caused by shocks, similar to those produced by a thunderclap or a sonic boom but with much more force. Although some windows may be broken over miles away, injury associated with flying glass will generally occur at overpressures above 0.5 pounds per square inch. Blast overpressures for the LDZ will be about 0.5 pounds per square inch at the outer boundary and 2 to 3 pounds per square inch at the inner boundary. The damage in this area will be highly variable as shock waves rebound multiple times off buildings, the terrain, and even the atmosphere.

Damage may include windows and doors being blown in. Gutters, window shutters, roofs, and lightly constructed buildings may experience even more structural damage. Emergency vehicles may have difficulty maneuvering as they near the incident site as both stalled and crashed automobiles and litter and rubble will progressively increase.

Most of the injuries incurred within the LDZ are not expected to be life threatening and will be associated with flying glass, debris, and traffic accidents. If injured survivors are

---

[73] See FEMA's Planning Guidance for Response to a Nuclear Detonation (2022).

ambulatory, emergency responder actions should focus on the Moderate Damage Zone, where victim rescue will be most effective in saving lives.

> Responders should only focus medical attention in the Light Damage Zone on severe injuries and should encourage and direct individuals to shelter in safe locations to expedite access to severely injured individuals.

### Moderate Damage Zone (MDZ)

The transition from the LDZ to the MDZ occurs when building damage becomes substantial. The determination is made by ground level and/or overhead imagery.

Damage in the MDZ includes significant structural damage, blown out building interiors, blown down utility lines, overturned automobiles, caved roofs, collapsed buildings, and extensive fires. Telephone poles and street light poles will be blown over. Sturdier buildings will remain standing, while lighter commercial and multi-unit residential buildings may collapse or become structurally unstable. Most wood frame houses will be destroyed.

Substantial rubble and damaged vehicles in the streets will make evacuation and access difficult or impossible without street clearing. Moving towards the incident site in the MDZ, rubble will completely block streets and require heavy equipment to clear. Urban search and rescue operations will be most efficiently and effectively engaged in non-radiation contaminated areas of the MDZ.

Most survivors in the MDZ will likely require medical care. The MDZ will be encumbered with several hazards including the following:

- Elevated radiation levels
- Potentially live power lines
- Ruptured, burning gas lines
- Unstable structures
- Sharp metal objects and broken glass
- Burning vehicles

Visibility in much of the MDZ will be limited for an extended period after the incident because of dust raised by the shock wave and from collapsed buildings. Smoke from fires will also obscure visibility.

> The MDZ should be the focus of early lifesaving operations. Early response activities should focus on medical triage with constant consideration of radiation dose minimization.

### Severe Damage Zone (SDZ)

The SDZ will begin where most of the buildings are severely damaged or collapsed. Blast overpressure that characterizes the SDZ is 5 to 8 pounds per square inch and greater. Few, if any, buildings are expected to be structurally sound or even standing in the SDZ, and very few people would survive. Radiation and other hazards will be extremely dangerous in the SDZ. Therefore, focus on lifesaving and critical infrastructure missions in the other blast damage zones will be more advantageous. Rubble will make streets impassable in the SDZ,

making response impossible. Approaching the incident site, all buildings will be destroyed, and the debris piles will be extremely large.

Response within the SDZ should not be attempted until radiation dose rates have dropped substantially in the days following the incident and the response within MDZ is significantly advanced. All response missions must be justified to minimize responder risks to ensure that responders' radiation exposures are below the occupational exposure limit.

# Appendix G: DATA & MODELS

Following a nuclear/radiological incident, a critical task is to identify and assess the nature and extent of contamination to inform response and recovery activities. The most effective way to assess the current and future extent of contamination following a nuclear/radiological incident is through data collection and modeling. This appendix is focused on the datasets and models used to guide response for nuclear/radiological incidents. The datasets and models useful for operational decision making are described in this appendix. The utility of each for different types of nuclear or radiological release incidents is highlighted where applicable.

In the following sections, specific models and datasets are identified and described with respect to how they meet nuclear/radiological incident response data requirements. Some of these models will be run by subject matter experts in dedicated modeling centers, while some are available to the end user to operate on their smartphone. The results of some models are classified, which could cause challenges for effective information sharing. An explanation of who has access and is expected to run or analyze each type of data or model is described.

## Emergency Support Function Leadership Group (ESFLG) Modeling and Data Inventory

FEMA's Emergency Support Function Leadership Group (ESFLG) Modeling and Data Inventory[74] contains the technical contact information for each modeling tool mentioned in this appendix, which can be used to request assistance in compiling impact libraries for planning documents. By looking up the Modeling and Data Inventory entry for the models/datasets identified in this document, one can click the "Related Models/Datasets" button to access additional models developed for research and planning. This will allow for identification of models that serve analogous functions. All relevant models/datasets can be browsed by applying a hazard filter for nuclear detonation and then examining each category of model/dataset (raw data, incident characterization, situational awareness, consequence models, impact estimates, decision support tools, and mission-specific requirements).

The Modeling and Data Inventory includes all-hazards models/datasets automatically, even when a hazard-specific filter is applied. Additional filters can be selected to identify models that fulfill particular aspects of planning needs (e.g., filter by ESF or by keyword).

## Interagency Modeling and Atmospheric Assessment Center (IMAAC)

The Interagency Modeling and Atmospheric Assessment Center (IMAAC) is mandated as the coordinating body for atmospheric plume modeling for radiological and nuclear incidents. The IMAAC is tasked with requesting and validating the plume model outputs and disseminating those validated results to the interagency in a standardized format within 30 minutes of the incident. The outputs released by the IMAAC can then be used to guide protective actions (shelter or evacuation) and emergency management operations for the

---

[74] The ESFLG Modeling and Data Inventory can be found at https://gis.fema.gov/Model-and-Data-Inventory/.

incident. Standardized IMAAC modeling and analysis products are available for shelter and evacuation strategies/protective action guidelines, guidance for responder exposure by geographic region, casualty estimates, estimated percentages of major injuries and burns, and blast effects including degree of damage to buildings by type of construction.

# Federal Radiological Monitoring and Assessment Center (FRMAC)

## Radiological Monitoring and Assessment System

The FRMAC is responsible for collating radiation measurements from various sources and recording those data in the FRMAC database, managed by the Department of Energy/National Nuclear Security Administration (DOE/NNSA). CBRNResponder data is included in this data set.

As soon as possible following the release, the FRMAC will incorporate radiation readings taken by aircraft from DOE/NNSA (Aerial Measuring System), EPA (Airborne Spectral Photometric Environmental Collection Technology), or SLTT responders. The FRMAC will integrate aerial monitoring data along with CBRNResponder data, EPA's RadNet monitoring system, and other measurements.

## TurboFRMAC

The FRMAC also runs a suite of models including the TurboFRMAC model to assess the impacts of the release. These collated data and additional analysis from FRMAC are provided to SLTT responders to be used to develop protective actions and by the IMAAC to provide updated models and more detailed guidance. As sufficient data about the radiation release becomes available, these updates will provide fatality estimates and refine evacuation recommendations to include non-life-threatening consequences, such as reducing radiation exposure to minimize the potential increased cancer risk.

# National Atmospheric Release Advisory Center (NARAC) Modeling System

The National Atmospheric Release Advisory Center (NARAC) has primary responsibility for modeling atmospheric releases for nuclear/radiological incidents. During an incident, the IMAAC utilizes NARAC models and then automatically distributes results to the NARAC, along with interpretations, explanations, and non-technical summaries. The NARAC models define the areas that should be considered for protective actions based on federal guidance and include evacuation along with other recommendations. The NARAC models can also estimate the scale of damage caused by a nuclear detonation and project initial trajectory information for a radioactive plume. IMAAC analysis products using these models are available through the IMAAC Portal on the CBRNResponder website and CMWeb on the llnl.gov website, both of which require prior access requests.

Real-time data measuring the radiation levels on the ground and in the atmosphere become available in the hours following a nuclear detonation. The data are collated and processed by the FRMAC using various methods and tools. The results are supplied to NARAC to refine the outputs of the NARAC modeling system and accompanying IMAAC summary analysis products. This analysis continues iteratively throughout the response.

Access and contact information are available in the Modeling and Data Inventory; see the "How do I get it?" shortcut for the NARAC Modeling System.

## CBRNResponder

All pre-established partnerships will have access to the incident information on the CBRNResponder network and additional organizations can be rapidly added. During a Stafford Declaration, all cooperating federal partners will be incorporated into the CBRNResponder Event Space. CBRNResponder incorporates nuclear/radiological data and IMAAC models into a mapped database. CBRNResponder can be used to provide real-time data to decision makers. Data can be collected using the CBRNResponder website, smartphone/tablet applications, fixed monitoring stations, and any other integrated equipment, networks, or systems.

## CRC SimPLER

Community Reception Center Simulation Program for Leveraging and Evaluating Resources (CRC SimPLER) helps radiation emergency decision makers understand their current capacity, potential bottlenecks, and additional resource needs when preparing for population monitoring during response to a radiation emergency. It provides predictions of throughput capacity, utilization of resources, wait times, and line lengths by hour and over the course of a shift. CRC SimPLER was developed using modelling software and incorporates timing data collected from Community Reception Center (CRC) exercises across the country.

CRC SimPLER is available for free online at https://ephtracking.cdc.gov/Applications/simPler/crc/home. Upon request, custom CRC layouts can be simulated within the model and results provided by emailing simpler@cdc.gov.

## Radiation Emergency Medical Management (REMM)

Nuclear/radiological incidents cause widespread injuries ranging from minor cuts from broken glass to complex cases of trauma combined with radiation exposure. Large, complex nuclear/radiological incident may destroy local medical treatment capability and capacity. Radiation Emergency Medical Management (REMM) provides guidelines and information for patient triage and treatment following a nuclear or radiological incident, including management and treatment of combined physical injuries and radiation exposure (e.g., decontamination of open wounds or burns plus high radiation exposure).

The Radiation Emergency Medical Management website maintained by HHS contains many specific tools very focused on health care professionals in addition to useful general resources to understand different types of radiological incidents and how radiation injuries and illness result from exposure and contamination. This information is useful for first responders and anyone working to develop a better understanding of the health consequences of radiological incidents. The tool is open access; a link is available in the Modeling and Data Inventory.

## Data and Modeling Assets for Decontamination and Cleanup

Decontamination and disposal of radioactive waste will be a long-term process, ongoing throughout recovery, but it will also be an urgent consideration. Access to the damage zones

requires the displacement and removal of contaminated debris to make roads passable and remove hazards from response areas. Debris removal will require safe disposal and decontamination, which can be guided by two resources: (1) the Incident Waste Decision Support Tool and (2) the RDD Waste Estimation Support Tool. Neither of the tools require specific subject matter expertise or special computing resources for use, but both require advanced access and experience to operate effectively.

## Incident Waste Decision Support Tool (I-WASTE DST)

The Incident Waste Decision Support Tool (I-WASTE DST) provides comprehensive information on the handling, transporting, decontaminating, and disposing of contaminated waste and debris. This includes calculations of waste quantity and guidelines to protect the workers who will handle it. I-WASTE DST was developed to provide technical information, regulations, and guidance on important disposal issues for all types of debris, including hazardous waste and specifically nuclear/radiological waste. The I-WASTE DST suite of resources can be accessed from the website https://iwaste.epa.gov.

## RDD Waste Estimation Support Tool (RDD WEST)

The RDD Waste Estimation Support Tool (RDD WEST) is a planning tool for estimating the volume and radioactivity levels of waste generated by a nuclear/radiological incident (especially RDDs) and determining subsequent decontamination activities. Though not developed for nuclear detonations, the RDD WEST can still be useful. The RDD WEST[75] allows users to evaluate various decontamination/demolition strategies to examine the impacts of those strategies on secondary waste generation (e.g., estimating the amount of debris produced by demolitions).

In addition to RDD WEST, EPA also maintains the Waste Estimation Support Tool 5.0 (WEST 5.0).[76] While not specifically for estimating nuclear/radiological waste, WEST 5.0 includes a nuclear/radiological scenario tool.

Additional EPA decision support tools for waste management can be found via the website https://www.epa.gov/emergency-response-research/decision-support-tools-waste-management.

## Preliminary Remediation Goals Calculator

Radionuclide Preliminary Remediation Goals are radionuclide exposure concentrations that the EPA has developed to prevent harm from long-term radiation exposure. Using exposure assumptions and EPA toxicity data, the Preliminary Remediation Goals Calculator[77] generates target radionuclide concentrations, which can be used as site cleanup goals for areas that have been contaminated with radionuclides. After a nuclear detonation, the Preliminary Remediation Goals Calculator can be used with site-specific data to ensure cleanup actions are targeted according to priorities.

---

[75] The RDD WEST is run from the user's computer after downloading the necessary software from http://cfpub.epa.gov/si/si_public_record_report.cfm?dirEntryId=246738 and a technical contact is available via the website.

[76] WEST 5.0 can be accessed via the website https://cfpub.epa.gov/si/si_public_record_report.cfm?Lab=NHSRC&dirEntryId=342918.

[77] The Preliminary Remediation Goals Calculator is open access and available at http://epa-prgs.ornl.gov/cgi-bin/radionuclides/rprg_search/.

## Residual Radioactivity Family of Codes

The Residual Radioactivity Family of Codes (RESRAD Family of Codes) has codes used to develop cleanup and decontamination criteria for residual radioactive material and to assess its associated radiation dose or risks. The models compute soil cleanup guidelines using dose- or risk-based cleanup standards. They can be used to project annual doses or lifetime risks to workers or members of the public resulting from exposures to residual radioactive material in soil. (The models project concentrations of radionuclides in various media resulting from residual radioactivity in soil.)

RESRAD Family of Codes requires prior request for access but is designed to be run by a skilled end user following an incident.[78]

# Data and Modeling Assets for Electromagnetic Effects

Multiple communication systems may be disrupted following a nuclear/radiological incident due to electromagnetic effects. These effects may be a product of a nuclear detonation and may not occur during other nuclear/radiological incidents. During an exercise or incident, the Electromagnetic Pulse Response may be used to make projections for the damage caused by EMP.

## Electromagnetic Pulse Response Model

The Electromagnetic Pulse Response Model can provide information about the electromagnetic effects on select equipment following a nuclear/radiological response. Defense Threat Reduction Agency (DTRA) then distributes this information to the interagency response, through the IMAAC analysis. If access is available, the Electromagnetic Pulse Response Model can also be accessed through the DHS Standard Unified Modeling, Mapping, and Integration Toolkit platform.

---

[78] Requests for download and more information can be found via the website https://resrad.evs.anl.gov/.

This page intentionally left blank.

# Appendix H: ADDITIONAL ASSETS

| Organization | Resource Name | Description |
|---|---|---|
| DHS (CBP Laboratories and Scientific Services) | Weapons of Mass Radiological/Nuclear Reachback | Provides national-level 24/7 nuclear/radiological reachback capability to federal D/As and SLTT governments. |
| DHS (CWMD Office) | Mobile Detection Deployment Units | Provides radiological/nuclear detection equipment capability that allows end users to screen, search, and detect radiological/nuclear materials. |
| DHS (Federal Protective Service) | Hazardous Response Program | Includes initial investigations of suspicious or threatening chemical, biological, radiological, nuclear, and explosive (CBRNE) incidents; conduction of CBRNE threat assessments; confirmations of unauthorized presence of CBRNE agents and materials; and the conduct of emergency operations. The Hazardous Response Program also provides evacuation support during CBRNE incidents, CBRNE mutual aid response through agreement, and training assistance. The program is compliant with OSHA and National Fire Protection Association guidance and regulations. |
| DHS (FEMA) | Radiological Operations Support Specialist (ROSS) | Provides technical radiological/nuclear support to Incident Command at the state emergency operations center level. |
| DOC/NOAA | Air Resources Laboratory (ARL) | Focuses its dispersion research on the development and improvement of sophisticated dispersion models and other tools for air quality and emergency response applications. This includes volcanic eruptions, forest fires, nuclear accidents, and homeland security incidents. ARL also designs and evaluates high resolution observing networks, develops instrumentation, and conducts tracer field studies to improve the accuracy of atmospheric transport and dispersion projections. |
| DOD | CBRN Response Enterprise: Command and Control CBRN Response Elements (C2CREs) | Designed to be employed by U.S. Northern Command (USNORTHCOM) or U.S. Indo-Pacific Command (USINDOPACOM) in support of a federal response to a CBRN incident and are designed to provide incident commanders with the following capabilities: urban search and rescue, mass casualty decontamination, and emergency medical triage and stabilization. Additionally, the C2CREs may be able to support mission assignments in the functional areas of logistics, transportation, and CBRN assessment. C2CREs can easily scale down for incidents that do not require all resident capability sets. |

| Organization | Resource Name | Description |
|---|---|---|
| DOD | CBRN Response Enterprise: Defense CBRN Response Force (DCRF) | Designed to be employed by USNORTHCOM or USINDOPACOM in support of a federal response to a CBRN incident. Joint Task Force – Civil Support is the designated headquarters of the DCRF. This DCRF is designed to provide incident commanders with the following capabilities: urban search and rescue, mass decontamination, emergency medical triage and trauma care (including limited surgical and intensive care), limited patient holding, and patient movement via both ground and rotary-wing MEDEVAC/CASEVAC. Additionally, the DCRF may be able to support mission assignments in the functional areas of logistics, ground/air transportation, site assessment, road clearing, and horizontal engineering. A health physicist from Air Force Radiological Assistance Team or another DOD organization will likely serve as an interface to the FRMAC and Advisory-Team (A-Team). The DCRF can easily scale down for incidents that do not require all resident capability sets. Furthermore, if additional assets are needed, DOD can request forces that are available and appropriate to support Lead Federal Agency requests for capabilities. |
| DOD | CBRN Response Enterprise: National Guard Teams | Comprised of Active Duty and Reserve Component forces in a Title 10 (federalized) duty status and National Guard forces in a Title 32 (non-federalized) duty status that provide life-saving capabilities for a national and regional CBRN response during major or catastrophic CBRN incidents. National Guard forces consist of Weapons of Mass Destruction-Civil Support Teams (WMD-CSTs), CBRNE Enhanced Response Force Packages (CERFPs), and Homeland Response Forces (HRFs) employed under state control. In extremis, all CRE units may be federalized to a title 10 status and allocated to U.S. Northern Command (USNORTHCOM) for command and control. WMD-CSTs are full-time National Guard units and provide 24/7 CWMD and CBRN detection, identification and threat characterization for prevention and response missions in support of federal and SLTT responders in all 54 states and territories.  All National Guard CRE forces support National Special Security Events (NSSEs) and other Special Event Assessment Rating (SEAR) events. |
| DOD/Armed Forces Radiobiology Research Institute (AFRRI) | Medical Radio-Biology Advisory Team | Provides health physics, medical, and radiobiological advice to military and civilian command and control operations worldwide in response to nuclear and radiological incidents requiring a coordinated federal response. Through "reach back," the deployed team of radiation medicine physicians and senior health physicists can call on the knowledge and skills of radiobiologists, biodosimetrists, and other research professionals at AFRRI as well as those of other DOD response teams. |

| Organization | Resource Name | Description |
|---|---|---|
| DOE (NNSA) | Nuclear Radiological Advisory Team | Provides an emergency response capability for on-scene scientific and technical advice for both domestic and international nuclear or radiological incidents. It is led by a Senior Energy Official who runs the NNSA field operation and who coordinates NNSA follow-on assets as needed. |
| DOE (NNSA) | Nuclear Weapons Accident Response Group | Provides technical guidance and responds to U.S. nuclear weapons accidents. The team assists in assessing weapons damage and risk and in developing and implementing procedures for safe weapon recovery, packaging, transportation, and disposal. |
| DOE (NNSA - NEST) | Radiological Assistance Program | First responder program for assessing and characterizing radiological hazards from nine regional offices at DOE sites throughout the United States. Each region has a minimum of three teams with a standard composition of eight personnel. Teams can be augmented with other specialists and will be tailored to the specific mission. The team conducts field monitoring and sampling measurements and provides radiological advice to protect the health and safety of responders and the public. |
| DOE (NNSA - NEST) | NEST Incident Management Team (IMT) | A Type 1 capable IMT is flexible, scalable, and deploys to support the management of nuclear/radiological incidents. The NEST IMT effectively and efficiently organizes, coordinates, supports, and manages the NEST field-level response. The NEST IMT is led by the DOE/NNSA Senior Response Official (SRO). |
| DOE (NNSA - NEST) | Aerial Measuring System (AMS) | A fleet of rapidly deployable aircraft equipped with specialized radiation detection systems to provide real-time measurements of ground radiation contamination. |
| DOE (NNSA - NEST) | Consequence Management Home Team (CMHT) | Provides analytical and operational support to NEST responders in the field, which includes the analysis and interpretation of the initial release based on early data. The CMHT also provides map products, coordination of laboratory assets, and situational awareness of response teams deployed to an incident. |
| DOE (NNSA - NEST) | Consequence Management Response Team (CMRT) | A multi-functional team that conducts radiological monitoring and sampling, data assessment, laboratory analysis, and radiological health and safety support. CMRT can deploy the Consequence Management Advanced Command (CMAC) in advance of the rest of the team. CMRT is the foundation of the FRMAC, a DOE/NNSA led interagency entity to coordinate federal radiological monitoring and assessment in response to nuclear/radiological incidents. |
| DOE (NNSA - NEST) | National Atmospheric Release Advisory Center (NARAC) | Provides tools and expertise to map and model the spread of hazardous and radioactive material in the atmosphere. |

| Organization | Resource Name | Description |
|---|---|---|
| DOE (NNSA - NEST) | National Search Program (NSP) | A rapidly deployable scientific and technical advisory team that supports and conducts search operations. |
| DOE (NNSA - NEST) | Accident Response Group (ARG) | A team of nuclear weapons experts that respond to incidents involving U.S. nuclear weapons or weapons components |
| DOE (NNSA - NEST) | Radiation Emergency Assistance Center/Training Site (REAC/TS) | The foremost center in the United States for medical advice on the management of radiation injuries, scientific expertise, specialized training, and onsite assistance for the treatment for radiation exposure incidents to medical professionals around the world. |
| DOE (NNSA - NEST) | Joint Technical Operations Team (JTOT) | Provides real-time scientific and technical support, including assessments based on nuclear design principles during nuclear/radiological and/or WMD incidents. |
| DOJ (FBI) | Evidence Response Team Unit (ERTU): Hazardous Evidence Response Team (HERT) | Provides training, leadership, and subject matter expertise in hazardous evidence collection, as well as in the management and processing of forensic evidence in CBRN crime scenes. ERTU also provides coordination and oversight for operational response and activities of FBI field office HERTs. These teams are DOJ/FBI field teams trained, equipped, and authorized to collect CBRNE evidence in contaminated environments. |
| EPA | Airborne Spectral Photometric Environmental Collection Technology (ASPECT) | The ASPECT aircraft is managed by EPA's CBRN Consequence Management Advisory Team and provides remotely sensed chemical/radiological (gamma and neutron) data and imagery (situational awareness). It can identify, quantify, and map chemical plumes and ground-based radiation. It is also capable of collecting high-resolution digital photography and video products. Data products are transferred to ground base support within minutes of collection through satellite communications, while in flight. |
| EPA | CBRN Consequence Management Advisory Division (CMAD) | Provides scientific and technical support for all phases of environmental response to a CBRN incident, including health and safety site characterization, environmental sampling and analysis, environmental monitoring, risk assessment building and structure decontamination, waste treatment environmental cleanup, and clearance; manages the EPA's ASPECT fixed-wing aircraft, which provides chemical/radiological data; and deploys and operates ground-based characterization and mapping capability for radiological incidents. |
| EPA, Integrated Consortium of Laboratory Networks (ICLN) | Environmental Response Laboratory Network | Provides capability to perform routine and emergency radio analysis of environmental samples. |

| Organization | Resource Name | Description |
|---|---|---|
| EPA | Environmental Response Team | Provides scientific and technical expertise, including health and safety, environmental sampling, air monitoring, toxicology, risk assessment, waste treatment, contaminated water/scientific divers, and site decontamination and remediation; provides field-analytical and real-time air monitoring with the EPA mobile laboratories known as Trace Atmospheric Gas Analyzers. |
| EPA | Homeland Security Research Program | EPA Office of Research and Development's Homeland Security Research Program provides the science and technology needed to effectively respond to and recover from radiological incidents and other disasters. Subject matter experts in sampling, sample analysis, decontamination, fate and transport, and waste management are available to provide support in decision-making based on cutting-edge science. |
| EPA | National Criminal Enforcement Response Team | Provides technical, safety, hazardous evidence collection, and other forensic support to law enforcement in the event of a weapon of mass destruction terrorist attack or environmental catastrophe. |
| EPA, DOE, DOD, DHS (USCG) | On-Scene Coordinators for oil and hazardous materials consequence management | Coordinate the on-scene tactical response to oil and hazardous materials incidents. Actions include assessment of the extent and nature of environmental contamination; assessment of environmental cleanup options; and implementation of environmental remediation, including decontaminating buildings and structures and management of wastes. For nuclear/radiological incidents, USCG provides the Federal OSC for incidents in certain areas of the coastal zone, and EPA provides the Federal OSC for incidents in the inland zone and in other areas of the coastal zone. |
| EPA | Radiation Task Force Leaders (RTFLs) | A sampling and monitoring force multiplier comprised of EPA Response Support Corps members based throughout EPA's Regions and Labs. The RTFLs are specially trained EPA personnel who will lead small teams of personnel in performance of tasks including field radiological measurements, contamination monitoring, soil sampling, air sampling, decontamination line setup and support, radiological control area support, and dose management support. |
| EPA | Radiological Emergency Response Team | Provides advice on protective measures to ensure public health and safety; assessments of dose and impact of release to public health and the environment; monitoring, sampling, laboratory analyses, and data assessments to assess and characterize environmental impact; and technical advice and assistance for containment, cleanup, restoration, and recovery. |
| EPA | Radiological Environmental Assessment Equipment | Sample preparation trailers and mobile laboratories carry electrical generators and supplies for approximately one week, not applicable for other assets. |

| Organization | Resource Name | Description |
|---|---|---|
| HHS (ASPR) | Radiation Injury Treatment Network (RITN) | A memorandum of understanding exists between the HHS ASPR and the National Marrow Donor Program on behalf of the RITN to utilize expertise available at bone marrow transplant and cancer centers for the treatment of patients of radiation exposure. RITN is led by the National Marrow Donor Program and American Society for Transplantation and Cellular Therapy, with essential support from the U.S. Office of Naval Research. |
| HHS (CDC/ATSDR) | Epidemiologic Contact Assessment Symptom Exposure (Epi CASE) Team | Enrollment forms give SLTT entities a tool to register responders and other persons exposed to chemical, biological, or nuclear agents from a disaster. The enrollment form is a two-page form that can be distributed on paper or electronically. It can be implemented quickly to collect information rapidly to identify and locate survivors and people displaced or affected by a disaster. |
| HHS (ASPR) | Strategic National Stockpile Agents for Nuclear/Radiological Incidents | National repository of antibiotics, chemical antidotes, antitoxins, life support medications, IV administration, airway maintenance supplies, and medical/surgical items. Nuclear/radiological-specific resources include chelating agents (calcium and zinc diethylenetriamine pentaacetate), Prussian blue, and growth factors/cytokines for white blood cells. |
| HHS (CDC/NIOSH) | Emergency Responder Health Monitoring and Surveillance™ (ERHMS™) guidance and tools | The ERHMS™ system is a health monitoring and surveillance framework that includes recommendations and tools specific to protect emergency responders during all phases of a response, including pre-deployment, deployment, and post-deployment phases. The intent of ERHMS™ is to identify exposures and/or signs and symptoms early in the course of an emergency response, prevent or mitigate adverse physical and psychological outcomes, ensure workers maintain their ability to respond effectively and are not harmed during response work, evaluate protective measures, and identify responders for medical referral and possible enrollment in a long-term health surveillance program. |
| HHS (ASPR) | Tactical Medicine Resources | HHS's Office of Emergency Management and Medical Operations, Special Operations Branch, TAC-Med Team has the capability to provide direct operational medical support (low-signature/footprint medical capability, high-threat/risk medical response), as well as tactical medical education, law enforcement medical direction, law enforcement liaison/force protection coordination, and medical consultation. Special Operations/TAC-Med has a limited capability for detection and decontamination (1 or 2 patients) for CBRN. |

| Organization | Resource Name | Description |
|---|---|---|
| NRC | Incident Response Program | Implements the NRC primary authority role. Communicates and coordinates directly with NRC licensed facilities or licensed material holders during an incident. Performs an independent assessment of facility conditions or material conditions to ensure a clear understanding of the significance of the incident and the possible sequence of future incidents. Advises on any conditions that could affect public health and safety or threaten the environment. Assesses potential consequences of an incident, the status of protective actions underway, and any conditions that might impede necessary protective actions. Communicates and coordinates with other federal D/As to ensure a common understanding of all aspects of an incident. |
| U.S. Department of Veterans Affairs | Medical Emergency Radiological Response Team (MERRT) | The MERRT responds to radiological disasters that require medical assistance and/or radiological decontamination of survivors. The MERRT provides medical assistance including direct patient treatment, assisting and training local health care providers in managing, handling, and treatment of radiation exposed and contaminated casualties; assesses the impact on human health; and provides consultation and technical advice to federal and SLTT authorities. When the Stafford Act is declared, MERRT will be doing their work in coordination with ESF #8. |

This page intentionally left blank.

# Appendix V: AUTHORITIES

Authorities applicable to this annex include PPD-8: National Preparedness, PPD-35: United States Nuclear Weapons Command, Control, Safety and Security, PPD-44: Enhancing Domestic Incident Response, HSPD- 5: Management of Domestic Incidents, NSM-16: Strengthening the Security and Resilience of United States Food and Agriculture, the Homeland Security Act of 2002, the Post-Katrina Emergency Management Reform Act of 2006 (PKEMRA), the Pets Evacuation and Transportation Standards Act of 2006, the Robert T. Stafford Disaster Relief and Emergency Assistance Act (Stafford Act), the Sandy Recovery Improvement Act of 2013, NSM-19: Counter Weapons of Mass Destruction (WMD) Terrorism and Advance Nuclear and Radioactive Material Security worldwide (classified), NSPD 42 / HSPD-14: Domestic Nuclear Detection, NSPM-36: Guidelines for U.S. Government Interagency Response to Terrorist Threats and Incidents in the United States and Overseas (classified), and numerous federal criminal statutes. Certain federal D/As are authorized to respond directly to specific nuclear/radiological incidents. Nothing in this annex alters or impedes the ability of federal D/As to carry out their respective authorities and associated responsibilities under law. This annex does not create new authorities nor change existing ones.

Federal D/As may take appropriate independent emergency actions within the limits of their own statutory authority to protect their workers (including contractors) and the public, mitigate immediate hazards, and gather information concerning the emergency to avoid delay.

In addition to the authorities referenced above, which include classified policy directives and memoranda, the following key legal authorities are applicable to this annex.

## Atomic Energy Act of 1954 (as amended)

The Atomic Energy Act (42 United States Code [U.S.C.]. §§ 2011–2297 (2003)) stipulates the DOD and DOE responsibilities for protection of certain nuclear materials, facilities, information, and nuclear weapons under their control. Energy Reorganization Act of 1974 (5 USC §§ 5313–5316, 42 USC §§ 5801–5891 (2002)) split these functions, assigning to one agency, the DOE, the responsibility for the development and production of nuclear weapons, promotion of nuclear power, and other energy-related work. To the other agency, the NRC, it assigned all nuclear regulatory work. However, the statutory authority for the regulation of defense nuclear facilities is assigned to both DOE and the NRC. The two acts also provide the foundation for NRC regulation of the nation's civilian use of byproduct, source, and special nuclear materials to ensure adequate protection of public health and safety, to promote the common defense and security, and to protect the environment. For incidents involving NRC or agreement state-regulated facilities, activities, or material, the NRC or agreement state has the authority to perform an independent assessment of the safety of the facility or material; evaluate licensee protective action recommendations; perform oversight of the licensee (monitoring, advising, assisting, and/or directing); and report information, as appropriate, to media and public entities.

The Atomic Energy Act also charges the EPA with additional responsibilities regarding radiation matters that directly or indirectly affect public health.[79] Under these authorities, the EPA has a mission for publishing PAGs,[80] providing technical assistance to SLTT governments, conducting long-term monitoring of ambient radiation levels, and taking other actions to prevent adverse effects to public health due to unnecessary exposure to ionizing radiation. The FBI is responsible to investigate and enforce violations of the Act.

## Price-Anderson Nuclear Industries Indemnity Act

Title 42 USC § 2210 establishes an insurance framework applicable to the nuclear energy industry to compensate the public for certain damages, including personal injury and property damages in the event of a nuclear incident at a commercial nuclear facility. The Price-Anderson Act also covers DOE facilities, private licensees, and their subcontractors. Under the existing framework, owners of nuclear plants pay a yearly premium for private insurance coverage (primary tier). If a nuclear accident were to cause damages in excess of the primary tier, each owner would be assessed a prorated share of the excess (up to approximately $138 million per reactor). The total amount of the secondary tier of funds will vary as the number of operating reactors changes. A single pool of insurance companies currently issues all policies for the primary and secondary tiers for all U.S. reactors. In the event of a nuclear incident, if the federal court with geographic jurisdiction finds that damages from the nuclear incident may exceed the amount of nuclear liability insurance available under the first and secondary tier funds, prioritization of remaining compensation will be managed by the court. The Price-Anderson Act specifies that the NRC must file with the court a proposed plan for an equitable allocation of available funds. The Price-Anderson Act also requires the President to submit to Congress proposed compensation plans for valid claims in excess of the first and secondary tier funds and any legislative authorities necessary to implement those compensation plans. The Price-Anderson Act commits Congress to thoroughly review the particular incident and to take whatever actions it deems necessary and appropriate to protect the public in that situation. Price-Anderson covers bodily injury, sickness, disease, or resulting death; property damage and loss; and living expenses for displaced individuals. The current insurance policy covers some environmental cleanup costs for large scale nuclear incidents. The extent of coverage for environmental cleanup will require legal resolution.  than being based upon the number of plants contributing to the fund.

[79] The Atomic Energy Act authorizes the NRC to enter into agreements that allow states to assume regulatory authority over specified types of radioactive materials. The NRC has relinquished to 39 states portions of its regulatory authority to license and regulate byproduct materials (radioisotopes), source materials (uranium and thorium), and quantities of special nuclear materials under critical mass. The mechanism for the transfer of the NRC's regulatory authority to a state is an agreement signed by the governor of the state and the Chairman of the Commission.
[80] A much more extensive write-up of the legal basis for the PAGs can be found in Section 1.3.1 (Legal Basis) of the 2017 PAG Manual.

# Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA)

The Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA)[81] gives the federal government authority to respond to the release or threatened release of hazardous substances (including radionuclides[82]) that may endanger public health or the environment. CERCLA also gives the federal government the authority to compel responsible parties to respond to releases of hazardous substances. CERCLA is implemented through the National Oil and Hazardous Substances Pollution Contingency Plan, more commonly called the National Contingency Plan (NCP), a regulation found in 40 CFR Part 300. At the on-scene level, Federal OSCs implement this response authority. On-Scene Coordinators may assist SLTT governments in responding to releases but also have the authority to direct and coordinate the response when needed to ensure protection of public health and the environment. Typical response actions include, but are not limited to, air monitoring; assessment of the extent of the contamination; stabilization of the release; decontamination; and waste treatment, storage, and disposal. Four federal D/As have On-Scene Coordinator authority for hazardous substance emergencies: EPA, DHS/USCG, DOD, and DOE. CERCLA is applicable for releases of certain materials and may not be available as an authority to respond to a nuclear/radiological incident.

CERCLA also established the Agency for Toxic Substances and Disease Registry (ATSDR)[83] to serve as a science-based public health agency working to address community concerns about hazardous waste. ATSDR is directed by congressional mandate to perform specific functions concerning the effect on public health of hazardous substances in the environment.

# The National Oil and Hazardous Substances Pollution Contingency Plan

The National Oil and Hazardous Substances Pollution Contingency Plan, more commonly called the National Contingency Plan (NCP), is the federal government's blueprint for responding to both oil spills and hazardous substance releases. The NCP is the result of efforts to develop a national response capability and promote coordination among the

---

[81] CERCLA provides broad authority to carry out removal and remedial actions and pursue recovery of costs incurred. CERCLA authorizes EPA [the President] to sample and investigate as an initial matter (42 USC 9604(e)(1)). This information would allow EPA [the President] to evaluate what was released, including both radioactive and non-radioactive contamination. There may be a potential CERCLA exclusion where it has been determined based on sufficient information that all the relevant conditions in the exclusion (CERCLA Section 101(22)(C)) have been met. See 42 USC 9601(22)(C). Potential application of any exclusion under this CERCLA provision would require more specific factual development. As a result, CERCLA would authorize EPA to proceed in the early data-gathering stages of response, and EPA would need to consider the potential CERCLA exclusion as to later stages of response. In the early stages, CERCLA would authorize EPA [the President] to sample and gather data (42 USC 9604(e)(1)). The data would help show whether the release included commingled non-radioactive hazardous substances (e.g., PCBs from the fire) or radioactive material other than the certain, specified radioactive material listed in the exclusion (CERCLA Section 101(22)). EPA [The President] has full CERCLA authority over non-radioactive hazardous substances and radioactive material other than the certain, specified radioactive material listed in the exclusion (CERCLA Section 101(22)). If, on the other hand, the release consisted of only the certain, specified radioactive substances listed in the exclusion (CERCLA Section 101(22)), then the CERCLA exclusion could possibly limit use of this response authority if the other conditions in that exclusion also were met.

[82] Radioactive forms of elements are called radionuclides. Some occur naturally in the environment, while others are human made, either deliberately or as byproducts of nuclear reactions.

[83] See 42 USC 9604 (i) for more information about ATSDR and their legal authorities.

hierarchy of responders and contingency plans. As required by the Clean Water Act of 1972, the NCP was revised to include a framework for responding to hazardous substance releases, as well as oil spills. Following the passage of Superfund legislation in 1980, the NCP was broadened to cover releases at hazardous waste sites requiring emergency removal actions. Over the years, additional revisions have been made to the NCP to keep pace with the enactment of legislation.

Under the NCP, federal D/As should plan for emergencies and develop procedures for addressing oil discharges and releases of hazardous substances, pollutants, or contaminants; coordinate their planning, preparedness, and response activities with one another; coordinate their planning, preparedness, and response activities with affected SLTT governments and private entities; and make available those facilities or resources that may be useful in a response situation, consistent with agency authorities and capabilities. Once a response has been triggered, the USCG or EPA is authorized to initiate and, in the case of a discharge posing a substantial threat to public health or welfare of the United States, is required to initiate and direct, appropriate response activities. Such response activities must occur when the EPA Administrator or DHS Secretary determines that any oil or Clean Water Act (CWA) hazardous substance is discharged, or a substantial threat exists of such discharge:

- Into or on navigable waters
- On the adjoining shorelines to the navigable waters
- Into or on the waters of the exclusive economic zone
- That may affect natural resources belonging to, appertaining to, or under the exclusive management authority of the United States

## Clean Water Act

The Clean Water Act employs a variety of regulatory and non-regulatory tools to reduce direct pollutant discharges into the nation's waterways, finance wastewater treatment facilities, and manage polluted runoff. It also gives the EPA the authority to implement pollution control programs and to set wastewater standards for industry and limitations on contaminants in surface waters. The broader goal of the Act is to help restore and maintain the chemical, biological, and physical integrity of the nation's waters.

The Act prohibits industrial sources and publicly owned treatment works from discharging pollutants into navigable waters without a permit. It also provides the EPA and USCG with broad hazardous substance removal authorities. However, these do not include authority over source, byproduct, or special nuclear material.

## Safe Drinking Water Act

Under the Safe Drinking Water Act (SDWA), the EPA sets legal limits on the levels of certain radionuclides in drinking water. These limits are applicable to all federal and SLTT jurisdictions, including local city public works facilities. Under SDWA, the Agency established a dose-based maximum contaminant level (MCL) for beta particle and photon (gamma) radioactivity of 4 mrem/yr. The MCL is based on lifetime exposure criteria, which assume 70 years of continued exposure to contaminants in drinking water.

# The Defense Against Weapons of Mass Destruction Act

In accordance with Title 50 USC § 2313, the Assistant Secretary of Defense for Homeland Defense is responsible for the coordination of DOD assistance to federal and SLTT officials. This responsibility is in responding to threats involving nuclear, radiological, biological, chemical weapons, or high-yield explosives or related materials or technologies, including assistance in identifying; neutralizing; dismantling; and disposing of nuclear, radiological, biological, chemical weapons, and high-yield explosives and related materials and technologies. DOE is directed to designate an Executive Agent for the coordination of DOE assistance to federal and SLTT officials in responding to threats involving nuclear, chemical, and biological weapons or related materials or technologies, including assistance in identifying, neutralizing, dismantling, and disposing of nuclear weapons and related materials and technologies and the coordination of DOE assistance to the DOD in carrying out that department's responsibilities under subsection (a) of this section.

# Resource Conservation and Recovery Act (RCRA)

The objectives of the Resource Conservation and Recovery Act (RCRA) are to protect human health and the environment from the potential hazards of waste disposal to conserve energy and natural resources, to reduce the amount of waste generated, and to ensure that wastes are managed in an environmentally sound manner. The RCRA regulates the management of solid waste, hazardous waste, and underground storage tanks holding petroleum products or certain chemicals. Under RCRA, hazardous waste treatment, storage, and disposal facilities are requiredto have permits, comply with operating standards, meet financial requirements in case of accidents, and comply with design requirements. The hazardous waste generated by a nuclear/radiological incident may have to be disposed of at these facilities. Source, byproduct, or special nuclear waste falls outside of the RCRA and under the jurisdiction of the NRC. If a radioactive waste is mixed with a hazardous waste, the resultant mixture is regulated by both the Atomic Energy Act and the RCRA as a mixed waste.

# Project BioShield Act

In 2004, the Project BioShield Act (the BioShield Act) amended the Public Health Service Act (PHSA) and the Federal Food, Drug, and Cosmetic Act (FD&C Act) to provide flexible authorities to expedite and enhance research, development, procurement, and stockpiling of medical countermeasures (MCM) for chemical, biological, radiological, and nuclear (CBRN) threat agents and authorized funding for procurement of those MCM. The BioShield Act also provided HHS with broader ability to quickly authorize use of certain MCM during emergencies. The BioShield Act amended the FD&C Act to authorize the Commissioner of Food and Drugs to issue emergency use authorizations (EUAs) for the use of MCM during public health emergencies (PHEs). The authorities enacted under the Project BioShield Act were further clarified and expanded under Pandemic and All-Hazards Preparedness Act (PAHPA), Pub. L. No. 109-417, PAHPRA, Pub. L. No. 113-5 and Pandemic and All-Hazards Preparedness and Advancing Innovation Act (PAHPAIA), Pub. L. No. 116-22.

# Pandemic and All-Hazards Preparedness Act

The Pandemic and All-Hazards Preparedness Act (PAHPA) of 2006 addressed a broad range of issues to further strengthen the nation's public health preparedness. It identified the

Secretary of HHS as the lead federal official for public health emergency preparedness and response and established a new Administration for Strategic Preparedness and Response (ASPR) within HHS. PAHPA provided new authorities for a number of programs, including the Biomedical Advanced Research and Development Authority within HHS for the advanced development and acquisition of MCM. PAHPA also placed the National Disaster Medical System under the purview of HHS and called for the establishment of a quadrennial National Health Security Strategy. It authorized the ASPR to exercise operational control of federal public health and medical response assets in a PHE operation, with the exception of DOD resources.

# Pandemic and All-Hazards Preparedness Reauthorization Act

The Pandemic and All-Hazards Preparedness Reauthorization Act of 2013 (PAHPRA) reauthorized PAHPA and enhanced HHS public health emergency preparedness and response capabilities, including funding for public health and medical preparedness programs (i.e., the Hospital Preparedness Program and Public Health Emergency Preparedness Cooperative Agreement) and for the purchase of MCM. PAHPRA increased the flexibility of Project BioShield as well as the flexibility of state health departments in dedicating staff resources to meet critical community needs in a disaster. In addition, PAHPRA enhanced the authority of the FDA to support rapid responses in advance of a PHE by amending EUA authorities to permit EUAs for potential PHEs and provided additional emergency authorities for FDA relating to emergency dispensing, expiration dating extensions, development and distribution of emergency use instructions, and waivers of certain requirements.

# Pandemic and All-Hazards Preparedness and Advancing Innovation Act

The Pandemic and All-Hazards Preparedness and Advancing Innovation Act (PAHPAIA) of 2019 amends the Public Health Service Act to build on work HHS has undertaken to advance national health security. Amendments include enhancing the authorities of the HHS Secretary, HHS ASPR, and the Director of the CDC to prepare for and respond to public health emergencies. PAHPAIA also authorizes uses for the Public Health Emergency Fund when the HHS Secretary declares a public health emergency or determines that a significant potential exists for a public health emergency and authorizes advance funding for buying medical countermeasures under the Project BioShield Act or to support advanced research and development of potential medical countermeasures. PAHPAIA also amends the Federal Food, Drug, and Cosmetic Act to enhance the authority of the FDA to support rapid responses to public health emergencies. PAHPAIA authorizes new public health and medical preparedness programs for regional health care preparedness and military and civilian partnerships and reauthorizes funding and enhances authorities for other public health and medical preparedness programs.

# Public Readiness and Emergency Preparedness Act (PREP Act)

The Public Readiness and Emergency Preparedness Act of 2005 (PREP Act) authorizes the Secretary of HHS to issue a declaration (PREP Act declaration) that provides immunity from

liability (except for willful misconduct) for claims of loss caused, arising out of, relating to, or resulting from administration or use of countermeasures to diseases, threats, and conditions determined by the Secretary to constitute a present or credible risk of a future public health emergency to entities and individuals involved in the development, manufacture, testing, distribution, administration, and use of such countermeasures. A PREP Act declaration is specifically for the purpose of providing immunity from liability and is different from and not dependent on other emergency declarations. The PREP Act also authorizes a fund in the U.S. Treasury to provide compensation to eligible individuals for physical injuries or death directly caused by administration or use of medical countermeasures covered by the declaration.

## Public Health Service Act

The Public Health Service Act forms the foundation of the HHS legal authority for responding to PHEs. Among other things, it authorizes the HHS Secretary to declare a PHE and take such actions as may be appropriate to respond to the emergency consistent with existing authorities; to lead all federal public health and medical response to PHEs and incidents covered by the NRF; to direct the U.S. Public Health Service and other departmental response components; to assist states in meeting the requirements of response to PHEs; to control communicable diseases; to maintain the Strategic National Stockpile; to provide for the operation of the National Disaster Medical System; to establish and maintain a Medical Reserve Corps; and to potentially provide targeted liability immunity for covered countermeasures to manufacturers, distributors, and certain classes of people involved in the administration of a program to deliver covered treatments to patients, their employees, and agents.

Section 311 of the PHSA provides the Secretary of HHS with authority to extend temporary assistance to states or localities to meet health emergencies at the request of SLTT authorities, including utilizing HHS personnel, equipment, medical supplies, and other resources, when SLTT resources are overwhelmed by an emergency situation. The HHS Secretary may authorize assistance regardless of a formal PHE or Stafford Act declaration.

Under Section 319 of the Public Health Service Act, when the Secretary has declared a PHE, he or she can take appropriate actions consistent with other authorities to respond to the emergency, including making grants; entering into contracts; and investigating the cause, treatment, or prevention of the disease or disorder. In addition, the Secretary may access the Public Health Emergency Fund if appropriated by Congress. Under 42 U.S. Code § 247d, the Emergency Fund is made available without fiscal year limitation if a PHE has been declared by the HHS Secretary. Funding is authorized to be appropriated to the Public Health Emergency Fund as may be necessary to respond to (1) a disease or disorder that presents a PHE or (2) a PHE, including significant outbreaks of infectious diseases or bioterrorist attacks.

The Strategic National Stockpile is authorized under Section 319F-2 of the PHSA and is maintained by the HHS Secretary to provide for the emergency health security of the United States. The Secretary of HHS may deploy the stockpile to respond to an actual or potential PHEs or to otherwise protect public health and safety or as required by the Secretary of the DHS to respond to an actual or potential emergency.

## Social Security Act, Section 1135

When the President declares a major disaster or an emergency under the Stafford Act or an emergency under the National Emergencies Act, and the HHS Secretary declares a public health emergency, the Secretary is authorized to take certain actions in addition to his or her regular authorities under section 1135 of the Social Security Act. The Secretary may waive or modify certain Medicare, Medicaid, Children's Health Insurance Program (CHIP) and Health Insurance Portability and Accountability Act (HIPAA) requirements as necessary to ensure to the maximum extent feasible that, in an emergency area during an emergency period, sufficient health care items and services are available to meet the needs of individuals enrolled in Social Security Act (SSA) programs and that providers of such services in good faith who are unable to comply with certain statutory requirements are reimbursed and exempted from sanctions for noncompliance other than fraud or abuse.

## Federal Food, Drug, and Cosmetic Act

The Federal Food, Drug, and Cosmetic Act is the foundation for FDA authority and responsibility to protect and promote the public health by ensuring the safety and effectiveness of human and veterinary drugs, biological products, and medical devices and ensuring the safety and security of the nation's food supply. When certain conditions are met, the Federal Food, Drug, and Cosmetic Act authorizes the HHS Secretary to declare circumstances exist justifying EUA of unapproved drugs, devices, or biological products or of approved drugs, devices, or biological products for an unapproved use. Importantly for preparedness, pre-submission to the FDA of EUA-supportive information for important products in development when no incident response is in progress may expedite EUA determination when an incident occurs, to an extent that could substantially mitigate morbidity and mortality.

Once a Secretarial determination is made, the Commissioner of the FDA may issue an EUA for particular products, assuming other statutory criteria and conditions are met. The Commissioner may allow unapproved medical products or unapproved uses of approved medical products to be used in an emergency to diagnose, treat, or prevent serious or life-threatening diseases or conditions caused by CBRN threat agents or emerging infectious disease when, among other criteria, there are no adequate, approved, and available alternatives. An EUA can be revoked when it is determined that the criteria for issuance are no longer met, or revocation is appropriate to protect public health or safety.

## The Office of Federal Procurement Policy Act

The Office of Federal Procurement Policy Act authorizes emergency procurement activities government-wide (1) in support of a contingency operation or (2) to facilitate the defense against or recovery from a CBRN attack against the United States. See also Federal Acquisition Regulation Part 18.2.

## Foreign Assistance Act of 1961

The Foreign Assistance Act reorganized the structure of existing U.S. foreign assistance programs, separated military from non-military aid, and created USAID to administer those non-military, economic assistance programs. USAID OFDA is responsible for leading and coordinating the U.S. government's response to disasters overseas.

# Defense Production Act

The Defense Production Act[84] is the primary source of Presidential authorities to expedite and expand the supply of critical resources from the U.S. industrial base to support the national defense and homeland security. In addition to military, energy, and space activities, the Defense Production Act definition of "national defense" includes emergency preparedness activities conducted pursuant to Title VI of the Stafford Act; protection and restoration of critical infrastructure; and activities to prevent, reduce vulnerability to, minimize damage from, and recover from acts of terrorism within the United States. The President's Defense Production Act authorities are delegated to the heads of various federal departments in Executive Order (EO) 13603.[85]

# Hazardous Materials Transportation Act

The Hazardous Materials Transportation Act (HMTA), enacted in 1975, is the principal federal law in the United States regulating the transportation of hazardous materials. Its purpose is to "protect against the risks to life, property, and the environment that are inherent in the transportation of hazardous material in intrastate, interstate, and foreign commerce" under the authority of the U.S. Secretary of Transportation.

The Act was passed as a means for improving the uniformity of existing regulations when transporting hazardous materials and to prevent spills and illegal dumping endangering the public and the environment, a problem exacerbated by uncoordinated and fragmented regulations. Regulations are enforced through four key provisions encompassing federal standards under Title 49 of the United States Code, Procedures and Policies, Material Designations & Labeling, Packaging Requirements and Operational Rules. Violation of the HMTA regulations can result in civil or criminal penalties unless a special permit is granted under the discretion of the Secretary of Transportation.

# The Occupational Safety and Health Act of 1970

The Occupational Safety and Health Act of 1970, Pub L. No. 651-678 (as amended at 29 USC) (OSH Act) was passed to prevent workers from being killed or seriously harmed at work. This law created OSHA, which sets and enforces protective workplace safety and health standards. OSHA also provides information, training, and assistance to employers and workers. Under the OSH Act, employers in all 50 states and U.S. territories have the responsibility to provide a safe workplace. Basic program elements for federal employee occupational safety and health programs and related matters are set out in 29 CFR 1960. OSHA's role primarily is to provide oversight and guidance for federal D/As' individual occupational safety and health programs through the Designated Agency Safety and Health Official and agency safety and health management staff.

During disaster response and recovery operations, even when OSHA is operating in a technical assistance and support mode, the agency's established standards remain in effect, and OSHA retains its ability to enforce the standards under its legal authority. For example, certain provisions of the Hazardous Waste Operations and Emergency Response (29 CFR 1910.120), Ionizing Radiation (29 CFR 1910.1096), and other standards may

---

[84] See the *Defense Production Act*, 50 U.S.C. App. 4501 et seq. (1950), as amended.
[85] See the *National Defense Resources Preparedness*, Executive Order 13603 (2012).

apply during response to and recovery from a nuclear/radiological incident under this annex. Although some states operate their own OSHA-approved occupational safety and health programs (state plans), OSHA's federal offices provide coordination, technical assistance, support services, and oversight in all 50 states, U.S. territories, and the District of Columbia.

EO 12196 extends protections for private sector employees provided under the OSH Act to federal employees. Generally, federal employer responsibilities under the EO and OSH Act apply no matter where the federal employee is located (e.g., outside the continental United States). The EO and OSH Act do not cover uniformed military personnel, U.S. Coast Guard personnel, nor members of the National Oceanic and Atmospheric Administration Commission Corps or U.S. PHS commissioned corps serving on active duty.

## 10 CFR § 20 – Standards for Protection Against Radiation

10 CFR § 20 establishes standards for protection against ionizing radiation resulting from activities conducted under licenses issued by the Nuclear Regulatory Commission. The purpose of these regulations is to control the receipt, possession, use, transfer, and disposal of licensed material by any licensee in such a manner that the total dose to an individual (including doses resulting from licensed and unlicensed radioactive material and from radiation sources other than background radiation) does not exceed the standards for protection against radiation.

## 10 CFR § 61.55 – Waste Classification

10 CFR § 61.55 provides the classification of low-level radioactive waste according to its radiological hazard. The classes include Class A, B, and C, with Class A being the least hazardous and accounting for 96 percent of low-level radioactive waste. As the waste class and hazard increase, the regulations established by the NRC require progressively greater controls to protect the health and safety of the public and the environment.

## Reorganization Plan No. 3 of 1970

Reorganization Plan No. 3 of 1970 transferred to EPA certain radiation authorities and responsibilities from other federal D/As. The applicable authorities transferred include certain sections from the PHSA and the Atomic Energy Act (AEA). This includes the authorities of the Federal Radiation Council, which were originally designated through EO and later codified in the AEA. Under these and other authorities, EPA has a mission for publishing Protective Action Guides (PAGs), providing technical assistance to SLTT governments, conducting long-term monitoring of ambient radiation levels, and taking other actions to prevent adverse effects to public health due to unnecessary exposure to ionizing radiation.

## 44 CFR § 350 – Review and Approval of State and Local Radiological Emergency Plans and Preparedness

The purpose of 44 CFR § 350 in this part is to establish policy and procedures for review and approval by FEMA of SLTT emergency plans and preparedness for the offsite effects of a radiological emergency that may occur at a commercial nuclear power facility.

# 44 CFR § 351 – Radiological Emergency Planning and Preparedness

44 CFR § 351 sets out federal roles and assigns tasks regarding federal assistance to SLTT governments in their radiological emergency planning and preparedness activities. This is applicable to radiological accidents at fixed nuclear facilities and transportation accidents involving radioactive materials. It relates to consequences and activities beyond the boundaries of any fixed nuclear facility with a potential for serious consequences and the area affected by a transportation accident involving radioactive materials. It includes the responsibility for developing federal response plans to implement various D/As' statutory authorities when responding to radiological emergencies.

# 28 CFR § 0.85 – Federal Bureau of Investigation General Functions

28 CFR § 0.85 identifies authorities of the Director of the FBI, including the authority to exercise lead agency responsibility in investigating all crimes for which the FBI has primary or concurrent jurisdiction, and which involve terrorist activities or acts in preparation of terrorist activities within the statutory jurisdiction of the United States.

# Title 50, USC, War and National Defense

As it applies to nuclear/radiological accidents or incidents, this statute provides a military commander the authority to establish a temporary National Defense Area around an accident/incident site to protect nuclear weapons and materials in DOD custody. This authority includes denial of access to an accident/incident site and removal of individuals who threaten orderly administration of the accident/incident site.

- §§ 2406, 2511 (codifying Executive Order 12344): Naval Nuclear Propulsion - These statutes established the Naval Nuclear Propulsion Program under the Department of Energy and Department of the Navy to provide for the safety of, the control of radiation and radioactivity associated with, and the response to radiological emergencies involving U.S. naval nuclear reactors and associated propulsion plants. The Naval Nuclear Propulsion Program is the lead federal agency for emergencies involving U.S. naval reactors, associated radiological and nuclear material, and radiological and nuclear material at Naval Nuclear Propulsion Program DOE facilities.

# Title 18, USC, Crimes and Criminal Procedure

Various sections of Title 18 USC: Crimes and Criminal Procedure, including but not limited to those referenced below, apply to nuclear/radiological incidents.

- § 831: Prohibited Transactions Involving Nuclear Materials
- § 2332a: Use of Weapons of Mass Destruction
- § 2332b(f): The Attorney General of the United States has primary investigative responsibility for all federal crimes of terrorism and certain other designated offenses
- § 2332f: Bombings of places of public use, government facilities, public transportation systems and infrastructure facilities

- § 2332h: Radiological Dispersal Devices
- § 2332i: Acts of Nuclear Terrorism

# Title 28, USC Judiciary and Judicial Procedure

Various sections of Title 28 USC, including but not limited to those referenced below, apply to nuclear/radiological incidents.

- § 533: Investigative and other officials; appointment

# Convention on Supplementary Compensation for Nuclear Damage

The Convention on Supplementary Compensation for Nuclear Damage was developed under the aegis of the International Atomic Energy Agency (IAEA) to be the basis for a global legal framework and mechanism for compensating survivors of nuclear damage that results from a nuclear incident. It entered into force on April 15, 2015; seven countries are presently party to the Convention, including the United States. In the event of a nuclear incident in the United States, funds could be made available to survivors; the first level would be from U.S. operators in the amount of 300 Special Drawing Rights or about $420 million dollars. Another subsequent source of funds, if required, could be made from Parties to the Convention on Supplementary Compensation, presently in the amount of about $140 million dollars.

# Convention on Early Notification of a Nuclear Accident and Convention on Assistance in the Case of a Nuclear Accident or Radiological Emergency

The Convention on Early Notification of a Nuclear Accident and Convention on Assistance in the Case of a Nuclear Accident or Radiological Emergency establishes a notification system for nuclear accidents that have the potential for international transboundary release that could be of radiological safety significance for another IAEA Member States. It requires IAEA Member States to report the accident's time, location, radiation releases, and other data essential for assessing the situation. DOS is the agency through which notifications are made and received under this Convention. Notification is to be made to affected IAEA Member States directly or through the IAEA and to DOS. The Convention on Assistance in the Case of a Nuclear Accident or Radiological Emergency sets out an international framework for cooperation among IAEA Member States and with the IAEA to facilitate prompt assistance and support in the event of nuclear accidents or radiological emergencies. It requires IAEA Member States to notify DOS of their available experts, equipment, and other materials for providing assistance. In case of a request, each IAEA Member State decides whether it can render the requested assistance as well as its scope and terms. DOS is the agency through which requests for assistance either to or from the United States are directed. The United States is party to both conventions.

# Executive Order 12656 of November 18, 1988 (as amended)

As amended, EO 12656, assigns national security emergency preparedness responsibilities to numerous federal D/As, as well as the National Security Council and the Homeland Security Council. National security emergency preparedness functions that are shared by more than one agency must be coordinated by the federal D/As having primary responsibility and must be supported by the other D/As having related responsibilities. In addition, each federal D/A must consider national security emergency preparedness factors to ensure an adequate response capability is maintained. Emergency plans and programs and an appropriate state of readiness, including organizational infrastructure, must be developed as an integral part of the continuing activities of each federal D/A.

This page intentionally left blank.

# Appendix Y: ACRONYMS AND ABBREVIATIONS

To promote readability, this annex utilizes acronyms only after the first occurrence of the proper name of a Federal Executive Branch department or agency. The exception to this rule applies to acronyms that only appear within tables and figures in the document, where space considerations and readability render the use of abbreviations optimal.

| Acronym / Abbreviation | Definition |
| --- | --- |
| AEA | Atomic Energy Act |
| AFRRI | Armed Forces Radiobiology Research Institute |
| AMS | Aerial Measuring System |
| ARF | action request form |
| ARG | Accident Response Group |
| ARL | Air Resources Laboratory |
| ASPECT | Airborne Spectral Photometric Environmental Collection Technology |
| ASPR | Administration for Strategic Preparedness and Response |
| A-Team | Advisory Team for Environment, Food, and Health |
| ATSDR | Agency for Toxic Substance and Disease Registry |
| BioShield Act | Project BioShield Act |
| C2CREs | Command and Control CBRN Response Elements |
| CASE | casualty assistance support element |
| CBP | U.S. Customs and Border Protection |
| CBRN | chemical, biological, radiological, and nuclear |
| CBRNE | chemical, biological, radiological, nuclear, and explosive |
| CDC | Centers for Disease Control and Prevention |
| CERCLA | Comprehensive Environmental Response, Compensation, and Liability Act |
| CERFP | CBRN Enhanced Response Force Package |
| CI | critical infrastructure |
| CIRG | Critical Incident Response Group |
| CISA | Cybersecurity and Infrastructure Security Agency |
| CMAC | Consequence Management Advanced Command |
| CMAD | Consequence Management Advisory Division |
| CMCU | Consequence Management Coordination Unit |
| CMHT | Consequence Management Home Team |
| CMRT | Consequence Management Response Team |
| CONOPS | concept of operations |
| CRC | Community Reception Center |
| CRC SimPLER | Community Reception Center Simulation Program for Leveraging and Evaluating Resource |
| CWA | Clean Water Act |
| CWMD | Countering Weapons of Mass Destruction |
| D/A | department/agency |
| DCRF | Defense CBRN Response Force |
| DEST | Domestic Emergency Support Team |

| Acronym / Abbreviation | Definition |
|---|---|
| DHS | U.S. Department of Homeland Security |
| DHS S&T | DHS Science and Technology Directorate |
| DOC | U.S. Department of Commerce |
| DOD | U.S. Department of Defense |
| DOE | U.S. Department of Energy |
| DOI | U.S. Department of Interior |
| DOJ | U.S. Department of Justice |
| DOL | U.S. Department of Labor |
| DOS | U.S. Department of State |
| DOT | U.S. Department of Transportation |
| DPA | Defense Production Act |
| DRZ | Dangerous Radiation Zone |
| DTRA | Defense Threat Reduction Agency |
| ECC | Environmental Compliance Coordinator |
| EO | Executive Order |
| EOC | emergency operations center |
| EPA | U.S. Environmental Protection Agency |
| ERHMS | Emergency Responder Health Monitoring and Surveillance |
| ERTU | Evidence Response Team Unit |
| ESF | Emergency Support Function |
| ESFLG | Emergency Support Function Leadership Group |
| EUA | emergency use authorization |
| FAA | Federal Aviation Administration |
| FBI | Federal Bureau of Investigation |
| FBI OSC | FBI On-Scene Commander |
| FCC | Federal Communications Commission |
| FCO | Federal Coordinating Officer |
| FD&C Act | Federal Food, Drug, and Cosmetic Act |
| FDA | Food and Drug Administration |
| Federal OSC | Federal On-Scene Coordinator |
| FEMA | Federal Emergency Management Agency |
| FEMA EOC | FEMA Emergency Operations Center |
| FIOP | Federal Interagency Operational Plan |
| FRC | Federal Resource Coordinator |
| FRMAC | Federal Radiological Monitoring and Assessment Center |
| FRPCC | Federal Radiological Preparedness Coordinating Committee |
| FSRT | Fatality Search and Recovery Team |
| HAZMAT | hazardous materials |
| HERO | Headquarters Emergency Response Official |
| HERT | Hazardous Evidence Response Team |
| HHS | U.S. Department of Health and Human Services |
| HMTA | Hazardous Materials Transportation Act |
| HOO | Headquarters Operations Officer |
| HRF | Homeland Response Force |
| HSE | Homeland Security Enterprise |

| Acronym / Abbreviation | Definition |
|---|---|
| HSIN | Homeland Security Information Network |
| HSPD | Homeland Security Presidential Directive |
| HZ | Hot Zone |
| IAEA | International Atomic Energy Agency |
| IC/UC | Incident Command/Unified Command |
| ICBRNR Protocol | International Chemical, Biological, Radiological, Nuclear Response Protocol |
| ICLN | Integrated Consortium of Laboratory Networks |
| ICS | Incident Command System |
| IHR | U.S. International Health Regulations |
| IMAAC | Interagency Modeling and Atmospheric Assessment Center |
| IMT | Incident Management Team |
| IND | improvised nuclear device |
| IOF | Initial Operating Facility |
| I-WASTE DST | Incident Waste Decision Support Tool |
| JACCIS | Joint Analysis Center: Collaborative Information System |
| JFO | Joint Field Office |
| JOC | Joint Operations Center |
| JTOT | Joint Technical Operations Team |
| JTTF | Joint Terrorism Task Force |
| LDZ | Light Damage Zone |
| LFA | Lead Federal Agency |
| MA | mission assignment |
| MCL | maximum contaminant level |
| MCM | medical countermeasures |
| MDZ | Moderate Damage Zone |
| MERRT | Medical Emergency Radiological Response Team |
| MERS | Mobile Emergency Response Support |
| MSRT | USCG Maritime Security Response Team |
| NARAC | National Atmospheric Release Advisory Center |
| NASA | National Aeronautics and Space Administration |
| NCP | National Oil and Hazardous Substances Pollution Contingency Plan |
| NDA | National Defense Area |
| NDRF | National Disaster Recovery Framework |
| NEST | Nuclear Emergency Support Team |
| NFP | National Focal Point |
| NGO | non-governmental organization |
| NIMS | National Incident Management System |
| NIRT | Nuclear Incident Response Team |
| NNSA | National Nuclear Security Administration |
| NOAA | National Oceanic and Atmospheric Administration |
| NOC | National Operations Center |
| NRC | Nuclear Regulatory Commission |
| NRCC | National Response Coordination Center |
| NRF | National Response Framework |
| NRIA | Nuclear/Radiological Incident Annex |

Nuclear/Radiological Incident Annex to the Response
and Recovery Federal Interagency Operational Plan

| Acronym / Abbreviation | Definition |
|---|---|
| NRITF | Nuclear/Radiological Incident Task Force |
| NRS | National Response System |
| NRT | National Response Team |
| NSA | national security area |
| NSC | National Security Council |
| NSF | National Strike Force |
| NSM | National Security Memorandum |
| NSP | Nuclear Search Program |
| NSPM | National Security Presidential Memorandum |
| OASH | Office of the Assistant Secretary of Health |
| OFDA | Office of Foreign Disaster Assistance |
| O/O | owner/operator |
| OSH Act | Occupational Safety and Health Act of 1970 |
| OSHA | Occupational Safety and Health Administration |
| PAG | Protective Action Guide |
| PAHPA | Pandemic and All-Hazards Preparedness Act |
| PAHPAIA | Pandemic and All-Hazards Preparedness and Advancing Innovation Act |
| PAHPRA | Pandemic and All-Hazards Preparedness Reauthorization Act |
| PHE | public health emergency |
| PHEIC | public health emergency of international concern |
| PHMSA | Pipelines and Hazardous Material Safety Administration |
| PHS | public health & safety |
| PKEMRA | Post-Katrina Emergency Management Reform Act |
| PPD | Presidential Policy Directive |
| PPE | personal protective equipment |
| PREP Act | Public Readiness and Emergency Preparedness Act |
| PSA | Protective Security Advisor |
| Rad Branch | Radiological Operations Branch |
| RANET | Response and Assistance Network |
| RAP | Radiological Assistance Program |
| RCRA | Resource Conservation and Recovery Act |
| RDD | radiological dispersal device |
| RDD WEST | RDD Waste Estimation Support Tool |
| REAC/TS | Radiation Emergency Assistance Center/Training Site |
| RED | radiological exposure device |
| rem | roentgen equivalent in man |
| REMM | Radiation Emergency Medical Management |
| REP Program | Radiological Emergency Preparedness Program |
| RESRAD | Residual Radioactivity Family of Codes |
| RITN | Radiation Injury Treatment Network |
| RNAC | Radiological/Nuclear Aerial Coordinator |
| ROSS | Radiological Operations Support Specialist |
| RPM | Remedial Project Manager |
| RRCC | Regional Response Coordination Center |
| RRT | Regional Response Team |

| Acronym / Abbreviation | Definition |
|---|---|
| RSF | Recovery Support Function |
| RSFLG | Recovery Support Function Leadership Group |
| RTFL | Radiation Task Force Leader |
| SABT | Special Agent Bomb Technician |
| SAC | Special Agent in Charge |
| SAR | Senior Agency Representatives |
| SDWA | Safe Drinking Water Act |
| SDZ | Severe Damage Zone |
| SFLEO | Senior Federal Law Enforcement Officer |
| SIOC | Strategic Information and Operations Center |
| SLTT | state, local, tribal, and territorial |
| SRMA | Sector Risk Management Agency |
| Sv | sievert |
| TCE | Threat Credibility Evaluation |
| UCG | Unified Coordination Group |
| UCS | Unified Coordination Staff |
| USACE | U.S. Army Corps of Engineers |
| USAID | U.S. Agency for International Development |
| USCG | U.S. Coast Guard |
| USDA | U.S. Department of Agriculture |
| USINDOPACOM | U.S. Indo-Pacific Command |
| USNORTHCOM | U.S. Northern Command |
| VA | U.S. Department of Veterans Affairs |
| WEST 5.0 | Waste Estimation Support Tool 5.0 |
| WHO | World Health Organization |
| WMD | weapons of mass destruction |
| WMD-CST | Weapons of Mass Destruction Civil Support Team |
| WMDD | Weapons of Mass Destruction Directorate |
| WMDSG | Weapons of Mass Destruction Strategic Group |

This page intentionally left blank.

"EXHIBIT K"



OFFICE OF THE ASSISTANT SECRETARY OF DEFENSE
FOR NUCLEAR, CHEMICAL, AND BIOLOGICAL DEFENSE PROGRAMS/
NUCLEAR MATTERS

# DoD 3150.08-M
## Nuclear Weapon Accident Response Procedures (NARP)

# INTERNET SUPPLEMENT





## TABLE OF CONTENTS

### Functional Areas

Administration and Logistics ------------------------------------------------------- AL-1

Communications --------------------------------------------------------------------- C-1

Legal --------------------------------------------------------------------------------- L-1

Medical ----------------------------------------------------------------------------- MED-1

Health and Safety ------------------------------------------------------------------ HS-1

Public Affairs ---------------------------------------------------------------------- PUB-1

Security ------------------------------------------------------------------------------ S-1

Contamination Control -------------------------------------------------------------CC-1

Training and Readiness Standards ------------------------------------------------ TRS-1

### Radiation Data

Radiological Monitoring Equipment ---------------------------------------------- RME-1

Specialized Radiological Monitoring and Hazard Assessment Capabilities ------------ SRMHAC-1

Radiation Detection and Measurement -------------------------------------------- RDM-1

Area and Resource Surveys ---------------------------------------------------------AR-1

Environmental Sampling ------------------------------------------------------------ ES-1

Radiological Monitoring, Measurement, and Control Forms -------------------------------RMMCF-1

Conversion Factors for Weapons Grade Plutonium --------------------------------------- CF-1

### Appendices

Incident Command System Functional Appendix --------------------------------------------ICSF-1

Inter-DoD Functional Annex --------------------------------------------------------- IDFA-1

Notional Accident Site --------------------------------------------------------------- NAS-1

Management of Contaminated Remains -------------------------------------------- MCR-1

### Reference Documents

References ---------------------------------------------------------------------------- REF-1

Definitions --------------------------------------------------------------------------- DEF-1

Abbreviations ------------------------------------------------------------------------AB-1

Figure 2.  Contingency Release Number 1

CONTINGENCY RELEASE NUMBER 1

To the General Public

"When the Public Is Probably in Danger"
(Does confirm)

(Format of sample release to be used when a nuclear accident occurs.  Public safety
considerations require this announcement because of the likelihood of fire or conventional high-
explosive detonation of the weapon.  The following statement should be made locally or by
appropriate higher authority if no local authority is available.)

An aircraft (other type of transportation) accident occurred (or other circumstances) about
(location and time).  The accident involved a nuclear weapon that contains conventional
explosives and radioactive material.  There is no danger of a nuclear detonation, but there is a
danger from the conventional explosives that (are burning, may detonate, have detonated).  The
public is requested to stay out of (indicate the area) (under surveillance by guards) in the interest
of safety and to avoid hampering operations at the accident scene.  An experienced response team
has been ordered to the scene.

(If appropriate, the following WILL be included in the release.)  Radioactive material in the form
of dust may be scattered because of the accident.  The dust poses little risk to health unless taken
into the body by breathing or swallowing, although it is unlikely that any person might inhale or
swallow an amount that should cause illness.  As a precautionary measure, you are asked to stay
calm and indoors.  Turn off fans, air conditioners, and forced-air heating units that bring in fresh
air from the outside.  Use them only to re-circulate air already in the building.  Eat and drink only
canned or packaged foods that have been inside.  If you must go outside, cover your nose and
mouth and avoid stirring up and breathing any dust.  It is important to remember that your
movement might cause yourself greater exposure to any radioactive dust, should it be present, and
you might possibly spread contamination to others.

(If plutonium is involved)  One of the materials involved is plutonium, which is both a toxic and a
radiation hazard and a chemical poison if ingested.  The radiation given off consists of alpha
particles that do not have sufficient energy to penetrate buildings, clothing, or even the outer
skin.  Therefore, short-term exposure to contamination outside the body poses a negligible health
risk.  The precautions mentioned earlier should be carefully followed to prevent inhalation or
ingestion.

Figure 2.  Contingency Release Number 1, continued

(If uranium is involved)  One of the materials involved is uranium.  Uranium, depending on the type, may be a radiological hazard or a chemical health hazard, similar to lead poisoning.  Uranium gives off alpha particles that do not penetrate skin and pose no health risk when outside the body.

The public is asked to stay out of the area (under surveillance or closed off by guards) (and if true) until a monitoring team, now en route to the accident site, may survey the ground and determine the exact area affected by the accident.  Any fragments found near the scene may be contaminated and should be left in place.  If fragments have been picked up, avoid further handling and notify (authorities) for proper recovery and disposition.

Periodic announcements will be made as more information is known.  It is expected that these precautionary actions will be modified as more information becomes available.  A U.S. (Military Service) team from (name of installation) is en route to (has arrived at) the accident scene.

We have no details yet on civilian or military casualties (or give number only of civilian and military casualties) or property damage.

The cause of the accident is under investigation.  Further details will be provided as they become available.

Figure 3.  Contingency Release Number 2

CONTINGENCY RELEASE NUMBER 2

To notify the general public

"No Radiological Danger to the Public"

(Confirms to reduce public alarm)

(Format of sample release to be used initially when no danger to the public from contamination or blast exists, but when confirming the presence or absence of a nuclear weapon or nuclear components significantly prevents or reduces widespread public alarm that may result from unusual activity at the accident and/or incident site.)

A U.S. (type) aircraft (other type of transportation) carrying HAZMAT, classified cargo, or unarmed nuclear weapon(s) crashed (or other circumstances) at about (location and time).

The public is requested to stay out of the area (add, if true:  under surveillance by guards) to prevent any remote possibility of hazard from the accident (or conventional HE detonation) and to avoid hampering removal operations.  There is no need for evacuation.  (There is no danger of nuclear detonation.)

The cause of the accident is under investigation.  Further details will be provided as they become available.

Figure 4.  Contingency Release Number 3

CONTINGENCY RELEASE NUMBER 3

To notify the general public

"When the Public Is Possibly in Danger"

(Confirms possibility of contamination in a nuclear weapon accident)

(Format of sample release to be used when nuclear weapons or nuclear components have been involved in an accident and the possibility exists for contamination due to fire or explosion, and details are unknown.  The release to the general public should only be used after the area has been secured.  Release may be modified as shown below depending on audience.)

MINIMUM ANNOUNCEMENT

A U.S. (type) aircraft (other type of transportation) carrying unarmed nuclear weapons or nuclear components crashed (or other circumstances) at (location) at about (time).

The public is asked to stay out of the accident area in the interest of safety due to the possibility of hazard from the accident (or conventional HE detonation) and to avoid hampering recovery operations.  (There is no danger of nuclear detonation.)

ADD THE FOLLOWING FOR APPROPRIATE OFFICIALS

Fire, rescue, and other emergency services personnel should approach the area with caution from upwind and be equipped with protective clothing and breathing apparatus.  Any local official at the scene of the accident or who has left the site who may provide details on the situation should call this number (_____).  Current information from the accident scene will help response personnel respond to the accident and provide additional public safety guidance.  If contact with the accident scene is established, determine the following:  condition of aircraft and/or vehicle (such as burning, evidence of explosion, or extent of damage); condition of accident site (such as fire or blast damage); or evidence of obvious cargo (such as shapes or containers).  Avoid handling any debris at the crash site.

If the aircraft is transporting nuclear weapons containing IHE or weapons overpacked with accident-resistant containers, detonation is much less likely, and the fire should be fought as long as there is a reasonable expectation of saving lives or containing the fire.  The weapons, or containers, if exposed, should be cooled with water.

Law enforcement officials should prevent unauthorized personnel from entering the site and picking up fragments of the plane (vehicle) or its cargo.  If any fragments have already been picked up, avoid further contact or handling.  Notify (authorities) for recovery and proper disposition.

A U.S. (Military Department) team from (name of installation) is en route to (has arrived at) the accident scene.

We have no details yet on civilian or military casualties or property damage.

The cause of the accident is under investigation.  Further details will be provided as they become available.

Figure 5.  Contingency Release Number 4-A

CONTINGENCY RELEASE NUMBER 4-A

"To Notify State and Local Officials
When the Public Is Possibly in Danger"
(Neither confirms nor denies)

(Format of sample release to be used if public safety considerations require notifying State and local officials that hazardous cargo has been involved in an accident, the possibility exists for contamination due to fire or explosion, and details are unknown.)

MINIMUM ANNOUNCEMENT

A U.S. (type) aircraft (other type of transportation) carrying HAZMAT crashed (or other circumstances) about (location) at (time).

Visitors are warned to stay out of the area of the accident in the interest of public safety.  Fire, rescue, and other emergency services personnel should approach the area with caution from upwind and be equipped with protective clothing and breathing apparatus.  Water should not be directly used on the aircraft unless needed to save property or lives.  Any local official at the scene of the accident who may provide details on the situation should make a telephone call to this number (local phone).  Current information from the accident scene helps evaluate the accident and provide additional public safety guidance.  If contact with the accident scene is established, determine the following: condition of aircraft (burning, evidence of explosion, extent of damage, etc.); condition of accident site (fire, blast, or damage); evidence of obvious cargo (shapes or containers).  Determine the need for a public announcement of nuclear weapons involvement based on the responses to the above.

EXPANDED ANNOUNCEMENT

If there is no immediate threat to life, and the fire may not be extinguished immediately (five minutes), the fire should be contained and allowed to burn out.  Water as a firefighting agent should be used with caution due to possible adverse reaction with materials involved in the fire.

Law enforcement officials should prevent unauthorized personnel from entering the site and picking up fragments of the plane (vehicle) or its cargo.  If any fragments have been picked up already, avoid further contact or handling.  Notify (authorities) for recovery and proper disposition.

Military personnel have been deployed (will be deployed) and will arrive (are scheduled to arrive) soon at the site.

Figure 6.  Contingency Release Number 4-B

<div style="border: 1px solid black;">

CONTINGENCY RELEASE NUMBER 4-B

To Notify the General Public
"When the Public Is Possibly in Danger"
(Neither confirms nor denies)

(Format of sample release to be used if public safety considerations require making a PUBLIC RELEASE that hazardous cargo was involved in an accident, the possibility exists for contamination due to fire or explosion, and details are unknown.)

A U.S. (type) aircraft (other type of transportation) carrying HAZMAT crashed (or other circumstances) about (location) at (time).  The public is warned to stay out of the area (under surveillance by guards) in the interest of safety and to aid operations at the accident scene.

A U.S. (Military Service) team from (name of installation) is en route to (has arrived at) the scene of the accident.

We have no details yet on civilian or military injuries or property damage.

Further announcements will be made as more information is known.

IN RESPONSE TO QUERY ONLY

In response to the question, "Are nuclear weapons stored at (name of facility) or (name of facility)?"  The official reply is, "It is DoD policy neither to confirm nor deny the presence of nuclear weapons at any particular location."

In response to the question, "Are nuclear weapons aboard a specific surface ship, attack submarine, or naval aircraft?"  The official reply is, "It is general U.S. policy not to deploy nuclear weapons aboard surface ships, attack submarines, and naval aircraft.  However, we do not discuss the presence or absence of nuclear weapons aboard specific ships, submarines, or aircraft.

</div>

9.  PUBLIC AFFAIRS RADIATION FACT SHEETS.  Figures 7. through 11. show standard public affairs radiation fact sheets.

Figure 7.  Fact Sheet 1:  Characteristics, Hazards, and Health Considerations of Plutonium

---

FACT SHEET 1

CHARACTERISTICS, HAZARDS, AND HEALTH CONSIDERATIONS OF PLUTONIUM

(For release to the general public)

The accident at _____(to be filled in)_____ has resulted in the release of the radioactive substance plutonium.  Persons who are downwind from the accident may become exposed to this substance by coming into contact with contamination (radioactive material that has coated or fallen on the surfaces of structures, the ground, or objects) from the mishap.  Also, very small amounts of plutonium may have been spread by the winds to adjacent areas.  Radiological survey teams are monitoring these suspected areas to determine the presence of plutonium and to measure the levels, if present.  No immediate danger exists to anyone, and no medical intervention is necessary; however, some actions may help prevent further contamination or reduce its spread to clean areas.

Plutonium, which is abbreviated Pu, is a heavy metal that has a shiny appearance, similar to stainless steel when freshly machined.  After exposure to the atmosphere for any period of time, it oxidizes to a dark brown or black appearance.  When released from a weapons accident, plutonium may not be readily seen by the naked eye, but in areas close to the accident, its presence may be assumed in dust and dirt on the ground or on flat surfaces, and from ash resulting from the accident fire.

Plutonium is an alpha radiation emitter; that is, it radiologically decays by emitting an alpha particle, a very heavy radioactive particle.  Alpha particles do not substantially penetrate materials.  Their range in air is only a few inches at most.  This means that alpha radiation is not a hazard to people if it stays external to the body.  The epidermis, or outer dead layer of the skin, is sufficient protection for exposure to this isotope from sources external to the body.  No external hazard exists to people walking through an area contaminated with plutonium.  Alpha radiation may, however, represent an internal radiation hazard when plutonium is taken into the body by inhaling contaminated air, eating contaminated food, or getting contamination into a wound or cut.  In actuality, contamination from ingestion is unlikely to be a problem, since plutonium is very poorly absorbed through the intestines.  Less than 0.02 percent may be absorbed, or 2 of every 10,000 atoms eaten.  Absorption through wounds may introduce small amounts of plutonium into the body.  Inhaling plutonium particles is the most likely route of internal exposure.

Inhaled plutonium is kept in the lungs in much the same manner that people in a dust storm inhale dust.  This "dust" settles in the lungs.  Once in the lungs, a low percentage of plutonium may be translocated by the bloodstream to the liver and the bones.  This deposition may be prevented by using "chelation" compounds, such as ethylenediamine tetraacetic acid or diethylenetriamine pentaacetic acid (DTPA), which hasten the excretion of plutonium from the body through the urine.  The use of these chelating compounds is not without some medical hazard to the individual, since they are IV-administered, and should be performed by a physician who has been in contact with appropriate agencies to coordinate the use of these drugs.

---

Figure 7.  Fact Sheet 1:  Characteristics, Hazards, and Health Considerations of Plutonium,
continued

Plutonium in a weapon has a radiological half-life (the length of time it takes for the plutonium to lose one half of its radioactivity) of more than 24,000 years.  This long half-life means that its radioactivity does not decrease substantially by nuclear decay or disintegration.  Likewise, eliminating plutonium from the body is also a very slow process.  Biological elimination of plutonium may be improved significantly by using the chelating agents mentioned above.

Therefore, until the limits of contamination are determined, the public is advised to follow a few simple guidelines to reduce the spread of contamination, and there will be little, if any, hazard.  Stay inside and reduce opening doors and windows.  Turn off fans, air-conditioners, and forced air heating units that bring in fresh air from the outside.  Use them only to recirculate air already in the building.  Children should not play outdoors.  Fruits and vegetables grown in the area should not be eaten.  Individuals who think they have inhaled some plutonium should not be unduly concerned.  The inhalation of plutonium is not an immediate medical emergency.  Very sensitive monitoring equipment is being brought into this area to survey the inhabitants of suspected contamination area(s) for inhaled radiation, and once established, this will be made available to those who need it.

Figure 8.  Fact Sheet 2:  Medical Department Fact Sheet on Plutonium

FACT SHEET 2

MEDICAL DEPARTMENT FACT SHEET ON PLUTONIUM

(For Medical Personnel)

Plutonium is a highly reactive element that may exhibit five oxidation states, from three to seven. The principal routes into the body are through inhalation and contaminated wounds; ingestion and contaminated intact skin are unimportant.

Inhalation is probably the most significant route of contamination in a nuclear weapon accident. Retention in the lungs depends on particle size and the chemical form of plutonium involved. Usually, in a weapons accident, plutonium is in the form of an oxide that has a pulmonary retention half-time of up to 1,000 days.

Absorption through wound contamination results in a translocation of some of the material to the skeleton and liver.  The majority remains in the vicinity of the wound and may result in the formation of a fibrous nodule within months to years.  The possible development of a sarcoma or carcinoma in such nodules is a matter of concern, although there have been no reports of such in the medical literature.

After entry into the body, some of the plutonium is solubilized by the body fluids, including blood, and is redistributed within the body.  Ultimately, it is distributed by the blood to the skeleton (45 percent), liver (45 percent), and the other tissues (10 percent).  The retention half-times are estimated to be 200 years (whole body), 100 years (skeleton), and 40 years (liver).

All medical treatment for plutonium contamination or inhalation should be coordinated with the appropriate Service Medical Department or with the REAC/TS because of the hazard of the substances involved.  DTPA compounds are defined as investigational drugs that require the advice and concurrence of the REAC/TS before administration.  The REAC/TS may be contacted at:  (423) 576-3131.

Treatment of plutonium-contaminated wounds should involve copious washing and irrigation to try to dislodge the contamination.  If possible, washings should be saved for later counting to determine contamination levels.  More extensive treatment by excision requires judgment in assessing the area involved, the difficulty of excision, and the total quantity in the wound.  Greater than 4 mCi of Pu embedded in a wound should be considered a candidate for such treatment.  It is not expected that the physician will need to make this determination, since a specialized team to perform such monitoring may be made available from the Incident Commander or his or her representative.  Immediate chelation therapy with DTPA (consult the REAC/TS for protocol) should be accomplished before surgical excision to prevent possible systemic absorption of plutonium.  In burn cases, flushing with sterile saline or water removes a great deal of contamination.  The remainder is likely to be removed when the eschar sloughs off.

Figure 8. Fact Sheet 2: Medical Department Fact Sheet on Plutonium, continued

DTPA treatment given immediately after wound or burn treatment has been shown to remove up to 96 percent of the remaining plutonium. In the case of inhaled plutonium, the results have been relatively disappointing, since the oxide forms of plutonium are transferred at a relatively slow rate from the lungs into the systemic circulation. Thus, little systemic burden of plutonium is available for chelation in the early period after exposure and there is never a time when a sizable systemic burden is available in the extracellular spaces for effective chelation.

In spite of this, DTPA should be used as soon as possible after significant inhalation exposures, since the oxides may not be the only compound present. Attempts to stimulate phagocytosis and the mucociliary response, or to use expectorant drugs, have not been successful in animal studies; however, this may not be true in humans.

The only demonstrated useful procedure in enhancing the clearance of insoluble particles, such as plutonium oxides, from the lung is bronchopulmonary lavage. The risk of this procedure versus the risk of future health effects from the estimated lung burden must be very carefully weighed. The use of repeated lavages should remove 25 to 50 percent of the plutonium that should otherwise be kept in the lung. Again, advice should be sought from the Service medical command and the REAC/TS.

Figure 9. Fact Sheet 3: Plutonium Fact Sheet

FACT SHEET 3

PLUTONIUM FACT SHEET

(For Operational Commanders)

As Operational Commander, you will be assaulted by many needs at once in determining the actions to be taken in coping with a nuclear weapon accident. You should have had the opportunity to review the preceding fact sheets for the general public and medical personnel. Several facts are important to keep in mind, as general guidance.

By the time you have arrived at the scene, the weapons have usually suffered low order detonations if they are going to do so. This low order detonation produces a cloud of finely dispersed plutonium that falls out over the area downwind, depending on particle size, wind direction and speed, and amount of explosives in the detonation. A very worst case situation is shown on the ARAC plots that are made available to you. The initial ARAC plots show desposition and dose predictions based on the detonation of all weapons involved, using all the available explosives. Desposition resulting from explosive dispersal is significantly larger than that resulting from a fire. The actual scenario should be less, perhaps 10 to 100 times less, based on the actual survey data from the site. Note that plots are predictive in nature, and must be corroborated by actual field measurements.

Figure 9.  Fact Sheet 3:  Plutonium Fact Sheet, continued

The cloud deposits its radioactive material over several hours after an explosion or fire, with the largest particles settling out earlier and closer to the accident site and the finest particles being carried further by the wind and taking longer to settle out.  In the case of such releases, Protective Action Recommendations to civil authorities for sheltering downwind members of the public in place must be made (and executed) within the several-hour period of plume passage to be effective for reduction of dose from the initial plume.  After initial cloud passage, the inhalation of material from the accident is by resuspending the plutonium by operations in the area of cloud passage, such as walking.  The DOE may compute a dose equivalent for persons in the area of the initial cloud passage.  People exposed in the plume may experience significant intakes of radioactive material through inhalation (with corresponding significant radiation doses).  Note that this is only from the cloud passage; doses from resuspension will be significantly less.

The important point is that the ARAC plot usually overestimates the total dispersion of plutonium, and the dose estimate is based only on cloud passage, not later resuspension of the plutonium; therefore, basing your sheltering plans on these numbers may easily result in a significant conservatism.

Sheltering should be recommended for the downwind population, but you must be careful to avoid the impression of extreme hazard from the plutonium.  Your sheltering advisory should indicate that there is a contamination hazard and a slight inhalation hazard.  Care should be taken not to increase tension over the accident and/or incident.  You and your PIO should stress that people should stay indoors as much as possible, keep houses closed to prevent contamination, and follow other ideas, as outlined in the public release.

Usually, the resuspension of plutonium in the original areas of contamination is not significant, except for the area very close to the accident site.  To prevent the spread of material in this area, consider spraying with some sort of fixative to prevent resuspension and/or spread of the plutonium.  Something as simple as hand sprayers with vegetable oil may be used to bind the plutonium into the soil and/or surface around the site.  A secondary advantage is that this method lowers the airborne hazard for the workers inside the control boundaries and may help the eventual cleanup process move faster.  It does, however, mask the plutonium from some alpha detection RADIACs, such as the AN/PDR 56, AN/PDR-77, and the ADM-300 with AP-100 alpha detector.  Usually, these types of instruments are used only for monitoring people or material leaving the site, not site contamination surveys.

In dealing with a nuclear weapon accident, some of the concepts that are usually used to handle injuries and/or fatalities on board ship do not hold true, or may be counterproductive.  Such an example is keeping the population under tight sheltering requirements or restricting traffic from the contamination area downwind.  Any recommendation for the civilian populace will be just that, a recommendation.  The military has no authority in the contamination areas unless they are military areas, or are within the NDA.  Use the local authorities, and have the FEMA representative assist in this function.

Some concept of the exact magnitude of the risk people experience from the accident may be compared with the risks outlined in the Nuclear Regulatory Guide 8.29 (reference (cb)).  The Service, DOE, and/or NNSA health physicists should be consulted to give the best approximation of the public risk; this may be compared with the risks reference (cb).

Figure 10.  Fact Sheet 4:  Characteristics, Hazards, and Health Considerations of Uranium

---

FACT SHEET 4

CHARACTERISTICS, HAZARDS, AND HEALTH CONSIDERATIONS OF URANIUM

(For Operational Commanders)

Some nuclear weapons may contain uranium.  Uranium is a mild to moderately radioactive material that may be hazardous if inhaled in large quantities.  In a nuclear weapon accident, the uranium in the warhead of the weapon may get dispersed into the air by fire or explosion of the HE in the weapon.  (Keep in mind that this is not a nuclear detonation.)  The heat and smoke from the fire or explosion may carry small particles of uranium into the air.  As the smoke plume travels downwind, the particles of uranium begin to settle to the ground, leaving a track of contamination on the ground surface and vegetation.  Larger particles settle out first, smaller particles may travel much further.  The highest levels of uranium contamination will be in the immediate area of the accident.  In general, the further away from the accident, the lower the levels of uranium contamination that may be expected.

Uranium is a heavy metal, somewhat like lead.  Uranium is a naturally occurring mineral that is mildly radioactive.  As found in nature, uranium consists mostly of the isotope U-238, with small quantities of U-235 and extremely small quantities of U-234.  This so-called "natural uranium" is only mildly radioactive, emitting alpha and beta radiation and low levels of gamma radiation.  The half-life of U-238, the major constituent of natural uranium, is 4.5 billion years.  It is likely that uranium released in the circumstances of a weapons accident is in the chemical form of uranium oxide.  Natural and depleted uranium are primarily chemical hazards (heavy metal toxins) rather than radiological hazards, even at relatively high exposures.  The radiological hazard associated with enriched uranium is higher than for its other forms.

Uranium may be "enriched," that is, the concentration of U-235 may be increased, by many methods.  Commercial nuclear reactors use uranium that has been enriched so that the U-235 makes about 5 percent of the total uranium mass (the rest is U-238).  Some nuclear weapons use highly enriched uranium (HEU) in which the U-235 makes up more than 90% of the total mass of uranium, though U-234 comprises almost 97% of the total alpha radiation activity.  The uranium left over from the enrichment process is called "depleted" uranium because it has only about one-third as much U-235 as natural uranium.  Nuclear weapons may contain several types of uranium, from depleted to highly enriched.

Uranium may be a mild to moderate radiation hazard if it is inhaled.  Uranium is not particularly hazardous if it stays outside the body.  If uranium is inhaled, the lungs and other organs of the body may receive doses of radiation; however, a person must inhale a very large quantity of uranium to get a significant dose of radiation.  Even if the uranium was involved in a fire or explosion, it is unlikely that anyone would get a serious radiation dose from inhalation.  It is much more likely that dispersal of uranium should create more of a "nuisance" contamination problem.

Figure 10.  Fact Sheet 4:  Characteristics, Hazards, and Health Considerations of Uranium,
continued

Compared to plutonium (the major HAZMAT in many nuclear weapons), uranium is not very hazardous.  In a nuclear weapon accident in which both plutonium and uranium have been dispersed, the hazard from plutonium is far more serious than that from uranium.  Although uranium emits alpha radiation (that may result in internal radiation doses if taken into the body) very much like plutonium, pound-for-pound, uranium is from 1,000 to 100,000 times less radioactive than plutonium.  A person would have to inhale roughly 1,000 to 100,000 times as much uranium mass to get the same dose as they would from plutonium.  In addition, uranium does not stay in the body as long as plutonium; therefore, the radiation dose received by the organs is somewhat lower.

Depleted and natural uranium is at least 100 times less radioactive than HEU.  It is unlikely that accidents involving dispersal of depleted or natural uranium will result in any significant radiation doses.  HEU contamination presents more of a problem than depleted or natural uranium, but is still far less of a problem than plutonium contamination.

If a person is directly exposed to a smoke plume from a fire or explosion involving uranium, he or she may have been exposed to significant levels of airborne uranium.  If he or she is in areas where the ground was contaminated, he or she may have been exposed to a much lower level of uranium than was re-suspended into the air.  If a person thinks he or she may have been exposed to uranium (as described above) he or she should contact the appropriate Federal or State authorities and let them know.  The authorities will arrange for appropriate radiation detection tests to be made.  These tests may include collecting urine samples and/or scheduling for a "lung count" examination.  Depending on the chemical form of the uranium that has been inhaled, some part of the uranium in the body is excreted in the urine.  Urine samples may be analyzed for the presence of uranium.  (All people have a low concentration of uranium in their urine from the trace quantities of uranium in the normal diet.)  Lung count is a procedure performed by placing very sensitive radiation detectors near a person's chest to look for low-energy X rays emitted by the uranium mixture.  Typically, the person reclines on a table or in a chair while the detectors are placed near the chest wall.  A lung count is not like an X-ray exam.  A lung count is a completely passive exam; the detectors do not emit any radiation, and the person does not receive any radiation dose from the exam.  A "quick" screening lung scan may be performed in about 10 or 15 minutes.  A more sensitive exam performed at a special "whole body counting" facility typically takes about 45 to 50 minutes.

In general, uranium is more hazardous to children than adults, due to the smaller size and different metabolism of children.  To assure that children are adequately protected, PAGs established by the EPA take this increased sensitivity into account.

If uranium stays outside of the body, it is not particularly hazardous.  The beta and gamma radiation emitted by uranium is relatively weak, and uranium emits only low levels of this radiation.  The intensity of these gamma rays is so low that the measurable radiation field from uranium only extends a few feet away from solid uranium metal.  Even high levels of uranium contamination on the ground do not produce any significant external radiation hazards.

"EXHIBIT L"



NOT MEASUREMENT
SENSITIVE

DOE STD-1128-2013
April 2013

# DOE STANDARD

Reaffirmation
January 2020

# GOOD PRACTICES FOR OCCUPATIONAL RADIOLOGICAL PROTECTION IN PLUTONIUM FACILITIES



## U.S. Department of Energy          AREA SAFT
## Washington, D.C. 20585

DISTRIBUTION STATEMENT A. Approved for public release; distribution is unlimited.

DOE-STD-1128-2013

**This document is available on the
Department of Energy
Technical Standards Program
Web Site at
https://www.standards.doe.gov/**

DOE-STD-1128-2013

## Foreword

This Technical Standard does not contain any new requirements. Its purpose is to provide information on good practices, update existing reference material, and discuss practical lessons learned relevant to the safe handling of plutonium. U.S. Department of Energy (DOE) health physicists may adapt the recommendations in this Technical Standard to similar situations throughout the DOE complex. The Standard provides information to assist plutonium facilities in complying with Title 10 of the Code of Federal Regulations (CFR), Part 835, Occupational Radiation Protection. The Standard also supplements the DOE 10 CFR 835 Implementation Guide, DOE Orders, and DOE standard, DOE-STD-1098-2008, Radiological Control, (RCS) and has as its sole purpose the protection of workers and the public from the radiological hazards that are inherent in plutonium storage and handling.

This Standard uses the word "shall" to identify a required practice or the minimum acceptable level of performance. The word "should" is used to identify good practices (preferred practices) recommended by this Standard. The word "may" is used to identify permitted practice (neither a requirement nor a recommendation).

This Standard includes provisions in the 2007 amendment to 10 CFR 835. This amendment updated the dosimetric terms and models for assessing radiation doses, both internal and external. Of particular interest for this Standard, the biological transportability of material is now classified in terms of absorption types; F (fast), M (medium) and S (slow). Previously this was classified in terms of material class; D (days), W (weeks) and Y (years). Throughout this Standard, discussions of previous studies describing the biological transportation of material in the body will continue to use D, W and Y, as appropriate. Discussions of other requirements which have not amended their dosimetric terms and models continue to use the older terminology.

This Standard does not include every requirement applicable to every plutonium facility. Individuals responsible for implementing Radiation Protection Programs at plutonium facilities need to be knowledgeable of which requirements (contractual or regulatory) are applicable to their facility.

Copies of electronic files of this Technical Standard may be obtained from either the DOE Radiation Safety Home Page Internet site (http://www.hss.energy.gov/HealthSafety/WSHP/radiation/ts.html) or the DOE Technical Standards Program Internet site (http://www.hss.doe.gov/nuclearsafety/techstds/standard.html).

*This page intentionally left blank.*

DOE-STD-1128-2013

## TABLE OF CONTENTS

1.0  INTRODUCTION… ..........................................................................................1-1
  1.1   PURPOSE AND APPLICABILITY…...........................................................1-1
  1.2   DEFINITIONS…..........................................................................................1-1
  1.3   ACRONYMS…............................................................................................1-2
  1.4   DISCUSSION… ..........................................................................................1-3

2.0  MANUFACTURE, PROPERTIES, AND HAZARDS… ....................................2-1
  2.1   MANUFACTURE OF PLUTONIUM......................................................2-1
  2.2    NUCLEAR PROPERTIES ....................................................................2-3
  2.3   PHYSICAL AND CHEMICAL PROPERTIES… ..................................2-7
  2.4   RADIOLOGICAL EFFECTS ON HUMANS…......................................2-14
  2.5   RADIATION EFFECTS ON MATERIALS… ........................................2-18
  2.6   OCCUPATIONAL HAZARDS….............................................................2-22
  2.7   STORAGE AND CONTAINMENT ........................................................2-28

3.0  RADIATION PROTECTION… ........................................................................3-1
  3.1   REGULATION AND STANDARDS ........................................................3-1
  3.2   RADIATION PROTECTION PROGRAMS…..........................................3-2
  3.3   RADIOLOGICAL CONTROL ORGANIZATIONS................................3-11
  3.4   STAFFING AND STAFF QUALIFICATIONS… .....................................3-12
  3.5   INSTRUMENTATION CONSIDERATIONS…........................................3-13
  3.6   RADIATION SAFETY TRAINING… ......................................................3-22
  3.7   RADIOLOGICAL RECORDS… .............................................................3-25
  3.8   ALARA AND OPTIMIZATION… ...........................................................3-27
  3.9   CONDUCT OF OPERATIONS… ...........................................................3-28

4.0  CONTAMINATION CONTROL.......................................................................4-1
  4.1   AIRBORNE CONTAMINATION CONTROL… .......................................4-1
  4.2   SURFACE CONTAMINATION CONTROL….........................................4-6
  4.3   PERSONNEL CONTAMINATION CONTROL…....................................4-17
  4.4   PERSONNEL DECONTAMINATION… ..................................................4-22

5.0  INTERNAL DOSIMETRY… ............................................................................5-1
  5.1   INTERNAL DOSE EVALUATION PROGRAM .....................................5-1
  5.2   CHARACTERIZATION OF INTERNAL HAZARDS… ..............................5-9
  5.3   SCOPE OF BIOASSAY PROGRAM… ...................................................5-10
  5.4   ESTABLISHING BIOASSAY FREQUENCY… .......................................5-15
  5.5   ADMINISTRATION OF A BIOASSAY PROGRAM… .............................5-17
  5.6   MODELING THE BEHAVIOR OF PLUTONIUM IN THE BODY .............5-20
  5.7   INTERPRETATION OF BIOASSAY RESULTS… ..................................5-24
  5.8   DOSE ASSESSMENT… .........................................................................5-28
  5.9   INDICATOR AND ACTION LEVELS .....................................................5-33
  5.10  RESPONSE TO SUSPECTED INTAKES…...........................................5-36

**DOE-STD-1128-2013**
**CONTENTS – (Continued)**

6.0   EXTERNAL DOSE CONTROL… ...............................................................6-1
      6.1   DOSE LIMITS… ............................................................................6-1
      6.2   RADIATIONS IN PLUTONIUM FACILITIES… ..........................6-5
      6.3   RADIATION DETECTION AND EVALUATION… ....................6-20
      6.4   EXTERNAL DOSE REDUCTION… ..............................................6-32

7.0   NUCLEAR CRITICALITY SAFETY… .....................................................7-1
      7.1   REGULATIONS AND STANDARDS ...........................................7-2
      7.2   CRITICALITY CONTROL FACTORS...........................................7-2
      7.3   CRITICALITY ACCIDENT EXPERIENCE… ...............................7-6
      7.4   CRITICALITY ALARMS AND NUCLEAR ACCIDENT DOSIMETRY… ..7-8
      7.5   RESPONSIBILITIES OF HEALTH PHYSICS STAFF… ..............7-12
      7.6   DEPARTMENT OF ENERGY PLUTONIUM VULNERABILITY
            ANALYSIS STUDY… ....................................................................7-14

8.0   WASTE MANAGEMENT… ........................................................................8-1
      8.1   POTENTIALLY CONTAMINATED WASTES… ..........................8-1
      8.2   AIRBORNE WASTE… ...................................................................8-5
      8.3   SOLID WASTE… ...........................................................................8-8
      8.4   LIQUID WASTE .............................................................................8-14

9.0   EMERGENCY MANAGEMENT… ..............................................................9-1
      9.1   EMERGENCY MANAGEMENT IN DOE… ..................................9-1
      9.2   SPECIFIC GUIDANCE ON EMERGENCY MANAGEMENT FOR
            PLUTONIUM FACILITIES… ........................................................9-3

10.0  DECONTAMINATION AND DECOMMISSIONING… ...........................10-1
      10.1  REGULATIONS AND STANDARDS ...........................................10-1
      10.2  DESIGN FEATURES… ..................................................................10-6
      10.3  DECONTAMINATION AND DECOMMISSIONING PROGRAM
            REQUIREMENTS… .......................................................................10-9
      10.4  DECONTAMINATION AND DECOMMISSIONING TECHNIQUES… .......10-9
      10.5  DECONTAMINATION AND DECOMMISSIONING EXPERIENCE…........10-10

11.0  REFERENCES… .........................................................................................11-1

      APPENDIX:     GLOSSARY………………………………………………………….A-1

DOE-STD-1128-2013

## FIGURES

2.1  Principal Mode of Plutonium Production by Neutron Irradiation of Uranium ...............2-2

2.2  Atom Ratio of $^{241}$Am to $^{241}$Pu (t=0) Produced by the Beta Decay of $^{241}$Pu as a
Function of Time Since Chemical Separation… ............................................................2-7

2.3  Neutron Energy Spectra of Plutonium-Beryllium and Plutonium-Boron
Neutron Sources Compared with a Fission Source….....................................................2-8

2.4  Hazards in Low-Exposure Plutonium Handling… .......................................................2-24

6.1  Absorbed Surface Dose Rate from Plutonium Dioxide as Measured
with an Extrapolation Chamber… ..................................................................................6-6

6.2  Energy Dependence of Various TLD-Albedo Dosimeters… ........................................6-23

6.3  Response of Electrochemically Etched CR-39 Used in Nuclear Track
Dosimeters as a Function of Neutron Energy ...............................................................6-23

6.4  Fixed Nuclear Accident Dosimeter Used at Hanford to Help Assess Doses
from Criticality Accidents ............................................................................................6-27

6.5  Neutron Energy Spectra as Measured by the Multisphere Spectrometer at
50 cm from Plutonium Metal, $PuO_2$, and $PuF_4$ Sources… .........................................6-31

6.6  Reduction in Photon Dose Rate with Various Shielding Materials at a
Distance of 3 cm from a 100-gram Disk of Plutonium Oxide… ...................................6-36

6.7  Reduction in Neutron Dose Rate for Various Slab Shields
for Plutonium Tetrafluoride Sources… ........................................................................6-37

6.8  Reduction in Neutron Dose Rate for Various Slab Shields
for Plutonium Oxide Sources…....................................................................................6-38

DOE-STD-1128-2013

## TABLES

2.1    Isotopic Composition of Three Grades of Plutonium: Heat Source, Weapons,
       and Reactor ............................................................................................................2-2
2.2    Uses and Availabilities of Plutonium Isotopes… ..................................................2-3
2.3    Radioactive Decay Properties of Selected Isotopes and Decay Products,
       Excluding Spontaneous Fission… .........................................................................2-5
2.4    Specific Activity Decay Heats of Selected Isotopes… ..........................................2-6
2.5    Allotropic Forms of Plutonium Metal… ...............................................................2-9
2.6    Solubilities and Properties of Selected Compounds… ........................................2-12
2.7    Common Biokinetic Models for Plutonium and Americium ................................2-18
2.8    Potential Hazards or Damage to Materials from Exposure to Radiation… ..................2-20
2.9    Hazards of Chemicals Used in Processing Plutonium ..........................................2-25
2.10   Storage Recommendations for Plutonium Metal and Dioxide… ..........................2-30
4.1    Surface Contamination Values, dpm/100 cm$^2$ ··················································4-3
5.1    Urine Bioassay Goals for $^{239}$Pu ............................................................................5-4
5.2    Fecal Bioassay Goals for $^{239}$Pu… ..........................................................................5-5
5.3    In Vivo Lung Measurement Bioassay Goals for $^{241}$Am as an Indicator of Aged
       Weapons Grade Plutonium… ................................................................................5-6
5.4    Example Plutonium Isotope Mixtures Immediately Post-Separation, wt%....................5-10
5.5    Activity Composition with Age for Reference 6% and 12% $^{240}$Pu Mixtures… ................5-10
5.6    Intake Retention Fractions for $^{239}$Pu............................................................................5-30
5.7    Suggested Plutonium or $^{241}$Am Indicator Levels for Internal Dosimetry Evaluation......5-34
5.8    Suggested Plutonium or $^{241}$Am Contamination Levels for Notification of Occupational
       Medicine Physician ................................................................................................5-34
6.1    Effective Depth of Tissue for Various Organs… ...................................................6-2
6.2    Tissue Weighing Factors… ...................................................................................6-3
6.3    Radiation Dose Limits for DOE and DOE Contractors… ......................................6-4
6.4    Isotopic Composition of the Plutonium Used in the Extremity Dosimetry
       Measurements… ....................................................................................................6-8
6.5    Gamma Dose Rates Along an Arm Phantom in Contact with a Steel Can
       Containing 1 kg of Plutonium Dioxide in an Uncontaminated Glove Box… ................6-9
6.6    Gamma Dose Rates Measured with an Arm Phantom Placed Inside Gloves
       Dusted with Plutonium Dioxide Powder ..............................................................6-10
6.7    Spontaneous Fission Neutron Yields… ................................................................6-15
6.8    Neutron Yields from Alpha-Neutron Reactions for oxides and Fluorides…................6-17
6.9    Neutron Yields for Trace Impurities in Plutonium and Uranium ...........................6-18
6.10   Photon Dose Rates at 2 Meters from Cylinders of Plutonium Containing 1 kg
       of Plutonium at 5 Years After Chemical Separation… .........................................6-35
6.11   Isotopic Composition of Plutonium Sources at 5 Years After Chemical
       Separation of the Plutonium… .............................................................................6-36
7.1    Subcritical, Single Parameter Limits for Plutonium Solutions and Metals…................7-3
8.1    Waste Types… .......................................................................................................8-2
8.2    Treatability Groups… .............................................................................................8-3
8.3    Recommendations for Storage of Plutonium Metal and Plutonium
       Oxide at Department of Energy Facilities… .........................................................8-20

**DOE-STD-1128-2013**

*This page intentionally left blank.*

DOE-STD-1128-2013

## 1.0    INTRODUCTION

### 1.1    PURPOSE AND APPLICABILITY

This Technical Standard (TS) does not contain any new requirements. Its purpose is to provide information on good practices, update existing reference material, and discuss practical lessons learned relevant to the safe handling of plutonium. U.S. Department of Energy (DOE) health physicists may adapt the recommendations from this TS to similar situations throughout the DOE complex. Generally, DOE contractor health physicists will be responsible to implement radiation protection activities at DOE facilities and DOE health physicists will be responsible for oversight of those activities. This guidance is meant to be useful for both efforts. The TS provides information to assist plutonium facilities in complying with Title 10 of the Code of Federal Regulations (CFR), Part 835, Occupational Radiation Protection (DOE, 2011); hereinafter referred to as 10 CFR 835. The TS also supplements the DOE 10 CFR 835 Implementation Guide, G 441.1-1C, Ch 1 (DOE, 2011a), DOE Orders, and DOE's standard Radiological Control , (DOE, 2017) and has as its sole purpose the protection of workers and the public from the radiological hazards that are inherent in plutonium storage and handling. This Standard does not include every requirement applicable to every plutonium facility. Individuals responsible for implementing Radiation Protection Programs at plutonium facilities need to be knowledgeable of which requirements (contractual or regulatory) are applicable to their facility.

This TS was originally based upon the data in PNL-6534, Health Physics Manual of Good Practices for Plutonium Facilities (PNL, 1988), which provided information of situations that were typical of DOE's plutonium operations; safe storage, handling and inspection, decontamination, and decommissioning (environmental restoration); and weapons disassembly. This 2013 revision updates the 2008 revision and discusses requirements for DOE accident investigations of particular applicability for plutonium facilities and updates information on chelation therapy.

The technical information presented here represents the best technical information available from within the DOE complex. Except to the extent that the guidance presented here duplicates mandatory regulations or contract requirements, it is not binding or mandatory. Any DOE Orders, manuals or guides, referred to in this TS are not binding unless they have been incorporated into the applicable contract to assist in identifying applicable requirements, "shall" statements are followed by a reference. Should and may statements are provided for consideration. However, judicious use of this TS, along with the regulatory documents discussed above, will help assure a comprehensive and technically defensible radiological protection program.

References are current as of December 2011.

### 1.2    DEFINITIONS

A glossary is provided (see Appendix) to ensure uniform understanding of words in this document. In all cases, the definitions given here are consistent with those used in the Implementation Guide (DOE, 2011a).

DOE-STD-1128-2013

### 1.3   ACRONYMS

| | |
|---|---|
| AC | Alternating Current |
| AMAD | Activity Median Aerodynamic Diameter |
| ANSI | American National Standards Institute |
| ALI | Annual Limit on Intake |
| ALARA | As Low As Reasonably Achievable |
| BNL | Brookhaven National Laboratory |
| CDC | Centers for Disease Control and Prevention |
| CAS | Chemical Abstracts Service |
| CAM | Continuous Air Monitor |
| CFR | Code of Federal Regulations |
| CED | Committed Effective Dose |
| D | Day |
| D&D | Decontamination and Decommissioning |
| DTPA | Diethylenetriamine Pentaacetic Acid |
| DAC | Derived Air Concentration |
| DPM | Disintegrations Per Minute |
| DOE | U.S. Department of Energy |
| DCF | Dose Conversion Factor |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| EMG | Emergency Management Guide |
| EMS | Emergency Management System |
| EOC | Emergency Operations Center |
| EPA | U. S. Environmental Protection Agency |
| EPHA | Emergency Planning Hazards Assessment |
| ERO | Emergency Response Organization |
| F | Fast |
| FDA | U. S. Food and Drug Administration |
| GI | Gastrointestinal |
| GM | Geiger-Mueller |
| HPS | Health Physics Society |
| HEPA | High Efficiency Particulate Air |
| HLW | High-Level Waste |
| HQ | Headquarters |
| IMBA | Integrated Modules for Bioassay Analysis |
| IG | Implementation Guide |
| IRF | Intake Retention Function |
| ISMS | Integrated Safety Management System |
| ICRP | International Commission on Radiological Protection |
| IEC | International Electrotechnical Commission |
| ISO | International Organization for Standardization |
| LANL | Los Alamos National Laboratory |
| LET | Linear Energy Transfer |
| LLW | Low-Level Waste |
| M | Medium |
| MDA | Minimum Detectable Amount/Activity |
| MDD | Minimum Detectable Dose |
| MARSAME | Multi-Agency Radiation Survey and Assessment of Materials and Equipment |

| | |
|---|---|
| MARSSIM | Multi-Agency Radiation Survey and Site Investigation Manual |
| MW | Mixed Waste |
| NAD | Nuclear Accident Dosimeters |
| NCRP | National Council on Radiation Protection and Measurements |
| NEPA | National Environmental Policy Act |
| NIOSH | National Institute for Occupational Safety and Health |
| NNSA | National Nuclear Security Administration |
| NIST | National Institute of Standards and Technology |
| NRC | U. S. Nuclear Regulatory Commission |
| NVLAP | National Voluntary Laboratory Accreditation Program |
| ORNL | Oak Ridge National Laboratory |
| PAGs | Protective Action Guides |
| PNAD | Personnel Nuclear Accident Dosimeter |
| PSO | Program Secretarial Office |
| QC | Quality Control |
| RCRA | Resource Conservation and Recovery Act |
| RCT | Radiological Control Technician |
| RWP | Radiological Work Permit |
| RCS | DOE Radiological Control Standard |
| RESL | Radiological and Environmental Sciences Laboratory |
| S | Slow |
| SNAP | Space Nuclear Auxiliary Power |
| TEPC | Tissue Equivalent Proportional Counter |
| TS | Technical Standard |
| TLD | Thermoluminescent Dosimeter |
| TED | Total Effective Dose |
| TRU | Transuranic |
| TSCA | Toxic Substances Control Act |
| USC | United States Code |
| WIPP | Waste Isolation Pilot Plant |
| W | Week |
| Y | Year |

## 1.4    DISCUSSION

Chapters 2 through 10 provide technical information to assist in safely managing plutonium operations. The topics covered are those considered by representatives of many of DOE's plutonium facilities to be most beneficial: Manufacture, Properties and Hazards, Radiation Protection, Contamination Control, Internal Dosimetry, External Dose Control, Nuclear Criticality Safety, Waste Management, Emergency Management, and Decontamination and Decommissioning.

## 2.0    MANUFACTURE, PROPERTIES, AND HAZARDS

This chapter briefly describes the manufacture of plutonium and presents the nuclear, physical, chemical, and radiobiological properties of plutonium (and/or sources for these data) that form the basis for radiological and toxic control limits. The data and discussion are intended to provide a basis for understanding the changes in hazards as a function of such parameters as isotopic composition, age since chemical processing, physical form, and chemical form. Data are presented to facilitate the calculation of radiation effects, which occur from a variety of plutonium sources.

Plutonium is the first man-made element produced on an industrial scale. The special nuclear properties of $^{239}$Pu and $^{238}$Pu have led scientists to focus their efforts on these two isotopes. The fission cross-section of $^{239}$Pu makes it a useful energy source for atomic weapons and nuclear power reactors. The 87.7-year half-life of $^{238}$Pu makes it an excellent heat source for space applications. Unfortunately, the same nuclear properties of plutonium that make it attractive to science also make this element hazardous to human beings. All 15 plutonium isotopes are radioactive, with half-lives ranging from 26 minutes for $^{235}$Pu to 7.6 x $10^7$ years for $^{244}$Pu.

## 2.1    MANUFACTURE OF PLUTONIUM

Because of its high specific alpha activity and high decay heat, $^{238}$Pu has been used as an isotopic heat source for devices that generate thermoelectric power, such as the Space Nuclear Auxiliary Power (SNAP) systems used in lunar and deep space missions. Small amounts of $^{238}$Pu with low $^{236}$Pu content were used as a power source for medical prosthetic devices such as cardiac pacemakers and a prototype artificial heart, but lithium batteries have replaced these plutonium power sources. $^{238}$Pu containing a few parts per million of $^{236}$Pu is produced by irradiating $^{237}$Np with slow neutrons. It can also be produced by irradiating $^{241}$Am to form $^{242}$Cm, which quickly decays to $^{238}$Pu.

In the past, most plutonium in DOE facilities was produced for nuclear weapons and was composed of greater than 90 wt% $^{239}$Pu and about 6 to 8 wt% $^{240}$Pu. This material has been referred to as "weapons grade" or "low exposure" plutonium. It is produced on a large scale by irradiating $^{238}$U in moderated production reactors (see Figure 2.1). Plutonium has also been produced as a byproduct in the operation of research reactors, and commercial nuclear power plants. It is recovered and purified by solvent extraction and ion exchange processes. The resulting highly concentrated Pu(NO$_3$)$_4$ product solution is converted to a nonhygroscopic PuF$_4$ intermediate by one of the several processes before being reduced to metal with calcium. Plutonium is also produced from the waste streams of the conversion processes and scrap recovery operations, which include material from research and development efforts. Other processes for reduction to metal include direct reduction of the oxide and electrolytic reduction. Typical isotopic compositions of three common grades of plutonium are given in Table 2.1.

$$\ce{^{238}_{92}U} + \ce{^{1}_{0}n} \longrightarrow \ce{^{239}_{92}U} \xrightarrow[\text{23.6 min}]{\beta^-} \ce{^{239}_{93}Np} \xrightarrow[\text{2.3565 d}]{\beta^-} \ce{^{239}_{94}Pu}$$

**Figure 2.1.**   Principal Mode of Plutonium Production by Neutron Irradiation of Uranium

**Table 2.1.** Isotopic Composition of Three Grades of Plutonium: Heat Source, Weapons, and Reactor (PNL, 1988)

| Isotope | Heat Source | Weapons Grade | Reactor Grade |
|---------|-------------|---------------|---------------|
| $^{238}$Pu | 90.0 | <0.05 | 1.5 |
| $^{239}$Pu | 9.1 | 93.6 | 58.1 |
| $^{240}$Pu | 0.6 | 6.0 | 24.1 |
| $^{241}$Pu | 0.03 | 0.4 | 11.4 |
| $^{242}$Pu | <0.01 | <0.05 | 4.9 |

Overviews of plutonium process chemistry at DOE's Hanford, Los Alamos, Rocky Flats, and Savannah River sites are given by Christensen et al. (1983), Baldwin and Navratil (1983), Coops et al. (1983), and Christensen and Mullins (1983). In each case, solutions for recovery, purification, and waste treatment operations are emphasized.

### 2.1.1 Future Sources of Plutonium

High-exposure plutonium, i.e., plutonium containing significant fractions of $^{240}$Pu, $^{241}$Pu, and $^{242}$Pu and generating external dose rate fields greater than the other isotopes of plutonium, is produced in power reactor fuels. Currently, this form of plutonium is in the irradiated fuel in spent-fuel storage basins and other sources resulting from development work performed to demonstrate plutonium fuel cycles. Because recycling of commercial reactor fuel is not anticipated, future supplies of plutonium will be primarily from DOE production facilities and from reprocessing of current material. In the more distant future, Space Nuclear Auxiliary Power may be a potential source of plutonium.

Special isotopes of reasonably high purity are also available, which can be useful to health physicists for calibration purposes. These isotopes and their sources are listed in Table 2.2.

New sources of plutonium include the return of atomic weapon components and plutonium recovered from decontamination and decommissioning (D&D) operations. Foreign plutonium from states of the former Soviet Union may become an additional

source. Their weapons-grade plutonium is believed to contain 5% $^{240}$Pu. Americium is not periodically removed from their stockpile material.

**Table 2.2** Uses and Availabilities of Plutonium Isotopes

| Isotopes | Uses | Availability |
|---|---|---|
| $^{236}$Pu, $^{237}$Pu | Popular environmental and biological chemical tracers. | Both available in microcurie quantities.[a] |
| $^{238}$Pu | Small thermal and electric-power generators. | Available in various isotopic enrichments, ranging from 78% to 99+%.[a] |
| $^{239}$Pu | Nuclear weapons and as a fast reactor fuel. Also, frequently used in chemical research where production-grade material of mixed isotopic content is suitable. | Available enrichments range from 97% to 99.99+%.[a] |
| $^{240}$Pu | Principally in flux monitors for fast reactors. | Available enrichments range from 93% to 99+%.[a] |
| $^{241}$Pu | The parent from which high-assay $^{241}$Am can be isolated for industrial purposes. | Samples available in enrichments of 93%[a] |
| $^{242}$Pu | For study of the physical properties of plutonium; also as a mass spectroscopy tracer and standard. | Samples available in enrichments ranging from 95% to 99.9+%; enrichments of production-grade material range from 85% to 95%.[a] |
| $^{244}$Pu | Available as a National Institute of Standards and Technology (NIST) Standard Reference Material (SRM) | DOE's New Brunswick Laboratory. |

(a)    Available in small quantities from the Oak Ridge National Laboratory (ORNL): ORNL Isotopes Sales Office, Oak Ridge National Laboratory, P.O. Box X, Oak Ridge, Tennessee 37830.

## 2.2    NUCLEAR PROPERTIES

Of the 15 plutonium isotopes, the two that have proven most useful are masses 239 and 238. Plutonium-239 is fissile, i.e., atoms of plutonium split upon exposure to thermal or fast neutrons. Chemical reactions can release a few electron volts of energy per atom; however, when a plutonium nucleus splits, it releases about 200 MeV of energy and two or three neutrons. This release of energy makes $^{239}$Pu useful for nuclear weapons and reactor fuel. In fact, in light water reactors much of the power originates from the fission of $^{239}$Pu, which is produced by neutron capture in $^{238}$U. Because of its higher specific activity, $^{238}$Pu is used as long-lived heat sources for powering planetary space missions where adequate solar energy is not available.

As mentioned before, all plutonium isotopes are radioactive. Isotopes with even mass numbers (except mass number 246) are primarily alpha emitters. Isotopes of mass numbers 232, 233, 234, 235, and 237 also decay by electron capture; isotopes of

DOE-STD-1128-2013

mass numbers 241, 243, 245, and 246 decay by beta emission. Many of the alpha-emitting isotopes, such as $^{238}$Pu and $^{240}$Pu, also fission spontaneously and emit neutrons. All of the particle emissions are accompanied by X-ray and gamma-ray emissions over a wide range of energies.

A review of the nuclear properties of plutonium (e.g., cross-sections, nuclear levels, half-lives, and fission yields) can be found in Volume 1 of the Plutonium Handbook: A Guide to the Technology (Wick, 1967) and in American National Standards Institute (ANSI) Standard N317, Performance Criteria for Instrumentation Used for In-Plant Plutonium Monitoring (ANSI, 1980a). Plutonium decay schemes, neutron yields, and neutron energy spectra are described in the following sections.

### 2.2.1  Decay Schemes

The decay modes of some important plutonium and other isotopes and decay products are shown in Table 2.3. For brevity, only the most abundant radiations have been included in the table; more detailed information can be found in papers by Gunnink and Morrow (1967) and Clein (1971), in International Commission on Radiological Protection (ICRP) Publication 107 (ICRP, 2007), and from the National Nuclear Data Center. Most of the isotopes are strong alpha-emitters, making alpha heating a problem for the storage and handling of large amounts of plutonium. The specific activities and decay heats for selected isotopes and decay products are given in Table 2.4. Kilogram quantities of $^{239}$Pu or gram quantities of $^{238}$Pu can generate enough heat to melt plastic bags. Sources of $^{238}$Pu shall be handled with insulated gloves, and special precautions shall be taken to ensure a good thermal heat sink during shipping and storage. (See also Section 2.5.1, "Self-Heating.")

The plutonium isotopes emit relatively few high-energy gamma rays, so even kilogram quantities can be processed without serious gamma-exposure problems. Because of the high density of plutonium, many gamma rays are self-absorbed. In some instances, the decay products may become significant in radiation protection and metallurgy. For instance, the isotope $^{236}$Pu often constitutes less than 1% of plutonium and is often ignored in dose calculations. However, if the plutonium is shielded by greater than 1 cm of lead or steel, the decay products of $^{236}$Pu may be the largest contributors to exposure. The decay product $^{208}$Tl emits a highly penetrating gamma ray with an energy of 2.615 MeV. Although $^{241}$Pu is a beta emitter and not as great an inhalation hazard as other isotopes of plutonium, in plutonium that contains a few weight percent $^{241}$Pu the $^{241}$Am decay product is important because it emits a large number of 60-keV photons, which can be a significant source of exposure to the hands and forearms when handling plutonium in gloveboxes (See Section 6.3.3 for more information). Also, $^{241}$Am can contribute to neutron dose. Americium-241 contributes to increased alpha emission which affects the neutron dose as well as radiolysis and helium retention and release. Because of its importance to radiation exposure, the fractional amount of $^{241}$Am produced by beta decay from $^{241}$Pu is given as a function of time since chemical separation (see Figure 2.2).

**DOE-STD-1128-2013**

**Table 2.3.** Radioactive Decay Properties of Selected Isotopes and Decay Products, Excluding Spontaneous Fission [a]

| Isotope | Half-Life | Mode of Decay Particle | Energy Mev | Yield % | X-ray [b] Energy MeV | Yield % | Gamma Ray Energy MeV | Yield % |
|---|---|---|---|---|---|---|---|---|
| $^{236}$Pu | 2.851 y | α | 5.77 | 69.3 | L's 0.011-0.021 | 13[c] | 0.0476 | $6.6 \times 10^{-2}$ |
| | | α | 5.72 | 30.6 | | | 0.109 | $1.2 \times 10^{-2}$ |
| $^{238}$Pu | 87.7 y | α | 5.50 | 71.0 | L's 0.011-0.021 | 15[c] | 0.0425 | $3.95 \times 10^{-2}$ |
| | | α | 5.46 | 28.8 | | | 0.0999 | $7.35 \times 10^{-3}$ |
| $^{239}$Pu | 2.41 x 10$^4$ y | α | 5.157 | 73.1 | L's 0.0116- | 5.0[c] | 0.099 | $1.22 \times 10^{-3}$ |
| | | α | 5.144 | 15.0 | 0.0215 | | 0.129 | $6.41 \times 10^{-3}$ |
| | | α | 5.106 | 11.8 | | | 0.375 | $1.55 \times 10^{-3}$ |
| | | | | | | | 0.414 | $1.46 \times 10^{-3}$ |
| $^{240}$Pu | 6564 y | α | 5.168 | 72.8 | L's 0.0115- | 10.8[c] | 0.0452 | $4.50 \times 10^{-2}$ |
| | | α | 5.124 | 27.1 | 0.0215 | | 0.104 | $7.08 \times 10^{-3}$ |
| $^{241}$Pu | 14.35 y | β | 0.0052[d] | 100 | -- | -- | 0.077 | $2.20 \times 10^{-5}$ |
| | | α | 4.896 | $2.04 \times 10^{-3}$ | | | 0.1037 | $1.01 \times 10^{-4}$ |
| | | | | | | | 0.114 | $6.0 \times 10^{-6}$ |
| | | | | | | | 0.149 | $1.9 \times 10^{-4}$ |
| | | | | | | | 0.160 | $6.71 \times 10^{-6}$ |
| $^{242}$Pu | 3.73 x 10$^5$ y | α | 4.901 | 77.5 | L's 0.0116- | 9.1[c] | 0.0449 | $3.6 \times 10^{-2}$ |
| | | α | 4.857 | 22.4 | 0.0215 | | 0.104 | $7.8 \times 10^{-3}$ |
| $^{241}$Am | 432.2 y | α | 5.486 | 85.2 | L's 0.0119- | 42[c] | 0.0263 | 2.4 |
| | | α | 5.443 | 12.8 | 0.0222 | | 0.0332 | $1.2 \times 10^{-1}$ |
| | | α | 5.388 | 1.4 | | | 0.0595 | 35.7 |
| $^{237}$U | 6.75 d | β | 0.039[e] | 0.8 | L's 0.0119- | 70[c] | 0.0263 | 2.43 |
| | | β | 0.050[e] | 3.4 | 0.0206 | | 0.0595 | 34.5 |
| | | β | 0.065[e] | 51 | | | 0.0648 | 1.28 |
| | | β | 0.069[e] | 42 | K's 0.097-0.114 | 53 | 0.165 | 1.85 |
| | | | | | | | 0.208 | 21.1 |
| | | | | | | | 0.268 | $7.1 \times 10^{-1}$ |
| | | | | | | | 0.332 | 1.2 |
| | | | | | | | 0.335 | $9.5 \times 10^{-2}$ |
| | | | | | | | 0.369 | $4.0 \times 10^{-2}$ |
| | | | | | | | 0.371 | $1.1 \times 10^{-1}$ |

(a)  Data from Dunford and Burrows (1993).
(b)  L's = L X-rays; K's = K X-rays.
(c)  Total for all X-rays. The value represents an average obtained from data at Pacific Northwest Laboratory, Lawrence Berkeley Laboratory, and Lawrence Livermore Laboratory.
(d)  Average beta energy given. The maximum beta average for $^{241}$Pu is 0.0208 MeV.
(e)  Average beta energy. The maximum beta energy for $^{237}$U is 0.248 MeV.

**DOE-STD-1128-2013**

**Table 2.4.** Specific Activity Decay Heats of Selected Isotopes[a]

| Isotope | Half-Life Y | | Specific Activity, Ci/G | | Average Particle Energy per Disintegration, MeV[b] | | Decay Heat W/g[b] |
|---|---|---|---|---|---|---|---|
| $^{236}$Pu | 2.851 | α | 53.4 | | α | 5.75 | 18.2 |
| $^{238}$Pu | 87.7 | α | 17.1 | | α | 5.49 | 0.567 |
| $^{239}$Pu | 2.407 x 10$^4$ | α | 6.22 x 10$^{-2}$ | | α | 5.14 | 1.93 x 10$^{-3}$ |
| $^{240}$Pu | 6564 | α | 0.229 | | α | 5.16 | 7.13 x 10$^{-3}$ |
| $^{241}$Pu | 14.35 | α | 2.52 x 10$^{-3}$ | | α+β | 5.27 x 10$^{-3}$ | 3.29 x 10$^{-3}$ |
| | | β | 103 | | | | |
| $^{242}$Pu | 3.733 x 10$^5$ | α | 3.93 x 10$^{-3}$ | | α | 4.90 | 1.16 x 10$^{-4}$ |
| $^{232}$U | 72.0 | α | 21.5 | | α | 5.31 | 0.690 |
| $^{233}$U | 1.59 x 10$^5$ | α | 9.75 x 10$^{-3}$ | | α | 4.72 | 2.84 x 10$^{-4}$ |
| $^{234}$U | 2.45 x 10$^5$ | α | 6.29 x 10$^{-3}$ | | α | 4.76 | 1.81 x 10$^{-4}$ |
| $^{235}$U | 7.04 x 10$^8$ | α | 2.17x10$^{-6}$ | | α | 4.24 | 6.02 x 10$^{-8}$ |
| $^{236}$U | 2.34 x 10$^7$ | α | 6.5 x 10$^{-5}$ | | α | 4.48 | 1.77 x 10$^{-6}$ |
| $^{238}$U | 4.47 x 10$^9$ | α | 3.38 x 10$^{-7}$ | | α | 4.18 | 8.58 x 10$^{-9}$ |
| $^{237}$Np | 2.14 x 10$^6$ | α | 7.08 x 10$^{-4}$ | | α | 4.76 | 2.08 x 10$^{-5}$ |
| $^{241}$Am | 432.2 | α | 3.43 | | α | 5.37 | 0.115 |

(a) Data from ICRP 38 (1983).
(b) Includes atomic recoil and low-energy X-ray production.

### 2.2.2 Neutron Yields and Spectra

Plutonium and plutonium compounds also emit neutrons from spontaneous fission and from alpha-neutron reactions with light elements. The spontaneous fission half-life and the neutron yields from spontaneous fission and alpha-neutron reactions for plutonium metal and plutonium compounds are provided in Section 6.0 of this TS. The approximate neutron yield from a substance with a known isotopic composition can be determined by adding the contributions from each component. This procedure and its limitations are described in detail in Section 6.0, which also discusses neutron equivalent dose rates.

Energy spectra from Pu-Be and Pu-B neutron sources are shown in Figure 2.3 Because of licensing restrictions on plutonium, these sources have been replaced with source fabricated from americium. Metallic plutonium emits neutrons having a Maxwellian energy distribution, with an average energy of about 1.9 MeV. Plutonium compounds and alloys also emit neutrons from alpha-neutron reactions, and these neutrons have significantly different energies:

-- PuF$_4$, about 1.3 MeV
-- 10% plutonium-aluminum alloys, 1.6 MeV
-- PuO$_2$, slightly more than 2 MeV
-- PuBe, 4.3 MeV.

DOE-STD-1128-2013

Plutonium compounds or alloys containing sodium, magnesium, silicon, chlorine, carbon, or oxygen have significant alpha-neutron yields, but little information is available about their neutron energy spectra.



**Figure 2.2.**    Atom Ratio of $^{241}$Am to $^{241}$Pu (t=0) Produced by the Beta Decay of $^{241}$Pu as a Function of Time Since Chemical Separation

### 2.3    PHYSICAL AND CHEMICAL PROPERTIES

This discussion of plutonium's physical and chemical properties begins with plutonium metal, followed by its alloys and compounds. Knowledge of the physical properties of these classes of materials and how the plutonium was produced is the key to understanding and predicting the hazards of working with this challenging element. According to Healy (1993), "Nature does not decide what happens to any material based on its radioactivity but rather on its form and mass." Form and mass are determined by the engineering application and the kinds of processes needed to achieve both intermediate and final products. Thus, to prevent nature from taking its course, there can be no shortcuts in good practices for plutonium facilities.

#### 2.3.1    Plutonium Metal

The metallic state of plutonium is undoubtedly the most complicated of all the elements. Plutonium is a silvery-white metal, much like nickel in appearance. It has a low melting point (640°C) and an unusually high boiling point (3327°C). The metal exists in six allotropic forms, as indicated in Table 2.5. Two of the allotropic forms, σ and σ', contract upon heating; the other forms expand upon heating.

**DOE-STD-1128-2013**



**Figure 2.3** Neutron Energy Spectra of Plutonium-Beryllium and Plutonium-Boron Neutron Sources Compared with a Fission Source

At room temperature, pure plutonium exists in the α phase, which has a triclinic structure with a theoretical density of about 19.86 g/cm³. The dimensional stability of this phase is aggravated by its high linear thermal expansion coefficient and its low α → β transition temperature. This transformation takes place at approximately 115°C, resulting in a 10% volume change. The combination of a high specific activity and low thermal conductivity can result in significant dimensional distortion during metal-forming operations. For this reason, a σ -stabilized dilute gallium alloy, which has a density of about 15.75 g/cm³, is used when a more dimensionally stable plutonium is desired (Merz, 1971).

**DOE-STD-1128-2013**

**Table 2.5.** Allotropic Forms of Plutonium Metal[a]

| Phase | Stability Range °C | Density g/cm$^3$[b] |
|-------|--------------------|--------------------|
| α | Stable below 115 | 19.86 |
| β | ~115 to 200 | 17.70 |
| λ | ~200 to 310 | 17.14 |
| σ | 310 to 452 | 15.92 |
| o ' | 452 to 480 | 16 |
| € | 480 to 640 | 16.51 |

(a)   Wick, 1967, p. 34.
(b)   Theoretical X-ray density. The actual density is slightly lower due to crystal
      lattice imperfection.

Plutonium is an active metal. In moist air or moist argon, the metal oxidizes rapidly, producing a mixture of oxides and hydrides (Haschke, 1992). If the metal is exposed long enough, an olive-green powdery surface coating of $PuO_2$ is formed. With this coating, the metal is pyrophoric, so plutonium metal is usually handled in an inert, dry atmosphere of nitrogen or argon. Oxygen retards the effects of moisture and acts as a passivating agent (Raynor and Sackman, 1963). For a description of the storage hazards that the oxidation of plutonium metal creates, see Section 2.6.3.1, "Oxidation of Plutonium." A comprehensive treatment of the oxidation of plutonium, the properties of its oxides, oxide growth, and oxidation kinetics was reviewed by Colmenares (1975).

Plutonium metal also reacts with most common gases at elevated temperatures. Plutonium metal is rapidly dissolved by HCl, HBr, 72% $HClO_4$, 85% $H_3PO_4$, concentrated $CCl_3COOH$ (trichloroacetic acid), sulfamic acid, and boiling concentrated $HNO_3$ in the presence of 0.005M HF. The metal reacts slowly with water, dilute sulfuric acid, and dilute acetic acid. There is no reaction with the metal in pure $HNO_3$ at any concentration, with concentrated acetic acid, nor with dilute sodium hydroxide.

DOE-STD-1128-2013

### 2.3.2  Plutonium Alloys

Alloying plutonium gives rise to a host of materials with a wide range of physical, chemical, and nuclear properties.[1] The search for and development of new alloys has been focused mainly on the manufacture of atomic weapons, reactor fuels, heat sources, and neutron sources. The challenge of alloy development is how to maximize the desired properties without adding undesired ones. Unfortunately, some properties mutually exclude others (e.g., a gain in hardness usually results in a loss of ductility), so users may be forced to rethink their needs.

The radiological hazards of a plutonium alloy taken through its product life cycle differ from those of the pure metal isotope by virtue of the alloy's properties, which affect its form (i.e., its chemical composition, density, and geometric shape). Because form can be radically changed by external conditions (e.g., heat, pressure, and chemical atmosphere), a knowledge of the following properties will aid in evaluating the radioactive hazard:

-- melting point                              -- diffusivity
-- viscosity                                    -- strength
-- vapor pressure                           -- ductility
-- corrosion resistance                   -- pyrophoricity.

In nuclear fuel applications, the neutron absorption cross-section of the alloying elements and impurities shall also be considered for its effect on radiation exposure.

### 2.3.3  Plutonium Compounds

Much of what was said in Section 2.3.2 about the properties of plutonium alloys also applies to plutonium compounds because both are mixtures of plutonium and other elements.

Plutonium is the fifth element in the actinide series, which consists of elements with properties that stem from partial vacancies in the 5th electron shell. These elements form the seventh row in the periodic table. In general, there are four oxidation states: III, IV, V, and VI. In aqueous solutions, plutonium (III) is oxidized into plutonium (IV), which is the most stable state. The compounds $PuF_4$, $Pu(I0_3)_4$, $Pu(OH)_4$, and $Pu(C_2O_4)_2 \cdot 6H_2O$

---

[1] See Volume 1 (Section 2) and Volume 2 (Section 5) of the Plutonium Handbook: A Guide to the Technology (Wick, 1967); Plutonium (Taube, 1964); and Chapter 11 of the"Reactor Handbook" in Materials, vol. 1 (Tipton, 1960). Beginning in 1957, a series of international conferences were held whose proceedings contain a wealth of information on plutonium alloys. From 1960 through 1975, the conferences were held every five years and produced a proceedings for each conference: Refer to The Metal Plutonium (Coffinberry and Miner, 1961); Plutonium 1960 (Grison et al., 1961); " Plutonium 1965" (Kay and Waldron, 1966); "Plutonium 1970 and Other Actinides," Parts I and II (Miner, 1971); and "Plutonium 1975 and Other Actinides" (Blank and Lindner, 1976).

DOE-STD-1128-2013

(plutonium oxalate) are insoluble in water. The chlorides, nitrates, perchlorates, and sulfates are soluble in water. Plutonium (IV) ions complex readily with organic and inorganic compounds. Of particular importance for radiological safety considerations are the solubility, particle size, and surface area of plutonium compounds. These properties play an important part in the transportability of plutonium in the environment and in the body. All plutonium compounds, except the oxides, were assumed in ICRP 30, Part 1 (ICRP, 1979) to behave as class W compounds in the ICRP lung model. Plutonium oxides were assumed to be class Y. The 2007 amendment to 10 CFR 835 adopted models from ICRP 60, 61, 66 and 68 (ICRP, 1991a, 1191b, 1994a, and 1994b). These models assumed plutonium compounds had an absorption type of either M or S (medium or slow). The solubility of plutonium compounds is an important parameter in avoiding "unintentional" homogeneous reactions. Knowledge of this property for both aqueous and organic solvents plays a key role in criticality safety and deserves a high priority.

Unfortunately, little data on particle-size are available, and those that have been generated focus on the reactivity of the materials in the separation and conversion processes. Much of the data are reported as crystallite size, which relates to surface area and solubility but not necessarily to the way the particles would be dispersed in the air. Surface area plays a role in the ability of materials to adsorb gases and vapors that can affect the long-term storage behavior of plutonium compounds. Pressure buildup in storage containers, either from out gassing due to self-heating or radiolytic effects, will depend on the stability of the compound and the amounts of chemisorbed or physisorbed water or other substances.

The following sections discuss the essential compounds of plutonium: plutonium nitrate and associated compounds, plutonium dioxide, plutonium hydride, plutonium sulfate, plutonium chlorides, and plutonium fuel mixtures.

### 2.3.3.1  Plutonium Nitrate, Oxalate, Peroxide, and Fluorides

Plutonium (IV) nitrate is the most used of all plutonium compounds. Essentially all chemical processing of plutonium has been conducted in nitrate solutions. These solutions of appropriate acidities range from concentrations of 10g to 250g of Pu/L for efficient precipitation processes. Intermediate compounds are also used in the processing of plutonium prepared from the nitrate: plutonium (III) fluoride, plutonium (II or IV) oxalate, and plutonium peroxide. Plutonium (IV) fluoride can be prepared from any of the preceding solids by hydrofluorination. Plutonium fluoride has been the compound of choice for reduction to the metal with calcium, principally because it is nonhygroscopic. The solubilities in various media, bulk densities, and particle sizes of these compounds are given in Table 2.6.

Table 2.6. Solubilities and Properties of Selected Compounds

| | Measured Solubility | | Bulk Density, g Pu/L | | |
| Compound | Medium | g/PuL | Filter Cake | Dry Compound | Sintered Media Porosity, $\mu$m[a] |
| --- | --- | --- | --- | --- | --- |
| Flouride (III) | 1M HF – 1M HCl | 0.03 | -- | 1-2.5 | 15-20 |
| Fluoride (IV) | 2M HF – 2M $HNO_3$ | 0.70 | 0.6-0.8 | 0.5-2.0 | 15-20 |
| Oxalate (III) | 0.3M $C_2O_4^{2-}$ 3M $HNO_3$ 0.01 | | 0.6-0.8 | - | 15-20 |
| Oxalate (IV) | 0.1M $C_2O_4^{2-}$ 4M $HNO_3$ 0.005 | | 0.5-0.6 | 0.6 | 15-20 |
| Peroxide (IV) | 3M $H_2O_2$ - 1M $HNO_3$ | 0.10 | 0.10-0.6 | - | 30-80 |

(a) Sintered media porosity required to remain precipitate.

Plutonium hexafluoride is the only volatile plutonium compound (bp 62°C) and is marginally stable. It can be prepared by oxidizing $PuF_4$ with $F_2$ at an elevated temperature (Weinstock and Malm, 1956). It can also be prepared at low temperatures by a fluorinating agent, fluorine dioxide (Malm et al., 1984). Plutonium waste treatment and decontamination may benefit from processes using photolysis or microwave discharge to produce active fluorine species from FOOF or $CF_4/O_2$ mixtures, which will react with plutonium or plutonium dioxide to form $PuF_6$ (Martz et al., 1991).

### 2.3.3.2 Plutonium Dioxide

Plutonium dioxide may now be the most important and most thoroughly studied of all plutonium compounds. Due to its chemical stability and relative inertness, it is the preferred form for shipping and storing plutonium at the present time. Direct oxide reduction (DOR) of $PuO_2$ is part of the integrated pyrochemical system used at the Los Alamos National Laboratory (LANL) (Christensen and Mullins, 1983; Mullins et al., 1982). Plutonium dioxide is formed when plutonium or its compounds (except the phosphates) are ignited in air, and often results when oxygen-containing compounds are heated in vacuum or in an inert atmosphere to 1000°C (Cleveland, 1970). The properties of $PuO_2$ are reported by Moseley and Wing (1965).

Loose $PuO_2$ powder, as formed by calcination, usually has a density of about 2 g/cm³. If the oxide is pressed and sintered into pellets, it may have a density of about 10.3 to 11.0 g/cm³. Surface measurements of typical oxides prepared from the calcination of plutonium (IV) oxalate at various temperatures range from 10 to 60 $m_2$/g. Caldwell (1961) found that the surface area decreased with increasing temperatures. Plutonium oxide fired at temperatures >600°C is difficult to rapidly or completely dissolve in common

DOE-STD-1128-2013

acids or molten salts. The best solvents are 12–16M $HNO_3$ with 0.10–0.1M HF, 5–6M HI, and 9M HBr (Cleveland, 1964; Holley et al., 1958). Processes were developed to correct this deficiency using a superacid, $HF/SbF_5$ (Olaha et al., 1985) and CEPOD, a fluoride-free electrochemical dissolver that used the silver anion as a redox catalyst (Bray et al., 1987).

### 2.3.3.3   Plutonium Hydride

Plutonium hydride is a compound of interest for separating plutonium scrap from other materials that do not readily unite with hydrogen.[2] The reaction between plutonium and hydrogen apparently proceeds by the initial formation of $PuH_2$. As more hydrogen is added, the dihydride becomes $PuH_{2+x}$. The hexagonal $PuH_3$ begins to form when the H/Pu ratio becomes about 2.75; when the H/Pu ratio reaches 2.9 to 3.0, only the hexagonal form remains. A wide spread is reported in the measured induction period for the first reaction (Haschke, 1991). Because the hydriding reaction is fully reversible, plutonium metal can be recovered by pumping off the hydrogen in a suitable vacuum furnace. This metal typically contains significant amounts of plutonium oxide but is suitable for feed to either molten salt extraction or electrorefining processes. The hydride can also be converted to the oxide. The advantage of the hydride recovery process is its ability to recover a large fraction of the scrap in metallic form. This method, therefore, has a major economic advantage over chemical recycling and subsequent reduction to metal. It is being used as a production aid for metallic scrap recovery.

### 2.3.3.4   Plutonium Sulfates

Plutonium sulfate tetrahydrate, $Pu(SO_4)_2 \cdot 4H_2O$, has not been of any process importance but has been of interest as a primary standard for plutonium. It is a good example of a stable compound that could be suitable as an interim storage form. Samples stored at relative humidities of up to 75% showed no evidence of alpha radiolysis of the water of crystallization after 28 months. The compound is hygroscopic in air of 95% relative humidity, and stable up to 650°C, at which point it quickly decomposes to $PuO_2$ (Cleveland, 1970). The potassium salt, $K_4Pu(SO_4)_4 \cdot 1H_2O$, was under study as a possible primary standard for $^{238}Pu$. Crystals stored in an air-tight steel container, which also functioned as a heat sink, proved to be stable. The solubility product of this compound was determined to be $10^{-18}$.

---

[2] The properties of plutonium hydrides may be found in Volume 3 of the <u>Handbook of Physics and Chemistry of the Actinides</u> (Ward, 1985). Kinetics of the plutonium hydrogen reaction are reviewed by Haschke (1991).

### 2.3.3.5 Plutonium Chlorides

Chloride salts, which are a very important category of residues, are byproducts of pyrochemical operations. Pyrochemical chloride-based operations currently in use include:

-- DOR
-- electrorefining
-- molten salt extraction
-- pyroredox.

Treatment of chloride-based residues is especially challenging for aqueous recovery techniques because of corrosion problems with stainless steel equipment. At the LANL site, Kynar-lined gloveboxes were installed to evaluate their behavior in production-scale operations. The Rocky Flats Plant (RFP) also had extensive experience in aqueous recovery of plutonium from chloride-based residues (Muscatello et al., 1986a, 1986b, 1987). Cesium chloroplutonate, $Cs_2PuCl_6$, was a primary analytical standard due to its stability to alpha radiolysis and may now have application as a storage form. It was first prepared by Anderson (1949). There is no evidence of water absorption at relative humidities as high as 53% (Miner et al., 1963). After 64 days at 90% relative humidity, $Cs_2PuCl_6$ forms a paste.

### 2.3.3.6 Plutonium Fuels

Plutonium and plutonium-uranium fuel mixtures were developed and tested in experimental reactors to prove the feasibility of operating power reactors. These fuels included both liquids and solids consisting of alloys and ceramic mixtures. Wick (1967) and Schneider and Roepenack (1986) provide comprehensive lists of fuels. Because of their pyrophoric nature, some of these alloys and compounds require special care and handling when exposed to reactive liquids or gases.

## 2.4 RADIOLOGICAL EFFECTS ON HUMANS

The radiobiological properties of plutonium and other transuranic (TRU) elements are known primarily from experiments performed on rats, dogs, baboons, and rabbits. Human data on plutonium are limited. Reviews of the vast literature on plutonium include Hodge et al. (1973); ICRP 19 (1972); ICRP 30, Part 1 (1979); ICRP 48 (1986); ICRP 30, Part 4 (1988b); and Liverman et al. (1974). Factors affecting radiobiological effects include the mode of entry of plutonium into the body, its distribution in the body, and its transfer to a fetus.

DOE-STD-1128-2013

### 2.4.1 Modes of Entry into the Body

Radioactive material can enter the body by four different pathways: by inhalation, through a wound (including an accidental injection), by ingestion, or by absorption through intact skin. These pathways may occur singly or in any combination.

-- Inhalation is probably the most prevalent mode for occupational intake of plutonium. It also provides a generally conservative assumption of intake for designing bioassay programs.

-- Wounds are potentially the most serious mode of intake because of the high dose-per-unit uptake of plutonium. Wounds can result from direct penetration by an object (i.e., a puncture or cut), from abrasion, or from burning by an acid, caustic, or thermal source.

-- Occupational ingestion of plutonium poses a relatively small risk because the uptake factor from the GI (gastrointestinal) tract to the blood is quite small and because most of the alpha energy from transformations within the GI tract is absorbed by the contents of the GI tract, rather than by the target tissues of the tract itself.

-- Absorption of plutonium through intact skin is, for practical purposes, almost nonexistent. However, when removing skin contamination, care shall be taken to ensure that the skin integrity is not damaged by rough or extensive decontamination procedures. If the skin integrity is damaged, the result can be considered a wound, regardless of how it occurred.

### 2.4.2 Distribution Within the Body

Three commonly encountered biokinetic models were promulgated by the ICRP for the internal distribution and retention of plutonium. These models are identified by the ICRP publications in which they were first reported: ICRP 30, Part 1 (1979), ICRP 48 (1986), and ICRP 30, Part 4 (1988b). These models were later updated with models derived from ICRP 60, 67 and 68 values. The models are all similar with regard to the organs of significance, but differ with regard to the fraction of uptake deposited in the organ and its respective retention (or clearance) half-time in the organ.

In all the ICRP models, once plutonium has reached the bloodstream, it is translocated primarily to the liver and skeleton. In the skeleton, it is deposited primarily on the endosteal surfaces of mineral bone, from which it is gradually redistributed throughout the bone volume by resorption and burial. Because of the extremely slow nature of this redistribution, plutonium is considered to be uniformly distributed over bone surfaces at all times following skeleton deposition. A small fraction of the translocated plutonium reaches the gonads. Although the gonadal fraction is different for males and females, the calculated gonadal doses are the same regardless of gender because the plutonium concentration in the tissues is assumed to

DOE-STD-1128-2013

be the same. The ICRP assumes that the remainder goes directly to excretion.

Metabolic distribution and retention parameters for the ICRP models are shown in Table 2.7. The table also includes the absorption factors from the GI tract to the bloodstream, as well as the inhalation class of common forms of plutonium.

Table 2.7 includes values from ICRP 60, 67 and 68 models which includes data from the Human Respiratory Tract Model for Radiological Protection Publication 66 (ICRP, 1994) and Age- Dependent Dose to Members of the Public from Intakes of Radionuclides: Part 2 Ingestion Dose Coefficients (ICRP, 1993). The Human Respiratory Tract Model constitutes an updating of the model used in Publication 30 for workers. The new model takes into account extensive data on the behavior of inhaled materials that has become available since the Publication 30 model was developed.

Americium, as an ingrown impurity from the decay of [241]Pu, can behave the same way as the plutonium host matrix in which it is contained. This implies that the [241]Am associated with an absorption type S inhalation of plutonium might exhibit absorption type S behavior, rather than the absorption type M behavior assigned by the ICRP. This type of observation was made in ICRP 48 (1996) and by Eidson (1980).

Experience has shown that the biokinetic models in Table 2.7 are subject to some significant variations. A Hanford plutonium-oxide-exposure case described by Carbaugh et al. (1991) has demonstrated lung retention far greater than that expected for a class Y material, leading to the suggestion of a tenaciously retained "super class Y" form. This phenomenon had been informally verified by dosimetry personnel at the Rocky Flats, Savannah River, and Los Alamos sites, and is supported in the literature by Foster (1991). At the other extreme, La Bone et al. (1992) have identified a circumstance in which a [238]Pu oxide inhalation class appeared to exhibit biokinetic behavior more characteristic of an inhalation class D material. These extremes emphasize the importance of addressing the uniqueness of individual workers and exposure circumstances when dealing with known intakes, rather than relying on the assumed standard models.

### 2.4.3    Transfer to the Fetus

In its most recent review of the metabolism of plutonium and related actinides, it was noted in ICRP 48 (1986) that there is no strong evidence for preferential deposition of plutonium in the fetus and that the concentration of plutonium in the bone of the embryo or fetus is rapidly diluted by growth. However, experimental animal studies have shown that plutonium crosses the placenta after injection in pregnant animals (Green et al., 1979). For fallout plutonium, it has been qualitatively confirmed in humans that plutonium crosses the placenta (Okabayashi and Watanabe, 1973). However, placental and fetal membranes appear to effectively trap a portion of the plutonium that might otherwise reach the fetus.

**DOE-STD-1128-2013**

The behavior of plutonium in the embryo/fetus changes with the development of the embryo/fetus (Sikov, 1987; Sikov et al., 1992). Liver and bone surfaces are the principal sites of plutonium deposition in the embryo/fetus, accounting for approximately 80% of the deposited plutonium (ICRP 48, 1986). Plutonium that deposits on bone surfaces following prenatal or neonatal exposure gradually moves into the bone matrix during subsequent bone-remodeling processes.

The radiation doses produced in the embryonic stage are assumed to be relatively homogeneous and represent a small fraction of the doses received by the pregnant woman when averaged over all tissues. The dose to the fetus would constitute an even smaller fraction of the maternal dose to any tissue in which there was specific deposition (Sikov et al., 1992). As gestation progresses, there is an increase in the relative plutonium concentration in specific fetal tissues, namely the bone and liver (Sikov et al., 1992). Although limited information is available, experimental animal and human data suggest that the average concentration is higher in the fetus during the second or third trimesters than in soft tissues of the pregnant woman, exclusive of the liver, yet significantly less than in maternal tissues of primary deposition, i.e., the bone and liver.

Because placental structures, including the yolk sac, effectively trap plutonium, progenitor cells of the gametes and hematopoietic lines that appear initially in the blood islands of the yolk sac are irradiated while they are primitive stem cells. However, the dose received by the early embryonic cells and the detriment produced is not currently known.

**Table 2.7.** Common Biokinetic Models for Plutonium and Americium

| Model Parameter | ICRP 30, Pt 1 | | ICRP 48 | | ICRP 30, Pt 4 | | ICRP 66/67/68 |
|---|---|---|---|---|---|---|---|
| **Metabolic Distribution**[(a)] | **F** | **T** | **F** | **T** | **F** | **T** | |
| Bone Surfaces | 0.45 | 100 y | 0.50 | 50 y | 0.45 | 50 y | n.a.(c) |
| Liver | 0.45 | 40 y | 0.30 | 20 y | 0.45 | 20 y | n.a. |
| Gonads[(b)] | | | | | | | |
| Male | 3.5 x 10-4 | | 3.5 x 10-4 | | 3.5 x 10-4 | | 3.5 x 10-4 |
| Female | 1.1 x 10-4 | | 1.1 x 10-4 | | 1.1 x 10-4 | | 1.1 x 10-4 |
| **GI Tract Absorption Factor** | | | | | | | |
| Pu oxides | $10^{-5}$ | | $10^{-5}$ | | $10^{-5}$ | | $10^{-5}$ |
| Pu nitrates | n.a. | | $10^{-4}$ | | $10^{-4}$ | | $10^{-4}$ |
| Pu others | $10^{-4}$ | | $10^{-3}$ | | $10^{-3}$ | | $5 \times 10^{-4}$ |
| Am (any) | $5 \times 10^{-4}$ | | $10^{-3}$ | | $10^{-3}$ | | $5 \times 10^{-4}$ |
| **Inhalation Class/Absorption Type** | | | | | | | |
| Pu oxides | Y | | Y | | Y | | S |
| Pu others | W | | W | | W | | M |
| Am (any) | W | | W | | W | | M |

(a)    F is the fraction of plutonium reaching the bloodstream that is translocated to the organ of concern. T is the retention (or clearance) half-time in the organ of concern.

(b)    Plutonium is assumed to be uniformly concentrated in male and female gonadal tissue where it is permanently retained. The deposition fractions are derived based on the relative mass of the reference male and female tissues.

(c)    n.a. = not specifically addressed, ICRP 67 lists a relative deposition for adults of 5/3 for skeleton/liver.

## 2.5    RADIATION EFFECTS ON MATERIALS

The following sections discuss, in order, self-heating and the various effects of radiolysis. Radioactive decay, particularly alpha decay, can and does affect operations in plutonium purification processes. The change in emphasis from plutonium production to waste cleanup, environmental restoration, and the retirement of nuclear weapons will present favorable circumstances for cumulative radiolytic effects, especially in the stabilization processes and the final storage form.

Self-heating and helium retention and release are also included in this section since they too are part of the end result of the alpha decay process. Neutron production from the alpha-neutron reaction is discussed in Section 6.0. The degree of all these effects depends

DOE-STD-1128-2013

on the plutonium isotopic composition and the americium impurity level. Table 2.8 lists potential hazards or damage to materials from exposure to radiation.

### 2.5.1    Self-Heating

Heat generated by radioactive decay in plutonium, its alloys, or its compounds can be calculated from data provided in Table 2.4, together with the isotopic composition and plutonium fraction. The power output of reactor-produced $^{239}$Pu metal is usually in the range of 2 to 10 W/kg. According to Van Tuyl,[3] the equilibrium surface temperature of a metal can that contains 1.2 kg of plutonium at the higher specific power would be 150°C. This calculation is complex because it depends on the thermal conductivities and configuration of all the materials in the shipping container. Thermal diffusivity measurements reported by Kruger and Robbins (1975) were combined with existing heat capacity values to derive a curve for the thermal conductivity of the Pu-1wt% Ga alloy from room temperature to 600°C. Gram quantities of $^{238}$Pu can melt from self-heating under poor heat-transfer conditions. The major effects to be expected from self-heating are phase transformation, dimensional changes, chemical reactions (depending on the gaseous environment or other materials in contact with the plutonium), and desorption of previously sorbed gases or vapors.

### 2.5.2    Radiolysis

In gases, liquids, and covalently bonded solids, the chemical effects of alpha particles and the associated recoil nucleus can cause ionization, excitation, and dissociation of molecules. From the energy requirement for ion pair formation, only about half the energy causes ionization; the other half goes into molecular excitation. Radiation effects are commonly measured by a quantity called the G-value, i.e, the number of molecules destroyed for each 100 eV of energy absorbed. For free radical production, this quantity is expressed as the $G_R$-value. For organic liquids, $G_R$-values typically range from 0.85 for carbon disulfide to 70 for carbon tetrachloride (Prevost-Bérnas et al., 1952).

Although there is a considerable body of data on the radiolysis of aqueous solutions, organic liquids, and solids irradiated by gamma rays, X-rays, and fast electrons, little has been published on the radiolysis of plutonium compounds, solvents containing plutonium, or radiation-induced damage in materials that come in contact with plutonium. Nevertheless, radiation-induced damage can affect all aspects of plutonium handling.

---

3 Van Tuyl, H. H. 1981. "Packaging of Plutonium for Storage or Shipment." Unpublished report by the Pacific Northwest Laboratory task force chairperson to the U.S. Department of Energy.

Table 2.8. Potential Hazards or Damage to Materials from Exposure to Radiation

| Radiation-Induced Reaction | Potential Hazard or Damage Problem |
|---|---|
| Radiolysis of oxygen-contaminated glovebox atmospheres | Production of ozone-damage to elastomers: gloves, seals, etc. |
| Gaseous $PuF_6$ | Deposition of solid $PuF_4$ on equipment |
| $PuO_2$ exposed to hydrocarbons or humid environments | Production of hydrogen gas pressure buildup in nonvented containers. |
| Ion exchange resins | Damaged resin can react violently with $HNO_3$ or other oxidizers. Also may result in hydrogen gas- pressure buildup. |
| $CCl_4$ saturated with $H_2O$ | Production of $Cl_2$. $C_2Cl_6$ HCl, and phosgene. |
| Polyethylene | Disintegrates with production of $H_2$. |
| Polyvinylchloride (PVC) plastics | Disintegrates with production of HCl-corrosion. |
| Tri-n-butylphosphate | Production of hydrogen and oxygen-pressure buildup in nonvented containers. |
| Aqueous plutonium solutions | Production of polymeric plutonium hydroxide (plutonium polymer), which plates out on vessel surfaces and piping, producing swelling, cracking, loss of ductility. |
| Low-acidity plutonium solutions | Increase in leachability. |

It would be futile and inappropriate to list, let alone discuss, all the possible radiolytic reactions affecting plutonium-handling. However, it is important to recognize the potential for and anticipate the consequences of these reactions. The following sections cover a broad range of the types of radiation-induced damage common to plutonium handling.

### 2.5.2.1 Hydrogen Production

The G-value for the production of $H_2$ by the alpha radiolysis of pure water is $1.9\pm0.1$ molecules of hydrogen per 100 eV (Prevost-Bérnas et al., 1952). Cleveland (1970) calculates that the energy released in 0.001M (0.24 g/L) of plutonium solution is on the order of $2 \times 10^{14}$ eV per minute. Thus, the hydrogen evolution would be approximately $3.8 \times 10^{15}$ molecules per liter per day for a 1M solution, or about 73 $cm^3$ of hydrogen per year.

The G-values for $H_2$ in solids irradiated by gamma rays are lower: 0.1 for ice (Johnson, 1970) and 0.01 for the hydrates of a large number of sulfates (Huang and Johnson, 1964). Because the stability of $PuSO_4 \cdot 4H_2O$ was found to be remarkably high (Cleveland, 1970), one of the sulfates may well serve as an alternate interim waste form. Dole (1974) summarized the radiation chemistry of polyethylene, quoting G-values for hydrogen as 5 molecules per 100 eV. Destruction of plutonium hexafluoride as the solid phase amounts to about 1.5% of the material per day (Weinstock and Malm, 1956). Cleveland (1970) calculated the mean change in average oxidation number in 0.5–2M of perchloric acid to be 0.018 moles per day, corresponding to a G-value of 3.2 equivalents per 100 eV. The formation of hydrogen peroxide from the radiolysis of water is believed to be the mechanism for the reduction of plutonium (VI)

ions. Lower oxidation states are formed by the disproportionation of the plutonium (V) species.

Pressurization of storage containers holding TRU wastes is a potential hazard for both long and interim storage periods (Kazanjian et al., 1985). Sampling of TRU waste drums shows that hydrogen is usually created (Roggenthem et al., 1989). Waste drums with pinholes can "breathe" when the atmospheric pressure changes, thereby introducing water vapor. Water vapor adsorbed on plutonium compounds is radiolytically decomposed, thereby producing hydrogen. It may be possible to add pressure relief valves and appropriate in-line filters to waste drums. (See Section 2.7 for more information on storage and containment.)

## 2.5.2.2  Redox Reactions

In most chemical processes for purifying plutonium, it is essential to maintain its valence state. The formation of hydrogen peroxide from the radiolysis of water is believed to be the mechanism for the reduction of plutonium (VI) ions. Lower oxidation states are formed by the disproportionation of the plutonium (V) species. Cleveland (1970) calculated the mean change in average oxidation number in 0.5-2M of perchloric acid to be 0.018 moles per day, corresponding to a G-value of 3.2 equivalents per 100 eV.

In the radiolysis of solutions, the presence of other ionic species can accelerate or inhibit the disproportionation of plutonium valence states. For example, the presence of the chloride ion in plutonium (VI) solutions prevents reduction to plutonium (IV). Reactions may reverse after long irradiation periods, in which case a steady-state condition should ultimately be reached, resulting in a net decomposition rate of zero. An excellent review of the radiation chemistry of plutonium nitrate solutions may be found in Miner and Seed (1966). In dilute solution (0.1M), $G_{H2}$ is about 0.5 and $G_{O2}$ increases to 1.45. Self-reduction of Plutonium hexafluoride as the solid phase amounts to about 1.5% of the material per day (Weinstock and Malm, 1956). See Cleveland (1970) Chapter 2, for more information.

## 2.5.2.3  Miscellaneous Radiolytic Reactions

A serious limitation to the use of organic ion exchange materials is their radiation stability. Brookhaven National Laboratory (BNL) reviewed the literature and summarized the effect of ionizing radiation on both organic and inorganic ion exchange materials (Gangwer et al., 1977). Extraction of plutonium (IV) from 3M $HNO_3$ into 30 vol% tributyl phosphate in kerosene at 5°C decreased the extraction coefficient by a factor of two when irradiated to a dose of $3.6 \times 10^7$ R (Tsujino and Ishihara, 1966). The mechanical properties of thin plastic films such as polyethylene and polyvinyl chloride degrade with exposure to plutonium. Cellulose vacuum-cleaner bags

will disintegrate in less than a month if used for housekeeping purposes in plutonium-contaminated gloveboxes. Leachability of plutonium-containing wastes could be affected by the production of nitric acid for air-equilibrated dilute salt solutions (Rai et al., 1980).

### 2.5.2.4  Helium Retention and Release

Helium introduced by alpha-bombardment of plutonium and the alloys and compounds of plutonium can cause lattice expansion. This was first observed for plutonium oxides, carbides, and nitrides by Rand et al. (1962) and was later observed for two plutonium carbide phases. Helium is retained in vitrified compounds. The retention and release behavior of helium in plasma-torch-fused $PuO_2$ microspheres for SNAP is an important parameter in the design of the heat source. Approximately 530 $cm^3$ at standard temperature and pressure per year-kg are produced by $^{238}PuO_2$ (Stark, 1970). Microspheres of 80% $^{238}PuO_2$ and 20% $^{239}PuO_2$ that were approximately 50 mm in diameter, prepared by the sol-gel process, released 92.8% of the helium in 8 months at room temperature (Northrup et al., 1970). Metals at temperatures well below the melting point trap the insoluble helium gas in tiny bubbles, which are more or less evenly distributed through the matrix material (Stevens et al., 1988). Helium buildup in weapon-grade material is approximately 4 standard $cm^3$ per year-kg.

## 2.6  OCCUPATIONAL HAZARDS

The major industrial hazard in plutonium facilities is the potential for loss of control of a highly toxic substance, resulting in either the inhalation or ingestion of plutonium or one of its compounds by personnel, or the exposure to excessive radiation from a criticality accident. The possibility of a fire or explosion in a plutonium facility is probably the most serious threat because the consequences of a fire could lead to loss of containment and subsequent dispersal of highly mobile plutonium particulates. In addition, fighting the fire with water to maintain containment could create the potential for a criticality accident and/or loss of containment in the immediate vicinity.

The day-to-day hazards for personnel in plutonium facilities involve exposure to gamma rays, X-rays, and neutrons, as well as possible accumulation of plutonium in the body. These hazards are described in more detail in Section 3.0, "Radiation Protection," and Section 7.0, "Nuclear Criticality Safety." The amount of plutonium needed to present potential hazards to personnel in plutonium-handling facilities is summarized in Figure 2.4. Hazards related to interim and long term storage of plutonium will be found in Section 2.7, "Storage and Containment."

### 2.6.1  Chemical Versus Radiological Hazards

The radiological toxicity of reactor-produced plutonium far exceeds the chemical toxicity of this heavy element. Furthermore, its low solubility in near-neutral or basic solutions reduces the uptake through ingestion by a factor >1000 for any plutonium compounds except certain complexes, such

as the citrate or ethylenediamine tetraacetic acid complex. (Refer to Sections 2.3, "Radiobiological Properties," and 6.0, "External Dose Control"). Tipton (1960) summarizes the differences in chemical hazards between plutonium and uranium: "In contrast to uranium, the chemical toxicity of plutonium is insignificant in comparison to the hazard arising from its natural radioactivity." Moreover, "the toxicity of plutonium and other transuranic elements," according to Voelz et al. (1985), "has only been studied in animals since acute toxicity has never been observed in man for these elements and epidemiologic studies have not produced positive results." However, recent evidence suggests that plutonium can catalyze reactions including oxidative stress in the absence of significant radioactive decay. These data presented by Claycamp and Luo (1994) suggest that plutonium complexes might contribute to long-term oxidative stress related to tumor promotion.

### 2.6.2    Associated Chemical Hazards

The main chemical hazard of plutonium is its vulnerability to oxidation and the pyrophoricity of some of its alloys and compounds (see Section 2.6.3).

The processing of plutonium, including separation from irradiated uranium, purification, conversion, waste disposal, environmental restoration, and D&D, necessarily requires the use of chemicals and reagents with varying degrees of toxicity and hazardous properties. A partial list of chemicals that have been used at DOE plutonium facilities is provided in Table 2.9. An abbreviated evaluation of the potential hazards of these substances is also provided. Table 2.9 is not meant to replace the Material Safety Data Sheet available from chemical manufacturers; rather, it is intended to help readers recognize the toxicity of these chemicals and identify any possible side effects from their use that could jeopardize radiation safety or plutonium containment.

### 2.6.3    Hazards Created by Oxidation and Pyrophoricity

This section describes the oxidation and burning characteristics of plutonium, summarizes the storage properties of the metal and oxides, and presents recommendations for their storage conditions. Waste remediation plans for TRU materials and the necessity for dealing with ton quantities of plutonium metal from the retirement of weapons require the identifying of long-term and intermediate-term waste forms with appropriate stability. Economic considerations make clear the importance of generating few, if any, new wastes in accomplishing this task.

#### 2.6.3.1   Oxidation of Plutonium

The problems of oxidation of metallic plutonium were recognized shortly after the discovery of plutonium, and extensive studies of the low-temperature corrosion of plutonium and its alloys have been performed. Oxidation can produce fine loose plutonium oxide, which disperses easily in glovebox systems, complicating housekeeping chores. If not controlled, loss of accountability and

DOE-STD-1128-2013

increased radiation exposure to personnel is certain. The reactivity of plutonium metal is discussed in Section 2.3.1. The tendency for enhanced oxidation is promoted by the self-heating properties of plutonium isotopes (discussed in Section 2.5.1). A kilogram of $^{239}$Pu can easily reach an equilibrium temperature of 80°C in a glove-box environment (Raynor and Sackman, 1967). Thermally isolated $^{238}$Pu metal can easily melt from its own decay heat. The heat generated by oxidation may be sufficient to ignite nearby combustible materials. Metal turnings and scrap should be reprocessed or converted to stable alternatives as soon as practicable. Plutonium metal, its alloys, and its reactive compounds need to be excluded from both oxygen and water vapor, but especially the latter since it catalyzes and accelerates oxidation.



**Figure 2.4.**    Hazards in Low-Exposure Plutonium Handling

DOE-STD-1128-2013

Table 2.9.    Hazards of Chemicals Used in Processing Plutonium [a]

| Chemical Name | CAS No.[b] | Hazard | Formula |
|---|---|---|---|
| Aluminum nitrate | 7784-27-2 | -- | $AL(NO_3)_3 9H_2O$ |
| Antimony pentafluoride | 7783-70-2 | -- | $SbF_5$ |
| Beryllium (metal) | 7740-41-7 | Neutron | Be |
| Calcium (metal) | 7740-70-2 | Release $H_2$ when wet, flammable | Ca |
| Calcium oxide | 1305-78-8 | Corrosive | CaO |
| Calcium chloride | 10043-52-4 | -- | $CaCl_2$ |
| Ferrous ammonium sulfate | 7783-85-9 | -- | $Fe(SO_4)(NH_4)_2 SO_4 6H_2O$ |
| Fluorine | 7782-41-4 | Oxidizer, poison | $F_2$ |
| Fluorine dioxide | -- | Oxidizer, poison | $F_2O_2$ |
| Carbon tetrachloride | 56-23-5 | -- | $CCl_4$ |
| Ferrous sulfamate | -- | -- | $Fe(SO_3NH_2)_2$ |
| Gallium (metal) | 7440-55-3 | -- | Ga |
| Hydrogen | 1333-74-0 | Flammable, explosive | $H_2$ |
| Hydrogen Fluoride | 7664-39-3 | Corrosive | HF |
| Hydrochloric acid | 7647-01-0 | Corrosive | HCl |
| Hydrogen peroxide | 7722-84-1 | Oxidizer | $H_2O_2$ |
| Iodine | 7553-56-2 | Poison | $I_2$ |
| Magnesium (metal) | 7439-95-4 | Water reactive, flammable explosive, produces neutrons when combined with Pu | Mg |
| Magnesium chloride | 7786-30-3 | Neutron | $MgCl_2$ |
| Magnesium oxide | 1309-48-4 | Neutron | MgO |
| Mercuric nitrate | 10045-94-0 | Oxidizer, poison | $Hg(NO_3)_2$ |
| Nitric acid | 7697-37-2 | Oxidizer, corrosive, poison | $HNO_3$ |
| Oxalic acid | 144-62-7 | Poison | $H_2C_2O_4$ |
| Potassium hydroxide | 1310-58-3 | Corrosive, Poison | KOH |
| Potassium chloride | 7447-40-7 | -- | KCI |
| Sodium chloride | 7647-40-7 | -- | NaCl |
| Sodium Hydroxide | 1310-73-2 | Corrosive, poison | NaOH |
| Sodium nitrate | 7631-99-4 | Oxidizer | $NaNO_3$ |
| Stannous chloride | 7772-99-8 | -- | $SnCl_3$ |
| Sulfamic acid | 5329-14-6 | Corrosive | $NH_2SO_3H$ |
| Sulfuric acid | 7664-93-9 | Corrosive, poison | $H_2SO_4$ |
| Tri-n-butyl phosphate | 126-73-8 | Flammable liquid | $(C_4H_9O)_3PO_4$ |
| Urea | 57-13-6 | -- | $CO(NH_2)_2$ |
| Uranium (metal) | -- | Flammable | U |
| Zinc chloride | 7646-85-7 | -- | $ZnCl_2$ |
| Soltrol 170 Phillips 66 | 68551-19-9 | Flammable liquid (isoparafins) | (Mixture C10–C14) |
| Carbon tetrafluoride | 75-73-0 | -- | $CF_4$ |

(a)  Refer to Material Safety Data Sheets for complete discussion of hazards.
(b)  Chemical Abstracts Service Registry number.

The corrosion or oxidation of plutonium does not always occur in a linear or predictable manner. The oxidation rate is a complex function of the surrounding atmosphere, the moisture content, and the alloys or impurities present in the metallic plutonium.[4]

### 2.6.3.2    Ignition Temperatures and Pyrophoricity of Plutonium, Its Alloys, and Its Compounds

Plutonium and some of its alloys and compounds are pyrophoric. Pyrophoric material is a liquid or solid that, even in small quantities and without an external ignition source, can ignite within 5 minutes after coming in contact with air (NFPA Fire Protection Handbook). Pyrophoric plutonium metal has been defined as "that metal which will ignite spontaneously in air at a temperature of 150°C (320°F) or below in the absence of external heat, shock, or friction" (Stakebake, 1992).[5] Finely divided plutonium metal would be considered pyrophoric while massive plutonium would be nonpyrophoric. Martz et al. (1994) has proposed a mechanism for plutonium pyrophoricity that predicts the ignition temperature as a function of surface mass ratio and particle size. The most numerous forms of pyrophoric plutonium are chips, lathe turnings, and casting crucible skulls. Plutonium hydride and sesquioxide ($Pu_2O_3$) are probably the most commonly occurring pyrophoric compounds. Plutonium carbide, oxycarbide, nitride, and oxide phases with compositions between the sesquioxide and dioxide are potentially pyrophoric. Known pyrophoric alloys include Pu-U and Pu-Ce, Waber (1967) summarized much of the early work on plutonium corrosion and oxidation and is a good source for identifying other pryophoric alloys.

---

[4] See Wick (1967), Coffinberry and Miner (1961), and Kay and Waldron (1966) for details on the oxidation of unalloyed plutonium and the stabilized alloy of plutonium.
[5] Also in DOE/DP-0123T, Assessment of Plutonium Storage Safety Issues at Department of Energy Facilities (DOE, 1994a).

The health physics aspects of an accidental plutonium fire can be serious. A fire can burn through containment structures, resulting in the dispersal of $PuO_2$ over a wide area, with the potential for inhalation exposure during the fire or during subsequent decontamination efforts. The conditions under which a plutonium fire can occur in a dry glovebox have been studied. With only 5% oxygen in nitrogen, the metal will burn easily. At the 1% level, however, a fire will not continue to burn unless heat is supplied (Rhude, 1962). Turnings shall be generated in a dry atmosphere and should be converted to the oxide as soon as convenient, preferably on the same day they are made. Some solvents and organic compounds form flammable mixtures with plutonium. In one incident, tetrachloroethane was inadvertently substituted for another lathe coolant in a metal-turning operation. Chips of plutonium aluminum alloys were ignited, resulting in the blowout of a glove-box panel. In a separate event, burning plutonium chips dropped into carbon tetrachloride resulted in an explosion (AEC, 1965).

### 2.6.3.3 Aerolization of Plutonium

The ignition of plutonium metal becomes a major hazard when enough plutonium has burned to produce a significant amount of dispersible material and a serious enough fire to damage the pertinent containment structures. The particle size of $PuO_2$ fired at a low temperature varies from 3% at <1 µm to 97% at 1-5 µm (Stakebake and Dringman, 1967). Sintered $PuO_2$ has a particle size <2 µm. Haschke (1992) made an effort to define the maximum value of the source term for plutonium aerosolization during a fuel fire. He found the rate to be constant (0.2-g $PuO_2$/cm² of metal surface per minute) above 500°C. The mass distribution for products of all metal gas distributions are approximately 0.07 mass% of the oxide particles having geometric diameters ≤10 µm.

2.7    **STORAGE AND CONTAINMENT**

The DOE mission for utilization and storage of nuclear materials has changed as a result of the end of the "Cold War" era. Past and current plutonium storage practices largely reflect a temporary, in-process, or in-use storage condition which shall now be changed to accommodate longer-term storage.

The DOE has sponsored a number of workshops on disposing of plutonium. Two of the objectives of these workshops have been to make recommendations for near-term and long-term storage forms and to identify possible alternatives. At the Hanford Plutonium Disposition Workshop held in Richland, Washington, from June 16 to 18, 1992, the two highest ranking stabilization processes were, first, denitration of plutonium nitrate, and, second, thermal stabilization. The third-ranked process included the precipitation of $Cs_2PuC1_6$ or $K_4Pu(SO_4)_4$ followed by thermal stabilization (Hoyt, 1993). At the workshop on plutonium storage sponsored by DOE Albuquerque, on May 26 and 27, 1993, both metal and oxide were considered suitable storage forms. A report has been issued summarizing information presented here and resulting from this workshop (DOE, 1994a). This important report includes sections on:

-- materials properties relevant to storage;
-- current storage practice;
-- advanced storage concepts;
-- hazard analysis; and
-- recommendations.

Existing storage and handling requirements for plutonium metal and oxides are currently covered in DOE Order 460.1D, <u>Hazardous Materials Packaging and Transportation Safety</u> (DOE, 2016d).  DOE M 441.1-1, <u>Nuclear Material Packaging Manual</u> (DOE, 2008e) and DOE-STD- 3013-2018, <u>Stabilization, Packaging, and Storage of Plutonium-Bearing Materials (DOE, 2018b)</u>, also provide information on packaging plutonium material.

The following property summaries adapted from Haschke and Martz (1993), are useful for determining potentially unsuitable storage and containment conditions for plutonium metal and oxide. Given that plutonium metal is chemically reactive in air and other environments, it also:

**DOE-STD-1128-2013**

-- Exhibits spontaneous self-sustained ignition (becomes pyrophoric) only if the metal dimension

   - is <0.1 mm and T >150°C
   - is >0.2 mm and T >500°C

-- reacts slowly in air at room temperature (maximum of about 1 μm/day)

-- has limiting (T-independent) oxidation rate in air above 500°C

-- is not a dispersible form (<10 μm geometric size) until oxidation occurs:
   - oxide from Pu+Air at ambient T: 100 mass % (ssa = 10-20 $m^2$/g)
   - oxide from $PuH_2+O_2$: ~25 mass % (ssa ~ 1 $m_2$/g)
   - oxide from $Pu+O_2$ and Pu+Air at T >500°C: < 0.1 mass % (ssa <0.1 $m^2$/g)

-- radiolytically decomposes organic and covalently bound specific species in the environment

-- reacts with most radiolytically produced gases and with nonequilibrium surface:
   - limits pressurization by gases
   - forms low-density (pressure-generating) and pyrophoric products

-- retains helium from alpha decay

-- is stabilized by certain storage atmospheres (reactivity decreased by $10^{12}$)

-- is stable if isolated from reactive species

-- has good storage history when stored properly.

A similar property summary for plutonium dioxide, the most commonly used form of plutonium, shows it to be stable and unreactive in air. Storage and containment recommendations, based on the properties of plutonium metal and dioxide, are shown in Table 2.10.

DOE-STD-1128-2013

**Table 2.10.** Storage Recommendations for Plutonium Metal Dioxide (adapted from Haschke and Martz, 1993)

- Metal and oxide are both suitable storage forms for plutonium (100 years).

- Organics (plastics, elastomers) shall be excluded from the primary container for both forms.

- Converting between metal and oxide is not recommended (negative impact of waste, cost, environmental safety and health risk).

- Both forms shall be properly prepared and certified:
  - Procedures for metal already exist (technology transfer needed).
  - Procedures for oxide need development (stabilization, desorption, loss on ignition.

- Both forms shall be in sealed primary containers for extended storage:
  - Positive seals (e.g., welds and metal seals) are necessary.
  - Seal certification or double sealing is necessary.

- Requirements diverge for short-term/retrievable storage:
  - Containers with metal gaskets are advantageous for metal storage.
  - After stabilization, oxide is best stored in a container fitted with a rupture disk in series with a vented stainless-steel frit container.

- Surveillance of stored materials is required.

Note: DOE M 441.1-1, Nuclear Material Packaging Manual (DOE, 2008e) and DOE-STD-3013-2018, Stabilization, Packaging, and Storage of Plutonium-Bearing Materials (DOE, 2018b), also provide information on packaging plutonium material.

DOE-STD-1128-2013

## 3.0 RADIATION PROTECTION

The radiation protection field is concerned with the protection of individuals, their progeny, and humanity as a whole, while still allowing for necessary activities which might involve radiation exposure. The aim of radiation protection is to prevent deterministic effects and to limit the probability of stochastic effects. Most decisions about human activities are based on an implicit form of balancing risks and benefits leading to the conclusion of whether or not the application of a particular practice produces a positive net benefit. Because the probability of health effects is not zero, the ICRP in Publication 26 (ICRP, 1977) recommended the following criteria for a system of dose limitation:

-- No practice shall be adopted unless its introduction produces a positive net benefit.

-- All exposures shall be kept as low as reasonably achievable, with economic and social factors being taken into account.

-- The dose equivalent to individuals shall not exceed the limits recommended for the appropriate circumstances.

These criteria and related information have been incorporated into DOE regulations, instructions, and manuals for radiation protection.

The successful operation of a plutonium facility requires scrupulous attention to providing adequate radiation protection and maintaining contamination control through the implementation of a quality health physics program. (In this section, "health physics" and "radiation protection" can be used interchangeably when referring to programs or personnel.) Prompt dose assessment is important for demonstrating compliance with standards, providing information to workers, establishing an accurate historical record, and for responding to accident and incident situations. This section defines the basis for the establishment of a sound health physics program at a plutonium facility.

## 3.1 REGULATION AND STANDARDS

Regulations on radiation protection in DOE and DOE contractor facilities are found in 10 CFR 835, Occupational Radiation Protection: Final Rule (DOE, 2011). Guidance is found in the supporting document Radiological Control (DOE, 2017) and the 10 CFR 835 Implementation Guide G 441.1-1C, Ch 1 (DOE, 2011a).

10 CFR 851 specifies health and safety regulations, which also apply to workers in DOE facilities. Other related source documents include publications of the U. S. Environmental Protection Agency (EPA), American National Standards Institute (ANSI), ICRP, National Council on Radiation Protection and Measurements (NCRP), and United Nations Scientific Committee on the Effects of Atomic Radiation. 10 CFR 851, Worker Safety and Health Program (DOE, 2019) provides requirements for worker safety and health. The worker safety and health program integrates the Rule's requirements with other site worker protection activities and the integrated safety management system (ISMS) [851.11(a)(3)(ii)].

In addition, each site that handles radioactive materials and/or radiation generating machines is required to establish and maintain its own documented radiation protection program, following the Federal regulations.

## 3.2 RADIATION PROTECTION PROGRAMS

Radiation protection programs include provisions for quality assurance, administrative controls, protection of visitors, visits by regulatory personnel, and onsite packaging and transportation of hazardous materials.

### 3.2.1 Quality Assurance

It is highly desirable for laboratories and industrial facilities handling plutonium to have a well-integrated quality assurance program. Such a program should have high visibility and strong management support. Quality assurance should be effectively applied throughout facility activities, including the radiation protection program. The basis for quality assurance programs in DOE facilities is established in 10 CFR 830, Nuclear Safety Management (DOE, 2011j). In addition, 10 CFR 830.120, Quality Assurance Requirement, requires the development of a Quality Assurance Program, specifies an implementation schedule, and provides the elements that the program shall address.

An effective quality assurance program for radiation protection will include establishment of appropriate standards of performance for essential activities and equipment, with an effective system of documentation and traceability of those activities and of the use of the equipment. Proper maintenance of those records will be necessary for reference purposes.

### 3.2.2 Administrative Controls

In any facility that handles radioactive materials, the major controls protecting workers, the public, and the environment are structures and installed equipment, which shield, contain, and confine the radioactive materials. However, to allow useful work to be performed in the facility and to assure that its protective features remain effective, a number of administrative controls are ordinarily required. These administrative controls are usually contained in a series of procedures related to the operations and maintenance activities to be carried out in the facility. All personnel who work in controlled areas should be familiar with the administrative controls that apply to their work. When changes or additions to administrative controls are made, these changes or additions should be effectively communicated to all persons who may be affected.

### 3.2.2.1    Radiation Protection Procedures

A plutonium facility should have a written policy on radiation protection, including a policy on keeping exposures as low as reasonably achievable (ALARA). All radiation protection procedures and controls should have formal, recognizable technical bases for limits, methods, and personnel protection standards. Procedures should be adequately documented, updated periodically, and maintained in a centralized historical file. A control system should be established to account for all copies and ensure that all new procedures are included in the historical files. A designated period of time for maintaining historical files should be established. DOE Order 200.1A, Information Technology Management (DOE, 2008b) and ANSI/HPS N13.6 (ANSI, 2010) provide guidance on how to maintain historical files. In addition, radiation protection procedures should have a documented approval system and established intervals for review and/or revision. A tracking system should be developed to ensure that the required reviews and revisions occur.

Radiation protection procedures should be provided for but not limited to the following topics:

-- Posting and labeling of facilities
-- development and maintenance of all radiation protection records
-- reporting of unusual radiation occurrences
-- use of radiation monitoring instruments
-- use of radiation sources (e.g., reference calibration)
-- reporting of radiation exposures
-- use of protective clothing
-- responding to radiological emergency events
-- surveying and monitoring
-- counting room equipment and use
-- instrument maintenance and control
-- development and use of Radiological Work Permits (RWPs)
-- responsibilities of operations staff for contamination control and personnel surveys.

Two topics, RWPs and facility posting and labeling, are discussed below in more detail.

### 3.2.2.2    Radiological Work Permits

10 CFR 835.501(d) requires written authorizations to control entry into and perform work within radiological areas. These authorizations shall specify radiation protection measures commensurate with the existing and potential hazards. Radiological Work Permits are a type of written authorization used for entry into high and very high radiation areas, high contamination areas, and airborne radioactivity areas. The RWPs also are used to control entry into radiation and contamination areas and for handling materials with removable contamination. The RWPs should be initiated by the work group responsible for the activity. All RWPs should be reviewed and approved by the radiation protection staff. Radiological

DOE-STD-1128-2013

Work Permits are recommended for other radiological work in accordance with the standard, Radiological Control, (DOE, 2017). Guidance for posting of RWPs and for their contents is contained in the standard, Radiological Control.

Radiological workers should read and understand the applicable RWP before performing work in a radiological area. The RWPs should be located at the access point to the applicable radiological work area. Workers should acknowledge by signature or through electronic means that they have read, understood, and will comply with the RWP before they initially enter the area and after changes. Out-of-date RWPs should be removed.

### 3.2.2.3    Radiological Surveys and Data Trending

Area monitoring in the workplace shall be routinely performed, as necessary, to identify and control potential sources of personnel exposure (10 CFR 835.401(a) (6)). This monitoring should include surveys in areas that are not ordinarily expected to be contaminated. The program should define minimum requirements, survey types, and frequencies.

Surveys should be performed at frequencies adequate to identify changes in posting required or an activity buildup, and to ensure that current radiological controls are appropriate. The surveys suggested by this section are minimum recommendations; additional surveys should be conducted, recorded, and reviewed as necessary to ensure full protection of personnel.

Contamination surveys should be performed to determine contamination area (CA) boundaries, the appropriate posting of sources or areas, and the location and extent of localized contamination.

Contamination surveys should be performed and documented prior to the start of radiological work, during general work activities at times when changes in contamination level may occur, and following work to assure that final radiological conditions are acceptable and documented. See Munson et al. (1988).

A sufficient number of points should be surveyed to adequately assess the radiological status of the area being surveyed.

Routine radiological surveys should be regularly conducted, recorded, and reviewed for all areas where personnel could be exposed to alpha, beta, gamma, X-ray, or neutron radiation throughout the site. Surveys should be performed at frequencies adequate to ensure protection of personnel. The following surveys should be considered the minimum. Additional surveys should be conducted, recorded, and reviewed as necessary to ensure that personnel exposures are maintained ALARA.

General radiation and contamination surveys should be performed:

DOE-STD-1128-2013

-- To identify and verify the boundaries of areas which shall be radiologically controlled.

-- to verify that radiation and contamination Levels outside of radiological areas remain less than specified limits.

-- to determine the appropriate posting of localized higher radiation levels, beams, or hot spots.

-- to ensure that radiological conditions are acceptable and documented prior to, during, and at the completion of work that may cause changes in radiation levels to occur (see Munson et al., 1988, p. 6.1.2).

-- to satisfy required predetermined procedure hold-points in work areas and adjacent areas, whenever operations are performed that may cause significant increases in radiation levels. The survey may be required as part of a radiological inspection step required by the work procedure. This includes areas above and below the work area as appropriate during special processing operations or cell decontamination, movement of permanent or temporary shielding, radioactive waste processing, and relocation of highly radioactive materials.

Routine radiation and contamination level surveys should be performed in the workplace at a frequency commensurate with the radiation hazard, to detect trends related to equipment, systems, environment, and work habits.

Non-routine surveys of radiation and contamination levels in the workplace should be performed:

-- Before initial use of a new installation, system, or equipment, or as soon as possible after a radiation source is brought into the area.

-- whenever changes in procedures, equipment, or sources have occurred that may cause changes in the external radiation levels.

-- after modification to a shield or changes in shield materials.

-- as the basis for trend evaluation of external radiation level conditions.

-- when a radiological accident has occurred or is suspected.

-- when requested by the personnel performing the activity (see Munson et al., 1988, p. 6.1.2).

Radiation surveys should be performed upon initial entry into process cells and tanks that contain radioactive piping or components.

DOE-STD-1128-2013

Surveys should be conducted when performing operations that might result in personnel being exposed to small intense beams of radiation (e.g., removing shielding for shielded X-ray devices).

Every reasonable effort should be made to maintain the radiation dose of the surveyor at levels that conform to ALARA guidance.

Surveys should be performed and documented according to established procedures.

Only fully trained and qualified personnel should conduct surveys that are to be the official records of radiation levels or for the protection of personnel; these surveys should be reviewed and approved by the Radiological Protection Manager or his/her designee.

Surveys should be performed with calibrated instrumentation appropriate for the intensity and energy of the radiation anticipated in the area to be surveyed.

Survey instruments should meet the performance check requirements established by the facility in accordance with ANSI N323a (ANSI, 1997b).

Combinations of survey instruments should be used as necessary to provide the capability to measure all types of radiation and dose rates characteristic of that which could be encountered at the facility being surveyed.

Records that establish the conditions under which individuals were exposed to external radiation (such as facility radiological conditions records generated by the monitoring programs) should be retained to provide a chronological and historical record. See ANSI/HPS-N13.6 (ANSI, 2010).

A sufficient number of points should be surveyed in order to adequately assess the radiological status of the area. Regular predetermined points may be used, but additional spot monitoring should be done to ensure that all changes in dose rates are identified, recorded, and reviewed.

All records of surveys should clearly identify, as a minimum:

--  The name, signature, and employee number of the surveyor.

--  survey instrument(s) model number, serial number, and calibration date.

--  the type(s) of radiation being monitored (e.g., neutron, gamma, etc.).

--  the dose rates.

--  the date and time the survey was performed.

DOE-STD-1128-2013

-- locations where radioactive material is located temporarily (or is being temporarily stored) or where equipment that generates ionizing radiation is being operated.

Records of the results of radiation surveys should be retained in accordance with facility policy.

Survey data should be reviewed by supervisory personnel. Significant findings should be presented to the facility manager in a timely manner.

Health physics personnel should summarize survey data in each building or area at least once a quarter. Significant changes or trends in area dose rates and/or radiological contamination should be noted and corrective actions assigned. The survey summary should be presented to the facility management quarterly.

Survey results and data summaries should be made available to the ALARA team chair periodically and should be used:

-- To provide a basis for evaluating potential worker exposure on a job and in ALARA preplanning.

-- to provide a baseline for trend analysis, investigation, and correction of unusual conditions.

-- to track the status of jobs (including identification of good practices) and to detect departures from good operating procedures and/or the failure of radiation controls.

-- to identify the origin of radiation exposures in the plant by location, system, or component.

Health physics personnel should post the results of radiation surveys or survey maps at the entrance to all permanent radiation areas, high radiation areas, and very high radiation areas. The results should be posted in the form of a survey map so that personnel can be aware of the locations of higher and lower levels of radiation within the area.

A survey data trending program should be conducted; to indicate the continuing effectiveness of existing control; to warn of deterioration of control equipment or effectiveness of operating procedures; to show long-term variations in radiation levels; and to identify and correct improper radiation work practices.

Health physics should perform trend analyses on all permanent radiation, high radiation, and very high radiation areas. At a minimum, one complete survey record should be evaluated and included in the trend analysis program for each survey required to be performed by the facility routine control program.

Health physics should use the facility reporting system to identify discrepancies and abnormal trends and should summarize the data review results in their monthly reports to the Radiological Protection Manager.

Survey data trends should be investigated when either:

-- an upward trend in general area radiation level occurs, causing a significant increase.

-- an abrupt change in radiation level occurs that cannot be directly correlated to normal activities.

### 3.2.2.4    Facility Posting and Labeling

Areas in plutonium facilities shall be posted in accordance with the requirements in 10 CFR 835 (DOE, 2011). Chapter 12 of Implementation Guide G 441.1-1C, Ch. 1 (DOE, 2011a) provides guidance to ensure compliance. The technical criteria and dose rate and/or levels for defining radiation, high radiation, very high radiation, contamination, high contamination, and airborne radioactivity areas are established in 10 CFR 835. The health physics staff should identify:

-- Areas to be barricaded and marked to prevent personnel from inadvertently entering them.

-- Areas to be physically controlled per 10 CFR 835, Subpart F.

Entrance to radiological areas shall be controlled (10 CFR 835.501(a and b)) commensurate with the existing and potential radiological hazard within the area.

The health physics staff should post current radiation surveys of radiation areas at the health physics access control point for use in prejob planning. Airborne Radioactivity Areas shall be posted with the words, "Caution, Airborne Radioactivity Area" or "Danger, Airborne Radioactivity Area" when the airborne radioactivity levels in the occupied area exceed, or are likely to exceed, the derived air concentration (DAC) value listed in Appendix A or Appendix C of 10 CFR 835 or where an individual could receive 12 DAC hours in a week (10 CFR 835.603(d)). These areas are posted to alert personnel of possible respiratory protection requirements.

### 3.2.2.5    Unposted Areas

Certain areas of facilities that handle radioactive materials should be maintained free of detectable radioactive contamination. These areas should also be maintained at ambient radiation levels equivalent to the environmental background of the facility. Parts of the facility that should meet these requirements include lunchrooms, offices, restrooms, janitor rooms, corridors outside operational areas, foyers, and outside areas surrounding the facility, including the building roofs.

DOE-STD-1128-2013

To assure these areas meet the requirements of radiological cleanliness, they should be surveyed with count-rate instruments sensitive to the radioactive isotopes of interest. In a plutonium facility, the instruments should meet the requirements listed in ANSI Standard N317-1991, Performance Criteria for Instrumentation Used for In-Plant Plutonium Monitoring (ANSI, 1980a). These clean areas should be maintained below the surface contamination levels cited in 10 CFR 835 (DOE, 2011).

### 3.2.3  Visitors

Regardless of the general radiation safety knowledge of visitors to a plutonium facility, they should be escorted at all times when they go into the posted areas of the plant. In addition, before going into such an area, they should be given a general orientation to the facility radiation protection program and informed about the potential radiation conditions in the areas where they will be going. They also should be provided with the same protective devices worn by facility personnel engaged in similar activities.

Visitors with a demonstrated need to enter the following areas may be allowed access if such access is controlled with a combination of training and the use of escorts trained for the specific area:

--  Radiological Buffer Areas
--  Radiation and High Radiation Areas
--  Contamination Areas
--  Radioactive Material Areas

Guidance for training for visitors is provided in the standard, Radiological Control, (DOE, 2017), Article 622:

--  Persons under 18 years of age should not be permitted to enter Radiation Areas or Contamination Areas without the approval of the Radiological Protection Manager.

--  Area entry requirements and access restrictions for visitors should be in accordance with established facility procedures.

--  Individuals, visitors included, shall (10 CFR 835.502(b)) be prevented from entering Very High Radiation Areas when dose rates are in excess of the posting requirements of 10 CFR 835.603(c), and visitors should be prohibited from accessing High Contamination and Airborne Radioactivity Areas.

In addition the following is recommended:

All facility personnel serving as a qualified escort should ensure that each visitor under his/her cognizance completes a facility radiological visitor form. The qualified escort should also sign the visitor form and complete it as appropriate.

DOE-STD-1128-2013

Facility-sponsored visitors should provide the following before entering radiological areas, unless these records have already been entered into the facility entry control system:

-- Evidence of completing required training, as applicable.

-- visitor radiation exposure disclosure.

The host facility manager should forward the visitor radiation exposure and medical disclosure forms to Dosimetry.

The use of offsite respirator fit test certification may be authorized (if in accordance with the applicable Radiation Protection Program) under the following conditions:

-- A respirator fit test has been completed within the previous year.

-- The individual presenting the respirator fit test certification card has not changed physical appearance in a way that would affect the seal of the respirator facepiece to the face.

-- The facility has the respirator facepieces available that the individual is certified to wear.

### 3.2.4    Visits by Regulatory Personnel

Periodically, personnel from the DOE and other Federal and state agencies visit radiation facilities for audit purposes or to discuss regulatory changes. In most cases, they will want to look at records of the radiation protection program and, in some cases, will also want to enter posted areas of the facility. They should have ready access to the facility provided that dosimetry and other requirements are met. They should have complete access to facility personnel knowledgeable in the subjects they wish to discuss.

### 3.2.5    Onsite Packaging and Transportation

DOE Order 460.1D (DOE, 2016d) establishes safety requirements for the proper packaging and transportation of DOE, including NNSA, offsite shipments and onsite transfers of radioactive and other hazardous materials and for modal transportation. DOE M 441.1-1, Nuclear Material Packaging Manual (DOE, 2008e) and DOE-STD-3013-2018, Stabilization, Packaging, and Storage of Plutonium-Bearing Materials (DOE, 2018b), also provide information on packaging plutonium material

**3.3      RADIOLOGICAL CONTROL ORGANIZATIONS**

The radiological control organization shall be structured so that all of the activities required to provide support to line management and workers can be accomplished.

### 3.3.1   Management Commitment

Management commitment to safety is the most important characteristic of an effective safety program, including a radiological control program. If the management commitment to safety is strong, the radiological control program will be valued and respected. The radiological control program should be provided adequate authority to permit performance of necessary assignments and program implementation. Management commitment to the ALARA concept is particularly important [see Article 111, Radiological Control (DOE, 2017)]. Adequate personnel, equipment, and funding should be available as a part of this commitment.

### 3.3.2   Radiological Control Organization Independence and Reporting Level

The radiological control organization should be independent of the line organization responsible for production, operation, or research activities and should have an equivalent reporting level. Because health physics personnel should have the authority to balance operations with safety, they should not report directly to the administrators of operations. When shift work is involved, the operations shift supervisor may make minor health physics decisions in support of the shift's Radiological Control Technicians (RCTs); however, decisions involving basic policies and procedures should be directed to a separate health physics organization.

If a safety organization includes the health physics program, it should be high enough in the company to assure direct access to the company president or equivalent. If the health physics program is administered by a separate radiological control organization, that organization should also be in a position to assure direct access to the company president. This is to safeguard the program from the pressures of production that exist in the operational environment, by keeping it independent of operating organizations.

A system of guides, policies, and procedures should be established to clearly identify the interrelationships, responsibilities, and authorities of those involved with the development, operation, and maintenance of the facility and the health and safety of the employees. These guides, policies, and procedures should be documented and should be reviewed at least once every year.

### 3.3.3   Adequacy of Personnel and Equipment

A sufficient number of qualified and, where required, certified radiological control personnel should be available to perform necessary tasks for support of plutonium facility startup and operation (See Section 3.4 for guidance concerning staffing and staff qualifications). Sufficient equipment, including protective clothing, respiratory protective equipment, and radiation detection instrumentation should be

available to support RCTs and operating personnel in the performance of work in controlled areas.

### 3.3.4    Assignment of ALARA Responsibility and Authority

Limiting radiation exposures to the lowest levels commensurate with the benefit of the work to be accomplished has long been a part of health physics and radiological protection programs of DOE and its contractors. 10 CFR 835 (DOE, 2011) establishes the policy of maintaining ALARA exposures of workers and the public to radiation from DOE operations. Procedures are required to be prepared (10 CFR 835.104) and implemented and records shall be maintained as required by 10 CFR 835.701 to demonstrate the implementation of ALARA. The DOE standard, Radiological Control (DOE, 2017), provides additional guidance. Munson et al. (1988) and Chapter 4 of Implementation Guide G 441.1-1C, Ch. 1 (DOE, 2011a), may be used in developing an ALARA program.

An ALARA committee should be established at the plutonium facility. The membership should include managers and workers from the line, the technical support organization, and the radiological control organization. A line manager, such as Director of Operations, Research, Training, or Maintenance should serve as the committee chair. The ALARA committee should make recommendations to management to improve progress toward minimizing radiation exposure and radiological releases (DOE, 2017).

## 3.4    STAFFING AND STAFF QUALIFICATIONS

A cadre of operating and maintenance personnel that has experience in the operation of a plutonium facility should be established during the construction of a new facility. The remainder of the operating and maintenance staff should be hired as soon as possible and should receive formal and informal training from the experienced personnel. This step is extremely important to enable all personnel to grow with the facility and learn the details of the operations. Once operations start, potential problems already should have been identified and engineering or administrative changes should have been made to resolve them.

Staffing in the radiological control organization requires technicians and professionals in many support areas. A successful health physics program is highly dependent on the availability of adequate staff support in areas such as environmental monitoring, instrument maintenance and calibration, internal and external dosimetry, meteorology, safety analysis, and risk management.

### 3.4.1    Professional Staffing and Qualifications

The senior staff of the radiological control organization should include health physicists and other professionals with four-year degrees in science or engineering. A continuing training program should be established for facility personnel. Pursuit of certification by the American Board of Health Physics for senior and professional staff members is encouraged (DOE, 2017).

At least one professional staff member at the plutonium facility should have a minimum of three years of health physics experience in the operation of plutonium facilities.

### 3.4.2    Technician Staffing and Qualifications

Recommendations for minimum entry-level requirements for RCTs are given in the DOE standard, Radiological Control (DOE, 2017), and DOE STD-1122-99, Radiological Control Technician Training, (DOE, 2009a). They include a high school education or equivalency and knowledge of certain scientific fundamentals. If a two-year degree in nuclear technology or an equivalent discipline is locally available, completion of such a program should be encouraged.

Where possible, RCTs and other members of the health physics staff should have a minimum of one year's experience working at a plutonium facility. Such experience is an important prerequisite to allowing them to work unsupervised. Personnel hired without such experience should work an internship of six months under the leadership of a qualified RCT or supervisor with experience in that facility.

The RCTs should be encouraged to pursue registration by the National Registry of Radiation Protection Technologists.

### 3.4.3    Staffing Levels

At least one professional health physicist is recommended to be on the staff of each major plutonium facility as a full-time employee.

There is no rule of thumb for determining the number of RCTs needed for a given plutonium facility. The number of RCTs should be based on an analysis that provides for sufficient coverage on each shift, given the number of samples, surveys, and other work to be performed; the time of training, donning and doffing protective clothing; shift turnover procedures; and other similar considerations. The site collective dose and individual dose limits in the facility may also lead to the need for additional personnel. Consideration should be given to having sufficient personnel to respond to off-normal conditions and emergencies as well as routine work. Major maintenance, modifications, or decommissioning activities may require additional personnel.

## 3.5    INSTRUMENTATION CONSIDERATIONS

The radiation from the radioactive decay of plutonium includes alpha, beta, gamma, X-ray (photons), and neutron radiation. An effective monitoring program for plutonium requires radiation detection instruments that are responsive to all of these forms of radiation. It is essential that instruments meet the performance criteria outlined in the applicable U.S. and international standards and be properly calibrated for their intended use.

### 3.5.1        Types of Instruments and Measurements

Alpha-sensitive instruments are necessary for most contamination control surveys. Exposure rate surveys are normally conducted with photon-sensitive instruments with known energy responses. Neutron surveys become important when processing tens of grams of $^{238}$Pu or hundreds of grams of mixed isotopes of plutonium, particularly compounds (i.e., $PuO_2$, $PuF_4$, etc.). The neutron survey is important in instances where photon shields, such as leaded glass, are used; such shields normally stop all of the charged particles, most of the low-energy photons, and essentially none of the neutrons. Under these circumstances, neutron radiation is likely to be the major contributor to whole body dose. See the 10 CFR 835 Implementation Guide G 441.1-1C, Ch. 1(DOE, 2011a) for a discussion of acceptable approaches for evaluating neutron radiation levels using the radiation weighting factors from the 2007 amendment to 10 CFR 835 (DOE, 2011).

Continuous air monitors (CAMs) are used extensively in plutonium facilities. Continuous air monitors and sample extraction lines that go to CAMs and continuous radiation dose monitors should be placed outside the glove boxes and hoods. In-line processing instrumentation is critical to accurately monitor the work stations and a review should be performed to determine instrument locations. Continuous air monitors may not have adequate detection capabilities for real-time monitoring at the DAC level. For $^{239}$Pu, the annual limit on intake (ALI) is 12 nCi for absorption type M compounds based on the DAC of 5 x $10^{-12}$ µCi/mL, as given in Appendix A to 10 CFR Part 835 (DOE, 2011). DOE G 441.1-1C, Ch. 1 recommends that real-time air monitors be capable of measuring 1 DAC when averaged over 8 hours (8 DAC-hours) under laboratory conditions. Alarm set points for real-time air monitors used for routine monitoring should be set at the lowest practical level so as to accurately indicate loss of containment or the need for corrective action without causing a significant number of false alarms. When monitoring for alpha emitters in areas with high radon concentrations an alarm set point greater than 8 DAC-hours may be necessary.

Continuous air monitors (CAMs) typically have had poor large-particle response due to particle loss during transport to the filter inside the system. Newer alpha air monitors are able to handle large particles more efficiently. Background levels of radon-thoron decay products may be present in concentrations up to 50 to 100 times greater than the level of plutonium of interest. If calibrated properly, alpha CAMs will subtract background levels of radon-thoron decay products; however, in practice the detection limit for plutonium may be as high as 40 DAC-h in the presence of high radon levels. A new generation of alpha CAMs is able to compensate for radon more effectively and meet the desired 8 DAC-h alarm level.

Transuranic aerosol measurement units have been developed and adapted to be used in the workplace. These units avoid preferential plate-out of larger particles by using an in-line filter. Higher flow rates than those normally used with CAMs may be used. Increased detection is obtained on a quasi-real-time basis by high-volume air sampling and counting in a separate vacuum chamber. Detection levels of less than 0.5 DAC-h have been quoted for these units. It has been demonstrated that high-volume impact samplers used at some facilities have demonstrated detection capabilities of 0.1 DAC-h in the laboratory and 1 DAC-h in the field. Other monitoring systems that use diffusion, impaction, or electronic discrimination to

reduce the effect of background resulting in an increased detection capability have also been used and are being improved upon. However, it is suggested that site-specific testing be performed on any new equipment to ensure compatibility and verify expected performance. See the <u>Health Physics Manual of Good Practices for the Prompt Detection of Airborne Plutonium in the Workplace</u> (Mishima et al., 1988) for additional information on the selection, placement, and operation of plutonium air monitors.

### 3.5.2    General Performance Criteria for Instruments

Programs for in-plant monitoring of plutonium consist mainly of airborne and surface contamination surveys and dose rate surveys. The general and specific performance criteria for the instrumentation needed to conduct these programs are described in ANSI N317-1991 (ANSI, 1980a). Performance specifications are also given in ANSI N323 (ANSI, 1997b), ANSI N42.17A (ANSI, 2003), and ANSI N42.17C-1989 (ANSI, 1987b) for portable health physics instrumentation and IEC Publication 60325:2002 (IEC, 2002) for alpha and beta contamination meters and monitors. Criteria for air monitoring instrumentation are contained in ANSI N13.1 (ANSI, 2011a), IEC Publication 761-2 and draft IEC Publication 761-6 (IEC, 1983), and ANSI N42.17B-1989 (ANSI, 1987a). Criticality alarm systems are discussed in ANSI/ANS 8.3-1986 (ANSI, 1997c). The criteria discussed in the following subsections are specified in these standards as referenced.

#### 3.5.2.1    Portable Survey Instruments

ANSI N317 (ANSI, 1980a) discusses several criteria related to the performance of portable survey instruments; these include the following requirements:

--    The overall accuracy shall be within ±20%, and the precision shall be within ±10% at the 95% confidence level.

--    The response time (i.e., the time for the instrument reading to go from zero to 90% of full scale) shall be < 10 seconds on the most sensitive scale and < 2 seconds at readings of 100 mrem/h, 100 mR/h, and 500 dpm or greater. (This criterion is unrealistic with current neutron instrument capabilities. Response time is typically 30 to 60 seconds.)

--    The instrument shall be able to maintain accuracy and precision for a minimum of 24 hours of continuous operation.

--    The instrument shall have a minimum battery lifetime of 200 hours of continuous operation.

ANSI N42.17A (ANSI, 1988a) specifications differ slightly.

--    The response of the instrument shall not change by more than ±15% from a reference value taken at 20°C over the anticipated temperature range for operation.

-- The instrument system shall function within specifications over all anticipated combinations of temperature and humidity (e.g., 15° to 65°C, 40% to 95% relative humidity).

**Photon survey instruments** should meet the accuracy requirements stated in ANSI N317 (ANSI, 1980a) over the energy range of 0.01 to 1.25 MeV. The angular response of this type of instrument should be within ±15% over a 2 π steradian frontal direction using at least two photon sources with energies ranging from 0.06 to 1.25 MeV. Experience has shown that this response specification is not met by most instruments at lower energies due to attenuation of the photon. The energy dependence should be within ±15% over the range of very low energy to 1.25 MeV and the operating range should be from 0.5 mR/h to at least 5000 mR/h.

Experience has shown that ±20% over very low energy to 1.25 MeV is more realistic. This specification applies to a specific window selection (e.g., below 0.05 MeV, the electron equilibrium cap or beta shield shall be removed).

ANSI N42.17A (ANSI, 2003) has a broader scope than ANSI N317 (ANSI, 1980a) but the criteria in it apply to portable survey instruments. Additional criteria include geotropism (maximum change of 6% from reference reading for all orientations), temperature shock (a critical parameter for instruments stored inside, but used outdoors during very cold or hot periods), mechanical shock, vibration, and ambient pressure (maximum change of 15% from reference reading for the latter four criteria). Some differences exist between ANSI N42.17A and ANSI N317. In most cases, the criteria for ANSI N42.17A are more applicable because these criteria are based on substantial testing, which was sponsored by DOE. In ANSI N42.17A, precision is tied into a measurement level; for example, it quotes a precision of 15% at <500 cpm and 10% at >500 cpm. Also, with the advent of liquid crystal displays and other digital readouts, "response time" is defined as the time it takes for the reading to move from 10% to 90% of the equilibrium or steady-state reading. Another significant difference in the standard is that the battery lifetime specification is 100 hours instead of the 200 hours mentioned in ANSI N317.

For direct alpha contamination surveys, the use of audible signals (headphones or speaker) greatly facilitates the detection of "hot spots."

IEC Publication 325 (IEC, 1981) provides additional guidance on the uniformity of probe response for alpha and beta contamination meters. Surface sensitivity measurements are also discussed in this standard.

**3.5.2.2    Performance Criteria for Fixed Monitoring Instruments**

Airborne contamination monitors, surface contamination monitors, photon and neutron area monitors, and emergency instrumentation are

fixed monitoring instruments subject to the following standard performance criteria.

**Airborne Contamination Monitors**. Airborne contamination monitors, normally CAMS (see Section 3.5.1), should meet the following criteria according to ANSI N317 (ANSI, 1980a). The primary purpose of any CAM is to detect the presence of airborne radioactivity and activate an alarm to warn personnel in the area so that actions can be taken to minimize personnel exposures. The goal for any CAM should be to perform this function as quickly as possible and at the lowest detectable level of radioactive airborne concentration. The quantity of airborne radioactivity that will result in an alarm within a given time interval is defined in units of DAC-h for a particular radionuclide and is a function of the nuclide's airborne concentration in DACs, the sampling rate, the lower limit of detection of the instrument, and the time needed for the alarm to occur. Mishima et al. (1988) provides guidance on each of these functions.

The minimum detection level of $^{239}$Pu, in terms of derived air concentration (DAC), should be 8 DAC-h at the point of sampling in the presence of nominal amounts of naturally occurring alpha-emitters such as radon and thoron and their decay products. (No guidance is provided on what a "nominal" amount is, however.) The operating range should be at least 100 minimum detection levels (i.e., up to 800 DAC-h for $^{239}$Pu). Instrument error should not exceed ±20% of the reading over the upper 80% of the operating range. The reproducibility of the system for any given measurement should be within ±10% at the 95% confidence level for a mid-scale or mid-decade reading. The instrument should be capable of operating with less than a 5% change in calibration over the ambient temperature range expected. The instrument should be equipped with an adjustable alarm set point (audible and visible alarms) that can be set at any point over the stated range. The air flow rate should be indicated and adjustable. Voltage and frequency variations of ±15% within design values should result in reading variations of no greater than 5% at the minimum detection level.

ANSI N42.17B (ANSI, 1987a) provides additional performance criteria for air monitors used to detect plutonium. This standard provides specifications for general criteria (sampler design, units of readout, alarm threshold, etc.), electronic criteria (alarms, stability, response time, coefficient of variation, and line noise susceptibility), radiation response, interfering responses (radiofrequency, microwave, electrostatic, and magnetic fields), environmental criteria (temperature, humidity, and pressure), and air-circuit criteria. More detailed specifications are provided in ANSI N42.17B than in ANSI N317 (ANSI, 1980a); however, the environmental criteria and the limits of variation are not as restrictive as those in ANSI N317. With respect to accuracy, ANSI N317 requires less than ±20%, and ANSI N42.17B requires 40% at the 95% confidence level. For the environmental criteria, ANSI N317 requires that the readings change less than 5% under ambient conditions, while ANSI N42.17B gives a 15% limit of variation. As discussed previously,

criteria from ANSI N42.17B are more applicable because they are supported by instrument testing.

ANSI N13.1 (ANSI, 2011a) provides detailed guidance on sampling methods. One criterion that relates to CAMs is that air sample lines between air inlet and filter media are to be eliminated where possible; where not possible, they are to be designed to meet the sampling criteria contained in the standard (e.g., short lines, proper sampling rate, smooth bends). The use of Tygon tubing as sample lines before the collection filter should be minimized or eliminated. Air in-leakage from surrounding areas can be a problem when using sampling lines. Testing for air in-leakage shall be performed at least annually or when seals or "O" rings are replaced.

**Surface Contamination Monitors**. Surface contamination monitors include hand and/or shoe counters and instruments (or probes) with sufficient flexibility to survey pieces of equipment, including exterior clothing. ANSI N317 (ANSI, 1980a) states that these instruments shall have an audible alarm, a frequency that is proportional to the count rate, or a preselectable trip setting, and that upon reaching that level shall activate an audible or visible alarm or both. These instruments should be calibrated according to the requirements in ANSI N323 (ANSI, 1997b) and be equipped with a traceable check source. Fixed instruments should be powered by alternating current (AC) and provided with an emergency power source.

**Photon and Neutron Area Monitors**. Photon and neutron area monitors measure the intensity of photon and neutron radiation in areas where significant quantities of plutonium are stored and/or handled. ANSI N317 (ANSI, 1980a) states that these monitors shall have a preselectable trip setting with audible annunciators, shall provide electronic signals for remote alarms if they are used as alarming devices, and shall be equipped with a visual meter or digital readout. All neutron and photon area monitors should be AC-powered and all critical monitors should be provided with an emergency power source. Many of the requirements that apply to portable survey instruments, as stated in ANSI N317 may also apply to this type of instrumentation. Calibrations should be performed according to the requirements in ANSI N323 (ANSI, 1997b).

### 3.5.2.3    Performance Criteria for Emergency Instrumentation

Meeting the criteria for criticality accident alarm systems, fixed nuclear accident dosimeters, and other emergency instrumentation is essential.

**Criticality Alarm Systems**. ANSI/ANS 8.3 (ANSI, 1997c) discusses the performance and design criteria for criticality accident alarm systems. The criteria include the following:

--    Criticality alarm systems shall be designed to detect immediately the minimum accident of concern; the minimum accident may be assumed to deliver the equivalent of an absorbed dose in free air of

20 rad at a distance of 2 meters from the reacting material within 60 seconds.

-- Systems shall be designed so that instrument response and alarm latching shall occur as a result of radiation transients of 1-millisecond duration. The alarm signal shall be for evacuation purposes only and of sufficient volume and coverage to be heard in all areas that are to be evacuated. Very high audio background noise in some areas may require that the alarm be supplemented with visual signals; however, high background noise is a dangerous situation that should be prevented by design. Instrument response to radiation shall be calibrated periodically to confirm the continuing performance of the instrument. The calibration interval may be determined on the basis of experience but shall be no less frequent than annually. Tests should be performed at least monthly and the results of testing should be documented.

The standard does not quantify criteria for reliability or the rejection of false alarms. Consideration should be given to the avoidance of false alarms as accomplished by providing reliable single detector channels or by requiring concurrent response of two or more detectors to initiate the alarm. (ANSI 1986a).

**Fixed Nuclear Accident Dosimeters**. All DOE facilities that have sufficient quantities and kinds of fissile material to potentially constitute a critical mass, such that the excessive exposure of personnel to radiation from a nuclear accident is possible, shall provide nuclear accident dosimetry for those personnel (10 CFR 835.1304). Requirements for fixed nuclear accident dosimeters are found in DOE Order 420.1C (DOE, 2012b).

**Effluent Monitors**. Facilities that deal with unencapsulated plutonium should have continuously operating effluent monitors to determine whether or not plutonium is being released to the environment. Effluent monitor criteria is found in IEC Publications 761-1 and 761-6 (IEC, 1983) and ANSI N42.18 (ANSI, 2004) and should be performed. Similar to airborne contamination monitors, effluent monitors should be tested for air in-leakage at least annually or when seals or "O" rings are replaced.

**Other Emergency Instrumentation**. Other emergency instrumentation should provide ranges for all radiation dose rates and contamination levels potentially encountered at the time of an accident. Normally, dose rate capabilities from a few millirem per hour to a few hundred rem per hour should be required. Performance specifications for emergency radiological monitoring instrumentation can be found in ANSI N320-1979 (ANSI, 1975) and BNWL-1742 (Andersen et al., 1974).

### 3.5.3    Instrument Calibrations and Testing

Radiation doses and energies in the work areas should be well characterized. Calibration of instruments should be conducted where possible under conditions and with radiation energies similar to those encountered at the work stations. Knowledge of the work area radiation spectra and instrument energy response should permit the application of correction factors when it is not possible to calibrate with a source that has the same energy spectrum. All calibration sources should be traceable to recognized national standards, such as NIST. Neutron energy spectral information is considered particularly important because neutron instruments and dosimetry are highly energy-dependent.

When the work areas have been well characterized, the calibration facility used by the plutonium plant should be set up to represent as closely as possible the work area's radiation fields. Californium-252 or PuBe calibration sources should be used for work areas that process plutonium metal and plutonium oxide because their neutron energy distribution is similar to those compounds. Facilities that process $PuF_4$ should use a $PuF_4$ source. Most work areas at processing plants are high-scatter areas and thus have significant quantities of low-energy neutrons. Because it may not be feasible to have sources and scatter geometries representative of all work locations at the facility, it should be important to determine specific spectra and correction factors for work locations to correct for the calibration. Scatter conditions should be taken into account when setting up a calibration facility. The effect of room scatter in a neutron calibration facility can be significant and may account for as much as 20% of the measured dose rate. Modeling, such as a Monte Carlo N-Particle (MCNP) code, should be used to correct for room scatter.

ANSI N323 (ANSI, 1997b) provides requirements on the calibration of portable instruments and periodic performance testing (e.g. source response checking) of instruments. Section 9.4 of G 441.1-1C, Ch. 1(DOE, 2011a) has additional guidance on this topic.

The reproducibility of the instrument readings should be known prior to making calibration adjustments. This is particularly important if the instrument has failed to pass a periodic performance test (i.e., the instrument response varies by more than $\pm 20\%$ from a set of reference readings using a check source) or if the instrument has been repaired. The effect of energy dependence, temperature, humidity, ambient pressure, and source-to-detector geometry should be known when performing the primary calibration. Primary calibration should be performed at least annually.

Standards referenced in Section 3.5.2 discuss specific performance testing of radiation detection instruments. Testing procedures in these standards should be used for periodic requalification of instruments or detailed testing of instruments.

The calibration of photon monitoring instruments over the energy range from a few keV to 300 keV is best accomplished with an x-ray machine and appropriate filters that provide known x-ray spectra from a few kiloelectron volts to approximately 300 keV. Radionuclide sources should be used for higher energies. Most ion chambers used to measure photon radiations have a relatively flat energy response

above 80 to 100 keV; $^{137}$Cs or $^{60}$Co are typically used to calibrate these instruments. These sources also may be used to calibrate Geiger-Mueller (GM) type detectors used for dose rate measurements. It should be noted that some GM detectors (e.g., those with no energy compensation) can show a large energy dependence, especially below approximately 200 keV. GM detectors should not be used if not energy compensated.

The calibration of alpha-detection instruments normally should be performed with $^{239}$Pu, $^{241}$Am, or $^{230}$Th sources. Several sources of different activities should be used to calibrate different ranges.

Whenever possible, beta detectors should be calibrated to the beta energies of interest in the workplace. A natural or depleted uranium slab source can be used for calibration of beta detectors when beta radiations in the workplace have energies similar to the uranium. The energy dependence of beta detectors can be tested using the calibration sources listed in the International Organization for Standardization (ISO) Publication 1980 (1984); such as $^{90}$Sr.

The calibration and testing of crucial monitoring systems are extremely important to the overall radiation protection program but have often been neglected. Effluent monitoring and sampling systems and remote area monitoring systems should be given several tests. The radiological, environmental, and mechanical characteristics of the instrumentation portion of the system should be fully evaluated prior to its first use to ensure its compatibility with performance requirements and facility operating conditions. The effluent sampling losses from the sample probe to the collector/detector should be determined. This test should be repeated at least annually and when a significant change in the sampling equipment is made. The sample probe should be examined at least once a year to verify that its design or performance has not been changed by corrosion. The recorder of the sample flow rate should be calibrated when it is installed and annually thereafter. The operability of the overall system should be completely tested once, with repeat tests only after modification, repair, or maintenance. Operability checks should be scheduled at least monthly and calibration performed at least annually.

The operation of criticality or other radiation alarm signal systems should be checked periodically to ensure that the alarms are audible at all potentially occupied locations. To prevent any desensitizing of staff, the staff should be aware that the tests will be performed, and where possible, tests should be scheduled during off-shift hours. Building systems should be tested semiannually and the area-wide system should be tested at least annually. Any portion of the detector/alarm system that is affected by the test should be reconfirmed for operability after the test is completed (e.g., if a detector is disconnected and a signal is injected at that point, the detector should be tested immediately after it has been reconnected).

## 3.6    RADIATION SAFETY TRAINING

A thorough radiation protection training program should be established at plutonium facilities. Separate training programs should be established for general employees, radiation workers, and RCTs. The training of all staff members should be carefully documented. The DOE standard, Radiological Control (DOE, 2017), and DOE standardized training programs (DOE, 2007b and DOE, 2008) provide guidance on information to be presented during the training programs.

The frequency requirements for Radiation Safety Training are specified in 10 CFR 835.901. Refresher training in the alternate year when retraining is not performed is recommended. Individuals who work with plutonium should have special plutonium facilities training, such as DOE HDBK-1145-2008 Radiological Safety Training for Plutonium Facilities (DOE, 2008c) in addition to Radiological Worker Training, (DOE, 2008).

Training requirements shall ensure that personnel have the training to work safely in and around radiological areas and to maintain their individual radiation exposure and the radiation exposures of others ALARA.

### 3.6.1    Radiological Worker Training

Before working in plutonium operations, all radiological workers shall be trained and qualified according to 10 CFR 835.901. A thorough radiation protection training program should be established at plutonium facilities. Before beginning plutonium training, each plutonium worker should receive Radiological Worker Training and other radiation safety topics as required by 10 CFR 835.901(a).

The level of radiation worker training should be determined in accordance with the standard, Radiological Control, Table 6.1 (DOE, 2017). All training should be in accordance with Radiological Worker Training, (DOE, 2008) and implemented by the guidance of Chapter 14 of Implementation Guide G 441.1-1C, Ch. 1(DOE, 2011a). All training dispositions and records shall be documented in accordance with 10 CFR 835.704 (DOE, 2011).

### 3.6.2    Radiological Control Technician Training

A thorough RCT training program should be established at plutonium facilities. Before plutonium operations begin, a trained and qualified staff of RCTs should be present. All RCT training should be accomplished in accordance with DOE HDBK-1122-99 (DOE, 2009a)

### 3.6.3     Training for Other Facility Personnel

Nonradiological workers in a plutonium facility should be given a general orientation on the radiation safety concerns for working with plutonium, the general protective measures used for work with plutonium, and the engineered safety features of the facility.

### 3.6.4    General Public Education

If there are members of the public who live or work near a plutonium facility, a plan for orientation of members of the public should be developed to inform them of facility activities. Such a plan should include information on the concerns that require protection of people from potential injuries by plutonium, the general protective measures used at the facility to confine it and keep it out of the public domain, and solicitation of information on the concerns of members of the local public about plutonium. To the extent possible, efforts should be made to allay those concerns. The information in the public education plan should also be provided to local news media.

### 3.6.5    Training Qualifications

All training instructors and materials should meet the requirements in DOE Order 426.2, (DOE, 2010a) and should meet the guidance in the standard, Radiological Control (DOE, 2017).

Each plutonium facility should develop performance-based training that reflects radiological conditions present at the facility. This training should be monitored to ensure that site specific, worker-performance-based measures, and practical factors are included in the plutonium training.

### 3.6.6    Health Physicist Training Involvement

Facility health physicists should have comprehensive knowledge of all of the material on plutonium radiation safety that is included in the training programs for radiation workers and RCTs.

## 3.7    RADIOLOGICAL RECORDS

The systematic generation and retention of records relating to the occupational radiation protection program are essential to describe the occupational radiation exposure received by workers and the conditions under which the exposures occurred. Such records have potential value for medical, epidemiological, and legal purposes.

Regulation 10 C FR 835 (DOE, 2011) establishes radiation protection program records requirements. The standard, Radiological Control (DOE, 2017), provides guidance for radiation protection program records.

10 CFR 835 Subpart H requires that records be maintained that document compliance with 10 CFR 835. Subpart H requires specific information on the following types of records:

--    Individual monitoring records
--    Monitoring and workplace records
--    Administrative Records

Most of the required radiological records have established retention periods. The retention periods are discussed in DOE Order 200.1A (DOE, 2008b). Individual records may be covered by the Privacy Act; the DOE has codified the Privacy Act in 10 CFR 1008, Records Maintained on Individuals (Privacy Act) (DOE, 2011i).

Detailed guidance on development and maintenance of a radiological exposure recordkeeping and reporting system can be found in Chapter 13 of Implementation Guide G 441.1-1C, Ch. 1(DOE, 2011a).

## 3.8    ALARA AND OPTIMIZATION

The policy of maintaining radiation exposures ALARA has existed in principle since the early 1940s. The evolution of ALARA into a formal program began in the early 1960s. It is well to remember that the ALARA approach was applied to radiation protection far earlier and is much more institutionalized than any comparable approach to other hazards.

Although there is, and has been since the 1940s, a series of official established dose limits, they do not represent ALARA. ALARA is a continuous process of controlling and managing radiation exposure to workers, the general public, and the environment. Although ALARA is based upon protection of people and the environment, the philosophy is also grounded on sound economic and operating principles. The responsibility for maintaining radiation exposures ALARA is not a unique responsibility of management or health physics personnel. It is a responsibility of everyone involved in managing, supervising, or performing radiation work. It is imperative to teach administrative personnel to support the principles and practice of ALARA, and to train all radiation workers to consider ALARA as they prepare for and perform their work.

10 CFR 835 Subpart K "Design and Control" contains specific requirements relating to ALARA considerations for facility design and modification. Also, DOE Order 458.1, Ch 3. "Radiation Protection of the Public and Environment" (DOE, 2011c) contains environmental ALARA requirements.

### 3.8.1    Current Status of ALARA Programs

Currently, it is common practice in a DOE facility to have a well-structured ALARA plan for the entire facility, with more detailed plans in the various buildings or functional subunits of the facility. There is ordinarily a facility coordinator who administers the overall ALARA plan and reports to top-level management of the facility. Coordinators for the various buildings or subunits of the facility receive guidance from the overall facility coordinator and report the results of their ALARA programs to that individual.

### 3.8.2    Achievement of Goals

The standard, <u>Radiological Control</u> (DOE, 2017), provides guidance to contractors (facility) to provide documentation of the ALARA process. To ensure improving radiological performance, at the beginning of each fiscal year, each facility prepares and submits Radiological Performance Goals. At least quarterly, the contractor (facility) provides the contractor senior site executive with an interim status report of the goals. At the end of the calendar year, an Annual Goal Status Report is issued.

Identifying specific ALARA goals in plutonium facilities requires close coordination between the facility ALARA team members (operations, maintenance, and health physics personnel) made up from a cross-section of personnel

DOE-STD-1128-2013

representing the various work elements of the facility. ALARA goals may be formulated as qualitative or quantitative types of goals, but shall be measurable and achievable, with clearly defined endpoints.

### 3.8.3  Quality Assurance

Important aspects of any ALARA program are the measurement of beneficial effects and the determination that important factors, such as economic impacts, the time involved in accomplishing tasks, and the utilization of personnel, are being optimized. To accomplish these objectives, it is necessary to have a written plan for the ALARA program and high quality records of activities involving exposures to workers, the public, and the environment. These permit comparisons with past experiences and analysis of the recorded activities. In many cases, such studies of the recorded activities not only confirm satisfactory execution of the work, but reveal opportunities for future improvements.

One approach which works very well is the inclusion of an ALARA worksheet along with the RWP. Such a worksheet should be prepared by an individual with responsibilities for the work to be performed, a relatively detailed knowledge of the radiological conditions, and knowledge of what is required to accomplish the task. The worksheet should contain estimates of the time to complete the task and the expected radiation doses that will be received. If any special engineered devices are used to control or reduce personnel exposure, they should be noted on the ALARA worksheet, along with any special instructions that they require. These worksheets provide valuable information for analysis of the effectiveness of the ALARA program for each job.

### 3.8.4  Technical Aspects

The technical aspects of ALARA programs include not only the standard equipment regularly used in controlling dose to workers, the public, and the environment, such as facility shielding, ventilation filters, installed and portable radiation measuring instruments, but also many special devices that may be used temporarily. Special devices can be used to provide exposure control and/or containment when it may not be practical without them. These include temporary shields, tents or greenhouses, portable fans, ductwork and filters, and special fixtures to hold highly radioactive materials requiring detailed inspections, repairs, modification, or fabrication. Such devices can permit doing difficult work at low radiation doses, which might not be possible otherwise.

Some of these special devices may have general application and can be kept on hand for use as needed. In some cases, devices would have to be especially fabricated for a specific task. Since this would ordinarily have a significant effect on the cost of doing that job, the economic aspects of doing or not doing the job would have to be carefully evaluated.

### 3.8.5  Attributes of Effective Review and Audit

Evaluation of the effectiveness of an ALARA program requires both reviews and auditing. The reviews will include detailed examination of the written ALARA program plan and the records of ALARA activities. The objectives in such reviews

DOE-STD-1128-2013

are to find if the written plan is being followed, and what is working or not working well. Such reviews can be performed adequately by either a knowledgeable member of the facility staff or an equally knowledgeable outsider. The written report of a review should be directed to a member of management who is responsible for implementation of the ALARA program.

Audits are best performed by an outside health physicist who is sufficiently knowledgeable about work with plutonium and its radiological characteristics that he/she knows where to look for problems and can make appropriate evaluations and recommendations. He should not only examine the ALARA program plan and records, but should also visit the working areas and laboratories in the facility, with a knowledgeable escort who can answer questions about activities and conditions in the facility.

There is nothing really unique in ALARA programs at plutonium facilities, compared with facilities handling other kinds of radioactive materials. However, the radioactivity of plutonium, its potential for criticality, and its relatively high radiotoxicity require somewhat more meticulous surveillance and control than many other radionuclides. Therefore, the detail in ALARA programs for plutonium facilities is likely to be somewhat greater than would be found in ALARA programs for many other facilities.

In any plutonium facility, it is highly desirable to have well-structured ALARA teams in each building or subunit of the facility. Facility goals should be developed by the facility ALARA teams. All facility-specific goals should be categorized using the facility-specified format and should include the following:

-- **Exposure Reduction**. Goals listed under exposure reduction may reflect occupational or nonoccupational exposure reduction. Exposure to radiological hazards or nonradiological hazards are relevant. Specific jobs for which exposure reduction plans have been developed should be covered in this section. Exposure may be reduced by reducing other hazards that contribute to the difficulty of performing work in radiological areas. For example, reducing noise, reducing heat stress conditions, or improving lighting may facilitate the completion and accuracy of work performed in radiological areas and, thus, reduce exposure. Such opportunities for exposure reduction should be carefully evaluated and appropriate ALARA goals established to make the most of these opportunities.

-- **Source Reduction**. Source reduction should concentrate on minimizing or eliminating the sources of radiation exposure. Reducing the number of areas with radiological contamination and reducing dose rate are examples of source-reduction goals. Where the presence of nonradiological hazardous materials results in mixed waste, the removal of the hazardous material may have ALARA benefits by reducing the waste classification. Such changes may also reduce exposure at a later time by eliminating the need to store or further treat the waste. In these cases, eliminating the hazardous material may be an appropriate source-reduction ALARA goal.

DOE-STD-1128-2013

-- **Administrative**. Administrative goals typically encompass training, program improvements, procedure revision, or other administrative-type activities. Administrative goals are generally qualitative, so it is difficult to develop endpoints for them. Specific efforts shall be made to ensure that adequate closure mechanisms exist for administrative goals.

During all phases of ALARA goal-setting, the facility health physics personnel should be intimately involved in providing advice and expertise on ALARA actions.

When addressing exposure reduction, a cost/benefit analysis should be made to determine the real cost of implementing a dose reduction plan. The Health Physics Manual of Good Practices for Reducing Exposures to Levels that are as Low as Reasonably Achievable (Munson et al., 1988), provides an excellent methodology for conducting a cost/benefit analysis by health physics personnel.

The application of ALARA principles to the performance of work in the field is the main objective of any ALARA program. ALARA design, engineering, planning, and administration come to fruition in maintaining exposures ALARA to workers and the public. The operational application of ALARA requires cooperation and coordination of many functional groups, including radiation protection, operations, maintenance, planning and scheduling, training, engineering, and administration.

The primary responsibility for controlling radiation exposure during operations rests with the individual and his/her immediate supervisor. The support functions provide the training, resources, guidance, and measurements, but it is in the application that the effectiveness of an ALARA program is realized. Operational measures for controlling exposure shall be applied to assure that any work with radioactive materials is carried out in the safest manner reasonable. Both engineered and administrative control measures should be used for limiting exposure.

Engineered controls should be utilized whenever possible. In addition, periodic verification of the continued effectiveness of these controls should be performed by facility health physics personnel. Ventilation and filtration systems should be routinely checked and inspected to assure that operation is maintained within the design criteria. The integrity of shielding, the reliability of equipment, and the calibration of instruments should likewise be routinely verified.

Although administrative controls are not an adequate substitute for engineered features, they are necessary. They are a part of the management systems developed and implemented to provide guidance, direction control, and limitations for activities. Administrative controls include the documents that describe organizational interfaces and prescribe controls for radiation protection. Administrative controls, especially procedures, should be reviewed by those responsible for ALARA to ensure that radiation exposure activities include dose limitation considerations.

Factors that shall always be considered in an ALARA program are the costs and benefits. This is especially important when the identified benefit represents a very

small increment of radiation dose reduction. Funds for dose reduction should always be applied to actions which will achieve the greatest dose reduction for the cost.

The final decontamination and decommissioning (D&D) of a plutonium facility should be given consideration in both the original design of the facility and any modifications done to the facility during its operating lifetime. Likewise, D&D should be given consideration in choosing operating processes and practices for the facility, including any changes in processes and practices during its operating lifetime. Both design and operating activities can affect the radiation levels and personnel doses encountered by workers who perform the D&D activities. To the extent practicable, design and operations should provide for radiation levels that are ALARA during D&D activities.

The successful implementation of an ALARA program requires the commitment, support, attention, and efforts of all members of an organization. In facilities in which the radiation exposures are already relatively low, implementation of the ALARA concept is particularly challenging. The reduction of radiation doses to ALARA levels demonstrates to workers and the public a continued emphasis, commitment, and concern for health and safety.

## 3.9    CONDUCT OF OPERATIONS

The organization and administration of operations should ensure that a high level of performance in DOE facility operations is achieved through effective implementation and control activities. Administration of operations activities should recognize that protection of the environment, maintaining high-quality safety, and productivity are compatible goals. The DOE policies should describe the standards of excellence under which the facility is expected to operate. Clear lines of responsibility for normal and emergency conditions shall be established. Effective implementation and control of operating activities are achieved primarily by having readily accessible written standards for operations, periodical monitoring and assessment of performance, and personnel accountability for performance. For a more detailed discussion, see DOE Order 422.1, Conduct of Operations (DOE, 2010b).

A high level of performance in DOE operations is accomplished by management establishing high operating standards and then by communicating the operating standards to workers:

--   By providing sufficient resources to the operations department

--   by ensuring that personnel are well trained by closely monitoring performance in operations

--   by holding workers and their supervisors accountable for their performance in conducting activities.

Senior management establishes operating standards, considering input from workers when appropriate. Working-level personnel will more strongly support the standards when they have had appropriate input into their development. The standards should define operating objectives, establish expected performance levels, and clearly define responsibilities in

plant operations. Standards for operating activities should be integrated into operations department procedures and programs. Operating standards should also be communicated to workers by training them in operating practices and by having supervisors monitor and guide work involving facility operations. Sufficient staff, facilities, equipment, and funding should be allocated to permit the operations department to effectively perform its functions. Performance in operations should be closely monitored by facility management, preferably using operating reports and goals, so that the performance of the operations department can be effectively measured. Operations personnel should be held accountable for their performance through supervisor counseling, performance appraisals, and, when necessary, disciplinary measures. Remedial training should be provided when appropriate.

The health physics organization, as a support element, shall ensure that all aspects of radiation safety are considered in the establishment of operations standards and policy. A well instituted cooperative relationship between operations and health physics is paramount to the health and safety of workers and the public and to protection of the environment.

A plutonium facility should have a written policy on radiation protection, including an ALARA policy. All radiation protection procedures and controls should have recognizable or formal technical bases for limits, methods, and personnel protection standards. Procedures should be adequately documented, updated periodically, and maintained in a centralized historical file. A control system should be established to assure that all copies are accounted for and that all new procedures are included in the historical files. A designated period of time for holding the historical files should be established. DOE Order 200.1A (DOE, 2008b) and ANSI/HPS N13.6 (ANSI, 2010) provide guidance on how long to keep historical files. In addition, radiation protection procedures should have a documented approval system and established intervals for review and/or revision. A tracking system should be developed to ensure that the required reviews and revisions occur.

The radiation protection procedure system should provide for but not be limited to, the following topics: radiation work procedures, posting and labeling, instrument calibration, and provision for audits.

### 3.9.1    Radiation Work Procedures

Radiation work procedures, including RWPs, survey procedures, ALARA reviews, sample counting, and other task procedures, fall within the requirements for conduct of operations. All sections of DOE Order 422.1 (DOE, 2010b) apply. The guidance and requirements of Section XVI, "Operations Procedures," is especially pertinent to radiation work procedures. Procedures are a key factor affecting radiation protection performance. Appropriate attention should be given to writing, reviewing, approving, and monitoring implementation of radiation protection procedures. There should be documented qualification and training requirements for those who prepare and approve procedures. A formal approval process should be established. Procedure changes and revisions should be subject to the same review and approval process as the initial procedure.

Personnel should be trained in the use of the procedures they will be expected to perform. For RWPs, workers should read the RWP and verify by signature that they have read it, understand its contents, and will comply with its requirements in the conduct of the work. Procedures should be available for personnel use. The

RWPs should be posted at the entrance to the work location. There should be a system in place to assure that posted copies of all work procedures, including RWPs, are current.

### 3.9.2    Posting and Labeling

The requirements for posting and labeling of working areas because of the presence, or potential presence, of radiation and/or radioactive material are specified in 10 CFR 835, Subpart G (DOE, 2011). Guidance in implementing the regulatory requirements can be found in Chapter 12 of Implementation Guide G 441.1-1C, Ch. 1(DOE, 2011a), and the standard, Radiological Control (DOE, 2017). Conformance of conduct of operations requirements should assure a reasonable degree of uniformity in the posting and the signs used, as well as verifying that operator aids and other posted information do not interfere with necessary radiological posting. It is necessary to formally review posting of radiological areas in the same manner that the posting of operating aids is reviewed, in conformance with DOE Order 422.1 (DOE, 2010b).

### 3.9.3    Calibration of Instruments

The status of installed and portable radiological instruments should be well known and appropriate to the use. (Calibration of radiological instruments is discussed in Section 3.5.2.)

"Ownership" of installed radiological dose rate and airborne contamination monitoring instrumentation should be well known and the responsibility and authority for calibration, repair, and notification clearly established. Because such information is often used by more than one group, formal notification procedures should be established to cover those times when the instrument is out of service or beyond the required calibration schedule. Configuration control and quality assurance requirements for installed systems should be established commensurate with their safety significance.

For portable instrumentation, conduct of operations requirements are normally built into the routine calibration and survey program. Functional checks are routinely made to verify calibration, instruments are checked to assure that they are within the calibration period, and survey procedures require identification of the instruments used so that if a problem is later found, measurements can be repeated.

### 3.9.4    Audits

Conduct of operations does not, in itself, contain requirements on auditing. Inspections, audits, reviews, investigations, and self-assessments are part of the checks and balances needed in an operating program. Auditing is one of the many tools that line management has at its disposal to identify problems. Regulation 10 CFR 835.102 requires internal audits of all functional elements of the radiation protection program no less frequently than every 3 years. These audits are to include program content and implementation. Each one of the 18 topics addressed in DOE Order 422.1 (DOE, 2010b) should be subject to both internal self-assessment and external auditing to assure effective implementation of their requirements. Any deficiencies identified should be documented and corrective

DOE-STD-1128-2013

actions aggressively pursued and tracked to completion. The self-assessment and audit process should include conducting trend analyses and root cause evaluations of deficiencies and communication of results throughout the organization.

### 3.9.5    Decommissioning of Weapons and Weapon Facilities

Decommissioning of nuclear weapons and nuclear facilities is subject to the same conduct of operations requirements as operating facilities. In general, some components, once they are separated, can be downgraded in safety significance. Also, facilities undergoing decommissioning will have fewer safety systems. During decommissioning, status control and shift turnover are extremely important considerations and shall be done in accordance with DOE Order 422.1 (DOE, 2010b). Posting and labeling of radiological areas are also an increasing challenge because of the rapidly changing radiological status. In extreme cases, it may be desirable to have workers review or sign the RWP each day to ensure they are aware of the status.

## 4.0    CONTAMINATION CONTROL

The primary control for contamination in a plutonium plant is the facility design. Contamination is confined primarily by enclosing the process areas and using controlled ventilation systems. The design objective for the confinement system is to essentially prevent or minimize exposure of plant personnel and the public to airborne contamination. To ensure that this objective is met, additional attention should be given to airborne contamination control, surface contamination control, and personnel contamination control. Radiological controls for the workplace should ensure that radionuclides are contained and handled properly and that intakes, if they occur at all, are negligible to the extent achievable with state-of-the-art technology. However, much of the current effort involves decommissioning of no-longer-needed production facilities. The lack of engineered controls or the systematic removal of existing controls during the decommissioning process introduces a completely different set of circumstances that requires special attention for adequate contamination control and worker and public protection.

## 4.1    AIRBORNE CONTAMINATION CONTROL

To achieve the design objective of preventing (or at least minimizing) internal exposure of plant personnel, airborne contamination shall be confined to process enclosures which have adequate air cleaning systems. Because both equipment and personnel errors can compromise designed protection and because older facilities may already have unconfined plutonium, air monitoring and other contamination control measures are needed. Experience has shown that the most common route for inadvertent plutonium deposition in man is by inhalation even though intakes may also occur by accidental ingestion or by wound contamination. In facilities being decommissioned, the use of temporary containment structures, interim ventilation systems, and administrative controls such as protective clothing and respirators may be required to replace engineered systems.

10 CFR 835.1002 requires that for the control of airborne radioactive material, the design objective shall be, under normal conditions, to avoid releases to the workplace atmosphere and in any situation, to control the inhalation of such material by workers to levels that are ALARA; confinement and ventilation shall normally be used.

Note: The use of ventilation systems may require the approval of Facility Criticality Safety personnel because these systems may concentrate fissionable material.

### 4.1.1  Internal Versus External Dose Philosophy

The overall goal of radiological protection is to minimize the total dose to the individual. However, because of the difficulties and cost of evaluating internal exposures to plutonium, it is best to avoid all internal exposures during routine operations and anticipated abnormal events by engineered controls and personnel protective equipment. As stated above, this is an extremely challenging goal for those facilities undergoing decontamination/decommissioning activities or facilities/sites in environmental remediation. The conditions encountered in decommissioning and environmental restoration will typically place a heavy reliance on administrative controls.

### 4.1.2   Purpose of Air Monitoring

Airborne contamination surveys are performed for the following reasons:

-- Prompt detection of airborne contaminants for worker protection.
-- Personnel exposure assessment.
-- Monitoring of trends within the workplace.
-- Special studies.

Of primary importance is the prompt detection of airborne contaminants. The rapid, early detection of airborne releases requires knowledge of the potential sources and characteristics of the airborne material, the locations of the personnel who are at risk, and the capabilities of the detection devices. Optimally, the samples should be taken between the source and the person to measure the potential airborne radioactivity exposure to the individual. With the numerous sources and mobility of the workers, accurate measurement of potential exposure to the individual using area air monitoring devices under all conditions is difficult, if not impossible, to achieve. To aid in early detection of unanticipated airborne radioactivity (e.g., as a result of an undetected pinhole leak in a containment glove), samples of airborne materials should be taken as close to their points of potential origin as practicable to maximize the probability of detection (airborne concentrations are at a maximum at their points of origin). To aid in monitoring of an individual's exposure to airborne radioactivity where area sampling is not representative of the individual's exposure, the use of lapel air samplers on the individual is recommended. Detailed guidance for the placement of air samplers and monitors, selection of system characteristics and requirements, and maintenance and calibration of the equipment is available in the Health Physics Manual of Good Practices for the Prompt Detection of Airborne Plutonium in the Workplace (Mishima et al., 1988) and Air Sampling in the Workplace (NRC, 1993).

### 4.1.3   Regulations and Limits

The regulations for control of radiation work are covered in 10 CFR 835 (DOE, 2011). Additional requirements and guidance for implementation is provided in the DOE standard, Radiological Control (DOE, 2017), and the Implementation Guide. While many of the topics included in the Implementation Guide relate to plutonium contamination control, specific guidance on contamination control has not been provided. The limits established for plutonium and other transuranic elements for contamination areas, high contamination areas, and airborne radioactivity areas are given in 10 CFR 835.603 and Appendix D of 10 CFR 835. The Appendix D values are summarized in Table 4.1.

DOE-STD-1128-2013

**Table 4.1 Surface Contamination Values**

| Radionuclide | Removable [2,4] | Total (Fixed + Removable) [2,3] |
|---|---|---|
| U-nat, U-235, U-238, and associated decay products | [7] 1,000 | [7] 5,000 |
| Transuranics, Ra-226, Ra-228, Th-230, Th-228, Pa-231, Ac-227, I-125, I-129 | 20 | 500 |
| Th-nat, Th-232, Sr-90, Ra-223, Ra-224, U-232, I-126, I-131, I-133 | 200 | 1,000 |
| Beta-gamma emitters (nuclides with decay modes other than alpha emission or spontaneous fission) except Sr-90 and others noted above[5] | 1,000 | 5,000 |
| Tritium and special tritium compounds[6] | 10,000 | See Footnote 6 |

[1] The values in this appendix, with the exception noted in footnote 5 below, apply to radioactive contamination deposited on, but not incorporated into the interior or matrix of, the contaminated item. Where surface contamination by both alpha and beta gamma-emitting nuclides exist, the limits established for alpha- and beta-gamma-emitting nuclides apply independently.

[2] As used in this table, dpm (disintegrations per minute) means the rate of emission by radioactive material as determined by correcting the counts per minute observed by an appropriate detector for background, efficiency, and geometric factors associated with the instrumentation.

[3] The levels may be averaged over one square meter provided the maximum surface activity in any area of 100 cm$^2$ is less than three times the value specified. For purposes of averaging, any square meter of surface shall be considered to be above the surface contamination value if: (1) from measurements of a representative number of sections it is determined that the average contamination level exceeds the applicable value; or (2) it is determined that the sum of the activity of all isolated spots or particles in any 100 cm$^2$ area exceeds three times the applicable value.

[4] The amount of removable radioactive material per 100 cm$^2$ of surface area should be determined by swiping the area with dry filter or soft absorbent paper, applying moderate pressure, and then assessing the amount of radioactive material on the swipe with an appropriate instrument of known efficiency. (Note - The use of dry material may not be appropriate for tritium.) When removable contamination on objects of surface area less than 100 cm$^2$ is determined, the activity per unit area shall be based on the actual area and the entire surface shall be wiped. It is not necessary to use swiping techniques to measure removable contamination levels if direct scan surveys indicate that the total residual surface contamination levels are within the limits for removable contamination.

[5] This category of radionuclides includes mixed fission products, including the Sr-90 which is present in them. It does not apply to Sr-90 which has been separated from the other fission products or mixtures where the Sr-90 has been enriched.

[6] Tritium contamination may diffuse into the volume or matrix of materials. Evaluation of surface contamination shall consider the extent to which such contamination may migrate to the surface in order to ensure the surface contamination value provided in this appendix is not exceeded. Once this contamination migrates to the surface, it may be removable, not fixed; therefore, a "Total" value does not apply. In certain cases, a "Total" value of 10,000 dpm/100 cm$^2$ may be applicable either to metals of the types from which insoluble special tritium compounds are formed, that have been exposed to tritium, or to bulk materials to which insoluble special tritium compound particles are fixed to a surface.

7 These limits apply only to the alpha emitters within the respective decay series.

Note: This document concerns release to controlled areas only. Requirements for unrestricted release of materials and equipment are found in DOE Order 458.1, Ch 3. (DOE, 2011c). Refer to that document for guidance regarding unrestricted releases.

DOE-STD-1128-2013

#### 4.1.4  Uncertainties and Limitations

Because of the large exposure per unit intake associated with plutonium and the difficulties in evaluating certain exposures, it is important to consider the uncertainty in the measurements when designing a plutonium monitoring program. Although the design objective of the facility will likely be no airborne plutonium contamination, the reality will be a measurement that ensures airborne plutonium is below an acceptable lower limit of detection. The sampling and monitoring program will need to be designed not only for prompt detection of airborne contamination, but to assure that samples are representative of the air that the workers are breathing and have a low enough limit of detection that only negligible doses could go undetected. This is especially important because of the technology shortfall for routine bioassay and in vivo analysis in detecting small intakes of plutonium. Air samples are typically considered representative if they are taken using a personally worn lapel air sampler or if the sample head is within 1 foot of the workers head. The need for an effective sampling and monitoring program is even more critical in the rapidly changing environment of decommissioning activities.

Numerous factors enter into any determination of plutonium contamination levels and the risk to workers. Some of these factors are detection efficiency of the measuring instrument, collection efficiency of the smear media or air sample filter, the location of the smear or air sample in relation to the source of contamination, the physical and chemical properties of the contamination, the representativeness of the air sample to the air being breathed by the worker, the engineered controls available, and the protective equipment used. All of these factors shall be considered in the development of a plutonium contamination control program and in evaluating the actions required for personnel protection.

#### 4.1.5  Samples and Instrumentation

For plutonium facilities, both air sampling and air monitoring are essential elements of the radiological control program. Real-time air monitoring using alpha-sensitive CAMs should be used to alert workers to rapid degradation of radiological conditions. The air sampling system with a lower limit of detection shall be adequate to provide continuing assurance that personnel exposures are within limits and ALARA.

The characteristics of a good plutonium CAM include:

--  A lower limit of detection equal to or better than 8-DAC-h

--  high reliability with a minimum of spurious alarms

--  a stable and constant flow air mover

--  stable and documented detector efficiency with geometry, filter collection efficiency, self-attenuation, etc., considered

--  methodology for radiation discrimination and natural radioactivity discrimination

--  system for activating an alarm

-- shielding for extraneous sources of interference such as radiation, radiofrequency, temperature, and vibration

-- mechanical and electrical ruggedness

-- ease of maintenance and calibration.

A plutonium air sampling program typically includes a system of fixed head air samplers to quantify air concentrations in the workplace. The basic characteristics of the sampling equipment remain the same except that there is normally less flexibility in locating the sampling heads but more flexibility in selecting and operating the counting instrumentation. In many instances, installed sampling systems may no longer be operational or may be in the wrong locations. In those instances, portable air sampling systems, either impactor-head type or filter type may be used to provide required worker protection.

### 4.1.6  Sample Analysis

Plutonium air samples are typically analyzed by alpha counting, alpha spectral analysis, or chemical analysis. The technique used will depend upon the filter media used, the physical and chemical state of the contaminate, the urgency for the data, interfering radionuclides, and other factors. Authoritative guidance in establishing plutonium air sampling counting and analysis methods can be found in NCRP Report No. 58, A Handbook of Radioactivity Measurements Procedures (NCRP, 1985) and in Air Sampling in the Workplace (NRC, 1993).

### 4.1.7  Monitoring Strategies and Protocols

The rapid, early detection of airborne releases requires knowledge of the potential sources and characteristics of the airborne material, the locations of the personnel who are at risk, and the capabilities of the detection devices. Optimally, the samples should be taken between the source and the potentially exposed worker (or member of the public) to intercept the airborne materials before they reach the individual. With the numerous sources and mobility of the workers, interception under all conditions is difficult, if not impossible to achieve. Samples of airborne materials should be taken as close to their points of origin as practicable to maximize the probability of their detection (airborne concentrations are at a maximum at their points of origin).

Fixed probes that are positioned to intercept releases from recognized major potential sources should be used along with portable air samplers for planned activities with known potentials for airborne release of contaminants and for temporary storage of contaminated materials in areas of low air flow. If the workplace exhaust system can be shown to provide rapid, essentially quantitative clearance of airborne contamination, fixed probes that sample the exhaust system may be adequate for routine coverage of unplanned activities. If justified by documented studies, other sampling arrangements may be used that provide improved "total" coverage of the workplace environment for the early detection of airborne contamination.

DOE-STD-1128-2013

Those responsible for the rapid and reliable detection of airborne plutonium should consider the following workplace characteristics in evaluating monitoring systems and working environments (Mishima et al., 1988):

-- The airflow patterns and airborne transport of plutonium in the workplace

-- The location of personnel within the workplace during various processing procedures

-- The location at which the airborne plutonium sample should be taken to accurately monitor the activity inhaled by workers

-- The ability of the system to transport an undistorted sample to the collection media or measurement device

-- The collection and retention efficiency of the collection medium

-- The efficiency of the measurement device in measuring the plutonium collected and differentiating the plutonium from other materials present

-- The accuracy and reliability of the system.

Guidance for each area listed above is provided in Mishima et al. (1988).

## 4.2    SURFACE CONTAMINATION CONTROL

Controlling plutonium surface contamination is essential because it may easily be resuspended in air and/or transferred to other surfaces. The following elements are important for controlling surface contamination: keeping plant surfaces clean; monitoring, reporting, and tracking contamination levels; and establishing appropriate control zones with limits and action levels for those zones.

### 4.2.1  Plant Surfaces

Good housekeeping practices are essential in keeping plant surfaces clean. Periodic housekeeping should be performed within contaminated areas to minimize the buildup of contamination and contaminated waste. Periodic decontamination both within contaminated glove boxes and in the general work area should be conducted to minimize removable contamination.

In some instances, it may be appropriate to apply fixatives to minimize the movement of plutonium contamination. However, it is generally desirable to attempt decontamination first. If decontaminating is not successful or perhaps, not appropriate for the job scope, a fixative may be appropriate. If a fixative is used, typically a paint, two layers of fixative should be used, with the bottom coat yellow and the top coat a different color. When the yellow begins to show through the top coat, additional fixative should be applied. Also, for areas which have had a fixative applied over plutonium contamination, a routine contamination survey should be conducted to assure that no contamination has become movable over time.

DOE-STD-1128-2013

In some cases a strippable coating may be used to allow easy decontamination at the completion of a job. These strippable coatings are sometimes used to decontaminate areas. An aerosol fixative is also available that can be pumped into a room, glovebox, or other work space, that coats all exposed surfaces, including the underside of components. This allows work to proceed without disturbing contamination.

Note: The use of fixatives may require the approval of Facility Criticality Safety personnel because fixatives may concentrate or moderate fissionable material.

Outside areas may also require a fixative to minimize the spread of contamination. Historically, some outside contaminated areas have been covered with asphalt to fix contamination. This is not a desirable material to use because it creates a mixed hazardous waste as well as significantly increasing the volume of contaminated material for disposal. Two substances that currently are used as an interim fixative for outside soil/surface contamination areas are (1) a derivative of pine tar (toll oil), which forms a non-toxic surface fixative that is hard and appears to have a relatively durable surface and (2) a mixture of white glue and water (enduro seal), which is easily sprayed on and sets rapidly to a firm surface. A water to glue ratio of about 25 to 1 appears to perform well in preliminary tests. Both of these fixatives are only interim measures because of eventual degradation from the elements. For more localized areas where a permanent fixative/cover is needed, a sprayable concrete (Shotcrete) is available. A disadvantage of this material is cracking, which defeats the sealing surface. Another material that can be used as a carpeting for outside contamination is a spray-on two-part polymer that provides a flexible, semidurable cover.

The characteristics of the cover can be adjusted to vary water transmission and the color can be changed to inhibit growth under the covering. The major problem for outside use of all of these fixatives is the invasion and actions of biota. Mice, rabbits, other wildlife as well as plant growth tend to burrow under any covering and spread the contamination. While these measures do not permanently solve the problem, they may provide a method of preventing the spread of contamination until a permanent, acceptable solution is determined.

### 4.2.1.1 Housekeeping

The three housekeeping practices listed below should be followed in a plutonium facility as part of the Conduct of Operations [see DOE Order 422.1 (DOE, 2010b)]:

-- The inventory of contaminated and potentially contaminated scrap and equipment should be kept to a minimum because all such materials are subject to special monitoring and accountability.

-- Radioactive contamination should be controlled and the spread of contaminants and the potential for accidents involving contaminants shall be minimized. (In at least one instance, poor housekeeping contributed to a serious criticality accident.) Management at all levels should continuously emphasize the importance of good housekeeping, and operating procedures should be written to ensure good housekeeping practices.

-- Measures shall be taken to maintain radiation exposure in controlled areas as low as is reasonably achievable through engineered and administrative controls (10 CFR 835.1001).

Where possible, materials that are not absolutely necessary to an operation should be kept out of the contaminated or potentially contaminated area. It is very important to minimize the creation of TRU waste. All packaging and unnecessary protective coverings should be removed before materials are introduced into the process area. Likewise, items that are not necessary to the process should be promptly removed, particularly from glove boxes, and not left to accumulate and become safety hazards, potential fire hazards, sources of radioactive (dust) accumulation, or sources of exposure.

Good housekeeping practices inside glove boxes should emphasize fire and explosion control. Only metal or nonflammable plastic containers should be used for the accumulation of scrap and wastes of any kind in the glove boxes and throughout plutonium facilities. Accumulation of combustible materials in glove boxes should be minimized. When explosive, flammable, or volatile liquids are allowed, they should be rigidly controlled and used only in inert gas atmospheres unless a safety analysis review shows it is safe to do otherwise. All residues should be removed immediately at the conclusion of each job or cleaning operation.

Considerable effort has been expended on the development of coated and corrosion-resistant tools. Some efforts have been marginally successful, but in most cases throw-away tools are favored. Electropolishing of contaminated metal tools and equipment has been shown to be a good method of decontamination and allows for their reuse in some cases or disposal as non-contaminated waste. Where possible, all tools with sharp edges or points (e.g., screwdrivers, ice picks, scissors) should be kept out of glove boxes.

Management should constantly demand good housekeeping. Mandatory, routine clean-up periods are becoming more common due to the increasing cost of storing and disposing of contaminated materials. Better housekeeping is required due to real-time, computerized accountability for nuclear materials. It has been demonstrated that kilogram quantities of plutonium oxide dust can accumulate in glove boxes unless they are routinely cleaned. Much of the exposure to workers originates from layers of plutonium oxide dust on the surface of gloves and the internal surfaces of glove boxes. In processes where plutonium oxide powder is handled, the glove boxes should be cleaned weekly to reduce the accumulation of dust layers and to reduce worker exposure. Although difficult to achieve and maintain, good housekeeping is equally essential during decommissioning of plutonium facilities.

### 4.2.1.2 Vacuuming

The subject of vacuuming within a glove box is somewhat complex. Experience has shown vacuuming to be the most effective and quickest way

DOE-STD-1128-2013

to clean a controlled-atmosphere (dry) glove box. It is not particularly effective for high-humidity or wet-process glove boxes, particularly those that involve acids. After acids have been used in a glove box, washing and wiping is the preferred method of cleaning the etched surfaces.

Vacuuming is particularly effective in dry-atmosphere and inerted enclosures where the levels of radioactive dust can quickly increase personnel exposure. In many cases, vacuuming reduces the exposure level more than a wipe down with a damp cloth, and it can be done more quickly and with less waste material generated. Two factors weigh against vacuuming: possible safety hazards from electrical sparks, and the occasional difficulty of operating in inert atmospheres (although the last item need not be of importance). However, in dry glove boxes with dusty operations using high-exposure plutonium, personnel exposure control is a problem and vacuuming is a quick and effective method of keeping the dust and exposure rates under control and should be considered.

Note: The use of vacuum cleaners may require review by Facility Criticality Safety personnel because vacuum cleaners are likely to concentrate fissionable material.

The use of vacuum cleaners for contamination control requires careful consideration and strict controls to assure that the process does not spread contamination. As a minimum, all vacuums used for radioactive material should have high efficiency particulate air (HEPA) filtration on the exhaust. In some instances, the additional precaution of having the exhaust vented into a process ventilation system should be considered.

### 4.2.2  Reporting and Documenting Contamination Levels

Radiological control programs require the performance of contamination surveys to determine existing conditions in a given location. Maps with sufficient detail to permit identification of original survey locations should be maintained. Records should contain sufficient detail to be meaningful even after the originator is no longer available. Contamination surveys should be recorded on appropriate standard forms and include the following common elements:

--  Date, time, and purpose of the survey

--  General and specific location of the survey

--  Name and signature of the surveyor and analyst

--  Pertinent information needed to interpret the survey results

--  Reference to a specific Radiological Work Permit if the survey is performed to support the permit [see DOE standard, Radiological Control part 751.1 (DOE, 2017)].

DOE-STD-1128-2013

Records should be maintained to document changes in monitoring equipment, techniques and procedures [see DOE standard Radiological Control, part 751.2 (DOE, 2017)].

In addition, records of contamination surveys should include, at a minimum, the following information:

-- Model and serial number of counting equipment

-- Contamination levels (using appropriate units) and appropriate supporting parameters, including counting efficiency, counting time, correction factors, type of radiation, and whether the contamination was fixed or removable

-- Location of areas found to contain hot particles or high concentrations of localized contamination

-- Follow-up survey results for decontamination processes cross-referenced to the original survey (see DOE standard, Radiological Control part 754 (DOE, 2017)).

Records for the release of material and equipment from radiological areas to controlled areas should describe the property, the date on which the release survey was performed, the identity of the individual who performed the survey, the type and identification number of the survey instrument used, and the results of the survey shall be documented (10 CFR 835.703(c)). Additional details on radiation records can be obtained from Chapter 13 of Implementation Guide G 441.1-1C, Ch. 1(DOE, 2011a).

All skin and personal property contaminations should be documented and evaluated to help improve the contamination control program. Documentation should include the following:

-- The person's name and work group

-- The location, amount, and type of skin or personal property contamination

-- The results of decontamination

-- A description of circumstances involved in the occurrence, such as radiation work permit number, protective clothing required, and protective clothing actually used.

### 4.2.3  Characteristics of Plutonium Contamination

There are few characteristics of plutonium contamination that are unique. Plutonium contamination may be in many physical and chemical forms. (See Section 2.0 for the many potential sources of plutonium contamination from combustion products of a plutonium fire to radiolytic products from long-term storage.) One characteristic of plutonium is its ability to migrate with no apparent motive force. Whether from alpha recoil or some other mechanism, plutonium contamination, if not contained or removed, will spread relatively rapidly throughout an area. This is especially true for

DOE-STD-1128-2013

plutonium newly released to the environment. For plutonium contamination in soil, after contact with soil, the plutonium tends to have its migration hindered and thus moves slower.

### 4.2.4 Monitoring

Radiation workers are often assigned tasks that conceivably could expose them to radioactive material. It is not sufficient to rely exclusively on equipment design to minimize contamination and exposure in the workplace. A radiation protection program shall include both monitoring of the workers (discussed in Section 4.3) and monitoring of the conditions in the workplace (10 CFR 835 Subpart E). Both functions are essential to a good radiation monitoring program.

Continuous radiation monitoring should be provided during the periods of high or unusual risk associated with the work in the area. Periods of high or unusual risk include the potential or actual breaching of the integrity of the glove-box or associated systems, including such maintenance as replacement of panels, glove changes, bag-out operations, replacement of filters, or repair of vacuum systems. Work that involves the use of temporary enclosures (greenhouses or glovebags) may also be provided with continuous coverage by an RCT, if the hazard is sufficient to warrant such measures. For decommissioning, most activities will be new, unique, and have no historical precedent. Consequently, high and unusual risks may become the norm and the use of temporary controls and continuous coverage the routine.

Monitoring of the workplace is an essential element of every routine surveillance program. It can be effectively accomplished using any or all of the techniques that are discussed in this section. The rigor with which all of the various elements of a radiation monitoring program are applied should be tailored to meet the needs of the individual work areas and should depend on the kind and quantity of radioactive material present and its potential for dispersion. Each program should be designed to meet existing needs, but also should be flexible to allow for incorporation of the possible advantages to be provided by the various available monitoring practices. Monitoring practices include, but are not limited, to the following:

--  Contamination surveys of the workplace

--  Release surveys

--  External exposure surveys

--  Airborne contamination surveys

--  Routine surveillance by an RCT.

### 4.2.4.1 Contamination Surveys of the Workplace

The radiation monitoring program should include documented survey procedures, a system for maintaining survey results, and contamination control limits for "fixed" and "removable" contamination. The results of contamination surveys should be reported in activity per area (e.g., dpm/100 cm$^2$) except for large-area swipes and swipes of very small items. This

4-11

DOE-STD-1128-2013

permits interpretation of the recorded data without requiring knowledge of instrument efficiency or geometry.

All workplaces should be monitored for contamination levels on a regularly scheduled basis. The frequency of such surveys will depend on the potential for dispersion of the radioactive material. As a minimum, all gloves, work surfaces, floors, equipment, etc., within the workplace should be surveyed according to the frequencies listed in the DOE standard, <u>Radiological Control</u> (DOE, 2017).

The change room and other support facilities within the controlled area should be surveyed for contamination daily. Continuous air monitors, survey instruments at step-off pads, and hand and shoe counters should be functionally tested daily or once per shift in support of the weekly and monthly surveys. These frequent surveys are also part of the routine surveillance program and permit immediate follow-up if low-level contamination is detected to minimize the potential for major incidents. Some fixtures and support areas outside the controlled area, such as door knobs and telephones of adjacent offices and the lunchroom, should also be surveyed daily. Other support areas should be surveyed monthly. If routine survey results detect any contamination in a given area, more detailed surveys shall be performed to determine the extent of the contamination. An investigation should be initiated to determine the source of the contamination and the cause.

To preclude the possibility that contaminated waste would be disposed of as ordinary waste, (1) all process and controlled area waste should be considered contaminated, and (2) mechanisms should be established that prevent the mixing of contaminated and noncontaminated waste.

### 4.2.4.2 Release Surveys

For transuranic radionuclides, the contamination level (fixed and removable) at which surfaces are considered contaminated are listed in Appendix D of 10 CFR 835 (DOE, 2011). That document also specifies the criteria for the release of materials and equipment to Controlled Areas.

This document concerns release to controlled areas only. The detailed requirements for unrestricted release of materials and equipment are found in DOE Order 458.1, Ch 3 (DOE, 2011c). Refer to that document for guidance regarding unrestricted releases.

### 4.2.4.3 External Exposure Surveys

To delineate the levels involved, measurements of external exposure should be made at the time a program is established at all locations where personnel exposure occurs. Additional photon and neutron measurements should be made at the same frequency as the contamination surveys. The buildup of plutonium contamination in glove boxes and on gloves and equipment may contribute substantially to the external dose rates.

#### 4.2.4.4 Measurement and Survey Techniques

This section discusses four types of contamination surveys that are typically used in DOE facilities. Surveys for removable contamination include a large-area wipe survey and a technical swipe or smear survey. Surveys for total/fixed contamination include a scan survey and a statistically based survey. These surveys, or a combination of them, are used to survey material for release from radiological control. The appropriate use of each type of survey is discussed.

**Surveys for Removable Contamination**

Two types of surveys are used for removable contamination: a large-area wipe survey and a technical swipe or smear survey.

A large-area wipe survey is used to detect gross removable contamination. A large-area wipe survey is typically performed using a large floor cloth and a dust mop type handle to wipe large areas. This technique tends to concentrate any low levels of removable contamination that may be present. The surface to be wiped and the wiping material should be industrially clean (i.e., free of debris, grease, etc.) to reduce self-absorption of alpha contamination. The buildup of material (radioactive or otherwise) that would attenuate alpha radiation needs to be considered in establishing the size of large-area wipe surveys. The survey is performed by wiping the surface of the area being surveyed and conducting frequent checks of the cloth using a portable instrument. For detection of alpha-emitting isotopes, a nonabsorbent material should be used. Removable contamination will be accumulated and concentrated on the wipe, increasing the probability of its detection. Checking for contamination is conducted by placing an alpha measurement instrument approximately 0.25 in. (0.6 cm) from the surface of the wipe for 5 seconds, and the count rate observed. If there is no increase above background, then the wipe may be placed in contact with the detector. If radioactivity above background is measured, the material is contaminated. Depending upon the specific circumstances, a series of technical smears may be required to locate and quantify the contamination within the area covered by the large-area wipe. In most instances, if contamination is detected on the large-area wipe, decontamination should be considered.

For transuranic radionuclides, the guideline values for removable contamination may be lower than the detection limit or MDA (minimum detectable activity or amount) of the portable instrument. See G 441.1-1C, Ch. 1(DOE, 2011a) for a discussion on MDA. If this is the case, the surface area of wipe surveys needs to be large enough that the quantity of radioactivity collected on the swipe will be greater than the detection limit of the instrument. Wipe surveys of areas smaller than this minimum surface area require more sophisticated measuring instruments, such as a scaler measurement, and the entire surface of the material should be wiped. The minimum area (A) for using a large-area wipe survey is given by:

$$A \quad = \frac{MDA}{L} \text{ x } 100 \text{ cm}^2 \qquad\qquad (4.1)$$

where L is the removable surface radioactivity value in dpm/100 cm$^2$ of the potential contaminant, given in Table 4.1. and MDA is in dpm.

The purpose of a technical smear survey is to locate and quantify removable contamination that is known or suspected to exist. For small items, a technical smear may be used at any time to verify the item's contamination status. A technical smear or swipe survey is performed by wiping a cloth, paper, plastic foam, or fiberglass disk over a 100-cm$^2$ area of the surface. The wipe should be taken with a dry medium using moderate pressure. A common field practice is to use two fingers to press the wipe medium against the surface to be wiped. The wipe is then moved along an "S" shaped path that has a nominal length of 8 in. (20 cm) to 10 in. (25 cm).

When the potential contaminant emits alpha radiation, paper or fiberglass filter papers should be used to assure that alpha activity is not attenuated by becoming imbedded in the wipe. To improve the MDA, smears may be taken over areas larger than 100 cm$^2$. However, for purposes of demonstrating compliance with contamination limits, 100-cm$^2$ smears need to also be taken and evaluated. The size of the area smeared should be limited to prevent buildup of material (radioactive or otherwise) that would attenuate alpha radiation. Appropriate corrections should be made for objects smaller than 100 cm$^2$.

If contamination is detected during a scan survey for fixed contamination, a survey for removable contamination should be performed to determine if the contamination is fixed and to quantify any removable contamination. The survey should be performed using a small piece of absorbent material, such as a standard paper smear. This type of survey for removable contamination is often called a technical smear survey. If no contamination above the values for removable contamination in Table 4.1 is detected during the smear survey, the contamination is fixed, and the area should be appropriately marked.

In addition, a technical smear survey may be used routinely to detect removable contamination, especially for contamination surveys of radiological areas.

**Scan Survey for Fixed Contamination**

A scan survey for fixed contamination requires passing a portable instrument over the surface of the area being surveyed at a fixed, known scan speed and at a specified distance from the surface. Typically, the scan speed is 1 - 2 in./s (2.5 - 5 cm/s) and the maximum distance is 0.25 in. (0.6 cm) for alpha contamination instruments, but this can vary depending on the instrument, probe configuration and background. A scan survey should be used to survey

material that resides in an area controlled for contamination purposes, an area where unsealed radioactive sources are used, or a radiological buffer area surrounding an area controlled for contamination purposes. A scan survey in conjunction with a wipe survey should be used to release from radiological control material with a total surface area less than 5 ft$^2$ (0.46 m$^2$). A statistically based survey, which will be discussed later, should be used to release from radiological control material with a surface are greater than 5 ft$^2$ (0.46 m$^2$).

During the performance of scan surveys, the audible response of the instrument is faster than the needle deflection (some instruments do not have a needle, e.g., digital read out instruments). Therefore, audible response should be used in conjunction with meter readings. For alpha surveys, the surveyor should pause for 3 to 5 seconds each time an individual pulse is detected in order to allow a longer count time at the location of the detected pulse, until it is determined whether the response indicates random background noise or detected contamination.

Several important factors affecting scan survey detection sensitivity are: instrument detection efficiency, background, size of the effective probe area, and the speed at which scan surveys are performed. For a given instrument, scan speed can be a critical factor as counting time is inversely proportional to scan speed. For instruments with larger detector faces, the scan speed is faster for a given rate of meter movement because a point on the surveyed surface remains beneath the window longer. To ensure that low levels of contamination can be detected, it is necessary that a maximum scan speed be mandated and that this speed be implemented during field measurements. As noted above, a typical scan speed for instruments in current use is 1 - 2 in./s (2.5 - 5 cm/s). However, the scan speed for a specific application should consider the instrument, probe, guideline value, and confidence level desired. The MARSSIM (DOE, 2000) contains guidance for determination of scan rates. It also suggests that an empirical method be used to verify scan rates. The equipment and method used in this determination may be incorporated into training for survey personnel to enhance their survey skills.

Similarly, the Multi-Agency Radiation Survey and Assessment of Materials and Equipment (MARSAME) (DOE, 2009b) document for releasing equipment such as earth movers, trucks and other equipment has been published.

### 4.2.5  Release Criteria

The release of material from radiological areas shall be performed according to 10 CFR 835.1101. In these areas, material and equipment should be treated as radioactive material and should not be released from radiological areas to controlled areas if either of the following conditions exist:

--  Measurements of accessible surfaces show that either the total or removable contamination levels exceed the values specified in Table 4.1

--  Prior use suggests that the contamination levels on the inaccessible surfaces are likely to exceed the values specified in Table 4.1.

Wire rope and electronic gear with cooling fans are examples of equipment that are difficult to survey and require special procedures to be released from contaminated and airborne radioactivity areas. Additional release criteria can be found in Section 4 of the DOE standard, <u>Radiological Control</u> (DOE, 2017).

It may be noted that Appendix D of 10 CFR 835 allows that surface radioactivity values be averaged over 1 $m^2$ provided that the activity in any 100 $cm^2$ is not more than three times the specified value.

The material release methodology has four main components: material evaluation, scan survey for fixed contamination, large-area wipe survey for removable contamination (described above), and statistical survey for fixed contamination. The material evaluation process involves consideration of the previous known uses of the material, as well as typical uses and the environment in which the material was used. Material evaluation places the material into one of two categories: not potentially contaminated or potentially contaminated.

Non-radioactive material can be released without an instrument survey if its documented history ensures

-- That it has never been used or stored in an area controlled for contamination purposes (i.e., a Contamination Area, High Contamination Area, or Airborne Radioactivity Area)

-- That it has never come into contact with unsealed radioactive material

-- That it has not been stored or used in a Radiological Buffer Area (RBA) surrounding a Contamination Area, High Contamination Area, or Airborne Radioactivity Area.

This material may be considered to be not contaminated and an instrument survey is not necessary according to the DOE standard, <u>Radiological Control</u> (DOE, 2017). A material history release form should be used to document the release of material that is known to be free of contamination by its history of use. If the material history release form cannot be completed, or if the history of the material is unknown, an instrument survey shall be made of the material. Material released from RBAs around Contamination Areas, High Contamination Areas, or Airborne Radioactivity Areas should also be evaluated using an instrument survey.  Material cleared for unrestricted release from a radiological area shall be done in accordance with DOE O 458.1.

The material evaluation process should also consider the nuclides to which the material was potentially exposed. If the material was exposed to significant quantities of nuclides that are difficult to detect, including tritium, $^{14}$C, $^{125}$I, or $^{129}$I, an appropriate survey methodology should be applied.

### 4.2.6  Plutonium Contamination Detection

The detection and measurement of plutonium contamination is necessary to ensure control of contamination and compliance with DOE requirements. Typically,

detection of plutonium contamination has been performed using survey instruments that detect the alpha activity. Routinely used health physics instruments (i.e., alpha survey instruments) may not be adequate for some D&D operations. Self-absorption of plutonium alpha particles within the source or in an irregular surface area may require the use of special X-ray and low energy photon instruments (e.g., a NaI detector). The NaI detector should also be used to detect plutonium contamination that has been painted over.

Discussions of methods used to detect plutonium contamination for past D&D operations can be found in publications by Umbarger (1982) and West et al. (1991). Umbarger reported on nondestructive assay techniques (including portable field instrumentation and laboratory-based methods) for sorting waste in low-level (class A) and TRU waste. Portable field instruments included the field FIDLER (i.e., thin NaI detector), phoswich detector (i.e., thin NaI detector coupled with a thicker CsI detector), ZnS alpha scintillation detector, a portable multichannel analyzer, and a hand-held gamma-ray spectrometer gun. The advantage of a phoswich detector over a NaI detector is its lower operating background. Laboratory-based systems include active and passive gamma-ray spectroscopy, passive neutron detection, and pulsed portable neutron generator interrogation.

During the decommissioning of a mixed-oxide fuel fabrication facility, West et al. (1991) used a nondestructive assay system to provide criticality safety monitoring, track the plutonium inventory, provide measurement of decontamination effectiveness, and provide quantitative characterization/assay of the waste. The system consisted of an integrated set of two passive neutron networks, two pulsed active neutron units, a high-resolution gamma spectrometer [high-purity germanium (HPGe)], and a neutron-coincidence counting unit. Waste determined to be less than 10 nCi/g was certified as class A low-level waste (LLW).

### 4.2.7 ALARA Guidelines

Contamination levels should be maintained ALARA to minimize the potential for the spread of contamination and to reduce the protective measures and equipment required. Control of radioactive material at the source and prevention of the generation of contamination are more effective and less costly than remediation.

## 4.3 PERSONNEL CONTAMINATION CONTROL

As described earlier, the purpose of contamination control is to prevent the ingestion or inhalation of plutonium by workers. This is primarily achieved by the engineered barriers discussed previously, containment, confinement, and ventilation control. Only if the primary controls fail or if there is a potential for personnel contamination during an activity are administrative controls such as protective clothing and respirators advisable.

### 4.3.1 Monitoring Philosophy

Monitoring the worker is necessary, not only to ensure that a potential intake is detected promptly and that the resulting internal dose is assessed, but to confirm the integrity of the engineered containment system and ensure the effectiveness of the overall radiation protection program.

There are several types of worker monitoring, some during and immediately following work with radioactive material and some scheduled for a later time at a preset frequency. This section addresses only methods of monitoring the worker at the workstation. Other methods are discussed in the section that deals with internal and external exposure controls.

Techniques to monitor the individual worker at the work site include:

--   Frequent/routine surveys of gloves

--   Exit surveys

--   Nasal swipes

--   Personal air sampling.

### 4.3.2   Monitoring Program

Instrumentation shall be provided and persons entering a plutonium work station shall be required to survey themselves at established frequencies. The requirements for radioactive contamination control and monitoring are found in 10 CFR 835.1102. As a minimum, workers should survey their gloves and coverall sleeves each time they are withdrawn from a glove box (or similar containment system) and after each glove replacement or bag-out operation.

Personnel monitoring for contamination should be mandatory at the egress from controlled areas and should be conducted in a verifiable manner. Assurance should be provided that personnel are monitored prior to breaks, meals, or exits from the plant site. Portal monitors, hand-and-shoe counters, and/or portable survey instruments may be used for this purpose. If employees are instructed to perform self-monitoring, the equipment should be set up in a "go/no-go" mode and employees should be clearly instructed in the required actions to take if predetermined action levels are exceeded. Frequent audits should be performed to verify that controls are adequate. Limiting the number of egress points and controlling personnel movement can minimize the numbers of locations where positive control of personnel monitoring shall be maintained.

### 4.3.3   Protective Clothing

Various types of protective clothing, including laboratory coats, shoe covers, gloves, coveralls, plastic or rubber suits, and air-purifying or atmosphere-supplying respiratory protective equipment, may be required for operations with transuranic radionuclides. The use of company-issue shoes and clothing for employees with work assignments in process areas can be a major aid in contamination control. Recently, some facilities are using disposable anti-contamination clothing. This may be a cost savings from a handling standpoint. However, disposal costs shall be considered. Additionally, consideration should be given to the potential for heat stress.

DOE-STD-1128-2013

### 4.3.3.1 Requirements for Routine Operations

As a minimum, personnel who handle or work with unsealed sources of plutonium should wear coveralls, gloves, and shoe covers. For inspections or visits, lab coats and shoe covers may be permissible in those same areas. When contaminated wet areas are to be entered, water-repellent (plastic or rubber) clothing should be worn. No personal outer clothing should be permitted under coveralls.

When working with unsealed plutonium sources or in glove boxes, hands should be protected by a minimum of two barriers, for example, at least one pair of surgeon's gloves and one pair of glove-box gloves. Where manual dexterity is not required and the work involves a potential for piercing one or both layers of rubber gloves, leather gloves should be worn over the surgeon's gloves. Automated methods should be considered for replacing routine manual methods that have a high risk of piercing the gloves.

Protective clothing should be removed at the exit to radiologically controlled areas and personnel monitoring for contamination performed. If for some reason this is not practical, the movement of personnel should be strictly controlled from the exit area to a location where protective clothing can be removed.

### 4.3.3.2 Requirements for Special Maintenance

For special maintenance work that involves significant quantities of plutonium, a double barrier concept should be implemented. An example of minimum requirements for protective clothing is provided below:

--  Two pairs of coveralls (and sometimes a plastic suit)

--  Canvas boots taped to the inner pair of coveralls, with rubber boots over the canvas boots

--  One pair of surgical gloves taped to the inner coveralls, with a leather, cotton, or rubber outer pair of gloves

--  Respiratory protective device with hood taped to respirator.

To create a double barrier between the source and all extremities, surgeon gloves should be worn in addition to the glove-box gloves. In general, black Neoprene gloves are the standard glove-box glove and the most economical to use where process conditions do not produce rapid glove deterioration. However, alpha particles from surface dust layers can induce surface cracking in black Neoprene. Hypalon 0 is more resistant to surface cracking, acid deterioration, and ozone effects, and this characteristic will, in many cases, make Hypalon gloves the most economical, despite their higher unit cost.

In recent years many new types of glove-box gloves have been developed. Glove usage should be tailored to the particular needs of the job. For

processes that require maximum dexterity, the 0.014-in. (0.038-cm) Neoprene gloves are still superior. Coated Hypalon gloves are superior to Neoprene for glove-box process operations that involve nitric acid or ozone levels that may cause deterioration. Ethylenepropylenediamine monomer (EPDM) gloves are used in some facilities and have good flexibility and are resistant to degradation caused by radiation and ozone. Greenhalgh et al. (1979) reported that Hypalon and EPDM gloves have greater than 30 times the longevity of Neoprene in low-level ozone concentration atmospheres. Viton gloves have proven to have a longer life than Neoprene gloves under many operating conditions, but suffer somewhat from stiffness. Where high gamma radiation levels are encountered, lead-loaded gloves may be necessary. However, their stiffness and workers' loss of manual dexterity should be considered in determining their influence on work efficiency and the total dose received.

Persons who perform operations that involve microspheres of $^{238}$Pu, coated or uncoated, should be aware that the heat generation of a single 100-$\mu$m- to 200-$\mu$m-diameter sphere can melt through glove material. In addition, containment of a quantity of microspheres, especially coated microspheres, is difficult because of electrostatic repulsion. Microspheres have been observed climbing the walls of a glass beaker and spreading throughout a glove box.

Glove storage problems occur occasionally. Experiments and static tests have not provided an adequate explanation of the sporadic problems that have been encountered. Test results in which gloves were stored under different lighting conditions (ultraviolet and fluorescent) and under stressed conditions (creased or bent) have not been consistent. Tests of gloves seem to indicate that glove degradation is caused by the combined effect of ionizing radiation, ozone, and lighting. The glove inventory should be rotated to prevent the inventory from becoming outdated while on the shelf.

All gloves in normal use at plutonium processing installations should be inspected prior to each use. All operating personnel should perform contamination self-surveys after every glove usage. The glove inspections should be made each time by the same team of trained individuals, and the condition of each glove should be recorded so that glove failures can be anticipated and preventative measures can be taken. The development of a statistical basis for establishing the frequency of glove changes should be considered because such a basis may be cost-effective. For example, the change-out frequency could be planned so that gloves are changed at some fraction of the mean time between failures or more preferably some fraction of the minimum time between failures. This type of change-out program could also minimize personnel doses and potential contamination spread incidents associated with too-frequent glove replacement. This procedure may require that each glove use be categorized. A routine replacement program will not replace an inspection program, but it is a supplement to the inspections. The inspector's surgeon gloves should, of course, be surveyed after the inspection of each glove-box glove. Gloves that are in questionable condition should be changed without delay. Gloves that are not in use for the remainder of that shift should be capped off with a glove cover or plastic bag.

**DOE-STD-1128-2013**

Gloves not in use should be stored inside the glove box in such a manner that they do not interfere with operations.

### 4.3.4  Respiratory Protection

Respiratory protection should be readily available. Respiratory protective equipment should be used for all bag-out operations, bag and glove changes, and any situation involving a potential or actual breach of confinement. Alternatively, the operation could be performed in a glovebag to maintain confinement. In any case, protection, in the form of air-purifying or atmosphere-supplying respirators, should be considered whenever concentrations of radionuclides in the air are likely to exceed 30% of the Derived Air Concentration (DAC) (i.e., where an individual without respiratory protection could receive 12 DAC-hrs in a week). For good performance, the respirator shall fit closely on the facial contours and make an impenetrable seal so that all air enters through the filter or is supplied by the breathing-air supply. ANSI Z88.2-1992 (ANSI, 1980b) describes qualitative and quantitative tests that should be used to ensure that the respirator fits the individual; only the quantitative test should be used for verification of respirator fit at plutonium facilities. Respirator fit tests should be performed annually.

The respiratory protective device selected should provide a protection factor appropriate for the air concentration anticipated. ANSI Z88.2 provides protection factors guidance.

Air-supplied hoods are becoming more popular because a fitting is not required and facial hair does not prohibit their use. Protection factors up to 1000 are allowed for air-supplied hoods. All respirators, including air-supplied hoods, require approval. While NIOSH approves most respirators, some respirator types in use at DOE facilities are not part of the NIOSH testing program.

### 4.3.5 ALARA Guidelines

The total dose to an individual and the collective dose to the work force should be ALARA. When applied to personnel contamination or internal intakes, this generally means less than detectable dose with the best available commercial technology.

### 4.3.6 Personnel Release Criteria

The decision to release personnel with detectable plutonium contamination is made on a case-by-case basis. If the individual is injured and needs prompt medical attention, medical treatment will always take precedence, with compensatory measures made for the protection of medical personnel and facilities. If injuries are absent or do not require immediate attention, decontamination is preferable to ensure that the dose to the contaminated individual and the potential for inhalation by the victim and medical staff are minimized and the spread of contamination is prevented.

In a case where decontamination is incomplete due to injury to the skin or other reasons, the individual may be provisionally released with measures to prevent the spread of contamination. Module 2.13, Radiological Considerations for First Aid, of DOE-HDBK-1122-99 (DOE, 2009a) provides guidance on control of contamination for medical events. Guidance should be provided to the individual on control of potentially contaminated wound dressings if they are removed after the individual is released.

## 4.4    PERSONNEL DECONTAMINATION

Skin decontamination should be performed by RCTs or other members of the health physics staff. The treatment and decontamination of wounds should be performed by medical staff.

Nonabrasive methods should be used for skin decontamination to protect the tissues from deeper contamination. Masking tape should be used to remove dry contamination. Wet decontamination should be used to remove residual contamination. The skin should be gently scrubbed with soap and water. The following procedure is recommended:

1.  Survey the worker to determine the contaminated areas of the skin. Have the medical staff treat and decontaminate breaks in the skin.

2.  Wipe loose contamination with a gauze sponge or cotton applicators dipped in mild antiseptic detergent. Do not spread contamination to uncontaminated areas.

3.  Rub the skin with the applicators to produce good sudsing.

4.  Use soft bristle scrub brushes for fingernails and other difficult-to-clean areas as long as the skin barrier is maintained intact. It may be difficult to decontaminate the cuticles and under the nails.

5.  Dry the skin area with cleansing tissue.

6.  After the skin is thoroughly dry, survey it for any remaining contamination.

7.  If no contamination is detected, apply a good-quality hand cream to prevent chapping.

Another effective nonabrasive decontamination method involves placing the contaminated hand in a cotton glove and then a Latex glove (causing the hand to perspire).

The decontamination factor is the ratio of the initial contamination level to the contamination level after decontamination methods are applied, as determined by survey instrument readings. Nonabrasive methods should be repeated until the decontamination factor between washes drops below 2 or 3 with significant contamination still remaining.

**DOE-STD-1128-2013**

If contamination persists on the skin, a more abrasive decontamination method may be necessary. The decision to proceed with a more abrasive method should be based on the effectiveness of the decontamination. An abrasive soap should be applied with a moist gauze sponge or soft handbrush while rubbing the skin to develop a soapy lather. Care should be exercised to prevent damage to the skin surface.

Liberal irrigation with lukewarm water or saline solution is recommended for eye, nose, and mouth contamination. These procedures are performed by the medical staff to remove contamination.

## 5.0    INTERNAL DOSIMETRY

Internal dosimetry is an essential part of a quality health physics program at every facility where plutonium is handled or processed. The purpose of an internal dosimetry program is to monitor workplace activities, to assess accidental or inadvertent intakes of radioactive material, and to conduct internal dose assessments from bioassay measurement data.

It is DOE policy that facilities are designed, operated, and remediated to prevent intakes of radioactive materials. Radiological controls for the workplace should ensure that radionuclides are contained and handled properly, and that intakes, if they occur at all, are negligible to the extent achievable with state-of-the-art technology. In spite of excellent design and operation policies, inadvertent intakes of radioactive material can occur as a result of equipment malfunction, failure to follow procedures, or the unanticipated presence of radioactive material.

Experience has shown that the most common route for inadvertent plutonium intake is inhalation. Intakes can also occur by accidental ingestion or by wound contamination. Surveillance programs should be designed to rapidly detect a release in the event of a loss of radioactive material containment. Internal dosimetry programs should be tailored to the needs of each plutonium handling facility so that inadvertent intakes are discovered and quantified and workers' doses are determined by appropriate methods.

When workers are inadvertently exposed to radioactive material, appropriate corrective action should be taken to ensure that control and containment have been re-established. Prompt detection by routine workplace monitoring practices is essential to regaining control after any contamination spread or loss of containment. Prompt workplace indications of potential intake are also crucial to start special bioassay monitoring for intake and dose assessment. An early assessment of the probable severity of an intake and its corresponding dose, preferably within the first two hours of the intake, is needed for decisions on dose reduction therapy and event reporting. For plutonium and americium intakes, the bioassay data necessary for final dose assessment may require long periods of time (many months) to obtain. Until such data become available, ongoing preliminary assessments of intake and dose may be necessary to provide guidance for the administrative and medical management of the workers.

## 5.1    INTERNAL DOSE EVALUATION PROGRAM

Internal doses are not directly measured but are estimated or calculated based on knowledge of the material to which a worker may be exposed and it's known or assumed biokinetic behavior. The common approach to internal dosimetry is to calculate an occupational intake based on worker bioassay measurements or workplace air-sample data and assumed breathing rates. Once an intake is calculated, appropriate internal doses to organs and tissues of concern can be estimated by using fundamental dosimetry principles, by various intake-to-dose conversion factors, which incorporate assumed biokinetic models, or by an appropriate computer code. Intake-to-dose conversion factors can be found in ICRP Publication 68 (ICRP, 1994b). Further discussion on intake and dose assessment is provided in Section 5.8.

Participation in internal dose evaluation programs is required by DOE for conditions identified in 10 CFR 835.402(c) (DOE, 2011). The internal dose evaluation program shall address both general workplace conditions and individual intakes.

Workplace conditions are monitored through air sampling programs as well as contamination surveys. For work that can have variable or changing conditions, more intensive surveillance may be required, using supplemental portable air samplers, continuous air monitors, or personal air samplers.

Individual worker monitoring for intakes is commonly performed using bioassay procedures. Bioassay monitoring includes both direct (in vivo) measurements of radioactivity in the body and indirect (in vitro) measurements of material excreted or removed from the body. Refer to Section 5.7.4 for information on assessing internal exposures from air monitoring data.

10 CFR 835.402(c) (DOE, 2011) specifies the requirements for participation in a radiological bioassay program. Because most plutonium facilities have a high degree of radiological control and containment for plutonium, chronic exposure to levels of occupational concern is unlikely and it is not considered likely that a worker would incur more than one unplanned intake in a year. Thus, participation in a bioassay program is generally based on the possibility that a single intake causing a dose in excess of 100-mrem committed effective dose CED might occur. Bioassay is also required if an intake is suspected for any reason.

Indications of intake include (but are not limited to) detection of facial or nasal contamination, air monitoring or sampling that indicates internal exposure, or any wound in which contamination is detected or suspected (See Section 5-9 for internal dosimetry recommended indicator and action levels.) The most common internal exposure monitoring program for workers is the bioassay monitoring program, which shall be designed for the specific nuclides and forms of material at a particular facility. Likely candidates for internal exposure monitoring include personnel who may be routinely exposed to surface or airborne contamination, or those identified by the foregoing workplace indicators.

Workplace monitoring for potential internal exposures is performed to verify the adequacy of containment and work practices. This monitoring includes air sampling, continuous air monitoring, personal contamination surveys, and workplace contamination surveys. Facilities are to be designed and operated to minimize internal exposure. Details regarding workplace monitoring and control practices are discussed in Section 4.0.

### 5.1.1  Performance Capabilities for Internal Exposure Monitoring

Bioassay monitoring programs shall be capable of showing compliance with the 5-rem/year stochastic and 50-rem/year deterministic dose limits of 10 CFR 835.202 (DOE, 2011). 10 CFR 835.402(c) (1) (DOE, 2011) identifies 100-mrem CED for all likely intakes as a level above which workers shall participate in a bioassay program. Therefore, ideally, such bioassay monitoring programs should be capable of detecting this level. In fact, this is not technically achievable for most routine plutonium bioassay programs. In order to meet this requirement, reliance shall be placed on workplace monitoring to identify potential intakes at the time they occur so that special bioassay monitoring can be initiated. Routine, periodic bioassay measurements have little chance of detecting a CED of 0.1 rem and can even have difficulty showing compliance with dose limits.

DOE-STD-1128-2013

Performance capabilities for bioassay and internal dosimetry programs can be expressed as the minimum detectable dose, based on some combination of minimum detectable activity and frequency of measurement or time post-intake at which the measurement is made. The term "minimum detectable dose" is preferred over any variants of the occasionally encountered terms "dose-missed" or "potentially undetected dose," which were usually defined as the same thing. The connotation of the latter terms is that of an actual intake which was not detected, whereas the intent was to define a measure of program sensitivity to doses that might have gone undetected had an intake occurred. The preferred term" minimum detectable dose" (MDD) ties the concept to the recognized terminology of minimum detectable activity (MDA). See G 441.1-1C, Ch. 1(DOE, 2011a), definition of MDA, for information on evaluating measurement results below these quantities.

The MDD for a bioassay monitoring program shall meet the aforementioned dose limit requirements of 10 CFR 835.202. A design goal of 100-mrem CED from all intakes of similar nuclides in a year is desirable but unrealistic for a routine program. To meet these requirements, bioassay programs should have measurement sensitivities (i.e., MDAs for bioassay measurements) established based on the material to which workers might be exposed. Examples of such sensitivities are given in Tables 5.1 and 5.2 (O'Connell, 2009) for pure $^{239}$Pu monitored by urinalysis and fecal analysis, respectively. Table 5.3 (O'Connell, 2009) provides an example of the $^{241}$Am sensitivity required for monitoring a mixture of weapons-grade plutonium, aged 30 years for ingrowth at time of intake. These tables illustrate the difficulty in relying on routine bioassay to demonstrate compliance with the limits and design goal.

**Table 5.1.** Urine Bioassay Goals[a] for $^{239}$Pu

| Days Post-Intake | Type M Urine Intake Retention Fraction[b] | Inhalation Dose Limit Goal[c] dpm | 100-mrem Committed Effective Dose Goal[d] dpm | Type S Urine Intake Retention Fraction[b] | Inhalation Dose Limit Goal[c] dpm | 100-mrem Committed Effective Dose Goal[d] dpm |
|---|---|---|---|---|---|---|
| 1 | 2.46E-04 | 7.36E+00 | 4.63E-01 | 2.50E-06 | 8.23E-01 | 1.79E-02 |
| 7 | 2.40E-05 | 7.18E-01 | 4.52E-02 | 3.08E-07 | 1.01E-01 | 2.21E-03 |
| 30 | 9.51E-06 | 2.85E-01 | 1.79E-02 | 1.72E-07 | 5.67E-02 | 1.23E-03 |
| 60 | 8.11E-06 | 2.43E-01 | 1.53E-02 | 1.65E-07 | 5.43E-02 | 1.18E-03 |
| 90 | 7.12E-06 | 2.13E-01 | 1.34E-02 | 1.61E-07 | 5.30E-02 | 1.15E-03 |
| 200 | 5.12E-06 | 1.53E-01 | 9.63E-03 | 1.61E-07 | 5.30E-02 | 1.15E-03 |
| 400 | 3.71E-06 | 1.11E-01 | 6.98E-03 | 1.70E-07 | 5.60E-02 | 1.22E-03 |
| 1000 | 2.44E-06 | 7.30E-02 | 4.59E-03 | 1.77E-07 | 5.83E-02 | 1.27E-03 |
| 10000 | 6.87E-07 | 2.06E-02 | 1.29E-03 | 8.25E-08 | 2.72E-02 | 5.91E-04 |
| 20000 | 4.83E-07 | 1.45E-02 | 9.09E-04 | 5.83E-08 | 1.92E-02 | 4.18E-04 |

(a) The goals reflect the activity in a 24 hour urine void corresponding to either a 50 rem committed equivalent dose or a 0.1 rem committed effective dose.

(b) Incremental (i.e., sample collected in a 24-hour period ending at the time indicated) values for excreta obtained from "Intake Retention Functions Developed from Models Used in the Determination of Dose Coefficients Developed for ICRP Publication 68 – Particulate Inhalation" (Potter, 2002). See Section 5.8.1.

(c) Calculated as Goal (dpm) = Intake x IRF x 2220 dpm/nCi, where Intake (nCi) is the 50 rem committed equivalent dose limit/dose conversion factor and IRF is the intake retention fraction.

The dose conversion factor (committed dose per unit intake) derived from the ICRP Publication 68 Database (ICRP, 1994b) is shown below:

|  | Type M, rem/nCi | Type S, rem/nCi |
|---|---|---|
| Bone Surface | 3.70 | 0.337 |

(d) Calculated as Goal (dpm) = Intake x IRF x 2220 dpm/nCi, where Intake (nCi) is the 0.1 rem committed effective dose threshold/dose conversion factor and IRF is the intake retention fraction.

The dose conversion factor (committed dose per unit intake) derived from the ICRP Publication 68 Database (ICRP, 1994b) is shown below:

|  | Type M, rem/nCi | Type S, rem/nCi |
|---|---|---|
| Effective Dose | 0.118 | 0.031 |

DOE-STD-1128-2013

**Table 5.2.** Fecal Bioassay Goals[a] for $^{239}$Pu

| Days Post-Intake | Type M Fecal Intake Retention Fraction[b] | Inhalation Dose Limit Goal[c] dpm | 100-mrem Committed Effective Dose Goal[d] dpm | Type S Fecal Intake Retention Fraction[b] | Inhalation Dose Limit Goal[c] dpm | 100-mrem Committed Effective Dose Goal[d] dpm |
|---|---|---|---|---|---|---|
| 1 | 1.10E-01 | 3.30E+03 | 2.07E+02 | 1.16E-01 | 3.82E+04 | 8.31E+02 |
| 7 | 2.29E-03 | 6.87E+01 | 4.31E+00 | 2.42E-03 | 7.97E+02 | 1.73E+01 |
| 30 | 2.81E-04 | 8.43E+00 | 5.29E-01 | 3.51E-04 | 1.16E+02 | 2.51E+00 |
| 60 | 1.31E-04 | 3.93E+00 | 2.46E-01 | 1.86E-04 | 6.13E+01 | 1.33E+00 |
| 90 | 6.65E-05 | 2.00E+00 | 1.25E-01 | 1.07E-04 | 3.52E+01 | 7.66E-01 |
| 200 | 1.42E-05 | 4.26E-01 | 2.67E-02 | 3.32E-05 | 1.09E+01 | 2.38E-01 |
| 400 | 4.67E-06 | 1.40E-01 | 8.79E-03 | 2.13E-05 | 7.02E+00 | 1.53E-01 |
| 1000 | 1.04E-06 | 3.12E-02 | 1.96E-03 | 1.12E-05 | 3.69E+00 | 8.02E-02 |
| 10000 | 2.96E-07 | 8.88E-03 | 5.57E-04 | 9.53E-08 | 3.14E-02 | 6.82E-04 |
| 20000 | 2.11E-07 | 6.33E-03 | 3.97E-04 | 3.20E-08 | 1.05E-02 | 2.29E-04 |

(a) The goals reflect the activity in a 24 hour fecal sample corresponding to either a 50 rem committed equivalent dose or a 0.1 rem committed effective dose.

(b) Incremental (i.e., sample collected in a 24-hour period ending at the time indicated) values for excreta obtained from "Intake Retention Functions Developed from Models Used in the Determination of Dose Coefficients Developed for ICRP Publication 68 – Particulate Inhalation" (Potter, 2002). See Section 5.8.1.

(c) Calculated as Goal (dpm) = Intake x IRF x 2220 dpm/nCi, where Intake (nCi) is the 50 rem committed equivalent dose limit/dose conversion factor and IRF is the intake retention fraction.

The dose conversion factor (committed dose per unit intake) derived from the ICRP Publication 68 Database (ICRP, 1994b) is shown below:

|  | Type M, rem/nCi | Type S, rem/nCi |
|---|---|---|
| Bone Surface | 3.70 | 0.337 |

(d) Calculated as Goal (dpm) = Intake x IRF x 2220 dpm/nCi, where Intake (nCi) is the 0.1 rem committed effective dose threshold/dose conversion factor and IRF is the intake retention fraction.

The dose conversion factor (committed dose per unit intake) derived from the ICRP Publication 68 Database (ICRP, 1994b) is shown below:

|  | Type M, rem/nCi | Type S, rem/nCi |
|---|---|---|
| Effective Dose | 0.118 | 0.031 |

DOE-STD-1128-2013

**Table 5.3.** Lung Measurement Bioassay Goals for [241]Am as an Indicator of Aged Weapons-Grade Plutonium[(a)]

| Time - days | IRF[(d)] | Type M Plutonium | Inhalation |
| --- | --- | --- | --- |
| | | Dose limit Goal[(b)] nCi [241]Am | 100-mrem Committed Effective Dose Goal[(c)] nCi [241]Am |
| 1 | 1.25E-02 | 3.39E-02 | 2.21E-03 |
| 3 | 1.69E-02 | 4.58E-02 | 2.99E-03 |
| 7 | 3.10E-04 | 8.40E-04 | 5.49E-05 |
| 10 | 1.54E-05 | 4.17E-05 | 2.73E-06 |
| 30 | 3.79E-14 | 0 | 0 |
| Time - days | IRF[(d)] | Type S Plutonium | Inhalation |
| | | Dose limit Goal[(b)] nCi [241]Am | 100-mrem Committed Effective Dose Goal[(c)] nCi [241]Am |
| 1 | 1.89E-01 | 1.73E+00 | 8.43E-02 |
| 7 | 6.01E-02 | 5.49E-01 | 2.68E-02 |
| 30 | 4.96E-02 | 4.53E-01 | 2.21E-02 |
| 60 | 4.21E-02 | 3.84E-01 | 1.88E-02 |
| 90 | 3.79E-02 | 3.46E-01 | 1.69E-02 |
| 200 | 3.14E-02 | 2.87E-01 | 1.40E-02 |
| 400 | 2.59E-02 | 2.36E-01 | 1.16E-02 |

(a) Defined as a Pu mixture consisting of, by weight %, 93% [239]Pu, 6.1% [240]Pu, 0.8% [241]Pu, 0.05% [238]Pu, and 0.05% [242]Pu, with 30 years allowed for [241]Am ingrowth (Table 5.4). Additional ingrowth of [241]Am post intake is negligible.

(b) Intake of a 30 year aged 6% mix of Pu, with the specific activities listed in Table 5.5, giving a committed equivalent dose of 50 rem to the bone surfaces. Calculated as:

Dose Limit Goal (nCi [241]Am) =

$$\frac{50 \text{ Rem x specific activity (Ci/g) of the }^{241}\text{Am in the 30 year aged 6\% Pu Mix x IRF}}{\text{Mixture dose coefficient (Rem/g) x 1.0E-9 Ci/nCi}}$$

Where: Mixture Dose Coefficient (Rem/g) =
$\sum$ (Specific Activity (Ci/g) of a 30 year aged 6% Pu Mix (from Table 5.5) x applicable radionuclide dose conversion factor (Rem/Ci) derived from the ICRP Publication 68 Database (ICRP, 1994b). See table below.

(c) Intake of a 30 year aged 6% mix of Pu, with the specific activities listed in Table 5.5, giving a committed effective dose of 0.1 rem.

100-mrem committed effective dose goal (nCi [241]Am) =

$$\frac{0.1 \text{ Rem x specific activity (Ci/g) of the }^{241}\text{Am in the 30 year aged 6\% Pu Mix x IRF}}{\text{Mixture dose coefficient (Rem/g) x 1.0E-9 Ci/nCi}}$$

Where: Mixture Dose Coefficient (Rem/g) =
$\sum$ (Specific Activity (Ci/g) of a 5year aged 6% Pu Mix (from Table 5.5) x applicable radionuclide dose conversion factor (Rem/Ci) derived from the ICRP Publication 68 Database (ICRP, 1994b). See following table.

Dose Coefficients (Rem/Ci)

| Absorption Type/ | | Pu-238 | Pu-239 | Pu-241 | Pu-242 | Am-241 |
|---|---|---|---|---|---|---|
| M | Bone Surface | 3.40E+09 | 3.70E+09 | 7.40E+07 | 3.60E+09 | 4.10E+09 |
| S | Bone Surface | 3.00E+08 | 3.40E+08 | 7.40E+06 | 3.20E+08 | 4.10E+09* |
| M | Whole Body | 1.10E+08 | 1.20E+08 | 2.15E+06 | 1.10E+08 | 1.00E+08 |
| S | Whole Body | 4.10E+07 | 3.10E+07 | 3.10E+05 | 2.80E+07 | 1.00E+08* |

* Type M dose coefficient for Americium-241 is used.

(d)  Incremental (i.e., sample collected in a 24-hour period ending at the time indicated) values for excreta obtained from "Intake Retention Functions Developed from Models Used in the Determination of Dose Coefficients Developed for ICRP Publication 68 – Particulate Inhalation" (Potter, 2002). See Section 5.8.1.

The problem is simply that the measurement technology is not available to provide the sensitivities required for the 100-mrem goal using routine, periodic measurements at reasonable frequencies. For example, routine Hanford analyses of plutonium in urine has a detection limit of 0.02 dpm/sample, plutonium in feces has a detection limit of 0.2 dpm/sample and americium lung counting has a detection limit of 0.16 nCi (Carbaugh, 2003). As shown in Table 5.1, for material type M, monthly routine bioassay measurements would not achieve a sensitivity for the 100-mrem goal. For material type S, even weekly routine bioassay measurements would not have the sensitivity for the 100-mrem goal. Monthly, or even bi-monthly, fecal bioassay, as shown in Table 5.2, could achieve the requisite sensitivity for the 100-mrem goal for material type M (worst case). However, as discussed in Section 5.3.3.2, there are associated difficulties in including fecal analysis as part of a routine bioassay program. As shown in Table 5.3, lung counting for material types M or S would also not achieve a sensitivity for the 100-mrem goal.

Therefore, because the goal of 100-mrem CED cannot, typically, be met through routine bioassay, the radiation protection organization should take the following administrative actions:

--  ensure that adequate control measures are applied to prevent intakes

--  document the adequate control measures for auditing purposes

--  upgrade bioassay measurement systems and workplace monitoring practices to provide state-of-the-art measurements

--  ensure that internal dose assessments use commercially viable technology.

--  ensure workplace monitoring programs are designed to identify potential intakes.

All confirmed occupational intakes of plutonium, regardless of magnitude, should be assessed. The results of all bioassay and other measurements needed to support the quality of measurements and dose assessment should be recorded and maintained. The recording and reporting requirements for internal dosimetry data are set forth in Section 3.7 of this report; however, the following is a summary list of internal dosimetry information for which recording is required:

-- Total CED from all intakes during a year

-- committed equivalent dose to organs or tissues of concern from all intakes during a year

-- magnitude of intake for each radionuclide during a year

-- data necessary to allow subsequent verification, correction, or recalculation of doses

-- gestation period equivalent dose to the embryo/fetus from intake by the declared pregnant worker during the entire gestation period.

Radiation exposure records programs shall also provide for the summation of internal and external doses, as required by 10 CFR 835.702 (DOE, 2011). While the summation process is not necessarily performed under a site internal dosimetry program, it behooves the program to recognize what is required. The following summations are identified by 10 CFR 835.702(c) (5) and (6):

-- Total effective dose (TED) defined as the summation of effective dose (for external exposures) and the CED

-- summation of the equivalent dose to the whole body from external exposure and the committed equivalent dose to organs or tissues of concern

-- cumulative TED

-- for the embryo/fetus of a declared pregnant worker, the summation of the equivalent dose to the whole body to the mother from external exposure during the entire gestation period and the gestation period equivalent dose to the embryo/fetus from intakes by the mother during the entire gestation period.

Doses should be calculated and recorded for any confirmed plutonium intake. What constitutes a confirmed intake is discussed in Section 5.7. Along with the doses, supporting records shall be maintained, including the bioassay data, assumptions, biokinetic models, and calculational methods used to estimate the doses. These may be included in letter-report dose assessments, databases, technical basis documents, and similar records, either singly or in combination.

### 5.1.2    Protection of the Embryo/Fetus, Minors, and Members of the Public

The equivalent dose limit for the embryo/fetus of a declared pregnant worker is 0.5 rem for the entire gestation period, defined as the summation of external dose received and internal dose received during the gestation period (not the 50-year committed internal dose). Internal exposure monitoring is required if an intake is likely to result in more than 10% of that limit (i.e., 50 mrem for the gestation period). As discussed in more detail in Section 5.6., providing adequate protection to keep the mother's intakes below the occupational limits will also provide adequate protection for the embryo/fetus. Thus, special bioassay for plutonium or americium related to pregnancy is not required. As a matter of caution, some sites try to obtain baseline bioassays as soon as a pregnancy is declared, with another baseline bioassay

following the end of pregnancy. Some sites also offer to restrict pregnant workers from jobs with relatively high potential for occupational intakes.

Minors and members of the public are limited, in part, by 10 CFR 835.207 and 10 CFR 835.208 (DOE, 2011) to a TED of 0.1 rem/year. Internal exposure monitoring is required if an intake is likely to result in 50% of that limit (0.05 rem). As noted in Section 5.1.1, because bioassay monitoring is not likely to be sufficiently sensitive to identify such intakes on a routine basis, enhanced workplace surveillance or restriction of access may be required.

## 5.2    CHARACTERIZATION OF INTERNAL HAZARDS

Plutonium can be encountered in a wide range of mixtures, e.g., a pure isotope in a standard solution, a highly variable combination of isotopes in so-called "weapons grade" or "fuels grade" Pu, or commercial spent fuel. In addition, the age of a mixture significantly affects its isotopic composition. As a typical weapons or fuels grade mixture ages, the $^{241}$Pu decays to $^{241}$Am. Although the mass changes may be quite small, the overall result can be a significant build-up of $^{241}$Am radioactivity with time. This buildup can make the mixture somewhat easier to detect by in vivo methods. Table 5.4 shows some example plutonium mixtures which might be encountered in DOE facilities. Isotopically pure forms of radionuclides can also be encountered. Table 5.5 demonstrates the impact of aging on the activity composition of two mixtures. The composition of plutonium in the facility can significantly affect the design and capabilities of an internal dosimetry program. As part of the program technical basis, the plutonium mixtures need to be determined. In addition, determinations should be made at the time of identified incidents of potential intake. Methods for such determination may include radiochemical analysis or chemistry followed by mass spectrometry.

The physical-chemical form of plutonium also affects the internal hazard posed. Oxides of plutonium tend to exhibit inhalation absorption type S behavior, whereas other compounds such as nitrates are assigned absorption type M by the ICRP. However, as noted in Section 2.4.1, extremes have been observed with regard to both highly soluble and highly insoluble forms, leading to the good practice of performing dissolution rate (i.e., solubility) tests on standard materials in a facility.

As plutonium ages in a residual, loose contamination form, such as might be found in old duct work, glove boxes, or other such components, it can be expected to undergo slow oxidation to a more insoluble form. Thus, absorption type S forms of plutonium may be reasonable assumptions of what to expect during many decommissioning operations.

Particle size is an important consideration for inhalation exposures. The normal practice for an aerosol is to identify the activity median aerodynamic diameter and its associated particle-size distribution. Particle sizes of 10 µm or less are considered respirable. It is acceptable to assume a 5-µm particle size for dosimetry purposes because actual particle size information is usually lacking. Particle size data are most readily obtainable for chronic exposure situations.

Unless representative air sampling is performed in the immediate proximity of a worker during abnormal working conditions, the practical likelihood of obtaining good particle-size information is slim.

## 5.3    SCOPE OF BIOASSAY PROGRAM

The relatively low annual limit on intake of plutonium renders its radiation hazard substantially more restrictive than its industrial hygiene or chemical toxicity hazard. Thus, internal radiation dose or intake monitoring is the appropriate focus of bioassay monitoring.

**Table 5.4.** Example Plutonium Isotope Mixtures Immediately Post-Separation wt%

| Isotope | Weapons-Grade Plutonium (6% $^{240}$Pu Mixture) | Fuels-Grade Plutonium (12% $^{240}$Pu Mixture) | Spent Commercial Fuel (25% $^{240}$Pu Mixture) |
|---|---|---|---|
| $^{238}$Pu | 0.05 | 0.10 | 1.49 |
| $^{239}$Pu | 93.0 | 84.4 | 59.50 |
| $^{240}$Pu | 6.1 | 12.4 | 23.98 |
| $^{241}$Pu | 0.8 | 3.0 | 10.33 |
| $^{242}$Pu | 0.05 | 0.1 | 4.0 |
| $^{240}$Am | 0.0 | 0.0 | 0.0 |

**Table 5.5.** Activity Composition with Age for Reference 6% and 12% $^{240}$Pu Mixtures (Carbaugh, 2003)

| Isotopic Component | Reference 6 % Pu Mix [a] | | Reference 12% Pu Mix [a] | |
|---|---|---|---|---|
| | Fresh | Aged | Fresh | Aged |
| **Specific Activity In Mixture, Ci/g** | | | | |
| $^{238}$Pu | 8.6E-3 | 6.7E-3 | 1.7E-2 | 1.4E-2 |
| $^{239+240}$Pu | 7.2E-2 | 7.2E-2 | 8.0E-2 | 8.0E-2 |
| $^{241}$Pu | 8.2E-1 | 1.9E-1 | 3.1E+0 | 7.3E-1 |
| $^{242}$Pu | 2.0E-6 | 2.0E-6 | 3.9E-6 | 3.9E-6 |
| $^{241}$Am | 5.3E-5 | 2.0E-2 | 2.0E-4 | 7.6E-2 |
| Pu-alpha | 8.1E-2 | 7.8E-2 | 9.7E-2 | 9.3E-2 |
| Total alpha | 8.1E-2 | 9.8E-2 | 9.7E-2 | 1.7E-1 |
| **Activity Ratios** | | | | |
| $^{239+240}$Pu:$^{241}$Am | NA | 3.5E+0 | NA | 1.0E+0 |
| Pu-alpha:$^{241}$Am | NA | 4.8E+0 | NA | 2.2E+0 |
| $^{241}$Pu:$^{239+240}$Pu | 1.2E+1 | 2.7E+0 | 3.8E+1 | 9.2E+0 |

(a) % = nominal $^{240}$Pu weight percent in mixtures.
   Fresh = 2 weeks of $^{241}$Am ingrowth following separation.
   Aged = 30 years of $^{241}$Am ingrowth following separation.

### 5.3.1    Classification of Bioassay Measurements

Bioassay measurements can be classified according to the primary reason for their performance. This is a useful practice for historically documenting why a worker participated in a bioassay program. Numerous reasons for bioassay measurements may be defined for specific facilities; some suggested common classifications are as follows:

-- **Baseline measurements** are used to establish a pre-exposure condition, either for a new employee or as a result of a new work assignment. The standard, Radiological Control (DOE, 2017), recommends baseline measurements if workers are considered likely to receive intakes resulting in greater than 100-mrem CED. It is a good practice to perform such measurements for newly hired employees, intra-company transferees, or workers transferred from facilities where bioassay measurements may not have been required. In addition, baseline measurements can verify workers' status for special work assignments. For plutonium bioassay, baseline measurements made before any occupational exposure can be expected to yield no detectable results using current technology.

Exempting workers from baseline bioassay implies accepting any detectable results as likely attributable to current occupational exposure. However, requiring baseline measurements can potentially impact the schedule of short-term jobs; the time required to obtain a chest count and a large-volume urine sample may add a day or two delay to entry procedures. Moreover, missing a baseline for a long-term employee who will be placed on a routine bioassay program is not likely to be as troublesome as not obtaining a baseline for a short-term worker who provides a termination sample that shows detection of plutonium after the worker has left the site and is difficult to reach for follow-up.

-- **Routine, or periodic, measurements** are performed on a predetermined schedule (e.g., an annual or quarterly frequency).

-- **Special bioassay measurements** are performed as follow-up to unusual routine results or suspected intakes (See Section 5.9 for recommended internal dosimetry indicator and action levels).

-- **End of assignment or termination measurements** are performed following completion of specific work or at the time of termination of employment. The DOE Standard, Radiological Control (DOE, 2017), recommends that workers who participate in bioassay programs have appropriate termination measurements.

Bioassay classification is important because the purpose of a sample may affect the collection and analysis or monitoring method chosen. For example, single-void urine samples are not adequate for routine monitoring of potential plutonium exposure, but can provide important information for dose-reduction therapy following a suspected intake; samples representative of excretion over a 24-hour period should be collected for quantitative intake and dose assessment. The date of sample collection (and possibly the time of collection) can be very important to special monitoring performed to assess intake. However, these are

much less important with regard to periodic monitoring, for which measurements are not expected to show detectable activity and when any detection whatsoever is likely to initiate investigation and special bioassay.

### 5.3.2    Monitoring Requirements and Selection of Employees

Workers who are considered likely to have intakes resulting in excess of 100-mrem CED are required to participate in a bioassay program. However, because of the extensive radiological control practices for plutonium facilities, including a high degree of engineered barrier containment, no typical plutonium worker is <u>likely</u> to have intakes of 100-mrem CED or more. However, this should not be used as an excuse to exclude workers from routine bioassay. Although no one should be considered likely to have intakes resulting in 100-mrem CED, some workers are at significantly higher risk for incurring an intake than others and should be on routine bioassay.

The workers at highest risk of incurring an intake are the ones in closest contact with the material. Typically, these are the operators, maintenance, and health physics personnel handling plutonium or plutonium-contaminated objects in the course of routine glove-box, maintenance, or decommissioning operations. In the event of containment system failure, or failure respiratory protection devices, it is these workers who will most likely incur exposure and subsequent intake. These workers should be on a routine bioassay program designed to meet the requirements of 10 CFR 835 (DOE, 2011) as a kind of safety net to identify intakes which might have gone undetected by workplace monitoring.

Other workers (e.g., supervisors, inspectors, observers, guards, and tour groups) who work in or visit a plutonium facility but are not directly working with the material or contaminated objects are at a substantially lower risk for incurring an intake. Although these people may not need to be on a routine bioassay program, they should be subject to participation in a special bioassay program if workplace indications suggest loss of control or containment.

### 5.3.3    Selection of Bioassay Monitoring Techniques

Bioassay monitoring techniques fall into two broad categories, direct measurement of radioactive materials in the body (in vivo counting) and analysis of material removed from the body for laboratory in vitro analysis. In vivo counting includes measurements of the chest, lung, skeleton, liver, and wounds. In vitro measurements include urinalysis, fecal analysis, and occasionally analysis of tissue, sputum, or blood samples. Methods for in vitro analysis include liquid scintillation counting, fluorescence measurements, gamma spectrometry, chemical separation followed by electrode position, and counting with radiation detectors. Selby et al. (1994) provide a brief overview of bioassay techniques and capabilities. Further discussion of the techniques is provided below.

#### 5.3.3.1    In Vivo Counting

Direct bioassay (in vivo counting) is the measurement of radiations emitted from radioactive material taken into and deposited in the body. Direct bioassay is appropriate for detection and measurement of photons emitted by plutonium and its

decay products. Lung, wound, liver, and skeleton counting are examples of in vivo monitoring most commonly used for plutonium and its progeny. Whole body counting, commonly used for monitoring high-energy fission and activation products in the body, is ineffective for direct measurement of plutonium due to the very low energy of photons emitted from plutonium and its decay products unless the plutonium is intimately mixed in a high-energy photon-emitting matrix, such as spent fuel.

Some low-energy x-rays emitted by plutonium decay products are energetic enough to escape the body. When direct bioassay is used, the detection system should be calibrated for the radionuclides to be measured in the appropriate organs. All calibration procedures, calibration records, and quality control data should be maintained. Energies most commonly used for plutonium monitoring are the 17-keV L X-rays and the 60-keV gamma of [241]Am. Mixtures of spent fuel material can lend themselves to whole body counting if the ratio of a readily detectable high-energy gamma-emitter (i.e., [137]Cs) to plutonium is known.

A plutonium facility should have the capability to detect and assess depositions of plutonium in the lungs of radiation workers. The major objective of lung counting is to provide measurements of suspected intakes triggered by workplace monitoring results. Lung measurements should be made to provide an early estimate of the magnitude of the intake and resulting lung deposition.

Two methods have been used to detect plutonium in the lung: the L x-ray method and the americium-tracer method. The L x-ray method is based on the measurement of L X-rays following the decay of plutonium. This method provides a direct measurement of plutonium. The detection capability of the method may be on the order of tens of nanocuries for plutonium and requires an accurate measurement of the chest wall thickness (because of the large attenuation of the low-energy X-rays by the rib cage and overlying tissues). Other problems that complicate the measurement of L X-rays are (1) the difference in attenuation in muscle and fat, (2) the possibility of nonuniform distribution of the plutonium in the lung, and (3) interferences from radionuclides in other organs or from other radionuclides in the lung.

The americium-tracer method has the advantage of better detection capability for some mixtures of plutonium. The typical MDA for [241]Am lung counting is 0.1 to 0.2 nCi. The americium-tracer method depends on the plutonium/americium ratio, which shall be independently determined or estimated for each intake. The detection level for this method with a plutonium/americium ratio of 15 is typically 2-nCi plutonium in the lung. The americium-tracer method also has the advantage of being less affected by attenuation in the chest wall or by variations in the muscle/fat ratio. However, it has the disadvantage of requiring an estimate of the plutonium/americium ratio, both initially and at long times post intake. This ratio may change over time because of ingrowth of [241]Am as the decay product of [241]Pu or because americium may naturally clear from the lungs and translocate among internal organs at a rate different than that for plutonium.

The most widely used systems for lung counting are high-purity germanium detectors, thin sodium-iodide detectors, phoswich detectors, and proportional counters. Multiple high-purity germanium detectors have advantages over the other detector systems because of their good resolution, allowing better identification of

the radionuclide, better detectability, and better background prediction capability. The main disadvantages of germanium detector arrays are their higher cost relative to other types of in vivo detectors and their lower reliability.

Measurement equipment to detect and measure plutonium contamination in wounds should be available at all plutonium facilities. Instrumentation used for this purpose may include thin-crystal NaI(Tl), intrinsic germanium, or Si(Li) detectors. The detection level for plutonium wound measurements is typically 0.1 nCi for $^{239}$Pu. Correction for depth due to absorption of photons in the overlying tissues should be considered. Collimated detectors are useful for determining the location of the plutonium in wounds.

Estimates of the depth of plutonium contamination in a wound may be made using solid-state germanium or Si(Li) detectors to measure the relative absorption of the low-energy X-rays emitted by plutonium. Information about depth is important for determining whether tissue excision is necessary to remove the contamination.

### 5.3.3.2  In Vitro Analysis

The two most common forms of in vitro analysis are urinalysis and fecal analysis.

**Urinalysis**. Urine sampling provides useful information about the amount of plutonium excreted following an intake. After chemical isolation, the plutonium in urine samples may be determined by various methods including: alpha spectrometry (gas-flow proportional or surface-barrier detection), alpha counting (zinc sulfide or liquid scintillation counting), fission track counting, and mass spectrometry. Analytical procedures for in vitro measurement of plutonium and other radionuclides have been published (Volchok and dePlanque, 1983; Gautier, 1983).

Urine samples should be collected away from the plutonium facility to minimize cross-contamination. Samples should be collected in contamination-free containers; measures should be considered for minimizing plateout on walls of container surfaces (such as by addition of trace amounts of gold, oxalate, or nitric acid).

**Fecal Analysis**. Fecal analysis is a useful procedure for evaluating the excretion of plutonium and many other radioactive materials because more than half of the material deposited in the upper respiratory tract is cleared rapidly to the stomach and GI tract.

The total fecal plus urinary elimination for the first few days after exposure, combined with in vivo counts that might be obtained, may provide the earliest and most accurate assessment of intake. Fecal samples taken during the second and third day after an inhalation incident are likely to provide the most useful data because the GI hold-up time may vary from a few hours to a few days.

Fecal sampling is primarily a monitoring procedure for confirming and evaluating suspected intakes, but is used at some plutonium facilities for routine periodic monitoring as well. Workers may find fecal sampling unpleasant or objectionable, and laboratory technicians may also have aversion to fecal sample analysis. Some of these problems may be minimized if commercial fecal sample collection kits are used for convenient collection and handling of samples (Fisher et al., 1982). Collection

kits also provide a means for collecting uncontaminated samples. Fecal samples may require additional sample preparation before analysis.

## 5.4    ESTABLISHING BIOASSAY FREQUENCY

The bioassay measurement frequency should be based on 1) the potential risks of an intake occurring and 2) the sensitivity of a bioassay program to detecting potential intakes. The bioassay program sensitivity can be selected using specified intervals between measurements based on the MDD associated with an interval.

The rationale for the selected bioassay measurement frequency should also be documented. It is appropriate to evaluate the probability of intake and to modify the sampling frequency based on that probability.

The frequency of bioassay measurements should normally not be decreased because analytical results are below the detection level. The bioassay program should be maintained to confirm the proper functioning of the overall internal exposure control program and to document the absence of significant intakes of radionuclides.

### 5.4.1    Frequency Based on Program Sensitivity

The minimum detectable dose concept refers to the potential dose associated with an MDA bioassay measurement at a given time interval post-intake. The pattern of retention of activity in the body, the MDA for a bioassay measurement technique, and the frequency with which that technique is applied define a quantity of intake that could go undetected by the bioassay program. An intake of such a magnitude would not be detected if it occurred immediately after a bioassay measurement and if it were eliminated from the body at such a rate that nothing was detected during the next scheduled measurement. The dose resulting from such an intake would be the MDD for that particular measurement technique and frequency.

Estimates of MDD in terms of CED should be documented for each measurement technique, MDA, and frequency. Retention functions specific to the various chemical forms and particle size distributions found in the facility should be used. Examples of MDD tabulations can be found in La Bone et al. (1993) and Carbaugh et al. (1994). In establishing MDD tables, it is important to consider dose contributions from all appropriate radionuclides in any mixture, rather than just the dose contribution from the bioassay indicator nuclide.

### 5.4.2    Frequency Based on Potential Risk of Intake

As discussed in Section 5.3.2, although plutonium workers are not generally considered to be at high risk of incurring intakes that might result in CEDs of 100 mrem or more, any plutonium worker can be considered to have the potential for such an intake. However, having the potential for intake does not mean that they are likely to incur an intake.

Workers who have the highest potential risk for an intake are those most closely working with plutonium or plutonium-contaminated material. Typically, these workers are glove-box workers, maintenance workers, and operational health physics surveillance staff. These workers should be on a routine plutonium or americium

bioassay program, including urinalysis and in vivo measurements. Such programs are relatively insensitive compared to the 100-mrem CED goal and are a safety net intended to catch intakes of significance relative to regulatory limits, rather than substantially lower administrative levels. Selection of bioassay frequency depends on the facility experience with potential intakes, the perceived likelihood of intake, and the MDD of a program. Annual urinalyses and in vivo chest counts are fairly typical. More frequent (e.g., semi-annual or quarterly) measurements may permit more timely review of workplace indicators in the event that an abnormal bioassay result is obtained, but do not necessarily mean a more sensitive program.

Plutonium facility decommissioning projects may present a different set of challenges for worker protection. In particular it is likely that clean up of areas will involve more plutonium that is not contained than is the case during normal operations. In addition, the workers involved may be relatively transient as the project progress through phases requiring different craft labor mixes. This being the case, more frequent bioassay may be necessary to provide good assurance that dose limits are not exceeded. As discussed in Section 5.3.1, it is likely that program administrators will require a baseline measurement prior to the start of work and another at the termination of work. However, if the worker moves between tasks, it may be difficult to determine the source of an uptake without intermittent bioassay. In such cases, the use of breathing zone air samplers may be appropriate.

### 5.4.3    Special Bioassay as Supplements to Routine Bioassay Programs

Special bioassay programs for workers with known or suspected acute inhalation intakes of plutonium or other alpha-emitting radionuclides should include both urine and fecal sampling. Special bioassay measurements should be initiated for each employee in a contaminated work area when surface contamination is detected by routine surveillance if it is possible that the contamination resulted in a CED of 100 mrem or greater. Excreta samples should not be collected where they may be contaminated by external sources of plutonium. Ideally, total urine and feces should be collected for about a week following intake. This permits a sensitive assessment of potential intake and internal dose. Longer term special samples collected at various times from a month to a year following intake can help to discriminate between ingestion, absorption type M inhalation, and absorption type S inhalation. See Section 5.9 for indicator levels where special bioassay should be considered.

### 5.4.4    Long-term Follow-up Bioassay Programs

Following an intake a long-term follow-up bioassay program may be required for a worker to compare the actual excreta or in vivo results with those projected by the evaluation. This is important to verify the accuracy of intake and dose assessments. The frequency and duration of a special program is dependent upon the projected values; it is suggested that as long as a worker continues to have detectable bioassay results, he or she should continue to be monitored. It is particularly important to have good baseline data and projections for individuals who return to plutonium work. The ability of a bioassay program to distinguish between an established, elevated baseline and a new potential intake is important in the continued monitoring of workers once an intake has occurred. Because of statistical fluctuations in low-level plutonium and americium measurements, it can be very difficult to identify a new intake by routine bioassay if a worker has an elevated baseline.

5.5    **ADMINISTRATION OF A BIOASSAY PROGRAM**

Administering a bioassay program requires that the policies, procedures, materials, support facilities, and staff be in place to enable a bioassay program to commence. Among the administrative items to address are the following:

--    Management policy requiring participation in bioassay program by appropriate workers (may be part of an overall radiation protection policy)

--    implementing procedures (e.g., criteria for who should participate, scheduling, sample kit instructions, sample kit issue/receipt, follow-up to unsuccessful sample or measurement attempts, data-handling)

--    arrangements with appropriate analytical laboratories, including specifications of analysis sensitivity, processing times, reporting requirements, and quality assurance provisions

--    onsite support facilities (e.g., sample kit storage locations, sample kit issue/collection stations, measurement laboratory facilities, equipment maintenance)

--    staff selection, qualification, and training.

Recommendations for testing criteria for radiobioassay laboratories are in Performance Criteria for Radiobioassay, ANSI/HPS N13.30 (ANSI, 2011b). These recommendations include calculational methods and performance criteria for bias, precision, and testing levels.

Some sites have established brief flyers or brochures describing their bioassay measurements. These may be distributed to workers during classroom training, upon notification of scheduled measurements, or at the time of the measurement or sample.

5.5.1    **In Vivo Monitoring**

The scheduling and measurement process for obtaining in vivo measurements is usually straightforward. Workers are scheduled for the measurements and results are available shortly after the measurement is completed. Counting times for in vivo [241]Am measurements range from about 15 minutes to an hour or more, depending on the type of measurement and sensitivity required. The long counting times can impose limitations on the throughput of workers through a measurement facility, making scheduling an important issue. Procedures should be in place to assure that workers arrive for scheduled measurements and that follow-up occurs when a measurement is not completed or a worker fails to show.

Occasionally, workers are found who are claustrophobic when placed inside in vivo counter cells. Leaving the cell door partially open may help reduce some of the anxiety, but will also likely compromise the low background for which the system is designed.

Many workers want to know the results of their measurements. While a simple statement by the in vivo measurement technician may be adequate, a form letter

stating that results were normal (or showed no detection of any of the nuclides of concern) can provide permanent verification. If results are not normal, a form letter can also be used to explain what happens next.

An important aspect of any in vivo measurement program is the calibration and verification testing of the measurement equipment. In vivo measurement results are highly dependent on the determination of a background result. Likewise, calibration using known activities in appropriate phantoms is also important. Phantoms are available commercially or by loan from the USDOE Phantom Library, operated by the Radiological and Environmental Sciences Laboratory in Idaho Falls. For information on or to request loans from the USDOE Phantom Library go to the DOELAP website: http://www.hss.doe.gov/sesa/corporatesafety/doelap/index.html.

### 5.5.2   Urine Sampling

Urine sampling programs can be effectively administered using either workplace or home collection protocols. Workplace sampling protocols shall assure that adequate precautions are taken to prevent external contamination of the sample by levels of activity well below the detection capabilities of friskers and workplace monitors. Home collection protocols have the advantage of being sufficiently removed from the workplace to render as essentially nonexistent the potential of very low-level contamination of the sample from external sources of plutonium. Avoidance of very minor external contamination of the samples is extremely important due to the dosimetric implications of plutonium in urine.

Large-volume urine samples are necessary for bioassay monitoring due to the very small urinary excretion rates. Ideally, 24-hour total samples would be preferred; however, such samples often impose substantial inconvenience on workers, resulting in noncompliance with the instructions. As an alternative, total samples can be simulated by either time-collection protocols or volume normalization techniques.

One method of time-collection simulation (NCRP, 1987; Sula et al., 1991) is to collect all urine voided from 1 hour before going to bed at night until 1 hour after rising in the morning for two consecutive nights. This technique has been reviewed with regard to uranium by Medley et al. (1994) and found to underestimate daily urine excretion by about 14%. Such a finding is not unexpected, since the time span defined by the protocol is likely to be about 18 to 22 hours for most people.

The volume normalization technique typically normalizes whatever volume is collected to the ICRP Reference Man daily urine excretion volume of 1400 mL. Reference Woman excretion (1000 mL/d) may be used for gender-specific programs. As a matter of practicality, routine monitoring programs do not usually use gender as a basis of routine data interpretation, particularly since results are anticipated to be nondetectable under normal conditions.

A third method calls for collection of a standard volume (e.g., 1 liter) irrespective of the time over which the sample is obtained. This method uses the standard volume as a screening tool only for routine monitoring. It does not attempt to relate measured routine excretion to intake, relying on well-defined and timely supplemental special bioassay to give true or simulated daily excretion rates.

DOE-STD-1128-2013

The most common sample collection containers are 1-liter polyethylene bottles. Although glass bottles are also used, they pose additional risks of breakage. Wide-mouthed bottles are preferred for convenience and sanitation. The number of bottles included in the kit should be appropriate to the protocol; for a total 24-hour protocol as much as 3 liters can be expected. Special provisions, such as a funnel or transfer cup, may improve the esthetics of sample collection and provide for added worker cooperation.

Some concerns can exist with length of sample storage before analysis. Storage may come from delays before batching samples in-house or due to transportation times to an offsite laboratory. The longer a sample stands, the more chemical and biological change it can undergo, typically manifesting itself as sedimentation and plateout on container walls. While samples can be preserved by acidification or freezing, good radiochemistry techniques should assure essentially complete recovery of any plateout or sediment. Samples sent offsite for analysis can be preserved with acid, but this method imposes hazardous material shipping requirements. Freezing samples can preserve them, but plateout and sedimentation upon thawing should still be expected.

Precautions are necessary if a lab uses an aliquot for analysis and extrapolates the aliquot result to the total sample. The aliquoting procedure should be tested using spiked samples to assure that it is representative.

A QC verification program should exist for laboratory analyses, including use of known blank samples and samples spiked with known quantities of radioactivity. Ideally, the samples should not be distinguishable by the analytical laboratory from actual worker samples. The number of QC verification samples may range from 5% to 15% of the total samples processed by a large-volume program; a small program focused on submittal of special samples following suspected intakes may have a much higher percentage of controls. An additional QC provision may be to request the analytical lab to provide results of their in-house QC results for independent review.

There are no standard or regulatory requirements for bioassay sample chain-of-custody provisions, nor has there been consensus on their need. Tampering with samples has not been a widely reported or suspected problem. Site-specific chain-of-custody requirements should be based on balancing the need with the resources required to implement them. Some sites have no chain-of-custody requirements associated with bioassay sample collection. At other sites, a simple seal placed on a sample container following collection by the subject worker is an effective means of providing a small degree of chain-of-custody. At the more complex level would be strict accountability requiring signature of issue, certification of collection, and signature of submittal.

Procedures describing details of the bioassay program should be documented. These procedures should include a description of sample collection, analysis, calibration techniques, QC, biokinetic modeling, and dose calculational methods used.

### 5.5.3    Fecal Sampling

A fecal sampling program shall be designed to ensure worker cooperation, whether collecting samples at home or in the workplace. Since the frequency of fecal voiding varies greatly from person to person, the sample collection program shall be adaptable. Flexibility in sample dates is important. It is suggested that when a fecal sample is required, the worker be provided with a kit and instructed to collect the sample, noting the date and time of voiding on the sample label. This practice can reduce the likelihood of unsuccessful samples. If multiple samples are required (for example, to collect the total early fecal clearance following an acute inhalation exposure), the worker may be given several kits and told to collect the next several voidings. the worker should be told to note the date and time of each sample.

Since the total fecal voiding should be collected, thought shall be given to the kit provided. Fecal sampling kits can be obtained from medical supply companies or designed by the site. A typical kit might include a large plastic zipper-closure bag to hold the sample, placed inside a 1- to 2-liter collection bucket with a tight-fitting lid. The bucket and bag can be held in place under a toilet seat by a trapezoid-shaped bracket with a hole through it sized to hold the bucket. After sample collection, the zipper bag is sealed, the lid is snapped tight on the bucket, and the bucket placed in a cardboard box.

Following collection, the sample handling, control, analytical, and quality control (QC) provisions are similar to those described above for urine samples. One particular concern for fecal analysis is the potential difficulty of dissolving class Y plutonium in the fecal matrix. While nitric acid dissolution may be adequate, enhanced digestion using hydrofluoric acid may be preferred.

### 5.6    MODELING THE BEHAVIOR OF PLUTONIUM IN THE BODY

A key issue to plutonium dosimetry is the modeling of how the material behaves in the body. Some of the standard models are described below, with additional discussion on the biological behavior given in Section 2.4. It is important that an internal dosimetry program establish and document the routine models and assumptions used for dosimetry. Computer codes typically incorporate standard models but may allow the flexibility to alter parameters. When altered on an individual-specific basis, the revised models need to be addressed in the pertinent case evaluations or the technical basis.

### 5.6.1    Respiratory Tract

The respiratory tract model of ICRP Publication 66 (ICRP, 1994a) may be used for evaluating inhalation intakes of radioactivity. The model has been widely published and internal dosimetry computer codes, hence it is not reproduced here.

Like all models, the ICRP respiratory tract model represents anticipated behavior. Once an exposure has occurred and actual data become available, deviations from the model in light of the data are appropriate.

In practice, the model has proved extremely valuable for calculating derived investigation levels and estimating intakes from bioassay data, using standard F, M,

and S absorption types of material. Model interpretation becomes more subjective when extensive data become available. Carbaugh et al. (1991) and La Bone et al. (1992) have provided excellent examples of two cases where the standard lung model assumptions did not fit the data.

Most internal dosimetry computer codes allow adjustment of particle size and selection of solubility classes. Some codes also permit detailed adjustment of the model's individual compartment parameters; with these codes, it may be possible to arrive at various subjective interpretations to explain the same data. When adjustments are made to the standard assumptions, it is important to explain what those adjustments are and why they were made.

### 5.6.2    Gastrointestinal Tract

The model used in ICRP Publication 68 to describe the behavior of radionuclides in the GI tract and for the calculation of doses from radionuclides in the lumen of the gut is that described in ICRP Publication 30 (1979 and 1988b). This model is also widely promulgated and used for evaluating ingestion intakes. The model is particularly subject to individual variations in fecal voiding frequency, so judgment shall be used in its application to human data.

A key parameter of the model for internal dosimetry is the $f_1$ factor for absorption to blood of material in the small intestine. The $f_1$ factor varies from $10^{-5}$ for plutonium oxides to $10^{-4}$ for plutonium nitrates and to $10^{-3}$ for other compounds and americium.

### 5.6.3    Systemic Retention and Excretion of Plutonium

Standard models for the systemic retention of plutonium are commonly used for internal dosimetry because in vivo detection of plutonium within the individual systemic compartments is not usually possible. Models proposed by the ICRP over a 10-year period are described in Section 2.4.2 of this document. Each of them has had a wide application, and ICRP has suggested that results derived using one model do not need to be rederived for compliance purposes using the newest model. Studies by the U.S. Transuranium Registry and summarized by Kathren (1994) have indicated that alternate compartments and clearance half-times may be more appropriate.

For plutonium absorbed to the blood the main sites of deposition are the liver and skeleton . ICRP Publication 78, Individual Monitoring for Internal Exposures of Workers.(ICRP, 1997) provides parameter values for biokinetic models of plutonium.

Excretion models for plutonium include the empirical models of Langham (1956) and Langham et al. (1980), Durbin (1972), Jones (1985), and Tancock and Taylor (1993), as well as study models such as Leggett (1984). This technical document does not take a position on the "best" model. Site choices of dosimetry tools such as reference tabulations (Lessard et al., 1987; ICRP, 1988a) and computer codes (such as IMBA - Integrated Modules for Bioassay Analysis), may dictate one model over another. The choice of model and explanation of its selection are among the technical bases of the site internal dosimetry program.

Note: The DOE website:
http://www.hss.energy.gov/nuclearsafety/qa/sqa/central_registry.htm
lists "toolbox" codes that are compliant with DOE's Safety Software Quality
Assurance requirements. The toolbox codes are used by DOE contractors to perform
calculations and to develop data used to establish the safety basis for DOE facilities
and their operation, and to support the variety of safety analyses and safety
evaluations developed for these facilities. IMBA is included in the DOE toolbox.

### 5.6.4    Natural Plutonium Balance in Man

Although plutonium can be found in members of the general public as a result of
worldwide fallout from atomic weapons detonations, the levels are quite small. A
summary of the literature can be found in ICRP Publication 48 (ICRP, 1986). Data
from McInroy et al. (1979, 1981) suggests that median body burdens of plutonium in
the U.S. population peaked at about 12 pCi during the 1960s and declined to about 2
pCi by 1977. Tissue concentration data from Nelson et al. (1993) can be used to
calculate a median body burden in the early 1970s of 3 to 4 pCi.

These body burdens imply that urinary or fecal excretion associated with worldwide
fallout will not be detectable by routinely available bioassay procedures.
Consequently, it is reasonable to assume that any bioassay detection by a worker-
monitoring problem is likely to be attributable to occupational exposure.

### 5.6.5    Mother-to-Fetus Transfer

Methods for evaluating embryo/fetal uptake have been described by Sikov et al. in
NUREG/CR-5631 (1992) and its 1993 addendum (Sikov and Hui, 1993). For uptakes
occurring during the first 2 months of pregnancy, the activity in the embryo/fetus is
assumed to have the same concentration as in the mother's "other soft tissue." For
later uptakes, the embryo/fetal concentration gradually increases relative to the
maternal concentration, but is assumed to remain uniformly distributed in the
embryo/fetus. At 3 months, the embryo/fetal concentration is 1-1/2 times the mother's
"other" soft tissues concentration. At 6 months, it is twice the mother's, and at 8
months it is thrice the maternal "other" concentration. Following transfer to the
embryo/fetus, activity is assumed to remain, without clearance, until birth.

DOE-STD-1128-2013

The Nuclear Regulatory Commission has developed simplified methods for assessing the gestation period dose to an embryo/fetus in Regulatory Guide 8.36 (NRC, 1992). Although the models have not been updated to reflect the 2007 amendment to 10 CFR 835 (i.e., use of dosimetric models based on ICRP Publication 60 and later publications), the Regulatory Guide is still useful in illustrating that very large maternal intakes of plutonium or americium are required to produce uptakes that would deliver 500 mrem, or even 50 mrem to the embryo/fetus. The NUREG/CR-5631 Addendum (Sikov and Hui, 1993) notes that maternal inhalation intakes of nominally 100 times the annual limit on intake (ALI) are required to give a 50-mrem embryo/fetal dose. For ingestion intakes, a 1,000 ALI maternal intake of plutonium is required to give a 50-mrem dose to the embryo/fetus. Thus, providing adequate radiation protection to limit maternal intake of plutonium and americium to the occupational limits will adequately provide for the protection of the embryo/fetus.

ANSI/HPS N13.54, Fetal Radiation Dose Calculations, (ANSI, 2008a) and ICRP Publication 88, Doses to the Embryo and Fetus from Intakes of Radionuclides by the Mother, (ICRP, 1998) provide additional guidance on assessing fetal dose. ICRP Publication 88 uses models that have been updated to reflect the 2007 amendment to 10 CFR 835.

## 5.7    INTERPRETATION OF BIOASSAY RESULTS

Bioassay measurements detecting plutonium or americium in workers can be initially interpreted as indicating that occupational intakes may have occurred. Standard bioassay procedures are not sufficiently sensitive to detect the worldwide environmental background levels in an in vivo or in excreta. Since most plutonium and americium bioassay measurement procedures include counting for radioactivity as the final step in the measurement process, they are subject to the statistics associated with the counting process.

Two key questions associated with bioassay data are (1) When does a sample result indicate the presence of something (i.e., when is the analyte detected)? and (2) What is the overall capability of the bioassay method for continual assurance of detection of the analyte?

The decision level, $L_c$ (also called the critical level for detection), is the level for a given measurement that indicates the likely presence of the analyte. The $L_c$ is dependent on the probability of obtaining false positive results (type I, or alpha, error) that is acceptable to the program. A 5% probability of false-positive results is a common design parameter of measurement programs, implying that for a large number of measurements, 5% of the time results will be indicated as positive when in fact there is no activity present. The $L_c$ is calculated from results of analyses of blank samples. Once a measurement is performed, it is appropriate to compare it with the $L_c$ to determine whether or not the result is "positive" (i.e., the analyte is detected).

The MDA is the level at which continued assurance of detection can be provided. The MDA is a function of the probabilities of both false positive and false negative (type II, or beta) errors and is typically based on a 5% probability for each kind of error. The MDA is also determined from analysis of blank samples, but is substantially higher than the $L_c$. The MDA is appropriate for use in designing bioassay programs and as the basis for estimating minimum detectable intakes and doses as indicators of program sensitivity. The MDA should not be used as a comparison with actual measurements to determine whether or not activity is present (i.e., <MDA is not an appropriate use of the concept).

Methods for calculating both $L_c$ and MDA are given in HPS N13.30. (ANSI, 2011b).

As an alternative to the $L_c$ and MDA of classical statistics, Miller et al. (1993) propose the use of Bayesian statistical methods for evaluating bioassay data.

General follow-up actions to abnormal bioassay measurements should include data checks, timely verification measurements, work history reviews, and performance of special in vivo measurements or excreta sample analyses for intake and dose assessments.

### 5.7.1  In Vivo Count Results

In vivo plutonium or americium measurements are generally relatively insensitive with regard to levels of occupational exposure concern. This applies particularly to routine chest or lung counting, skeleton counting, and liver counting. For that reason, any detection of plutonium or americium should be investigated. The investigation should address the validity of the measurement by reviewing the spectrum and its

associated background subtraction. These reviews are particularly important if the result is near the $L_c$. Follow-up to a positive result should include a confirming measurement. Ideally, this should be an immediate (same day) recount of equal or higher sensitivity. The farther removed in time a verification measurement is from the original measurement, the more important it becomes to factor in potential lung clearance in comparing the two measurements. A follow-up measurement taken 30 days after an initial high-routine may not be capable of providing verification if the material of concern exhibits absorption type M behavior.

Chest-wall thickness has a significant impact on chest counting. Corrections are commonly made using a height-to-weight ratio or ultrasonic methods (Kruchten and Anderson, 1990).

Corrections may be required to address apparent detection in one tissue resulting from photon crossfire from another tissue. For example, chest counting is performed primarily to estimate activity in the lung. Yet, there is substantial bone over the lungs (rib cage, sternum) and behind the lungs (vertebrae). Plutonium and americium are both bone-seeking radionuclides which will deposit on those bone surfaces and can interfere with chest counting. It is possible for a person having a systemic burden of plutonium from a wound in the finger to manifest a positive chest count from material translocated to the skeleton, axillary lymph nodes, or liver (Carbaugh et al., 1989; Graham and Kirkham, 1983; Jefferies and Gunston, 1986). Interpreting such a chest count as a lung burden can render dose estimates somewhat inaccurate.

When comparing in vivo measurements made over many years, it is important to make sure that the measurements are, in fact, comparable. One consideration is to make sure that corrections have been consistently applied to all similar measurements. It is not unusual for measurement systems to be replaced or to change the algorithms used for calculating results over time. Step changes in data can occur and should be addressed by monitoring long-term detectable trends (Carbaugh et al., 1988).

In vivo wound counting for plutonium or americium is usually one facet of special bioassay following a wound. While a portable alpha survey meter may show if surface contamination is present at the wound site or contamination of the wounding object, alpha detectors are not capable of measuring imbedded activity or activity masked by blood or serum. Thus, plutonium and americium facilities should have available a wound counter utilizing a thin sodium iodide or semi-conductor (e.g., planar germanium) detector. Such detectors are capable of measuring the low-energy photons emitted from plutonium and americium. The ability to accurately quantify wound activity is highly variable, depending on the calibration of the equipment and how deeply imbedded material is in the wound. If the object causing a wound and blood smears taken at the time of a wound show no detectable activity, then a wound count also showing no detectable activity is probably sufficient to rule out an intake. If the wounding object or the blood smears show detectable activity, special urine samples should be obtained regardless of the wound count result. In this latter circumstance, lack of detectable activity on a wound count could be attributable to deeply imbedded material at the wound site or to rapid transportation of material from the wound to the systemic compartment.

In growth of [241]Am from [241]Pu in plutonium mixtures can also significantly impact in vivo data interpretation. Rather than decreasing with time, [241]Am results can increase without additional intake. This circumstance is particularly likely if dealing with residual activity bound up in wound sites, but may also be observed by in vivo chest or skeleton counting. A method to evaluate [241]Am in growth is described is Section 5.8.4.

### 5.7.2    Urine Sample Results

Detection of plutonium or americium activity in a routine or special urine sample using commonly available radiochemical measurement techniques should be investigated as a potential intake. A data review should be made to assure that the sample result was correctly determined, and batch quality control sample data should be verified.

If the result is near the $L_c$, it is possible that statistical fluctuation of the measurement process could account for the apparent detection. Recounting the final sample preparation once or twice can be a helpful technique to verify a result or classify it as a false-positive. If the first recount also detects the analyte, it can be concluded that the sample does contain the analyte (the likelihood of two consecutive false positives at a 5% type I error per measurement is 0.0025, or 0.25 %.) If the first recount does not detect the analyte, a second recount can be performed as a tie-breaker.

An investigation should be initiated for any abnormal plutonium or americium urinalysis result. "Abnormal" for a person with no prior history of intake should be interpreted as any detectable activity.

Once an intake is confirmed, sufficient samples shall be obtained to establish a reasonably anticipated baseline against which future measurements can be compared. This is important both to provide future verification of the accuracy of the assessment and to identify potential additional intakes.

The statistical fluctuation of low-level measurements can be particularly troublesome for long-term excretion patterns. Factors of 2 can be easily expected due to day-to-day variability and imprecise adherence by the worker to urine collection protocols.

### 5.7.3    Fecal Sample Results

Fecal samples are much more sensitive to detection of intakes than are urine samples and, consequently, are an important part of follow-up bioassay monitoring for potential intakes initially identified by workplace indications. Pitfalls to the data interpretation include highly variable individual fecal voiding patterns, ranging from more than one per day to one every few days. This makes it extremely important to know what time interval is represented by a collected fecal sample. While normalizing a single set of fecal data to reference man daily excretion rate can be done, it is not likely to improve the quality of assessment.

The preferred fecal sampling protocol following an intake is to collect all the early fecal clearance (meaning total feces for the first five-to-seven days). This method will allow a good estimation of inhalation or ingestion intake, but does not readily permit discrimination of inhalation from ingestion, or identify whether inhaled material

exhibits absorption type F, M, or S clearance patterns. For optimum interpretation, total fecal collection should be interpreted in light of early urine and in vivo data for preliminary estimates. The urine data is likely to be particularly valuable in conjunction with fecal data to classify an intake as absorption type M or S. Longer-term follow-up fecal samples at nominally 30, 60, and 90 days post intake should substantially improve the classification of material as absorption type M or S.

Fecal sampling can also be applied to monitor excretion at long times post-intake. One caveat in such sampling is that a worker still active in a plutonium facility may be incurring very minor chronic exposure, which can significantly interfere with long-term interpretation of acute exposure data. Bihl et al. (1993) have discussed experience with a routine fecal sampling program.

### 5.7.4 Use of Air Sample Data in Internal Dosimetry

Results of air sampling and continuous air monitoring implying more than 40 DAC-hours exposure should be used to initiate special bioassay to assess intakes of plutonium. Although bioassay data are the preferred method for assessing intakes and internal doses, air sample data can be used for assessing internal doses if bioassay data are unavailable or determined to be inadequate or nonrepresentative. Air sample data can be used to calculate an exposure to airborne material either in terms of DAC-hours or potential radioactivity intake as follows:

$$DAC\text{-}hours = \frac{Air\ Concentration}{DAC} * Duration\ (hours) \qquad (5.2)$$

DAC = The airborne concentration for radionuclides listed in Appendix A of 10 CFR 835, taking into consideration the absorption type (F/ M/ S) expressed in µCi/mL or Bq/m³

$$Intake = Air\ Concentration * Breathing\ Rate * Time \qquad (5.3)$$

Air concentration = airborne radioactivity in units of µCi/mL or Bq/m³

If air sample results are representative of air breathed by individuals, then doses can be calculated using the 5-rem stochastic limit for CED ($E_{50}$) or the 50-rem deterministic limit for committed equivalent dose ($H_{T,50}$) and the respective stochastic or deterministic DAC or ALI conversion factor, as shown below:

$$E_{50}\ or\ H_{T,50} = \frac{(\#\ of\ DAC\text{-}hours)}{2000\ DAC\text{-}hours} * Dose\ Limit \qquad (5.4)$$

$$E_{50}\ or\ H_{T,50} = \frac{Intake}{ALI} * Dose\ Limit \qquad (5.5)$$

If respiratory protection is worn by workers, the appropriate respirator protection factor may be applied to the above calculations (i.e., dividing the calculated result by the protection factor.)

General air sampling programs should be augmented by breathing zone sampling when air concentrations to which individuals are exposed might be highly variable. Breathing zone sampling may include both fixed-location and personal (lapel) air samplers. Personal air samples are more likely to be representative of actual exposure conditions than are samples collected at fixed locations, and can be particularly useful for assessing potential intakes involving short-term exposure to well-monitored air concentrations.

## 5.8   DOSE ASSESSMENT

Dose assessment involves collecting and analyzing information concerning a potential intake and developing a conclusion regarding the magnitude of intake and its associated committed doses. Dose assessments are conducted by investigating the nature of a potential intake and by analyzing bioassay measurement results or other pertinent data.

Biokinetic models are used in conjunction with bioassay data to evaluate the intake, uptake, and retention of plutonium in the organs and tissues of the body. Intake estimates can then be used to calculate committed effective and organ equivalent doses. It is essential that good professional judgment be used in evaluating potential intakes and assessing internal doses. Carbaugh (1994) has identified a number of considerations for dose assessments.

Computer codes are commonly used for assessment of intakes, dose calculation, and bioassay or body content projections. La Bone (1994a) has provided an overview of what should be considered in selecting a computer code, as well as descriptions of a number of internal dosimetry codes available in 1994. Internal dosimetry code users should understand how the code works and be aware of its limitations. Computer codes merely provide the logical result of the input they are given. Use of a particular computer code does not necessarily mean a dose estimate is correct.

As used in this section, the definition of "intake" is the total quantity of radioactive material taken into the body. Not all material taken into the body is retained. For example, in an inhalation intake, the ICRP Publication 66 respiratory tract model predicts that, for 5-$\mu$m AMAD particles, 82% of the intake will be deposited in the respiratory tract; the other 18% is immediately exhaled (ICRP, 1994a). For a wound intake, material may be initially deposited at the wound site. Once the material has been deposited, it can be taken up into systemic circulation either as an instantaneous process (e.g., direct intravenous injection of a dissolved compound) or gradually (e.g., slow absorption from a wound site or the pulmonary region of the lung). Both the instantaneous and slow absorption processes are often referred to as uptake to the systemic transfer compartment (i.e., blood). Once material has been absorbed by the blood, it can be translocated to the various systemic organs and tissues.

An understanding of this terminology is important to review of historical cases. In the past sites reported internal doses as an uptake (or projected uptake) expressed as a percentage of a maximum permissible body burden. The standard tabulated values for maximum permissible body burdens were those in ICRP Publication 2 (ICRP, 1959). Many archived historical records may have used this approach. DOE Order 5480.11 (superseded), required calculation of dose equivalent. Now, 10 CFR 835 (DOE, 2011), has codified the calculation of intakes and committed doses.

### 5.8.1 Methods of Estimating Intake

There are several published methods for estimating intake from bioassay data (Skrable et al., 1994a; Strenge et al., 1992; ICRP, 1988b; King, 1987; Johnson and Carver, 1981). These methods each employ an idealized mathematical model of the human body showing how materials are retained in and excreted from the body over time following the intake. IRFs are used to predict the fraction of an intake that will be present in any compartment of the body, including excreta, at any time post-intake. Intake retention functions incorporate an uptake retention model that relates uptake to bioassay data and a feed model that relates intake to uptake and bioassay data. ICRP Publication 54 (ICRP, 1988a) and Lessard et al. (1987) have published compilations of IRFs. More recently, in Potter published compilations of IRFs, consistent with the 2007 amendment to 10 CFR 835 (Potter, 2002). Selected IRFs calculated consistent with the 2007 amendment to 10 CFR 835 for the urine and fecal excretion and remaining in the whole body are shown in Tables 5.6 for absorption type M and S forms of $^{239}$Pu. These functions would be similar in value to those for other long-lived forms isotopes of Pu.

$$Q_t = \text{Intake} * IRF(Q_t) \tag{5.6}$$

In its simplest form, a compartment content at any time post-intake ($Q_t$) can be expressed as the product of intake multiplied by the intake retention function value for compartment Q at time t post-intake, or:

Results predicted by the model can then be compared with the observed bioassay data. Such results are often referred to as expectation values.

Simple algebraic manipulation of the model allows calculation of intake from the compartment content at time t, as shown below:

$$\text{Intake} = \frac{Q_t}{IRF(Q_t)} \tag{5.7}$$

When multiple data points are available for a compartment, the intake can be estimated using an unweighted or weighted least-squares fitting procedure, as described by Skrable (1994b) and Strenge et al. (1992) or as can be found in most statistics textbooks. As an alternative, data can be fit by eye to a graphical plot; however, the apparent fit can be misleading if data has been logarithmically transformed.

Intake can also be estimated from air sample data, as described in Section 5.7.4. This method is appropriate if bioassay data are not available or insufficiently sensitive. Intake estimates based on air samples and bioassay data are also appropriate as a check on each other. Valid bioassay data showing detectable results should be given preference over intake estimates based on air sample results.

**Table 5.6.** Intake Retention Fractions[a] for [239]Pu

| Days-Post Intake | Type M Inhalation | | | Type S Inhalation | | |
|---|---|---|---|---|---|---|
| | Urine | Feces | Whole Body | Urine | Feces | Whole Body |
| 1 | 2.46E-04 | 1.10E-01 | 4.95E-01 | 2.50E-06 | 1.16E-01 | 4.90E-01 |
| 7 | 2.40E-05 | 2.29E-03 | 8.34E-02 | 3.08E-07 | 2.42E-03 | 6.25E-02 |
| 30 | 9.51E-06 | 2.81E-04 | 7.29E-02 | 1.72E-07 | 3.51E-04 | 5.06E-02 |
| 60 | 8.11E-06 | 1.31E-04 | 6.68E-02 | 1.65E-07 | 1.86E-04 | 4.29E-02 |
| 90 | 7.12E-06 | 6.65E-05 | 5.98E-02 | 1.61E-07 | 1.07E-04 | 3.87E-02 |
| 200 | 5.12E-06 | 4.67E-06 | 5.74E-02 | 1.61E-07 | 3.32E-05 | 3.25E-02 |
| 400 | 3.71E-06 | 3.71E-06 | 5.74E-02 | 1.70E-07 | 2.13E-05 | 2.74E-02 |
| 1000 | 2.44E-06 | 1.04E-06 | 5.44E-02 | 1.77E-07 | 1.12E-05 | 1.79E-02 |
| 10000 | 4.16E-07 | 2.96E-07 | 4.11E-02 | 8.25E-08 | 9.53E-08 | 5.12E-03 |
| 20000 | 4.83E-07 | 2.11E-07 | 3.29E-02 | 5.83E-08 | 3.20E-08 | 3.13E-03 |

(a) Incremental (i.e., sample collected in a 24-hour period ending at the time indicated) values for excreta obtained from "Intake Retention Functions Developed from Models Used in the Determination of Dose Coefficients Developed for ICRP Publication 68 – Particulate Inhalation" (Potter, 2002). See Section 5.8.1.

**5.8.2    Alternate Methods of Intake Assessment**

Historically, intake as described in the foregoing section was not always calculated when assessing plutonium exposures. Estimates of uptake using methods similar to Langham (1956), Healy (1957), or Lawrence (1987) focused on assessing the magnitude of radioactivity retained in the body, rather than intake (which includes material not retained and of no dosimetric significance). These methods were (and are) dosimetrically sound in so far as estimates of deposition and uptake are concerned, but do not meet the current regulatory requirement of 10 CFR 835 (DOE, 2011) to calculate intake.

**5.8.3    Estimating Dose from Intakes of Plutonium**

The committed equivalent dose ($H_{T, 50}$) and the CED ($E_{50}$) resulting from an intake of plutonium may be calculated by multiplying the estimated intake (I) by either the dose conversion factor for effective dose ($DCF_{eff}$) or the dose conversion factor for equivalent dose ($DCF_{equ}$) :

$$E_{50} = I * DCF_{eff} \qquad\qquad H_{T, 50} = I * DCF_{equ} \qquad\qquad (5.8)$$

Dose conversion factors consistent with the 2007 amendment to 10 CFR 835 can be obtained from the ICRP Publication 68 Database (ICRP, 1994b) or calculated directly using computer programs.

DOE-STD-1128-2013

Values for simplified dose conversion factors can be obtained by dividing a dose limit by the corresponding value for the ALI. A caution shall be observed with this approach: not all tabulated valued of ALIs are the same. The ALIs and DACs are commonly rounded in most tabulations to one significant figure (e.g., as in Appendix A of 10 CFR 835). Substantial variation can occur as a result of unit conversion. For example, Appendix A of 10 CFR 835 lists the DACs for [246]Pu absorption types M and S as both 8E-08 uCi/ml but lists the DACs in the SI units as 3E+03 Bq/m$^3$ for absorption type M and 2E+03 Bq/m$^3$ for absorption type S. Such rounding errors can introduce significant discrepancies in dosimetry calculations. This method also raises a question about which ALI or DAC should be used if compliance monitoring is being based on comparison with secondary limits, such as the ALI or DAC rather than the primary dose limits.

Where individual-specific data are available, the models should be adjusted. However, the general lack of capability to monitor organ-specific retention for plutonium (i.e., content and clearance half-times) makes the use of default models most practical.

Ideally, one should obtain as much bioassay information as possible to determine the intake and track the retention of plutonium in the body to reduce the uncertainty associated with the daily variation in the measurements. A regression analysis should be used to fit the measurement values for estimating the initial intake and clearance half-times.

### 5.8.4    Evaluating [241]Am Ingrowth in an In Vivo Count

Ingrowth of [241]Am from [241]Pu can significantly impact bioassay monitoring projections. Unless accounted for, it can lead to suspicion of new intakes, or underestimation of clearance rates. The amount of [241]Pu present in a plutonium mixture depends on the irradiation history and time since irradiation. Freshly processed mixtures containing 6% by weight of [240]Pu may contain about 0.5% by weight of [241]Pu and a 12% [240]Pu mixture may contain 3% [241]Pu. Commercial spent fuel can be much higher. The ingrowth of [241]Am occurs following a plutonium intake over a period of years. Less transportable (Material Type S) forms of plutonium may have [241]Am ingrowth which gradually becomes detectable. An extreme case of this was demonstrated in a well-documented Hanford plutonium-oxide exposure which exhibited a factor-of-2 increase in [241]Am lung content in the 3000 days following intake (Carbaugh et al., 1991). Such an increase could not be explained using the standard 500-day class Y lung clearance half-time; finally, a 17-year biological clearance half-time was estimated. The subsequent CED equivalent was estimated to be a factor of 3 higher than if the standard 500-day half-time had been used. Similar difficulties have occurred with initial detection of [241]Am by routine in vivo chest counting or in long-term monitoring of residual wound content.

While many available internal dosimetry computer codes will calculate the projected [241]Am lung content following an intake (accounting for ingrowth in the process), none of the current codes will do curve-fitting from long-term data and at the same time adjust the data for ingrowth. Therefore, the following simplistic method was developed to assess that data.

DOE-STD-1128-2013

An estimate of the $^{241}$Am ingrowth can be made by assuming that, at the time of intake (t = 0), all the material that will compose the long-term component is deposited in a single compartment and that the rate of transfer of material from the compartment at any subsequent time t is proportional to the quantity of material remaining in the compartment (i.e., simple exponential transport kinetics). The following equation will then describe the buildup of $^{241}$Am in that compartment following an initial deposition of $^{241}$Pu and $^{241}$Am and a given or assumed effective clearance rate:

$$A_{t,Am} = \lambda_{r,Am} \frac{A_{O,Pu}}{k_{e,Am} - k_{e,Pu}} (e^{-k_{e,Pu}t} - e^{-k_{e,Am}t}) + A_{O,Am} e^{-k_{e,Am}t} \qquad (5.9)$$

where $A_{t,Am}$ = activity of $^{241}$Am at time t

$\lambda_{r,Am}$ = radiological decay constant for $^{241}$Am

$A_{0,Pu}$ = activity of $^{241}$Pu at time 0

$k_{e,Am}$ = effective clearance rate of $^{241}$Am

$k_{e,Pu}$ = effective clearance rate of $^{241}$Pu

$A_{0,Am}$ = activity of $^{241}$Am at time 0

$t$ = elapsed time

The effective clearance rate ($k_e$) of any nuclide is the sum of the radiological decay constant ($\lambda_r$) and the biological clearance rate ($\lambda_{bio}$). By assuming that the biological clearance rate is constant for both parent and progeny nuclides, the equation reduces to three unknowns: the initial amount of parent, the initial amount of progeny, and the biological clearance rate. These unknowns can be dealt with by assuming a standard isotopic composition at the time of intake and then solving the equation for a biological clearance rate using an iterative process until the calculated result matches the observed result at a given time t. A computer or calculator algorithm can eliminate the need for lengthy hand calculations.

Once an optimum combination of isotopic compositions and biological clearance rate is found, internal dosimetry codes or hand calculations can be used to estimate organ and effective doses. As a check on the results, standard computer codes can be used in a bioassay projection mode to project the $^{241}$Am content based on the estimated intake and biological clearance rate.

## 5.9    INDICATOR AND ACTION LEVELS

Indicator and action levels are essential to operation of a routine internal dosimetry program. Because a wide range of levels can be defined by various facilities and organizations, this document does not attempt to prescribe particular level titles. As used in this document, indicator and action levels are simply workplace or bioassay measurements, or associated calculated doses, at which specific actions occur.

Indicator levels based on workplace indicators for reacting to a potential intake are suggested in Table 5.7. The intent of these indicator levels is to provide guidance for field response to any potential intake of radioactive material with a potential for a dose commitment that is >100-mrem CED. It is suggested that when these levels are reached, appropriate management members of the health physics and operations organizations be informed. See Section 5.4.3 for guidance on special bioassay. Table 5.8 suggests notification levels to the occupational medicine physician for possible early medical intervention in an internal contamination event. These tables, derived from Carbaugh et al. (1994), are based on general considerations and significant experience with past intakes of radioactive material and, because they are based on field measurements, do not correspond with any exact dose commitment to the worker.

The decision to administer treatment and the treatment protocol are the joint responsibilities of the physician in charge in full coordination with the patient who has been informed of the risks and benefits of any treatment being considered. The basic principle is that the proposed intervention should do more good than harm (Gerber and Thomas, 1992).

Guidelines for the medical intervention of a radionuclide intake can be found in several publications. NCRP Report No. 65 (NCRP, 1980) and the joint publication of the Commission on European Communities (CEC) and the DOE Guidebook for the Treatment of Accidental Internal Radionuclide Contamination of Workers (Gerber and Thomas, 1992) both contain detailed guidance in intervention and medical procedures useful in mitigating radiation overexposures. The ICRP recommends in Publication 60 (ICRP, 1991a) a limit of 2-rem/y (20-mSv/y) on effective dose.

Thus, the ALIs found in ICRP Publication 61 (ICRP, 1991b) and used in the CEC/DOE Guidebook noted above are those which would provide a CED of 2-rem/y instead of current U.S. regulations of 5-rem/y.

Guidance in the CEC/DOE Guidebook can be summarized as follows:

--    When the estimated intake is below one ALI, treatment should not be considered.

--    When the estimated intake is between 1 and 10 times the ALI, treatment should be considered.

Under these situations, short-term administration will usually be appropriate, except for intake of materials poorly transported from the lung (Material Type S).

**DOE-STD-1128-2013**

**Table 5.7.** Suggested Plutonium or [241]Am Indicator Levels for Internal Dosimetry Evaluation

| Indicator | Notification Level |
|---|---|
| Nasal or mouth smears | Detectable Activity |
| Facial Contamination (direct measurement) | 200 dpm |
| Skin Breaks or Blood Smears | Any skin break while handling material other than sealed sources |
| Head, neck contamination | 2,000 dpm |
| Contamination in a respirator | Detectable activity inside respirator after use |
| Hands forearms, clothing contamination [a] | 10,000 dpm |
| Airborne Radioactivity | Acute intake equivalent to 40 DAC-hours after accounting for respiratory protection factor |

(a) Clothing contamination levels apply to exposure without respiratory protection, such as on inner coveralls or personal clothing.

**Table 5.8.** Suggested Plutonium or [241]Am Contamination Levels for Notification of Occupational Medicine Physician

| Indicator | Medical Notification Level, dpm |
|---|---|
| Nasal or mouth smears | 1,000 |
| Facial Contamination | 25,000 |
| Skin breaks or wounds | 100 |

-- When the estimated intake exceeds 10 times the ALI, then extended or protracted treatment should be implemented, except for materials poorly transported from the lung.

-- For poorly transported material in the lung, lung lavage (i.e. internal lung washing under anesthesia) is the only recommended treatment, and it is only a consideration for intakes exceeding 100 times the ALI.

Because the dose associated with the ALI in the CEC/DOE Guidebook is 2-rem CED and because the upper administrative level recommended by the standard, Radiological Control, is 2 rem, intervention levels of 2 rem and 20 rem might be used for guidance in the manner presented in the CEC/DOE Guidebook:

-- When the CED for an estimated intake is below 2 rem, treatment is not generally recommended.

-- When the CED for an estimated intake is between 2 rem and 20 rem, treatment should be considered. Under these situations, short-term administration will usually be appropriate.

-- When the CED for an estimated intake exceeds 20 rem, then extended or protracted treatment is strongly recommended, except for poorly transported material in the lung.

Decorporation therapy should be administered immediately following any suspected intake or accidental internal contamination in excess of established action levels. The extent and magnitude of an internal plutonium contamination usually cannot be determined quickly; however, the usefulness of therapy will diminish if plutonium is allowed to translocate to bone where DTPA is ineffective. La Bone (1994b) has provided a recent approach to evaluating urine data enhanced by chelation (DTPA) therapy.

An initial prophylactic chelation therapy may be appropriate because bioassay measurements (particularly urinalysis) cannot usually be completed within the response time required for effective chelation therapy. Urinalysis becomes very helpful following administration of chelation therapy because there is a direct correlation between DTPA, urinary excretion, and dose averted because of plutonium excreted. Bihl (1994) has shown that about 2 mrem of CED is averted for every dpm of $^{239}$Pu excreted. The averted dose would be less for assessment of dose in the newer quantity, per the 2007 amendment to 10 CFR 835, of CED. This is because the dose per intake is less under the newer models. For Material Type S compared to Class Y it is lower by approximately a factor of 10 for $^{239}$Pu.

This provides useful information for measuring the effectiveness of DTPA therapy and determining if it is worthwhile to initiate or to continue therapy. For example, using the pre-2007 amendment to 10 CFR 835 models, if DTPA is administered when untreated excretion is 2 dpm/d, excretion should increase to 20 to 100 dpm for a dose savings of 40- to 200-mrem/d CED. However, the dose aversion would only be 4 to 20-mrem/d CED under the models required by the 2007 amendment to 10 CFR 835. Additionally, it is probable that the efficacy of treatment will decrease with continued administration as plutonium is removed from the liver and the rate of transfer into the systemic compartment decreases.

## 5.10   RESPONSE TO SUSPECTED INTAKES

Experience has shown that most intakes of plutonium are accidental. Plutonium facilities and operating procedures are designed to prevent intakes. Nonetheless, it is important for management to prepare for the possibility that workers might receive an intake of plutonium--even though the probability of an incident may be very small. Prompt and appropriate action following an accidental intake of plutonium will allow for therapeutic measures to be taken to minimize the internal contamination and lessen the potential for harmful effects. The health physicist and medical staff should work closely to ensure that the proper course of action is followed.

All employees suspected of having received an intake of plutonium should be referred for special bioassay measurements. Because a fraction of an intake by inhalation may be retained in the nasal passages for a few hours after exposure to airborne radioactive materials, any level of contamination on a nasal swab indicates an intake that should be followed up by a special bioassay measurement program. However, lack of detection on nasal smears cannot be taken as evidence that an intake did not occur either because the nasal passages can be expected to clear very rapidly or, alternatively, because the worker could be a mouth-breather. Special bioassay should also be initiated if plutonium contamination is found on the worker in the vicinity of nose or mouth.

For acute intakes, direct bioassay measurements should be taken before, during, and after the period of rapid clearance of activity. Urine and fecal samples collected after known or suspected inhalation incidents should also be used to estimate the magnitude of the intake. Initial assessments of intakes from contaminated wounds are based primarily on wound count and urinalysis data.

Guidance on evaluation of intakes of plutonium is found in DOE-STD-1121-2008, Internal Dosimetry (DOE, 2008d). DOE-STD-1121-2008 recognizes the difficulty in making final assessments of plutonium intakes and cautions that it "is not appropriate to place heavy reliance on the actual magnitude of the dose in the first few days following a suspected intake." Notwithstanding this difficulty, for various reasons there is a need to be able to make a timely evaluation of the potential magnitude of plutonium intakes. DOE Order 225.1B, Accident Investigations (DOE, 2011d), has a criterion for accident investigation based on a "confirmed monitoring result (workplace or individual) indicating an intake (via inhalation, ingestion, wound or absorption) of radioactive material by a general employee equivalent to 2 or more times the annual limit on intake." The Order also states that "Confirmation must be made within 3 working days following identification of monitoring results (workplace or individual monitoring) indicating an exposure exceeding one or more of the criteria in this section."

If a significant intake is indicated, the worker should not return to further potential exposure to plutonium until the intake has been thoroughly assessed and a predictable bioassay pattern established. This is particularly important because a new intake of a very low level may confound the interpretation of bioassay measurements for previous intakes of plutonium.

The health physicist shall make important decisions for prompt action at the site of an accidental or suspected intake of plutonium or other radioactive materials. Often, these

decisions shall be based on limited data. Information that may be available for initially estimating the amount and type of intake may include the following:

--   levels of measured contamination in the work area

--   skin contamination levels, affected areas, and whether the skin is damaged or punctured

--   wound contamination levels

--   chemical form of the material involved

--   results of air monitoring

--   nasal smear activity levels

--   sputum and/or mouth contamination.

The special bioassay monitoring program is initiated following a known or suspected intake. This information is needed for dose assessment and future exposure management. The intake is confirmed if follow-up bioassay measurements indicate positive measurement results. Additional bioassay measurements may be needed to quantify the intake and provide data for determining the effective dose. The frequency of bioassay monitoring will depend on the specific case to be evaluated. Selection of the appropriate sampling frequency is based on the previously discussed performance capabilities for workplace monitoring program, consultations with internal dosimetry specialists, and the cooperation of the affected employee.

### 5.10.1    Planning

The management at the plutonium facility should be prepared to follow an emergency action plan for response to a plutonium intake. If a worker accidentally inhales or ingests plutonium or is injured by a plutonium-contaminated object, the action plan should be initiated immediately. A rapid response is important because any delay in implementing appropriate action could lessen the effectiveness of decorporation therapy and increase the probability for internalized plutonium to deposit on bone surfaces.

### 5.10.2    Medical Response Plan

The health physicist and medical staff shall establish an emergency action plan for the appropriate management of an accidental intake of plutonium. The elements of the plan should include the following:

--   Decision levels for determining when monitoring data or accident events require emergency medical response

--   responsibilities of the affected worker, health physicist, medical staff, and management or supervisory personnel

--   instructions for immediate medical care, decontamination, monitoring, and longer-term follow-up response

-- provisions for periodically reviewing, updating, and rehearsing the emergency action plan.

The sequence and priority of the emergency action plan may vary with the magnitude and type of accidental conditions and their severity. An initial early assessment of the incident should focus, first, on treatment of life-threatening physical injuries and, second, on the radioactive contamination involved. Minor injuries should be treated after decontamination.

A rapid estimate of the amount of internal contamination by plutonium or other alpha-emitters may not be possible. If a significant intake (meaning one that exceeds 10 times the ALI) is suspected, medical staff should proceed with decorporation therapy after first treating major injuries.

### 5.10.3  Responsibilities for Management of Internal Contamination

Responsibilities should be assigned for action in response to an accidental internal plutonium contamination. The affected worker has the responsibility to inform the health physicist, RCT, or his immediate supervisor as soon as an intake is suspected. (More broadly, all radiological workers have the responsibility to report conditions that could lead to an intake to their immediate supervisor and/or the health physics organization.) The health physicist or RCT should make an initial survey of the extent of the contamination and immediately contact his supervisor and, when action levels are exceeded, contact a member of the medical staff. He should continue to provide monitoring and radiation safety support to the medical staff and supervisors during the management of the contamination incident. Care should be taken to limit the spread of radioactive contamination.

The health physicist should immediately begin to gather data on the time and extent of the incident. Contamination survey results should be recorded. Radionuclide identity, chemical form, and solubility classification should be determined. Nasal smears should be obtained immediately if an intake by inhalation is suspected. When action levels are exceeded, all urine and feces should be collected and labeled for analysis. Decontamination should proceed with the assistance of the medical staff. Contaminated clothing and other objects should be saved for later analysis.

### 5.10.4  Immediate Medical Care

The medical staff should provide immediate emergency medical care for serious injuries to preserve the life and well-being of the affected worker. Minor injuries may await medical treatment until after an initial radiation survey is completed and the spread of contamination is controlled. However, the individual should be removed from the contaminated area as soon as possible. Chemical contamination and acids should be washed immediately from the skin to prevent serious burns and reactions.

DOE-STD-1128-2013

**Chelation**

Chelation therapy, or chelation, is the process of removing unwanted metals from the body by administering an agent that binds to the metal and promotes its excretion. It is important to remove plutonium from the body because it is retained in the bones and liver for many years. Plutonium remaining in the body continues to irradiate nearby tissues. This results in increased risk of cancer. For over 60 years, chelation therapy has been practiced successfully and safely in treating lead and other heavy metal poisoning.

Chelating agents can be administered orally, intravenously, or as a mist, depending on the agent and the type of poisoning. Several chelating agents are available; each has different affinities for different metals. DTPA (diethylenetriaminepentaaceticacid) has been proven effective for the treatment of people accidentally contaminated internally with the transuranic nuclides plutonium, americium, and curium. Recently, based on additional clinical data and peer-reviewed articles, the Food and Drug Administration (FDA) has approved DTPA as a safe and effective compound to enhance elimination/excretion of radioactive materials from the body. There are two primary DTPA compounds: Ca-DTPA and Zn-DTPA. Ca-DTPA is more effective than Zn-DTPA in the first 24 hours after contamination. To avoid long-term depletion of essential metals, Ca-DTPA is administered initially, followed by Zn-DTPA if multiple doses are required.

The number of treatments is based on the results of the bioassay analyses. Most situations involve single treatments; however, a 2010 wound incident at a DOE facility involved 71 treatments. Possible side effects of such an extended chelation therapy regiment could include depletion of essential elements, which can be treated by administering supplemental minerals.

In addition, according to the Centers for Disease Control and Prevention (CDC) Web site, people who are given repeat doses of Ca-DTPA within a short period of time may have nausea, vomiting, diarrhea, chills, fever, itching, and muscle cramps. Other side effects may include headache, lightheadedness, chest pain, and a metallic taste in the mouth. Chelation therapy administered by nebulized inhalation may cause breathing difficulties in some individuals.

According to the FDA Web site at:
**http://www.fda.gov/Drugs/EmergencyPreparedness/BioterrorismandDrugPrepa
redness/ucm130314.htm**:

- If Ca-DTPA is not available, or treatment cannot be started within the first 24 hours after contamination, treatment should begin with Zn-DTPA.
- If Zn-DTPA is not available, Ca-DTPA can be given for continued treatment, along with vitamin or mineral supplements that contain zinc.
- Ca-DTPA and Zn-DTPA can be administered by nebulizer or directly into the blood stream (i.e., intravenously). If the route of internal contamination is through inhalation alone, then nebulized chelation therapy will suffice. If the routes of contamination are multiple (e.g., inhalation and through wounds), then intravenous chelation therapy is preferred.
- The duration of treatment is dictated by the level of internal contamination and the individual's response to therapy. Levels of internal contamination should be

DOE-STD-1128-2013

ascertained weekly during chelation therapy to determine when to terminate treatment.
• Zn-DTPA is the preferred treatment for the pregnant woman with internal contamination.
• FDA recommends nebulized DTPA for patients whose internal contamination is only by inhalation.
• The safety and effectiveness of the intramuscular route has not been established for
Ca-DTPA or Zn-DTPA.
• The duration of Ca-DTPA and Zn-DTPA therapy depends on the amount of internal radioactive contamination and the individual's response to therapy.
• Ca-DTPA should be used with caution in patients suffering from a severe form of a disease called hemochromatosis.

Additional information is on the CDC Web site at:
**http://www.bt.cdc.gov/radiation/dtpa.asp**.

Some of this information includes:

• Radioactive materials chelated to DTPA are excreted from the body in the urine; therefore, DTPA shall be used carefully in people whose kidneys do not function properly.
• Breathing treatments using DTPA may not be safe for some people with asthma. If a person with asthma requires treatment with DTPA, the drug should be injected.
• DTPA should not be used to treat people who are internally contaminated with the radioactive materials uranium or neptunium.

The big advantage of chelation for radioactive metals, such as plutonium, is the radiation dose reduction for the patient. Substantial dose reductions can be achieved if DTPA is administered within a few hours (recommended within 1 hour) of the intake of plutonium. Dose reductions from 10 percent to 90 percent have been achieved for contaminated wound or burn cases and up to 30 percent for inhalation cases.

The decision to administer chelation therapy is made by the worker in consultation with a board-certified occupational medicine physician. In communicating information to the individual concerning the risks and benefits of chelation refer to the Health Physics Society policy paper which discusses providing individual risk estimates. The position paper states, in part: "*the Health Physics Society recommends against quantitative estimation of health risks below an individual dose of 5 rem in one year or a lifetime dose of 10 rem above that received from natural sources*". More information on this position paper is found at:
http://hps.org/documents/risk_ps010-2.pdf

Chelation is generally recommended when the estimated dose exceeds 2 rem CED. If a quick dose estimate cannot be made, indicators such as airborne radioactivity exposure, nasal/mouth smears, facial contamination, skin breaks, or bioassay measurements are used. Chest or whole-body counts and wound counts are used as well.

"EXHIBIT M"

Case 3:25-cv-05030-AGT    Document 32    Filed 02/02/26    Page 396 of 521



**National Institute of
Standards and Technology**
U.S. Department of Commerce

NEWS (https://www.nist.gov/news-events/news)

# Low-Level Plutonium Sample Involved in NIST-Boulder Lab Incident

June 10, 2008

Boulder, Colo.– On Monday afternoon, June 9, researchers in a laboratory room at the Commerce Department's National Institute of Standards and Technology (NIST) campus in Boulder, Colorado discovered that a vial holding about 1/4 gram of plutonium in a powdered form had cracked* and that some particles had spilled from the vial. The laboratory room and an adjacent lab in NIST's Building 1 were immediately sealed off. Twenty-two NIST staff and associates who had been working in or near the lab were asked to remain in the immediate area until they could be carefully monitored and any radioactive materials on their clothing or bodies removed.

Trace contamination was found on the soles of the shoes or on a few articles of clothing for most of the 22 personnel. In most cases, the trace contamination was easily removed using soapy water following standard health physics practices, and 20 personnel were sent home contaminant-free. Two staff members who had worked directly with the material had trace contamination on their hands and began the standard health physics practice of carefully washing their hands to remove the contamination.

NIST health safety personnel supervised the careful testing of nearby hallways and adjacent labs and offices. Some areas of trace contamination were found in the nearby hallways and in a small office area at the end of a hallway. These areas were cleaned and retested to ensure they were contamination free. There was no evidence of any contamination outside of the immediate area or in the doorways leading out of the building.

The affected laboratory room and the adjacent connecting laboratory room were sealed off for further testing, along with the nearby men's room. These areas will be fully assessed and cleaned as required. Air sampling in the affected laboratory room shows no evidence of airborne plutonium particles. There is no evidence that any radioactive materials left the affected laboratory, apart from the trace contaminants in nearby areas and on the affected personnel, and all those traces have been thoroughly cleaned and the areas retested, showing no radiation above normal background levels.

Plutonium is a radioactive element, and the researched sample involved is a certified reference material with very precisely known radiation activity levels. The affected NIST employees and associates are being carefully monitored to quantify any potential individual exposure from the plutonium. Based on continuing test results, appropriate actions will be taken if necessary.

The small plutonium sample (smaller than a dime in size) was being used in a research project to develop improved radiation detectors for use by nuclear inspectors outside NIST. The Nuclear Regulatory Commission has been advised about the incident. NIST is conducting a thorough investigation to gather facts about how the incident occurred and to determine what, if anything, may be done to prevent any similar situations in the future.

NIST employees have been given information about the incident.

Additional information on the NIST Boulder plutonium incident is available online (https://www.nist.gov/director/pao/information-updates-and-publications-relating-june-9-2008-plutonium-incident-nist).

*Corrected July 17; the sample included 1/4 gram of plutonium in the form of 0.53 gram of plutonium sulfate tetrahydrate.*

## Media Contact

301-975-2762
Released June 10, 2008, Updated February 3, 2025

Was this page helpful? (https://www.nist.gov/webform/page_feedback?page=https://www.nist.gov/news-events/news/2008/06/low-level-plutonium-sample-involved-nist-boulder-lab-incident&page_title=Low-Level Plutonium Sample Involved in NIST-Boulder Lab Incident&source_entity_type=node&source_entity_id=405801)

Case 3:25-cv-05030-AGT     Document 32     Filed 02/02/26     Page 398 of 521

https://www.nist.gov/news-events/news/2008/06/nist-finds-radiation-contamination-lab-sink



National Institute of
Standards and Technology
U.S. Department of Commerce

NEWS (https://www.nist.gov/news-events/news)

# NIST Finds Radiation Contamination in Lab Sink

June 17, 2008

Boulder, Colo. – Re-entering the sealed laboratory room where a small plutonium spill occurred on June 9, National Institute of Standards and Technology (NIST) radiation safety experts have found contamination in a laboratory sink and other surfaces within the laboratory. NIST has updated city of Boulder officials and the Nuclear Regulatory Commission (NRC) on the latest findings.

Meanwhile, two regional members of the Department of Energy (DOE) Radiological Assistance Program will be arriving at NIST's invitation later today for a consultation to explore ways in which the DOE can help with assessing the contamination and cleanup. In addition to carrying out its own investigation and cooperating with an NRC investigation, NIST is asking for assistance from outside radiation safety officials to carry out a probe of the incident.

"We have asked for this extra help because we want to be sure that we fully understand how this incident occurred. We want to make sure we clean up the contamination properly and we want to know if there are any improvements we can make in our safety program," said James M. Turner, NIST deputy director.

In the past few days, NIST health physicists have re-entered the lab where the June 9 incident took place for the first time since the room was sealed. They started an inventory of the plutonium contamination in the room. They detected contamination on the floor and on various tabletops and surfaces, consistent with a spread of material by hands and shoes.

They also found contamination in the laboratory sink and subsequently learned that a researcher who worked directly with the plutonium sample had used that sink to wash his hands during the incident. NIST has alerted the city of Boulder and city waste water treatment plant personnel to this new information. The discharge from the sink enters the sanitary sewer system. While the exact amount washed down the drain is

Case 3:25-cv-05030-AGT    Document 32    Filed 02/02/26    Page 399 of 521

not known, the entire amount of plutonium in the sample was approximately 1/4 gram*. NIST is conducting studies to determine a better estimate of the amount of radiation discharged.

The main health risk from plutonium occurs through inhalation or ingestion. NIST continues to monitor the health of its affected laboratory personnel.

NIST remains in close contact with the NRC over the status of the situation in Boulder. The NRC investigation into the incident is also continuing.

NIST will work with independent radiation experts to conduct an investigation into the causes of the June 9 event and evaluate the effectiveness of NIST's actions in responding to the incident. Kenneth C. Rogers, former commissioner of the Nuclear Regulatory Commission from 1987 to 1997, has agreed to assist NIST in this effort.

The experts will make site visits to NIST in both Boulder, Colo., and Gaithersburg, Md. They will conduct interviews and gather facts, receive access to NIST data and information on the incident, and then inform NIST of their findings. The information provided by these experts will be used by NIST to prevent similar incidents in the future.

*Corrected July 17; the sample included 1/4 gram of plutonium in the form of 0.53 gram of plutonium sulfate tetrahydrate.

Additional information on the NIST Boulder plutonium incident is available online (https://www.nist.gov/director/pao/information-updates-and-publications-relating-june-9-2008-plutonium-incident-nist).

# Media Contact

301-975-2762
Released June 17, 2008, Updated February 3, 2025

Was this page helpful? (https://www.nist.gov/webform/page_feedback?page=https:// www.nist.gov/news-events/news/2008/06/nist-finds-radiation-contamination-lab- sink&page_title=NIST Finds Radiation Contamination in Lab Sink&source_entity_type=node&source_entity_id=405791)

https://www.nist.gov/news-events/news/2008/06/medical-tests-indicate-internal-contamination-due-june-9-plutonium-incident



NIST   **National Institute of
Standards and Technology**
U.S. Department of Commerce

NEWS (https://www.nist.gov/news-events/news)

# Medical Tests Indicate Internal Contamination Due to June 9 Plutonium Incident

June 27, 2008

BOULDER, Colo. – New results from sensitive medical tests indicate internal plutonium exposure in a small number of personnel at the National Institute of Standards and Technology (NIST) due to a plutonium spill in a laboratory room June 9.

To protect the privacy of the individuals involved, certain specifics about these tests cannot be made available at this time.

"We are concerned for the health and safety of our personnel and deeply regret these results showing internal plutonium exposure," NIST Deputy Director James M. Turner said. "We are getting advice from the best medical experts in the country and will do everything we can to ensure that the people affected get the best possible medical treatment."

Treatment for plutonium exposure consists of receiving one or more injections of a chelating agent that circulates through the bloodstream and attaches to plutonium atoms in the body to allow them to be excreted more easily in the urine. The principal effect of internal plutonium exposure is a potential increased long-term risk of cancer. Removing as much plutonium as possible from the body reduces the risk, according to plutonium health effects experts.

The contamination was detected in urine samples using a technique called alpha spectroscopy. The test detects weak radiation signals from alpha particles, the principal form of plutonium radiation that can cause health effects.

In consultation with medical experts, NIST has been monitoring the health of the

laboratory personnel who potentially could have been exposed as a result of the June 9 incident.

Additional urinalysis testing using thermal ionization mass spectrometry is also being conducted for all personnel potentially exposed. Full results from these tests, which typically detect lower levels of contamination than the alpha spectroscopy tests, are not expected for up to four weeks.

Testing for possible plutonium exposure is complex, and results can be difficult to interpret. NIST is providing updates as results become available and can be summarized appropriately.

Also on Thursday, June 26, three small spots of trace-level contamination, barely above background levels that occur throughout the environment, were discovered in a different NIST building from the location where the spill occurred. The trace contamination was found on items belonging to an individual who was in the lab after the spill occurred on June 9, but before it was reported.

NIST radiation health experts know of no safety or health concerns from the trace levels of surface contamination found yesterday. Health concerns from plutonium occur primarily with inhalation or ingestion.

Turner said, "We are re-interviewing all potentially exposed personnel to determine if any other areas need to be checked to ensure there is no trace contamination remaining."

"We are committed to strengthening our safety program and its implementation to help prevent safety incidents in the future," Turner said.

Additional information on the NIST Boulder plutonium incident is available online (https://www.nist.gov/director/pao/information-updates-and-publications-relating-june-9-2008-plutonium-incident-nist).

# Media Contact

301-975-2762
Released June 27, 2008, Updated February 3, 2025

https://www.nist.gov/news-events/news/2008/06/plutonium-discharge-sink-below-federal-and-state-limits

 **National Institute of Standards and Technology**
U.S. Department of Commerce

NEWS (https://www.nist.gov/news-events/news)

# Plutonium Discharge into Sink Below Federal and State Limits

June 24, 2008

BOULDER, Colo. – Using detailed measurements made with the assistance of a National Nuclear Security Administration (NNSA) team, the National Institute of Standards and Technology (NIST) has determined that a discharge of plutonium powder into the sanitary sewer system from a laboratory room sink at NIST on June 9 was below federal and state limits.

Boulder wastewater officials have said in a statement that the wastewater treatment process has shown no indication of contamination. NIST has been consulting closely with the City of Boulder wastewater officials and city management since the incident. In the same statement, wastewater and city officials did not express health concern for the local population due to the discharge.

"The health and safety of our personnel and local communities is our top priority," James M. Turner, NIST deputy director, said. "The fact that this incident occurred is not acceptable. We are actively investigating what happened and have enlisted the help of top radiation safety experts to review our procedures. We are committed to strengthening our safety program and its implementation to help prevent safety incidents in the future."

An NNSA Radiological Assistance Program (RAP) team entered the contaminated laboratory room on Thursday evening, June 19, with NIST health physicists and made extensive radiation measurements. These measurements were shared with Department of Energy (DoE) analysts across the country, who calculated how much plutonium can be accounted for in the lab, thus helping to set an upper limit on the amount possibly discharged into the sanitary sewer.

A report from DoE with the calculations using the new data was received by NIST on

Monday, June 23.

An inspector from the Nuclear Regulatory Commission (NRC) observed the process Thursday.

The original entire powdered plutonium sample was a well-characterized reference sample containing about ¼ gram of plutonium (about 1/100th ounce). The NNSA radiation measurements, combined with measurements made by NIST, showed that between 76 and 87 percent of the original sample remains in the laboratory room, primarily at the spill site and with the original glass vial container. The maximum amount that likely could have been lost when a researcher washed his hands in the laboratory sink immediately after discovering the cracked vial is about 0.06 gram.

Federal and state regulations permit the discharge of 0.0000002 microCuries per milliliter of plutonium into sanitary sewer systems. The DoE and NIST calculations indicate that at most 0.06 grams of the entire plutonium sample could had been lost down the sink drain, which corresponds to a discharge of about 0.00000014 microCuries per milliliter, given the average discharge of wastewater from NIST. This means that any plutonium washed down the drain would have been below the legal limits.

According to NIST radiation safety experts, prior to entering the contaminated laboratory, air sampling had not shown airborne contamination. In the course of repeated entries to the contaminated lab room, air sampling equipment placed by the team detected airborne contamination, likely as a result of the team's activities. The team ceased operations and subsequent air sampling showed that radiation readings had returned to normal background levels in the spill room laboratory. Since responding to the incident, NIST radiation safety experts have monitored and found no evidence of any releases of contaminated air to the atmosphere.

NIST is contracting with radiation clean-up experts for further operations in the contaminated laboratory room and will ensure that all operations are rigorously conducted to ensure the safety of clean-up crews, NIST building occupants, the public and the environment.

Radiation health effects from plutonium primarily come from alpha particles, which do not penetrate the skin. Adverse health effects from plutonium exposure occur primarily with ingestion or inhalation of the particles.

In consultation with medical experts, NIST continues to monitor the health of the laboratory personnel who were confirmed to have had trace levels of external contamination, as well as others who could potentially have been exposed. I testing for possible exposure to large doses of internal contamination have for all personnel tested, and a small sample of results from more sensitive te

https://www.nist.gov/director/pao/information-updates-and-publications-relating-june-9-2008-plutonium-incident-nist



Office of the Director (https://www.nist.gov/director) / Chief of Staff (https://www.nist.gov/director/chief-staff)

## Public Affairs Office (https://www.nist.gov/pao)

# Information Updates and Publications Relating to June 9, 2008 Plutonium Incident at the NIST-Boulder Laboratory

**Nuclear Regulatory Commission Special Inspection and Investigative Reports**

- NRC issues Confirmatory Order to National Institute of Standards After Agreement is Reached under the Alternate Dispute Resolution, 03/02/10
- Confirmatory Order (NRC Inspection Report 030-03732/2008-011, NRC Investigation Report 4-2008-062) (https://www.nist.gov/document/nistadrconfirmatoryorderpdf), 03/01/10

**Nuclear Regulatory Commission Public Meeting**

- NRC Public Meeting Summary, September 17, 2009 (https://www.nist.gov/document/nistmeetingsummarypackagepdf)
- September 17, 2009 -- Remarks by Richard F. Kayser, NIST Special Assistant for Environment, Safety, and Health, at Nuclear Regulatory Commission Public Meeting (https://www.nist.gov/speech-testimony/remarks-dr-richard-f-kayser-nuclear-regulatory-commission-public-meeting)

**Information Updates:**

- November 7, 2008 -- Blue Ribbon Commission Issues Findings on NIST Safety (https://www.nist.gov/news-events/news/2008/11/blue-ribbon-commission-issues-findings-nist-safety)
- September 16, 2008 -- NIST Takes Additional Steps to Strengthen Safety at Its Boulder Laboratory (https://www.nist.gov/news-events/news/2008/09/information-update-september-16-2008-nist-takes-additional-steps-strengthen)
- August 14, 2008 -- Ultra-sensitive Tests Confirm No Significant Health Risks Expected from Plutonium Exposures (https://www.nist.gov/news-events/news/2008/08/information-update-august-14-2008-ultra-sensitive-tests-confirm-no)
- July 30, 2008 -- NIST Commits to Action for Strengthening Safety NIST Responds to Investigative Report, City of Boulder Regarding Safety Improvements (https://www.nist.gov/news-events/news/2008/07/information-update-july-30-2008-nist-commits-action-strengthening-safety)
- July 11, 2008 -- Reports from Five Radiation Safety and Health Experts on the June 9 Plutonium Incident (https://www.nist.gov/news-events/news/2008/07/reports-five-radiation-safety-and-health-experts-june-9-plutonium-incident)
- July 10, 2008 -- No Significant Health Risks Expected from Plutonium Exposures (https://www.nist.gov/news-events/news/2008/07/information-update-july-10-2008-no-significant-health-risks-expected)
- July 2, 2008 -- NIST Response to NRC Confirmatory Action Letter (https://www.nist.gov/news-events/news/2008/07/nist-response-nrc-confirmatory-action-letter)
- June 27, 2008 -- Medical Tests Indicate Internal Contamination Due to June 9 Plutonium Incident (https://www.nist.gov/news-events/news/2008/06/information-update-june-27-2008-medical-tests-indicate-internal)
- June 24, 2008 -- Plutonium Discharge into Sink Below Federal and State Limits (https://www.nist.gov/news-events/news/2008/06/information-update-june-24-2008-plutonium-discharge-sink-below-federal-and)
- June 17, 2008 -- NIST Finds Radiation Contamination in Lab Sink (https://www.nist.gov/news-events/news/2008/06/information-update-june-17-2008-nist-finds-radiation-contamination-lab-sink)
- June 13, 2008 -- Additional Trace Contamination Found in NIST-Boulder Lab (https://www.nist.gov/news-events/news/2008/06/information-update-additional-trace-contamination-found-nist-boulder-lab)
- June 10, 2008 -- Low-Level Plutonium Sample Involved in NIST-Boulder Lab Incident (https://www.nist.gov/news-events/news/2008/06/low-level-plutonium-sample-involved-nist-boulder-lab-incident)

## Reports (all PDFs):

- Letter to Ms. Jane Brautigam City Manager, Boulder, CO (https://www.nist.gov/document/brautigam-letter-7-30-09pdf), 07/30/09
- Confirmatory Action Letter Item 4.a: Assessment of Release of Plutonium to the

Case 3:25-cv-05030-AGT    Document 32    Filed 02/02/26    Page 406 of 521

City of Boulder Sanitary Sewerage (https://www.nist.gov/document/
confirmatoryactionletter05-07-09pdf), 05/07/09

- Final Root Cause Analysis Report (https://www.nist.gov/document/
  rootcauseplutonium010709pdf), 01/07/09
- Final Report of the NIST Blue Ribbon Commission on Management and Safety
  (https://www.nist.gov/document/final1108pdf), 11/08
- September 16, 2008, Letter to the City of Boulder from Rich Kayser, Interim
  Director, NIST Boulder Laboratories (https://www.nist.gov/document/
  graingerletterpdf)
- DOE-assisted Safety Audit of NIST Boulder Laboratories (https://www.nist.gov/
  document/doeassistedauditfinalnistreportpdf), 08/08
- Initial Report of Plutonium Contamination at NIST Boulder from the NIST
  Ionizing Radiation Safety Committee (https://www.nist.gov/document/
  irscpureportfinal-2pdf), 07/30/08
- Letter to the City of Boulder from Thomas R. O'Brian, Director, NIST Boulder
  Laboratories (https://www.nist.gov/document/responsetocity072208-2pdf), 07/22/08
- Confirmatory Action Letter Item 4(a): Estimate of Release to the City of Boulder
  Sanitary Sewerage (https://www.nist.gov/document/releasebouldersanitaryseweragepdf),
  07/11/08
- NIST 30-Day Report on Radiation Incident at NIST Boulder Laboratories:
  Report Pursuant To 10 C.F.R. 50.30(c)(2) And Paragraph 4 of the July 2, 2008
  Confirmatory Action Letter from the Nuclear Regulatory Commission (https://
  www.nist.gov/document/nist30dayreportpdf)
- Reports from Five Radiation Safety and Health Experts on the June 9
  Plutonium Incident
    ○ Paul S. Hoover -- Senior Advisor, Radiation Protection Division, Los
      Alamos National Laboratory (https://www.nist.gov/document/hooverpdf)
    ○ Kenneth C. Rogers -- Former Commissioner, Nuclear Regulatory
      Commission (1987-1997) (https://www.nist.gov/document/rogerspdf)
    ○ J. Michael Rowe -- Consultant (https://www.nist.gov/document/rowepdf)
    ○ Lester A. Slaback, Jr. (retired 2001) -- Supervisory Health Physicist,
      National Institute of Standards and Technology (https://www.nist.gov/
      document/slabackpdf)
    ○ Richard E. Toohey -- Director, Dose Reconstruction Programs, Oak Ridge
      Associated Universities (https://www.nist.gov/document/tooheypdf)

**Testimony:**

- NIST Deputy Director Dr. James Turner testified on plutonium spill at NIST
  Boulder, CO, laboratory (https://www.nist.gov/%3Cnolink%3E/congressional-and-
  legislative-affairs)

"EXHIBIT N"

# NIST-BOULDER PLUTONIUM CONTAMINATION EVENT NRC SPECIAL INSPECTION



# Events Leading Up to the Plutonium Spill

- ◉ Untrained researchers use the plutonium, unsupervised
- ◉ Researcher ruptures the plutonium source during an experiment on June 9, 2008
- ◉ Researcher washes hands in sink
- ◉ Researcher unknowingly tracks the loose plutonium powder throughout the building
- ◉ Untrained workers attempt to decontaminate the building

# Initial Event Response

- ◉ NIST personnel attempt to decontaminate the building themselves
- ◉ NIST contacts the NRC to report the event the day <u>after</u> it occurred
- ◉ NRC dispatches a Health Physicist to NIST the following day
- ◉ NRC identifies multiple deficiencies in the NIST initial response

# Continued Event Response

- On June 19, a second Health Physics inspector was dispatched by NRC

- DOE's Radiological Assistance Program (RAP) Team was also there during this time to characterize the extent of contamination

- Due to the results of the DOE characterization, a NRC Special Inspection Team was dispatched on June 30, 2008

# EPA Involvement in the NIST Event

◉ The City of Boulder, in coordination with the US EPA, Region VIII, initiated a biosolids monitoring program to analyze the extent of plutonium contamination, if any, in the Boulder Waste Water Treatment Facility

◉ None of the samples revealed the presence of plutonium above background levels

# Plutonium Sources and Containers



# WING 1 BUILDING 1



# LABORATORY 2120/2124 DIAGRAM



# MULTI-USE LABORATORY



# DETECTOR RESEARCH PROJECT



# DETECTOR CRYOSTAT/LEAD BRICKS/MARBLE TABLE



# NO EATING OR DRINKING ALLOWED!



# LABORATORY 2124



# TIME TO CALL IN DOE's RAP TEAM



# INSTRUMENT PEGGED



# SOURCE STORAGE CABINET



# STORAGE OF PLUTONIUM



# Two Centimeters Wide By Four Centimeters High



# MAY BE BROKEN?????



# YEP, IT'S BROKEN!



# LABORATORY 2124



# HEPA-FILTRATION SYSTEM and CAM



# HAGEN CONTAINERS



# SOURCE RECOVERY DRY-RUN



# 326 MILLICURIES OF RECOVERED PLUTONIUM



# TIME TO CLEAN (DECONTAMINATE)



# 48,000 POUNDS OF WASTE



# 312 DAYS FOR CLEAN-UP



# CREEP, CREEP, CREEP



# EXCAVATION OF OUTDOOR DRAINLINE



# SOIL SAMPLES FROM OUTSIDE TRENCH



# REMOVAL OF CONCRETE FLOOR



# EXCAVATION OF INDOOR DRAINLINE



# ENERGY*SOLUTIONS* MOBILE LABORATORY



# SHIPMENT OF LLW



# SOIL SAMPLES FROM INSIDE TRENCH



# ORISE CONFIRMATORY SURVEYS



# RADIOLOGICAL CONSEQUENCES

Radiological consequences were potentially very significant, but actual safety consequences were minimal

- No dose limits were exceeded
- Material potentially discharged to sewer did not exceed regulatory limits
- Contaminated areas of the NIST facility were cleaned

## DIRECT CAUSE

Breakage of glass bottle containing plutonium on a hard surface led directly to the incident

- · Marble top laboratory table
- · Lead bricks
- · Detector cryostat

## CONTRIBUTING CAUSES

- · Personnel were inexperienced and not properly trained
- · An adequate hazard analysis was not performed
- · Written operating procedures were not developed

## CONTRIBUTING CAUSES

- · Plutonium sources were used and stored in a mixed –use laboratory
- · The setup of the experiment was insufficient
- · Direct oversight of work involving plutonium was inadequate
- · The immediate emergency response to the event was inadequate

# ROOT CAUSE

Inadequate management oversight and accountability to ensure that the Radiation Safety Program was sufficient to handle plutonium safely

# NEXT STEPS

- · 10 apparent violations identified
- · Inspection report issued
- · Enforcement pending

# Read The NIST Report Yourself

◉ Go to www.nrc.gov/reading-rm/adams.html

◉ Pull up ADAMS ML 093080053

"EXHIBIT O"

Case 3:25-cv-05030-AGT    Document 32    Filed 02/02/26    Page 453 of 521

News

# Sixteen workers exposed to radiation at US DOE lab in Idaho



INL live photostream

Publish date: November 10, 2011

Written by: Charles Digges

Six workers were contaminated by low-level plutonium radiation and 10 others were exposed on Tuesday at the US Energy Department's Idaho National Laboratory (INL) nuclear research lab in Idaho, the government said.

The Government said on Tuesday that 17 workers had been exposed, but that figure was downwardly revised to 16 late early Wednesday.

All 16 workers underwent full body scans on Wednesday. Officials at the INL said radioactive contamination was detected on the skin or clothing of at least six of the workers after Tuesday's mishap, and two were confirmed to have inhaled radioactive particles, Reuters reported

The results of the scans conducted on the exposed workers prompted doctors on Wednesday to order additional lung examinations of three workers, and urine and stool samples to be taken from all 16, lab officials said. All are technicians employed by laboratory contractor Battelle Energy Alliance.

INL spokesman Earl Johnson told Reuters that none of the workers reported feeling ill or showed symptoms of radiation sickness. All were allowed to return home after initial laboratory tests.

But a statement from the INL said it might be weeks until the extent of the workers' exposure is known.

"We're still collecting and analyzing samples from all 16; there is a lot of work to be done to get the correct information," another INL spokeswoman, Sara Prentice, told reporters.

There was no evidence that radiation was released outside the aging facility, and there was no risk to the public or the environment, the lab said the statement.

Bellona nuclear physicist and executive director, Nils Bøhmer, who has visited the Idaho National Laboratory with other Bellona staff said that aging equipment and facilities at the 62-year-old facility could have played a roll in Tuesday's accident.

A special team of Energy Department investigators was expected in Idaho next week to launch its own inquiry. In the meantime, new curbs have been placed on the handling of some radioactive materials at the INL complex, US press reports said.

## Health implications for the exposed workers

Investigators in Idaho were at the site trying to determine what went wrong.

The accident, which lab officials said occurred during routine procedures, was believed to be the worst in at least four years at the sprawling site, which occupies 1432 square kilometres in the high desert of eastern Idaho.

The lab's statement said there was no release of radiation beyond a single room in the reactor building, which lies about 60 kilometres from the city of Idaho Falls. An initial equipment inspection pointed to possible damage inside a small plutonium fuel container that was the source of the exposure.

The health impacts of plutonium vary depending on the type of plutonium and whether the contaminant becomes trapped in the body. If plutonium gets trapped in the lungs, for example, it could lead to damage to the body's cells, lab officials said.

The 16 employees exposed to the radiation Tuesday were offered intravenous treatments with calcium or zinc, which binds to the plutonium and expedites its elimination from the body to limit potential harm, the lab's statement said.

But according to spokeswoman Prentice, just four of the exposed technicians agreed to the precautionary treatments, which are designed to flush radioactive particles from their bodies.

Further lung examinations were ordered for two workers whose body scans tested positive for radiation in their lungs and for a third worker whose lungs showed an "anomaly."

Bellona's Bøhmer said that "the number of exposed workers is quite high, and I hope that there will be full explanation into what caused the accident and how much radiation the [16] workers were exposed to."

## Questions about the accident

The technicians were exposed when a foot-long rectangular container of plutonium fuel inside the facility's decommissioned Zero Power Physics Reactor (ZPPR) was opened during regular work to prepare it for shipment to another facility, World Nuclear News reported.

"This was a procedure that has been done many times before," Prentice told Reuters.

An inspection of the container, which Prentice said is shaped like a covered cake pan, did not reveal that the exterior had been damaged. But she said that "there may be damage" to the stainless steel that covers the fuel inside.

"One of the issues with US nuclear facilities is that a large proportion of them are of substantial age," said Bellona's Bøhmer. "This could be part of the reason for this accident at [the INL]."

Spokesman Johnson said that technicians were dressed in lab coats and wearing gloves, but the work they were performing requires no respirators or other special protective gear. He said all 16 workers were present in the room but that only two had handled the fuel container in question.

## Tons of radioactive waste at INL

Before the ZPPR was decommissioned in 1992, researchers used it to build and test nuclear reactors more cheaply than the cost of constructing an entire power plant.

Last year, cleanup workers had finished removing millions of kilograms of steel and other materials that made up the reactor core, but its shell remains — along with plutonium fuel that once powered the reactor.

Some 6,000 employees and contractors work at the Idaho lab, which opened in 1949 as a national reactor testing station.

## INL's history of accidents — first fatality in US nuclear history

According to lab records, the last serious accident to take place at the site was in 2007, when a worker was treated for minor burns and smoke inhalation from a small laboratory fire, though no radiation release was reported in connection with that incident.

In January 1961, the Idaho lab was the site of the only fatal nuclear accident in US history so far, killing 3, when an explosion occurred at the INL's Stationary Low-Power Reactor Number One (SL-1). A control rod for absorbing extra neutrons during nuclear reactions, was extracted too far, leading to a core meltdown and an explosion.

The reactor vessels jumped some three metres and concussion and blast killed all three military enlisted personnel working on the reactor. Because of severe radioactive contamination, all three men had to be buried in lead coffins.

"EXHIBIT P"

Case 3:25-cv-05030-AGT    Document 32    Filed 02/02/26    Page 458 of 521
www.nature.com/scientificreports

# SCIENTIFIC REP🌻RTS

OPEN

# Anthropogenic plutonium-244 in the environment: Insights into plutonium's longest-lived isotope

Received: 29 July 2015
Accepted: 19 January 2016
Published: 22 February 2016

Christopher R. Armstrong, Heather A. Brant, Patterson R. Nuessle, Gregory Hall & James R. Cadieux

Owing to the rich history of heavy element production in the unique high flux reactors that operated at the Savannah River Site, USA (SRS) decades ago, trace quantities of plutonium with highly unique isotopic characteristics still persist today in the SRS terrestrial environment. Development of an effective sampling, processing, and analysis strategy enables detailed monitoring of the SRS environment, revealing plutonium isotopic compositions, e.g., $^{244}Pu$, that reflect the unique legacy of plutonium production at SRS. This work describes the first long-term investigation of anthropogenic $^{244}Pu$ occurrence in the environment. Environmental samples, consisting of collected foot borne debris, were taken at SRS over an eleven year period, from 2003 to 2014. Separation and purification of trace plutonium was carried out followed by three stage thermal ionization mass spectrometry (3STIMS) measurements for plutonium isotopic content and isotopic ratios. Significant $^{244}Pu$ was measured in all of the years sampled with the highest amount observed in 2003. The $^{244}Pu$ content, in femtograms (fg $= 10^{-15}$ g) per gram, ranged from 0.31 fg/g to 44 fg/g in years 2006 and 2003 respectively. In all years, the $^{244}Pu/^{239}Pu$ atom ratios were significantly higher than global fallout, ranging from 0.003 to 0.698 in years 2014 and 2003 respectively.

With a half-life of 81 million years, plutonium-244, the longest-lived plutonium (Pu) isotope, can be produced both relatively and by anthropogenic means. Among the plutonium isotopes, $^{244}Pu$ carries the unique distinction of being both relatively heavy and stable (by contrast the half-lives of its heavier counterparts $^{245}Pu$, $^{246}Pu$, and $^{247}Pu$ are 10.5 hours, 10.9 days, and 2.3 days respectively). These unique properties, together with advanced analytical techniques, make it possible to monitor and delineate natural and anthropogenic $^{244}Pu$ in the terrestrial environment.

The genesis of $^{244}Pu$ in nature occurs as the result of r-process nucleosynthesis, e.g., in supernova(s) and neutron star mergers[1–3], some of which contributed to the formation of our Solar System over 4.6 billion years ago[4]. Although the $^{244}Pu$ once present in the Earth's crust has decayed to undetectable levels[5,6], and the neutron fluxes are insufficient for $^{244}Pu$ to be produced naturally in uranium ores, this isotope has been observed as a galactic hitchhiker on Earth in very small quantities in the relatively pristine deep-sea environment, e.g., in sediments[7,8] and manganese and iron-manganese encrustations[3,9]. This rare nuclide has also been found in meteorites[10,11] and in lunar rock samples[12,13].

Anthropogenic $^{244}Pu$ owes its presence in the biosphere to high flux reactors and thermonuclear detonation events respectively. Although anthropogenic $^{244}Pu$ occurrence in the environment is expected to greatly exceed that of its natural counterpart, it is typically found in very small amounts; and studies of $^{244}Pu$ in the environment are scarce. Indeed the first (and only) atmospheric global fallout ratio for $^{244}Pu$ ($^{244}Pu/^{239}Pu = 5.7 \times 10^{-5}$) has only recently been put forth[14]. In addition to its scarcity, analysis of $^{244}Pu$ by conventional means, i.e., alpha spectrometry and mass spectrometry, is a challenge. For context, the radiological properties of plutonium isotopes 236 through 244 are shown in Table 1. Owing to its relatively small specific activity (0.7 GBq/kg), $^{244}Pu$ measurement by alpha spectrometry is generally impractical. Additionally, $^{244}Pu$ is commonly used as an internal tracer for plutonium analysis by mass spectrometry; and in such cases $^{244}Pu$ cannot be measured accurately.

The main reason for the dearth of anthropogenic $^{244}Pu$ in the environment is because it requires very unlikely conditions to be produced: since neutron capture by $^{242}Pu$ produces $^{243}Pu$, timely neutron capture must also occur by $^{243}Pu$ before it beta decays, which has a roughly 5 hour half-life, to americium-243. Man-made production of $^{244}Pu$

Nonproliferation Technology Section, Savannah River National Laboratory, Aiken, SC, 29808, USA. Correspondence and requests for materials should be addressed to C.R.A. (email: christopher.armstrong@srnl.doe.gov)

| | Pu-236 | Pu-238 | Pu-239 | Pu-240 | Pu-241 | Pu-242 | Pu-244 |
|---|---|---|---|---|---|---|---|
| Half-life (in years) | 2.9 | 87.74 | 24,110 | 6537 | 14.4 | 375,000 | 8.1E7 |
| Specific activity (GBq/kg) | $2.0E + 7$ | $6.4E + 53$ | $2.3E + 3$ | $8.5E + 3$ | $3.9E + 6$ | $1.5E + 2$ | 7.0E-1 |
| Principal decay mode | alpha | alpha | alpha | alpha (some spontaneous fission) | beta | alpha | alpha |
| Decay energy (MeV) | 5.768 | 5.593 | 5.244 | 5.255 | 0.021 | 4.983 | 4.6 |
| Radiological hazards | alpha, weak gamma | alpha, weak gamma | alpha, weak gamma | alpha, weak gamma | beta, weak gamma | alpha, weak gamma | alpha, weak gamma |

**Table 1.  Summary of the radiological properties of relevant plutonium isotopes[36,37].**

therefore can only occur under extreme conditions, and typically via one of two pathways: In a high flux reactor ($\geq 5 \times 10^{15}$ neutrons per square centimeter per second) with a heavy isotope target - conditions not typically encountered in commercial or weapons production reactors - or during a thermonuclear weapon detonation.

## The need for plutonium-244

The world's stock of $^{244}$Pu is rapidly depleting. This is a concern primarily because, as mentioned previously, $^{244}$Pu is a common internal standard used in isotope dilution mass spectrometry for plutonium analyses. It is also an invaluable target material in the production of superheavy elements[15]. Moreover, because of its long half-life it poses significantly less radiation hazard than other plutonium isotopes; therefore, $^{244}$Pu is an attractive isotope for basic research studies of plutonium. The current shortage and prohibitive cost of making more material (billions of US dollars in over a 50 year timescale[16]), has prompted the only U.S. supplier of plutonium certified reference materials (CRM), New Brunswick Laboratories (NBL), to stop selling its $^{244}$Pu CRM[17].

To meet the growing need for this precious commodity, recent interest has been sparked to harvest the isotope from legacy materials, for example, from targets that were irradiated in the high flux reactors at the Savannah River Site USA (SRS) during the heavy isotope production campaigns decades ago. Examples of these materials include the Mark-42 and Mark-18 targets. The Mark-42 targets, containing $^{239}$Pu as the seed material, were designed to produce $^{242}$Pu, americium-243 ($^{243}$Am), and curium-244 ($^{244}$Cm). These nuclides were often recycled and incorporated into subsequent target materials to undergo further irradiations to produce californium-252 ($^{252}$Cf). Californium-252 is an ideal neutron source for a variety of medical and industrial applications. The Mark-18 targets contained $^{242}$Pu. These targets were designed for the sole purpose of producing californium-252 ($^{252}$Cf). At present, the most promising candidates for $^{244}$Pu recovery are the Mark-18 (Mk-18 A) targets. From August 1969 until November 1970, eighty-six Mk-18 A targets were irradiated in a high-neutron-flux mode in the 2000 megawatt-thermal (MWt) K-Reactor at SRS[18,19]. This intense exposure resulted in irradiated Mk-18 A targets with very unique isotopic contents. Upon removal from the reactor, 21 targets were processed at Oak Ridge National Laboratory (ORNL) in 1972–1973 to recover $^{252}$Cf, heavy curium ($^{246}$Cm through $^{248}$Cm), and plutonium. The plutonium fraction, rich in $^{244}$Pu, was electromagnetically separated in the calutrons at ORNL to produce gram quantities of 98–99% $^{244}$Pu. NBL obtained some of this material to produce the aforementioned $^{244}$Pu CRM. Other high-purity samples of $^{244}$Pu were made available to scientists for basic research and for safeguards programs[19]. The remaining Mk-18 A targets, expected to contain 21 grams of $^{244}$Pu - greater than 90% of the world's inventory - are currently being stored at SRS. Recognizing the importance of this unique material, in 2001, the United States Department of Energy (DOE) designated the $^{244}$Pu in the remaining targets as a national resource material[20]. Fueled by demand, researchers at Savannah River National Laboratory (SRNL) and ORNL have recently proposed a plan, currently under development, to process these remaining targets to recover $^{244}$Pu and heavy curium[17,19].

## Historical studies of plutonium-244

At present the only detailed studies of anthropogenic $^{244}$Pu in the environment are related to the thermonuclear weapons testing in the northern Marshall Islands[14,21–24]. Between 1946 and 1958, the United States conducted 43 thermonuclear detonation tests at Enewetak and Bikini atolls. These tiny land masses continue to provide some of the few locations where measurable quantities of heavy elements (and isotopes) can be sampled. For example, an examination of a sample related to the 10.4 megaton Ivy Mike test[25] detonated on November 1, 1952, lead to the discovery of $^{244}$Pu (einsteinium (Es) and fermium (Fm) were also discovered[22]). A follow up study[21] examined debris from the Mike test fallout and provided equally fruitful results. Diamond et al. noted that the Mike explosion produced, via neutron capture by $^{238}$U, uranium isotopes $^{239}$U to $^{255}$U (inclusively). Measurements of the beta-decay products of these short half-life isotopes resulted in the identification of a plethora of heavy elements and associated isotopes produced from the Mike test (Fig. 1), including a $^{244}$Pu/$^{239}$Pu atom ratio of $(1.18 \pm 0.07) \times 10^{-3}$.

More recent anthropogenic $^{244}$Pu investigations of this sample area have provided additional $^{244}$Pu/$^{239}$Pu results. A 2010 study[24] of soils collected from the Bikini atoll presented $^{244}$Pu/$^{239}$Pu atom ratios ranging from roughly $2$–$5 \times 10^{-4}$. In another study[23], a soil sample collected from Enewetak atoll from the Fig-Quince tests exhibited a $^{244}$Pu/$^{239}$Pu atom ratio of $3.2 \times 10^{-5}$. A contributing factor to the relatively small ratio observed in this latter study is the low fission yields generated in some of these tests[23]. In these cases relatively low $^{244}$Pu production is expected.

## Plutonium-244 production at the Savannah River Site (SRS)

The Savannah River Site (SRS), formerly the Savannah River Plant (SRP) began operation in the early 1950's. The site, located close to the Savannah River in South Carolina (USA), encompasses roughly 800 square kilometers (Fig. 2). Its primary purpose was to produce special nuclear materials for national defense, specifically



**Figure 1. Production of uranium isotopes in the November 1952 Mike thermonuclear event and the associated beta decay products.** Modified from Diamond *et al.* 1960[21]. ▫ beta unstable nuclide. ▪ beta stable nuclide.

**Figure 2. Map of Savannah River Site (SRS) located in South Carolina, USA.** Triangles show previous reactor locations (C, K, L, P, and R reactors). Circles show other locations of interest including A: A-Area comprising the Savannah River National Laboratory (SRNL); M: Fuel Fabrication Facility (decommissioned); H: H-Canyon and Tritium Reprocessing Facilities; K: Plutonium storage facility (formerly K reactor).

weapons-grade Pu and tritium ($^3$H) required for thermonuclear devices[26]. Over its history the site produced metric tons of plutonium comprising Pu isotopes with masses 238 through 244. Former and current plutonium and tritium production and processing facilities are shown in Fig. 2 including Savannah River National Laboratory (SRNL). For over 60 years SRNL, located in A-area at SRS, has performed a variety of research and development functions to support operations at SRS facilities including F-Canyon (decommissioned) and H-Canyon used nuclear fuel reprocessing facilities.

The highly versatile reactors at SRS provided a unique breeding ground for $^{244}$Pu, as this isotope was produced in the high flux reactors as a byproduct of the californium-252 production campaigns. Notably, during the aforementioned 1969–1970 period, the most $^{252}$Cf ever made, some 2.1 g, was produced in the SRS K-Reactor[27] (Fig. 2). To accomplish this feat, targets with $^{242}$Pu as the source nuclide (including the aforementioned Mark-18 targets)



**Figure 3.** Plutonium isotopic content in shoe brush debris samples from three stage thermal ionization mass spectrometry (3STIMS) measurements (logarithmic scale) in femtograms per gram with two-sigma error. Data are reported for sample years in which a $^{242}$Pu internal standard was added to the samples.

| Year | $^{239}$Pu | $^{240}$Pu | $^{241}$Pu | $^{244}$Pu |
|------|-----------|-----------|-----------|-----------|
| 2003 | $62.06 \pm 5.61$ | $5.57 \pm 0.50$ | $0.12 \pm 0.01$ | $44.23 \pm 2.00$ |
| 2004 | $50.09 \pm 4.52$ | $3.81 \pm 0.34$ | $0.08 \pm 0.01$ | $1.46 \pm 0.13$ |
| 2005 | $26.84 \pm 2.42$ | $2.45 \pm 0.22$ | $0.04 \pm 0.01$ | $1.34 \pm 0.12$ |
| 2006 | $42.62 \pm 3.85$ | $4.45 \pm 0.40$ | $0.07 \pm 0.01$ | $0.31 \pm 0.03$ |
| 2009 | $712.88 \pm 71.90$ | $217.24 \pm 21.91$ | $22.51 \pm 2.27$ | $3.10 \pm 0.31$ |
| 2011 | $46.34 \pm 3.43$ | $5.10 \pm 0.39$ | $0.06 \pm 0.01$ | $0.53 \pm 0.04$ |

**Table 2.** Plutonium isotopic content from three stage thermal ionization mass spectrometry (3STIMS) measurements in femtograms per gram (fg/g) with two-sigma error. Data are reported for sample years in which a $^{242}$Pu internal standard was added to the samples.

were introduced into the high flux reactor. Taking advantage of the unique capabilities inherent to the SRS reactors, many other transplutonium isotopes were also produced at SRS including curium-244 (which was initially proposed as a deep-space heat source and later abandoned in favor of plutonium-238), and its heavier isotopes, e.g., curium-246–248[17] as well as isotopes of berkelium (Bk), einsteinium (Es), and fermium (Fm)[28].

### Aim

Owing to its remarkable plutonium production history[26], SRS offers a unique environment for detailed study of plutonium fate and transport. We recently reported findings of a long-term study of plutonium detailing sampling, radiochemical processing, and analysis of Pu ($^{238}$Pu through $^{242}$Pu) in environmental samples from SRS[29]. In this present contribution, we focus specifically on $^{244}$Pu. This current contribution expands on this work, and here we report $^{244}$Pu results from sample collections spanning eleven years. In contrast to the aforementioned studies of anthropogenic $^{244}$Pu related to thermonuclear weapon testing[21,23–25], this current study reports the occurrence of reactor-produced $^{244}$Pu in the terrestrial environment. Collectively, these studies afford unique insights into the fate and transport of this rare isotope.

### Results

**Plutonium isotopic content.**   Samples consisting of foot borne debris removed via a mechanical shoe brush were collected and processed from 2003 through 2014. For years in which a $^{242}$Pu internal standard (tracer) was added during radiochemical processing (2003, 2004, 2005, 2006, 2009, and 2011), the plutonium isotopic content was quantified for isotopes $^{239}$Pu, $^{240}$Pu, $^{241}$Pu, and $^{244}$Pu by three stage thermal ionization mass spectrometry (3STIMS). The isotopic mass data for these samples, in femtograms (fg = $10^{-15}$ g) per gram, are shown in Fig. 3 on a logarithmic scale, and reported in Table 2. Although measurable quantities of all isotopes investigated were observed in all years, mass results of isotopes $^{239}$Pu, $^{240}$Pu, and $^{241}$Pu are included in Fig. 3 and Table 2 for comparative purposes only (see Discussion). Significant amounts of $^{244}$Pu were observed in all years, with amounts ranging from 0.31 to 44.23 fg/g in years 2006 and 2003 respectively.

**Plutonium atom ratios.**   Atom ratio data for $^{240}$Pu/$^{239}$Pu, $^{241}$Pu/$^{239}$Pu, $^{242}$Pu/$^{239}$Pu, and $^{244}$Pu/$^{239}$Pu for this eleven year study are reported in Table 3. The $^{240}$Pu/$^{239}$Pu, $^{241}$Pu/$^{239}$Pu, and $^{242}$Pu/$^{239}$Pu isotopic ratios reported up to 2013, depicted as the shaded region in Table 3 and included for comparison, have been reported previously

| Year | $^{240}Pu/^{239}Pu$ | $^{241}Pu/^{239}Pu$ | $^{242}Pu/^{239}Pu$ | $^{244}Pu/^{239}Pu$ |
|------|------|------|------|------|
| 2003 | $0.0894 \pm 0.0007$ | $0.00189 \pm 0.00009$ | NA | $0.6981 \pm 0.0034$ |
| 2004 | $0.0757 \pm 0.0004$ | $0.00166 \pm 0.00006$ | NA | $0.0286 \pm 0.0002$ |
| 2005 | $0.0908 \pm 0.0005$ | $0.00158 \pm 0.00006$ | NA | $0.0488 \pm 0.0004$ |
| 2006 | $0.1040 \pm 0.0005$ | $0.00155 \pm 0.00005$ | NA | $0.0072 \pm 0.0001$ |
| 2007 | $0.0945 \pm 0.0001$ | $0.00148 \pm 0.00077$ | $0.01875 \pm 0.00014$ | $0.0215 \pm 0.0001$ |
| 2008 | $0.0952 \pm 0.0003$ | $0.00155 \pm 0.00002$ | $0.01968 \pm 0.00008$ | $0.0224 \pm 0.0001$ |
| 2009 | $0.3035 \pm 0.0015$ | $0.03131 \pm 0.00024$ | NA | $0.0043 \pm 0.0001$ |
| 2010 | $0.1083 \pm 0.0003$ | $0.00129 \pm 0.00003$ | $0.01851 \pm 0.00012$ | $0.0249 \pm 0.0004$ |
| 2011 | $0.1097 \pm 0.0024$ | $0.00132 \pm 0.00026$ | NA | $0.0112 \pm 0.0007$ |
| 2012 | $0.1128 \pm 0.0016$ | $0.00178 \pm 0.00011$ | $0.01733 \pm 0.00051$ | $0.0152 \pm 0.0003$ |
| 2013 | $0.1322 \pm 0.0011$ | $0.00124 \pm 0.00010$ | $0.04273 \pm 0.00055$ | $0.0203 \pm 0.0003$ |
| 2014 | $0.1516 \pm 0.0026$ | $0.00106 \pm 0.00010$ | $0.02778 \pm 0.00070$ | $0.0026 \pm 0.0002$ |
| Fallout | $0.180 \pm 0.007^{38}$ | $0.00194 \pm .00014^{39}$ | $0.0039 \pm 0.0007^{39}$ | $5.7E\text{-}05^{14}$ |

**Table 3. Three stage thermal ionization mass spectrometry (3STIMS) plutonium atom ratios for SRS environmental samples spanning an eleven year period with two-sigma error.** Shaded values were initially reported in Armstrong et al. 2015[29]. NA: not applicable ($^{242}Pu$ could not be quantified).

in our initial report[29]. With the exception of the 2009 sample, in which a pronounced higher burnup signature is observed, collectively the $^{240}Pu/^{239}Pu$ isotopic data generally appear to be representative of a variable admixture of fallout and weapons-grade plutonium from local operations, with several ratios approaching weapons-grade Pu ($<7\%$ $^{240}Pu$). Although the $^{241}Pu/^{239}Pu$ ratio in 2009, all other measured ratios are roughly similar to atmospheric global fallout, reflecting the decay of this relatively short half-life isotope (Table 1) from decades-old SRS material. The $^{242}Pu/^{239}Pu$ ratios (for years in which $^{242}Pu$ was measured) are uniformly above fallout, consistent with an admixture of fallout and higher burnup material. Elevated $^{244}Pu/^{239}Pu$ atom ratios were also measured in every sample year relative to atmospheric fallout (Table 3), but to a larger extent than observed in the $^{242}Pu/^{239}Pu$ data. Similarly to the data reported in Table 2, the 2003 sample year featured the most pronounced $^{244}Pu$ enrichment, exhibiting a $^{244}Pu/^{239}Pu$ atom ratio of approximately 0.7.

## Discussion

**Plutonium-244 in the Savannah River Site (SRS) environment.** Significant and highly variable $^{244}Pu$ was observed throughout the eleven year period of this study. Due to the sheer volume of foot traffic that passes through the shoe brushes (hundreds of people annually from various A-Area locations and SRS in general), and the range of materials collected (soil, rock/mineral fragments, organic material, etc.) variability in plutonium-244 collections from year to year is expected. However, despite this variability, every collection year significantly exceeded the atmospheric fallout value.

The presence of significant $^{244}Pu$ in all sample years can be attributed to the rich history of transuranic isotope production at SRS. The proximity of associated radiochemical processing activities to our clean laboratories in which the shoe brush sample collectors are housed may also be a key factor. As mentioned previously, $^{244}Pu$ was produced in the SRS high flux reactors decades ago. The irradiated targets containing $^{244}Pu$, $^{244}Cm$, $^{252}Cf$, etc., were stored and/or processed in F-Area and at the Savannah River Laboratory (SRL)[28], now SRNL, in A-Area (Fig. 2). This latter location is located a short distance ($<\frac{1}{2}$ km) from our A-Area clean laboratories. This long-term dataset demonstrates a unique $^{244}Pu$ signature, reflective of this production history, which continues to persist in the SRS local environment today.

The most striking collection years occurred in 2003, in which the most elevated $^{244}Pu$ was observed, and in 2009, which featured anomalously high $^{239}Pu$, $^{240}Pu$, and $^{241}Pu$. The high $^{244}Pu$ observed in the 2003 sample is likely due to activities associated with high activity waste (HAW) processing in the SRNL A-Area facility, located less a half kilometer from our cleanroom facilities (where the shoe brush sample collectors are located). In the early 2000's a decision was made by DOE to initiate disposition of HAW stored in F-Area (Fig. 2) at SRS. This HAW contained appreciable quantities of transuranic isotopes, particularly americium and curium, associated with the targets that had been irradiated in the high flux SRS reactors, e.g., K-Reactor, decades earlier. This material had been in temporary storage for decades in F-Area. Disposal involved converting the material into a borosilicate glass, i.e., vitrification, at the SRS Defense Waste Processing Facility (DWPF) for permanent storage. Due to the high activity of this material[30], relatively small batches were sent to the Shielded Cells Facility in A-Area to undergo characterization studies prior to vitrification at DWPF. In 2002, a detailed analysis (including alpha spectrometry) was conducted on this material and significant quantities of $^{243}Am$ and $^{244}Cm$ were measured (unpublished data). Although $^{244}Pu$ was not analyzed, a significant quantity of this isotope is also expected to be present in that 2002 HAW sample. Thus, the timing of this HAW processing campaign is consistent with the 2003 sample collection that yielded the high $^{244}Pu$. The marked elevation in $^{240}Pu$ and $^{241}Pu$ relative to $^{239}Pu$ in 2009 was most likely due to plutonium oxide processing activities that occurred during this time frame in an adjacent laboratory in A-Area at SRNL[29,31]. These materials contained relatively high $^{240}Pu$ and $^{241}Pu$; and it is conceivable that, similarly to the high $^{244}Pu$ collection in 2003, a small contribution was tracked into our laboratory wing entrance and picked up by the shoe brushes. Thus an examination of this complete dataset reported in Table 3 provides clear evidence of both the weapons-grade Pu and the heavy element production legacies at SRS. Further, the persistence of these materials offers unique insights into plutonium fate and transport in the local SRS environment.

**Comparison to other studies.** Little data from reactor-produced $^{244}$Pu in environmental samples are currently available. As such, comparison to anthropogenic $^{244}$Pu data is limited to either samples associated with thermonuclear weapon tests or potentially reactor-produced $^{244}$Pu that is difficult to distinguish from global fallout. The $^{244}$Pu/$^{239}$Pu atom ratios reported in Table 3 are significantly higher than the values reported from the most recent Marshall Island studies[32,33]. Moreover, the lowest $^{244}$Pu/$^{239}$Pu ratio observed in this study (~0.003 in 2014) is greater than the $^{244}$Pu/$^{239}$Pu atom ratio observed in the earlier collections following the Mike thermonuclear detonation test (($1.18 \pm 0.07) \times 10^{-3\,(21)}$). Recent environmental samples obtained from the Sellafield nuclear reprocessing facility in the United Kingdom feature $^{244}$Pu/$^{239}$Pu atom ratios[14] consistent with global fallout. The quantities of $^{244}$Pu measured in our study are representative of a sample set that is unique to the SRS environment, where gram quantities of $^{244}$Pu were made in the specially-designed high flux reactors that once operated at SRS. Although production and processing of $^{244}$Pu ceased decades ago, re-suspension of these legacy materials resulted in a general dispersion of $^{244}$Pu containing solid phases such that small quantities are still readily quantifiable.

## Methods

**Methodology.** The environmental samples in this study consist of materials collected from the bottom of visitors' footwear via a mechanical shoe brush[34] before entering the cleanroom facilities (Class 1000–10,000) at Savannah River National Laboratory (SRNL). The shoe brush (Liberty Shoe Brush 2010SC; Liberty Industries Inc., East Berlin, CT, USA) mechanically removes foot borne debris via four rotating brushes that contact the front, sides, and bottom of the footwear in conjunction with a vacuum system. Further sample collection details are provided in a previous study[29]. Briefly, collections consist of a variety of common terrestrial materials, including aerosol particles, mineral fragments, vegetation debris, soil, etc. For all intents and purposes, no size or shape discrimination occurs with this collection method. Observed sizes of collected materials range from tens of microns to single centimeters. This sampling method offers a unique opportunity to collect bulk samples that are representative of the surrounding SRNL (A-Area; Fig. 2) environment. Samples are collected periodically (typically once or twice per year) and processed via the SRNL radiochemical processing procedure specifically designed for trace level plutonium purification and separation[29]. The separated and purified plutonium samples are analyzed first by alpha spectrometry and then by mass spectrometry for total plutonium and plutonium isotopic composition determination.

**Sample preparation and mass spectrometry.** All glass, quartz, and Teflon materials are pretreated (leached) by refluxing for several hours in 8 M nitric acid. Type 1 (18 MΩ) water and high purity semiconductor grade acids are used exclusively in this study. All work was conducted in Class 10,000 and Class 1,000 clean rooms.

Experimental details related to this study have been described previously[29]. This plutonium separation and purification approach is specifically tailored to eliminate impurities and potential mass spectrometry isobaric interferences, e.g., from curium-244. Briefly, upon extraction from the shoe brushes, samples are mixed manually and approximately 100 grams are subsampled and weighed out. All samples are ashed for at least eight hours in a furnace at 600 °C to destroy organic components in the matrix. The samples are subsequently digested and centrifuged in accordance with a well-established method[32], and the solid residue is archived for periodic monitoring of refractory Pu. The sample is transferred by weight to a leached pyrex beaker and spiked with $^{242}$Pu (15–20 pg from NIST SRM 4334 G). The remaining solution is archived. After an oxidation state adjustment (to Pu(IV)) and a co-precipitation step trace plutonium purification is performed according to an original methodology[33] whereby samples are loaded and eluted through successive columns of AG1 X 8 resin (Eichrom) and AG1 X 4 (Eichrom) ion exchange resins.

**Three stage thermal ionization mass spectrometry (3STIMS).** Plutonium measurements were conducted with a 1960 s-era KAPL (Knolls Atomic Power Laboratory) design Three Stage Thermal Ionization Mass Spectrometer (3STIMS) fabricated in-house in the 1970's. The instrument uses three 90° × 30.5 cm sectors arranged in magnetic/magnetic/electrostatic order (momentum/momentum/energy filter order) with a single ion counting detector. This arrangement allows for measurement of very high ratios between adjacent ion masses, of order 10E8, but the instrument must be sequentially tuned from mass to mass to collect ions at each isotope, less efficient than an instrument with a detector per ion beam. It routinely analyzes nanogram mass U samples and picogram mass Pu samples. Purified samples are loaded onto anion exchange resin beads, which are then loaded by hand onto high-purity rhenium filaments and placed in the source region of the mass spectrometer for thermal ionization.

**3STIMS measurements.** Isotopic content measurements of $^{239}$Pu, $^{240}$Pu, $^{241}$Pu, and $^{244}$Pu together with atom ratios of $^{240}$Pu/$^{239}$Pu, $^{241}$Pu/$^{239}$Pu, $^{242}$Pu/$^{239}$Pu, and $^{244}$Pu/$^{239}$Pu were carried out by three-stage thermal ionization mass spectrometry (3STIMS). These data are corrected for small impurities (trace $^{238-241}$Pu) in the NIST SRM 4334 G standard. All data are mass bias corrected, thus reducing systematic error. Stringent quality assurance and quality control measures are routinely undertaken with the 3STIMS instrument. A two-sigma relative standard deviation (RSD) of approximately 10% is expected for measurements of Pu in the 10 fg (fg = $10^{-15}$ g) range. In addition to employing internal standards, an external standard (certified ratio standard: New Brunswick CRM-128) consisting of 10–30 pg total Pu of a 1:1 $^{239}$Pu:$^{242}$Pu with trace $^{238}$Pu (<1 fg), $^{240}$Pu and $^{241}$Pu (on the order of single fg) is ran with every sample set. For Pu isotopic abundances excellent accuracy is observed with this instrument. For example, when compared to the certified (CRM-128) value, the 239/242, 240/242, and 241/242 ratios are routinely within analytical error (typically 0.5% or better).

**Quality assurance and quality control (QA/QC).**     Stringent quality assurance and quality control (QA/QC) protocols for trace plutonium analysis in environmental samples have been in place for decades in this laboratory. Reagent blanks (run through complete chemistry with the same amount of SRM 4334G standard used in actual samples) and bench standards (run through chemistry with ~3 pg of $^{240}$Pu from NIST SRM 4338 A) were processed with every sample set. The background Pu levels in the laboratory are monitored routinely (via swipe sampling, radiochemical processing and 3STIMS analysis) and are consistently below the analytical detection limit of the 3STIMS. Although the reagent blanks were similarly below the instrument detection limit. In addition, as part of a National Institute of Standards and Technology (NIST) international blind round robin exercise conducted in 2005–2006, we investigated a new NIST standard reference material, Rocky Flats Soil II (SRM 4353 A). The results of this exercise provided data that contributed to the certification of this material[35]. This material represents weapons-grade Pu that was not expected to contain $^{244}$Pu. Thus this material enables us to establish the low end of detection (~0.006 atom percent $^{244}$Pu) for a similar sample matrix to the one investigated in this study. A set of replicate samples were spiked with $^{242}$Pu and a second set was run unspiked, i.e., there was enough $^{239}$Pu in the samples on which to tune the TIMS instrument. Thus, in addition to routine screening to verify background levels, this exercise enabled us to further verify that the laboratory background contained negligible $^{244}$Pu. See the Supplementary Information section (Table S.1) for further details.

## References

1.  Kuroda, P. K. Nuclear fission in the early history of the earth. *Nature* **187**, 36–38 (1960).
2.  Qian, Y. Z. The origin of the heavy elements: recent progress in the understanding of the r-process. *Prog. Part. Nucl. Phys.* **50**, 153–199 (2003).
3.  Wallner, A. *et al.* Abundance of live 244Pu in deep-sea reservoirs on Earth points to rarity of actinide nucleosynthesis. *Nat Commun* **6**, 5956 (2015).
4.  Avice, G. & Marty, B. The iodine-plutonium-xenon age of the Moon-Earth system revisited. *Philos. Trans. R. Soc., A* **372**, 20130260/20130261–20130260/20130216 (2014).
5.  Alexander, E. C., Jr., Lewis, R. S., Reynolds, J. H. & Michel, M. C. Plutonium-244; confirmation as an extinct radioactivity. *Science* **172**, 837–840 (1971).
6.  Turner, G., Harrison, T. M., Holland, G., Mojzsis, S. J. & Gilmour, J. Extinct 244Pu in ancient zircons. *Science* **306**, 89–91 (2004).
7.  Paul, M. *et al.* Experimental limit to interstellar 244Pu abundance. *Astrophys. J.* **558**, L133–L135 (2001).
8.  Paul, M. *et al.* A window on nucleosynthesis through detection of short-lived radionuclides. *Nucl. Phys. A* **719**, 29c–36c (2003).
9.  Wallner, C. *et al.* Supernova-produced and anthropogenic 244Pu in deep-sea manganese encrustations. *New Astron. Rev.* **48**, 145–150 (2004).
10. Fahey, A. J., Goswami, J. N., McKeegan, K. D. & Zinner, E. Aluminum-26, plutonium-244, titanium-50, rare earth elements, and trace element abundances in hibonite grains from CM and CV meteorites. *Geochim. Cosmochim. Acta* **51**, 329–350 (1987).
11. Lewis, R. S. Rare gases in separated whitlockite from the St. Severin chondrite. Xenon and krypton from fission of extinct plutonium-244. *Geochim. Cosmochim. Acta* **39**, 417–432 (1975).
12. Hutcheon, I. D. & Price, P. B. Plutonium-244 fission tracks. Evidence in a lunar rock 3.95 billion years old. *Science* **176**, 909–911 (1972).
13. Reed, S. J. B., Smith, D. G. W. & Long, J. V. P. Rare earth elements in chondritic phosphates - implications for plutonium-244 chronology. *Nature* **306**, 172–173 (1983).
14. Steier, P. *et al.* AMS of the Minor Plutonium Isotopes. *Nucl. Instrum. Methods Phys. Res., Sect. B* **294**, 160–164 (2013).
15. Robinson S. M., Allender, Jeffrey, S., Patton & Brad, D. Processing and Disposition of Special Actinide Target Materials – 13138. In: *WM 2013 Conference* (2013).
16. Patton, B. D. *et al.* Preserving plutonium-244 as a national asset. *Annu. Meet. Proc. Inst. Nucl. Mater. Manage.* **52**, a211/211–a211/217 (2011).
17. Robinson, S. A. Jeffrey; Bridges, Nickolas; Loftin, Bradley; Patton, Bradley Recovery of Mark-18A (Mk-18A) Target Materials: Program Management Plan. *Oak Ridge National Laboratory* (2014).
18. Goldberg, S. A., Cappis, J., Clarke, S. & Whitesel, R. Efforts to Save 244Pu in Mark 18A Targets for Use in International Safeguards Measurements. International *Atomic Energy* Agency (2001).
19. Robinson, S. A. Charles; Allender, Jeffery; Collins, Emory; Fuller, Kenneth; Loftin, Bradley; Patton, Bradley. Evaluation of Disposition Options for Mark-18A (Mk-18A) Target Materials. *Oak Ridge National Laboratory* (2013).
20. Moniz, E. J. Savannah River Site Mk-18A Targets. In: *Excess Material Disposition Decision Memorandum No. 3* (2001).
21. Diamond, H. *et al.* Heavy isotope abundances in Mike thermonuclear device. *Phys. Rev.* **119**, 2000–2004 (1960).
22. Ghiorso, A. *et al.* New elements einsteinium and fermium, atomic numbers 99 and 100. *Phys. Rev.* **99**, 1048–1049 (1955).
23. Hamilton, T. F. *et al.* Frequency distribution, isotopic composition and physical characterization of plutonium-bearing particles from the Fig-Quince zone on Runit Island, Enewetak Atoll. *J. Radioanal. Nucl. Chem.* **282**, 1019–1026 (2009).
24. Lachner, J., Christl, M., Bisinger, T., Michel, R. & Synal, H.-A. Isotopic signature of plutonium at Bikini atoll. *Appl. Radiat. Isot.* **68**, 979–983 (2010).
25. Bliss, W. Enewetak Fact Book. *U.S. Department of Energy Nevada Operations Office* (1982).
26. Bebbington, W. P. History of Du Pont at the Savannah River Plant. *E.I. Du Pont De Nemours and Company* (1990).
27. Boswell, J. M. Reactor Production Diversity. In: *50 Years of Excellence in Science and Engineering at the Savannah River Site.* Westinghouse Savannah River Company (2000).
28. Harbour, R. M., Ice Clark, H., Hale William, H. & Lowe John, T. Development of Chemical Processes and Equipment to Recover Curium-244 and Californium-252. *Westinghouse Savannah River Company* (2000).
29. Armstrong, C. R. *et al.* Plutonium Isotopes in the Terrestrial Environment at the Savannah River Site, USA: A Long-Term Study. *Environ. Sci. Technol.* **49**, 1286–1293 (2015).
30. Peters, T. B. H., Diprete, D. T., Diprete, D. P. & C. C. Fink, S. D. Demonstration of Disposal of Americium and Curium Legacy Material Through High Level Waste System: Results from Baseline, Nitrate Added Flowsheet Studies. *Westinghouse Savannah River Company* (2001).
31. Kessinger, G. F. *et al.* Material properties of plutonium-bearing oxides stored in stainless steel containers. *JNMM* **38**, 82–95 (2010).
32. Greiling, H. D. & Lieser, K. H. Properties of thorium dioxide, uranium dioxide, and plutonium dioxide as function of pretreatment and their dissolution in nitric acid. *Radiochim. Acta* **35**, 79–89 (1984).
33. Crouch, E. A. C. & Cook, G. B. The analysis of complex mixtures of elements resulting from the irradiation of fissile materials. *J. Inorg. Nucl. Chem.* **2**, 223–228 (1956).
34. Liberty Industries website, www.liberty-ind.com. (Accessed: 23rd November 2015).
35. Nour, S., Inn, K. & Filliben, J. Development of the NIST Rocky Flats Soil Standard. *J. Radioanal. Nucl. Chem.* **277**, 161–168 (2008).
36. *CRC Handbook of Chemistry and Physics, Internet Version 2005*, 85 edn. CRC Press (2005).

37. Baum, E. M., Ernesti, Mary, C., Knox, Harold, D., Miller, Thomas, R. & Watson, Aaron, M. *Nuclides and Isotopes Chart of Nuclides*, Seventeenth edn. *Bechtel Marine Propulsion Corporation* (2009).
38. Zheng, J., Tagami, K. & Uchida, S. Release of Plutonium Isotopes into the Environment from the Fukushima Daiichi Nuclear Power Plant Accident: What Is Known and What Needs to Be Known. *Environ. Sci. Technol.* **47**, 9584–9595 (2013).
39. Oughton, D. H. *et al.* Plutonium from Mayak: Measurement of Isotope Ratios and Activities Using Accelerator Mass Spectrometry. *Environ. Sci. Technol.* **34**, 1938–1945 (2000).

## Acknowledgements

The authors gratefully acknowledge Sheila Smalley for providing technical assistance, particularly in performing the radiochemical separations throughout her many years of service at Savannah River National Laboratory. We thank the three anonymous reviewers who contributed significantly to the quality of this manuscript. This document was prepared in conjunction with work accomplished under Contract no. DE-AC09-08SR22470 with the U.S. Department of Energy.

## Author Contributions

All authors contributed to this work. C.R.A. and J.R.C. conceived the study and C.R.A. wrote the main manuscript. H.A.B., P.R.N. and G.H. provided technical support. All authors reviewed the manuscript.

## Additional Information

**Supplementary information** accompanies this paper at http://www.nature.com/srep

**Competing financial interests:** The authors declare no competing financial interests.

**How to cite this article**: Armstrong, C. R. *et al.* Anthropogenic plutonium-244 in the environment: Insights into plutonium's longest-lived isotope. *Sci. Rep.* **6**, 21512; doi: 10.1038/srep21512 (2016).

This work is licensed under a Creative Commons Attribution 4.0 International License. The images or other third party material in this article are included in the article's Creative Commons license, unless indicated otherwise in the credit line; if the material is not included under the Creative Commons license, users will need to obtain permission from the license holder to reproduce the material. To view a copy of this license, visit http://creativecommons.org/licenses/by/4.0/

"EXHIBIT Q"

Environmental Advances 8 (2022) 100229



Contents lists available at ScienceDirect

# Environmental Advances

journal homepage: www.sciencedirect.com/journal/environmental-advances



# Internal contamination cases: The REAC/TS experience

Jason Davis [*], Carol Iddins

*Radiation Emergency Assistance Center/Training Site, Oak Ridge Institute for Science and Education, Oak Ridge Associated Universities, P.O. Box 117, MS-39, Oak Ridge, TN 37831-0117, United States*

**A R T I C L E   I N F O**

*Keywords:*
Internal contamination
Ionizing radiation
Countermeasures

**A B S T R A C T**

The Radiation Emergency Assistance Center/Training Site or REAC/TS is a United States Department of Energy (DOE) emergency response asset and part of the National Nuclear Security Administration's (NNSA) Nuclear Emergency Support Team (NEST). REAC/TS started in 1976 to provide support to the US DOE and is under the Oak Ridge Institute for Science and Education (ORISE) and operated for the US DOE by Oak Ridge Associated Universities, a consortium of 125+ universities to further science and developing future scientists. As part of the support for the US DOE, REAC/TS is on call 24 hours a day, seven days a week for any radiological/nuclear (R/N) injuries or illnesses in the US and throughout the world. REAC/TS was one of the initial eight World Health Organization (WHO) Collaborating Centers, throughout the world, established in 1980 for radiation emergency management and subsequent member of WHO's Radiation Emergency Management Preparedness and Assistance Network (REMPAN). This article will discuss the REAC/TS experience with more recent internal contamination cases and discuss the many gaps existing in assessing and managing cases of internal contamination.

## 1. Introduction

A wide variety of scenarios pose the risk of internal radionuclide contamination, and internalization of radioactive materials is an urgent medical situation for which treatment decisions should not be delayed. Documented incidents in which human intakes occur at levels sufficient to cause deterministic effects are exceptionally rare. This rarity leads to a lack of adequate education and experience amongst most medical professionals to appropriately respond to an internal contamination event (Breitenstein, 2003). The Radiation Emergency Assistance Center/-Training Site (REAC/TS) was established in 1976 to support the US Department of Energy (DOE) and National Nuclear Security Administration (NNSA) by assessing, managing, and providing guidance on cases of injuries and illnesses from ionizing radiation, including those involving internal contamination.

If a potentially contaminated patient presents for treatment, medical staff will need to work closely with health physics personnel in initially assessing potentially contaminated personnel. Although secondary to the treatment of life-threatening conditions, dose assessment is an important part of radiation accident management. Prompt decorporation is crucial for mitigating both immediate and future biological effects from radiological contamination, and appropriate estimation of doses

can help guide clinical practitioners as they plan a course of treatment, as well as provide information on the expected clinical course of the victim's injuries (Toohey, 2003). Radioactive materials that have been internalized via inhalation, ingestion, absorption through wounds or intact skin, or injection or puncture are more difficult to detect and, in some ways, more difficult to manage than either external contamination or external doses (Giussani, 2020).

The material presented in this article reflects the REAC/TS experience in managing cases of internal contamination and addresses the gaps still existing with assessing and managing these cases. This information was presented at the 16th World Health Organization (WHO) Radiation Emergency Management Preparedness and Assistance Network (REMPAN) Coordination Meeting held 22-24 March 2021.

## 2. Materials and Methods

The authors gathered information from the REAC/TS Radiation Accident Registry from the past decade and examined the incidents for trends of type of facility involved, as well as the particular radionuclides involved, etc. In reviewing the REAC/TS cases and recently reported cases in the literature, the authors identified areas in which the limited availability of equipment, the lack of approved techniques, or the

This research did not receive any specific grant from funding agencies in the public, commercial, or not-for-profit sectors.
* Corresponding author.
*E-mail address:* Jason.davis@orau.org (J. Davis).

https://doi.org/10.1016/j.envadv.2022.100229
Received 31 July 2021; Received in revised form 21 March 2022; Accepted 15 April 2022
Available online 18 April 2022
2666-7657/© 2022 Published by Elsevier Ltd. This is an open access article under the CC BY-NC-ND license (http://creativecommons.org/licenses/by-nc-nd/4.0/).

*J. Davis and C. Iddins*                                                                                                                                    *Environmental Advances 8 (2022) 100229*

absence of nuclide-specific decorporation compounds hindered the assessment and management of intake cases.

## 3. Results

The authors identified 62 cases of radioactive material intakes resulting from unusual occurrences within the past decade. Initial notification of these cases come from: DOE sites (23); hospitals (13); Poison Center referrals (5); federal research centers (3); veterinary medicine (3); non-government companies (3); US Department of Defense (2); US Nuclear Regulatory Commission (2); universities (2); and state radiological control departments (2). These totals do not include intakes resulting from routine operations (Fig. 1) or intentional administration of radionuclides for diagnostic or therapeutic purposes. Four of these cases occurred outside of the U.S. and five resulted in the decision to administer Pentetate Calcium Trisodium or Pentetate Zinc Trisodium (DTPA). The most common radionuclide encountered was tritium, followed by iodine, and uranium (Fig. 2). There was a total of 151 individuals impacted from these incidents.

### 3.1. Limitations of Internal Dosimetry Methods – In Vitro

Energy deposited in a tissue by internal radionuclides cannot be measured directly. Radiation protection professionals must, instead, rely on measurements of the amount of radioactive material in excreta or the measurement of the portion of energy escaping the body to deduce how much radioactive material is in the body. This information can then be used to extrapolate how much material was initially deposited in the body and, by extension, how much energy has been delivered to the body (Toohey, 2003).

Quantitative and qualitative determination of internal radiation contamination is frequently accomplished through bioassay techniques for the identification and measurement of radionuclides in urine, blood or fecal samples (in vitro bioassay) and/or through lung, thyroid, wound or whole body counting (in vivo bioassay). For a number of radionuclides, or in the absence of suitable *in vivo* measurement capabilities, excreta sampling may be the only practical method for obtaining the data necessary to determine body concentrations.

Determination of a body burden using excreta requires interpreting the measured result using a biokinetic model. The most often-used models are those developed by the International Commission on Radiation Protection (ICRP). The early models were developed for regulation-based monitoring of radiation workers and are not intended to be used for determining body contents in an actual intake scenario (International Commission on Radiation Protection, 1979). More contemporary models are intended to be applicable to the interpretation of bioassay data and determination of individual doses (International Commission on Radiation Protection, 2015), but are developed for a healthy individual of average weight and height such that they are not ideal for patient-specific dosimetry (Lacerda IVB, 2018).

Performance of bioassay analysis requires specialized instrumentation, radiochemistry capabilities, and expertise. It is important to identify specialized bioassay laboratories during the emergency planning process, as hospital laboratories usually do not have the required instrumentation and expertise for determination of the type and quantities of radioactive materials present (International Atomic Energy Agency, 2005).

The primary limitation of the usefulness of bioassay techniques for emergency determination of intakes is the time associated with sample collection and processing. Routine bioassay samples are generally collected over a 24-hour period to minimize uncertainties associated with urine clearance rates. In an emergency, a single spot sample may be used for initial analysis. Even optimized separation and spectroscopic methods may take 3-5 hours before results are available (Nour, 2011). For some alpha-emitting radionuclides, analysis can be performed using inductively-coupled plasma mass spectroscopy (ICP-MS) with less stringent requirements for radiochemical separation and re-concentration. However, the counting times with this process may exceed 12 hours (Maxwell, 2011).

A number of approaches have been investigated for obtaining more timely information, including: the use of handheld instrumentation for the determination of radionuclide concentrations in nasal swabs (Yoon, 2017); gross alpha and beta counting using liquid scintillation techniques for initial screening (Li C. L., 2011); and the use of field-deployable instrumentation for initial analysis of samples (Li C. S., 2009).



**Fig. 1.** Total number of bioassay results above the detection level for US Nuclear Regulatory Commission (dashed line) and US Department of Energy (solid line).

*J. Davis and C. Iddins*                                                                                                        *Environmental Advances 8 (2022) 100229*

## PERCENT OF CASES



**Fig. 2.** Proportion of cases involving specific radionuclides for REAC/TS cases spanning the past decade.

### 3.2. Limitations of Internal Dosimetry Methods – In Vivo

In vivo bioassay refers to direct measurement of the amount of radioactive material deposited in organs, tissues, or the whole body using externally-placed detectors (Giussani, 2020). Common methods are thyroid counting, lung counting, and whole body counting. In vivo methods are preferable to *in vitro* methods, as they facilitate the rapid screening of triage of patients without the collection of samples, or laborious analysis of excreta samples (National Council on Radiation Protection and Measurements, 2009). Further, *in vivo* methods of determining the activity of a contaminant within an organ are not subject to the uncertainties inherent in biokinetic modeling. External evaluation of incorporated radionuclides suffers from the presence of external contamination, which may mask the presence of internalized material, as well as from the presence of radiological material in other organs (Lobaugh, 2015)

For an initial assessment, whole-body counters are the preferred method of assessing internal contamination with gamma- x-ray-emitting radionuclides. However, their use in a triage scenario is obviated by their limited availability and that they possess a greater sensitivity than required for triage (Giussani, 2020). For some radionuclides, such as I-131, handheld radiation monitoring equipment can be used to collect preliminary information on the presence of radionuclides within the body. This information could then be used for initial triage of impacted individuals. The usefulness of these methods can be severely limited if

the contaminants emit weak beta particles or weak photons (Bolch, 2012).

### 3.3. Availability of Decorporation Therapies

It is unlikely for acute radiation sickness to develop after radionuclide intake, except for in cases of exceptionally large intakes (Yan, 2019). However, the incorporation and internal contamination with radionuclides deposited in organs and tissues may continue to irradiate tissues long after the initial event, increasing the probability of stochastic effects. To aid in the expedited removal of radioactive contamination from within the patient, treatment staff may consider the use of blocking or decorporation therapies, the most common of which being stable iodine, diethylenetriaminepentaacetic acid (DTPA) and Prussian blue (Yan, 2019).

Researchers at the Bundeswehr Institute of Radiobiology evaluated the need for a stockpile of medical countermeasures and concluded that the most difficult variable to assess in establishing a strategic stockpile would be the fraction of the potentially contaminated victims needing treatment, as opposed to those with no contamination or levels of contamination such that decorporation is not warranted (Rump, et al., 2021). The US Department of Health and Human Services estimates that approximately 40-60% of the contaminated victims will need treatment for a larger-scale event, and proportionately fewer for a radiological dispersal device (RDD) (Institute of Medicine, 2009),

*J. Davis and C. Iddins*

*Environmental Advances 8 (2022) 100229*

The Bundeswehr team examined RDDs as a likely scenario leading to large numbers of contaminated individuals. Commercially available radionuclides were evaluated for their suitability for use in an RDD. Dispersibility and frequency of use were considered in determining which deorporation therapies would be most logical for inclusion in a stockpile (Rump, et al., 2021)

In evaluating the decorporation therapies available, the group noted that the manufacturers recommended a treatment duration of 30 days for Prussian Blue and an irregular dosing schedule over several weeks for DTPA, based on bioassay results. Simulations performed as part of the study indicated that therapeutic efficacy reaches a plateau after about 90 days for some radionuclides but commented that the timescale will vary depending on the time elapsed between exposure and administration of the drug.

For the US Strategic National Stockpile (SNS), expected protective countermeasures (CMs) for internal contamination following an IND still focus on the main pharmaceuticals already listed for internal contamination. It is expected that the Stockpile will likely be used, at a minimum, days after an improvised nuclear device (IND) scenario, but expedited deployment might be more feasible in an RDD event. The US SNS does contain other materiel including equipment, medical supplies and many other pharmaceuticals. These "push packages" are staged around the US and may be rapidly transported. It is of note that the SNS is intended for use in large-scale incidents and will generally not be opened for smaller, more frequent, occupational internal contamination incidents (DiCarlo, 2021).

In 2007, The World Health Organization (WHO) hosted a workshop with the intention of defining the needs for a stockpile for radiological or nuclear (R/N) or chemical emergencies. Discussions were held on existing stockpile approaches in other countries, such as the USA, UK, Germany, Japan, Sweden, China, Russia, Finland, Brazil and Argentina. The working group identified the primary manufacturers and distributors for known decorporation therapies:

- Heyl Lab (Germany and some other countries) for Prussian Blue and DTPA;
- Hameln Pharmaceuticals (Germany) with an associated supplier to the USA for Prussian Blue;
- Farmzasshita (Russian Federation) for Ca-DTPA, KI, and Prussian Blue, and;
- As of the time of publication, local production of decorporation agents by the Brazilian Armed Forces pharmacy.

For the concept of a world stockpile to be feasible, the group recognized that WHO and IAEA would need to work in conjunction in order to overcome issues including individual member state's licensure of pharmaceuticals; drug approval processes; logistics; and international coordination countermeasures (World Health Organization, 2007).

The efficacy of many decorporation treatments is time dependent. For example, DTPA is effective at chelating and removing plutonium from the body when the radionuclide exists in the blood and extracellular fluids of soft tissues or is loosely bound on skeletal surfaces, but its efficacy rapidly diminishes as the metal is incorporated into skeletal tissue (Durbin, 1998). Rump et al. demonstrated in a scenario-based model, that starting DTPA treatment within 12 hours of the time of intake of plutonium could reduce the committed absorbed dose by as much as 97%. Conversely, the study indicated that the efficacy decreased with increasing time between the intake and initiation of treatment (Rump A. S., 2017). On the other hand, while maximum efficiency is achieved when Prussian Blue is administered within the first day of an intake, it has been shown that the biological half-life of cesium can be effectively reduced when the drug is administered up to a year after intake (Melo, 2014).

## 4. Conclusions

In evaluating cases of internal contamination, many questions need to be answered. The most obvious being the incident scenario, the radionuclide and form of the radionuclide they were working with, if known. In many situations at US DOE sites there is a mixture of radionuclides known as legacy waste. In addition to this, it is important to know the personal protective equipment used during the incident. Of note, two cases of inhalation were likely averted during the SARS-CoV-2 pandemic secondary to the wear of procedure masks as part of pandemic public health measures. The assessment of the intake is imperative. This may be done using many techniques to include bioassay of excreta, urine or nasal/oral swab spot checks, surveys. There are limitations associated with the use of each of these techniques, however, and these limitations need to be appropriately communicated to – and understood by – emergency responders and planners.

## CRediT authorship contribution statement

**Jason Davis:** Conceptualization, Investigation, Writing – original draft. **Carol Iddins:** Investigation, Writing – review & editing, Supervision.

## References

Bolch, W.H., 2012. Guidance on the use of handheld survey meters for radiological triage. Health Phys. 102 (3), 305–325. https://doi.org/10.1097/HP.0b013e3182351660.

Breitenstein, B., 2003. The medical management of unintentional radionuclide intakes. Radiat. Prot. Dosim. 105 (1-4), 495–497. https://doi.org/10.1093/oxfordjournals.rpd.a006290.

DiCarlo, A., 2021. Scientific research and product development in the United States to address injuries from a radiation public health emergency. J. Radiat. Res. (Tokyo) 1–12. https://doi.org/10.1093/jrr/rrab064.

Durbin, P.K., 1998. Development of decorporation agents for the actinides. Radiat. Prot. Dosim. 79 (1-4), 433–443. https://doi.org/10.1093/oxfordjournals.rpd.a032445.

Giussani, A.L.-L., 2020. Eurados review of retrospective dosimetry techniques for internal exposures to ionising radiation and their applications. Radiat. Environ. Biophys. 59 (3), 357–387. https://doi.org/10.1007/s00411-020-00845-y.

Institute of Medicine, 2009. Assessing Medical Preparedness to Respond to a Terrorist Nuclear Event: Workshop Report. The National Academies Press, Washington, DC. https://doi.org/10.17226/12578.

International Atomic Energy Agency, 2005. Generic Procedures for Medical Response During a Nuclear or Radiological Emergency. IAEA, Vienna.

International Commission on Radiation Protection, 1979. Limits for intakes of radionuclides by workers. Ann. ICRP 2 (3-4).

International Commission on Radiation Protection, 2015. Occupational Intakes of Radionuclides: Part 1. Ann. ICRP 44 (2).

Lacerda IVB, V.J., 2018. Patient-specific phantoms versus reference phantoms: a preliminary comparison on organs dose distribution. Braz J Radiat Sci 6 (2A).

Li, C.I., 2011. International workshop on emergency radiobioassay: considerations, gaps and recommendations. Health Phys. 101 (2), 107–111. https://doi.org/10.1097/HP.0b013e3182313a5da.

Li, C.S., 2009. Field deployable technique for 90Sr emergency bioassay. Radiat. Prot. Dosim. 136 (2), 82–86. https://doi.org/10.1093/rpd/ncp153.

Lobaugh, M.S., 2015. In vivo measurement of Am-241 in the lungs confounded by activity deposited in other organs. Health Phys. 108 (1), 67–75. https://doi.org/10.1097/HP.0000000000000168.

Maxwell, S.C., 2011. Rapid determination of 237-Np and plutonium isotopes in urine by inductively-coupled plasma mass spectrometry and alpha spectrometry. Health Phys. 101 (2), 180–186. https://doi.org/10.1097/HP.0b013e3182170648.

Melo, D.L., 2014. Efficacy of Prussian Blue on Cs-137 decorporation therapy. Health Phys. 106 (5), 592–597. https://doi.org/10.1097/HP.0000000000000035.

National Council on Radiation Protection and Measurements, 2009. NCRP Report No. 161 Management of Persons Contaminated with Radionuclides: Handbook. National Council on Radiation Protection and Measurements, Bethesda.

Nour, S.L., 2011. Emergency radiobioassay preparedness exercises through the NIST radiochemistry intercomparison program. Health Phys. 101 (2), 170–175. https://doi.org/10.1097/HP.0b013e3182149823.

Rump, A.S., 2017. The incorporation of radionuclides after wounding by a "dirty bomb": The impact of time for decorporation efficacy and a model for cases of disseminated fragmentation wounds. Adv. Wound Care 6 (1), 1–9. https://doi.org/10.1089/wound.2016.0693.

Rump, A., Oxtheim, P., Eder, S., Hermann, C., Abend, M., Port, M., 2021. Preparing for a "dirty bomb" attack: the optimum mix of medical countermeasure resources. Military Med. Res. 8 (3), 1–16.

Toohey, R., 2003. Internal dose assessment in radiation accidents. Radiat. Prot. Dosim. 105 (1-4), 329–331. https://doi.org/10.1093/oxfordjournals.rpd.a006250.

*J. Davis and C. Iddins*

*Environmental Advances 8 (2022) 100229*

World Health Organization. (2007). Development of stockpiles for radiation emergencies-Report of the Radio-Nuclear Working Group. In M. C. del Rosario Pérez (Ed.), WHO consultation meeting on Development of Stockpiles for Radiation and Chemical Emergencies (p. 42). Geneva: World Health Organization. https://www.who.int/ionizing_radiation/a_e/emergencies/WHO_stockpile_report_2007.pdf.

Yan, R.L., 2019. Pharmacological treatment of inhalation injury after nuclear or radiological incidents: the Chinese and German approach. Military Med. Res. 6 (10), 1–10. https://doi.org/10.1186/s40779-019-0200-2.

Yoon, S.H., 2017. Rapid analysis of 239, 238-Pu, 241-Am, and 90-Sr for nasal smear samples in radiation emergency and evaluation of the intake retention fraction. Health Phys. 112 (5), 451–457. https://doi.org/10.1097/HP.0000000000000635.

"EXHIBIT R"

**LA-UR-23-26857**
Accepted Manuscript

# Chelation Modeling of a Plutonium-238 Inhalation Incident Treated with Delayed DTPA

de Souza Zanotta Dumit, Sara
Miller, Guthrie
Grémy, Olivier
Poudel, Deepesh
Bertelli, Luiz
Klumpp, John Allan

Provided by the author(s) and the Los Alamos National Laboratory (2024-04-03).

**To be published in:** Radiation Research

**DOI to publisher's version:** 10.1667/RADE-23-00135.1

**Permalink to record:**
https://permalink.lanl.gov/object/view?what=info:lanl-repo/lareport/LA-UR-23-26857





Los Alamos National Laboratory, an affirmative action/equal opportunity employer, is operated by Triad National Security, LLC for the National Nuclear Security Administration of U.S. Department of Energy under contract 89233218CNA000001. By approving this article, the publisher recognizes that the U.S. Government retains nonexclusive, royalty-free license to publish or reproduce the published form of this contribution, or to allow others to do so, for U.S. Government purposes. Los Alamos National Laboratory requests that the publisher identify this article as work performed under the auspices of the U.S. Department of Energy. Los Alamos National Laboratory strongly supports academic freedom and a researcher's right to publish; as an institution, however, the Laboratory does not endorse the viewpoint of a publication or guarantee its technical correctness.

**Running Title:** Delayed DTPA treatment after Pu-238 inhalation

**Title:** Chelation modeling of a plutonium-238 inhalation incident treated with delayed DTPA

**Authors:** Sara Dumit[1], Guthrie Miller[2], Olivier Grémy[3], Deepesh Poudel[1], Luiz Bertelli[4], John A. Klumpp[1]

[1]*Los Alamos National Laboratory (LANL), Radiation Protection Division, Los Alamos, NM 87545, USA*

[2]*Unaffiliated (retired from Los Alamos National Laboratory), Santa Fe, NM, USA*

[3]*Commissariat à l'Energie Atomique et aux Energies Alternatives (CEA), Direction de la Recherche Fondamentale, Institut de Biologie François Jacob, Université Paris-Saclay, Fontenay-aux-Roses, France*

[4]*L Bertelli and Associates, Salt Lake City, UT, USA*

**Corresponding Author:**

Dr. Sara Dumit

Los Alamos National Laboratory

Radiation Protection Division

P.O. Box 1663, MS G761

Los Alamos, NM 87545

United States of America

Email: sarad@lanl.gov

1       **ABSTRACT**

2    **Dumit, S., Miller, G., Grémy, O., Poudel, D., Bertelli, L., Klumpp, JA. Chelation modeling**

3    **of a plutonium-238 inhalation incident treated with delayed DTPA. *Radiat. Res*. 000: 000-000**

4    **(2023).**

5         **This work describes an analysis, using a previously established chelation model, of**

6    **the bioassay data collected from a worker who received delayed chelation therapy following**

7    **a plutonium-238 inhalation. The details of the case have already been described in two**

8    **publications. The individual was treated with Ca-DTPA via multiple intravenous injections**

9    **and then nebulizations beginning several months after the intake and continuing for four**

10   **years. The exact date and circumstances of the intake are unknown. However, interviews**

11   **with the worker suggested that the intake occurred via inhalation of a soluble plutonium**

12   **compound. The worker provided daily urine and fecal bioassay samples throughout the**

13   **chelation treatment protocol, including samples collected before, during, and after the**

14   **administration of Ca-DTPA. Unlike the previous two publications presenting this case, the**

15   **current analysis explicitly models the combined biokinetics of the plutonium-DTPA chelate.**

16   **Using the previously established chelation model, it was possible to fit the data through**

17   **optimizing only the intake (day and magnitude), solubility, and absorbed fraction of**

18   **nebulized Ca-DTPA. This work supports the hypothesis that the efficacy of the delayed**

19   **chelation treatment observed in this case, results mainly from chelation of cell-internalized**

20   **plutonium by Ca-DTPA (intracellular chelation). It also demonstrates the validity of the**

21   **previously established chelation model. As the bioassay data were modified to ensure data**

22   **anonymization, the calculation of the "true" committed effective dose was not possible.**

23   **However, the treatment-induced dose inhibition (in percentage) was calculated.**

24

1                                    **INTRODUCTION**

2        Occupational internal exposure to plutonium via inhalation is a non-negligible risk, even

3    when adequate safety controls are in place at the workplace *(1)*. If the plutonium intake is

4    considered significant, medical countermeasures such as chelation treatment with solution of

5    *diethylenetriaminepentaacetic acid* (DTPA) in the form of calcium or zinc trisodium salt may be

6    applied *(2-4)*. The purpose of administering DTPA is to remove heavy metals, such as plutonium,

7    from the body, thus reducing the internal radiation dose *(2-4)*. However, the administration of

8    DTPA affects plutonium's normal biokinetics inside the body, as it enhances plutonium's rate of

9    excretion. Therefore, the standard plutonium biokinetic models cannot be applied to model the

10   bioassay data affected by chelation *(1, 5-9)*.

11       The present work aimed to interpret the bioassay data of a male worker involved in a

12   plutonium-238 inhalation incident and treated with DTPA, as the calcium chelate (Ca-DTPA), at

13   the French Alternative Energies and Atomic Energy Commission (CEA), France. The case has

14   been described in-depth elsewhere by Grémy et al. *(10-11)*.

15       Previous papers describing this case *(10-11)* posited that the long-term efficacy of

16   treatment and bioassay data could be best explained by intracellular chelation of plutonium,

17   particularly in the liver. The objective of this paper was to model the bioassay data collected after

18   the plutonium intake, including the measurements which were affected by chelation therapy, using

19   a recently developed *(9)* and validated *(1)* chelation model by Dumit et al. This model incorporates

20   intracellular chelation in the skeleton and liver. Therefore, successful modeling of the data would

21   support the hypothesis of intracellular chelation.

22

1          **MATERIALS AND METHODS**

2    **Case description**

3          The inhalation incident, along with a full description of the chelation treatment protocol

4    have been described elsewhere *(10-11)*. Briefly, the plutonium intake was detected after a routine

5    fecal bioassay analysis. The assumption of a wound intake was excluded, as no sharp tools were

6    used by the worker and no wound was observed. Based on all information collected, it was then

7    assumed that the worker had an inhalation of a soluble plutonium material months before the intake

8    was detected *(10-11)*.

9          In this study the date of intake and the material solubility were treated as variables to be

10   determined by the data.

11   **Bioassay data**

12         The worker's bioassay data are summarized in Table 1, along with the normalization

13   uncertainties used for analysis.

14                    **Table 1.** Bioassay data used.

| Bioassay data | Affected by chelation?[a] | Number of data (nData) | Normalization uncertainties (S)[b] |
|---|---|---|---|
| 24-h urine | No | 3 | 0.3 |
| 24-h urine | Yes (intravenous) | 99 | 0.5 |
| 24-h urine | Yes (nebulized) | 79 | 0.5 |
| 24-h urine | Yes, collected on the day of treatment[c] | 73 | 0.5 |
| 24-h feces | No | 3 | 1.5 |
| 24-h feces | Yes (intravenous) | 86 | 1.5 |
| 24-h feces | Yes (nebulized) | 11 | 1.5 |
| 24-h feces | Yes, collected on the day of treatment[c] | 40 | 1.5 |
| | | Total nData = 394 | |

15   [a]Affected by chelation means the bioassay was collected after the first treatment with Ca-DTPA.

16   [b]Scattering factor (SF) = geometric standard deviation (GSD) = exp(S). The Results and Discussion Section shows the error bars

17   in the plots, which reflects the values of S used.

18   [c]Collected on the day of treatment (see Figure 1) means the 24-hour collection period ended at the time of Ca-DTPA treatment.

19

1   A total of 394 data points (nData) were used. Both urine and fecal samples were collected.

2   However, because the worker requested maximum anonymization, Grémy et al. *(10-11)* multiplied

3   the bioassay results by a factor known only to the authors *(10-11)* to further ensure anonymity.

4   This prevents calculation of the actual doses, but allows conclusions about the relative effect of

5   the chelation treatment.

6   In Figure 1, the bioassay collection times are explained. The times are relative to the time

7   of the first chelation treatment, which is day 0. Thus, D35 is 35 days after the first treatment.



**Fig. 1.** Diagram showing the time of data collections on days 35, 36, 37, etc., after the 1st
chelation treatment (1st treatment on day 0, 2nd on day 21, and 3rd on day 35.) As seen in the
diagram, bioassay collected "on the day of treatment" means that the 24-hour collection period
ended at the time of treatment. The mBq values are urinary excretion values.

8

9   In this study the bioassay data collected before, during, and after the administration of

10  intravenously injected and nebulized Ca-DTPA were included. Several fecal bioassay datapoints

11  were not included in the analysis because the results were zero, with a zero measurement standard

12  deviation.

13  The normalization uncertainties were assigned on a dataset/type of measurement basis,

14  where the largest reasonable value of S was used for normalization uncertainties for different types

15  of measurements (Table 1). We assigned relatively large uncertainties which are roughly similar

1 to what we might expect to see at Los Alamos National Laboratory (LANL). Specifically, the log

2 of the geometric standard deviation, S, for urine bioassay measurement was set to S = 0.3 and 0.5,

3 and for fecal measurement it was set to S = 1.5 (as shown in Table 1).

4 **Chelation treatment**

5 More details about the treatment regimen are available elsewhere *(10-11)*. Briefly, the

6 worker started chelation therapy with Ca-DTPA at a time delayed (months) from the plutonium

7 intake. The worker received 40 intravenous (i.v.) injections of Ca-DTPA over nearly 21 months.

8 About a month later, the worker received 42 inhalations/nebulization of Ca-DTPA over

9 approximately 23 months. Intravenous and nebulized therapies started respectively at 0 and 739

10 days after the 1st Ca-DTPA treatment. In this work, we included all the 40 intravenous injections

11 of Ca-DTPA, and the 42 Ca-DTPA treatments administered via nebulization. Hence, a total of 82

12 Ca-DTPA treatments were included in the modeling.

13 **Software**

14 The software package IDode *(12-13)* was used in this work. IDode does internal dosimetry

15 calculations using models that are defined by Ordinary Differential Equations and is able to

16 calculate parameter uncertainties using Markov Chain Monte Carlo (MCMC), as seen in recent

17 publications *(1, 9, 12-17)*.

18 The software package Activity and Internal Dose Estimates (AIDE) *(18)* was used in this

19 work for validating results from IDode, when possible, including validation of the dosimetric

20 models implemented in IDode.

21 **Biokinetic models**

1      All biokinetic models were constructed in IDode software *(12-13)*. The biokinetic models

2    are listed in Table 2.

3                     **Table 2.** Biokinetic and dosimetric models used.

| Model type | Reference | Model identification | Varied parameters during fit |
|---|---|---|---|
| Biokinetic | ICRP[a] *(19)* | ICRP[a] 30 Gastrointestinal (GI) tract model | None: all fixed[b] |
| Biokinetic | ICRP[a] *(20)* | ICRP[a] 66 Inhalation model | Intake day, intake amount, nebulized Ca-DTPA fraction[c], and solubility parameter[d] |
| Biokinetic | Leggett et al. *(21)* | Plutonium systemic model | None: all fixed[b] |
| Biokinetic | Dumit et al. *(1, 9)* | Chelation model | None: all fixed[b,e] |
| Dosimetric | ICRP[a] *(22)* | ICRP[a] 60 dosimetric system | N/A |

4  [a]ICRP = International Commission on Radiological Protection.

5  [b]None (all fixed) = the default values published in the original publications were used, i.e., not allowed to vary during the fitting.

6  [c]"Nebulized Ca-DTPA fraction" (numerically the same as the amount in grams) is a fraction of the inhaled DTPA that is absorbed
7  into the blood.

8  [d]The intake day, intake amount, nebulized Ca-DTPA inhalation fraction, and lung solubility parameter ($s_p$) were allowed to vary.

9  [e]The Ca-DTPA amounts and times were specified according to the treatment protocol administered to the worker. Except the
10  nebulized Ca-DTPA amounts were fitted jointly to represent the amount of nebulized Ca-DTPA that is absorbed into the blood
11  (represented as one parameter being varied).

12

13

14      The intake day, intake amount, one solubility parameter of the inhalation model ($s_p$) *(20)*,

15    and the nebulized Ca-DTPA amounts were allowed to vary in order to fit the data (see Tables 2

16    and 3). Hence, a total of four parameters were allowed to vary. The other solubility parameters, $s_{pt}$

17    and $s_t$, of the inhalation model *(20)* were set to zero.

18      The ICRP Publication 60 *(22)* dosimetric system was used. The dosimetry used ICRP

19    Publication 38 *(23)* nuclear decay data and absorbed fraction data (i.e., alpha absorbed fractions),

20    as published by Cristy and Eckerman *(24)*.

21    **Chelation modeling approach**

22      This study uses a chelation modeling approach as described and used in previous

23    publications *(1, 9, 25-29)*, where biokinetic models describing DTPA chelates are linked together

24    and, via second-order kinetics, combined with the plutonium systemic model *(21)*. Together, these

1   models allow the description of the *in vivo* chelation process, and when linked with the plutonium

2   systemic model, allow the description of the transfer of material to the various organs and excretion

3   compartments (urine and feces). The units used in this study were grams for Ca-DTPA (the non-

4   radioactive material) and Bq for plutonium (the radioactive material) *(1, 9)*, given that IDode is a

5   radiation program that assumes a radioactive decay chain, where the natural unit is activity *(9)*.

6   **Statistical analysis and Markov Chain Monte Carlo method (MCMC)**

7           The data were described mathematically by independent likelihood functions that assumed

8   (small) normal measurement uncertainty convoluted with lognormal normalization uncertainty

9   (combined likelihood $\propto$ to exp($-\chi^2/2$) *(1, 30)*). The Markov Chain Monte Carlo (MCMC) method

10   was used, which yields a chain of model parameter values, i.e., calculates a collection of alternate

11   possible interpretations of the data in the form of the posterior distribution of parameter values

12   *(30)*, given the data and the assumed priors. The chain of model parameter values is used to

13   calculate the posterior distribution of any function of the parameters, for instance, doses. The prior

14   on each parameter was taken to be either linear-uniform over a specified range or log-scale uniform

15   a factor of 100 greater and smaller than the starting, minimum $\chi^2$ (Chi-squared), values *(30)*. Self

16   consistency between the models used and the assumed likelihood functions describing the data

17   *(30)* was judged by having the chain average of $\chi^2$/nData (number of data points) approximately

18   one. The interested reader is referred to the appendix for details about the fitting procedure,

19   convergence criteria for MCMC, etc.

20                         **RESULTS AND DISCUSSION**

21   **Material solubility, intake estimation, and modeling of bioassay data**

1    The solubility of the plutonium material in the lungs was modeled using a single parameter

2    $s_p$, from the ICRP Publication 66 human respiratory tract model *(20)*, which was varied to best fit

3    the data. Given the fact the intake day was unknown, the time of intake was also varied.

4    The 40 intravenous injections of Ca-DTPA were included in the modeling as previously

5    described *(1, 9)*. As for the 42 Ca-DTPA treatments administered via nebulization, we assumed

6    that a fixed fraction of the nebulized Ca-DTPA was instantaneously dissolved into the blood.

7    Gradual absorption of the nebulized Ca-DTPA, based on a priori data, was modeled but

8    did not result in a better fit (data not shown). Because of the very rapid lung clearance, nebulized

9    Ca-DTPA was treated as an injection of a fraction of the total inhaled amount of Ca-DTPA. Recent

10    work confirms that only 10% - 30% of inhaled Ca-DTPA reaches the blood *(11)*.

11    The MCMC results are shown in Table 3, which represent an MCMC run of a total of

12    32,000 chain iterations carried out in parallel on 16 threads (2,000 on each thread).

13    **Table 3.** Parameter results after MCMC calculations.

| Parameter (unit) | Prior[a] (range) | Minimum $\chi^2$ value | Average | Standard Deviation (SD) | Percentiles[b] | | |
|---|---|---|---|---|---|---|---|
| | | | | | 2.50% | 50.00% | 97.50% |
| Intake day (days) | Uniform (-100 to -1000) | -633 | -582 | 98.5 | -777 | -581 | -413 |
| Intake amount (Bq) | Log-scale uniform (x/100) | 2254 | 2161 | 211 | 1805 | 2160 | 2617 |
| Nebulized Ca-DTPA fraction[c] | Uniform (0.1 to 1) | 0.211 | 0.214 | 0.048 | 0.130 | 0.211 | 0.321 |
| $s_p$ (d$^{-1}$) | Log-scale uniform (x/100) | $7.0 \times 10^{-4}$ | $7.67 \times 10^{-4}$ | $1.07 \times 10^{-4}$ | $5.72 \times 10^{-4}$ | $7.63 \times 10^{-4}$ | $9.86 \times 10^{-4}$ |
| Calculated Quantities (Unit) | | Minimum $\chi^2$ value | Average | Standard Deviation (SD) | Percentiles[b] | | |
| | | | | | 2.50% | 50.00% | 97.50% |
| Committed effective dose, $E$(50) (Sv) | | 0.020 | 0.0195 | 0.00189 | 0.163 | 0.194 | 0.024 |
| Committed equivalent dose to the Bone Surfaces, $H_{BS}$(50) (Sv) | | 0.225 | 0.220 | 0.148 | 0.192 | 0.219 | 0.249 |
| Committed equivalent dose to the Lung, $H_{LU}$(50) (Sv) | | 0.084 | 0.079 | 0.0098 | 0.063 | 0.079 | 0.101 |
| Committed equivalent dose to the Liver, $H_{LI}$(50) (Sv) | | 0.079 | 0.077 | 0.0064 | 0.066 | 0.077 | 0.090 |
| **$\chi^2$/nData (none)** | | **0.893** | **0.928** | **0.012** | **0.894** | **0.929** | **0.948** |

[a]As mentioned in the Materials and Methods section, the prior on each parameter was taken to be either uniform over a specified range or log-scale uniform a factor of 100 greater and smaller than the starting, minimum $\chi^2$, values ("x").
[b]Example: for 2.5%, 2.5% of chain values are below value shown; only 5% of chain has values outside the range from lower to upper percentiles. The 50% percentile is the median.
[c]"Nebulized Ca-DTPA fraction" (numerically the same as the amount in grams) is a fraction of the inhaled DTPA that is absorbed into the blood.

Figure 2 shows scatter plots of Ca-DTPA amount (nebulized fraction) versus intake day, $s_p$ parameter versus intake amount, and committed effective dose, E(50), versus intake amount.







**Fig. 2.** Plot (a) shows the Ca-DTPA amount (nebulized fraction) versus the intake day. The shaded green area in Plot (a) shows the limits of the prior on the Ca-DTPA amount and intake day. Plot (b) shows parameter $s_p$ versus the intake amount. Plots (a) and (b) show the results for the 16,000 MCMC iterations (red squares) and also shows the result when the run was continued to 32,000 iterations (blue squares). Plot (c) shows the committed effective dose, E(50), versus intake amount (black squares). Each datapoint represents a possible alternative interpretation of the data.

1

2          Figure 2a shows that the Ca-DTPA amount (nebulized fraction) is not limited by the prior.

3     As one can observe by looking at the prior box shown in Figure 2a, the Ca-DTPA amount is

4     determined by the data.

5          Describing the dataset with a single solubility parameter indicated an insoluble material, in

6     contrast to the determination of Grémy et al. *(10-11)*—that the material was soluble based on

7     interviews with the worker. In this work, the best fit was obtained assuming an insoluble material,

1    with an $s_p$ value of $7 \times 10^{-4}$ (Table 3). Figure 2b shows that $s_p$ is limited by the data (not by a prior)

2    and the values are small, meaning an insoluble material.

3        Figure 2c shows that the committed effective dose, E(50), is, for the most part, tightly

4    correlated with the intake amount.

5        Figures 3 and 4 show the model fit to the bioassay data (urine and feces, respectively).





**Fig. 3.** Model interpretation of the $^{238}$Pu data in 24-h urine. Plots a-b show different time scales on the x-axis ("Time"). Plot (a) shows the model versus the data collected before Ca-DTPA treatment (light gray squares), the data collected after i.v. chelation with Ca-DTPA (black squares), and the data collected on the day of chelation treatment (gray triangles). The first chelation treatment occurred on day 0 and the 3rd treatment on day 35 (D35) as shown in Figure 1 and Figure 3a (gray arrow pointing at it). Plot b shows the entire urine dataset. The dark gray squares are data collected after nebulized Ca-DTPA treatment. The model curve is the posterior average and the gray shade following the model curve is the standard deviation (SD) calculated by MCMC.

1





**Fig. 4.** Model interpretation of the $^{238}$Pu data in 24-h feces. These plots show the model (which had the parameter "$s_p$" as one of the fitted parameters—see footnote "c" in Table 2, and the results shown in Table 3) versus the fecal data. Plots a-b show different time scales on the x-axis ("Time"). Plot (a) shows the model fitting the data collected before Ca-DTPA treatment (light gray squares), the data collected on the day of chelation treatment (gray triangles), and the

data collected after i.v. chelation with Ca-DTPA (black squares). Plot b shows the entire fecal dataset. The dark gray squares are data collected after nebulized Ca-DTPA treatment. The model curve is the posterior average and the gray shade following the model curve is the standard deviation (SD) calculated by MCMC.

Because of the complexity of this dataset, the $\chi^2$ breakdown by type of bioassay data, which is shown in Table 4, is easier to understand than Figures 3b or 4b. The largest disagreement between model and data is for the 3 pre-chelation fecal samples that standout strikingly in Figure 4a ($\chi^2$/nData = 4.09, nData = 3). Other significant disagreement ($\chi^2$/nData > 1.5) observed in this study was for the pre-chelation urine samples ($\chi^2$/nData = 2.06, nData = 3). The model performs remarkably well in describing this dataset but may have systematic differences. Going forward, one way to investigate this would be to improve the precision of bioassay measurements (discussed below in the "Study limitations" section).

**Table 4.** $\chi^2$/nData by unique bioassay type (minimum $\chi^2$ parameter values).

| Bioassay data | Affected by chelation?[a] | Number of data (nData) | $\chi^2$/nData | $\chi^2$% |
|---|---|---|---|---|
| 24-h urine | No | 3 | 2.06 | 1.72 |
| 24-h urine | Yes (intravenous) | 99 | 0.920 | 25.4 |
| 24-h urine | Yes (nebulized) | 79 | 0.952 | 19.4 |
| 24-h urine | Yes, collected on the day of treatment[b] | 73 | 1.47 | 32.5 |
| 24-h feces | No | 3 | 4.09 | 3.42 |
| 24-h feces | Yes (intravenous) | 86 | 0.424 | 4.74 |
| 24-h feces | Yes (nebulized) | 11 | 0.502 | 12.1 |
| 24-h feces | Yes, collected on the day of treatment[b] | 40 | 0.256 | 0.786 |
| | | Total nData = 394 | $\chi^2$/nData = 0.893 | |

[a]Affected by chelation means the bioassay was collected after treatment with Ca-DTPA.
[b]Collected on the day of treatment (see Figure 1) means the 24-hour collection period ended at the time of treatment.

Figure 3 (a-b) shows that the chelation model is tracking the up-down pattern of chelation treatment administration in urine. However, Figure 4 (a-b) shows only a small chelation effect in

1  fecal excretion. In order to investigate whether the chelation model was accounting for fecal

2  excretion, an exercise was conducted. The exercise consisted of fixing the value of the $s_p$ parameter

3  to be 1/day, corresponding to a soluble material, and varying the other parameters—intake day,

4  intake amount, and nebulized Ca-DTPA fraction—to minimize $\chi^2$. Interestingly, the result, shown

5  in Figure 5 is that the fecal excretion does show an up-down behavior for a soluble material, even

6  though this is not as good of a representation of the entire dataset ($\chi^2$/nData = 2.0, nData = 394 for

7  $s_p$ = 1 d$^{-1}$, as compared to $\chi^2$/nData = 0.893, nData = 394 when $s_p$ is allowed to vary, as seen in

8  Table 3). Thus, assumption of a soluble material increases the $\chi^2$/nData, resulting in a poorer fit of

9  the data.

10



**Fig. 5.** Exercise results showing the model interpretation of the $^{238}$Pu data in 24-h feces when

the model has the parameter "$s_p$" set with the value of 1 d$^{-1}$.

11

12  The chelation model used was developed using wound cases datasets (and with a much

13  lesser amount of fecal data points) *(9)*. The chelation model has been recently validated using data

1  from an inhalation case *(1)*. The results of the present study show the usefulness of the chelation

2  model *(1, 9)* (same model structure and parameters) for another plutonium inhalation case *(1)*.

3  **Dose assessment and efficacy of delayed chelation treatment**

4        The dose assessment results, including the committed effective dose, $E(50)$, and the

5  committed equivalent dose to the bone surfaces, $H_{BS}$, to the lungs, $H_{LU}$, and to the liver, $H_{LI}$, are

6  presented in Table 5 (see also Table 3). Please note, given the fact that the bioassay data were

7  modified to ensure data anonymization, as requested by the worker *(10-11)*, the calculation of the

8  "true" committed effective dose was not possible. The fact that all bioassay results were multiplied

9  by a single factor (which is in between 0.25 and 2, and its true value is known only by the authors

10  of the original works *(10-11)*) to ensure anonymity does not impact the validity of results for the

11  percentage reduction of dose. Not enough plutonium was present to meaningfully contribute to

12  depletion of Ca-DTPA, which is to say that in this parameter regime the nonlinear chelation model

13  containing second-order kinetics is to a very good approximation linear in intake amount.

14  Therefore, the results presented in this work are valid regardless of the true value of the factor used

15  to multiply the bioassay data. The interested reader is referred to the appendix of Dumit et al. *(9)*

16  for more discussion of this topic.

17

18

19

20

21

**Table 5.** Dose assessment results obtained using minimum $\chi^2$ values of the parameters shown in Table 3.

|  | $E(50)$ | $H_{BS}(50)$ | $H_{LU}(50)$ | $H_{LI}(50)$ |
|---|---|---|---|---|
| Chelation treatment (both i.v. and nebulized) included | 0.020 Sv | 0.225 Sv | 0.084 Sv | 0.079 Sv |
| No Ca-DTPA treatment | 0.0311 Sv | 0.633 Sv | 0.084 Sv | 0.164 Sv |
| Reduction of dose[a] | 36% | 65% | 0% | 52% |

[a]For example, the Ca-DTPA treatment reduced the $E(50)$ by a factor of $0.020/0.0311 \approx 0.64$. Thus, the delayed chelation treatment administered months after the intake produced 36% ($1 - 0.64 = 0.36$) reduction of the $E(50)$ internal dose.

The "no Ca-DTPA" calculation (Table 5) does not include Ca-DTPA treatment in the modeling. The committed effective dose $E(50)$, and the committed equivalent doses $H_{BS}$, $H_{LU}$, and $H_{LI}$, are significantly larger without chelation treatment, as seen in Table 5. Thus, the delayed Ca-DTPA treatment was effective in the present case of an inhalation of an insoluble plutonium material.

Studies using animal data *(31, 32)* have shown decorporation of plutonium from the lungs after administration of nebulized Ca-DTPA. In this study, there is no reduction of plutonium in the lungs because the 2nd order kinetics chelation modeling approach is not implemented in the inhalation model used *(20)*.

**Intracellular chelation**

Previous works by Grémy et al. *(10-11, 33-34)* and Dumit et al. *(1, 9, 28-29)* have shown and discussed in more details regarding the ability of Ca-DTPA to chelate intracellular plutonium in the liver and skeleton. The present work supports these past studies. Figure 6 (a-b) illustrates the removal of plutonium from both skeleton (Figure 6a) and liver (Figure 6b). The calculations assumed minimum $\chi^2$ parameter values as shown in Table 3.





**Fig. 6.** Removal of $^{238}$Pu from skeleton (a) and liver (b).

1

2          Previous works have argued that the rapid clearance of Pu via urine results from

3   extracellular chelation, that is chelation of Pu in blood *(28, 34)*.  However, in the model considered

4   here all chelation proceeds on about the same time scale, and the extracellular chelation is much

5   smaller than intracellular chelation.

1    This study shows that Ca-DTPA can reduce committed whole-body and organ doses via
2    intracellular chelation. More studies are needed to evaluate the mechanisms involved in
3    intracellular chelation for skeleton and liver, which is out of the scope of this work. Grémy and
4    Miccoli *(35)* and Dumit et al. *(36)* have discussed (via *Letters to the Editor* in the Radiation
5    Research Journal) the importance of intracellular chelation, the effect of Ca-DTPA on fecal
6    excretion, and the modeling of the biliary pathway. The interested reader is referred to these
7    publications for more information on these topics.

8    **Study limitations**

9    There were limitations with this dataset. First, the intake date and solubility of the material
10   are unknown, with the assumption that the intake occurred via inhalation based on interviews with
11   the worker.

12   Using a single solubility parameter to model the plutonium material in the lungs is
13   undoubtedly an oversimplification, which presents potential implications on the overall findings
14   observed in the present study. As mentioned in the Materials and Methods section and shown in
15   the Results section, the single solubility parameter was treated as a variable during the fitting, and,
16   using our assumptions about data uncertainties, provides a self-consistent description of the
17   dataset.

18   As mentioned in the Results and Discussion section (under "Dose assessment and efficacy
19   of delayed chelation treatment"), reduction of plutonium in the lungs was not observed because
20   the 2nd order kinetics chelation modeling approach is not implemented in the inhalation model used
21   *(20)*. Although controlled animal studies *(31, 32)* have shown decorporation of plutonium from

1    the lungs after administration of nebulized Ca-DTPA, such implementation is out of the scope of

2    this study.

3        Additionally, the quality of the fit to pre-chelation fecal data is poor even with large

4    uncertainties.

5        In regards to improvement of the experimental technique in future research, in addition to

6    keeping very detailed and precise records of the timing of bioassay collections and Ca-DTPA

7    treatment administrations, it would be better to use longer bioassay collection intervals

8    (particularly for fecal excretion). The collection intervals should be large enough to limit biological

9    variability to about 10%. More precise fecal measurements would permit better quantification of

10    intracellular chelation in the liver and drive refinement of the chelation model.

11        **SUMMARY AND CONCLUSION**

12        The objective of this paper was to model the bioassay data collected after a plutonium

13    intake and treatment with both intravenously injected and nebulized Ca-DTPA. This objective was

14    successfully achieved without revision of the underlying chelation model. The present work

15    supports the conclusions of the previous two papers *(10-11)* regarding the occurrence of

16    intracellular chelation, and demonstrates the efficacy of delayed Ca-DTPA treatment for reducing

17    the $^{238}$Pu internal dose in tissues/organs. Finally, it demonstrated that, for modeling purposes,

18    administration of nebulized Ca-DTPA can be treated as an i.v. injection of $\approx$ 40% of the

19    administered dose.

20        This study involves an extremely complex and unique dataset, and the chelation model

21    seems to successfully describe the dataset, further demonstrating its broad applicability *(1, 9)*. It

22    also revealed questions meriting further investigation, particularly regarding modeling the fecal

1  excretion pathway and the interpretation of fecal bioassay data. Collaboration between researchers

2  from different institutions is invaluable and crucial to the scientific advancement of the internal

3  dosimetry field.

4  ## ACKNOWLEDGMENTS

5  The authors would like to thank the anonymous reviewers for improving this manuscript

6  with their helpful comments and recommendations.

7

8

9

10

11

12

13

14

15

16

17

18

19

**REFERENCES**

1. Dumit S, Miller G, Poudel D, Bertelli L, Klumpp JA. Chelation Model Validation: Modeling of a plutonium-238 inhalation incident treated with DTPA at Los Alamos National Laboratory. Health Phys 2023; 124(2): 113-124.

2. Food and Drug Administration. FDA news P04-78 [online]. 2004. Available at https://www.fda.gov/drugs/bioterrorism-and-drug-preparedness/fda-approves-drugs-treat-internal-contamination-radioactive-elements Accessed 15 June 2023.

3. Hameln Pharmaceuticals GmbH. Full prescribing information: Pentetate calcium trisodium injection (Ca-DTPA) for intravenous or inhalation administration [online]. 2013a. Available at https://www.accessdata.fda.gov/drugsatfda_docs/label/2013/021749s008lbl.pdf Accessed 15 June 2023.

4. Hameln Pharmaceuticals GmbH. Full prescribing information: Pentetate zinc trisodium injection (Zn-DTPA) for intravenous or inhalation administration [online]. 2013b. Available at https://www.accessdata.fda.gov/drugsatfda_docs/label/2013/021751s008lbl.pdf Accessed 15 June 2023.

5. Management of persons accidentally contaminated with radionuclides. NCRP Report No 65. Bethesda: National Council on Radiation Protection and Measurements; 1980.

6. Basic safety standards for direct methods for measuring radionuclides in the human body. IAEA Safety Reports Series No. 114. Vienna: International Atomic Energy Agency; 1996.

7.  Occupational intakes of radionuclides: Part 1. ICRP Publication No 130. Thousand Oaks: International Commission on Radiological Protection; 2015.

8.  Dumit S, Bertelli L, Klumpp JA, Poudel D, Waters TL. Chelation modeling: the use of ad hoc models and approaches to overcome a dose assessment challenge. Health Phys 2020; 118(2):193-205.

9.  Dumit S, Miller G, Klumpp JA, Poudel D, Bertelli L, Waters T. Development of a new chelation model: bioassay data interpretation and dose assessment after plutonium intake via wound and treatment with DTPA. Health Phys 2020; 119(6):715-732.

10. Grémy O, Blanchin N, Miccoli L. Interpretation of enhanced fecal and urinary plutonium excretion data under a 2-y regular DTPA treatment started months after intake. Health Phys 2021; 121(5):494-505.

11. Grémy O, Blanchin N, Miccoli L. Excretion of Pu-238 during long-term chelation therapy by repeated DTPA inhalation. Health Phys 2022; 123(3):197-207.

12. Miller G, Bertelli L, Klare K, Weber W, Doyle-Eisele M, Guilmette R. Software for empirical building of biokinetic models for normal and decorporation-affected data. Health Phys 2012; 103:484-494.

13. Miller G, Klumpp JA, Poudel D, Weber W, Guilmette RA, Swanson J, et al. Americium systemic biokinetic model for rats. Radiat Res 2019; 192:75-91.

14. Miller G, Dumit S, Poudel D, Klumpp JA. Alternate analysis of an in vitro solubility study on the lung dissolution rate of $^{238}PuO_2$ material involved in the 2020 incident at Los Alamos National Laboratory. Health Phys 2023; 124(2):88-96.

15. Miller G, Dumit S, Poudel D, Klumpp JA. Analysis of nasal swipe data from the Los Alamos National Laboratory database. Health Phys 2023; 124(2):125-128.

16. Klumpp JA, Poudel D, Dumit S, Weber W, Miller G, Guilmette RA, et al. Plutonium systemic biokinetic model for rats. Radiat Res 2022; 198(5):449-457.

17. Miller G, Klumpp JA, Melo D, Poudel D. The role of extracellular fluid in biokinetic modeling. Health Phys 2017; 113(6):519-526.

18. Bertelli L, Melo DR, Lipsztein J, Cruz-Suarez R. AIDE: internal dosimetry software. Radiat Protect Dosim 2008; 130:358-367.

19. Limits for intakes of radionuclides by workers. ICRP Publication No 30 (Part 1). New York: International Commission on Radiological Protection; 1979.

20. Dose coefficients for intakes of radionuclides by workers. ICRP Publication No 66. New York: International Commission on Radiological Protection; 1994.

21. Leggett RW, Eckerman KF, Khokhryakov VF, Suslova KG, Krahenbuhl MP, Miller SC. Mayak worker study: an improved biokinetic model for reconstructing doses from internally deposited plutonium. Radiat Res 2005; 164:111-122.

22. 1990 recommendations of the Internal Commission on Radiological Protection. ICRP Publication No 60. New York: International Commission on Radiological Protection; 1991.

23. Radionuclide transformations (energy and intensity pf emissions). ICRP Publication No 38. New York: International Commission on Radiological Protection; 1983.

24. Cristy M, Eckerman KF. SEECAL: program to calculate age dependent specific effective energies. Oak Ridge, TN: Oak Ridge National Laboratory; ORNL/TM-12351 Dist. Category UC-407, Health Sciences Research Division; 1993.

25. Lopez MA, Etherington G, Castellani CM, Franck D, Hurtgen C, Marsh J, et al. Final report of CONRAD work package 5 coordination of research in internal dosimetry. In: Breustedt

B, Blanchardon E. editors. CONRAD Task 5.2.2.: towards a biokinetic model for DTPA-therapy. EC Project Num FP6-12684 EURATOM 2005-2008, Coleccioón Documentos Ciemat, ISBN 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-583-0, Madrid: CIEMAT; 2008. p. 123-146.

26. Breustedt B, Blanchardon E, Berard P, Fritsch P, Giussani A, Lopez MA, et al. Biokinetic modelling of Ca-DTPA decorporation therapy: the CONRAD approach. Radiat Protect Dosim 2009; 134:38-48.

27. Breustedt B, Blanchardon E, Berard P, Fritsch P, Giussani A, Lopez MA, et al. The CONRAD approach to biokinetic modeling of Ca-DTPA decorporation therapy. Health Phys 2010; 99:547-552.

28. Dumit S, Avtandilashvili M, Strom DJ, McComish SL, Tabatadze G, Tolmachev SY. Improved modeling of plutonium-DTPA decorporation. Radiat Res 2019; 191:201–210.

29. Dumit S, Avtandilashvili M, McComish SL, Strom DJ, Tabatadze G, Tolmachev SY. Validation of a system of models for plutonium decorporation therapy. Radiat Environ Biophys 2019; 58:227–235.

30. Miller G. Probabilistic interpretation of data—a physicist's approach. Morrisville, NC: Lulu Publications; 2017.

31. Grémy O, Tsapis N, Bruel S, Renault D, Van der Meeren A. Decorporation approach following rat lung contamination with a moderately soluble compound of plutonium using local and systemic Ca-DTPA combined chelation. Radiat Res 2012; 178(3): 217-223.

32. Miccoli L, Ménétrier F, Laroche P, Grémy O. Chelation treatment by early inhalation of liquid aerosol DTPA for removing plutonium after rat lung contamination. Radiat Res 2019; 192(6): 630-639.

33. Grémy O, Laurent D, Coudert S, Griffiths NM, Miccoli L. Decorporation of Pu/Am actinides by chelation therapy: new arguments in favor of an intracellular component of DTPA action. Radiat Res 2016; 185:568-579.

34. Grémy O, Miccoli L, Lelan F, Bohand S, Cherel M, Mougin-Degraef M. Delivery of DTPA through liposomes as a good strategy for enhancing plutonium decorporation regardless of treatment regimen. Radiat Res 2018; 189:477-489.

35. Grémy O, Miccoli L. Comments on "Improved modeling of plutonium-DTPA decorporation" (Radiat Res 2019; 191:201-10). Radiat Res 2019; 192(6):680-681.

36. Dumit S, Breustedt B, Avtandilashvili M, Strom DJ, McComish SL, Tabatadze G, Tolmachev SY. Response to the letter to the editor by Grémy and Miccoli on "Improved modeling of plutonium-DTPA decorporation". Radiat Res 2019; 192(6):682-683.

1                                    **APPENDIX**

2   **More details regarding numerical analysis**

3           The analysis was carried out using the software package *(12-13)* IDode (Internal

4   Dosimetry using models based on Ordinary Differential Equations), and more information is

5   available from the IDode help file. Because this is an exceptionally intricate numerical situation

6   involving second order kinetics and a very large range of numerical values, we discuss some of

7   the details here.

8           First, regarding the forward-model (FM) solver times (the forward-model solutions are

9   obtained for specified times), for the usual situation with a single intake and no chelation these

10  are not very important, and even a relatively small number of times (say 30 to 100) are sufficient

11  to completely specify the forward-model solutions, using interpolation to fill in between the

12  specified times. In this case with rapid changes of excretion because of chelation this is not true

13  and a large number of solver times were required. These consisted of:

14          -    very early times (starting at -1,000 days),

15          -    very late times (out to 20,000 days),

16          -    the times of all bioassay data,

17          -    the times of all bioassay data minus 1 day (to allow calculation of 24-hour excretion

18               without interpolation),

19          -    and times relative to each chelation treatment of 0, 0.1, 0.2, 0.4, 0.8, 1.6, and 3.2

20               days, giving about 900 specified solver times.

21           The FM calculation of 24-hour excretion is particularly demanding in this case. Figure

22  A.1 shows both cumulative and 24-hour excretion.

23



**Fig. A.1.** Forward Model calculation of excretion, Urine (a) and Feces (b). The 24-hour excretion is calculated in two ways, "Diff" means using the difference of the interpolated solutions, and "Eqs" means using the differential equations to calculate the rate of excretion and multiplying by the excretion time interval.

1

2        As shown in Fig. A.1 (b), for fecal excretion the 24-hour increment is 7 orders of

3    magnitude smaller than the cumulative excretion. Thus, differencing the cumulative excretion to

1    calculate the 24-hour excretion requires extraordinary precision of the cumulative amount, which

2    argues for always using the 24-hour excretion calculated using the differential equations.

3    However, that is inaccurate in a short time after a chelation treatment, where, because of rapid

4    time variation, nonlinearity of the cumulative excretion is important (note the difference for urine

5    at 8 days shown in Fig. A.1). As a compromise, the differential equations were used after 300

6    days, where the 24-hour increment as a fraction of the cumulative amount starts plunging down

7    to very small values.

8          It is interesting to note in Fig. A.1 the slight decrease of cumulative excretion at late

9    times, which is caused by nuclear decay. As is conventionally done, nuclear decay is

10   compensated in the calculation of 24-hour excretion using either method.

11         Regarding the Markov Chain Monte Carlo (MCMC) calculation of parameter

12   uncertainty, to guarantee convergence, a very large number of forward-model calculations are

13   needed (see discussion by Miller *(30)*). The results reported here utilize 2,000 FM calculations

14   (MCMC chain iterations) performed independently on 16 threads with the results combined. This

15   required about 1 hour using a 16-processor Acer laptop—about 0.1 second per FM calculation.

16         Convergence was judged partly by the appearance of the scatter plots, looking for

17   evidence of initialization bias (clumping) corresponding to the 16 different chain random number

18   seeds used on the 16 different threads. Also, the comparison of results from the 1st half of the

19   chain and the full chain was used to give an indication of convergence. This is shown in the

20   Table A.1 below. The priors on the parameters were either uniform (LINEAR) or log-scale

21   uniform (LOG). The columns labeled Value and SD show either the linear average and standard

22   deviation (LINEAR prior) or the logarithmic average and standard deviation (LOG prior).

23

1    **Table A.1.** Information related to convergence of the MCMC run. The run length was 2,000

2    chain iterations calculated independently on 16 threads and then combined.

| Parameter | Prior | Min | Max | Value | ValueFirstHalf | SD | SDFirstHalf | DeltaLarge |
|-----------|-------|-----|-----|-------|----------------|-----|-------------|------------|
| Intake day | LINEAR | -1000 | -100 | -583 | -595 | 98.3 | 95.8 | 0.174 |
| Intake | LOG | 22.5 | $22.5 \times 10^4$ | 2192 | 2174 | 0.097 | 0.090 | 0.017 |
| Nebulized Ca-DTPA fraction | LINEAR | 0 | 1 | 0.214 | 0.214 | 0.048 | 0.047 | 0.104 |
| $s_p$ | LOG | $8.1 \times 10^{-6}$ | $8.1 \times 10^{-2}$ | $7.6 \times 10^{-4}$ | $7.6 \times 10^{-4}$ | 0.141 | 0.133 | 0.026 |

3

4    The four varied parameters shown in Table A.1 were randomly assigned to two groups of

5    two parameters (IDode input parameter MaxParameterPerGrp=2). This random assignment of

6    parameters to groups was changed in a cyclical manner. At each chain iteration the parameters in

7    only one group were only varied with the others held fixed. As discussed by Miller *(30)*, the

8    selection of the random walk half intervals "delta" used in the Metropolis-Rosenbluth-Taylor

9    MCMC algorithm is very important for efficient convergence. This was done as follows.

10    As discussed by Miller *(30)*, each parameter was mapped into a corresponding "theta"

11    parameter (the cumulative prior probability) ranging from 0 to 1. The uncertainty/variability of

12    each theta parameter in terms of a quantity called "DeltaLarge" was estimated by initial shorter

13    MCMC runs to approximately determine the observed standard deviation (SD) of each parameter

14    given the data and the priors and setting DeltaLarge = 3/2 SD. DeltaLarge is therefore the Delta

15    needed to encompass essentially the full range of uncertainty of the parameter. After determining

16    DeltaLarge for each parameter by repeating shorter MCMC runs (1,000 iterations on each thread

17    was used) Delta is set to be DeltaLarge × DeltaFactor, where DeltaFactor is an input parameter

18    from 0 to 1, and using repeated short runs, the size of DeltaFactor was adjusted to achieve an

19    approximate acceptance fraction (fraction of time that the chain moves) of ½. Once DeltaFactor

20    is set (in this case DeltaFactor was 0.5), the MCMC run was continued out to the specified

21    number of iterations (in this case 2,000 on each thread). With a larger number of iterations, the

1    value of acceptance fraction changes somewhat, and in this case the final acceptance fraction

2    was 0.42.

3         Thus, with given DeltaLarge for each parameter, the single input parameter DeltaFactor

4    was used to set the acceptance fraction to be about ½. A large acceptance fraction goes along

5    with small delta and the chain exploring only a small region of parameter space and slow

6    convergence, while a small acceptance fraction with large delta more rapidly explores a larger

7    region of parameter space but with a larger fraction of the time where the chain does not move.

8         Calling for a dose calculation doubles the number of differential equations (in this case

9    from 64 to 128) because of needing to calculate the number of nuclear transformations in each

10   compartment in addition to the activity in each compartment. The MCMC calculation of Dose

11   used the parameter values of the combined saved chains (the combined "tape" file) without

12   rerunning the chain, so the more complex FM calculation was done only for the saved tape-file

13   parameter values.

14

"EXHIBIT S"



> Radiat Prot Dosimetry. 2018 Dec 1;182(1):98-103. doi: 10.1093/rpd/ncy145.

# AN ACCIDENT OF INTERNAL CONTAMINATION WITH PLUTONIUM AND AMERICIUM AT A NUCLEAR FACILITY IN JAPAN: A PRELIMINARY REPORT AND THE POSSIBILITY OF DTPA ADMINISTRATION ADDING TO THE DIAGNOSIS

Hideo Tatsuzaki [1], Takako Tominaga [1], Eunjoo Kim [2], Sadahiro Watanabe [1], Yayoi Tsutsumi [1], Masashi Sagara [1], Chie Takada [3], Takumaro Momose [3], Osamu Kurihara [2], Makoto Akashi [4]

Affiliations

PMID: 30165696   DOI: 10.1093/rpd/ncy145

## Abstract

This article introduces the first accident of internal contamination with plutonium (Pu) or americium (Am) in Japan for which treatment was carried out. An accident of internal contamination with Pu and Am occurred at a Pu research facility at Oarai-town of Ibaraki prefecture in Japan. A plastic bag containing these radionuclides ruptured when five workers were inspecting a storage container in a hood. As a consequence, these workers were internally contaminated with Pu and Am. Although contamination on the body surface was observed in all five workers, a positive nasal swab was detected in only three of them. A chelating agent, calcium diethylenetriaminepenta-acetate (CaDTPA), was administered to all of them including the two workers without a positive nasal swab. However, bioassay detected a significant amount of Pu and Am in urine after administration of DTPA in these two workers, whereas the levels of these nuclides were below minimum detectable levels in urine before the administration. Since the prevalence of adverse reactions in DTPAs is low, the present results suggest that administration of DTPA can be used for the diagnosis of internal contamination even when a nasal swab is negative or contamination around body orifices is not detected.

PubMed Disclaimer

"EXHIBIT T"

"EXHIBIT U"

"EXHIBIT V"



**DEPARTMENT OF THE NAVY**
NAVAL FACILITIES ENGINEERING SYSTEMS COMMAND
BASE REALIGNMENT AND CLOSURE
PROGRAM MANAGEMENT OFFICE WEST
33000 NIXIE WAY BLDG 50, SUITE 207
SAN DIEGO, CA 92147

5090
Ser BPMOW/225
November 07, 2025

Susan Philip, MD, MPH
Health Officer for the City and County of San Francisco
San Francisco Department of Public Health (SFDPH)
San Francisco, CA 94103

Dear Dr. Philip:

I am responding to your October 30, 2025, letter regarding the environmental cleanup work at the former Hunters Point Naval Shipyard (HPNS). As we discussed during our meeting on October 31, 2025, there was no public health or worker risk associated with the single plutonium-239 (Pu-239) sample collected from ambient air monitoring. The Department of the Navy's (DON) Base Realignment and Closure Program Management Office (BRAC PMO) overseeing the work is committed to the safety and health of the community during all phases of the environmental program and we take this responsibility very seriously. We appreciate SFDPH's November 03, 2025, statement affirming that no immediate action is required to protect public safety.

As part of the DON's ongoing commitment to the health and safety of the Bayview Hunters Point community, we have constant real-time dust management and monitoring and ambient air sampling during all field work. We implement the Parcel C Dust Management and Air Monitoring Plan (DMP) to protect onsite workers and the local community. This plan, as with all work plans for HPNS projects, was subject to a rigorous multi-stage review process that included collaboration with the SFDPH, and final approval by the HPNS regulatory agencies: the United States Environmental Protection Agency (EPA), the California Department of Toxic Substance Control (DTSC) and the California Regional Water Quality Control Board.

The dust management portion of the DMP meets the requirements of the Bay Area Air Quality Management District (BAAQMD) (2015) Particulate Matter and Visible Emissions Regulation. DMP protective measures implemented by onsite workers include the following three elements to protect the workers and the surrounding residents from fugitive dust emissions: 1- air quality sampling for total suspended particulates, lead, manganese, PM10, and asbestos at the Parcel C perimeter, 2- real-time dust monitoring at the Parcel C perimeter and at daily work areas, and 3- radionuclides of concern air sampling and laboratory analysis from the Parcel C perimeter and at daily work areas. Real time dust monitoring is the first line of defense to determine whether additional dust mitigation measures are required. The standard turn-around time for laboratory analyses for radionuclides is four months.

Air monitoring action levels, as described in the DMP, are set conservatively low, by design, to protect onsite workers. If action levels are exceeded, the contractor is required to take actions to further mitigate fugitive dust to protect onsite workers and the local community. Exceeding an action level does not mean there is a risk to public health. The Pu-239 action level of $4.00 \times 10^{-15}$ microcuries per milliliter (µCi/mL), equates to an exposure of 10 mrem (assuming breathing it continuously for one year). The sample in question represents a one-week period.

5090
Ser BPMOW/225
November 07, 2025

In March 2025 we were made aware by our contractor that one ambient air sample collected in November 2024 at a downwind air monitoring location in Parcel C reported Pu-239 at $8.16 \times 10^{-15}$ µCi/mL, above the project action level. From a public dose perspective, a person continuously exposed to this level of Pu-239 for the week that was collected, would have received a dose of less than 0.5 mrem. For perspective, a round-trip flight from San Francisco to New York results in an exposure of 4 mrem.

In accordance with the DMP, and the Health and Safety Plan, the Field Team responded by halting work for a safety standdown and enhancing dust control measures. Dust suppression enhancements included increasing the frequency of ground surface wetting and ensuring the ongoing use of biodegradable liquid polymer stabilizers on material stockpiles. Efforts were made to minimize on-site vehicle traffic where possible.

The documentation, including laboratory reports relevant to this specific sampling event, will be sent to you and the HPNS regulatory agencies in the next week.

I understand and acknowledge your concern regarding the delay in reporting. It is our goal to be timely and transparent and provide accurate data and relevant information. The Pu-239 result was a single outlier that could not be reproduced. The DON has taken more than 200 air samples since July 2023, and this outlier result is the only detection of Pu-239 to date. Pu-239 was not detected when the sample was retested in May 2025, and the result could not be attributed to any field work occurring onsite during that time period. These inconsistencies called into question the validity of the result. Between May and August, the DON and the laboratory further investigated the test results and conducted a methodical review of the laboratory's procedures and practices to ensure they complied with standards. A third party also conducted an analysis of the laboratory's performance. We understood this unconfirmed exceedance, if treated as legitimate, did not represent a potential exposure. Given these facts, we believed it was prudent to work with our experts to attempt to validate the authenticity of the result before communicating it publicly.

I recognize your need for earlier communication with your office, even while our respective technical staffs are working with uncertain or preliminary data. Our established monthly meetings with SFDPH provide an excellent opportunity to collaboratively develop more effective communication strategies.

As discussed in our October 31, 2025, meeting, we encourage SFDPH representatives to participate in the November 17, 2025, Hunters Point Shipyard Citizens Advisory Committee meeting, where we will share available information with the public. Your presence, along with U.S. EPA and the California DTSC, will help to provide facts and context to the community.

We value your engagement and encourage you to continue to communicate directly with us when concerns arise. We strive to provide timely and comprehensive responses to all inquiries.

Sincerely,

Anthony Megliola
Director

Copy to:  (Next page)

5090
Ser BPMOW/225
November 07, 2025

Copy to:
Mike Montgomery (EPA, Director of Superfund and Emergency Management Division);
Shamann Walton (District 10 Supervisor);
Thor Kaslofsky (OCII, Executive Director, Office of Community Investment and Infrastructure);
Anthony Chu (CDPH, Division of Radiation Safety and Environmental Management)

"EXHIBIT W"



OFFICE OF THE ASSISTANT SECRETARY OF DEFENSE

WASHINGTON, DC 20301-1200

HEALTH AFFAIRS

MEMORANDUM FOR ASSISTANT SECRETARY OF THE ARMY (M&RA)
                         ASSISTANT SECRETARY OF THE NAVY (M&RA)
                         ASSISTANT SECRETARY OF THE AIR FORCE (M&RA)
                         DIRECTOR, JOINT STAFF

SUBJECT: Policy for Department of Defense Stockpile of Pentetate Calcium
Trisodium Injection and Pentetate Zinc Trisodium Injection

       This memorandum supersedes "Policy for Department of Defense Stockpile of
Pentetate Calcium Trisodium Injection and Pentetate Zinc Trisodium Injection" dated
February 25, 2009 (Health Affairs 9-005). The policy addresses the Department of
Defense (DoD) Pentetate Calcium Trisodium (Ca-DTPA) and Pentetate Zinc Trisodium
(Zn-DTPA) Injections stockpile for the treatment of individuals internally contaminated
by the effects of a Radiological Dispersal Device or Improvised Nuclear Device. The
U.S. Food and Drug Administration approved Ca-DTPA and Zn-DTPA for the treatment
of individuals with known or suspected internal contamination with the transuranic
elements plutonium, americium, or curium. These products augment existing DoD
medical consequence management capability.

       The attachment provides updated guidelines for the use of these radiation medical
countermeasures. The point of contact for this issue is Colonel Keith Vesely, who can be
reached at (703) 845-3310, or Keith.Vesely@ha.osd.mil.

Charles L. R.

Charles L. Rice, M.D.
President, Uniformed Services University of
    the Health Sciences
Performing the Duties of the
    Assistant Secretary of Defense
    (Health Affairs)

Attachment:
As stated

**HA POLICY: 10-004**

cc:
Surgeon General of the Army
Surgeon General of the Navy
Surgeon General of the Air Force
Director, Health and Safety, U.S. Coast Guard
Director, Defense Logistics Agency

**HA POLICY: 10-004**

**Health Affairs Policy for Use of Department of Defense Stockpile of Pentetate Calcium Trisodium Injection or Pentetate Zinc Trisodium Injection for the Treatment of Individuals Internally Contaminated By the Effects of a Radiological Dispersal Device or Improvised Nuclear Device**

The Department of Defense (DoD) established an initial stockpile of Pentetate Calcium Trisodium Injection (Ca-DTPA) and Pentetate Zinc Trisodium Injection (Zn-DTPA) intravenous medications for the treatment of individuals internally contaminated by the effects of a Radiological Dispersal Device (RDD) or Improvised Nuclear Device (IND). The U.S. Food and Drug Administration (FDA) approved Ca-DTPA and Zn-DTPA as medical countermeasures for the treatment of individuals with known or suspected internal contamination with the transuranic elements plutonium (Pu), americium (Am), or curium (Cm) to increase the rates of elimination. Ca-DTPA and Zn-DTPA augment existing DoD medical consequence management capability.

The use of Ca-DTPA and Zn-DTPA at military facilities shall be consistent with the Department of Health and Human Services (HHS) Radiation Event Medical Management guidelines, (http://www.remm.nlm.gov/index.html). The Assistant Secretary of Defense for Health Affairs (ASD(HA)) will review this policy upon any future revision of HHS guidance on the use of Ca-DTPA or Zn-DTPA.

BACKGROUND

United States military personnel, their families, U.S. Government civilian workers, and U.S. Government contractors may be at risk from terrorist use of transuranic metals as components of an RDD or "dirty bomb." Terrorists might use Pu as the fissile material in an IND. Risks from such radioactive materials include contamination and exposure, externally and internally. In cases where prevention of internal contamination has failed, victims may take in radioactive material through inhalation, ingestion, open wounds, or burns. Various factors, including the chemical form of the isotope and the pathway of absorption, may influence the treatment method and effectiveness of internal radioisotope removal. Such treatment may include recapture of the radioactive metals through binding with a chelator (i.e., binding agent). Chelation (i.e., binding) involves the formation of stable ionic complexes for elimination from the body in urine. Ca-DTPA and Zn-DTPA form less stable chelates with uranium and neptunium *in vivo* resulting in the deposition of these elements in tissues including the bone. Ca-DTPA and Zn-DTPA treatments are not effective for uranium and neptunium. For clarification, Ca-DTPA and Zn-DTPA do not bind with radioactive isotopes such as iodine or cesium.

STOCKPILES

Military medical treatment facility (MTF) commanders shall evaluate the RDD and IND threat to their supported population and, if a threat exists, consider holding a

**HA POLICY: 10-004**

small quantity of Ca-DTPA and Zn-DTPA on-hand.  MTFs shall be prepared to function independently for up to the first 48 hours of an event.

ASD(HA) acquired and will pre-position stockpiles of Ca-DTPA and Zn-DTPA at Theater Lead Agents for Medical Materiel, Defense Distribution Depots, and those Medical Materiel facilities specifically designated by the GCC (hereafter referred to as "GCC storage location(s)") (see Table 1).

ASD(HA) will retain a small quantity of Ca-DTPA and Zn-DTPA at Defense Distribution Depot Susquehanna (DDSP) to serve as the fly-away package for radiological medical specialty teams (e.g., a U.S. Army Radiological Advisory Medical Team (RAMT)).

**Table 1:  GCC Storage Locations**

| GCC | GCC STORAGE LOCATION(S) | NOTES |
|---|---|---|
| USAFRICOM | U.S. Army Medical Materiel Center Europe (USAMMCE) | |
| USCENTCOM | U.S. Army Medical Materiel Center – South West Asia | |
| USEUCOM | USAMMCE | |
| USNORTHCOM | Brooke Army Medical Center | |
| USPACOM | TLAMM-Pacific, U.S. Army Medical Materiel Center-Korea, Defense Distribution Depot Yokosuka Japan | Three locations are required to support forces throughout the region. |
| USSOUTHCOM | KellyUSA | |

RELEASE AUTHORITY

Materiel purchased by the MTF is for use by that facility and its subordinate or supported units or facilities.  Authority to release this supply of Ca-DTPA and Zn-DTPA is vested in the MTF Commander, who retains operational control of these radiation medical countermeasures.  Operational decisions regarding use of this supply will be consistent with the priorities for Ca-DTPA and Zn-DTPA use presented in this policy, in addition to current clinical guidelines by cognizant public health specialists and organizations, and the FDA-approved product labels.

ASD(HA) designates the commander of each GCC as release authority for the ASD(HA)-acquired Ca-DTPA and Zn-DTPA stored within each respective GCC area of responsibility.

ASD(HA) will retain control of any remaining materiel stored at DDSP and will coordinate with Joint Staff and Defense Supply Center Philadelphia (DSCP) if such materiel is used as a radiological medical specialty team fly-away package.

**HA POLICY: 10-004**

For pre-event distribution, Ca-DTPA and Zn-DTPA will be shipped from GCC storage locations using standard medical logistics supply chain processes, or, if required, alternate GCC-directed means (e.g., military ground or air transport).  For post-event distribution, Ca-DTPA and Zn-DTPA will be shipped from GCC storage locations using standard life-or-death medical logistics supply chain processes, or, if required, alternate GCC-directed means (e.g., military ground or air transport), as the products are most effective when administered immediately and up to the first 24 hours after internal contamination with the transuranic elements Pu, Am, and Cm.  The associated costs shall be paid by the GCC in all cases.

The GCC should evaluate the threat of release of the transuranics Pu, Am, and Cm, and develop plans to treat individuals and to receive, store, maintain, and rapidly distribute Ca-DTPA and Zn-DTPA for treatment of appropriately selected casualties. Treatment with Ca-DTPA or Zn-DTPA should not begin without approval of the Command Surgeon or Public Health Emergency Officer when there is clinical diagnosis or suspected occurrence of internal contamination with these radioactive metals.

SCREENING AND ASSESSMENT

All potential casualties must be screened for external radioactive contamination to determine if they have a possibility for internal contamination.  External screening shall be accomplished with appropriate instrumentation capable of detecting low energy gamma emissions with particular attention given to monitoring the upper body, especially for contamination of the head, hair, and shoulders.  The resulting high-risk subpopulation should be medically evaluated.  Presumptive casualties potentially requiring chelation treatment consist of two groups.  The first group includes individuals near ground-zero or in the close (high zone) downwind plume footprint processed through controlled exits. The second potential high-risk group includes those individuals in the high exposure (high zone) areas but who escaped contamination screening at an exit point or triage site (unscreened).  Individuals presenting at the controlled exits of guided evacuation routes, or at triage points must be screened for potentially contaminated wounds or upper body contamination, and triaged accordingly.  The resulting known or suspected positives from all potential casualties whether screened at controlled exits or at another site and time should be treated as soon as possible, pending diagnostic testing to determine their need for continuation of therapy.

INDICATIONS AND USAGE

For indications and usage, dosage and administration guidelines, and laboratory testing and monitoring information of Ca-DTPA and Zn-DTPA, see Appendices 1 and 2, respectively.  These attachments are the product inserts and describe the FDA-approved use of the two chelators.

**HA POLICY: 10-004**

COLLECTION OF PATIENT TREATMENT DATA

Clinical staff will complete an Armed Forces Radiobiology Research Institute (AFRRI) Biodosimetry Worksheet for each patient treated to assist the health care provider in determining the duration of treatment.  The worksheets are available from the Biodosimetry Tools section of the AFRRI website (http://www.afrri.usuhs.mil/outreach/ biodostools.htm#forms).  Forward the completed forms to the patient medical record custodians.

Clinical staff should complete the Ca-DTPA manufacturer Patient Treatment Form or the Zn-DTPA manufacturer Patient Treatment Form for each patient treated, subject to operational constraints.  The manufacturer requests the information to develop long-term response data and information on the risk of developing late malignancy.  Mail completed forms to:  Hameln Pharmaceuticals GMBH, Langes Feld 13, 31789 Hameln, Germany. The forms are available from the U.S. commercial distributor's website (http://www.akorn.com/dtpa_product_info.php).

RADIOLOGICAL MEDICAL SPECIALTY TEAMS

The DoD has radiological medical specialty teams available to assist the GCC in response to events of the type described in this policy (e.g., AFRRI Medical Radiobiology Advisory Teams and U.S. Army RAMTs).  The teams have various capabilities, including providing health physics, medical, and radiobiological advice to military and civilian command and control operations; evaluating radiation hazards; advising on contamination control, radiation exposure risks, and protective action guidelines.  A U.S. Army RAMT can provide limited medical support.  The teams are deployable and, through "reachback," can call on the knowledge and skills of radiobiologists, biodosimetrists, and other research professionals.  Use of the teams' expertise in planning and response is strongly encouraged.

LOGISTICS CONSIDERATIONS

Inventory Management:  All Ca-DTPA and Zn-DTPA inventory shall be tracked and accounted for at each GCC storage location and the MTF storage locations using existing Service and Joint medical logistics automated information systems (AIS) (e.g., Defense Medical Logistics Standard Support).  Inventory managers will ensure that on-hand balances and quality assurance information are entered into their respective medical logistics AIS and that the AIS are reporting the data to the Joint Medical Asset Repository (JMAR).  The JMAR will provide this data to the ASD(HA) Force Health Protection & Readiness Chemical, Biological, Radiological, and Nuclear Defense Medical Materiel Dashboard.

Storage and Shipping Requirements:  The temperature requirement for Ca-DTPA and Zn-DTPA, as defined on the product labels, is 15 - 30°C (59 - 86°F).  Exposures

**HA POLICY: 10-004**

outside the required storage temperatures could cause the product to lose efficacy, could lead to product adulteration that could threaten patient safety, or could lessen shelf life. Both products shall be transported, stored, and handled in accordance with the guidance provided on the product label and in the United States Pharmacopeia (USP), Chapter 1079, Good Storage and Transportation Standard. The USP is the U.S. standard for the storage and handling of finished pharmaceutical products. Appropriate shipping procedures and containers shall be used to maintain required temperature range during transit and temperatures will be monitored during transport by placing electronic time and tracking temperature devices in every container, in accordance with local cold chain/thermal management standard operating procedures.

Security: The integrity of the medical logistics supply chain must remain secure. The risk to the product is that it will be diverted by those seeking monetary gain or by those who fear they will not receive treatment. The use of electronic track and trace technology (e.g., Radio Frequency Identification) is encouraged.

Shelf Life/Expiration Dates: The ASD(HA)-acquired Ca-DTPA and Zn-DTPA each consists of a single lot, and so each has a single expiration date. The product has a 10-year shelf life from time of manufacture when stored and transported at the temperatures defined on the product labels. The lot numbers and expiration dates for the ASD(HA) stockpiled materiel are in Table 2.

Shelf Life Extension: Ca-DTPA and Zn-DTPA are not entered in the DoD/FDA Shelf Life Extension Program (SLEP). ASD(HA) is exploring SLEP eligibility for both products and will provide guidance at a future date.

Associated Supplies: The majority of the supplies needed are commonly present in existing MTFs (e.g., needles, syringes, intravenous sets, and blood/urine collection supplies). If Ca-DTPA or Zn-DTPA is pushed from a GCC storage location or MTF to a treatment team or smaller MTF, or if treatment is conducted outside MTFs (e.g., gymnasium, tent), all required supplies may not be available. MTF commanders and the GCC storage location will coordinate with the supported MTFs or medical response teams to determine the identity and quantity of associated supplies necessary to initiate and sustain treatment with Ca-DTPA and Zn-DTPA, will develop kits of associated supplies as required, and will ensure that these kits and the Ca-DTPA and Zn-DTPA are delivered simultaneously. The GCC will fund the costs for the associated supplies.

RESUPPLY AND REPLENISHMENT

Resupply During a Contingency (e.g., Response to an RDD or IND): MTFs in the U.S. and its territories shall coordinate for resupply with Local, Territorial, and State Strategic National Stockpile Coordinators. MTFs outside the U.S. and its territories shall requisition materiel from their supporting GCC storage location. National Stock