EXHIBIT A JAG LETTERS



**DEPARTMENT OF THE NAVY**
OFFICE OF THE JUDGE ADVOCATE GENERAL
TORT CLAIMS UNIT NORFOLK
9324 VIRGINIA AVENUE SUITE 104
NORFOLK VA 23511-2949

5890
Ser J243728
January 10, 2025

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

MS KELLY TANKERSLEY
1033 REVERE AVENUE B
SAN FRANCISCO CA 94124

Dear Ms. Tankersley:

SUBJECT:  CLAIM OF KELLY TANKERSLEY; OUR FILE NO. J243728

This responds to your administrative claim in the amount of $5,000,000.00 for damages allegedly resulting from radiation exposure by Hunters Point Naval Shipyard in San Francisco, California. The claim was analyzed under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2401(b), and 2671-2680. Our investigation has determined the United States is not liable under the FTCA for the damages claimed.

The United States is liable under the FTCA when the negligence or wrongful act of a Federal employee proximately causes injury. The damages alleged did not result from any negligent act or omission on the part of an employee of the United States. Accordingly, your claim is denied.

If you do not agree with this decision, be advised you have six months from the date of mailing of this letter to file suit in the appropriate Federal district court. If you have any questions, please contact me by at thomas.e.campbell1.civ@us.navy.mil.

Sincerely,

THOMAS E. CAMPBELL
Tort Claims Attorney



# DEPARTMENT OF THE NAVY
### OFFICE OF THE JUDGE ADVOCATE GENERAL
### TORT CLAIMS UNIT NORFOLK
### 9324 VIRGINIA AVENUE SUITE 104
### NORFOLK VA 23511-2949

5890
Ser J243728
July 25, 2024

MS KELLY TANKERSLEY
1033 REVERE AVE
SAN FRANCISCO CA 94124

Dear Ms. Tankersley:

SUBJECT:   CORRESPONDENCE IN RE KELLY TANKERSLEY; OUR FILE NO. J243728

We received the correspondence you submitted purporting to be a claim against the United States. I am writing to inform you that the correspondence does not contain information necessary to properly present a claim under the Federal Tort Claims Act (FTCA). See 32 C.F.R. § 750.6(a). Specifically, you failed to provide a sum certain (please complete all parts of block 12 of the enclosed SF95 claim form).

**Until we receive this information you have not presented a proper claim and the two-year statute of limitations continues to run.**

Please follow the instructions provided with the SF 95. If we do not receive the SF 95 or a letter containing the requested information in a timely manner, your attempt to file a claim may be barred by the statute of limitations.

Additionally, the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq., and its implementing regulations, 28 C.F.R. § 14.4 and 32 C.F.R. § 750.27, require the claimant to cooperate with the Government by presenting sufficient information to allow the claim to be administratively adjudicated. Therefore, in addition to the information requested above, please provide the following information:

a.   A written report by your attending physicians on the nature and extent of the injury, nature and extent of treatment, any degree of temporary or permanent disability, the prognosis, period of hospitalization, and any diminished earning capacity. In addition, you may be required to submit to a physical or mental examination by a physician employed by any Federal agency;

b.   Itemized bills for related medical and hospital expenses incurred, or itemized receipts for payment of such expenses;

c.   A statement of expected expenses for future treatment;



# DEPARTMENT OF THE NAVY
OFFICE OF THE JUDGE ADVOCATE GENERAL
TORT CLAIMS UNIT NORFOLK
9324 VIRGINIA AVENUE SUITE 104
NORFOLK VA 23511-2949

5890
Ser J243728
June 24, 2024

MS KELLY TANKERSLEY
1033 REVERE AVE
SAN FRANSISCO CA 94124

Dear Ms. Tankersely:

SUBJECT:    YOUR CORRESPONDENCE OF JUNE 1, 2024; OUR FILE NO. J243728

This is to confirm receipt of your correspondence, received in this office on June 10, 2024. I have enclosed a date-stamped copy as verification of receipt.

Please note 28 C.F.R. Part 14.2(a) governs the requirements for the successful filing of a claim under the Federal Tort Claims Act (FTCA); and 32 C.F.R. Part 750 provides the Department of the Navy's regulations concerning requirements for the successful filing of claims under both the FTCA, 28 U.S.C. §§ 1346(b), 2401(b), 2671-2680, and the Military Claims Act (MCA), 10 U.S.C. § 2733.

Your correspondence is currently being reviewed to determine if it is sufficient to constitute a properly presented claim under the regulations provided above. If necessary, you will soon be notified by the legal professional assigned to your claim if any additional information is needed to complete your claim.

In the meantime, if you have any questions, please contact this office at the letterhead address or by phone at (757) 350-3085.

Sincerely,

SIMONE E STEBER
Tort Claims Assistant

Enclosure

https://mail.google.com/mail/u/0/?ik=35795fc2d1&view=pt&search:..

To: "Campbell, Thomas E CIV USN COMNAVREG MIDLANT VA (USA)" <thomas.e.campbell1.civ@us.navy.mil>

Dear Mr. Campbell, Thank you for the reply and don't forget that I requested an evaluation if that can be arranged with whoever the agency choses. It doesn't have to be in San Francisco and I am open to pretty much anywhere else. Do keep in mind that my "sum certain" is open to negotiation. I want more than anything to get away from this location and well, there is no excuse for the delay in obtaining treatment but it may be impossible in this city and there is nothing your agency can do to change this.

    Thank you, Kelly

[Quoted text hidden]

 Gmail

**Kelly Tankersley <tk0260@gmail.com>**

---

## Date to submit Federal Claim

3 messages

---

**crest <tk0260@gmail.com>**                                        Mon, Dec 2, 2024 at 4:21 PM
To: thomas.e.campbell1.civ@us.navy.mil

Dear Thomas Campbell, I hope you received my previous emails but I wasn't certain. I sent two but then I wasn't sure
and then I sent another that was a summary of the two previous ones only to realize that all were sent. There is no
way anyone can understand what I am going through. I know I stated this before, but the things I requested are
already provided for by law but how to make those responsible act accordingly is another hurdle. I want to ask what
date you have as the official date of submitting my administrative claim in order to know when I will be allowed to file
a claim in Federal Court. The 6 month period is approaching fast and I would like a confirmation from you to satisfy
the requirements that are needed to do this correctly. Please let me know.   Thank you, Kelly

---

**Campbell, Thomas E CIV USN COMNAVREG MIDLANT VA (USA)**             Tue, Dec 3, 2024 at
<thomas.e.campbell1.civ@us.navy.mil>                                          6:24 AM
To: crest <tk0260@gmail.com>

Dear Ms. Tankersley,

We are showing August 27, 2024, as the date your administrative claim was "perfected."  Please recall your initial
submission in June of 2024 did not contain a "sum certain" (an amount claimed) as is required under the Federal Tort
Claims Act.  So, you responded to my July letter with a claim form that contains a sum certain, which was received in
our office on August 27.  Thus, the six months the Agency is allowed to adjudicate your claim begins to run from
August 27.  I hope this helps.

Sincerely,

Thomas E. Campbell

Tort Claims Attorney

Department of the Navy

Office of the Judge Advocate General

Tort Claims Unit Norfolk

ATTORNEY WORK PRODUCT / CONTROLLED UNCLASSIFIED INFORMATION-LEGAL AND/OR PRIVACY.
Controlled by OJAG-Code 15; LDC: n/a; POC: Signer above. Any misuse or unauthorized disclosure of this information may
result in both criminal and civil penalties.  The information contained in this e-mail and/or accompanying documents is intended
for the exclusive use of the individuals to whom it is addressed.  It may contain information that is pre-decisional, privileged or
protected from release under the Privacy Act, FOIA or other applicable laws.  Do not disseminate this e-mail, or its contents and
attachments, to anyone who does not have an official need for access, or without the express consent of the sender.

[Quoted text hidden]

---

**crest <tk0260@gmail.com>**                                        Tue, Dec 3, 2024 at 6:51 PM

 Gmail

Kelly Tankersley <tk0260@gmail.com>

**Untitled document**
2 messages

**Kelly Tankersley (via Google Docs)** <tk0260@gmail.com>                                    Thu, Oct 10, 2024 at 3:30 PM
Reply-To: Kelly Tankersley <tk0260@gmail.com>
To: tk0260@gmail.com
Cc: thomas.e.campbell1.civ@us.navy.mil

### Kelly Tankersley attached a document

**K**   Kelly Tankersley (tk0260@gmail.com) has attached the following document:

📄 Untitled document

*Snapshot of the item below:*

**Kelly Tankersley**                                    **October 10, 2024**
**1033 Revere avenue**
**San Francisco, CA 94124**
**tk0260@gmail.com**

Dear Thomas Campbell,  I wanted to let you know what I have been doing to gather the additional information that is required to process my claim. I finally sent a letter with this information but it was returned due to my incorrect spelling of the address and now what I believed to be a step in the right direction has turned out to be not as hopeful as I thought.  What I am most focused on is the medical requirements that are needed.   There are many circumstances that make this difficult and one of the reasons I sent a letter prior to filing a claim, is because there was no other means to notify anyone of what has happened or to receive the response that is required. I had to uncover this exposure on my own over the course of years and had no idea what it would turn out to be.  There are very reliable tests available for most heavy metals including Uranium, Lead, Cobalt, Arsenic and Mercury but these are not regularly offered by most Health plans or even suggested by most Doctors.  Plutonium testing is far more difficult to gain access to and more expensive.  There are no release levels for Plutonium and the two isotopes I showed evidence of were not even listed in the inventory of contaminants reported for this site. Regardless, the only possible source would be the Shipyard and from the detonation of a thermonuclear device such as those detonated in the Marshall Islands.  It is clearly spelled out how materials such as this are to be managed and I shouldn't have to mention this but exposure to Plutonium is a time sensitive situation that can greatly reduce adverse health effects if promptly treated.  I am very angry that the Doctor who gave me access to the Genova tests has sought to exploit this situation for her own gain.  The repeated disclosure of my test results have only made it more difficult for me to receive the help I need.  I have had to try to gather the most recent information regarding the impact this is having on my health but the city of San Francisco and the Health Department here are actively blocking any reports of problems associated with this Shipyard.  I am still unable to see the results of testing done back in February that indicate an ever-increasing blood lead and other heavy metals.  I had to push like hell to get those tests done and I have appealed and complained to see the results to no avail. This is beyond ridiculous and there is not much I can do other than find another provider and request the treatment I need. That is exactly what I did and I plan on relaying the response I have received from REAC/TS to my doctor and hopefully receive treatment with zn-dtpa.  I was also contacted by an individual from RNCP (Radiation nuclear countermeasures program) , a program within the DOE, who stated that my email had been forwarded to her.  She also mentioned that she had come across an article from Dr. Sumchai and mistakenly believed that Dr. Sumchai was actually a doctor treating me.  She said that the CDC would be able to provide follow-up bioassays when needed and wanted me to have Dr. Sumchai contact them.  This has been very difficult for me.  Most days I am unable to do the things I need to do to find help. Filing a claim is not the way I should have to resort to obtaining help.  There are no contacts available to help anyone who find themselves in this situation.  I still believe Dr. Kathryn Higley should have brought this to the attention to someone overseeing this project and removed me out of harms way. It was no sooner than I came to realize that I have been exposed from dust generated from the shipyard, that the activity started in Parcel E-2 that I submitted photos of. This was the first time I really paid attention and I didn't know what they were doing and I was extremely sick during this time.  I now believe all of the dirt that they moved around and placed here was highly contaminated and was purposely put here and then a liner was put over the majority of the area afterwards. I do not care what remedy will be put in place as the final solution and have no opinion as to whether any risk will remain, once completed.  I know that getting it to that state has been very messy with little regard to those closest to the work that is being performed to accomplish this.  I have already explained that this is easy to prove and I would like nothing more than the opportunity to do this by submitting to an evaluation by any federal agency or provider you chose.  I have lost the initial hopefulness I felt as I looked forward to my upcoming appointment on November 12.  I went ahead and filed a IMR (independent medical review) requesting treatment with ca-dtpa or zn-dtpa hoping it would streamline this beforehand.  You have to understand this is terrible to have to wait to receive treatment and this has become very hard to bear.  I received a reply and I am required to have a doctor explaining the reason for this treatment to expedite this action.  Doesn't everyone understand the importance of treating Plutonium exposure? It is defined in all aspects of this nation's emergency response instructions for the DoD, Homeland Security, DTIC, FEMA and every other included agency.  The DoD is supposed to respond as detailed in CERCLA and directive 3150.08 and it should be at the lowest level possible and started two years ago.  Take care of this first then I should file a claim not the other way around.  I had no idea that this would come to be, but having to have had to remain here has been only adding to the exposure I already have and the injury is ongoing as long as I remain. I am so tired of reading the Federal registry and all these codes that give the impression that all is fair and good in this country when I know that most do not adhere to any of these regulations.  My longtime roommate and friend Mats, who also has Plutonium exposure, can't understand why anyone would do something such as this. He is from Sweden and people there pay extremely high taxes in return for a government that cares for their people from the "cradle to the grave" and something like this is unheard of and would never happen.  I tell him it has to do with the money. I believe even you should be worried that so much money has been spent on this Shipyard and the final package will be to leave the majority of contamination onsite for future generations to manage.  I'm not implying this is solely the Navy's decision because it can't be. The city of San Francisco being the primary stakeholder has been demanding many things over the years and have had the deciding voice in the provisions of this transfer. I want the chance to prove what I'm claiming has happened to me and then it will be possible to assess the injury, not before. So let me know how I can be seen or evaluated by a federal agency because at my end it is taking too long. It is of no use to try to describe what this is like and if I have to file a federal suit to get access to the truth, I will.  How can I be in control of my life or my health if I am not allowed to discover what is retained in my body?  The things I now know that  I have been in contact with should never be circulating in the air I have been breathing and I believe I have the right to know and that may be the only thing I ask for when I go to Federal Court if that is what I have to do.

Thank you so much for reading,
   Kelly Tankersley

This is a courtesy copy of an email for your record only. It's not the same email your collaborators received. Click here to learn more.

Google™

---

**crest** <tk0260@gmail.com>                                    Thu, Oct 10, 2024 at 3:34 PM
To: Kelly Tankersley <tk0260@gmail.com>

Sorry the case is Kelly Tankersley
   File No. 243728
   [Quoted text hidden]

EXHIBIT B DOD STOCKPILE AND GUIDELINES FOR
USE



**THE ASSISTANT SECRETARY OF DEFENSE**

1200 DEFENSE PENTAGON
WASHINGTON, DC 20301-1200

FEB 25 2009

**HEALTH AFFAIRS**

MEMORANDUM FOR ASSISTANT SECRETARY OF THE ARMY (M&RA)
ASSISTANT SECRETARY OF THE NAVY (M&RA)
ASSISTANT SECRETARY OF THE AIR FORCE (M&RA)
DIRECTOR, JOINT STAFF

SUBJECT:  Policy for Department of Defense Stockpile of Pentetate Calcium Trisodium
Injection and Pentetate Zinc Trisodium Injection

The Department of Defense established a stockpile of Pentetate Calcium
Trisodium Injection (Ca-DTPA) and Pentetate Zinc Trisodium Injection (Zn-DTPA).
The U.S. Food and Drug Administration approved both products as countermeasures for
the treatment of internal contamination with the radioactive transuranic elements
plutonium, americium, and curium.  These countermeasures are for the treatment of
individuals exposed to and internally contaminated by a Radiological Dispersal Device or
Improvised Nuclear Device.

The attachment provides guidelines for the release, release authority, and use of
these radiation countermeasures.  My point of contact is Colonel Keith Vesely, Director,
Medical Countermeasures, Force Health Protection, and Readiness, who may be reached
at (703) 845-3310 and Keith.Vesely@ha.osd.mil.

S. Ward Casscells, MD

Attachment:
As stated

cc:
Surgeon General of the Army
Surgeon General of the Navy
Surgeon General of the Air Force
Director, Health and Safety, US Coast Guard
Director, Defense Logistics Agency

**HA POLICY:  09-005**

**Health Affairs Policy for Release of Department of Defense Stockpile of Pentetate Calcium Trisodium Injection and/or Pentetate Zinc Trisodium Injection for the Treatment of Individuals Exposed To and Internally Contaminated by a Radiological Dispersal Device or Improvised Nuclear Device**

The Department of Defense (DoD) established an initial stockpile of Pentetate Calcium Trisodium Injection (Ca-DTPA) and Pentetate Zinc Trisodium Injection (Zn-DTPA) intravenous medications. These medications are for the treatment of individuals exposed to and internally contaminated by a Radiological Dispersal Device (RDD) or Improvised Nuclear Device (IND). The U.S. Food and Drug Administration (FDA) approved Ca-DTPA and Zn-DTPA as countermeasures for the treatment of individuals with known or suspected internal contamination with the radioactive transuranic elements plutonium, americium, or curium to increase the rates of elimination. Ca-DTPA and Zn-DTPA augment existing DoD medical consequence management capability.

The use of Ca-DTPA and Zn-DTPA at military facilities shall be consistent with the Department of Health and Human Services Radiation Event Medical Management guidelines, (http://www.remm.nlm.gov/index.html). For the purposes of this policy, personnel on military installations shall be considered as "the general public" for purposes of access to countermeasures from the strategic national stockpile or other non-DoD sources, with the exception of institutionalized persons and emergency workers whose duties could involve responding to the release of an RDD/IND or otherwise require them to remain in the emergency planning zone. The Assistant Secretary of Defense (Health Affairs) (ASD (HA)) will review this policy upon any future revision o the Department of Health and Human Services guidance on the use of Ca-DTPA and/or Zn-DTPA.

## BACKGROUND

United States (U.S.) military personnel, their families, U.S. Government civilian workers, and U.S. Government contractors may be at risk from terrorist use of specific radioactive transuranic metals (i.e. plutonium - Pu, americium - Am, and curium - Cm) as components of a RDD or "dirty bomb." Terrorists might also use plutonium (Pu) as the fissile material in a failed IND. The internal contamination of victims may occur through inhalation, ingestion, and wounds or burns. Various factors, including the chemical form of the isotope and the pathway of absorption, may influence the treatment method and effectiveness of radiocontaminant removal. When prevention of exposure has failed, treatment may include recapture of the radiocontaminant metals through binding with a chelator (i.e., binding agent). Chelation (i.e., binding) involves the formation of stable ionic complexes, eliminated from the body in urine. Ca-DTPA and Zn-DTPA form less stable chelates with uranium and neptunium in vivo resulting in the deposition of these elements in tissues including the bone. Ca-DTPA and Zn-DTPA treatments are not effective for uranium and neptunium. Neither Ca-DTPA nor Zn-DTPA binds radioactive iodine.

**HA POLICY:  09-005**

**STOCKPILES**

Medical treatment facilities (MTF) shall be prepared to function independently for up to 48 hours. MTFs with patient holding capability will maintain a minimum of 10 single dose vials of Ca-DTPA and 5 single dose vials of Zn-DTPA. MTF commanders may increase the amount held based on the RDD/IND threat and population at risk.

ASD (HA) acquired and will preposition stockpiles of Ca-DTPA and Zn-DTPA at Theater Lead Agents Medical Materiel (TLAMMs) in the Pacific rim, Europe, and south west Asia. ASD (HA) may authorize re-disposition of the stockpiles based on mission needs and risk assessments. DoD will not centrally stockpile Ca-DTPA or Zn-DTPA within the continental United States (CONUS).

**RELEASE AUTHORITY**

Materiel purchased by MTF is for use by that facility and its subordinate or supported units or facilities, specifically to respond to an RDD or IND. Authority to release this supply of Ca-DTPA and Zn-DTPA is vested in the MTF Commander, who retains operational control of these radiation countermeasures. Operational decisions regarding use of this supply will be consistent with the priorities for CA-DTPA and Zn-DTPA use presented in this policy, in addition to current clinical guidelines by cognizant public health specialists and organizations, and the FDA-approved product labels.

The stockpiles of Ca-DTPA and Zn-DTPA positioned by ASD (HA) outside the continental United States (OCONUS) remain within the control of ASD (HA); they are not released to the Services or Geographic Combatant Commanders (GCC). ASD (HA) will, as necessary, release all, or a portion of, the stockpile to the Joint Chiefs of Staff (JCS) should the risk to personnel become imminent or a radiological event (i.e., RDD or IND) occur. ASD (HA) will be advised on this decision by the Service Surgeons General, JCS, Commanders of Combatant Commands (CCDRs), the Joint Preventive Medicine Policy Group (JPMPG), and other advisory bodies.

For pre-event distribution, after ASD (HA) approval, the Defense Logistics Agency (DLA) will initiate shipments using standard medical logistics supply chain processes, or, if required, alternate GCC-directed means (e.g., military ground or air transport). For post-event distribution, DLA will initiate shipments using standard life-or-death medical logistics supply chain processes, or, if required, alternate GCC-directed means (e.g., military ground or air transport), as the products are most effective when administered immediately and up to the first 24 hours after internal contamination with the transuranic elements plutonium, americium, and curium. On a case-by-case basis, ASD (HA) will consider requests for JCS/CCDRs to create small stockpiles at other locations or in specific units, or authorize the release of portions of the stockpile.

2

**HA POLICY: 09-005**

Following ASD (HA) release of Ca-DTPA and Zn-DTPA, JCS, in coordination with U.S. Northern Command as the global synchronizer, and the affected CCDRs, will apportion these medications to GCCs for use OCONUS. Treatment with Ca-DTPA and/or Zn-DTPA should not begin until the Public Health Emergency Officer (PHEO) confirms release of an RDD or IND, or there is clinical diagnosis or suspected occurrence of internal contamination with the radioactive transuranic metals plutonium, americium, or curium.

GCCs should evaluate the threat of the release of the radioactive transuranics plutonium, americium, and curium and develop plans to protect personnel and to potentially receive, store, maintain, and rapidly distribute Ca-DTPA and Zn-DTPA to treat appropriately selected casualties. The chelating capacity of Ca-DTPA is greatest immediately and up to approximately 24 hours after internal contamination when the radiocontaminant is still circulating and readily available for chelation.

## INDICATIONS AND USAGE

Ca-DTPA and Zn-DTPA is FDA-approved for treatment of individuals with known or suspected internal contamination with plutonium, americium, or curium to increase the rates of elimination. The manufacturer recommends Ca-DTPA for the initial treatment because Ca-DTPA results in about a 10-fold higher rate of elimination of plutonium in the urine as compared to Zn-DTPA when given during the first 24 hours after exposure. At 24 hours post exposure Ca- and Zn-DTPA are equally effective at the elimination of radioactivity.

Screen all potential casualties for their risk of internal contamination. Medically evaluate the resulting high-risk subpopulation. Presumptive casualties potentially requiring chelation treatment consist of two main groups. The first group includes individuals with a history of being near the RDD ground-zero or in the close (high zone) downwind plume footprint who present with findings of gross external radiocontamination on radiation detector screening of the upper body, especially contamination of the head, hair, and shoulders. The second potential high-risk group includes persons who were outdoors in the high exposure (high zone) areas but who escaped contamination screening at an exit point or triage site (unscreened). Screen persons presenting at the controlled exits of guided evacuation routes, or at triage points for potentially contaminated wounds or upper body contamination, and triage accordingly. Treatment is usually indicated when internal contamination exceeds ten times the Allowable Level of Intake (ALI). Treat the resulting known or suspected positives as soon as possible, pending diagnostic testing to determine their need for continuation of therapy.

3

**HA POLICY: 09-005**

**OPERATIONAL EMPLOYMENT**

Physicians, hospitals, and other DoD force health protection components will provide aid, to include the administration of Ca-DTPA and Zn-DTPA, to military personnel, their families, U.S. Government civilian workers, and U.S. Government contractors injured by a terrorist act involving radioactive material or a nuclear detonation. There are many scenarios for such acts that result in a range of exposures, and produce few to many casualties. Such events can take place in any environment.

**RADIOLOGICAL MEDICAL SPECIALTY TEAMS**

DoD has radiological medical specialty teams available to assist medical personnel in response to events of the type described in this policy (e.g., Armed Forces Radiobiology Research Institute (AFRRI) Medical Radiobiology Advisory Team, Service Radiological Advisory Medical Teams). The teams have various capabilities, including providing health physics, medical, and radiobiological advice to military and civilian command and control operations; evaluating radiation hazards; advising on contamination control, radiation exposure risks, and protective action guidelines; and providing radiological medical support. The teams are deployable and, through "reach back," can call on the knowledge and skills of radiobiologists, biodosimetrists, and other research professionals. Use of the teams' expertise in planning and response is strongly encouraged.

**DOSAGE AND ADMINISTRATION**

Chelation treatment is most effective within the first 24 hours after internal contamination. Start treatment as soon as possible after suspected or known internal contamination. Treat individuals who cannot receive immediate chelation treatment as soon as treatment capability becomes available. Chelation treatment is still effective even after time has elapsed following internal contamination however, the chelating effects of Ca-DTPA / Zn-DTPA are greatest when radiocontaminants are still circulating or are in interstitial fluids. The effectiveness of chelation decreases with time following internal contamination as the radiocontaminants sequester in liver and bone.

It is preferable to administer Ca-DTPA, if available, as the initial dose during the first 24 hours after internal contamination because Ca-DTPA is more effective than Zn-DTPA during this time. When Ca-DTPA is contraindicated (e.g., pregnancy), Zn-DTPA may be used for the initial treatment. After 24 hours, Zn-DTPA and Ca-DTPA are equally effective. Additional therapies may be needed (e.g., Prussian blue, potassium iodide) if internal contamination with radiocontaminants other than plutonium, americium, or curium, or unknown radiocontaminants occurs.

4

**HA POLICY: 09-005**

Table 1 summarizes dosage and methods of administration of Ca-DTPA and Zn-DTPA; consult the individual product labels for definitive guidance (e.g., contraindications, precautions, dosage and administration).

After the initial dose, on the next day, if additional chelation therapy is indicated, it is preferable to switch to Zn-DTPA, if available, due to the safety concerns associated with prolonged Ca-DTPA use (e.g., calcium loss). If Zn-DTPA is not available, treatment may continue with Ca-DTPA, however mineral supplementation may be required. Evacuate patients requiring maintenance treatment to a medical treatment facility offering definitive care capability.

## LABORATORY TESTS AND MONITORING

When possible, before initiating treatment, obtain baseline blood and urine samples, including Complete Blood Count (CBC) with differential, Blood Urea Nitrogen (BUN), serum chemistries and electrolytes, urinalysis, and blood and urine radioassays. To establish an elimination curve, a quantitative baseline estimate of the total internalized transuranic element(s) and measures of elimination of radioactivity should be obtained by appropriate whole-body counting, by bioassay (e.g., biodosimetry), or fecal/urine sample whenever possible.

During treatment, monitor CBC with differential, BUN, serum chemistries and electrolytes and urinalysis regularly. If the individual is receiving more than one dose of Ca-DTPA, monitor these laboratory tests very carefully.

## COLLECTION OF PATIENT TREATMENT DATA

Clinical staff will complete an AFRRI Adult / Pediatric Field Medical Record (Initial Contact Worksheet) and Biodosimetry Worksheet (Appendix I) for each patient treated to assist the health care provider in determining the duration of treatment. The worksheets are available from the Biodosimetry Tools section of the AFRRI web site (http://www.afrri.usuhs.mil/outreach/biodostools.htm#forms).

Clinical staff will complete the Ca-DTPA manufacturer Patient Treatment Form and/or the Zn-DTPA manufacturer Patient Treatment Form for each patient treated. The manufacturer requires the information to develop long-term response data and information on the risk of developing late malignancy. Mail completed forms to: Hameln Pharmaceuticals GMBH, Langes Feld 13, 31789 Hamlen, Germany. The forms are available from the U.S. commercial distributor's web site (http://www.akorn.com/dtpa_product_info.php).

5

**HA POLICY: 09-005**

## LOGISTICS CONSIDERATIONS

Inventory Management:  TLAMM and MTF storage locations shall track and account for any and all Ca-DTPA and Zn-DTPA inventory using existing Service and Joint medical logistics automated information systems (AIS) (e.g., Defense Medical Logistics Standard Support(DMLSS)).  Inventory managers will ensure the on-hand balances and all quality assurance information is entered into their respective medical logistics AIS and that AIS is reporting the data to the Joint Medical Asset Repository (JMAR).  JMAR will provide this data to the ASD (HA) Force Health Protection and Readiness Chemical, Biological, Radiological, and Nuclear (CBRN) Medical Dashboard.

Storage and Shipping Requirements:  The temperature requirement for Ca-DTPA and Zn-DTPA, as defined on the product labels, is 15 - 30°C (59 - 86°F).  Exposures outside the required storage temperatures could cause the product to lose efficacy, could lead to product adulteration that could threaten patient safety, and/or could lessen shelf life.  Transport, store, and handle both products in accordance with the guidance provided on the product label and in the United States Pharmacopeia (USP), Chapter 1079, Good Storage and Transportation Standard.  USP is the U.S. standard for the storage and handling of finished pharmaceutical products.  Use controlled-temperature shipping containers validated for the season, mode, and transit time.  Monitor temperatures during transport by placing electronic time and tracking temperature devices in every container, IAW local cold chain/thermal management standard operating procedures.

Security:  Ensure the integrity of the medical logistics supply chain is secure.  The risk to the product is that it will be diverted by those seeking monetary gain or by those who fear they will be not receive treatment (e.g., worried well, local nationals).  The use of electronic track and trace technology (e.g., Radio Frequency Identification (RFID)) is encouraged.

Shelf Life/Expiration Dates:  ASD (HA) acquired Ca-DTPA and Zn-DTPA each consist of a single lot, and so each has a single expiration date.  The product has a 10-year shelf life from time of manufacture when stored and transported at the temperatures defined on the product labels.  The lot numbers and expiration dates for ASD (HA) stockpiled materiel are in Table 2.

Shelf Life Extension:  Ca-DTPA and Zn-DTPA are not entered in the DoD/FDA Shelf Life Extension Program (SLEP).  ASD (HA) is exploring SLEP eligibility for both products and will provide guidance at a future date.

Associated Supplies:  The majority of the supplies needed are commonly present in existing medical treatment facilities (e.g., needles, syringes, intravenous sets).  If TLAMMs or MTFs push Ca-DTPA and/or Zn-DTPA to a treatment team or smaller

6

**HA POLICY:  09-005**

MTF, or if treatment is conducted outside a medical treatment facility (e.g., gymnasium, tent), do not assume that all required supplies are, or will, be available. MTF commanders and TLAMMs will coordinate with the supported medical treatment facilities / medical response teams to determine the identity and quantity of associated supplies necessary to initiate and sustain treatment with Ca-DTPA and Zn-DTPA, will develop support kits as required, and will ensure the support kits and Ca-DTPA/Zn-DTPA are delivered simultaneously.

**RESUPPLY AND REPLENISHMENT**

Resupply during a contingency (e.g., response to release of an RDD or IND): CONUS MTFs shall coordinate for resupply with local, territorial, and state Strategic National Stockpile Coordinators. OCONUS MTFs shall requisition materiel from their supporting TLAMM. National Stock Numbers and National Drug Codes for each product are in Table 2; additional logistics data is in Tables 3 and 4.

Replenishment of MTF-Acquired Materiel: Replenishment of MTF-acquired materiel is the responsibility of the Services / MTFs. TLAMMs shall not use the ASD (HA) acquired stockpile materiel to replenish MTFs.

Replenishment of ASD (HA)-Acquired Ca-DTPA and Zn-DTPA Stockpile: ASD (HA) acquired Ca-DTPA and Zn-DTPA to ensure immediate access in the event of RDD or IND release. Replenishment of the DoD stockpile is the responsibility of the GCCs, Services, and DLA.

7

**HA POLICY: 09-005**

**Table 1:  Dosage and Administration of Ca-DTPA and Zn-DTPA for the Treatment of Internal Contamination With the Radioactive Transuranic Elements Plutonium, Americium, & Curium**

| SEE NOTES 1 and 2 | | Ca-DTPA | Zn-DTPA |
|---|---|---|---|
| **INITIAL DOSE** | **ADULT** | Single 1.0 gram (i.e., 1000 milligrams, one ampoule), once a day | • Unless contraindicated (e.g., pregnancy) it is preferable to administer CA-DTPA as the initial dose during the first 24 hours after internal contamination. • If indicated, administer single 1.0 gram (i.e., 1000 milligrams (mg), one ampoule), once a day |
| | **PEDIATRIC** | Single dose of 14 mg/kilogram (kg), one a day, not to exceed 1.0 gram | • It is preferable to administer CA-DTPA as the initial dose during the first 24 hours after internal contamination. • Single dose of 14 mg/kg, once a day, not to exceed 1.0 gram |
| **MAINTENANCE DOSE** | **ADULT** | • After the initial dose, on the next day, if additional therapy is indicated, it is preferable to switch to Zn-DTPA, if available. • If Zn-DTPA is not available, treatment may continue with Ca-DTPA, but mineral supplements should be given concomitantly, as appropriate • Single 1.0 gram (i.e., 1000 mg, one ampoule), once a day | • After the initial dose, on the next day • Single 1.0 gram (i.e., 1000 mg; one ampoule), once a day |
| | **PEDIATRIC** | • After the initial dose, on the next day, id additional therapy is indicated, it is preferable to switch to Zn-DTPA, if available. • If Zn-DTPA is not available, treatment may continue with Ca-DTPA, but mineral supplements should be given concomitantly, as appropriate • Single dose of 14 mg/kg, once a day, not to exceed 1.0 gram | • After the initial dose, on the next day • Single dose of 14 mg/kg, once a day, not to exceed 1.0 gram |
| **METHOD OF ADMINISTRATION** | **INTRAVENOUS (IV)** | • IV administration s recommended and should be used if route of internal contamination is not known or multiple routes of internal contamination are likely • Administer solution (1 gram in 5 milliliters (mL)) with either a slow IV push over a period of 3-4 minutes or by intravenous infusion over 30 minutes, diluted in 100-250 mL of 5% dextrose in water (D5W), Ringers Lactate, or normal saline | |
| | **NEBULIZATION** | Where internal contamination is only by inhalation within the preceding 24 hours | Where internal contamination is only by inhalation |
| | | • Dilute at a 1:1 ratio with sterile water or saline • The safety and effectiveness of the nebulized route has not been established in the pediatric population | |

**NOTES:**
1. Do not administer Ca-DTPA and Zn-DTPA via the intramuscular route.
2. Chelation is most effective if administered within the first 24 hours after internal contamination and should be started as soon as possible after suspected or known internal contamination.

8

**HA POLICY:  09-005**

**Table 2: Product Identification, Lot Numbers, & Expiration Dates for ASD (HA) Acquired Ca-DTPA and Zn-DTPA Stockpile**

| Product | Description | National Stock Number (NSN) | National Drug Code (NDC) | Lot Number | Expiration Date |
|---------|-------------|------------------------------|---------------------------|------------|-----------------|
| Ca-DTPA | 200 mg/mL single use ampoules | 6505-01-526-6210 | 52919-001-03 | 641060 | 31-Oct-16 |
| Zn-DTPA | 200 mg/mL single use ampoules | 6505-01-526-6547 | 52919-002-03 | R446060 | 30-Nov-14 |

**Table 3: Pentetate Calcium Trisodium Injection (Ca-DTPA) & Pentetate Zinc Trisodium Injection (Zn- DTPA) Logistics Data**

| Description | Size of Ampoule | Ampoule Strength | Unit of Sale | Intermediate Package | Case |
|-------------|-----------------|------------------|--------------|----------------------|------|
| 200 mg/mL single use glass ampoules (amps) | 5 mL | 1000 mg (1 gram) | Box of 10 amps | 10 Boxes Shrink-wrapped (1 Bundle (Bndl)) | 10 Bndls |

**Table 4: Manufacturer, Distributor, Case Weight & Dimensions of Ca-DTPA and Zn-DTPA**

| Manufacturer | Distributor | Case Dimension | Case Wt |
|--------------|-------------|----------------|---------|
| Hameln Pharmaceuticals | Akorn | 515 millimeter (mm) high x 380 mm wide x 207 mm deep (8.15" x 20.28" x 14.96") | 13 kg (28.7 pounds) |

**HA POLICY: 09-005**

HUNTERS POINT SHIPYARD
REGULATIONS UNDER HEALTH CODE ARTICLE 31

Adopted November 16, 2004; amended June 15, 2010; amended August
15, 2023, by repealing and replacing in their entirety.

**I.     EFFECTIVE DATE AND APPLICABILITY OF REGULATION**

A.     <u>Authorization</u>.  Upon recommendation of the Director of the Department of Public
Health, the Health Commission adopts these regulations pursuant to Section 3107(a) of Article
31 of the Health Code applicable to all Hunters Point Shipyard (HPS) parcels.  These
regulations are effective upon approval by the Health Commission.  The Director of the
Department of Public Health has delegated the authority to implement Article 31 to the
Director of the Environmental Health.  All references in the ordinance to the Director shall be
to the Director of the Environmental Health.

B.     <u>Purpose</u>.  These regulations:

1.     Establish the circumstances under which Applicants as defined in Article 31 must
submit Required Plans and Reports to the Director and the requirements the applicable
Required Plans and Reports must satisfy.

2.     Provide a framework for assuring compliance with certain mitigation measures adopted
by the City and County of San Francisco as required by the California Environmental Quality
Act (CEQA) for Phase I of the HPS Redevelopment Plan Project (Phase I Project) and the
Candlestick Point-HPS Phase II Development Plan Project (Phase II Project).  Copies of all
referenced mitigation measures are on file with the Director.

3.     Provide a framework for assuring compliance with environmental restrictions imposed
on the property through the Navy transfer deeds and recorded Covenants to Restrict Use of
Property that are part of the implementation of the federal Comprehensive Environmental
Response Compensation and Liability Act (CERCLA) (these documents are hereafter referred
to as the "CERCLA documents").

4.     Establish soil screening criteria for soil used for specified purposes.

Environmental Health
HEALTH COMMISSION                                                                      3/4/2020

C. <u>Applicability</u>. These regulations apply to an Applicant as defined in Section 3101(a) of Article 31 of the Health Code.

**II. DEFINITIONS**

A. "Durable Cover" means hardscape (e.g., asphalt, buildings, sidewalks, etc.) or a minimum of two feet of clean imported fill that is constructed over HPS Bay Fill or Native Soil, or equivalent physical barrier, designed to meet the performance requirements stated in the Record of Decision (ROD) for each Parcel.

B. "Environmental Restrictions" means protective provisions, covenants, restrictions, requirements, prohibitions, and terms and conditions in a recorded deed or Covenant to Restrict Use of Property to protect present or future human health or safety or the environment as a result of the presence on land of hazardous materials.

C. "HPS Bay Fill" means non-native historically imported fill that was placed bay ward of the original shoreline and/or placed on top of native bedrock and soil to create the current footprint of HPS. The term HPS Bay Fill does not mean: i) bedrock especially bedrock outcrops as identified in the Navy Remedial Action Work Plans that were specifically excluded from requiring a durable cover; ii) any imported soil, which has been certified to meet soil import criteria, and was used to build the durable cover (i.e., a minimum of two feet of clean imported fill); iii) clean soil that has been imported by the Navy, meaning it has been certified to meet soil import criteria, and used as backfill in conjunction with any prior Navy removal or remedial action (e.g., soil excavation areas).

D. "Institutional Controls" means land use and activity restrictions and prohibitions to address hazardous substances; Institutional Controls are Environmental Restrictions.

E. "Native Soil" shall mean any soil that was deposited through natural processes.

F. "Property suitable for unrestricted residential use" means parcels that are free of Environmental Restrictions requiring a Durable Cover or engineered cap. Presently, only Parcels A-1, A-2 and D-2 meet this definition.

G.  "Required Plans and Reports" means any of the following as defined in these regulations:

    1.  Closure Report.

    2.  Disposal Plan.

    3.  Dust Control Plan.

    4.  Environmental Health and Safety Plan.

    5.  Evaluation for Lead-Based Paint in Soil.

    6.  Foundation Support Pile Installation Plan.

    7.  Property Summary Report. In addition to providing basic information about the property, the property summary report is designed to satisfy the requirement in Article 31 for a site evaluation report where the Director determines that CERCLA documents provide the information otherwise required in a site evaluation report.

    8.  Serpentinite Cover Plan.

    9.  Site Evaluation Report.

    10.  Soil Import Plan.

    11.  Unexpected Condition Response Plan. Article 31 refers to this document as an unknown contaminant contingency plan.

    12.  Any additional reports determined necessary by the Director in a particular instance to carry out the purposes of the ordinance.

H.  "Work Area" means the Prescribed Subsurface Activity Area as defined in Article 31.

## III.  ARTICLE 31 MAP

The Article 31 Map, as defined in Article 31, Section 3107(d) is attached to these regulations as Exhibit 1.  The map shows the HPS area subject to Article 31, the boundaries of each parcel established by the Navy for the purposes of remediation under the federal CERCLA, the former landfill disposal site, and a demarcation line showing the area within 1,000 feet of the perimeter of the landfill disposal site as further described in Section 3106 of Article 31 of the Health Code.  For Navy

Parcels A-1, A-2, and D-2, the Article 31 Map shows the historic fill areas and utility lines remaining from the Navy ownership era.

## IV. REQUIRED PLANS AND REPORTS.

Applicants must submit the specified Required Plans and Reports under the following circumstances:

    A.   <u>All Areas of HPS</u>. Applicants proposing subsurface work in any part of the HPS area as shown on the Article 31 Map must submit the following Required Plans and Reports containing the information further specified in these regulations, as applicable to the specific work proposed:

        1.   Disposal Plan.

        2.   Dust Control Plan.

        3.   Environmental Health and Safety Plan.

        4.   Foundation Support Pile Installation Plan.

        5.   Property Summary Report.

        6.   Soil Import Plan.

        7.   Unexpected Condition Response Plan.

    B.   <u>Designated Areas of HPS</u>. Under the circumstances enumerated in this section, Applicants must submit the following additional Required Plans and Reports. With a few exceptions, additional Required Plans and Reports are required only for Work on Parcels A-1, A-2, and D-2 to satisfy the requirements in Section 3114[1] of Article 31 of the Health Code.

        1.   Evaluation for Lead Based Paint in Soil. This report is required if:

            a.   The Work involves the demolition of any of these Navy Buildings located on Parcel A-1 or D-2: 101, 808, 813, and 821; or

            b.   The Work involves the demolition of any other Navy building containing lead based paint and the land use for the Work Area is

---

[1] The Director has determined that Section 3114 applies to Parcels A-1, A-2, and D-2. (See Exhibit 2 for a list of parcel specific Navy documents)

4

designated for residential use free of an environmental restriction requiring a durable cover or engineered cap over the soil.

2. Serpentinite Cover Plan (SCP). This report is required if the Work Area is on Parcels A-1, A-2, or D-2.

3. Site Evaluation Report (SER) and Subsequent Reports to Site Evaluation.

    a. A SER is required for work on:

        i. Parcels A-1, A-2 or D-2 if the Director has evidence that hazardous materials are present in the soil, soil gas or groundwater in the Work Area; and/or

        ii. Parcel D-2 if the Work Area is underlain by Navy-era utility lines

    b. Subsequent Reports to a Site Evaluation. If a SER is required, these additional reports may be required as determined necessary by the Director:

        i. Scope of Work to Collect Additional Information.

        ii. Supplemental SER.

        iii. Site Mitigation Plan.

        iv. Risk Evaluation Report.

C. <u>Closure Report and Statement</u>. Upon completion of the Work, all Applicants shall submit a Closure Report and Closure Report Certification Statement.

D. Applicants shall prepare Required Plans and Reports to the satisfaction of the Director. The Director may require any additional information on a site-specific basis as determined necessary by the Director to achieve the purposes of Article 31.

## V. MINIMUM REQUIREMENTS FOR REQUIRED PLANS AND REPORTS, ALL AREAS OF HPS.

The minimum requirements for Required Plans and Reports that may be applicable throughout the HPS area as part of the permit application process are as follows:

A. <u>Disposal Plan</u>:  If any offsite disposal of soil is proposed, Applicant must provide:

    1.    A list of landfills and contact information to be used for offsite disposal;

    2.    Examples of tracking spreadsheets (or equivalent).  The tracking spreadsheets must include: date of excavation, location of excavation, quantity of soil, soil type, bill of lading or manifest number for disposal, soil transporter and landfill name; and

    3.    As applicable, proof of how Applicant will comply with Phase I FEIR Mitigation Measure 8.A, requiring certain asbestos to be treated as hazardous waste, and Phase II FEIR Mitigation Measure HZ-3, requiring compliance with all applicable legal requirements concerning offsite transport and disposal of hazardous materials in contaminated soil.

B. <u>Dust Control Plan (DCP).</u>  Applicant must prepare a DCP.  The DCP must:

    1.    Comply with all of the following requirements that are applicable to the work:

        a.    Construction Dust Control Requirements in Article 22B of the Health Code.

        b.    Phase I Project Mitigation Measures 2.B, concerning particulate emissions from construction sites, and 8.A, concerning handling of naturally occurring asbestos during construction.

        c.    Phase II Project Mitigation Measure MM HZ-15, concerning management of construction dust.

        d.    DPW Order #171,378, as amended.

        e.    Bay Area Air Quality Management District (BAAQMD) regulations, as amended, pertaining to visible dust, and dust from asbestos or lead-based paint materials.

    2.    Provide for a community notice and complaint response process meeting the following requirements:

DocuSign Envelope ID: BA1DAB5F-9744-4574-B2F8-578519F447DD

a.   Provides that prior to commencing any new area of earth disturbing activities (i.e. or restarting an area that was previously stabilized and undisturbed for more than a year), a notice (i.e. door hangar, post card, flyer or equivalent) will be given to all residents in the same complex or adjacent areas (i.e. across the street) that contains contact information (i.e. phone number and email or equivalent) for real time reporting of any dust control complaints.

b.   Contains a description of the complaint response process.

c.   Sets out the time frame within which the responsible entity will respond to verified complaints (must be within two working days).

C.   Environmental Health and Safety Plan (EHSP). Applicant must prepare an EHSP to address the safety and health hazards of each phase of the site operation. Applicant is advised to follow the outline for an EHSP in an approved Risk Management Plan if one exists for the Work Area. The EHSP must include:

1.   A health and safety risk or hazard analysis for each activity in the work plan.

2.   Training requirements for employees, including:

a.   Use of Personal Protective Equipment (PPE).

b.   Work practices to minimize risk.

c.   Use of engineering controls and equipment.

d.   Medical surveillance requirements.

e.   Identification of potential unexpected conditions and protocols detailed in the UCRP.

3.   PPE to be used for each site task.

4.   Medical surveillance, as necessary.

5.   Frequency and types of air monitoring, personnel monitoring, monitoring techniques and maintenance of equipment.

6.   Site control measures.

7. Decontamination procedures.

8. An emergency response plan.

9. A spill containment program.

10. Provisions for complying with Phase I Project Mitigation Measures 7.D, 7.E, 8.A and Phase II Project Mitigation Measure HZ-2a.2, as applicable to the Work Area.

11. Provisions for complying with applicable Cal/Occupational Safety and Health Administration (OSHA) rules and regulations in effect at the time the activity is being conducted.

D. <u>Foundation Support Pile Installation Plan</u>. For all Work that involves installing foundation support piles in artificial fill materials, Applicants must prepare a Foundation Support Pile Installation Plan that satisfies the Phase II Project Mitigation Measure MM HZ-5A. Specifically, the Foundation Support Piles Installation Plan must specify:

1. Pilot boreholes for each pile that will be drilled through the artificial fill materials so the piles can be installed without damage or misalignment and to prevent potentially contaminated fill materials from being pushed into the underlying sediments or groundwater.

2. Alternatively, the Foundation Support Piles Installation Plan may specify an equivalent process that the Director determines will accomplish the same goal of installing the piles without damage or misalignment and prevent potentially contaminated fill materials from being pushed into the underlying sediments or groundwater.

E. <u>Property Summary Report (PSR)</u>. The PSR must include the information specified in this paragraph. In the event an Applicant is required to prepare a SER per paragraph IV.B.3, the SER may contain the information required for the PSR in lieu of submitting a separate PSR. The PSR shall contain all the following information, unless otherwise specified by the Director:

DocuSign Envelope ID: BA1DAB5F-9744-4574-B2F8-578519F447DD

1.    Description of the Work Area, including:

    a.    Block and lot numbers and address(es) of the proposed project and any subparcel designation.

    b.    The permit being applied for, if any.

    c.    The permit agency and application number assigned to the project, if applicable.

    d.    The proposed workplan for Work Area, cross-referencing the HPS Redevelopment Plan and showing intended land uses.

    e.    The name, address, and phone number of the following:

        i.    Contractor(s).

        ii.    Property Owner(s).

        iii.    Project Coordinator(s) or Expediter(s).

        iv.    Architect(s).

        v.    PSR Preparer(s).

    f.    A plot map, to scale, of the proposed project, proposed land uses, and the Work Area. This plot map must include, but is not limited to, the following:

        i.    SCALE: 200 ft. to 1 inch Minimum.

        ii.    LOCATION(S) of all previous buildings and potentially contaminating uses.

        iii.    A line showing a 1,000 foot radius from the former landfill disposal area (see Article 31 Map), if applicable.

        iv.    All CERCLA and non-CERCLA monitoring wells in the Work Area including Geographical Information System (GIS) coordinates.

2.    A reference to all the applicable CERCLA documents.

Environmental Health
HEALTH COMMISSION

3/4/2020

DocuSign Envelope ID: BA1DAB5F-9744-4574-B2F8-578519F447DD
DocuSign Envelope ID: BA1DAB5F-9744-4574-B2F8-578519F447DD

3.      A list of the applicable Article 31 Required Plans and Reports that are being submitted.

4.      A detailed description of the Work Area, including but not limited to:

  a.      Lineal foot dimensions (i.e. length, width, and depth).

  b.      Any excavation or disturbance of soils during all phases of construction both onsite and within the sidewalk(s) adjacent to the project.

  c.      Planned landscaping, if any, during or after major construction is completed.

  d.      The relationship of the Work Area to the total project and the perimeter of the property line.

5.      A Property Summary Report Certification Statement.  The PSR shall contain a certification statement from the PSR preparer(s), that states, "In my professional judgment and in accordance with standards of practice for my profession, the PSR, contains all required information, meets the requirements of all applicable law and properly evaluates the required information."

F.      <u>Soil Import Plan (SIP)</u>.  The SIP must estimate the quantities of soil to be imported onto the site; describe the locations of use and describe the procedures to be used to ensure that import soil does not exceed the established screening levels set out in these regulations in Section IX. Applicants are advised to follow the outline for a SIP in an approved Risk Management Plan if one exists for the Work Area. The SIP should also include but may not be limited to:

1.      Sample numbers and IDs.

2.      Laboratory reports including additional analytes that are reported as part of the designated analyses even if the analytes are not required by this SIP (i.e. the primordial radionuclides are usually reported at the same time as the analysis for the SIP designated radionuclides. These additional analytes should be reported to SFDPH if they were reported by the laboratory).

DocuSign Envelope ID: BA1DAB5F-9744-4574-B2F8-578619F447DD
DocuSign Envelope ID: BA1DAB5F-9744-4574-B2F8-578619F447DD

3.     Evaluation Summary Table.

4.     Material Classification.

5.     Plans for updates every 5 years (i.e. if project extends for more than 5 years).

G.     <u>Unexpected Condition Response Plan (UCRP).</u>  Details on actions that will be taken if previously unexpected contamination is found, as required by the Phase II Project Mitigation Measure MM HZ-2a.1, Unknown Contaminant Contingency Plan. Applicants are advised to follow the outline for an UCRP in an approved Risk Management Plan if one exists for the Work Area.

## VI.    MINIMUM REQUIREMENTS FOR ADDITIONAL REQUIRED PLANS AND REPORTS, DESIGNATED AREAS OF HPS.

This section sets out the minimum requirements for the additional Required Plans and Reports that may be required depending on the location of the Work Area as set forth in paragraph IV.B.

A.     <u>Evaluation of Lead Based Paint in Soil.</u>  An evaluation of lead based paint in soil must meet the following requirements:

1.     An evaluation for lead based paint must be performed by a person qualified for such an evaluation, and submitted to the Director.

2.     If lead based paint is found to exist on these structures, the soil surrounding the buildings must be sampled in accordance with U.S. Department of Housing and Urban Development's (HUD)Lead-Based Paint Guidelines Chapter 5, pages 24 and 25, using the current lead based paint in soil standards in accordance with levels established on Table 1 in Section IX, Soil Screening Criteria.  The HUD Guidelines are available at https://www.hud.gov/program_offices/healthy_homes/lbp/hudguidelines (click on the link for Chapter 5 – Risk Assessment and Evaluation). A plan for collection and analysis of soil samples for lead must be submitted to the Director.

DocuSign Envelope ID: BA1DAB5F-9744-4574-B2F8-578519F447DD

3.    If elevated levels of lead are found in the soil samples, a plan for excavation of any soil exceeding the Table 1 Section IX levels must be submitted to the Director. Once the work is done a report summarizing the results and, if needed, documenting the excavation of areas above the screening goal must be submitted.

B.    <u>Serpentinite Cover Plan (SCP)</u>.  The SCP must contain descriptions and figures designating the type of cover material that will be used to cover serpentinite fill. The cover material must meet one of the following requirements as set forth in the June 2011 memo from the Health Department to San Francisco Planning (on file with the Director) setting forth requirements to satisfy the Phase I Project Mitigation Measure 8.A:

1.    One foot of clean, non-serpentinite, non-naturally occurring asbestos-containing fill commonly referred to as Soil Cover.  If this Soil Cover is designated to be used as a cover in the SCP, then the SCP must reference an Article 31 approved SIP that contains procedures to verify that the Soil Cover does not contain naturally occurring asbestos or other hazardous substances. Alternatively, the Applicant must submit a new SIP prepared pursuant to Section V.F. of this regulation.  The sample results that verify that the import soil is free from asbestos or other hazardous substances must be submitted for the Director's approval.

2.    Hardscape.  A building, street, sidewalk, paving stones, rip rap or similar material, as determined by the Director, can be used as a cover in lieu of fill.

3.    Vegetative cover that holds soil in place.

C.    <u>SER and Subsequent Reports to Site Evaluation</u>.

The specifications for these reports are contained in attached Exhibit 2 and are applicable for Parcels A-1, A-2 and D-2.

Environmental Health
HEALTH COMMISSION

3/4/2020

DocuSign Envelope ID: BA1DAB5F-9744-4574-B2F8-578519F447DD

Case 3:25-cv-05030-AGT    Document 20-5    Filed 02/04/25    Page 31 of 36
DocuSign Envelope ID: BA1DAB5F-9744-4574-B2F8-578519F447DD

## VII.    REQUIRED CLOSURE REPORT AND CERTIFICATION

A.    <u>Closure Report</u>.  A closure report must be prepared following completion of activities authorized by a permit subject to Article 31 of the Health Code. The Closure Report shall include:

1.    A list of the permit numbers (i.e. from DBI, DPW or DPH) and Article 31 case numbers covered by the Closure Report.

2.    A description of how and when the approved Required Plans and Reports were implemented and any changes to the approved Required Plans and Reports that were made during implementation.

3.    For Work Areas that required soil import in compliance with an approved SIP, electronic submittal of all required forms, tables, laboratory analytical results, summary tables of analytical results, and any other information required or voluntarily collected to demonstrate compliance under the SIP.

4.    For Parcels A-1, A-2, or D-2, verification of the cover material placed over the site as required by the SCP.  The Director has determined that placement of cover material over the Work Area in combination with the requirements of Building Code Section 106A.3.2.5.1 satisfies the Phase I Project Mitigation Measure 8A requirement to prevent future exposure to serpentinite material. (See memo from Rajiv Bhatia and Amy Brownell, San Francisco Department of Public Health to Bill Wycko, San Francisco City Planning Department, dated June 14, 2011, on file with the Director).

5.    Any drawings, figures and pictures necessary to demonstrate compliance. Completed tracking spreadsheets (or equivalent) for disposal of excavated soil. All environmental sampling data in a form compatible with GIS, to the extent feasible.

B.    <u>Closure Report Certification Statement</u>.  The Closure Report shall include a statement from the preparer that, "In my professional judgment the control, safety, and mitigation

13

measures identified in the Required Plans and Reports, as applicable, and all other requirements of applicable law were implemented as described in this Closure Report and in accordance with standards of practice for my profession."

## VIII. REPORT PREPARER'S QUALIFICATIONS

A. The preparer(s) of all Required Plans and Reports except the EHSP and the Foundation Support Piles Installation Plan, must:

    1. Have experience or educational background in environmental site history.

    2. Be one or more of the following who is registered or certified by the State of California:

        a. A Civil or Chemical Engineer.

        b. A Geologist.

        c. A Hydrogeologist.

        d. A person with an equivalent registration as determined by the Director.

B. The preparer(s) of the EHSP must:

    1. Have experience in preparation of EHSPs for soil excavation, soil grading and soil disposal for soil that may contain contaminants listed on Table 1.

    2. Be one of the following:

        a. A Certified Industrial Hygienist.

        b. A person with an equivalent registration as determined by the Director.

C. The preparer(s) of the Foundation Support Piles Installation Plan must:

    1. Have experience in designing and installing foundation support piles in potentially contaminated artificial fill materials.

    2. Be one of the following:

        a. A Civil Engineer registered in the State of California.

        b. A person with an equivalent registration as determined by the Director.

14

## IX.    SOIL SCREENING CRITERIA

The soil screening criteria in Table 1 apply in these circumstances:

    A.    When soil import is proposed to be used as Soil Cover on Parcels A-1, A-2, and/or D-2 as described in a SCP (Section VI.B.).

    B.    When soil import is proposed to be used as Durable Cover on any parcel required to have a Durable Cover.

    C.    On Parcels A-1, A-2 and/or D-2, when Applicant proposes to test previously installed Soil Cover.

    D.    On Parcels A-1, A-2, and/or D-2, when testing of Native Soil is required by these regulations or proposed by an Applicant (i.e. for use as Soil Cover in a SCP). In such cases, most, if not all, Native Soil will only require testing for naturally occurring asbestos.

### TABLE 1

| HAZARDOUS CONSTITUENT | LEVEL |
|---|---|
| Inorganic persistent and bioaccumulative toxic substances listed in 22 California Code of Regulations, title 22 section 66261.24(a)(2)(A) | The most stringent of the following three reference sources or as they may be updated from time to time in the future including wholesale changes to the name or structure of screening levels by these organizations (with proof of the wholesale changes submitted to and approved by the Director). As of the date of these regulations the most current versions were: |
| Volatile organic toxic pollutants listed in 40 C.F.R. Part 122, Appendix D, Table II | |
| Polychlorinated Biphenyls | |
| Pesticides | |
| Metals with the exception of Arsenic | |
| Semi-volatile organic compounds | |
| Polycyclic aromatic hydrocarbons | 1. Department of Toxic Substances Control (DTSC), 2019. Human and Ecological Risk Office Human Health Risk Assessment Note Number: 3, DTSC-modified Screening Levels (DTSCm), updated April. https://dtsc.ca.gov/wp-content/uploads/sites/31/2019/04/HHRA-Note-3-2019-04.pdf 2. Regional Water Quality Control Board (RWQCB). Environmental Screening Levels (ESLs) for Residential Soils. The most current version can be requested by going to this webpage and emailing your request as instructed https://www.waterboards.ca.gov/sanfrancis |

15

| | cobay/water_issues/programs/esl.html |
| | 3. United States Environmental Protection Agency (US EPA). Regional Screening Levels for Residential Soils. https://www.epa.gov/risk/regional-screening-levels-rsls-generic-tables |
| Arsenic | 11 mg/kg based on Duvergé, D.J., 2011. Establishing Background Arsenic in Soil of the Urbanized San Francisco Bay Region. San Francisco State University. December. Or as may be approved by the Director. |
| Asbestos | Less than 0.25% based on the screening level for NOA at school sites (DTSC, 2004) or any updates to this guidance. |
| pH levels | Hazardous Waste levels for corrosivity as defined in California Code of Regulations, title 22 section 66261.22. |
| Total petroleum hydrocarbons | RWQCB ESLs or any subsequent equivalent updates including wholesale changes to the name or structure of screening levels by RWQCB as approved by the Director (see website above). |
| Radionuclides | Current calculated US EPA Preliminary Remediation Goals for radionuclide contaminants at Superfund sites (or as they may be updated from time to time in the future) using site specific input parameters for residential soil as approved by the Director. https://epaprgs.ornl.gov/radionuclides/ |

## X.    DIRECTOR'S WRITTEN NOTIFICATION OF COMPLIANCE

The Director shall provide Applicant and the relevant department with written notification that Applicant has complied with the requirements of this Article and any applicable requirements in Article 12B of the Health Code concerning monitoring wells.  As a condition of permit approval, in carrying out the permitted work, Applicant shall be required to comply with Required Plans and Reports, as determined by the Director to be applicable, and all laws applicable to soil removal and off-site disposal.

By: _____

Dr. Grant Colfax

Director, San Francisco Department of Public Health

Resolution No.

By: _____
Mark Morewitz
C7F97BEBFCEA41E...

Mark Morewitz

Executive Secretary to the Health Commission

17



HUNTERS POINT NAVAL SHIPYARD
San Francisco, California

ARTICLE 31 MAP

| Date 6/30/2014 | Project 730384802 | Figure 1 |

LANGAN TREADWELL ROLLO